UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EARL DONALD BAKER,<br><br>    Plaintiff,<br><br>    vs.<br><br>SMITH & WESSON CORP.,<br><br>    Defendant. | Case No.<br><br><br>JURY TRIAL DEMANDED |

COMPLAINT

Plaintiff, EARL DONALD BAKER ("Plaintiff" or "Baker"), by his attorneys, LEE & BREEN, LLC, for his Complaint against Defendant SMITH & WESSON CORP. ("Defendant" or "S&W"), and states as follows:

NATURE OF THE ACTION

1. This is a federal-question action involving claims of whistleblower retaliation brought under the employment protection provisions of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A ("SOX"). Plaintiff asserts that he was retaliated against by S&W, his employer, for reporting illegal conduct by S&W employees.

THE PARTIES

2. Plaintiff was an employee of S&W from February of 2013 to September of 2014.

3. S&W is a publicly traded company holding a class of securities under the Securities and Exchange Act of 1934 (15 U.S.C. §78l). S&W is a Delaware corporation with its principal place of business in Springfield, Massachusetts.

1

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction in this action pursuant to 28 U.S.C. §§1331 and 1367. This Court has original jurisdiction pursuant to 28 U.S.C. §1331 because Plaintiff asserts claims that arise under the laws of the United States, namely, the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A. The Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. §1367 because those claims are so related to Plaintiff's federal-question claims that they form part of the same case or controversy.

5. This Court has personal jurisdiction over Defendants because it has sufficient business contacts with the State of Illinois, specifically it sells its products within the State of Illinois, and has committed tortious acts towards a citizen of Illinois.

6. Pursuant to 28 U.S.C. §1391 (b)(1) venue is proper in this court as Defendant "resides" in the Northern District of Illinois as Defendant is subject to this Court's personal jurisdiction.

## FACTS COMMON TO ALL COUNTS

7. Plaintiff became an employee of S&W in February, 2013 and held the position of Cell Coordinator of Tooling. Plaintiff was placed on administrative leave from S&W beginning July, 2014 and was ultimately terminated in September of 2014.

8. Within his first two weeks of working at S&W, Baker noticed that S&W had awarded a large number of contracts to one particular vendor, Pioneer Tool Supply ("Pioneer").

9. Thereafter Baker also noticed that contracts filled by Pioneer were not necessarily the best-priced, nor were they properly fulfilled.

10. Baker also heard reports from co-workers that Pioneer provided gifts, money and vacations to S&W employees.

11.     Also, for roughly one year Pioneer billed S&W for work done on an eight-day work week.

12.     Baker also heard from co-workers that the Cutter Department was making tools and giving them to Pioneer to be billed, as if Pioneer made them.

13.     Baker became concerned about legal and company policy violations at that point.

14.     Baker contacted his supervisor, Larry Flatley, and told him of his concerns about Pioneer.

15.     Shortly thereafter, S&W gave Baker his first performance evaluation. On or about June 25, 2013, Baker met with Flatley, who was his reviewing official, and Flatley awarded baker a rating of "Meets Expectations" in every category and an overall performance rating of "Meets Expectations."

16.     During that same review, Flatley commented to Baker, "You think you are more virtuous than others."

17.     Over the next several months, Flatley made a number of derogatory comments directed at Baker. In response, Baker reported these comments to human resources ("HR"), and HR advised Baker to report Flatley's conduct to Dan Fontaine ("Fontaine"), the plant manager and Baker's second line supervisor.

18.     Baker also reported to HR his concerns about Pioneer and its cozy relationship with Flatley.

19.     On or about February 4, 2014, Baker received an email from Ted Hebert of Pioneer. Hebert's email questioned the amount of work that Baker awarded to MSC, another vendor and a competitor of Pioneer, and declared, "Tim came back and mentioned we got only 2 tubs of regrinds, but MSC had 4 tubs waiting for pickup." Baker responded later the same day to Hebert

3

that the email was inappropriate and that Pioneer should not question the work that was given to other contractors.

