UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EARL DONALD BAKER,<br><br>    Plaintiff,<br><br>    vs.<br><br>SMITH & WESSON CORP.,<br><br>    Defendant. | Case No. 18-cv-03847<br><br>Honorable Edmond Chang |

**DECLARATION OF EARL BAKER**

1. I started a tooling business in 1991 with no customers and one machine.

2. I grew the business over twenty-one years and ultimately had thirty-five machines.

3. In 2004, I was named to the Business Advisory Panel of the United States congress.

4. In 2013, I was contacted by a recruiter in Florida acting as an agent for Smith and Wesson (S&W).

5. I was informed that S&W was seeking an entrepreneur to fill a Cell Coordinator position.

6. After negotiating with S&W, I agreed to accept the Cell Coordinator position. My salary was $85,000.00 and then $87,250.00 annually.

7. Cell Coordinator's job that I had was to, in part, supervise machine tool operators to make, sharpen, inventory, and tooling for use in departments making various parts to guns and other equipment or machinery. Machine tool operators do this by getting tools or cutters that cut, drill, or shave raw material based on computer commands. I was also responsible for requisitioning tools, also known as cutters, from outside vendors to supplement S&W's inventory.

1

Cutters are vended from "auto cribs" that hold hundreds of thousands of them. Cutters are made and owned either by S&W itself or by vendors that charge S&W for use of their cutters.

8. My direct supervisor was Larry Flatley who was in charge of Specialty Services. It was a department that he came up with and headed, which sold S&W's over-capacity in machine tooling (capacity to run machine tools in excess of what S&W needed for itself), heat treat, or metal finishing to other companies such as Harley Davidson, or Mack Truck.

9. After accepting the position with S&W, I sold my business and then later my home in Ohio. I moved to Connecticut and began working at S&W's plant in Springfield, Massachusetts.

10. I began work for S&W in February, 2013.

11. Soon after I began working for S&W, I began to notice that a large number of contracts were awarded to one particular vendor, Pioneer Tool and Supply ("Pioneer").

12. When I started looking more closely at the Pioneer contracts, I noticed that there were not necessarily the best-priced, nor were they properly fulfilled.

13. I raised these issues on several occasions with my supervisor, Larry Flatley ("Flatley").

14. In May of 2013, I was asked to attend a Pioneer barbeque in conjunction with an industry trade show as the senior S&W representative. While there, I was asked to fill out a ticket for a drawing by Pioneer tool for prizes ranging from iPads to fishing trips. I was uncomfortable entering the drawing as a S&W employee, so I did not enter. I was later confronted by a Pioneer Tool employee as to why I had not entered.

15. I had a performance review on June 25, 2013, at which I received a "Meets Expectations" rating in all categories and an overall performance rating of "Meets Expectations."

2

(See attached **Exhibit A**). On two separate occasions, I also received commendations for doing well at my job, signed by S&W management and my supervisor, Flatley.

16. During the summer of 2013, Flatley became abusive towards me. It got so bad that I went to human resources ("HR") for help. (See attached **Exhibit B**). One complaint I expressed was that I was singled out and not given a cost of living increase that all had been promise and got.

17. I also reported to HR that I believed the cause of Flatley's antagonism to be my refusal to participate in or look the other way on Pioneer's improper gifts to S&W employees who were involved in using cutters, i.e., purchasing cutters, and that Flatley's conduct was cheating the company and was against company policy and the law. I reported to HR my actions in reporting accounting, quality, and pricing issues to Flatley (I did not know he was the kingpin of the "system") precipitated the abusive behavior.

18. HR advised me to report Flatley's conduct to Dan Fontaine ("Fontaine"), the plant manager, my second line supervisor, and Flatley's direct supervisor. HR told me to not mention anything about the vendor (Pioneer) with Fontaine, as the company was going to investigate the situation before involving anyone else. (See Exhibit B).

