**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**WESTERN DIVISION**

| | |
|---|---|
| EARL DONALD BAKER, | Case No.  3:19-cv-30008-MGM |
| Plaintiff, | |
| vs. | Honorable Mark G.  Mastroianni |
| SMITH & WESSON CORP., | |
| Defendant. | |

## DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendant

Smith & Wesson (S&W) submits its Statement of Undisputed Facts (SUF).

## STATEMENT OF UNDISPUTED FACTS

### Relevant Background Information

1.      Founded in 1852, S&W is the oldest firearms manufacturer in the United States.  It

produces a variety of pistols, revolvers, rifles, and ammunition for the military, law enforcement, and

civilian use.  PEX 293 at ¶ 4.

2.      Headquartered in Springfield, Massachusetts, S&W currently employs more than 1,000

full-time employees and has facilities in Maine, Connecticut, and Missouri.  *Id.* at ¶ 5.

### S&W's Code of Conduct and Ethics

3.      S&W has adopted a Code of Conduct and Ethics applicable to all employees that directs

employees promptly to disclose any conduct of a questionable, fraudulent, or illegal nature.  PEX 296 at

¶ 4; PEX 296, Ex. A.  S&W upholds the highest ethical principles and standards of corporate conduct in

all of its business operations.   PEX 296 at ¶ 4.  S&W also maintains a Whistleblower Policy for (1)

the  confidential,  anonymous  submission  by  the  Company's  employees  of  concerns  regarding

suspected violations of S&W policy, law, or other wrongdoing; and (2) the receipt, retention, and

treatment of complaints received by the Company.  *Id.* at ¶ 5; PEX 296, Ex. B at 1.

4.     The Whistleblower Policy advises employees and others that they can report "suspected violations of law, policy, or other wrongdoing" to: (1) a supervisor; (2) S&W's Chief Executive Officer (CEO), Chief Financial Officer (CFO), the Internal Auditor, or Controller; (3) the Chairman of the Audit Committee; or (4) anonymously via mail.  PEX 296, Ex. B at 1.  Employees can also report concerns via S&W's 24-hour anonymous toll-free ethics hotline.  PEX 296 at ¶ 6; PEX 296, Ex. C.  S&W's Whistleblower Policy and ethics hotline are advertised on posters throughout S&W's premises and are included in S&W's employment policies and annual ethics training.  PEX 296 at ¶ 6.  Baker testified he knew about the hotline, but that he did not make a report because he "didn't want to do anything that would harm [S&W]."  Baker Tr. at 399-400.  He also testified he did not make any complaints to the SEC, *id.* at 400, or tell anyone in at S&W that he felt any information needed to be disclosed to the SEC or in a SEC filing, *id.* at 516-17.  Indeed, Baker testified that his understanding of SOX is "[b]ased on [his] limited knowledge of and what [he] surmised from the training [he received] at Smith & Wesson."  Baker Tr. at 392; 518-19.

5.     S&W's policy prohibits any form of retaliation against any employee who in good faith reports concerns or potential violations.  PEX 296, Ex. B at 2.  Specifically, the policy states S&W:

> will not discharge, demote, suspend, threaten, harass, or in any other manner discriminate or retaliate against any employee in the terms and conditions of the employee's employment because of any lawful act done by that employee to either (a) provide information, cause information to be provided, or otherwise assist in any investigation regarding any conduct that the employee reasonably believes constitutes a violation of any Company code of conduct, law, rule, or regulation, including any rule or regulation of the Securities and Exchange Commission or any provision of Federal law relating to fraud against shareholders, or (b) file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or, to the employee's knowledge, about to be filed relating to an alleged violation of any such law, rule, or regulation.

*Id.*

### S&W's Cutter Department

6.     A critical component of S&W's firearm manufacturing process is the Cutter

Department, which is responsible for purchasing, manufacturing, re-sharpening and maintaining thousands of cutting tools.  PEX 294 at ¶ 4.  This department is responsible for maintaining an inventory of more than 70,000 cutting tools (either made in-house or purchased from vendors), including the cutting tools used by S&W's various Computerized Numerical Control (CNC) machines. *Id. at* ¶¶ 5-6.  CNC machines cut handgun frames, barrels, slides, revolver cylinders and other firearm parts out of pieces of steel.  *Id.* at ¶ 5.  If sharp, properly calibrated, and properly manufactured tools are not available, S&W's manufacturing process is compromised.  *Id.* at ¶ 6.

### *S&W Engages Outside Consultant to Identify Cost-Savings Opportunities*

7.     As with most US-based companies, the 2008 financial recession seriously impacted S&W's operations.  PEX 297 at ¶ 4.  The tough economic climate precipitated a significant decline in discretionary spending by consumers and government customers on firearms and ammunition.  *Id.* Thus, S&W began to identify and implement cost-saving opportunities.  *Id.*

8.     In 2011, S&W engaged a consulting firm, Alverez & Marsal (A&M), to conduct an analysis of the company's strategic sourcing in an effort to assist S&W in continuing to reduce its costs while increasing operational efficiencies.  PEX 298 at ¶ 5. Sponsored by Mark Smith, Vice President of Operations and Supply Chain Management, the objective of the review was to identify the current state and desired future state of procurement in each area, as well as to create a plan to implement the desired future state in order to reap cost savings and operational benefits.  *Id.* at ¶ 6; PEX 298, Ex A.

9.     As part of this analysis, A&M reviewed the procurement process for cutter tool sourcing and made several recommendations.  *Id.* at ¶ 7.  First, it recommended that S&W split its purchasing of tools between two vendors: Pioneer Tool (Pioneer) and MSC Industrial Supply Company (MSC), permitting S&W to obtain a large portion of its cutting tools on consignment.  *Id.* at ¶ 8.  Obtaining tools on consignment rather than directly purchasing them provided S&W the

convenience of having tools on site, without the burden of owning or maintaining the inventory, predicting future needs, or absorbing the cost of fixing broken or flawed tools. *Id.* This solution offered a major cost saving advantage and substantial advantages in terms of time savings and efficiency and the reduction of production delays. *Id.*

10.     Second, A&M recommended that S&W use two vendors because it would: (1) allow each vendor seamlessly to supply tools allocated to it based on cost savings in S&W's RoboCribs (S&W's automated tool distribution systems); and (2) permit an ongoing competitive environment to ensure that S&W could maintain sufficient inventory. *Id.* at ¶ 9.  A&M also recommended that S&W continue to negotiate marginal savings with its specialty tool suppliers, as well as require Pioneer, MSC, and a third vendor to bid for certain jobs. *Id.* at ¶ 10.

11.     Avoiding production or process disruptions during or after S&W's implementation of the project was a primary objective. *Id.* at ¶ 12.  Thus, a committee of S&W's employees oversaw the tool bidding process, which included members from the Engineering, Cutter, and Procurement Departments. *Id.* at ¶ 11.  The committee's bidding decisions were made in collaboration with A&M. *Id.* Selecting a vendor required the committee to evaluate several factors including: (1) price; (2) consistent tool quality and availability; (3) capability to produce or supply the required tools; (4) the ability to consistently supply the quantity of tools needed; and (5) expertise in automated tool inventory management. *Id.* at ¶ 12.  Baker testified that he did not review the A&M study or report while employed for S&W (the study was completed before he began, *see supra* ¶ 8).  Also, he did not ask for it or about it while he was employed.  Baker Tr. at 41-42.

