**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**WESTERN DIVISION**

| | |
|---|---|
| EARL DONALD BAKER, | Case No. 3:19-cv-30008-MGM |
| Plaintiff, | |
| vs. | Honorable Mark G. Mastroianni |
| SMITH & WESSON CORP., | |
| Defendant. | |

**PLAINTIFF EARL BAKER'S RESPONSE IN OPPOSITION TO DEFENDANT SMITH**
**& WESSON CORP.'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Earl D. Baker, in Response to Defendant's Motion for Summary Judgment states as follows:

**STATEMENT OF FACTS**

Plaintiff has filed a separate response to Defendant's Statement of Undisputed Facts. Plaintiff asserts additional facts relevant to Defendant's Motion for Summary Judgment below.

Baker began work for S&W in February, 2013. (DKT # 17-1, ¶10). Soon after he began working for S&W, Baker began to notice that a large number of contracts were awarded to one particular vendor, Pioneer Tool and Supply ("Pioneer"). When he started looking more closely at the Pioneer contracts, he noticed that they were not necessarily the best-priced, nor were they properly fulfilled. Baker raised these issues on several occasions with his supervisor, Larry Flatley. (*Id*., ¶¶ 11-13). In addition, during his first week of work, Baker was told by a representative from MSC, another S&W vendor and competitor of Pioneer's, that MSC had previously "blown the whistle" to S&W that Pioneer was billing for eight days a week, and that

after that incident, S&W had pulled most of its work from MSC. (Deposition of Earl Baker, Plaintiff's Response Exhibit 1, p. 217).

In May of 2013, Baker was asked to attend the Pioneer Tool Booth an at industry conference as a S&W representative. While there, he was asked to put his business card into a drawing by Pioneer Tool. Flatley told Baker at the barbeque "come back tomorrow, you'll be the highest ranking employee and you'll be sure to win," but Baker thought he was joking. (Plaintiff's Response Exhibit 1, p. 106; Cicero, p. 211). Baker was uncomfortable entering the drawing, so he declined. (DKT #17-1, ¶14). This was Flatley's first real indication that Baker is a "boy scout" with a strong personality. Baker later was confronted by a Pioneer employee asking why he had not entered the raffle. (DKT # 17-1, ¶ 14). Baker found this odd because the only way the employee would have known Baker had not entered was if the Pioneer employee had looked through the entries. (Baker, p. 319). Days later, a Pioneer driver came to Baker's office and held out an iPad as if to hand it to Baker and said "Larry Flatley won something." (Baker, p. 106). In Baker's mind, this validated Flatley's claim that the raffle was "rigged" and would be won by the highest-ranking S&W employee at the barbeque. (Baker, p. 330).

Baker had a performance review on June 25, 2013, at which he received a "Meets Expectations" rating in all categories and an overall performance rating of "Meets Expectations." However, during the summer of 2013, the relationship between Flatley and Baker began to significantly deteriorate. In fact, Flatley was so antagonistic towards Baker that Baker felt that he had to go to human resources ("HR") to get some help with the situation. (Plaintiff's Response Exhibit 1, p. 105. Baker initially met with HR representative Anne Glica, but Glica's supervisor, Kathy Salvador, soon got involved. Baker reported to Glica and Salvador that he believed Flatley's treatment of him and Baker's not receiving a cost of living raise that other employees received

resulted from Flatley's "growing animosity" towards Baker because Baker opposed Flatley over some issues with Pioneer. (*Id.*). Baker relayed the raffle incident and that he believed that Pioneer was given unwarranted preference over other vendors, that there were charges that should have been billed, but were not, and that there were refunds that S&W should have received from Pioneer, but did not. (*Id.*) Specific examples of Baker's reports to HR that summer are set forth in Plaintiff's Response to Defendant's Statement of Undisputed Facts ("RSUF"), ¶ 47.

On or about February 4, 2014, Baker received an email from Ted Hebert of Pioneer, questioning the amount of work that had been awarded to MSC, another vendor and competitor of Pioneer. (DKT #17-1, ¶ 19). Baker responded that same day stating that the email was inappropriate and that Pioneer should not question the work that was given to other contractors. (*Id.*) One day after Baker communicated to Pioneer of its inappropriate intrusion into Smith & Wesson's business with Pioneer's competition, Baker was given an out-of-cycle review out of the blue. (*Id.*, ¶ 20; RSUF, ¶ 61). This was Baker's first notice that Flatley was in any way dissatisfied with his performance. (DKT #17-1, ¶ 21; FSUF, ¶ 19). Along with the review, Flatley also gave Baker a list of seminars and classes to attend and then said, "you are not going to want to do this shit, so you might just want to quit and save yourself the trouble." (DKT # 17-1, ¶ 22). Baker immediately began taking the classes that had been recommended and also prepared detailed Rebuttals to the review. (*Id.*, ¶ 23; Plaintiff's Response Exhibit 11, Ex. D; Plaintiff's Response Exhibit 12; Plaintiff's Response Exhibit 13).

On or about February 17, 2014, Ed Suraci ("Suraci"), who was employed in HR as the Director of Organizational Effectiveness, was asked by Dan Fontaine, the Plant Manager, to intervene in the issues between Flatley and Baker. (Plaintiff's Response Exhibit 46, p. 1). Suraci noted that his investigation time "became split between the 2 issues of [Baker's] job performance

and providing documentation on the Pioneer relationship." (*Id.*) Suraci determined, and communicated to Flatley on March 10, 2014, that "If [he] was looking to make a case to remove Earl from his position, I [Suraci] had not seen any evidence to support that conclusion …" (*Id.*) Suraci later shared with Fontaine that "there was clearly not enough supporting documentation to remover (sic) Earl from his position." Suraci noted that "Dan [Fontaine] agreed, and stated that he was holding Larry [Flatley] at least 50% accountable for the situation." (*Id.*, p. 2). Also, in March, Suraci also noted that "what is also emerging as more hearsay and assumption that fact is direct involvement of some of our purchasing people. Not enough information to prove collusion, but definitely ineptness." (Plaintiff's Response Exhibit 27).

By April 11, 2014, Suraci was of the opinion that "Larry [Flatley] [was] acting subversively to undermine Earl's position." (Plaintiff's Response Exhibit 46, p. 3). Further, while Fontaine was "coming" to the conclusion that Baker was "losing control of the department," Suraci "debated" that conclusion with Fontaine "on the question of how much of that is due to Larry?" (Plaintiff's Response Exhibit 46, p. 3). On April 13, 2014, in an email to Rob Cicero, S&W's general counsel, Suraci noted that he had advised Fontaine that "with the Pioneer investigation currently going on, we cannot be putting Earl under undue pressure," but that "this is what I think Larry [Flatley] is doing." (Plaintiff's Response Exhibit 47).

Contrary to S&W's ultimate termination of Baker, in April of 2014, Suraci's conclusion was not that Plaintiff should be fired, but rather that he should be moved away from Flatley, stating: "Given [a S&W engineer's] confirmation of Earl's trade knowledge and experience, might we consider assigning Earl to the slide quality project for 3-6 months?" (Plaintiff's Response Exhibit 48). Suraci was also "looking into" moving [Baker] under Tom Walsh. (Plaintiff's Response Exhibit 49; Deposition of Ed Suraci, Plaintiff's Response Exhibit 28, p. 115).

By the end of March, Suraci believed that the issues Baker was raising should be brought to the attention of Cicero. (Plaintiff's Response Exhibit 1, p. 334; Deposition of Robert Cicero, Plaintiff's Response Exhibit 22, p. 28). Thereafter, Suraci continued to investigate the "HR" portion of Earl's reports while Cicero took over the Baker's "concerns about improper and unethical conduct." (Plaintiff's Response Exhibit 28, p. 126; Plaintiff's Response Exhibit 22, p. 43-44). Baker continued to provide reports and information to Suraci and Cicero as they requested. Baker reported instances where it appeared that confidential bidding information provided by one vendor had been shared with other vendors, examples of "financial and accounting improprieties," examples of Pioneer overcharging S&W, including reselling a tool that had been originally made by S&W back to S&W for a huge profit, and issues with the lack of monitoring of the inventory in "Crib 99." (See, RSUF, ¶ 48). Baker also reported instances of employees receiving inappropriate gifts. (RSUF, ¶ 50). While S&W portrays Baker's reports in a negative fashion and intimates he was continually making reports in an effort to deflect from his performance issues, Baker was actually reporting issues and providing "evidence" in support of his claims in response to requests from Suraci and Cicero.