20. On or about February 5, 2014, Flatley called Baker into his office and handed Baker an out-of-cycle performance review, which was dated February 4, 2014, the date of Herbert's inappropriate email. Baker was surprised to receive this review, as he was not due to be reviewed at that time and was not notified of any out-of-cycle performance review.

21. On information and belief, Flatley singled out the "more virtuous than other employee" Baker, to send him a message.

22. Flatley's out-of-cycle performance review rated Baker's overall performance at the lowest rating, "Does Not Meet Expectations." The review also delineated specific deficiencies and prescribed a training program and other specific corrective measures.

23. This was Flatley's first notice to Baker that Flatley was in any way dissatisfied with Baker's performance.

24. Flatley gave Baker a list of seminars and classes to attend and then said, "You are not going to want to do this shit, so you might just want to quit and save yourself the trouble."

25. After receiving the performance review, Baker immediately went to HR and spoke with HR representative Ann Glica, who told Baker to write a rebuttal to the review and return it to her. She also recommended appealing the negative review to the plant manager, Fontaine.

26. On or about February 6, 2014, Baker began taking the classes listed and suggested in his review. He also requested a meeting with Fontaine.

27. Baker also drafted a detailed rebuttal and gave it to Glica. When Baker met with Glica to give her his rebuttal, Glica told him that Baker should not report Flatley's receipt of improper gifts from Pioneer.

4

28. On information and belief, SW's HR and/or upper management was weighing whether to cover up the bribes from Pioneer or be forced to properly investigate what Baker reported.

29. On or about February 10, 2014, Baker participated in a meeting with Fontaine, Flatley, and Ed Suraci ("Suraci"), a S&W HR representative. At the start of the meeting, Suraci, who had not been involved in the Baker review or the Pioneer bribery matters before, explained that he was not there in an HR capacity, but as a "planner."

30. The previous HR employees who had been involved before disappeared at the last minute.

31. At the February 10 meeting, Suraci explained that he did not consider Flatley's February performance review to be valid because February was not the proper time for a performance review.

32. Flatley then explained his criticisms of Baker. Baker then started to respond, but Fontaine said that he had little patience and was not going to go point by point through a review that HR did not consider valid.

33. Baker protested that Flatley improperly criticized him in the review and that he should at least have a chance to respond to the false accusations, and Fontaine then turned the review face down on his desk and said, "These do not exist as far as I'm concerned, so we will not talk about them. It is obvious you two do not communicate with each other." Fontaine then assigned Suraci to mediate between Baker and Flatley.

34. On or about February 13, 2014, Baker and Suraci met one-on-one in Baker's office, and Baker reported to Suraci his belief that Flatley was potentially receiving improper gifts and payments from Pioneer in return for giving Pioneer work when it was counter to S&W's financial

5

interests and about the email Pioneer sent to Baker asking about work awarded to other vendors.

35. Baker further reported to Suraci that he believed the poor performance review and Flatley's suggestion that Baker quit his job were directly motivated by Baker's questioning whether Flatley might be receiving improper gifts from Pioneer in return for giving Pioneer work when it was counter to S&W's financial interests. Baker further stated that he believed that Flatley was trying to fire him.

36. In response, Suraci asked Baker to forward him the email from Pioneer. Following the meeting, on information and belief, Suraci investigated the Pioneer bribery accusations.

37. Suraci also told Baker to keep issues about Pioneer and Flatley from everyone except himself and Robert Cicero ("Cicero") of S&W's Legal Department.

38. Suraci also told Baker to report any abuses by Flatley directly to him.

39. On or about February, 2014, Baker realized that his briefcase, which he usually stored under his desk, was unlatched. Baker opened his briefcase and found that his journal containing details about the situation with Flatley and a list of his computer passwords was missing.