19. On or about February 4, 2014, I received an email from Ted Hebert of Pioneer, questioning the amount of work that had been awarded to MSC, another vendor and competitor of Pioneer. I responded that same day stating that the email was inappropriate and that Pioneer should not question the work that was given to other contractors. (See attached **Exhibit C**).

20. On February 5, 2014, I was given an unexpected and out-of-cycle review. In that review, I was given an overall evaluation of "Does Not Meet Expectations." The review also delineated specific deficiencies and prescribed a training program and other specific corrective

3

measures. The written review was originally dated February 4, 2014, but later versions were dated February 7, 2014. (See attached **Exhibit D**).

21. This was the first time Flatley stated, in any way, dissatisfaction with my performance.

22. Flatley also gave me a list of seminars and classes to attend and then said, "you are not going to want to do this shit, so you might just want to quit and save yourself the trouble."

23. I immediately began taking the classes that had been recommended.

24. I also prepared a detailed Performance Appraisal Rebuttal and a Response to the "Earl Baker Result – 2/7/14" document that had been prepared by Flatley as part of my review. (See attached Group **Exhibit E**).

25. On February 17, 2014, Ed Suraci ("Suraci"), who also worked in HR as the Director of Organizational Effectiveness, was asked by Fontaine to intervene in the issues between Flatley and me. Suraci noted that his investigation time with me "became split between the 2 issues of his [my] job performance and providing documentation on the Pioneer relationship." (See Suraci investigation summary, February 17, 2014 entry and "Informally scheduled follow-up meetings with Earl" entry, attached as **Exhibit F**).

26. Suraci determined, and communicated to Flatley on March 10, 2014, that "If Larry [Flatley] was looking to make a case to remove Earl from his position, I [Suraci] had not seen any evidence to support that conclusion …" (See March 10, 2014 entry, Exhibit F).

27. Suraci later shared with Fontaine that "there was clearly not enough supporting documentation to remover (sic) from his position." Suraci noted that "Dan [Fontaine] agreed, and stated that he was holding Larry [Flatley] at least 50% accountable for the situation." (See second

4

undated entry of Suraci "Earl Baker, Larry Flatley Investigation and follow-up" attached as **Exhibit G**).

28. Suraci also investigated a quality related incident that occurred and for which I had isolated the issue to a particular tool. I went to Flatley about it and he told me "don't say anything." A similar problem had occurred in September of 2013. When I stated in a meeting that I believed I had isolated the problem, Flatley came to my office after the meeting and called me a "fucking moron" and stated that I "[had] no credibility in this company" and that I was "an embarrassment to the department."

29. Suraci, after meeting with the engineer who investigated the quality issue, determined that I had in fact isolated the problem. In an April 18, 2014 email to Salvador, Suraci confirmed that the engineer had "confirmed that Earl had isolated the cause of the slide problem last week, which suggests that Larry suppressed valuable and costly which (sic) might have solved the quality problem (last week, and possibly last September)." (See attached **Exhibit H**).

30. By April 11, 2014, Suraci was of the opinion that "Larry [Flatley] [was] acting subversively to undermine Earl's position." (See April 11, 2014 entry, Exhibit F).

31. On April 13, 2014, in an email to Cicero, General Counsel of S&W, Suraci noted that he had advised Fontaine that "with the Pioneer investigation currently going on, we cannot be putting Earl under undue pressure," but that "this is what I think Larry is doing." (See attached **Exhibit I**). Interestingly, this portion of the April 13 email was redacted when it was incorporated into Suraci's summary report. (See Exhibit F).

32. On Friday, April 18, 2014, Suraci acknowledged that I could prove someone had been tampering with my "Pitch Boards" and that there was "some logic" to my assumption that it was Flatley. (See April 18, 2014 entry, Exhibit F).

5

33. Suraci's ultimate conclusion was not that I should be fired, but rather that I should be moved away from Flatley, stating: "Given [the engineer's] confirmation of Earl's trade knowledge and experience, might we consider assigning Earl to the slide quality project for 3-6 months?" (See Exhibit F). Suraci was also "looking into" moving me under Tom Walsh.