12.     Following the A&M project, S&W entered into Letters of Understanding (LOIs) with Pioneer, MSC, and a third vendor Linco with two-year terms.  PEX 298 at ¶ 13. The January 23, 2013, LOI with Pioneer required the vendor to: (1) have a representative manage the stocking of Pioneer tools in the RoboCribs using the vendor's proprietary software, with the cost of such management

included in the price of each tool; (2) provide the tools within the RoboCribs on consignment; and (3) continue to inspect tools as agreed upon with S&W and provide inspection reports at no cost. *Id.* Baker testified that he was aware of the letters of intent, but never reviewed them while he was employed by S&W. Baker Tr. at 42, 397-98

### *Cutter Department Cell Coordinator*

13.     The Cutter Department's Cell Coordinator position is responsible for managing the daily operations of and supervising employees within the Cutter Department. PEX 294 at ¶ 9; PEX 294, Ex. A. The Cell Coordinator's core duties include: (1) planning and assigning work for the Department's workers; (2) implementing relevant policies and procedures, including safety and 5S audits; (3) managing, recommending, and implementing improvements to current production methods, equipment, operating procedures, inventories and working conditions; (4) participating in and providing training and development; and (5) maintaining and controlling the Department's budget. PEX 294 at ¶ 9 & Ex. A at 1. The Cell Coordinator was also expected to demonstrate strong interpersonal and communication skills and be a strong team player. PEX 294 at ¶ 9 & Ex. A at 2.

14.     The Department's Cell Coordinator also worked with the Engineering and Procurement Departments to order cutting tools. Dziobek Tr. at 13-14. When the Cutting Department needed to purchase tools, the Cell Coordinator worked with the Engineering Department to obtain the specifications for the tools. *Id.* at 15-16 Once the specifications were obtained, the Purchasing Department issued a purchase order. *Id.* at 13-14. A Buyer within the Purchasing Department selected the vendor and determined the terms for the purchase of the requested tools. *Id.* at 14. Cell Coordinators were not involved in negotiating the price or lead time for tool sourcing. *Id.* at 14-16, 18.

15.     Shortly after S&W entered into the LOIs, S&W hired Baker as a Cell Coordinator in the Cutter Department after his predecessor, Stanley Wnuk, announced his retirement. PEX 294 at ¶

7.   Flatley identified Baker as a candidate through a recruiter in Florida.  *Id.* at ¶ 8.  During his interview, Baker held himself out as an expert in the manufacturing and production of cutting tools. *Id.*  Baker claimed he had extensive experience managing similar departments and owning his own tooling business for twenty-one years.  *Id.*  Based upon these representations, Flatley believed that Baker would be a good choice to fill the role as Cell Coordinator, and extended Baker an offer of employment.  *Id.*  On February 28, 2013, an offer letter for the Cell Coordinator, Manufacturing Tools position was submitted to Baker, which he signed on March 4, 2013.  DEX 1.  The letter indicated Baker's first day of employment would be March 25, 2013, and that he would report directly to Flatley. *Id.*

16.   Flatley asked Baker to work with Wnuk, who had worked with S&W for over three decades, to familiarize himself with the Cutter Department's operations and S&W's tooling needs. PEX 294 at ¶ 10; Baker Tr. at 35-36.  During this transitional period, Baker was expected to understand the cutting and manufacturing process and become familiar with S&W's processes and systems.  PEX 297 at ¶ 5.

17.   Baker testified that when he was hired and undergoing training, he understood that his role would be to "maintain what [S&W] considered to be a successful department."  Baker Tr. at 35. Baker testified that he trained with Wnuk for 3 months to ensure that "there was no lag in the successes" the Department had experienced.  *Id.*

18.   After this training period, Flatley assigned Baker three critical projects: (1) using S&W's RoboCrib computer software to manage the inventory of the tools in Crib 99 and to automate the tool reordering process; (2) conducting problem-solving exercises with the team leaders in the Cutter Department; and (3) creating a system to increase production on the Company's Schneeberger tool grinding machine.  PEX 294 at ¶ 10; *see also* PEX 297 at ¶ 5.

19.   Flatley met with his direct reports on a weekly basis.  PEX 294 at ¶ 11.  He met with

Baker every Monday at 1:00 p.m., starting on April 15, 2013.  *Id.*  During these weekly meetings, Flatley discussed with Baker his performance and the performance of his Department.  Flatley took detailed handwritten notes of his weekly meetings with Baker.  *Id.*; PEX 294, Ex. B; Baker Tr. at 59.

20.     Flatley had a specific notetaking system throughout Baker's employment that used different colors to flag items for review during their meetings.  Baker Tr. at 59.  Generally, Flatley took notes from the first meeting of the month in pencil and for each subsequent meeting for that month, he would use a different colored pen or pencil.  PEX 294 at ¶ 12.  In the top right-hand corner of his handwritten notes, Flatley added the date of the meeting in the color he used that day to take handwritten notes.  *Id.*; *see also* PEX 294, Ex. B.  In some instances, Flatley provided to Baker a copy of his handwritten notes from their weekly meetings.  Baker Tr. at 59-60; Baker Tr., Baker146.

### Baker Exhibits Deficient Performance Early in his Employment

21.     Flatley identified performance concerns early in Baker's employment and communicated his concerns to Flatley's supervisor, Director of Manufacturing Dan Fontaine.  PEX 297 at ¶ 6.  Flatley observed that Baker had trouble managing routine daily and weekly tasks necessary to keep the Cutter Department running.  PEX 294 at ¶ 13; PEX 297 at ¶ 6.

22.     In June 2013, Flatley provided Baker with a performance evaluation that assigned projects and tasks on SMART Objectives forms.  DEX 5; Baker Tr., Baker490-93; Baker Tr. at 77-81; Flatley Tr. at 134.  Baker was tasked with: (1) completing team problem-solving exercises known as Kaizens;[1] (2) using the RoboCrib/Autocrib computer software to manage Crib 99; and (3)

---

[1]The goal of these exercises was for the various team leaders to work together to identify creative solutions to ongoing issues, including how to prevent and address broken tools and stock outs.  PEX 294 at ¶ 26.

developing a program that will fully use the Schneeberger Grinder machine.[2]  Baker Tr., Baker490-93; Baker Tr. at 77-81; Flatley Tr. at 134-35; PEX 294 at ¶¶ 18-21.  Flatley identified on each form the dates by which each SMART Objective should be completed.  Baker Tr., Baker490-93.  Baker signed the SMART Objectives, without any objection or comment.  *Id.*; Flatley Tr. at 135; Baker Tr. at 80.  Flatley continued to meet with Baker on a weekly basis to assess his progress towards these tasks and his other performance goals.  Baker Tr., Baker490-93; PEX 294, Ex. B; Baker Tr. at 81-82.

23.     S&W's Pitch Boards are a data collection and display system used on the production floor to measure performance, quality, and delivery of cutting tools and audit compliance.  PEX 294 at ¶ 14.  Mr. Baker was required to update the Pitch Board (a white board) on a daily basis for his Department with information reflecting safety, quality, delivery and cost goals and measurements.  *Id.*  Baker testified that he understood that Flatley expected him to update the Pitch Board daily.  Baker Tr. at 36.