Further, throughout the investigation, Baker was dissuaded by S&W HR representatives from seeking outside counsel regarding his treatment by S&W, and Baker's statements that he may seek outside counsel were held against him. In an April 18 email from Suraci to Salvador, Suraci notes that he "cautioned [Baker] about continuing to suggest that [Baker] would seek outside counsel." Salvador responded that "he really shouldn't keep talking about seeking outside counsel. That doesn't help his cause internally." Suraci responded "Agree and agree. I'm gonna have a heart-to-heart with him when I get back." (Plaintiff's Response Exhibit 50).

Additionally, Baker was repeatedly harassed by Defendant and its employees. From the time of Baker's out-or cycle review until the day he was put on administrative leave, his office was broken into at least four times. After the first break in, Baker discovered that his journal containing his notes regarding Flatley and his computer passwords was missing. Also, on one occasion, S&W security found a thumb drive inserted into the back of Baker's computer. (DKT #17-1, ¶36; Plaintiff's Response Exhibit 51).

## LEGAL ARGUMENT

S&W's summary judgment motion regarding Baker's SOX claim rests upon it's assertion that: 1) the only thing that Baker complained about was "kickbacks" from one particular vendor, Pioneer, and that because kickbacks are not prohibited by any of the federal statutes enumerated in Section 806, he has not engaged in protected behavior; 2) that Baker did not have the requisite education and experience to form an objectively reasonable belief that the conduct he reported constituted securities fraud;[1] (3) that because Baker admitted that he did not "know the laws" or the "legal implications" of the laws, he could not have a subjective belief that his reports fell within SOX; (4) that Baker cannot show the requisite causation between his reports and the adverse employments actions against him; and (5) that S&W has established that it would have taken the same adverse employment actions even without the protected activity. As Baker will demonstrate, S&W's arguments fail both factually and legally and it is therefore not entitled to summary judgment. Similarly, with respect to Baker's public policy claim, because Baker has alleged that his reports and S&W's conduct go beyond the conduct addressed in SOX, his public policy claim must also be allowed to proceed.

---

[1] As explained in more detail below, Baker has not premised his SOX claim on alleged shareholder fraud. Rather, his complaint makes clear that he believed, and reported, that S&W's conduct violated federal securities laws and regulations and company rules and policies. (DKT #1, ¶ 91).

### A. <u>Summary Judgment Standard</u>

At the summary judgment stage, the trial court examines the entire record "in the light most flattering to the non-movant and indulges all reasonable inferences in that party's favor. Only if the record, viewed in the manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." *Cadle Company v. Hayes*, 116 F.3d 957 at 959-60 (1st Cir. 1997); *see also Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000); *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)(*quoti*ng *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986)); *see also Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-555, 110 S. Ct. 1331 108 L.Ed. 2d 504 (1990); *Continental Ore Co. V. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, n. 6, 82 S.Ct. 1404, 8 L.Ed. 2d 777 (1962).

Further, "at the summary judgment stage, the nonmoving party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in genuine dispute accepted, and all internal conflicts in the evidence resolved favorably to him." *Blanchard v. Peerless Ins. Co.*, 958 F.2d 483, 489 (1ˢᵗ Cir. 1992). "Even when a plaintiff has relied exclusively on his own testimony, courts have denied summary judgment, as long as the plaintiff's 'testimony was not contradictory or rife with inconsistencies such that it was facially impossible.'" *Perez v. Progenics Pharms., Inc.*, 965 F.Supp.2d 353, 362 (S.D.N.Y. 2013) *citing Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010). *See also*, *Bridgewater v. Taylor*, 832

F.Supp. 2d 337, 345 (S.D.N.Y. 2011) (denying summary judgment were defendant's evidence consisted "solely of his own testimony," but this testimony offered "a plausible alternate version of events.")  If a court is presented with two competing narratives, it cannot decide the issue on summary judgment as "the court would have to evaluate the credibility of [the parties], a task outside the court's domain at the summary judgment stage."  *Perez*, 985 F.Supp.2d at 368.

### B. Baker's SOX Claim

As noted by S&W, in order to establish a *prima facie* case under SOX, a plaintiff has the burden of proving that (1) the employee engaged in a protected activity; (2) the employer knew of the protected activity; (3) the employee suffered an adverse action; and (4) the circumstances were sufficient to raise the inference that the protected activity was a contributing factor in the adverse action.  *Day v. Staples, Inc.*, 555 F.3d 42, 53 (1st Cir. 2009).  If the employer establishes a *prima facie* case, then the burden shifts to the employer to demonstrate, by clear and convincing evidence, that the employer would have taken the same personnel action even absent the protected activity. S&W asserts that it should be granted summary judgment because Baker cannot satisfy his burden of proving elements (1), (2), or (4) and that even if Baker could make such a showing, S&W has sufficiently demonstrated that it would have taken adverse action against Baker anyway.

#### 1. Limiting Baker's Claims to the OSHA Complaint

Smith & Wesson's attempt to limit the reports that Plaintiff made during his employment to only "kickbacks" is spurious.  Mr. Baker was deposed in this matter for over fifteen hours during which he testified to numerous discussions and referenced email after email in which he pointed out the improper sharing of confidential bidding information, accounting discrepancies and internal control violations, and S&W employees receiving improper gifts to Flatley, his supervisor, various S&W human resources employees, Cicero, and other senior management employees.

While this litigation has been pending for over six years, Baker was not represented by counsel for approximately one year before current counsel filed its appearance. While unrepresented, Baker engaged, to the best of his ability, in written discovery with S&W, but no oral discovery was conducted. After current counsel removed the action to federal court in Illinois (where Baker resided at the time) in June of 2018, S&W filed a motion to transfer to the current court. That motion was not decided until January of 2019. The parties then engaged in additional written discovery and began taking oral depositions in July of 2020. Baker himself was not first deposed until August 14, 2020. S&W's implication that Baker had ample opportunity to fully describe all of his reports to S&W over the course of this litigation is simply not correct. [2]

Further, S&W argues that Baker is limited to the claims raised in his OSHA filing. While it is true that a plaintiff cannot raise new "claims" that were not raised in the OSHA proceeding, Baker has not asserted any new "claims" in this federal action. The OSHA filing complained of unlawful retaliation against Baker under SOX and that is exactly what the current action claims. S&W seems to be using the notion that new claims cannot be raised to attempt to limit the facts that this Court can consider in determining S&W's summary judgment motion. In that regard, courts have noted that the relevant inquiry is what was communicated to the employer, not what was in the OSHA complaint. *Portes v. Wyeth Pharms., Inc.*, 2007 U.S.Dist. LEXIS 60824, *11 (S.D.N.Y. 2007); *Platone v. FLYi, Inc.*, 2006 DOLSOX LEXIS 105, *34-35 (September 29, 2006).

---

[2] S&W also calls into question Baker's discovery responses and implies that Baker did not comply with an order from the Court. Again, this is simply not true. As noted in S&W's Memorandum (p. 10, fn. 3), S&W requested all communications in which Baker "communicated allegations of fraud of any type of the violation of any Securities and Exchange Commission Rules of Regulations." Baker objected to that request noting that a SOX plaintiff, in their communications to their employer, does not have to specifically identify specific code sections or even be aware that any reported conduct falls within the SOX statute. Whether a particular statement made by Baker to an agent or employee of S&W potentially falls within SOX is a legal question, and as such, seeks the metal impressions of Baker's counsel and is protected from discovery by the work product doctrine. This Court ultimately ruled that any such communications which are not "privileged or protected" should be provided. Because the identification of any such communications was protected by the work product privilege, no additional communications were identified.

Further, the "four protected activities" S&W represents were "alleged" during the OSHA proceeding were broad enough to include all of Baker's interactions between he and S&W personnel. The "protected activities" were not isolated events, but rather spanned months and involved ongoing communications between Baker and S&W HR, legal, and management employees. For example, as explained in more detail below, while Baker initially met with Suraci in February of 2014, Baker's interaction with Suraci regarding the various issues Baker raised went on for months as Baker continued to provide information to Suraci as Suraci requested it during his investigation. Similarly, when Suraci determined that Cicero should get involved, Baker met with Cicero, but then continued to provide follow up information and details as requested. Thus, the impression that S&W tries to convey that Baker's communications with the relevant S&W employees were isolated communications that can be evaluated independently is simply not true. This Court can, and should, consider anything that was "communicated to the employer" when deciding this summary judgment motion.

## 2. <u>Baker Provided Protected Information to S&W</u>

S&W claims that Baker's submission was not that of protected information. First, S&W implies that all such submissions must involve fraud. Second, S&W attempts to limit Baker's reporting to alleged "kickbacks" which S&W asserts are not prohibited by SOX. S&W's argument is spurious.