40. As Suraci investigated the Pioneer bribery issue, he asked Baker to take information relating to the Pioneer bribery issue to Cicero in S&W's Legal Department.

41. Suraci assured Baker that his participation in the Pioneer bribery investigation would be kept confidential.

42. On or about March 8, 2014, Baker met with Cicero for three hours after work because Cicero wanted to keep the meeting "low-profile."

43. In this meeting, Baker reported to Cicero improper conduct against S&W's financial interest and company policy, including funneling bids of other vendors to Pioneer and

6

improper gifts from Pioneer.

44.     In response Cicero directed Baker to not speak to anyone else about the Pioneer bribery issues because S&W's upper management did not yet know who might be involved.

45.     On or about Friday, March 28, 2014, Flatley came to Baker's office and said that Fontaine wanted to see both of them. Baker assumed it was about a project that he and Flatley were working on called the Houlton project. Baker asked Flatley if he should bring the Houlton file, and Flatley responded, "No, leave it."

46.     When the two got to Fontaine's office, Flatley told Fontaine that Baker had "not done anything" on the Houlton project and made other false accusations about Baker's work performance.

47.     Flatley had never complained about these issues before or notified Baker in any way.

48.     Baker told Fontaine that the very file that Flatley just told him to leave in his office right before the meeting would show the work that Baker had completed on the Houlton project.

49.     Baker also rebutted Flatley's other false accusations in that meeting with Fontaine.

50.     Immediately after that meeting with Fontaine and Flatley, Baker went around to other departments under Flatley and gathered evidence to rebut Flatley's false accusations against him and that Flatley was singling him out.

51.     Then, on or about Monday, March 31, 2014, Baker met again with Fontaine to review the false accusations that Flatley had made the previous Friday. Fontaine asked for documentation on production, quality, and the Houlton project, which Baker showed to Fontaine.

52.     Suraci called Baker and said that Fontaine was satisfied with Baker's documentation.

7

53. Then, Suraci asked Baker to send him photos rebutting Flatley's false accusation, which Baker did.

54. Suraci also asked Baker to send the pictures to Fontaine immediately. When Baker took the pictures to Fontaine, he handed the pictures back to Baker and refused to keep the evidence.

55. On or about April 2, 2014, there was a problem in the Slide Department relating to the finish of a part, and on or about April 7, 2014, Baker found a solution to the problem. However Flatley instructed Baker to not say anything about the solution.

56. Sales at S&W are roughly $2,000,000.00 a day, and so Baker was aware that not reporting the solution, as directed by Flatley, would cost S&W a substantial amount of money.

57. Accordingly, Baker appealed to Flatley about giving notice of the solution, but he reiterated that Baker should keep quiet. Accordingly Baker reported this issue to Suraci.

58. Then, on or about April 18, 2014, Fontaine told Baker that he does not want Baker to go to HR about Flatley anymore.

59. Baker called Suraci who had been conducting the investigation and told him that Fontaine had told Baker to not report issues with Flatley to HR anymore. Baker further stated to Suraci that he felt that directive from Fontaine was illegal.

60. Suraci then came to Baker's office with Fontaine, and they clarified that Baker was allowed to go to HR when he believed there were problems at S&W.

61. Over the next few weeks, Flatley's hostility increased and became more constant. Flatley insulted Baker in front of others. In private meetings, Flatley called Baker a "fucking moron" and "mentally slow."

62. Flatley also undermined or excluded Baker from his work functions.

Case: 1:19-cv-03400 Document #: 1 Filed: 06/01/18 Page 8 of 20 PageID #:8

8

63. In or about early June, 2014, Baker met with Suraci and Anne Bruce (Bruce"), S&W's Vice President of HR, to discuss the June 2014 performance review. In this meeting Bruce told Baker that Flatley's earlier out-of-cycle performance review was part of his personnel record and that she intended to tell Flatley that Baker was accusing him of retaliation. Baker then asked that his complaints be kept confidential, and after the meeting Baker emailed Bruce asking her again to not break his confidentiality.