34. Throughout the investigation, I was dissuaded by S&W HR representatives from seeking outside counsel regarding my treatment there, and my statements that I may seek outside counsel were held against me. In the April 18 email from Suraci to Salvador (Exhibit H), Suraci notes that he "cautioned [me] about continuing to suggest that [I] would seek outside counsel." Salvador responded that "he really shouldn't keep talking about seeking outside counsel. That doesn't help his cause internally." Suraci responded "Agree and agree. I'm gonna have a heart-to-heart with him when I get back."

35. I was also told by Fontaine that I was not to go to HR anymore with any "issues," but was instead to deal with them directly with Flatley. When I reported this to Suraci, he seemed upset and intervened on my behalf. Suraci informed me the next day that I was again "allowed" to go to HR with issues about Flatley.

36. Additionally, from the time of my out-or cycle review until the day I was put on administrative leave, my office was broken into at least four times. After the first break in, I discovered that my journal containing my notes regarding Flatley and my computer passwords was missing. I later discovered that several emails had been deleted from my email. Many of the deleted emails were from me to Flatley reporting some quality issue with a Pioneer tool or a value assessment of Pioneer. Also, on one occasion, S&W security found a thumb drive inserted into the back of my computer.

37. S&W eventually fired me. I never returned to work at S&W after I was put on administrative review.

38. After applying to hundreds of jobs, I got a job as a non-salaried machinist. I currently make $52,000 per year.

39. On two separate occasions, I was forced to move into my daughter's basement.

40. We currently pay $1,500.00 for rent and pay $3,000.00 for other monthly expenses.

41. After my firing, my wife began grinding her teeth and broke her bridge.

42. I have had two surgical procedures on my back due to a herniated disc.

43. We do not have dental insurance and our health insurance coverage only covers 80% of surgical procedures.

44. In the last six months, our out-of-pocket dental and medical expenses have exceeded $27,000.00.

45. I originally retained the Employment Law Group to represent me in my action against S&W. I paid them $42,000.00.

46. However, the Employment Law Group withdrew in from the representation in January of 2017.

47. I conducted a nationwide search for new counsel but was not successful. I represented myself in the administrative proceedings for fourteen months and incurred another $18,000.00 in litigation costs.

48. Finally, after talking to eighteen different firms, in November of 2017 I was introduced to Lee & Breen through a mutual acquaintance.

49. After months of discussions, Lee & Breen agreed to represent me with no up-front retainer.

7

50. Given my employment situation, the litigation expenses I have already incurred, and my wife's and my health problems, I do not have the funds to provide any retainer fees or to cover the costs of the vast majority of expenses that will be incurred in order to proceed with this litigation.

51. I have identified the following individuals as likely to testify:

Lawrence Flatley;
Daniel Fontaine;
Robert Cicero;
Ed Suraci;
Anne Bruce;
Ann Glica;
Kathy Salvador;
Robert Francis;
Various employees of Rhode Island Carbide with knowledge of how S&W employees improper relations with Pioneer were cheating S&W; and
Various Houlton, Maine S&W employees with knowledge of how S&W employees with improper relations with Pioneer were cheating S&W.

52. On information and belief, Fontaine, Cicero, Salvador, and Glica are all S&W employees.

53. ON information and belief, Flatley resides in Massachusetts.

54. On information and belief Suraci resides in Massachusetts.

55. On information and belief Bruce resides in Nevada.

56. On information and belief Francis resides in Connecticut.

57. Rhode Island Carbide is a competitor of Pioneer. Evidence, both documentary and witnesses, located in Rhode Island will shed light on how S&W employees with improper relations with Pioneer were cheating the company.

58. S&W's Houlton, Maine facility also has documents and witnesses that will shed light on how S&W employees with improper relations with Pioneer cheated the company at that Maine location.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July ___, 2018.

                                                                                     EARL BAKER