24.     Flatley met with Baker, the Cutter Department Team Leader, and an Engineering representative each morning to review information on the Pitch Board, including the prior day's performance and results.  PEX 294 at ¶ 15.  If the prior day's goals were met, there would be limited discussion.  *Id.*  If not, Baker was expected to document on the Board the reasons why and countermeasures to identify the root cause of the missed goals.  *Id.*  It was Flatley's view that Baker did not update his Pitch Board in a timely manner, despite frequent reminders by Flatley.  *Id.*  at ¶ 16.  In addition, the information he included was often incorrect or incomplete.  *Id.*

25.     S&W expected each Cell Coordinator and his or her team leads to conduct 5S audits and safety audits weekly.  *Id.* at ¶ 17.  These audits were intended to organize S&W's workplace for

---

[2]S&W had recently purchased the Schneeberger machine at substantial cost to allow it to manufacture and regrind a number of tools in-house, which would allow S&W to reduce its costs and its reliance on outside vendors.  PEX 294 at ¶ 21.

efficiency and effectiveness. *Id.* Each "S" refers to one of five phases of the audit: sort, straighten or set-in order, systemic cleaning, standardize, and sustain. *Id.* The safety audits focused on identifying safety potential issues like the removal of guarding on machines or the exposure of electrical panels. *Id.* Baker initially did not timely complete his 5S compliance audits. *Id.* at ¶ 18. He later conceded in an April 7, 2014, email to Fontaine that he should have been conducting the audits since he took over the Cutter Department in April 2013. PEX 297 at ¶ 7; PEX 297, Ex. A.

26. As outlined in his July 2013 SMART Objectives, Baker was expected to automate the tools in the Crib 99 using the RoboCrib/Autocrib computer software. *See supra* at ¶ 22; PEX 294 at ¶ 19. Crib 99 was the storage room used to house tools that were not in the automated RoboCribs. *Id.* Transitioning from the antiquated system of using logbooks to the computerized system would allow S&W accurately to maintain its inventory in real time and schedule necessary new, regrind, and repair work.[3] *Id.* at ¶¶ 19-20. A computerized system would also allow the Cutter Department to calculate when and how many of each tool number needed to be manufactured or ordered based upon how frequently the Company was using a specific tool to prevent stock outs of that tool. *Id.* at ¶ 20. Baker never fully implemented the computer inventory system for the Department, which led to tool stock outs and a host of other issues affecting production. *Id.*

27. Flatley also tasked Baker with determining what tooling could be made with the Schneeberger machine and what personnel would be necessary to make those tools. *See supra* at ¶ 22; PEX 294 at ¶ 21. Baker was instructed to obtain the support that he needed from the Engineering and other departments to meet these goals, develop plans to implement making sample tools, and establish a testing procedure and timeline. PEX 294 at ¶ 21. Baker claimed that Engineering would not support his efforts. *Id.* After discussing Baker's concerns with him and the Engineering

---

[3] Regrinding is the process by which the Company or vendor sharpens a used tool so that it can be used again.

Department, Flatley concluded that Baker did not know how to run the Schneeberger machine. *Id.* at ¶ 22. To assist Baker, Flatley agreed to send him to a week-long training session in Chicago concerning the machine's operations and capabilities. *Id.* at ¶ 22. Despite this extra assistance, Baker did not identify plans, testing procedures, or timelines that would allow S&W to use the machine to its full potential, depriving the Company of substantial cost savings and operational efficiencies. *Id.*

28.     As a leader, Baker was expected to conduct team problem solving exercises, called Kaizens with other departments. *See supra* at ¶ 22; PEX 294 at ¶ 26. This was one of the goals Flatley identified in Baker's June 2013 SMART Objectives. *See supra* at ¶ 22. Baker only performed one problem-solving exercise between March 2013 and February 2014. PEX 294 at ¶ 26. Flatley perceived that Baker was resistant to working cooperatively with others and hostile to the idea that other employees, including managers with decades of experience working for S&W, could help solve the Cutter Department's issues. *Id.* Flatley believed that Baker's resistance to conducting problem solving exercises caused many of the Cutter Department's issues to worsen during Baker's tenure. *Id.*

29.     By the Fall of 2013, it was clear to Flatley that Baker was not effectively managing the Cutter Department, was resistant to feedback, and was not progressing on his goals and projects. *Id.* at ¶ 27. In fact, Flatley's handwritten notes from his weekly meetings with Baker showed he had to repeatedly raise the same performance and project status concerns. *Id.* at ¶ 12; PEX 294, Ex. B. Although Flatley asked Baker to prepare action plans to complete his assigned projects, Baker did not provide them to Flatley, and the department continued to suffer. PEX 294 at ¶ 27.

30.     Baker approached Vice President of Human Resources Anne Bruce and told her that he was struggling to meet Flatley's expectations. PEX 296 at ¶ 7. Bruce understood from this discussion that Baker believed his performance was exemplary. *Id.* It was Bruce's perception that Baker did not like to be challenged or questioned, and instead, wanted to do things his own way. *Id.* at ¶ 8.

### *S&W Places Baker on a Performance Improvement Plan*

31.     Despite regular coaching and meetings with Flatley, Baker continued to struggle to manage the Cutter Department and complete his assigned projects.  *Id.* at ¶ 28.  On February 7, 2014, Flatley and Fontaine issued to Baker an interim performance evaluation and performance improvement plan (PIP) to provide him coaching and concrete goals before his upcoming annual review.  *Id.*; PEX 294, Ex. C & D; PEX 297 at ¶ 8.  They consulted with Bruce, who agreed with this approach.  PEX 296 at ¶ 9.

32.     Baker's overall interim performance rating on the interim evaluation was *Does Not Meet Expectations* – failing to meet expectations in five out of fifteen of the core principles and needing improvement in seven of them.  PEX 294, Ex. C.  The evaluation also contained an attachment that outlined four major areas where Baker failed to meet expectations: (1) managing multiple tasks; (2) increasing output and reducing costs with the CNC machines; (3) meeting calendar commitments; and (4) using and embracing technology that would improve the performance of the Department.  *Id.* For each area, the attachment provided concrete examples of tasks and projects that Baker had not completed to his managers' expectations.  *Id.*  Flatley and Fontaine believed that formalizing goals for Baker in a PIP and focusing him on a discreet number of projects would help improve his performance. PEX 294 at ¶ 29; PEX 297 at ¶ 9.   The PIP, packaged as a training program, contained three components: (1) seminars; (2) in-house training; and (3) specific Cutter Department projects.  PEX 294, Ex. D

33.     At his evaluation meeting, Baker denied he had any performance issues and that he had not completed assigned tasks.  PEX 294 at ¶ 30; PEX 297 at ¶ 9.  Instead, Baker maintained he was hired because he was one of the top tooling people in the country and his performance reflected this. PEX 294 at ¶ 30.  Indeed, in his five-page rebuttal to his interim evaluation, Baker was unwilling to accept any responsibility or accept management's feedback and instructions.  PEX 296, Ex. D.  For

instance, Baker referred to Flatley's feedback about his performance as being a "lie" and criticized Flatley as "micromanag[ing] over individual numbers." *Id.* Baker took the position that he performed at a ***"role model"*** level, the highest rating available, and that he had to "overcome significant opposition from [Flatley] who didn't believe [] things were attainable." *Id.* In response to Flatley's "Does Not Meet Expectations" rating, Baker wrote that he thinks "it's absurd that [Flatley] who has never managed his own business would judge [Baker] as a failure in this category." *Id.* Baker admitted in his rebuttal that he had not completed two Kaizens a month, but claimed he did not know he was expected to. *Id.* However, his first SMART Objective, which he signed on July 8, 2013, expressly stated that Baker needed to "conduct bi-monthly Kaizens." Baker Tr., Baker490.

34.     Although Baker took advantage of certain seminars and in-house training outlined in his PIP, he failed to complete any of the assigned projects. PEX 294 at ¶ 31; PEX 297 at ¶ 10.