S&W cites to *Day v. Staples, Inc.*, *supra* for its assertion that because Baker's reports did not allege fraud, such reports do not qualify as protected information. The plaintiff in *Day* sued his former employer alleging that he had been fired for "reporting fraud" and complaining that the employer had violated "federal law relating to fraud against shareholders." *Id*. at 42, 54. As noted above, unlike the plaintiff in *Day*, Baker does not premise his claim on any reports of shareholder

fraud.  Rather, Baker expressly alleged that his reports related to violation of federal securities laws and regulations and violation of company rules and policies.  Thus, the discussion of fraud and the elements of a fraud claim in *Day* is not applicable to Baker's claim.

Further, as implicitly recognized by S&W, *Day* does not stand for the proposition that fraud is necessarily required.  In discussing the types of communications that are protected, the court noted that only communications that relate to "three broad categories" are included, specifically, "(1) a violation of a specified federal criminal fraud statutes …; (2) a violation of any rule or regulation of the SEC; and/or (3) a violation of any provision of federal law relating to fraud against shareholders."  *Id*.  The court went on to state that "[t]he first and third categories share a common denominator:  that the conduct involves 'fraud," and *many* of the second category claims (violations of SEC rules or regulations) will also involve fraud."  *Id*. at 55.  (Emphasis added.) The fact that "many" SEC rule violation cases will involve fraud is a far cry from requiring that *every* such communication involve fraud.

In fact, several cases have held that reports of violations of SEC regulations do not have to contain allegations of fraud.  *Feldman v. Law Enforcement Assocs. Corp*, 779 F.Supp.2d 472, 492 (E.D.N.C. 2011) ("Disclosures made by employees concerning reasonably perceived violations of SEC rules governing internal control standards can constitute protected conduct under SOX."); *Smith v. Corning, Inc.*, 496 F.Supp.2d 244, 248-50 (W.D.N.Y. 2007) (the disclosure that a company was implementing a financial reporting program that was not GAAP-compliant was protected under SOX); *Leznik v. Nektar Therapeutics, Inc.*, 2007 DOLSOX LEXIS 96 (Dept. of Labor SAROX Nov. 16, 2007) ("employees disclosures about efforts to circumvent … internal controls are protected activities, because they address violations of SEC rules").

The employer made the same argument S&W makes here in *Yang v. Navigators Group Inc.*, 18 F.Supp.3d 519 (S.D.N.Y. 2014). There, the court, noting that *Day* does not support such an argument, summarily dismissed it stating: "Defendant argues that the SEC rules and regulations purportedly violated must be 'regulations prohibiting fraud.' No Second Circuit case has so held. The First Circuit has noted that 'many … violations of SEC rules … will also involve fraud' but did not hold that only those rules involving fraud are contemplated by §1514A. [citing *Day*]. As the statute plainly contemplates reporting of violations of 'any rule or regulation,' the Court declines to limit the scope of the statute to only SEC rules and regulations prohibiting fraud." *Id*. at 528, fn. 2. As such, a plaintiff's failure to communicate instances of "fraud," in and of itself, is not a basis for summary judgment.

Further, numerous cases have explained that the employee "does not have to expressly state that the company is engaged in illegal conduct, to satisfy section 806." *Sequeira v. KB Home*, 716 F.Supp.2d at 554. As long as the employer understands "the serious nature" of the employee's allegations, the communications are sufficient. *Id*.

The facts in *Collins v. Beazer Homes USA, Inc.*, 334 F.Supp.2d 1365 (N.D.Ga. 2004), closely match those at issue here. In *Collins*, the plaintiff was hired as Director of Marketing for one of the company's divisions. Soon after she started, the plaintiff changed to a new advertising agency because she was not happy with the original agency's services. Weeks later, the plaintiff met with the vice president of sales and marketing for the parent company. During that meeting she reported that "she did not like how they were paying the [original] agency and did not like how marketing costs were being categorized." *Id*. at 1369. The VP asked the plaintiff whether there were other incidents where the plaintiff felt that invoices were not being properly categorized and

the plaintiff indicated that there were. The VP stated that the plaintiff was raising "serious allegations" and that she needed to raise the issues with human resources.

The plaintiff subsequently met with the VP of Human Resources for the parent company. After the meeting, the VP of HR began to "investigate the plaintiff's claims and spoke to various company officials," seeking to "determine whether the issues that [the plaintiff] had raised were merely business issues or whether something criminal, against the law or against company policy was taking place." *Id*.

With respect to the termination of the advertising agency, the plaintiff stated that she had been told by another employee that the division president had told the employee "to pay [the original advertising agency] regardless of the amount because [the division president] and [the owner of the advertising agency] were friends." The plaintiff relayed this information to the VP of Sales and also reported that "she suspected kickbacks in lumber purchases and that marketing costs were not being properly broken down in order to hide information." *Id*. at 1370. The plaintiff also sent an email to the CEO of the parent company stating that a "cover-up/corruption" existed, but did not give any details. *Id*.

The company asserted that the plaintiff had not engaged in any protected activity "because she never specifically alleged securities or accounting fraud and because her complaints were too vague to constitute protected activity." *Id*. at 1376. In response, the plaintiff pointed to four specific disclosures that she had made which she asserted were within SOX protection: (1) she alleged that the division was knowingly overpaying invoices to the original advertising agency; (2) the division was using the original advertising agency because of a personal relationship between management and the owner of the agency; (3) another employee was violating the division's commission scheme by overpaying sales agents who were the employee's personal

friends; and (4) there were kickbacks involving the purchase of lumber.  The plaintiff contended that these disclosures were protected because they related to "attempts to circumvent the company's system of internal accounting contracts."  *Id*. at 1377.

The court found that the plaintiff's claims were sufficient to survive summary judgment. First, the court recognized that the plaintiff's complaints did not:

> rise to the level of the complaints that were raised by Sherron Watkins at Enron.  However, there mere fact that the severity or specificity of her complaints does not rise to the level of action that would spur Congress to draft legislation does not mean that the legislation it did draft was not meant to protect her.  In short, if Congress had intended to limit the protection of Sarbanes-Oxley to accountants, or to have required complainants to specifically identify the code section that they believe was being violated, it could have done so.  It did not.

*Id*.

Further, with respect to the company's argument that the plaintiff's complaints were too vague, the court noted that "the individuals to whom they were addressed understood the serious nature of Plaintiff's allegations," noting that the VP of Sales "understood Plaintiff's complaints regarding the payment of invoices as a 'serious allegation' that raised questions about improper accounting."  Further, after meeting with the plaintiff, the VP of HR "began to investigate Plaintiff's claims to determine whether there was something that may be criminal, against the law or against company policy, including violations of the company's Standards of Corporate Conduct."  *Id*.  While to court agreed that "the connection of Plaintiff's complaints to the substantive law protected in Sarbanes-Oxley is less than direct," "plaintiff's allegations detailed violations of the company's internal accounting controls in favor of preferential treatment based on personal relationships."  *Id*. at 1377-78.

The court also found that even the company's ultimate determination that some of the allegations were without merit did "not change the fact that they understood the nature and type of

allegations that she made and that those allegations were within the zone of protection afforded by Sarbanes-Oxley." *Id*. at 1378. "Because reasonable jurors could find by a preponderance of the evidence that Plaintiff engaged in protected activity," the court determined that the company was not entitled to judgment as a matter of law. *Id.*

The court in *Sequeira v. KB Homes*, 716 F.Supp.2d 539 (S.D.Tex. 2009), also addressed alleged violations of company internal policies. There, the plaintiff was hired by the defendants as a Senior Marketing Manager. Soon after his arrival, the plaintiff terminated a contract with a company service provider because the plaintiff "came to believe that [the contractor] was submitting false invoices because he had a personal relationship with the [company] employee who oversaw his contract. Plaintiff believed that [the contractor's] invoices lacked the kind of detail that would be expected in a contractual relationship." *Id*. at 543. While the plaintiff "had no specific knowledge that [the contractor] was submitting fraudulent invoices; at the very least, … he believed that [the contractor] was violating his contract and that the potential for fraud existed." *Id*. The plaintiff's concerns about the contractor motivated his later refusal to initial certain items on a spreadsheet that was generated by the company's regional accounting department and was used every month "to ensure that [company] policies had been followed." *Id*. at 544. At a subsequent meeting with the company's president, the plaintiff also reported his concerns about the marketing department's expenses, including payments to an advertising vendor who charged $50 for soap dishes, that the company did not have a proper method of tracking vendor expenditures or contracts, and the lack of "internal controls." *Id*. at 546.

In discussing the plaintiff's protected activity, the company argued that the plaintiff's complaints were not sufficiently related to securities law violations to constitute protected activity. However, the court disagreed, stating:

> Given the context of Plaintiff's complaints, a reasonable jury could find that [the company president and vice president] understood the serious nature of Plaintiff's allegations. He identified specific behavior regarding vendor contracts, inventory controls, and the SOX spreadsheet. He expressed concern to [the company president] that the company did not have adequate controls in these areas. While he did not use the words "internal controls" in his conversation with [the company vice president], he warned him that they "do not know what we do not know" and that the situation with [the contractor] was "just the tip of the ice berg."