64. In or about early June of 2014, Flatley emailed Baker his 2014 Annual Performance Review. The review was similar to the February 2014 out-of-cycle review, and a separate attachment with comments acknowledged that Baker completed the prescribed training but claimed that he fell behind on numerous projects and assignments.

65. Shortly after the June, 2014, performance review meeting, Baker met with Cicero from S&W's Legal Department, who informed Baker that S&W had looked into Baker's reports that Flatley might be receiving improper gifts from Pioneer in return for giving Pioneer work when it was counter to S&W's financial interests. Cicero claimed that S&W was unable to find anything actionable. Cicero then asked Baker if he was "at a point where we should discuss your separation from Smith and Wesson."

66. Cicero's claim that S&W was unable to find anything actionable in connection to the Pioneer bribery issues was false.

67. In or about June 6, 2014, Baker met with Bruce, who began the meeting by declaring, "If you had worked harder and e-mailed Human Resources less, you wouldn't be in this position. I have 20 pages of data emailed from you."

68. In or about June 18, 2014, Baker met with Bruce, Flatley and Fontaine to discuss the contents of his June 2014 performance review. Bruce told Baker at the meeting that "Due to

9

time constraints, we cannot cover all eight points of disagreement; however, you may choose one." Baker then spoke about one issue, and Fontaine responded by saying, "I am affirming Flatley's review."

69. In July of 2014, Baker was due for a 3.5% cost of living raise that was routinely given to S&W employees. Baker did not get that raise.

70. Baker's contract provided for an up to 15% annual bonus based on the company's profitability the preceding year. Although S&W had a record year for profits in 2013, due to the unfavorable performance review, Baker did not get any bonus.

71. On or about July 2, 2014, Baker met with Cicero. At the meeting, Cicero offered Baker two weeks' severance. Cicero then said to Baker, "What if Larry funneled bids to Pioneer? What if Larry broke into your office? What if Larry got an iPad from a vendor? What is the harm to Smith and Wesson? Pioneer matched the bids so there is no harm."

72. Baker did not quit.

73. S&W then placed Baker on paid administrative leave.

74. On or about August 20, 2014, Baker received a letter from the S&W legal department signed by Cicero. The letter informed Baker that S&W had found no evidence to support his allegations of misconduct at the company, including: improper gifts to employees of S&W from Pioneer, favoritism toward Pioneer, Baker's office being broken into, or emails being deleted.

75. This letter claiming that S&W found no evidence was false.

76. On or about August 28, 2014, Baker sent an email to Cicero, Fontaine, Suraci and Bruce explaining that he disagreed with S&W's findings that no misconduct had occurred and that he wanted to return to work and asked to be given a date on which he could resume working.

10

77. In his August 28, 2014 email, Baker also informed S&W that he had done research on his rights and believed that the complaints he had made (allegations of supervisors accepting bribes and kickbacks) were protected activity under the Sarbanes-Oxley and the Dodd-Frank Act. Baker further stated that he believed he had been retaliated against for raising his concerns to management and then complaining about retaliation. Baker also stated that he believed the paid administrative leave on which he had been placed was retaliation for his whistleblowing, in violation of the Sarbanes-Oxley and Dodd-Frank Acts.

78. Baker filed a SOX complaint with the Occupational Safety and Health Administration.

79. After S&W was notified of Baker's SOX complaint with OSHA, S&W terminated Baker by letter.

80. Flatley has since "retired".

81. Baker has experienced economic damages and mental anguish as the result of S&W's illegal retaliation.

82. Due to his diminished reputation in the industry, Baker has been forced to take jobs that are beneath his qualifications.

83. Baker was a supervisor at S&W, but now works as a non-salaried machinist.

84. Baker's annual pay is significantly less than it was when he was employed by S&W.

85. Due to the stress of Flatley's retaliatory conduct, S&W's investigation and ultimate cover up, and Baker's ultimate termination, Baker developed high blood pressure and emotional harm.