35.     Baker's failure to complete these projects negatively impacted S&W's operations. For instance, Baker did not implement a computerized production and shipping process for tools needed in S&W's Houlton, Maine facility. PEX 294 at ¶ 31. This resulted in a delay in start-up production in March and April 2014 because Crib 99 did not have the tools necessary to meet increasing production needs. *Id.* at ¶ 32. In addition, Flatley was required to order the required tools from an external vendor at a higher cost. *Id.* Flatley was also required to hold weekly meetings with the Cutter and Purchasing Departments to coordinate shipments and inventory until the situation stabilized. *Id.*

36.     Flatley remained committed to seeing Baker succeed in his job and gave him another chance to address this critical task. *Id.* at ¶ 33. Flatley expected that Baker would have learned from the previous two months and made the decision to produce or purchase the tools required for the Houlton's June production using the computer database. *Id.* When Flatley asked Baker about the status of the June tool inventory in May 2014, including shipping the necessary tools to Houlton, Baker had not even ordered the necessary tools. *Id.* In fact, Baker did not even inform the team leader which

tools needed to be produced so that production could be scheduled.  *Id.*  Baker's failure to complete this critical task – despite numerous opportunities – caused great concern for Flatley.  *Id.*

37.     Other aspects of Baker's performance continued to decline, despite being placed on a PIP.  *Id.* at ¶¶ 34-37; PEX 297 at ¶ 10.  For instance, Baker did not: (1) develop a process to use the RoboCrib software effectively to manage the Crib 99 inventory; (2) identify barriers to the Cutter Department's ability to make and regrind tools for the entire Company; or (3) develop a procedure to manage the inventory of carbide blanks used to make cutting tools.  PEX 294 at ¶ 34; PEX 297 at ¶ 10.  In fact, Baker failed to even identify the action items necessary to complete these tasks.  PEX 294 at ¶ 34.  Each initiative should have served as significant production improvement and cost-saving mechanisms for the Company.  *Id.*

38.     After the February 2014 interim evaluation, it was Flatley's perception that Baker had formed an increasingly hostile attitude towards Flatley.  *Id.* at ¶ 35.  Flatley also perceived that Baker was resistant to constructive feedback and advice and wanted to do things the way he wanted to do them, regardless of whether it was best for S&W.  *Id.*  After the evaluation meeting, Fontaine asked Ed Suraci, Director of Organizational Effectiveness, to work with Flatley and Baker to improve their working relationship and to coach Baker concerning his performance issues.  Suraci Tr. at 23.  Suraci met with Baker numerous times throughout February, March and April to try to help him accept feedback, communicate effectively, and organize his work.  Suraci Tr. at 149, 233-36, 590.

39.     For instance, Suraci attended a meeting in April 2014 with Baker and Fontaine.  It was Suraci's perception that Baker was "very argumentative and belligerent" and unprofessional.  Suraci Tr. at 279-80, 286.  After the meeting, Suraci told Baker "that his behavior was inappropriate." *Id.* at 280-81.  Further, as part of his coaching, Suraci questioned why Baker was so aggressive and argumentative with Fontaine, who was trying to help Baker.  *Id.* at 280.  Suraci relayed to Bruce that Baker had "stared down" Fontaine during the meeting because he was not going to let Fontaine "take

him on." PEX 296 at ¶ 21; Bruce Tr. at 70-72.

### *S&W Places Baker on a Second PIP*

40.     It became clear to Fontaine and Flatley that, as Baker's annual evaluation in June 2014 approached, Baker had not improved his performance (and appeared unwilling to) and was not fulfilling the obligations of his performance improvement plan.  PEX 294 at ¶ 39; PEX 297 at ¶ 10. On June 5, 2014, Bruce, Fontaine, and Flatley delivered to Baker his 2014 annual performance evaluation and a second PIP.  PEX 294 at ¶ 40; PEX 297 at ¶ 11; PEX 296 at ¶ 10.  Like his interim performance evaluation, Baker's overall performance rating for his June 2014 annual evaluation was *Does Not Meet Expectations.*  Baker failed to meet expectations in eight out of fifteen of the core principles and needed improvement in six of them.  PEX 294, Ex. E.  Flatley and Fontaine determined that Baker was "incapable of plotting [a strategic course]" for the Cutter Department or "mentoring the [D]epartment management."  *Id.*  And despite trainings, coaching, and a PIP, Baker's department was "worse off than it was a year ago when [he] started as manager."  *Id.*

41.     Baker's second PIP also identified concrete and measurable goals for his improvement. PEX 294 at ¶ 40; PEX 297 at ¶ 11.  Those goals included: (1) completing a system to transfer tools to Houlton (and reducing tool stock outs); (2) identifying additional cutter cost-cutting strategies; (3) focusing on new product cutting tool requirements; and (4) automating S&W's tool inventory management.  *Id.*; PEX 294, Ex. F.

42.     Fontaine and Flatley wanted Baker to place more focus on tool inventory to avoid repeating situations where tools were not ordered, including implementing the RoboCrib software. PEX 297 at ¶ 12; *see e.g., supra* at ¶ 36. They also instructed Baker to identify cost-cutting strategies with vendors, with a primary focus on strategies to make or regrind more tools in-house.  PEX 297 at ¶ 13.  And once again, he was instructed to use the Schneeberger machine as a means of lowering S&W's reliance on outside vendors.  *Id.*   Baker was also tasked with improving the Cutter

Department's new product launch support. *Id.* at ¶ 14. Creating tools to make a new product was one of S&W's most expensive steps in the launch process, making the Cutter department an integral part of that process. *Id.* During Baker's tenure, Fontaine received complaints from the Engineering Department that product development was often held up because of tooling issues. *Id.* Thus, Fontaine and Flatley instructed Baker to devise a plan to support the product launch team and ensure that any issues that arose with launching a new product were no longer attributed to tooling issues. *Id.*

43.     As he did with his interim review, Baker submitted a lengthy written rebuttal to his June 2014 evaluation. *Id.* at ¶ 15; PEX 296 at ¶ 11 & Ex. E. Baker again appeared unwilling to accept any responsibility or accept management's feedback and instructions. PEX 296; Ex. E. For instance, in his rebuttal, Baker stated that he viewed his performance evaluation not as a "working document to identify areas of strength and strategize for growth in areas of deficiency," but as "a forum for [Flatley's] slanderous untruths." *Id.* Notably, each of the performance issues and goals documented in Baker's June 2014 evaluation had been identified and discussed with him during his February 2014 evaluation. PEX 294 at ¶ 41; PEX 296 at ¶ 12; *Compare supra* at ¶¶ 31-32 *with* ¶¶ 40-42.

44.     For over two hours on June 18, 2014, Bruce, Flatley, and Fontaine met with Baker to discuss the details of his evaluation and written rebuttal. PEX 296 at ¶ 12; Baker Tr. at 167-68. It was Bruce's perception that Baker acted in an unprofessional manner during this meeting, including raising his voice and using aggressive language. PEX 296 at ¶ 12. Baker testified that Bruce, Fontaine, Flatley and he "went down the portions of the review" during this meeting and that provided goals to him through the PIP. Baker Tr. at 168, 170. During this meeting, Baker was warned that failure to improve his performance would lead to termination. PEX 296 at ¶ 12.