*Id*. at 554.

The company further argued that there was no protected speech because the plaintiff "only reported non-compliance with company procedures, which is not protected behavior under the statute." *Id*. The court, however, again disagreed noting that the plaintiff "believes, rightly so, that there is a law requiring companies to maintain internal accounting controls. He believes that [the company] violated this law by failing to follow its own procedures regarding vendor contracts and inventory control." *Id*. As such, the court found that the plaintiff had engaged in protected behavior.

As explained in more detail in Baker's Response to S&W's Statement of Undisputed Facts (¶¶ 47, 48, 50), Baker's reports were not limited to merely "kickbacks," but rather included instances of poor accounting and violation of internal controls and company policies. Sections 13(b)(2) and (5) of the 1934 Securities Exchange Act state:

> (2) Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall— (A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that— (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences; and (C) notwithstanding any other provision of law,

pay the allocable share of such issuer of a reasonable annual accounting support fee or fees, determined in accordance with section 7219 of this title. ****

(5) No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2).

Efforts to circumvent internal accounting controls have been recognized to constitute a violation of the 1934 Exchange Act, 15 U.S.C. §78m(b)(5). *Zulfer v. Playboy Enterprises, Inc.*, 2013 U.S.Dist. LEXIS 199070, *18 (C.D.Ca. 2013). And "Federal courts regularly hold that disclosure of a perceived violation of 15 U.S.C. §78m(b)(5) is SOX-protected as a disclosure related to a violation of a 'rule or regulation of the SEC.'" *Id. citing Collins*, 334 F.Supp.2d at 1377 (plaintiff's disclosures were protected by SOX because "they allege[d] attempts to circumvent the company's system of internal accounting controls and therefore state[d] a violation of Section 13 of the Exchange Act"), *and Sequeira*, 716 F.Supp.2d at 551-54 (plaintiff reasonably believed that there was a legal requirement that publicly traded companies should have effective internal controls in place, and his disclosure relating to company's failure to maintain internal controls was SOX-protected").

Baker reported to HR and the General Counsel that management employees received large bribes, including television sets, from a vendor which Baker believed, rightly so, were in violation of S&W policy.[3] He also reported that there were several instances where S&W was either grossly overpaying for tools or were purchasing items which they did not need to purchase because of years' worth of current inventory. Baker reported instances where Pioneer appeared to have been

---

[3] S&W policy states that "receipt of improper payments, including but not limited to cash payments, material gifts, transportation, meals, entertainment and lodging whose purpose it is to unfairly influence the competitive balance that exists between the suppliers is prohibited." (Plaintiff's Response Exhibit 24, p. 6-7).

given bid information from other vendors so it could undercut those bids. Baker believed that this violated company policy.

Baker also reported that S&W did not adequately monitor the autocrib billing, resulting in significant overcharges, including an instance where a vendor was charging for eight days a week. As discussed in more detail below, S&W's own internal auditors recognized that the autocrib system "Needs Improvement" which signified that "one or more significant findings or weaknesses in internal control were noted …. These findings indicate that serious errors or fraud may occur and not be detected on a timely basis and that immediate action should be taken to correct the control weaknesses identified." (Plaintiff's Response Exhibit 44.)

Further, similar to *Collins*, Baker initially brought his complaints of improper bribes and gifts being given to Flatley and Flatley's preferential treatment towards Pioneer tool, to Glica, and soon after, Salvador, Glica's supervisor also became involved. (Baker, p. 110). Ultimately, Suraci, was brought in and conducted an investigation. Suraci testified that he took Baker's allegations "seriously." (Plaintiff's Response Exhibit 28, p. 270). At the end of March, 2014, Suraci determined that Cicero should get involved. (Plaintiff's Response Exhibit 1, p. 334, Plaintiff's Response Exhibit 22, p. 28). From that point on, it was Cicero's responsibility to investigate any allegations related to "business practices," "business operations," or "vendor relationships." (Plaintiff's Response Exhibit 28, p. 61). Given the "nature" of Baker's concerns, Cicero took it seriously and began an investigation. (Plaintiff's Response Exhibit 22, p. 29). As part of that investigation, Cicero investigated gifts that were given to employees to determine if the gifts were intended to unduly influence the employees. (Plaintiff's Response Exhibit 22, p. 73-76). Cicero also investigated allegations of double-billing by Pioneer. (Plaintiff's Response Exhibit 22, p., 77).

Based on Baker's actual reports and S&W's response and investigation into those reports, Baker clearly communicated protected information to S&W, and therefore, engaged in protected activity.  S&W is not entitled to summary judgment on this basis.

3.  **Baker's Reasonable Belief that S&W's Conduct Violated SOX**

SOX provides protection to an employee which the employee "reasonably believes" constitutes a violation of one of the three categories of conduct.  "Reasonable belief" has been established to include both a subjecting and objective component.  *Day*, 555 F.3d at 54.

a.  **Baker's Complaints Were Objectively Reasonable**

With respect to its argument that Baker cannot have an objectively reasonable belief that his reports regarding inadequate accounting, violation of internal controls and policies, large bribes to management and other employees, and other issues violated one of the categories contained in SOX, S&W, citing *Day*, asserts that Baker must have had an "objectively reasonable" belief that the company intentionally misrepresented or omitted certain material facts to investors.  Again, however, this argument is inapplicable to the current facts.  In *Day*, the question was whether the plaintiff objectively believed that there had been "shareholder fraud," and, as such, the court determined that the plaintiff "must have an objectively reasonable belief that the company intentionally misrepresented or omitted certain facts to investors, which were material and which risked loss."  In contrast, here, Baker has alleged that his communications with his superiors, S&W HR, and S&W legal conveyed allegation of violations of federal securities laws and regulations. As discussed above, allegations involving violation of SEC rules or regulations does not have to allege, or even involve, fraud.  As such, S&W's discussion of *Day* and its requirements of "materiality, scienter, loss, and a causal connection," and its assertion that Baker's reports were

not objectively reasonable because "they did not remotely 'approximate the basic elements of a claim of securities fraud'" are not relevant or applicable to Baker's claim.[4]

Generally, "in assessing the reasonableness of a plaintiff's belief regarding the illegality of the particular conduct at issue, courts look to the basis of the knowledge available to a reasonable person in the circumstances with the employee's training and experience. It is sufficient for a plaintiff to show that she reasonably believed, based on the knowledge available to her, considering her training and circumstances, that her employer was violating the applicable federal law." *Perez v. Progenics Pharms., Inc.*, 965 F.Supp.2d 353, 364 (S.D.N.Y. 2013) (Internal citations and quotations omitted.) The objective reasonableness of a plaintiff's belief is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee. *Sequeira v. KB Home*, 716 F.Supp.2d 539, 550 (S.D.Tex. 2009). "The objective reasonableness of an employee's belief therefore cannot be decided as a matter of law if there is a genuine issue of material fact, meaning that reasonable minds could disagree on the issue." *Id.* (Internal citations and quotations omitted.)

S&W asserts that Baker's belief was not objectively reasonable because "Baker did not possess the level of training or education to understand the complexities of SOX." (Memorandum at p. 14.) However, courts are in agreement that no particular expertise is required for a plaintiff to have an objectively reasonable belief. *Sequeira*, 716 F.Supp.2d at 539; *Parexel Int'l Corp. v. Feliciano*, 2008 U.S. Dist. LEXIS 98195 (E.D. Pa. 2008).[5] Further, as long as that belief is

---

[4] Other cases have called into question the *Day* court's determination that such allegations are required. *See, for example, Sylvester*, 2001 DOLSOX LEXIS 39 at *53 ("[A] complainant can engage in protected activity under Section 806 even if he or she fails to allege or prove materiality, scienter, reliance, economic loss, or causation.")

[5] The court in *Day* also noted that the comments in the final regulations implementing the SOX whistleblower provisions, the DOL stated it: "[B]elieve[d] that it would be overly restrictive to require a complaint to include detailed analysis when the purpose of the complaint is to trigger an investigation to determine whether evidence of discrimination exists …. Although the [SOX] complainant often is highly educated, not all employees have the sophistication or legal expertise to specifically aver the elements of a prima facie case and/or supply evidence in support thereof." *Day*, 555 F.3d at 55, fn. 11).

reasonable, it does not matter if the conduct alleged is actually a violation of a rule or law or not. *Perez v. Progenics Pharms., Inc.*, 965 F.Wupp.2d 353 (S.D.N.Y. 2013).