86. Baker has experienced chest pains and twice went to urgent care in fear that he was having a heart attack.

11

87.     For a long period, Baker had trouble sleeping, had frequent nightmares, and began grinding his teeth. Baker broke one tooth and permanently damaged others.

88.     Baker still experiences emotional distress as a result of S&W's retaliation and cover-up.

## COUNT I
### Sarbanes-Oxley Whistleblower Retaliation
### Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, *et seq*.

89.     Baker hereby incorporates all allegations set forth in all the foregoing paragraphs as though fully alleged herein.

90.     S&W is a covered employer under SOX.

91.      Baker reasonably believed that the conduct of Flatley, including his relationship with Pioneer Tools, constituted illegal conduct in violation of federal securities law and regulations, state laws, and S&W's company rules and policy.

92.     Baker put S&W on notice of the conduct he believed to be in violation of securities laws and regulations and company rules and policy when he notified persons within S&W who held supervisory authority over him and who had the authority to investigate misconduct.

93.     In violation of SOX, 18 U.S.C. § 1514A, and in retaliation for Baker's protected activity of reporting a reasonable belief that securities laws and regulations were being violated, S&W took adverse action against Baker, including, but not limited to, denying Baker a raise, denying Baker a bonus, imposing discipline on Baker, subjecting Baker to a hostile work environment, giving Baker a poor performance review, damaging Baker's reputation and future employment opportunities, placing Baker on leave, and ultimately terminating Baker's employment.

Case 3:19-cv-00008-MCM Document 1 Filed 06/01/18 Page 13 of 20

94.     On information and belief, the decision to retaliate against Baker was not made by one person.

95.     On information and belief, S&W, including one or more persons involved in the investigation of the Pioneer bribery issues or the retaliation against Baker were well aware of SOX and its statutory protection of whistleblowers.

96.     On information and belief, S&W has had other bribery-related claims before and settled them, and S&W's management, including those involved in the investigation of the Pioneer bribery issues or the retaliation against Baker were aware of them.

97.     The Pioneer bribery practices were neither new, isolated or recent.

98.     The Pioneer bribery practices were well known to many employees and this on-going way of doing business and looking the other way was a business culture of S&W.

99.     Flatley, who was an active participant and beneficiary of the Pioneer bribery schemes for years, was the supervisor to whom Baker initially reported his concerns along with to HR.

100.    On information and belief, up the chain of command from Flatley, including but not limited to Fontaine, Cicero, Bruce, Smith and Debney were aware of or participated in the SOX violation.

101.    Cicero has advised Baker that he does not report to Smith or Debney, but to the Board of Directors of S&W.

102.    If Cicero told Baker the truth, and truthfully reported to the Board of Directors, the Board too was aware of S&W's Pioneer bribery issues and S&W's retaliation against Baker.

103.    Beginning with Flatley and his adherence to S&W's culture, as well as other management employees who were willing to play ball or look the other way, S&W willingly,

13

knowingly, and egregiously retaliated against Baker and covered up both the Pioneer bribery practices and retaliation against Baker.

104. On information and belief, two or more HR or management employees actively or tacitly participated in a conspiracy with knowledge or awareness of the facts giving rise to the Pioneer bribery issues or retaliation against Baker.

105. On information and belief, those co-conspirators knowingly conspired, with malice aforethought, to violate SOX, public policy, and other laws and company rules and policy articulated in this Complaint.

106. As a result of the knowing, intentional and egregious retaliation in violation of SOX, Baker is entitled to such legal and equitable relief to effectuate the purposes of SOX, including, *inter alia*, employment reinstatement, back pay with interest, front pay, compensatory damages, special damages, punitive damages, and attorneys' fees and costs.