45.     Although Baker took the time to draft a detailed written rebuttal to his evaluation, he did not provide any of the required project plans by the performance improvement plan's stated deadline. PEX 297 at ¶ 15. Instead, after the deadline for submitting his project plans passed, Baker

shoved a single page Excel document with handwritten notes on it under Fontaine's door. *Id.* The notes appeared to Fontaine to be a rough outline for only one of his three assigned project plans. *Id.*

### S&W Becomes Aware of Baker's Allegations Regarding Pioneer

46.    After Baker's February 2014 evaluation, he started making allegations about Flatley's treatment of him. PEX 296 at ¶ 15. Although his claims expanded and changed over time, Baker's initial complaints concerned Flatley: (1) holding Baker to different standards than other Cell Coordinators; (2) excluding Baker from meetings; (3) going through Baker's office when he was not there and deleting emails from his computer; and (4) cursing at and using inappropriate language towards him. *Id.*

47.    S&W management first became aware of Baker's complaints about Pioneer in March 2014, after a meeting between Baker and Suraci to discuss his February performance evaluation.[4] PEX 296 at ¶ 13. Bruce referred Baker's allegations concerning Pioneer to Robert Cicero, S&W's Vice President, General Counsel, and Chief Compliance Officer, for investigation. *Id.*; PEX 293 at ¶ 6. Bruce, on the other hand, handled Baker's concerns about Flatley's treatment of him and about his evaluation. PEX 296 at ¶ 13.

48.    To understand Baker's concerns about Pioneer, Cicero met with Baker on April 1, 2014, for approximately three hours. PEX 293 at ¶ 7; Baker Tr. at 448 (testifying that he did not speak with Cicero about his allegations until late March or early April 2014). Baker's concerns as Cicero understood them included: (1) Pioneer exercising improper influence by providing gifts to S&W employees; (2) Flatley improperly protecting Pioneer's business with S&W; (3) S&W making tools

---

[4] Although Baker raised certain vague concerns with S&W Human Resources representatives prior to March 2014, his concerns at that time focused on his poor relationship with Flatley and not on specific allegations concerning S&W's relationship with Pioneer. PEX 296 at ¶ 14. S&W's Human Resources Department did not believe that Baker was raising any ethics issues concerning S&W's relationship with Pioneer during those discussions regarding Flatley's management style. *Id.*

for Pioneer and then selling them back to S&W at a higher cost; and (4) Pioneer retaliating against him and encouraging Flatley to terminate him. PEX 293 at ¶ 7 & Ex. A. After meeting with Baker, Cicero initiated a thorough investigation into each of Baker's concerns. PEX 293 at ¶ 7.

### S&W Investigates Baker's Allegations Concerning Pioneer

49.     Over the next several months, Cicero participated in several more meetings with Baker, many of which lasted several hours. PEX 293 at ¶ 8; Baker Tr. at 573. In reviewing Baker's concerns, Cicero interviewed a number of witnesses (including S&W and Pioneer employees) and reviewed a large volume of documents, including emails forwarded to him by Mr. Suraci and Baker. *Id.* Baker also provided documents and emails to Cicero as part of the investigation. Baker Tr. at 573.

### The Investigation Did Not Substantiate Baker's Claim That Pioneer Improperly Tried to Influence S&W Employees

50.     Baker alleged that Pioneer exercised improper influence over S&W employees, including providing improper gifts to employees. *See supra* at ¶ 48. He claimed that: (1) Flatley was given an iPad by Pioneer as a result of winning a "fixed" raffle; (2) Pioneer attempted to influence Baker by sending him Red Sox tickets; and (3) Pioneer attempted to win Baker over by giving him a gift card for $100. PEX 293, Ex. A at 3; PEX 293 at ¶ 14. After investigating these allegations, Cicero determined that there was no evidence to support Baker's claims of improper influence by Pioneer through the use of gifts or other benefits. PEX 293, Ex. A at 3; PEX 293 at ¶¶ 15-18.

51.     Baker's allegation concerning a "fixed" raffle centered around a customer appreciation event Pioneer held in May 2013 during the Eastec exposition and trade show. *Id.* at ¶ 15. Baker alleged that Pioneer employees encouraged him to place his business card into a raffle for prizes, but he refused to do so. *Id.* Baker also alleged that, a few days after the event, a representative of Pioneer came by S&W offices looking for Flatley carrying an iPad. *Id.* ¶ 15 & PEX 293, Ex. A at 3. Baker testified at his deposition that the Pioneer representative did not tell Baker that Flatley won the iPad. Baker Tr. at 327-28. He also testified that he did not know whether the Pioneer representative gave it

to Flatley and, if so, whether Flatley accepted it.  *Id.* at 328-31.  Baker testified that he did not ask Flatley whether he received the iPad and did not do anything to investigate the situation.  *See infra* at ¶ 53.  Baker testified at his deposition that he "didn't view anyone giving or receiving anything improper" at the raffle.  Baker Tr. at 331.

52.     When Cicero asked Baker why he believed that Flatley received this prize, Baker told him that he ***assumed*** Flatley had won an iPad only because the Pioneer representative had an iPad in his hand when he spoke to him.  PEX 293 at ¶ 15.  Baker also assumed that the representative stopped by his office in an effort to "rub his nose" in the fact that Flatley had won a prize that could have been Baker's.  *Id.*  However, Baker admitted to Cicero that no one told him that Flatley had won an iPad, and that he never saw Flatley receive the iPad.  *Id.*

53.     Similarly, Cicero was unable to substantiate Baker's allegations that Pioneer improperly attempted to influence Baker with gifts.  *Id.* at ¶¶ 17-18; PEX 293, Ex. A at 3.  Baker told Cicero that Baker had received baseball tickets in the mail and assumed they were sent by Pioneer in an effort to "buy his influence."  PEX 293 at ¶ 17.  A short time later, Baker admitted to Cicero that Pioneer did not send him the tickets.  *Id.*  Likewise, Cicero found no evidence supporting Baker's claim that Pioneer attempted to influence him by providing a gift card to him.  *Id.* at ¶ 18.  Although Baker received a $100 gift card (along with a Christmas card) from two Pioneer representatives, Cicero concluded that the gift card – which was of a nominal value and approximated the cost of a business lunch for three people – was a "thank you" gift from Pioneer during the holidays.[5]  *Id.*  Cicero concluded that it did not appear to be an effort by Pioneer to improperly influence Baker and did not violate any S&W policies.  *Id.*  Baker testified at his deposition that he did not investigate his concerns about these alleged gifts and that he told Human Resources that vendors providing gifts was not "a

---

[5]Smith asked Pioneer to no longer provide gift cards in the future to avoid any potential misunderstandings.  PEX 298 at ¶ 17.

violation from the standpoint that vendors are allowed to offer gifts."  Baker Tr. at 318-20.  He also testified that he "didn't actually witness anyone receive gifts."  *Id.* at 319, 520.

### *The Investigation Did Not Substantiate Baker's Claim That Flatley Improperly Protected Pioneer's Business With S&W*

54.    Baker also alleged that Flatley attempted to steer business to Pioneer and otherwise tried to protect Pioneer's business with the Company.  *See supra* at ¶ 48.  Baker claimed that: (1) Flatley disciplined Baker for admonishing Pioneer for questioning the allocation of work to another vendor; (2) Flatley must have "fed" Pioneer information so that Pioneer could beat the price offered by another tool supplier; and (3) Flatley did not allow Baker to inspect and fix defective tools sent by Pioneer.  PEX 293 at ¶ 19; PEX 293, Ex. A at 3-6.

55.    Cicero's investigation found no evidence that Baker was given a poor performance review in February 2014 because Baker allegedly admonished Pioneer for questioning S&W's purchase of tools from another vendor.  PEX 293 at ¶ 20 & Ex. A at 3-4.  Cicero determined that, pursuant to Pioneer's LOI, there was nothing unusual or improper about Pioneer asking Baker about the distribution of business among vendors.  PEX 293 at ¶ 20.  Instead, Cicero concluded that Baker's February 2014 interim performance evaluation was intended to address Baker's serious performance deficiencies, which predated this seemly innocuous interaction with Pioneer.  *Id.*; PEX 293 at 3-4, Ex. A.