In *Sequeira*, *supra*, the plaintiff admitted that he had no formal training on either "internal controls" or Sarbanes-Oxley. *Id*. at 551. However, the court was "unable to find, as a matter of law, that Plaintiff's belief that [the company] was intentionally engaging in activity that amounted to shareholder fraud is objectively unreasonable" as the statute "does not require, as Defendants suggest, that the whistleblower have a specific expertise." *Id*. Further, "an employee's reasonable but mistaken belief that the employer violated a federal law relating to securities fraud is protected." *Id*. The court found that while the plaintiff "is not an accounting expert, [] a reasonable jury could find that his experience was sufficient, in this situation, for him to identify areas where he believed the company was violating securities laws related to shareholder fraud." *Id*. The court distinguished *Day* in which the plaintiff had just graduated college, who had no relevant work experience, and who did not have the "knowledge, training, and experience to harbor a reasonable belief of fraud in the seventh week of his employment." *Id*. at 552.

Similarly, in *Perez*, the plaintiff had a Ph.D. and a master's degree in organic chemistry and was employed with the defendant as a Senior Manager of Pharmaceutical Chemistry. *Id*. at 353. During the plaintiff's employment, the defendant issued a press release regarding the results of a Phase 2 trial for one of its experimental drugs in which the CEO stated that he was "pleased with the preliminary findings." *Id*. at 358. The plaintiff subsequently reported to several senior officers that he believed that the defendant was "committing fraud against shareholders since representations made to the public were not consistent with the actual results of the relevant clinical trial" and that the plaintiff thought this misrepresentation in the press release was "illegal." *Id*. at 259.

In evaluating the objecting reasonableness of the plaintiff's belief, the court noted that "in light of Plaintiff's training, education, and experience, a reasonable jury could find that it was objectively reasonable for Plaintiff to rely on conversations with colleagues, his review of [company reports], as well as his own work for his belief that the [press release] … was 'misleading] and not 'a true reflection of what [was] being discussed behind closed doors." *Id*. at 365.

Here, S&W mistakenly likens the facts regarding Baker's education and experience to those of the plaintiff in *Day*. However, Baker is not a young adult who had recently graduated from college without any substantial work experience. Rather, prior to coming to S&W, Baker had owned his own tooling shop for over 21 years. As the shop owner, he was responsible for all of the purchasing and for monitoring costs and believed that "price, delivery, and quality are the major factors involved in procuring something for the best interest of your company. (Plaintiff's Response Exhibit 1, p. 270). S&W did a nationwide search to find a person of Baker's experience in purchasing tooling before hiring him. (¶33 of S&W SUF). Further, upon arrival at S&W Baker was made to undergo certain training including watching various training seminars on the company's "LRN" system. One of these LRN sessions touched upon SOX. (Plaintiff's Response Exhibit 1, p. 137). As discussed, Baker did not have to know or identify what rules or law were being broken, nor is it relevant whether any such rules or law were actually being broken. Given Baker's experience with purchasing, his reporting of the overcharging, the inadequate inventory controls, the violations of company policies, and the accounting inaccuracies were clearly objectively reasonable.

Further, Baker did not have any specific legal expertise or any significant training in SEC rules and regulations that would make his belief that company employees receiving significant

bribes constituted a violation of SEC rules and regulations unreasonable. *Barker v. UBS AG*, 888 F.Supp.2d 291, 299 (D. Conn. 2012 ("While Barker's education and background may indicate some familiarity with securities regulation, it does not indicate any particular expertise which would make [her beliefs of misconduct] objectively unreasonable"); *Perex v. Progenics Pharms., Inc.*, 965 F.Supp.2d 353, 365 (S.D.N.Y. 2013) ("because plaintiff does not appear to have any knowledge or training in securities law, a jury could find that it was reasonable for Plaintiff to conclude that a press release that he found misleading could be … a violation of an SEC rule or regulation …").

Moreover, a company's actions, investigations, and internal reports can also support the objective reasonableness of an employee's report. *Leznik v. Nektar Therapeutics, Inc.*, 2007 DOLSOX LEXIS 96 (2007). In *Leznik*, the plaintiff was employed as the Staff Corporate Counsel for the defendant. She began working on a project to develop bioequivalent generic versions of certain popular medications. She subsequently raised several issues about the project including "manufacturing problems, a lack of financial transparency in the project, and whether duplicate contracts paid an outside consultant twice for the same work." *Id*. at *4. The plaintiff was later removed from the project. *Id*. However, the plaintiff continued to "research and raise a variety of problems she perceived with [the defendant's] contracting processes, internal accounting controls, and a potential violation of [the defendant's] conflicts of interest code." *Id*. at *6. A few weeks after the plaintiff's termination, an audit performed by an outside accounting firm "declared [the defendant's] internal accounting controls materially deficient and its financial statements unreliable. *Id*. at *25. Further, the plaintiff's supervisor testified that she had consulted with outside legal counsel "about issues [the plaintiff] perceived to be SOX violations so that she could ascertain whether [the defendant] was obliged to address those issues." *Id*. The ALJ noted that

"the legislative history of SOX states that corporate action taken in response to disclosure of information supports a finding that the employee's belief was a reasonable one." *Id*.

Here, it is undisputed that S&W employees took Baker's allegations "seriously" and as potential violations and investigated the allegations as such. In addition, as in *Leznik*, S&W's own internal audit confirms many of the issues raised by Baker, and therefore supports the reasonableness of Baker's belief. Prior to Baker's arrival[6] at S&W, the company undertook an internal audit to "review the Company's processes for monitoring and managing consumable inventories." (Plaintiff's Response Exhibit 44, p.2). The audit was prompted by the report from MSC referenced above, that the inventory reports provided by Pioneer[7] were instructing MSC "to bill for tools that were not in the tool cribs." *Id*. During the investigation, it was learned that while S&W managers received a copy of invoices to review and approve, "independent verification and monitoring of the transactions that are billed is not performed." *Id*. at .6. The investigation also verified, as reported by Baker, that S&W had been billed for eight days of inventory transactions in a seven day week. *Id*. at p. 7. Interestingly, it appears that Baker was hired "as part of one of the remediation measures" identified in the report. (Cicero, p. 86). However, rather than share this internal audit report with Baker to help assure him that S&W was

[6] It is irrelevant that the internal audit report was created prior to Baker's employment. *Klopfenstein v. PCC Flow Technologies Holdings, Inc.*, 2006 DOLSOX LEXIS 59, *35 (2006) ("[W]e do not believe that activity is protected only when the complainant is the first to raise the issue …..") Further, Baker was never made aware of the audit report or that S&W had already investigated the very problems that he was raising. Other senior managers of S&W, including Fontaine, Flatley, and Frances were also apparently never shown or not told of the specifics of the internal audit report. (Fontaine, p. 39, Flatley, p. 35, Francis, p. 71). Further, that S&W was working on, and ultimately did, correct the problem at the time of Baker's reporting "is consistent with, not inconsistent" with Baker's reasonable belief. *Zulfer v. Playboy Enterprises, Inc.*, 2013 U.S.Dist. LEXIS 199070, *21, fn. 31 (C.D.Ca. 2013).

[7] Prior to the time the internal audit was conducted, Pioneer was the exclusive provider of tools for S&W. Pioneer had recommended that S&W purchase fourteen "autocribs" to house its entire consumable tooling inventory. While S&W owned the tool cribs, Pioneer owned the software that provided S&W with "all its billing and inventory count information." When S&W began using additional tool crib vendors, the inventory discrepancy was found and reported by MSC. (Plaintiff's Response Exhibit 44, p. 3-4).

aware of his concerns and was addressing them, S&W never told Baker about the report.  (Baker Dec., ¶ 31).

Baker's belief that S&W's violation of its own company policies and lack of internal controls was objectively reasonable and, as such, S&W is not entitled to summary judgment on this basis.

### b.  <u>Subjective Belief</u>

S&W asserts that "because Baker could not identify any violations of the laws enumerated in SOX, admitting that he did not 'know the laws' or the 'legal implications,'" he could not have had a subjective belief that his reports involved SOX violations.  However, case after case has recognized that a plaintiff need not cite to specific code sections that they believe the employer violated in order to be protected.  *Day*, 555 F.3d at 55; *Welch v. Chao*, 536, F.3d 269, 275 (4th Cir. 2008); *Barker v. UBS AG*, 888 F.Supp.2d 291 (D. Conn. 2012).  Further, an employee "need not demonstrate that a violation of law actually occurred."  *Barker*, 888.F.Supp.2d at 298.  Rather, "it is sufficient that an employee demonstrates that she reasonably believed that the defendant's conduct violated federal law."  *Id*.