## COUNT II
### Dodd-Frank Wall Street Reform & Consumer Protection Act
### 15 U.S.C. §78u-6(h)(1), et seq.

107. Baker hereby incorporates all allegations set forth in all the foregoing paragraphs as though fully alleged herein.

108. Baker reasonably believed that the conduct of Flatley, including his relationship with Pioneer Tools, constituted illegal and fraudulent conduct in violation of federal securities laws and regulations, other laws, or Company rules or policy.

109. Baker put S&W on notice of the conduct he believed to be in violation of securities laws and regulations, other laws, or Company rules or policy when he notified persons within S&W who held supervisory authority over him and who had the authority to investigate misconduct.

110. In violation of the Dodd-Frank Act, and in retaliation for Baker's protected activity of reporting a reasonable belief that securities laws and regulations were being violated, S&W took adverse action against Baker, including, but not limited to, denying Baker a raise, denying Baker a bonus, imposing discipline on Baker, subjecting Baker to a hostile work environment, giving Baker a poor performance review, damaging Baker's reputation and future employment opportunities, placing Baker on leave, and ultimately terminating Baker's employment.

111. On information and belief, the decision to retaliate against Baker was not made by one person.

112. On information and belief, S&W, including one or more persons involved in the investigation of the Pioneer bribery issues or the retaliation against Baker were well aware of SOX and its statutory protection of whistleblowers.

113. On information and belief, S&W has had other bribery-related claims before and settled them, and S&W's management, including those involved in the investigation of the Pioneer bribery issues or the retaliation against Baker were aware of them.

114. The Pioneer bribery practices were neither new, isolated or recent.

115. The Pioneer bribery practices were well known to many employees and this on-going way of doing business and looking the other way was a business culture of S&W.

116. Flatley, who was an active participant and beneficiary of the Pioneer bribery schemes for years, was the supervisor to whom Baker initially reported his concerns along with to HR.

117. On information and belief, up the chain of command from Flatley, including but not limited to Fontaine, Cicero, Bruce, Smith and Debney were aware of or participated in the SOX violation.

118. Cicero has advised Baker that he does not report to Smith or Debney, but to the Board of Directors of S&W.

119. If Cicero told Baker the truth and truthfully reported to the Board of Directors, then the Board too was aware of S&W's Pioneer bribery issues and S&W's retaliation against Baker.

120. Beginning with Flatley and his adherence to S&W's culture, as well as other HR and management employees who were either willing to play ball or look the other way, S&W willingly, knowingly, and egregiously retaliated against Baker and covered up both the Pioneer bribery practices and retaliation against Baker.

121. On information and belief, two or more HR and management employees actively or tacitly participated in a conspiracy with knowledge or awareness of the facts giving rise to the Pioneer bribery issues or retaliation against Baker

122. The co-conspirators knowingly conspired, with malice aforethought, to violate SOX, public policy, other laws and rules and policy of the Company.

123. As a result of retaliation in violation of the Dodd-Frank Act, Baker is entitled to such legal and equitable relief to effectuate the purposes of the Dodd-Frank Act, including, *inter alia*, employment reinstatement, double back pay with interest, front pay, compensatory damages, and attorneys' fees and costs.

## COUNT III
**Wrongful Termination and Retaliation in Violation of Massachusetts Public Policy**

124. Baker hereby incorporates all allegations set forth in all the foregoing paragraphs as though fully alleged herein.

125. Baker reasonably believed that the conduct of Flatley, including his relationship with Pioneer Tools, constituted illegal or fraudulent conduct in violation of federal securities laws and regulations company rules or policy, and public policy.

16

126. Baker put S&W on notice of the conduct he believed to be in violation of securities laws and regulations, company rules or policy, or public policy when he notified persons within S&W who held supervisory authority over him and who had the authority to investigate misconduct.