56.    Cicero's investigation was also unable to substantiate **any** of Baker's other claims of improper pricing by or preferences to Pioneer, including any instances where Flatley allegedly "fed" Pioneer information in order to help it outbid another supplier.  PEX 293 at ¶ 21-22 & Ex. A at 4-5.  Rather, in discussing Baker's concerns with him, Cicero started questioning whether Baker even understood the consignment process and why it was strategically important to S&W.  PEX 293 at ¶ 29.  For instance, Baker alleged that Pioneer was charging $770 for certain broaches, while other

companies were offering the same tools for hundreds less.[6]  *Id.* at ¶ 22; PEX 293, Ex. A at 4.  Cicero's investigation revealed that: (1) Pioneer was charging around $100 more (and not nearly twice the price per broach) than the other vendor; and (2) that the difference in price reflected the additional services provided by Pioneer in providing the tools on ***consignment, consistent with the terms of the LOI and the recommendations of A&M***.  PEX 293 at ¶¶ 23, 25 & Ex. A at 4.  Also, the investigation revealed that S&W was concerned that the other vendor did not have the capacity to meet its production needs as a sole-source provider of these critical tools.  PEX 293 at ¶ 26 & Ex. A at 5.

57.     Although Baker claimed Pioneer subsequently made a counter bid for "$1 less" than the other supplier's bid (and that the other vendor was subsequently "shut out"), Cicero's investigation revealed that Pioneer's counter bid was: (1) for the direct purchase of the tools; and (2) higher than the other vendor's original bid (not $1 less).  PEX 293 at ¶ 25 & Ex. A at 4-5.  Further, the investigation revealed that S&W ultimately did split the order between Baker's supplier and Pioneer because the Company felt it was necessary to have a second supplier to ensure it had sufficient tools during periods of high production.  PEX 293 at ¶ 26; PEX 293, Ex. A at 5.  Baker testified he did not investigate his allegations that Pioneer had an unfair advantage in the bidding process, but he simply told "HR, Legal, and Ed Suraci" about the rumors he heard.  Baker Tr. at 235-37; 278-81.

58.     Further, Baker alleged that Flatley was protecting Pioneer because when Baker attempted to inspect and fix defective Pioneer tools, Flatley prohibited him and instructed him to call Pioneer to have any defective consignment tools removed from the RoboCrib.  PEX 293 at ¶ 27.  Cicero concluded that Flatley's instructions to Baker were consistent with the LOI between S&W and Pioneer.  *Id.*  As part of that agreement, Pioneer, not S&W, was required to inspect Pioneer's consigned tools and fix them.  *Id*. at ¶¶ 27-28; PEX 293, Ex. A at 5-6.

---

[6]A broach is a toothed tool that is used in a broaching machine for precision machining of holes and odd shapes.

59.    Cicero's investigation was unable to find any evidence that Flatley improperly protected Pioneer's business or provided improper advantages to Pioneer.  PEX 293 at ¶¶ 28-29. Instead, Flatley and S&W acted consistent with the existing LOI and proper business practices.  *Id.* Baker testified that although he was aware of them, he did not review the LOIs while he was employed with S&W.  Baker Tr. at 397-98.

### The Investigation Did Not Substantiate Baker's Claim That S&W Repurchased Its Own Tools from Pioneer

60.    Baker further alleged that S&W, at Flatley's direction, was making tools, selling them to Pioneer, and then repurchasing the same tools from Pioneer at a much higher cost.  PEX 293 at ¶ 30 & Ex. A at 6.  Baker did not provide or identify any evidence that supported this allegation, acknowledging he did not have any personal knowledge of the alleged practice.  PEX 293 at ¶ 30. Although Cicero's investigation confirmed that, in the past, when S&W had excess production capacity, it would make tools for outside customers, he could not identify any instance when the Company purchased its own tools back from Pioneer, much less at a higher price.  *Id.*  Baker admitted at his deposition, he heard this information from a co-worker and did not even "know what the tool was" that was allegedly sold at a premium.  *Id.*; Baker Tr. at 352-54; *see also* PEX 293 at ¶ 32.  He further testified that, he did not "know where [the employee] got his information" and did not feel that he (Baker) "was the prime investigator of this [issue]."  Baker Tr. at 354.

### The Investigation Did Not Substantiate Baker's Claim That Pioneer Retaliated Against Him

61.    The remainder of Baker's allegations concerning Pioneer accused Pioneer of retaliating against Baker and encouraging Flatley to terminate his employment.  PEX 293 at ¶ 33; PEX 293, Ex. A at 6-7.

62.    In support of this claim, Baker alleged that Flatley clapped in the middle of the Department floor, with a grin on his face, because he thought Baker had been fired.  PEX 293 at ¶ 33 & Ex. A at 6-7.  Baker conceded that he did not witness the incident, but claimed that a co-worker had

told him about it.  PEX 293 at ¶ 34.  During subsequent discussions with Cicero, however, Baker conceded that the co-worker had explained to Baker that the clapping incident had nothing to do with him.  *Id.*

63.    Additionally, Baker alleged that Pioneer intentionally locked him out of the RoboCrib software while he was working late on Sunday, March 30, 2014.  *Id.* at ¶ 33; of PEX 293, Ex. A at 6-7.  Cicero was unable to corroborate this allegation.  PEX 293 at ¶ 35.  The investigation found that the lockout was likely caused by Baker because his use of the software caused too many access licenses to be used at one time, locking up the system and locking out Baker and other S&W employees.  *Id.* at ¶ 36; PEX 293, Ex. A at 6-7.  Further, the investigation revealed that Baker contacted Pioneer's IT support team close to midnight on Sunday evening and the situation was resolved by early Monday morning.  *Id.* at ¶ 36; PEX 293, Ex. A at 6-7.  The fix for the system was merely for Baker to "reboot" it.  PEX 293 at ¶ 35.  As such, Cicero's investigation did not find any evidence that Pioneer was trying to undermine Baker or get him fired.  *Id.* at ¶ 36.

64.    On June 30, 2014, Cicero met with Baker in his office to discuss the initial results of his investigation.  *Id.* at ¶ 9.  Cicero told Baker that he was unable to substantiate any of Baker's allegations about Pioneer or Flatley.  *Id.*  Baker expressed disagreement with Cicero's findings and reiterated each of his prior allegations.  *Id.*  He insisted that Cicero "keep looking."  *Id.*  As a result, Cicero's investigation continued through July and early August of 2014.  *Id.*

65.    Cicero communicated his ultimate findings in an August 20, 2014 letter to Baker.  PEX 293, Ex. A.  The letter explained in detail Cicero's findings with respect to each of the allegations raised by Baker.  *Id.*[7]

66.    Baker submitted an email to Cicero (copying Bruce, Fontaine, and Suraci) thanking

---

[7] Cicero's letter further explained that because Baker alleged retaliation in his employment as a result of raising these same issues, Human Resources would investigate such allegations and address them in a separate letter.  *Id.* at 1 n.1

him for the letter and stating that he disagreed with "SW's finding no evidence to support [his] allegations of misconduct."  DEX 42 at 1.  He further stated, in a conclusory manner, that the reason he disagrees is that he "researched [his] rights and have confirmed the things that [he] complained about were protected under the Sarbanes-Oxley Act and the Dodd Frank Act [and that reporting] supervisors who accept bribes and kickbacks is protected activity under the Sarbanes-Oxley Act." *Id.* Baker testified that he was represented by counsel when he received the investigation report.  He agreed that, in response to it, he did not identify any additional evidence Cicero should consider in investigating his concerns.  Baker Tr. at 567-68.  Baker further testified that he did not have personal knowledge of how Cicero conducted his investigation, including the documents reviewed, the witnesses he interviewed, or the witnesses' statements to Cicero.  *Id.* at 573-75.