S&W further asserts that because Baker "conceded" that he did not know whether certain conduct was illegal, fraudulent, or violated SOX, he could not have held a subjective belief.  An argument similar to that raised by S&W here was raised by the employer in *Sequeira*, *supra*, where, even though the plaintiff's claim asserted that the company had engaged in fraud against the shareholders, the plaintiff admitted that he "had no specific knowledge that [the contractor] was submitting fraudulent invoices."  Further, when asked whether he had any specific knowledge that any other vendor payments were fraudulent, the plaintiff responded that "'fraud' was 'strong' but that there were invoices … that were 'high' and that 'raised questions.'"  *Sequeira*, 716 F.Supp.2d

at 553.  With regard to these statements, the court stated that it did "not interpret these statements to mean that Plaintiff did not believe the company was intentionally violating one of the six enumerated provisions.  These statements are better understood as communicating that he did not actually know, but rather suspected, that some vendors were submitting fraudulent invoices, and that the company did not have the proper controls in place to prevent it."  *Id*.  Even in a case that relied upon a claim of fraud, the plaintiff's acknowledgment that he was uncertain whether fraud occurred was not sufficient to allow the conclusion that the plaintiff did not have a subjective belief that fraud had occurred.

Similarly, in *Klopfenstein v. PCC Flow Technologies Holdings, Inc.*, 2006 DOLSOX LEXIS 59 (2006), the plaintiff noticed a discrepancy in the in-transit inventory balances for overseas transactions.  Although the plaintiff stated that he did not believe that the discrepancy amounted to "fraud," he did believe that "if uncorrected, it would cause a material overstatement of [the company's] assets and that correcting the overstatement would materially affect [the company's] income for the period that the correction would take place.  *Id*. at *5.  Subsequently, outside auditors concluded, and reported to the company's VP of Finance, that the inventory imbalances were one of several problems that needed to be corrected.  *Id*. at *7.

The defendant argued that because the plaintiff admitted that he did not believe that the inventory imbalances amounted to fraud, his reports were not protected.  Although not definitely deciding the issue, the ALJ stated that the problems with the inventory discrepancies, "suggested, at a minimum, incompetence in [the defendant's] internal controls that could affect the accuracy of its financial statements.  [The plaintiff's] communications thus related to a general subject that was not clearly outside the realm covered by SOX, and it certainly is possible that [the plaintiff] could have believed that the problems were a deficiency amounting to a 'violation.'"  *Id*.  at *35.

Finally, in *Barker*, 888 F. Supp.2d at 291, the plaintiff worked as an Associate Director in the Business Management Group of the Equities Chief Operating Officer's office. The company the plaintiff worked for owned seats on the New York Stock Exchange. Pursuant to NYSE rules, a firm must own a minimum number of seats in order to trade on that exchange. The plaintiff's team ultimately accumulated a list of discrepancies for exchange seats, shares, or both, not accounted for on the company's balance sheet and, at the direction of the superior, the plaintiff prepared a "gap analysis," a report regularly prepared to identify a gap in processes. *Id*. at 294. The plaintiff admitted that she had not used the words "fraud" or "violation of securities law" in her gap analysis or when reporting her work to her various superiors, and that she "had no idea" whether someone had intentionally hidden the exchange seat shares. *Id*. at 295, 298. The plaintiff asserted, however, that she had reported her concerns regarding the firm's "inaccurate and misleading reporting of its exchange seat shares." *Id*. Noting that an employee "does not need to specifically allege fraud, or reference a specific statute," or need to "demonstrate that a violation of law actually occurred," the court held that "a reasonable jury could conclude that [the plaintiff] had a subjectively reasonable belief that USB had violated the law by reporting inaccurate information to its shareholders." *Id*. at 298.

Here, while Baker may not have known the ultimate "legal implications" of some of the S&W conduct he reported, based on the cases discussed above, it is clear that he did not need to have any such knowledge to fall within the protection of SOX.     Further, Baker's lack of "certainty" as to knowledge of whether certain conduct "constituted mail, wire, bank or securities fraud" as referenced in S&W's brief (p. 16) does not mean that he did not have a subjective belief, right or wrong, that S&W's conduct violated SOX.

Baker testified to numerous instances of conduct which he believed was fraudulent, illegal, or a violation of SOX.  Baker believed that "vendors charging double or what [he] considered exorbitant costs" and instances where vendors were "[taking] tools out of the shop without any accountability, and then selling them back again as new" and not getting credit for defective tools that were returned to the vendors all constituted "illegal" or "fraudulent" conduct.  (Baker, p. 512). He also believed, again, rightly or wrongly, that employees accepting "gifts that were not appropriate" and making decisions that "were not in the best interest of" S&W were both violations of company policy and SOX based on what he had learned in the LRN training.  (*Id*., p. 490 – 91). Baker also believed if employees had a "systematic approach" to turning a blind eye to "mischarges," that was a "part of SOX" (*Id*., p. 306); that accepting material gifts violated SOX because such gifts could be used as leverage to gain favoritism (*Id*., p. 336, 339-340); that S&W selling a S&W manufactured tool to Pioneer for $3 which Pioneer then turned around and sold back to S&W for $40 "unequivocally" constituted fraud and a violation of SOX (*Id*., p. 359); that continuing to buy drills that S&W already had a five year supply of on hand "could be" both fraud and a violation of Sox because "no one is watching the henhouse" (*Id*., p. 361).  Again, with respect to Baker's subjective belief, the question is not whether any of these instances actually constituted a violation of any of the laws, rules, or regulations enumerated in SOX, or whether Baker understood the full legal implications of any of these activities, but only whether he subjectively believed that violations had occurred.  Based on Baker's testimony, he clearly did have such a subjective belief and summary judgment cannot be granted on this basis.

4. **Causation**

"To satisfy the 'causation' element of her prima facie case, [a plaintiff] had to show only that her protected activity 'contributed to' her termination." *Deltek, Inc. v. Department of Labor*,

649 Fed.Appx. 320, 329 (4th Cir. 2016).  "The 'contributing factor' standard, we have recognized, is a broad and forgiving one, distinctly more protective of plaintiffs that the familiar McDonnell Douglas framework applied to Title VII cases."  A plaintiff can satisfy this "rather light burden" by "showing that her protected activities tended to affect her termination in at least some way, whether or not they were a primary or even a significant cause of the termination."  *Id*. (Internal citations and quotations omitted.)  *See also*, *Barker*, 888 F.Supp.2d at 300 ("A contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.  A plaintiff need not prove that her protected activity was the primary motivating factor in her termination, or that the employer's articulated reason was pretext in order to prevail.")

Here, Baker clearly satisfies the "contributing factor" standard as S&W's own termination letter cites to Baker's reports as a contributing factor to his termination.  In Baker's termination letter dated September 23, 2014, Anne Bruce, S&W's VP of HR refers to the investigations that had been conducted regarding Baker's reports and admitted that "the company was unable to substantiate your allegations of wrongdoing by others.  To the contrary, the allegations lacked any reasonable basis in fact and give rise to the concern that your allegations were not made in good faith."  Plaintiff's Response Exhibit 52.  Clearly, Baker's protected activities "tended to affect" his termination in at least some way.  S&W's purported determination that Baker's claims lacked merit does not change this admission by S&W's VP of HR.

Further, S&W's assertion that the fifteen-month gap between Baker's initial report and his ultimate termination is insufficient to infer causation is also factually and legally incorrect.  Baker raised his initial concerns with S&W's HR employees in the summer of 2013 and was thereafter given a negative out-of-cycle review in February of 2014.  Baker was then continually subjected

to overly harsh and critical behavior by Flatley. Further, that initial report to HR gave rise to additional meetings with HR management (Suraci) in February of 2014, and S&W's legal department (Cicero) in April of 2014, which contained additional reports. Those reports, in turn, resulted in months of meetings and Baker's provision of information as requested ***by the S&W employees***. Baker was unilaterally put on administrative leave in early July of 2014. On September 22, 2014, Baker filed his OSHA complaint and was subsequently terminated on September 23, 2014.

While S&W appears to imply that there was one report in mid-2013 and then nothing until Baker's termination in September of 2014, nothing could be farther from the truth. Rather, throughout 2014 until his termination, Baker was continuously providing additional reports and information while S&W was investigating Baker's claims. S&W's General Counsel and HR requested those reports and information. S&W cannot use its own lengthy investigation as a basis for the length of time between Baker's initial report and his termination.

Further, there were a series of adverse employment actions from Baker's initial report throughout the investigation process – harassment, negative reviews, forced administrative leave, and ultimately termination. As such, while the time from start to finish may have been "lengthy," there was a 'chain of adverse actions' that ended with the termination, and, as such, a jury could find temporal proximity. *See*, *Rock v. Lifeline Sys. Co.*, 2015 U.S.Dist. LEXIS 144335 (D.Mass. 2015) ("although temporal proximity is lacking between [the plaintiff's] reporting and termination, a reasonable jury could potentially find a temporal proximity between her reporting and a chain of adverse actions that culminated in her eventual termination".)