127. In violation of Massachusetts public policy, and in retaliation for Baker's protected activity of reporting a reasonable belief that securities laws and regulations and/or Company rules and policy were being violated, Defendant S&W took adverse action against Baker, including, but not limited to, denying Baker a raise, denying Baker a bonus, imposing discipline on Baker, subjecting Baker to a hostile work environment, giving Baker a poor performance review, damaging Baker's reputation and future employment opportunities, placing Baker on leave, and ultimately terminating Baker's employment.

128. On information and belief, the decision to retaliate against Baker was not made by one person.

129. On information and belief, S&W, including one or more persons involved in the investigation of the Pioneer bribery issues or the retaliation against Baker were well aware of SOX and its statutory protection of whistleblowers.

130. On information and belief, S&W has had other bribery-related claims before and settled them, and S&W's management, including those involved in the investigation of the Pioneer bribery issues or the retaliation against Baker were aware of them.

131. The Pioneer bribery practices were neither new, isolated or recent.

132. The Pioneer bribery practices were well known to many employees and this on-going way of doing business and looking the other way was a business culture of S&W.

17

133. Flatley, who was an active participant and beneficiary of the Pioneer bribery scheme for years, was the supervisor to whom Baker initially reported his concerns along with to HR.

134. On information and belief, up the chain of command from Flatley, including but not limited to Fontaine, Cicero, Bruce, Smith and Debney were aware of or participated in the SOX violation.

135. Cicero has advised Baker that he does not report to Smith or Debney, but to the Board of Directors of S&W.

136. If Cicero told Baker the truth and truthfully reported to the Board of Directors, then the Board too was aware of S&W's Pioneer bribery issues and S&W's retaliation against Baker.

137. On information and belief, beginning with Flatley and his adherence to S&W's culture and other HR or management employees who were either willing to play ball or look the other way, S&W willingly, knowingly, and egregiously retaliated against Baker and covered up both the Pioneer bribery practices and retaliation against Baker.

138. On information and belief, two or more HR and management employees actively or tacitly participated in a conspiracy with knowledge or awareness of the facts giving rise to the Pioneer bribery issues or retaliation against Baker.

139. On information and belief, the co-conspirators knowingly conspired, with malice aforethought, to violate SOX, public policy and other laws and company rules and policy, and public policy articulated in this Complaint.

140. As a result of this violation, Baker is entitled to compensatory damages, attorneys' fees and costs, special damages, punitive damages, and such other relief as the Court deems just and equitable.

**PRAYER FOR RELIEF**

As a result of Defendants unlawful retaliation in violation of the Sarbanes-Oxley Act, the Dodd-Frank Act, and Massachusetts public policy, Plaintiff respectfully requests be awarded the following relief against Defendant:

I.     Reinstatement or, in lieu thereof, backpay with interest, full front pay, stock options and benefits;

II.    Economic damages for lost compensation and benefits, as well as damage to Baker's career, reputation, and earning capacity;

III.   Compensatory damages, including but not limited to pain and suffering, emotional distress, and reputational damage;

IV.   Attorneys' fees and costs;

V.    Immediate abatement of Defendant's unlawful actions;

VI.   Punitive damages;

VII.  Double backpay plus interest; and

VII.  Any other relief that may be deemed just and equitable.


Date: June 1, 2018                                      Respectfully submitted,

                                                                     EARL DONALD BAKER

                                           By:    <u>John Y. Lee</u>
                                                               One of his Attorneys

John Y. Lee
Lisa C. Breen
Lee & Breen, LLC
188 Industrial Drive, Suite 403
Elmhurst, IL 60126
Tel.: (312) 241420
Email: jlee@leebreenlaw.com

Case 1:19-cv-03400 Document 1 Filed 06/01/18 Page 20 of 20

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Respectfully submitted,

EARL DONALD BAKER

By: <u>John Y. Lee</u>
One of his Attorneys

John Y. Lee
Lisa C. Breen
Lee & Breen, LLC
188 Industrial Drive
Suite 403
Elmhurst, IL 60126