### S&W Concurrently Investigated Baker's Fair Treatment and Retaliation Allegations

67.     As discussed *supra*, after Baker's February 2014 interim evaluation, Baker started making allegations about Flatley, claiming he was treating Baker unfairly.  *See supra* at ¶ 46.  In response to his concerns, Bruce commenced a far-ranging, months-long investigation in March 2014 into Baker's evolving and increasingly reckless complaints.[8]   PEX 296 at ¶ 16.   During the investigation, members of the HR Department interviewed numerous employees, reviewed emails provided by Baker, and reviewed other emails and documents relating to Baker's allegations.  *Id*. Baker Tr. at 575-77 (testifying that he was aware that the HR team was investigating his concerns, that he met with them several times, and that he was able to provide documentation and names of witnesses in support of his claim).  The HR team's investigation was unable to substantiate Baker's

---

[8]  Although Bruce began her investigation in the Spring of 2014, her report concerning the results of her investigation was not released until September 23, 2014.  PEX 296 at ¶ 20; Ex. F.  The delay was caused by Baker continually adding new allegations throughout the investigation, including allegations he raised for the first time during a June 2, 2014, meeting to discuss Bruce's investigation of his initial allegations and in Baker's emails to S&W's CEO.  *Id. at* ¶¶ 17, 20.

allegations, and in fact proved each allegation false.  PEX 296 at ¶ 16; PEX 296, Ex. F.  Indeed, as detailed in her report, Bruce found that Baker knowingly provided false information to her and others about a number of his allegations.  PEX 296 at ¶ 16 & Ex. F at 1,4.

### *S&W Places Baker on Administrative Leave Pending the Completion of the HR Investigation Due to His Disruptive Behavior*

68.     Rather than cooperate in good faith with Bruce's investigation, Baker interfered with it by attempting to manipulate members of the HR team conducting the investigation, behaving in a disruptive and belligerent manner during meetings, disclosing confidential information regarding the investigation to co-workers and subordinates, attempting to manipulate witnesses, and "planting" fabricated allegations.  *Id.* at ¶¶ 16, 21; Ex. F of PEX 296 at 4; PEX 298 at ¶ 22.

69.     For instance, several times, Baker provided Bruce or Suraci the name of a witness he claimed would corroborate his story or who witnessed the event at issue.  PEX 298 at ¶ 22.  When the witness was interviewed, the witness would indicate that his or her only knowledge of the allegation was what *"**Baker told him or her about it.**"*  *Id.*  During the investigation, Bruce also determined that Baker was disclosing confidential information regarding the investigation to others.  PEX 296 at ¶ 16.  Subsequently, Smith became aware from the HR Team that Baker was openly discussing his allegations and confidential information within the workplace with coworkers and subordinates, which led him to believe that Baker was attempting to influence the investigations.  PEX 298 at ¶ 22.

70.     During meetings with Baker, Baker accused Flatley and others of being part of the "Nazi" party, "evil," a "rapist," and a murderer. PEX 296 at ¶ 22 & Ex. F at 4; Suraci Tr. 152-53.  Bruce believed that Baker was attempting to undermine and/or smear Flatley's reputation within the workplace.  PEX 298 at ¶ 22*;* PEX 296 at ¶ 23.  Bruce found that these allegations were not made in good faith.  PEX 296 at ¶ 23.

71.     Among other allegations, Baker alleged that Flatley sexually assaulted a S&W employee.  PEX 293 at ¶ 11; PEX 293, Ex. A at 7; PEX 296, Ex. F at 4; Suraci Tr. at 142-48.  During

a meeting in April 2014, Baker told Suraci that a female co-worker told him that she had been sexually assaulted in her home ten years before.  *Id.*  Baker reported that although the female co-worker did not tell him who assaulted her, he assumed that it was Flatley because she had recently told Baker that she did not like Flatley.  Suraci Tr. 142-48.  A few days later, when asked to disclose the identity of the co-worker for the investigation, Baker refused, but agreed to speak with her to confirm the allegation was about Flatley.  *Id.*  Baker reported back that the co-worker told him that Flatley had not assaulted her.  *Id.*  Only then did Baker retract the allegation.  *Id.*  Suraci relayed this accusation to other members of the HR team, including Bruce, Salvador, and Glica.  *Id.* at 144.  They were deeply troubled that Baker was willing would make such a serious and hurtful accusation based on this kind of assumption.  PEX 296 at ¶ 22; PEX 293 at ¶ 11.

72.    Baker also alleged, without any factual basis, that Flatley was responsible for the death of his fiancée nearly 20 years before.  Suraci Tr. at 150-51; PEX 296, Ex. F at 4; PEX 293 at ¶ 12 & Ex. A at 7.  Baker claimed that Flatley's fiancée, who also worked at S&W at the time, was killed with Flatley's firearm.  Suraci Tr. at 150-51; PEX 296, Ex. F at 4; PEX 293 at ¶ 12; PEX 293, Ex. A at 7.  When asked for the source of this allegation during Cicero's investigation, Baker said he had heard a rumor that she killed herself shortly after she found out Flatley was having an affair.  PEX 293 at ¶ 12 & Ex. A at 7.  Again, Cicero and the HR team were deeply troubled that Baker would be willing to make this type of accusation based solely on a 20-year-old rumor.  PEX 293 at ¶ 12 & Ex. A at 7.

73.    Bruce concluded that Baker's allegations, coupled with Baker's assertions to her that he wanted Flatley to be "punished," were part of Baker's efforts to "bring down" or otherwise personally attack and harm Flatley.  PEX 296 at ¶ 23.  Bruce debriefed Smith on the concerns the HR team uncovered during their investigation, including the inflammatory allegations Baker made about Flatley.  Smith Tr. at 54-55

74.    Baker's interference coupled with his increasingly reckless and threatening behavior

and accusations caused concern for Smith and Bruce as Baker had access to sensitive and highly confidential information and worked in a firearm manufacturing facility.  PEX 298 at ¶ 23; PEX 296 at ¶¶ 23-24. Also, Baker's behavior was impeding S&W's ability to conduct the investigations. Consequently, Smith and Bruce decided to place Baker on paid administrative leave until the investigations could be completed.  PEX 298 ¶ at 24; Smith Tr. 55-57.

75.     With respect to his administrative leave from July 2014 until September 2014, Baker testified that he does not know how S&W made the decision to place him on administrative leave. Baker Tr. at 470-71.  Baker also testified that when he was told that he was being placed on administrative leave, the conversation was "pretty short and sweet" and that it was for his "benefit." Baker Tr. at 185.

### *The Investigation Did Not Substantiate Baker's Allegations Concerning Flatley's Treatment of Him*

76.     One of the first allegations the HR team investigated concerning Flatley's alleged mistreatment of Baker was Baker's claim that on April 16, 2014, Flatley deliberately excluded Baker from a meeting.  PEX 296, Ex. F at 1-2.  Baker alleged that when he showed up at 11:15 a.m. (fifteen minutes prior to when he believed the meeting began), Flatley was already in the meeting room conducting another meeting.  *Id.* at 1.  Baker claimed that another employee, Jim Duffy, was also waiting for the meeting to begin and, in frustration, gave up and returned to his office.  *Id.*  Baker alleged that, when Flatley exited the room at or around 11:30 a.m., he asked Flatley when the meeting was beginning and Flatley told him that the meeting had already happened.  *Id.* at 2.