Finally, and tellingly, S&W's VP of HR, Bruce, as late as September 19, 2014, was drafting a response to the Baker's Rebuttal to the June, 2014 review and had left Baker a message about

planning his "return to work." (Plaintiff's Response Exhibit 42). However, on September 22, 2014, Baker filed his OSHA complaint, in and of itself a protected activity. Despite all indications prior to his filing that S&W planned to have Baker return, he was terminated ***the day after his OSHA filing***. This fact is, in and of itself, sufficient to meet the "rather low burden" of establishing causation in this matter.

With respect S&W last assertion with regard to the causation element – that there were "intervening acts" that would break any causal chain – as discussed below, there are numerous factual questions as to the merit of Baker's purported "performance issues" and whether S&W actually intended to terminate Baker based on those issues. As such, there are factual issues as to whether those alleged performance issues are sufficient to constitute "intervening acts" that would break any causal chain. S&W is not entitled to summary judgment on the causation element.

5. **Performance Issues**

Finally, S&W asserts that even if Baker has raised sufficient facts to demonstrate a prima facie case of retaliation, it is not liable because it has established that it would have terminated Baker regardless of Baker's protected activity. Again, because there are substantial factual disputes regarding the purported bases for S&W's termination of Baker, it is not entitled to summary judgment on this basis.

S&W's termination letter to Baker states that the bases for the termination were: 1) performance deficiencies, including the assertion that Baker's supervisor, Flatley, "concluded in the June 5, 2014 review that you were incapable of continuing as the Cell Coordinator;" 2) that S&W was unable to substantiate Baker's allegations of wrongdoing by others; and 3) those

allegations lacked any reasonable basis in fact, and that they gave rise to the "concern" that they were not made in good faith.[8]  Plaintiff's Response Exhibit 52.

As discussed above, the second basis contained in the termination letter, S&W's inability to "substantiate" any of Baker's claims of misconduct, clearly cannot be used to support S&W's assertion that it would have fired Baker regardless of these allegations.  To prove that it would have fired Baker regardless of his protected activity, S&W must establish that, even removing the allegations from the analysis, it has "clear and convincing" evidence that it would have fired him.  18 U.S.C. §1514A(b)(2)(A); *Barker*, 888 F.Supp.2d at 301.   Thus, this purported reason for the termination cannot be referenced with regard to Baker's performance.

With respect to the issue of Baker's performance, S&W's termination letter misrepresents that Flatley had concluded in the June 5, 2014 review that Baker was "incapable of continuing" in his job.  First, nowhere in the June 2014 review does Flatley make such a determination, and in fact, Flatley testified that as of June it was not his decision or opinion that Baker should be fired.  Further, Flatley stated that he did not have any input in terminating Baker and was never asked whether Baker should be terminated or not.  (Deposition of Larry Flatley, Plaintiff's Response Exhibit 2, p. 132).  Similarly, Fontaine, also testified that no decision had been made to terminate Baker as of June, 2014.  (Deposition Transcript of Dan Fontaine, Plaintiff's Response Exhibit 38, p. 89, ln. 8-10).

Further, in March of 2014, Suraci noted that S&W did not have a sufficient basis to terminate Baker at that time. (Plaintiff's Response Exhibit 35, p. 2).  On March 28, Fontaine stated that he met with both Baker and Flatley and that he "had concerns with both of them."  (Plaintiff's

---

[8]  S&W also asserts that Baker's termination was based on "declining morale and performance in the Cutter Department."  First, there is no mention of this issue in S&W's termination letter to Baker and S&W cites to no evidentiary basis for this assertion.  As such, it should be disregarded by the Court. Further, Baker contests this statement.  (RSUF, ¶ 89).

Response Exhibit 53). In April, as reported in Suraci's investigation notes, Francis reported to Suraci that Francis believed that "data from Earl's area is good, and shows improvements to processes, and that Dan Fontaine and Larry Flatley don't seem to recognize or appreciate those improvements. Instead, they just say that the numbers are bullshit." (Plaintiff's Response Exhibit 35, p. 5). Francis further testified that Baker's department's performance during Baker's employment was "one of the best in the company" and that Baker's department's performance was "exceptional." (Deposition of Robert Francis, Plaintiff's Response Exhibit 3, p. 32, 35, Plaintiff's Response Exhibit 36).[9]

Baker was then reviewed in June of 2014 and given certain objectives. While S&W asserts that these recommendations were goals with specific deadlines, Baker understood these to be "objectives," but not "mandates," and that it was actually Baker who expressed his goals to Flatley and Fontaine and that they would then help keep Baker on track progressing towards those goals. (Baker, p. 81, 91; RSUF, ¶ 22, 90). Thus, there is a fact question regarding any argument by S&W that Baker did not meet any express deadlines for certain objectives.

In any event, Baker was out of the office, first on vacation and then on administrative leave, starting in early July, 2014[10] and never returned to work before his termination. Baker did not have an opportunity to allegedly perform poorly. Even after Baker was put on administrative leave, it was Fontaine's understanding that Baker was coming back to work. (Fontaine, p. 95). On or about August 29, 2014, Anne Bruce left Baker a voicemail message wanting to talk to him about

---

[9] In July, Francis was in the process of helping Baker put together various charts and spreadsheets, as well as a presentation, "to show respect for the work that you and your team have done" and to "document improvements" in Baker's department. (Plaintiff's Response Exhibit 40). Baker was terminated before the presentation could be made.
[10] It is unclear who made the decision to put Baker on paid leave. Baker testified that it was Cicero who "mandated" that Baker go on leave and who said that it was for Baker's protection. (Plaintiff's Response Exhibit 1, p. 184). However, Cicero denied that he made that decision. (Plaintiff's Response Exhibit 22, 39). Bruce testified that it was "likely a group decision," but that she did not recall "who the final decision-maker was if there was one." (Deposition Transcript of Anne Bruce, Plaintiff's Response Exhibit 45, p. 116).

his return to work, and even as late as September 19, 2014, Bruce was drafting a letter to Baker to rebut the issues raised in his Rebuttal to the June review.  (RSUF, ¶90).  As such, it appears that as late as September 19, S&W intended that Baker would return to work.  Given that Baker was out of the office since early July, there could not have been any change to S&W's evaluation of Baker's job performance between September 19 and September 23 when he was terminated.  The *ONLY* thing that happened between September 19 and September 23 is that Baker filed his OSHA complaint on September 22.   At the very least, there is a factual question as to whether S&W relied on Baker's purported, and disputed,[11] performance issues in support of its termination of Baker.

The third basis provided in the termination letter is S&W's "concern" that Baker's allegations were not made "in good faith."  S&W has not presented any evidence that Mr. Baker's allegations were not made in "good faith."   While Cicero testified that he did not investigate whether Baker's concerns were in good faith or not, he also testified that he had spoken to several other employees about whether they had knowledge of S&W making a tool in-house for Pioneer to sell back at a higher price.  While the employees "related to [Cicero] that they didn't have firsthand practice, [] they heard about it, and they heard that it was true."  (Cicero, p. 183, 200). Cicero further testified that he spoke with one employee who believed that the rumor was true and believed that Flatley "was involved" and that Cicero "came up with a lot of people that had heard things."  (Cicero, p. 205).  Again, setting aside the ultimate "truth" of these rumors, it cannot be said that Baker's relaying of the rumors was not in good faith when other employees also believed them to be true.

---

[11] See, RSUF, ¶¶ 26, 27, 28, 33, 34, 35, 36, 37, 42, 43, 45.

Further, there is no evidence that S&W's "concerns" that the allegations were not made in good faith, in and of themselves, would have resulted in Baker's termination. As such, none of the bases for termination cited in S&W's actual termination letter are sufficient "clear and convincing" evidence to establish that S&W would have fired Baker absent his protected activity.

In its brief, however, S&W also identifies "Baker's increasingly reckless conduct towards and allegations concerning Flatley" as a reason for Baker's termination. Again, this is not an enumerated bases in S&W's termination letter, and so, does not appear to have been an actual reason for the termination when it happened. However, even if the Court were to consider this as a potential basis, there is clearly a factual question as to the veracity of these claimed "facts."