77.     The investigation could not substantiate this claim.  *Id.* at 1-2.  Instead, the investigation revealed that Flatley scheduled the meeting in question through an Outlook calendar invitation from 11:15 am until 11:30 am.  *Id.*  Baker's own calendar confirmed that he had received and accepted the calendar invitation scheduling the meeting for that time.  *Id.*  The investigation also revealed that when Baker arrived late to the open meeting, he did not enter the room.  *Id.*

78.     Moreover, the employee with whom Baker interacted (Duffy) denied Baker's version of events.  *Id.*  Duffy reported during the investigation that he approached Baker, who was standing in the hallway outside of his office for more than ten minutes, to see if Baker needed anything.  *Id.*  When Baker said no, Duffy returned to his office.  Although Flatley told Baker, upon leaving the meeting room, that the meeting was over, Flatley did not penalize Baker for missing this meeting.  *Id.*  Indeed, although Baker viewed this interaction as a major incident between them, Flatley considered the missed meeting to be a minor (and forgettable) incident.  *Id.*

79.     Baker also alleged that he was held to different standards than other Cell Coordinators with regard to the Safety and 5S audit reports.  *Id.* at 2-3.  As noted above, the Safety and 5S compliance audit reports record safety and productivity metrics for each department*.  See supra* at ¶ 25.  Baker complained that, unlike other Cell Coordinators, he was required to meet with Flatley to discuss his Boards daily.  PEX 296, Ex. F at 2.  In addition, he claimed that Flatley modified the numbers on his Boards to make him perform additional work.  *Id.*

80.     HR's investigation concluded that Baker was not treated differently than other Cell Coordinators with respect to their Boards or meetings with Flatley concerning them.  *Id.* at 2-3.  Indeed, other Cell Coordinators reporting during the investigation that Flatley reviewed their Boards daily.  *Id.*  They explained to the HR team that the daily meetings at the Boards were vital to the effective and efficient operation of their respective departments and considered them an important daily coaching opportunity as managers.  *Id.* at 3.

81.     Finally, Baker also alleged during the HR investigation that his February and June 2014 performance evaluations were issued in retaliation for the concerns he raised about Pioneer.  PEX 296 at ¶ 18; PEX 296, Ex. F at 3-4.  Bruce and her team fully investigated Baker's retaliation claims.  *Id.*  They conducted a thorough review of the deficiencies identified in Baker's performance evaluations, and Baker's detailed written rebuttals to those evaluations.  *Id.*  Their investigation found ***no*** evidence

that the numerous, persistent performance issues identified in Baker's performance evaluations and discussed with him throughout his employment with S&W were the result of his allegations about Pioneer.  *Id.*

82.     Indeed, Baker admitted at his deposition that his June 2013 evaluation was not retaliatory.  Baker Tr. at 442.  He further admits that, with respect to the February 2014 interim performance evaluation, he does not have "specific information that [Flatley] knew" about his allegations when the interim performance evaluation was prepared.  *Id.* at 447-48.  Indeed, Baker explained that he had "no way of either knowing that [Flatley] had" any knowledge about his alleged complaints at the time the interim evaluation was prepared.  *Id.* at 448.  Baker also testified that he does not contend that he was subjected to discipline while employed at S&W.  *Id.* at 470.

### Baker Sends a Series of Emails to S&W's CEO

83.     Several days after he was placed on administrative leave, Baker repeatedly reached out by email to James Debney, CEO of S&W.  On July 10, 2014, Baker sent an email to Debney claiming that his confidentiality had been breached during Cicero's and Bruce's investigations.  DEX 41 at 1-2.

84.     On July 16, 2014, Baker sent an email to Debney raising many of the same issues he had already raised with Bruce and Cicero and requesting that Debney "make [him] an offer that allows [him] to stay."  *Id.* at 4-5.

85.     On August 1, 2014, Baker sent an email to Debney, repeating one of his previously conceded allegations against Flatley (the clapping incident) and advancing several new accusations concerning Flatley's conduct.  DEX 41 at 7-8; PEX 293 at ¶ 37 & Ex. A at 8.  In the letter, Baker alleged for the first time that Flatley: (1) threateningly pointed at the co-worker who told Baker about the clapping incident; (2) made an expletive-laden statement to his entire staff that Baker believed was directed at him; and (3) threatened to "cut [Baker's] head off and shit down [his] throat" on the day

that Baker left S&W.  *Id.*  Baker's email was forwarded to Cicero for response.  *Id.*

86.    The first allegation was addressed by Cicero during his investigation and found to be unsubstantiated.  *See supra* at ¶ 62.  Further, Baker readily admitted to Cicero that he had learned that the incident had nothing to do with him.  *Id.*

87.    Baker's new claims concerning Flatley's alleged threatening and obscene behavior were also unsubstantiated.  PEX 293, Ex. A at 7-8.  None of the individuals Flatley identified as having witnessed or heard Flatley's alleged statements supported Baker's allegations.  *Id.*  To the contrary, one "witness" confirmed that he (the witness) was merely repeating well-travelled rumors (likely planted by Baker) and three "witnesses" expressly refuted Baker's claim.  *Id.*

88.    On August 4, 2014, while still on administrative leave, Baker sent another email to Debney called "Choices" referring to choosing between "***death or more death***" and "harm and more harm," and describing employees as "***scum***" and ***"genuflecting butt kissers."***  Baker concluded the email by stating:

> I take no pleasure telling you this but feel you needed to know how ***blatant and arrogant the vermin are. Their alpha dog displays will either caused [sic] you to respond as openly harsh or lose control and respect of the masses.*** These things they may not have been told to you and I feel ***you and I are down to our last few cards***. I would like to hear from you.

PEX 254 (emphasis added).

### *S&W Terminates Baker's Employment*

89.    By early September 2014, it was clear to S&W that (1) Baker's performance was not improving; (2) he was unwilling to accept the feedback and management of his supervisors; (3) employee morale within his Department was at an all-time low; and (4) given his refusal to accept feedback or to acknowledge or address his performance issues, there was no way for Baker to succeed at the Company.  PEX 297 at ¶ 6; PEX 298 at ¶ 27; PEX 296 at ¶ 25.  For these reasons, Smith and Fontaine concluded that S&W had no choice but to terminate Baker's employment.  *Id.*

90.    On September 23, 2014, Bruce sent a letter to Baker informing him of his termination

"effective today."  PEX 296 at ¶ 26; PEX 296, Ex. G.  Bruce's letter explained to Baker that he had "experienced significant ongoing performance deficiencies that were addressed with [him] on numerous occasions, including by written performance appraisals dated February 5, 2014 and June 5, 2014."  *Id.*  The letter went on to inform Baker that, although Flatley had determined in Baker's June 5, 2014 evaluation that Baker was unable to continue as Cell Coordinator for the Cutter Department, "[S&W] deferred any action with respect to [Baker's] employment so that [S&W] could complete the investigation into allegations [he had] made and provide [him] with written summaries of those findings."  *Id.*  Bruce made clear to Baker that S&W's investigation revealed that his unsubstantiated allegations "lacked any reasonable basis in fact and give rise to the conclusion that [his] allegations were not made in good faith."  *Id.*

91.    With respect to his termination, Baker testified that he does not know who made the decision to terminate him.  Baker Tr. at 474.  He also testified that as a result, he does not know who retaliated against him with respect his termination.  *Id.*  Baker further testified that other than the September 23, 2014 termination letter he does know why he was terminated.

92.    Baker also testified that he does not know specific laws and that he does not know if S&W was engaged in mail, wire, bank or securities fraud.  Baker Tr. at 522-23.  Baker also testified that he does not know for certain if he ever told anyone at S&W that it had engaged in mail, wire, bank, or securities fraud.  *Id.* at 523-24.  Baker further testified that he does not know if anyone at S&W violated any laws against shareholders with respect to the conduct he complained about.  *Id.* at 524.