In Cicero's letter to Baker of August 20, 2014, providing the results of Cicero's investigation into Baker's allegations, Cicero states that Baker had expressed concerns for his personal safety based on Baker's purported reference to "three incidents that showed 'what Larry is capable of.'" Plaintiff's Response Exhibit 34, p. 7. The three cited incidents were Baker's "allegations" that Larry had sexually assaulted a female co-worker, that Larry had something to do with the death of his fiancé, and that another employee had told Baker that Larry had "threatened him with bodily harm." *Id*. However, Cicero's actual testimony does not support the notion that Baker made any such "allegations." Rather, Baker purportedly told Cicero that Baker feared for his and his family's safety.[12] When asked why, Cicero testified that Baker relayed "a rumor" that Baker had heard that "about 10 years prior, Mr. Flatley had sexually assaulted a woman." (Cicero, p. 172). Baker also gave "the example" of Flatley "having something to do with his wife's suicide and another employee relaying a story to Baker about "Larry physically

---

[12] Baker not only feared Flatley, but also Pioneer. In March of 2014, Baker apologized to Suraci for being "paranoid," but noted that Pioneer "does $4.5 million" with S&W, the implication being that Pioneer could be "upset" with Baker for interfering with its "preferred" vendor status. Baker relayed to Suraci that when Baker had worked late the night before, his wife "worried he had come to some harm." (Plaintiff's Response Exhibit 54).

threatening him."  Rather than Baker making "allegations" or accusations against Flatley, Baker merely relayed what he had heard regarding Flatley in response to Cicero's question of why Baker felt concerned for his safety.  It is not fair to hold Baker responsible for his legitimate concern given what he had heard about Flatley.

Similarly, Bruce's letter of September 24, 2014 describing the results of the HR investigation, mentions that Baker "accused Larry of being 'evil,' a 'nazi,' a 'rapist,' and of being culpable in the suicide of his fiancé almost 20 years ago."  (Plaintiff's Response Exhibit 33). Cicero's report and Bruce's letter are the first written mention of these alleged statements and accusations by Baker against Flatley.  These allegations are not mentioned in any of Baker's reviews or in any written communication with Baker or any written "write-up."  Nor is there any evidence of any disciplinary action taken against Baker for these purported "allegations."  In addition, even assuming that it was not true that Flatley had sexually assaulted a female employee, that Flatley had something to do with his finance's death, or that he'd physically threatened an employee, that has no bearing on whether Baker believed these stories when he heard them or that he relayed these rumors in bad faith.

Further, Flatley himself testified that while Baker was acting "hostile" and "yelling" and "screaming" during a February meeting regarding Baker's out-of-cycle review, after that meeting until the time Baker was put on administrative leave, Baker was no longer hostile, but instead, acted in a "more professional" manner.  (Plaintiff's Response Exhibit 2, p. 191).  In addition, Suraci testified that the "rape" and "murder" allegations were investigated immediately and determined to be false.  Suraci stated that he used the allegations "as a learning opportunity with Earl" but that everyone "moved on" from those allegations "within two weeks to a month" of February 25, 2014.  (Plaintiff's Response Exhibit 28, p. 151-152). Suraci also noted in his

investigation notes in March of 2014 that S&W did not have a sufficient basis to terminate Baker at that time.  (Plaintiff's Response Exhibit 35, p. 1).   If Baker's purported allegations against Flatley in February were so outrageous and warranted Baker's termination, why would Suraci make this statement in March?   Similarly, why would Bruce wait to raise the issue of these allegations with Baker until September 23, the same day that he was terminated?

Given that Flatley, the purported victim of Baker's "reckless conduct," testified that other than one meeting, his relationship with Baker was "professional;" that Suraci testified that the allegations were investigated early and that everyone moved on from them quickly; and that Cicero's testimony indicates that Baker never made any such "allegations," clearly there is a question of facts as to 1) whether the "allegations" were ever actually made by Baker, and 2) whether they were actually a basis for S&W's termination of Baker or merely an after-created excuse for S&W's unlawful retaliation.

Finally, S&W also implies (without explanation) that the fact that the individuals who made the decision to terminate him – Smith and Fontaine - were "not charged with investigating or implicated by any of Baker's reports," somehow supports its assertion that S&W would have terminated Baker regardless of his protected activity.   However, the relevant question is not whether the decision makers were implicated in the wrongdoing, but rather, whether they were *aware* of the employee's reports of wrongdoing.  *Rock v. Lifeline Sys. Co.*, 2015 U.S.Dist. LEXIS 144335, *38-39 (D. Mass. 2015) (although decision maker was not aware of the plaintiff's reports, those that were in a "position to influence" the ultimate decision makers were aware of the reports and that an OSHA complaint had been filed.)  Here, Smith and Fontaine were clearly aware of

Baker's reports, the ongoing investigation, and the filing of Baker's OSHA complaint.[13]  As such, S&W is not entitled to summary judgment on this basis.

**C.  Baker's Wrongful Termination Claim**

With respect the Baker's wrongful termination in violation of public policy claim, S&W asserts that because that claim "is founded on the same alleged conduct" as the SOX claim, it is preempted by SOX.  However, because the wrongful termination claim is actually based on conduct that has been deemed as criminal by the Massachusetts legislature, and which S&W has asserted does *NOT* fall within SOX, S&W's argument must fail.

Massachusetts statute Part IV, Title I, Chapter 271, describes "Crimes Against Public Policy."  Specifically, Section 39 related to "Gifts to Influence Business Affairs" and prohibits"

> (a)  Whoever, in relation to any transaction or matter concerning the business affairs of an employer, principal or beneficiary (1) offers, gives or agrees to give an agent or fiduciary of another person and benefit or anything of value with intent to influence the recipient's conduct, or (2) as an agent or fiduciary, solicits, accepts or agrees to accept any benefit or anything of value from another person who Is not an employee, principal, or beneficiary upon an agreement or understanding that such benefit or thing of value will influence his conduct, shall be punished by imprisonment in the state prison of not more than five years, or by a fine of not more than ten thousand dollars, or both.

ALM GL ch. 271, ¶ 39.

Massachusetts courts have recognized that, in certain circumstances, an at-will employee may maintain an action against his former employer for wrongful discharge.  See *Upton v. JWP Businessland,* 425 Mass. 756 (1997).  Further, the Supreme Judicial Court of Massachusetts has noted that "the reporting of suspected criminal activity [should not] be discouraged by the threat of discharge.  *Shea v. Emmanuel College*, 425 Mass. 761, 763 (1997).  "Termination in retaliation

---

[13] Cicero testified to a meeting regarding "Mr. Baker and his continued employment" which was attended by Cicero, Smith, James Debney, the CEO of S&W, Jeff Buchanan, the CFO, and Bruce.  (Plaintiff's Response Exhibit 22, p. 19).  Fontaine testified that he was aware that Baker had expressed concerns about improper relations between S&W managers and vendors and that he had met with Cicero "in which [Cicero] reviewed with me an investigation that he had done on the topic."  Plaintiff's Response Exhibit 38, p. 33-34).

for bringing criminal conduct to a supervisor's attention is a termination in violation of public policy." *Schutz v. Go Ahead Vacations, Inc.*, 1999 Mass. Super. LEXIS 393, *7 (Superior Court, 1999). *See also*, *Mello v. Stop & Shop Cos.,* 402 Mass. 555 (1988) (Supreme Judicial Court assumed, without deciding, that an at-will employee who told his employer of criminal wrongdoing occurring within his company would be entitled to recover for a wrongful discharge).

Chapter 271 clearly describes criminal conduct and, given that the title of the Chapter is "Crimes Against Public Policy," there can be no doubt that the proscribed behavior constitutes a recognized public policy in Massachusetts. Baker reported to S&W HR and its general counsel that conduct in violation of this criminal statute was occurring at S&W. When asked at his deposition whether he looked into the statute during his investigation or whether he was even aware of this statute, Cicero stated that he did not recall. (Cicero, p. 185). S&W's failure to recognize the scope of Baker's allegations are not Baker's fault. Even if, as repeatedly asserted by S&W, "bribery" and "kickbacks" are not conduct that falls within the prohibited conduct enumerated in Section 806 of SOX, it nevertheless constitutes criminal conduct under Massachusetts law. S&W's only basis for summary judgment on Baker's wrongful termination in violation of public policy cause of action is that the cause of action is preempted by SOX. Based on the cases discussed above, such is not the case and S&W's motion for summary judgment on Baker's wrongful termination claim must be denied.

Wherefore, Plaintiff respectfully requests this Court to enter an order denying Defendant's Motion for Summary Judgment in its entirety.

REQUEST FOR ORAL ARGUMENT.

Respectfully submitted,

EARL D. BAKER

By: /s/ John Y. Lee
　　　Attorney for Plaintiff


John Y. Lee
Lee & Breen, LLC
188 Industrial Drive, Suite 403
Elmhurst, IL 60126
Tel.: (312) 241-1420
Email: jlee@leebreenlaw.com


By: /s/ Benjamin Rudolf
　　　Attorney for Plaintiff

Benjamin Rudolf
Murphy & Rudolf, LLP
One Mercantile Street
Worcester, MA 01609
Tel.: (508) 425-6330
Email: brudolf@murphyrudolf.com