# Plaintiff's Response Exhibit 1

Baker, Earl Donald                                    August 14, 2020

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

WESTERN DIVISION


--------------------------------x
EARL DONALD BAKER,                      Civil Action No.

     Plaintiff(s),                    3:19-cv-30008-MGM

v.

SMITH & WESSON CORP.,

     Defendant(s).

--------------------------------x




REMOTE VIDEOTAPED DEPOSITION OF EARL DONALD BAKER

Friday, August 14, 2020

9:36 a.m. Eastern




Reported by:  Linda S. Kinkade RDR CRR RMR RPR CSR

Videographer:  Sarah Howard

Agency:  Henderson Legal Services, Inc.

Ref. No. 48988

Baker, Earl Donald

August 14, 2020

2 (Pages 2 to 5)

---

**2**

A P P E A R A N C E S :

(All parties appearing remotely)

On Behalf of EARL DONALD BAKER:

    Lee & Breen, LLC

    188 Industrial Drive

    Elmhurst, Illinois 60126

    (312) 241-1240

    By:  John Lee, Esq.

    jlee@leebreenlaw.com

On Behalf of SMITH & WESSON CORP.:

    Polsinelli PC

    1401 I Street, NW

    Washington, DC 20005

    (202) 783-3300

    By:  Connie N. Bertram, Esq.

    cbertram@polsinelli.com

    By:  Jack Blum, Esq.

    jack.blum@polsinelli.com

CONTINUED ON FOLLOWING PAGE

---

**3**

APPEARANCES (continued):

On Behalf of SMITH & WESSON CORP. (continued):

    Bulkley, Richardson and Gelinas, LLP

    1500 Main Street, Suite 2700

    Springfield, Massachusetts 01115

    By:  Jeffrey E. Poindexter, Esq.

    jpoindexter@bulkley.com

---

**4**

INDEX OF EXAMINATION

EXAMINATION OF EARL DONALD BAKER ........... PAGE

    BY MS. BERTRAM ..................... 8

    BY MR. LEE ........................ --

INDEX OF EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Letter from Smith & Wesson dated .. | 25 |
| | 2/28/2013 to Earl Donald Baker | |
| | Baker0002095 - Baker0002096 | |
| Exhibit 2 | Cell Coordinator ................... | 34 |
| | TELG_001538 - TELG_001540 | |
| Exhibit 3 | April 15, 2013 Facebook post....... | 45 |
| Exhibit 4 | Spreadsheet pages 1-10 containing . | 61 |
| | substance of texts | |
| Exhibit 5 | Performance evaluation of June of . | 77 |
| | 2013 Baker0000071 - Baker0000072 | |
| Exhibit 6 | Email dated November 7th, 2013.... | 142 |
| Exhibit 7 | February 2014 performance ......... | 146 |
| | evaluation | |

---

**5**

| | | |
|---|---|---|
| Exhibit 8 | Earl Baker Result 2/7/14 .......... | 147 |
| | Baker0000110 | |
| Exhibit 9 | Earl Baker Result 2/7/14 Response . | 147 |
| | SW0000112 - SW0000114 | |
| Exhibit 10 | (skipped) | |
| Exhibit 11 | Email correspondence from ......... | 155 |
| | (topmost) E Baker to D Fontaine | |
| | 4/17/2014 SW0000493 | |
| Exhibit 12 | (skipped) | |
| Exhibit 13 | Earl Baker's Training Program ..... | 157 |
| | 2/4/14 Baker0000096 | |
| Exhibit 14 | Performance Appraisal 6/5/14 ....... | 167 |
| | Baker0000176 - Baker0000178 | |
| Exhibit 15 | E. Baker Goals 6/18/14 with ...... | 168 |
| | handwritten notes | |
| | Baker0000181 - Baker0000182 | |
| Exhibit 16 | Earl Baker 2014 Review Rebuttal ... | 172 |
| | Baker0000172 - Baker0000175 | |
| Exhibit 17 | Email with attached letter dated .. | 185 |
| | 9/23/2014 to Earl Baker from Anne | |
| | Bruce Baker0000535 - Baker0000536 | |
| Exhibit 18 | (skipped) | |
| Exhibit 19 | Amended Complaint for Relief....... | 213 |

---

Henderson Legal Services, Inc.

Baker, Earl Donald

August 14, 2020

3 (Pages 6 to 9)

---

**6**

INDEX OF EXHIBITS (continued)

Exhibits 20-24 (skipped)
Exhibit 25    Email correspondence from ....... 222
(topmost) E Baker to E Suraci
sent 3/26/2014

---

**7**

P R O C E E D I N G S

VIDEO SPECIALIST: Here begins video 1 in
the video-recorded deposition of Earl Baker, taken in
the matter of Earl Baker vs. Smith & Wesson
Corporation, in the United States District Court, for
the District of Massachusetts, case number
3:19-CV-30008-MGM.

Today's date is August 14th, 2020. The time is
9:36 a.m. This deposition is being held remote, video
deposition using Zoom reporting, in Colorado Springs,
Colorado. The court reporter is Linda Kinkade. The
videographer is Sarah Howard. Both are presenting on
behalf of Henderson Legal Services.

Will counsels please introduce themselves and
state whom they represent.

MR. LEE: John Lee representing Earl Baker.

MS. BERTRAM: And this is Connie Bertram
representing Smith & Wesson. And I have in the room
with me Jack Blum.

VIDEO SPECIALIST: Will the court reporter
please swear in the witness remotely.

THE REPORTER: And counsel will agree that
I can report today remotely? So stipulated?

MR. LEE: Yes.

MS. BERTRAM: Yes.

---

**8**

THE REPORTER: Thank you. Would you raise
your right hand, please, sir.

EARL DONALD BAKER,
having been first sworn and/or affirmed on
his oath, was thereafter examined and testified as
follows:

THE REPORTER: Thank you, counsel.

MS. BERTRAM: And do you need to do
something with his driver's license?

THE REPORTER: We did that. Thank you.

MS. BERTRAM: Okay. Good.

EXAMINATION
BY MS. BERTRAM:

Q. Mr. Baker, my name is Connie Bertram, as
you know, and I'm with the law firm of Polsinelli PC.
Have you ever been deposed before?

A. No.

Q. Have you ever provided sworn testimony in
any type of proceeding?

A. I don't believe so.

Q. So let me go through some of the ground
rules for the deposition. It's not like an ordinary
conversation. We do have a court reporter who is
present. She's going to be recording your testimony.
Do you understand that?

---

**9**

A. Yes.

Q. She's going to be creating a transcript
that you'll have an opportunity to review. So that
that transcript is clear, we need to make certain that
we provide verbal responses. Do you understand that?

A. Yes.

Q. And also it's very important that we
understand each other during the course of the
deposition. If you don't understand a question that
I've asked you, just ask me to repeat it or to
rephrase it to make sure that you heard and you
understand the question. Do you understand that?

A. Yes.

Q. Also, this is an issue for all depositions,
but particularly when they are being taken by Zoom,
it's very important that we not talk over each other.
So please wait until my question has been completed
before you answer it. Do you understand that?

A. Yes.

Q. And do you understand that you're under
oath; is that right? Was that a yes?

A. Yes.

Q. And just as if you're testifying before the
court, you have an obligation to tell the truth. Do
you understand that?

---

Baker, Earl Donald

August 14, 2020

4 (Pages 10 to 13)

---

**10**

1  A. Yes.  09:38:37
2  Q. Is there anything that could interfere with  09:38:37
3  your ability to understand the questions I'm asking  09:38:44
4  you today?  09:38:48
5  A. Not that I'm aware of.  09:38:50
6  Q. Is there anything that would prevent you  09:38:51
7  from providing complete and truthful testimony during  09:38:54
8  your deposition today?  09:38:58
9  A. No.  09:38:59
10  Q. Have you taken any drugs or medications  09:38:59
11  that could negatively impact your ability to remember  09:39:02
12  facts or events?  09:39:07
13  A. No.  09:39:09
14  Q. Have you consumed alcohol in the past eight  09:39:09
15  hours?  09:39:14
16  A. No.  09:39:14
17  Q. Have you consumed any drugs or used any  09:39:15
18  drugs in the past eight hours?  09:39:18
19  A. I took Prilosec and ibuprofen.  09:39:20
20  Q. Okay. Do you feel that either of them  09:39:26
21  would impair your ability to provide complete and  09:39:27
22  truthful testimony today?  09:39:31
23  A. No.  09:39:32
24  Q. Now in the OSHA proceedings we had asked  09:39:32
25  you some questions, some interrogatories, and you  09:39:37

---

**11**

1  answered those, correct?  09:39:39
2  A. Yes.  09:39:40
3  Q. And so I'm going to focus at least  09:39:41
4  initially on the period after your termination by  09:39:44
5  Smith & Wesson, so after September of 2014.  09:39:47
6  Since that time have you ever -- have you been  09:39:54
7  a party in any litigation?  09:39:57
8  A. I'm unsure of the timing of the litigation,  09:39:59
9  but we had some issues relating to a medical bill,  09:40:10
10  which you have been copied on, over the last few  09:40:15
11  years, but that was all.  09:40:20
12  Q. That's it? That's the only potential  09:40:23
13  litigation that you've been involved in?  09:40:25
14  A. That I can recall, yes.  09:40:27
15  Q. And what was the -- what was the amount at  09:40:28
16  issue?  09:40:30
17  A. The amount?  09:40:32
18  Q. Mm-hmm.  09:40:34
19  A. I don't recall the exact amount.  09:40:35
20  Q. What was the amount generally?  09:40:39
21  A. Generally around $10,000, I would guess.  09:40:41
22  Q. And who was the or what was the plaintiff  09:40:47
23  in that -- in that matter?  09:40:50
24  MR. LEE: Object to the form of the  09:40:53
25  question, but you may answer.  09:40:54

---

**12**

1  He didn't say there was a lawsuit or -- but go  09:40:57
2  ahead. Go ahead and answer.  09:41:02
3  A. I don't recall whether it was a collection  09:41:04
4  agency or a hospital.  09:41:07
5  Q. Okay. Who did you owe the money to  09:41:09
6  originally?  09:41:12
7  A. It would have been to Summa Healthcare.  09:41:13
8  Q. And where is that located?  09:41:17
9  A. I believe in -- I believe that would have  09:41:19
10  been in Akron, Ohio.  09:41:27
11  Q. And have you ever declared bankruptcy?  09:41:31
12  A. No.  09:41:34
13  Q. Have you ever been arrested?  09:41:34
14  A. No.  09:41:35
15  Q. Have you ever been charged or convicted of  09:41:36
16  any crime?  09:41:39
17  A. No.  09:41:39
18  Q. Where do you currently work?  09:41:40
19  A. Master Machining, Incorporated LLC in  09:41:49
20  Castle Hayne, North Carolina.  09:41:49
21  Q. And what town was that? I'm sorry.  09:41:55
22  A. Castle Hayne.  09:41:57
23  Q. And when did you start working at Astra?  09:41:59
24  A. No, I'm sorry, it's Master Machining.  09:42:03
25  Q. Okay. Okay. I'm sorry. I'm still having  09:42:06

---

**13**

1  a little bit of trouble hearing you. So if you can  09:42:09
2  keep your voice up, that would be great.  09:42:11
3  And what's your current position with Master  09:42:15
4  Machining?  09:42:18
5  A. Machinist.  09:42:18
6  Q. And that's the position you've been in --  09:42:21
7  how long have you been in that position now?  09:42:25
8  A. I worked there for a year and six months,  09:42:31
9  and then had occasion to take a job as an inspector at  09:42:38
10  GE, and now I'm back in that role since, I believe it  09:42:43
11  was April of 2020. So there's interruption between,  09:42:43
12  so it's not a --  09:42:49
13  Q. What made you decide to go back to Master  09:42:52
14  Machining?  09:42:55
15  A. They had a reduction in force at GE across  09:42:55
16  the company spectrum due to the issue, ongoing issues  09:42:59
17  with Boeing, and also the COVID situation has  09:43:05
18  curtailed many of the contracts that GE has with -- I  09:43:12
19  was in the aviation division, so they are experiencing  09:43:17
20  an 80 percent reduction in work.  09:43:21
21  Q. And have you ever -- other than  09:43:26
22  Smith & Wesson, have you ever made an internal or  09:43:28
23  external complaint against any employer?  09:43:31
24  A. No.  09:43:33
25  Q. At some point you were approached about  09:43:34

---

Baker, Earl Donald                                     August 14, 2020

5 (Pages 14 to 17)

## 14

| | |
|---|---|
| 1 | working for Smith & Wesson in 2013, right? | 09:43:45 |
| 2 | A. Yes. | 09:43:48 |
| 3 | Q. And who approached you about working for | 09:43:49 |
| 4 | the company? | 09:43:52 |
| 5 | A. His last name was Sargent. He's a | 09:43:52 |
| 6 | recruiter out of Florida. I later found out that he | 09:43:58 |
| 7 | worked at Smith & Wesson previously and that he was a | 09:44:03 |
| 8 | friend and associate, a good friend of Larry | 09:44:08 |
| 9 | Flatley's, so, as a recruiter, he contacted me. | 09:44:14 |
| 10 | Q. Okay. And were you looking for a job when | 09:44:18 |
| 11 | he reached out to you? | 09:44:21 |
| 12 | A. There had been a period I had looked for a | 09:44:23 |
| 13 | job, but I was not currently looking at that point. | 09:44:28 |
| 14 | Q. And when he approached you, you had been | 09:44:31 |
| 15 | working at Lakeland Tool for 22 years, right? | 09:44:37 |
| 16 | A. Lake Tool, yes. It was my company that I | 09:44:37 |
| 17 | started in 1991. | 09:44:39 |
| 18 | Q. And what products or services did that | 09:44:41 |
| 19 | company offer? | 09:44:46 |
| 20 | A. We were a support industry for machining in | 09:44:47 |
| 21 | predominantly the Akron, Ohio area, but we had | 09:44:57 |
| 22 | customers as far away as Amarillo, Texas, and, you | 09:45:01 |
| 23 | know, so we had -- we weren't limited to that area, | 09:45:08 |
| 24 | but most of them were from there. | 09:45:11 |
| 25 | Q. And you said that you provided support for | 09:45:13 |

## 15

| | |
|---|---|
| 1 | machining. What type of support did you provide? | 09:45:16 |
| 2 | A. We sharpened their tools and made -- made | 09:45:19 |
| 3 | and designed tooling systems to -- for them to machine | 09:45:22 |
| 4 | parts. So there's more than one way to do things, so | 09:45:30 |
| 5 | we would at times give our expertise on what tooling | 09:45:33 |
| 6 | should be made and give quotes and, of course, make | 09:45:38 |
| 7 | those tools. | 09:45:43 |
| 8 | Q. And what types of tools did you -- | 09:45:43 |
| 9 | A. Predominantly cutting tools. | 09:45:49 |
| 10 | Q. And did you sell your tools through a | 09:45:52 |
| 11 | distributor? | 09:45:55 |
| 12 | A. No. | 09:45:55 |
| 13 | Q. So you sold them only directly to | 09:45:57 |
| 14 | manufacturing facilities; is that right? | 09:46:01 |
| 15 | A. I did market my own, but there were a | 09:46:03 |
| 16 | couple of distributors that used me as a source, so I | 09:46:08 |
| 17 | did both work where I had direct contact and then | 09:46:15 |
| 18 | there were a couple of vendors that would act as an | 09:46:19 |
| 19 | agent to sell my services elsewhere. | 09:46:24 |
| 20 | Q. And which companies acted as distributors | 09:46:29 |
| 21 | or agents for your company? | 09:46:29 |
| 22 | A. One was called Chrome Hard. They sold new | 09:46:31 |
| 23 | tools. They also offered a resharpening service that | 09:46:36 |
| 24 | they would then sublet to me. And then there was | 09:46:40 |
| 25 | another person, his last name escapes me, but Jeff -- | 09:46:44 |

## 16

| | |
|---|---|
| 1 | I can't remember his last name -- but he was based | 09:46:53 |
| 2 | in -- originally from Elkhart, Indiana, and he would | 09:46:58 |
| 3 | bring me jobs, I'd quote them, and he would distribute | 09:47:02 |
| 4 | the work to my customers or to his customers. | 09:47:07 |
| 5 | Q. And did you specialize in any particular | 09:47:10 |
| 6 | type of manufacturing or industry? | 09:47:13 |
| 7 | A. Actually as part of our business plan we | 09:47:16 |
| 8 | tried to diversify with different businesses we worked | 09:47:21 |
| 9 | with, so that, when one sector was down, the other | 09:47:24 |
| 10 | sector would be busy, and that allowed us to stay | 09:47:27 |
| 11 | afloat when other companies did not. So we had a | 09:47:32 |
| 12 | multiple range. | 09:47:38 |
| 13 | Q. And let's focus on -- so you said you | 09:47:38 |
| 14 | started in 1991, right? | 09:47:43 |
| 15 | A. Yes. | 09:47:45 |
| 16 | Q. So let's focus on 1995. How many tools per | 09:47:45 |
| 17 | year was Lakeland manufacturing? | 09:47:52 |
| 18 | A. It would be too hard to even estimate. | 09:47:56 |
| 19 | Q. Okay. Did your production numbers increase | 09:47:59 |
| 20 | over time? | 09:48:02 |
| 21 | A. Yes. I think that we, from '91 on through | 09:48:03 |
| 22 | up until probably the first 15 years, I would say | 09:48:07 |
| 23 | there was a gradual increase every year, and we | 09:48:15 |
| 24 | gradually added machines. So it increased, but there | 09:48:20 |
| 25 | were years where the economies -- where there would be | 09:48:23 |

## 17

| | |
|---|---|
| 1 | fluctuations. | 09:48:29 |
| 2 | Q. What was the last part of what you just | 09:48:29 |
| 3 | said? | 09:48:32 |
| 4 | A. As the economy of the country increased or | 09:48:32 |
| 5 | decreased, of course, you might have a year that fell | 09:48:35 |
| 6 | back a little bit, but, overall, the whole range, the | 09:48:40 |
| 7 | 22 years, it gradually got better every year for the | 09:48:45 |
| 8 | first 15 years. The last five were more up and down. | 09:48:50 |
| 9 | Q. And the last full year that you operated | 09:49:01 |
| 10 | was 2012, right? | 09:49:10 |
| 11 | A. Yes. The last full year, yes. | 09:49:12 |
| 12 | Q. Okay. How many machines did you have at | 09:49:15 |
| 13 | that point for making tools? | 09:49:19 |
| 14 | A. Thirty-six. | 09:49:21 |
| 15 | Q. And how many tools did you manufacture | 09:49:24 |
| 16 | during that year? | 09:49:29 |
| 17 | A. Really didn't count. I couldn't tell you | 09:49:30 |
| 18 | off the top of my head. | 09:49:37 |
| 19 | Q. Do you recall what your revenue was in | 09:49:37 |
| 20 | 2012? | 09:49:40 |
| 21 | A. Not really specifically. I know generally. | 09:49:41 |
| 22 | Q. What was it generally? | 09:49:48 |
| 23 | A. Generally it was in the hundred thousand | 09:49:48 |
| 24 | dollar range is what our billables, but it's hard | 09:49:53 |
| 25 | to -- hard to extrapolate that when you're an | 09:50:00 |

Baker, Earl Donald

August 14, 2020

6 (Pages 18 to 21)

**18**

entrepreneur how much of that is actually income or
how much gets invested back into the company by
purchasing, you know, other machines and so forth,
reinvestment.

Q. And the only manufacturing that Lakeland
did was tool manufacturing, right?

A. No, we did some jobs for people with -- I
had machining expertise, and if there was a part that
had a extraordinarily tight tolerance, I might do that
work for them. So that wasn't necessarily all
tooling.

And to correct you, it's Lake Tool. Lake was
an acronym of my children's names. So it's Lake Tool,
L-A-K-E.

Q. Thank you for clarifying that. And what
percentage of the work that Lake did was manufacturing
a product as opposed to a tool?

A. It had to be at least 95 percent tooling.

Q. And did you use any principles of lean
manufacturing in the production work that you were
doing?

A. Not by that specific title, but I was
somewhat of a nerd in that when a lot of people --

MR. LEE: A what?

THE WITNESS: A nerd.

**19**

MR. LEE: Oh, okay.

A. When we would go to the beach or were -- my
wife would read a, you know, a novel and I would read
books on management. So those principles were done
within my business, but not under the guise of, you
know, I didn't maybe put that label of "lean
manufacturing." We didn't have a lean pitch board for
our size company, but lean principles were used
throughout our industry, and I did use those
principles to grow Lake Tool into a successful
organization.

Q. And did you purchase metals and other --
other items that were needed to manufacture the tools?

A. Yes.

Q. And did you use a procurement process for
that?

A. No.

Q. Pardon me?

A. There wasn't really a process. I was the
sole owner, so I didn't have to go through any
procurement process that would take place in a larger
company.

Q. And did you take any supplies or tools or
other items on consignment in the work that you did?

A. Not that I can recall.

**20**

Q. Did you work with a RoboCrib at Lake?

A. I did not have a RoboCrib, but many of my
customers did.

Q. And did you use pitch boards?

A. I did not.

Q. How large was your facility at Lake?

A. It would be small by -- in comparison to
most companies in that my machines weren't massive
machines. So I think our facility was a 48 x 48
facility, and then we had offsite offices. I
maintained an office and machines in my residence so
that I could respond to jobs in a quick manner.

Q. And I take it you had about five employees
at most at Lake?

A. Yes.

Q. And how many employees did you have as of
2012?

A. 2012 I had between one and two employees.
We had one at the very end. Throughout most of 2012 I
had two. And I may have actually had three at the
beginning, I'm not sure.

Q. Okay. And how did your revenue in 2012
compare to 2011?

A. I'm not sure. I think it was about the
same.

**21**

Q. And how did the revenue in 2011 compare to
2010?

A. I would say about the same.

Q. Was there a point where your revenue
dropped off as a consequence of the recession or any
other factors?

A. Yes, 2008.

Q. Okay. And it went down after that, is that
right, for 2008, 2009, and 2010?

A. There was a dip in 2008, but we had
rebounded from that somewhat.

Q. Was Lake Tool always owned by you 100
percent?

A. Yes. Yes.

Q. And you never reported to anybody when you
worked at Lake, correct?

A. Correct.

Q. As of when you went to work for
Smith & Wesson in 2013, what was the status of Lake
Tool?

MR. LEE: Objection to the form of the
question, but you may answer.

A. I'm not sure what you're saying. What was
the status?

Q. Was it still operational?

Baker, Earl Donald

August 14, 2020

7 (Pages 22 to 25)

---

**22**

1    A. Yes.
2    Q. Was it still servicing customers?
3    A. Yes.
4    Q. How many customers did it have at that
5    point?
6    A. As far as I -- we could have a customer
7    that wouldn't do business with us for three months or
8    five months, but they were still a customer.  Then
9    they would come back and ask for a tool.
10    So we didn't have any that, say, there was a
11    termination point where they say we're not going to do
12    business with you any longer, they just -- we did
13    business with all of them.
14    So I would imagine that we had 20 customers at
15    that time that would give us work, you know, when they
16    needed it.
17    Q. And did you have any employees as of March
18    of 2014?  I'm sorry.  Let me -- let me strike that and
19    state it again.
20    Did you have any employees as of March of 2013?
21    A. Yes.
22    Q. And were you making revenue at that
23    point --
24    A. Yes.
25    Q. -- at Lake Tool?  And were you generating

---

**23**

1    any profit?
2    A. We actually, I believe, was contacted by
3    Mr. Sargent in either late 2012, and it was just in
4    the beginning phase, we were just talking.  And then
5    as it ramped down we stopped taking in as many orders.
6    So by the end we didn't want to leave things
7    hanging with customers that they didn't have the
8    ability to get tools, so we slowly ramped down.  We
9    stopped taking in orders.  And when we got to the last
10    couple months we -- we were full-scale into trying to
11    find a buyer for Lake Tool and then also facilitate,
12    once we did find a buyer, getting that machinery
13    transferred over to them.
14    Q. And when did you start ramping down?
15    A. It's hard to say exactly.
16    Q. Was it in 2013?
17    A. Yes.
18    Q. And what triggered you starting to ramp
19    down?
20    A. We had an interview on, I think by phone,
21    and when that concluded, they set up an on-site
22    interview at Smith & Wesson, and it was after that
23    commitment to them that we were -- that it was a go.
24    I actually had another company that -- in
25    talking with companies about purchasing my Lake Tool,

---

**24**

1    there was another company that became interested in
2    me.  And I actually flew from my interview from
3    Smith & Wesson and met someone in, I believe it was
4    Finley, Ohio, to interview for a job there.
5    (Jeffrey Poindexter, Esq. joined the
6    deposition)
7    Q. And when did you first start trying to sell
8    the equipment at Lake Tool?
9    A. Once we had an agreement and a decision
10    that we were going to proceed in a certain direction,
11    so, you know, then it became job one to get the
12    business sold.
13    Q. And when you say once you had signed the
14    deal, are you talking about signing the offer letter
15    with Smith & Wesson?
16    A. Yes.
17    Q. And how long did it take you to sell the
18    equipment?
19    A. I can't recall the actual date when I
20    signed with Smith & Wesson, but we had a deal in place
21    by, I would say, around the first of March, but that's
22    just a guess.
23    Q. Why don't we look at Exhibit 1, which is
24    the offer letter that you received from
25    Smith & Wesson.

---

**25**

1    MS. BERTRAM:  John, are you able to access
2    the files?
3    MR. LEE:  Hold on.  Did Missy send it to
4    us?  Hold on.
5    MS. BERTRAM:  She sent the link, and I saw
6    that you-all responded to her, but I didn't see what
7    either of them said.
8    MR. LEE:  Oh.  So let's make this
9    Smith & Wesson 1, Smith & Wesson 2, and so on?
10    MS. BERTRAM:  They're marked as exhibits up
11    in the upper right-hand corner on the PDF.
12    THE REPORTER:  Counsel, you'll be sending
13    me the link as well?
14    MS. BERTRAM:  I'll send them to you after
15    the deposition.
16    THE REPORTER:  Sure.
17    THE WITNESS:  Okay.  I'm looking at it.
18    MS. BERTRAM:  Okay.  John, do you have
19    access to it?
20    MR. LEE:  Yeah, I have Exhibit 1.
21    (Exhibit 1 previously marked
22    for identification and referenced
23    herein: Letter from Smith & Wesson
24    dated 2/28/2013 to Earl Donald Baker
25    Baker0002095 - Baker0002096)

---

Baker, Earl Donald

August 14, 2020

8 (Pages 26 to 29)

---

**26**

Q. Okay. Good. Mr. Baker, this is a February 28th, 2013 letter from Smith & Wesson to you, correct?

A. Yes.

Q. And you signed that on the second page on March 4th of 2013, correct?

A. Yes.

Q. And so did you sell the equipment of Lake Tool after March 4th of 2013?

A. Yes.

Q. And how soon after you signed the offer letter?

A. Sometime between then and March 23rd.

Q. And March what?

A. 23rd.

Q. Okay. And did you get full asking price for the equipment that you sold?

A. No. I actually -- the company I sold to was only interested in my -- the name of my company and the reputation and the customer base, and they weren't really interested in the tooling.

So we ended up selling some tooling to different competitors of mine in the area. So Fox Toolbox and Tools and Machines, and there were at least four companies that purchased different parts, but I facilitated piecemealing, sending stuff that the

---

**27**

company I sold to didn't want.

Q. And what did you sell the company -- what was the amount that you sold the company for?

A. Fifty thousand.

Q. And what did you sell the various pieces of equipment for in total?

A. I negotiated the purchase of these things for the company that purchased it, but I did not receive any of the proceeds. So I facilitated that for the purchaser, but he got, anything that these other competitors bought, the proceeds of that went to the company that was purchasing.

Q. And the shop that you maintained at Lake Tool, you said it was like 48 feet by 48 feet, did you own or rent that at the time?

A. Owned.

Q. Okay. When did you buy it?

A. I bought it in 2008.

Q. And what did you buy it for in 2008?

A. I bought it for 160 with a $30,000 down payment.

Q. And did you sell that also in March of 2013?

A. Well, let's see, no, not in March.

Q. Okay.

---

**28**

A. The sale of the building took place sometime over that first year at Smith & Wesson, and it was done remotely, and we ended up selling it for a loss.

Q. And do you recall what you sold it for?

A. I believe it was -- no, I don't really recall the exact amount, but I know that we didn't get what we wanted, so we actually had a balance left that we had to pay the bank for.

In 2008 was when the market bubble burst, so the amount that the bank had appraised the building for was 189, and I had 30 down, and the purchase price was 160.

Later, in 2008, within months after purchasing the property, they reassessed the appraisal and appraised it at $85,000. So we lost the $30,000 that we put down plus the valuation which caused us to -- we had a line of credit that was based on having $60,000 equity in the building, and that caused us to lose our line of credit.

Q. And when you started working for Smith & Wesson, you also owned a home in Ohio, right?

A. Yes.

Q. Did you try to sell it before you started working for Smith & Wesson?

---

**29**

A. The house?

Q. Yes.

A. There was a period we tried to sell the house. I don't know that we listed it, but we were speaking with the realtor about it, and we didn't know whether to rent or sell it. There wasn't a whole lot of time.

Once we spoke to Smith & Wesson, they gave me one month to liquidate everything, and they wanted me on site by March 23rd. So it didn't leave us a whole lot of time.

Q. And so you elected to rent it; is that right?

A. Yes.

Q. And did you in fact rent it?

A. Yes. My daughter, who was going to school, her and my son-in-law lived there with my grandchildren, and they paid a partial rent. It didn't cover the expense -- or it didn't cover the full amount, but they paid what they could afford while she was in college.

Q. And what amount did they pay in rent?

A. I really don't recall, my wife would know.

Q. We were looking at Exhibit 1, which is the offer letter that you received from Smith & Wesson.

---

Baker, Earl Donald

August 14, 2020

9 (Pages 30 to 33)

### 30

1    If you look at the third paragraph, it talks about    10:07:11
2 relocation benefits that were offered to you.    10:07:14
3      **A. Okay.**    10:07:23
4      Q. And did you submit your relocation expenses    10:07:23
5 to the company?    10:07:25
6      **A. Yes.**    10:07:26
7      Q. What -- what expenses did you seek, what    10:07:26
8 amount?    10:07:26
9      **A. They had a relocation coordinator that was**    10:07:29
10 **assigned to me, and she would -- she disbursed the**    10:07:34
11 **amounts. It was -- it was an initial amount for**    10:07:39
12 **incidental expenses, and then she coordinated a moving**    10:07:46
13 **truck to come pack the stuff and move it. They also**    10:07:51
14 **procured a place for me to stay for the first month,**    10:07:54
15 **and they furnished it with furnishings. And I then**    10:07:59
16 **later rented from that. And also paid for some**    10:08:07
17 **storage fee. But that was all coordinated through the**    10:08:12
18 **relocation coordinator.**    10:08:16
19      Q. And you understood that if you were    10:08:20
20 involuntarily terminated -- involuntarily terminated    10:08:25
21 or if you resigned, that you would have to pay back    10:08:29
22 the relocation expenses to the company; is that right?    10:08:32
23      **A. Within a certain time frame, yes.**    10:08:35
24      Q. Okay. And what was your understanding of    10:08:37
25 what your liability would have been if you had left    10:08:39

### 31

1 Smith & Wesson within that period of time?    10:08:42
2      **A. What was the question again?**    10:08:45
3      Q. What was your understanding of the amount    10:08:48
4 that you would owe Smith & Wesson if you voluntarily    10:08:50
5 resigned within that time period?    10:08:53
6      **A. My understanding? I really didn't -- I**    10:08:55
7 **didn't think in those terms, so I really -- I couldn't**    10:09:01
8 **tell you.**    10:09:06
9      Q. Do you know whether it would have been in    10:09:06
10 excess of $10,000?    10:09:09
11      **A. It probably would have.**    10:09:11
12      Q. In excess of $20,000?    10:09:12
13      **A. I'm unsure.**    10:09:24
14      Q. When you were working with Smith & Wesson,    10:09:25
15 did you ever consider the fact that you would owe the    10:09:26
16 company money if you decided to resign from your    10:09:29
17 position within that specified period of time?    10:09:30
18      **A. I may have, but, like I say, I'm -- I think**    10:09:34
19 **of positive things, so I didn't really dwell on the**    10:09:37
20 **negative aspects. Maybe at times I thought about it,**    10:09:43
21 **just because it's prudent to look at all things, but**    10:09:48
22 **that wasn't something that I spent a great deal of**    10:09:52
23 **time thinking about.**    10:09:55
24      Q. And did you consider the job at    10:09:56
25 Smith & Wesson to be a dream job for you?    10:09:59

### 32

1      **A. I did.**    10:10:05
2      Q. And did you view it as a second chance for    10:10:05
3 you and your wife?    10:10:08
4      **A. "Second chance," I don't understand that,**    10:10:08
5 **what you're asking.**    10:10:12
6      Q. Did you view the move and the job as a    10:10:18
7 second chance for you and your wife because of the    10:10:18
8 financial circumstances you were in in Ohio?    10:10:20
9      **A. No, those terms "second chance" implies**    10:10:23
10 **that we had blown the first chance and were looking**    10:10:28
11 **for a second opportunity. I had -- we have been**    10:10:38
12 **married now for 43 years, and it was more of a**    10:10:41
13 **situation that put strain on my wife because she**    10:10:45
14 **wasn't necessarily happy leaving the home that we**    10:10:52
15 **raised all our children in and we had lived in for 30**    10:10:56
16 **some years.**    10:11:02
17      **There was a comfort factor that, if anything,**    10:11:03
18 **it was a situation that maybe was a negative for my**    10:11:08
19 **wife, but, you know, we -- we do everything together,**    10:11:18
20 **so it was an opportunity for her to -- her and I to**    10:11:23
21 **experience some different things and live in a**    10:11:28
22 **different part of the country, but change like that is**    10:11:31
23 **never a comfortable thing. We were more comfortable**    10:11:33
24 **where we were.**    10:11:36
25      Q. And what was your financial situation as of    10:11:37

### 33

1 March of 2013?    10:11:41
2      MR. LEE: Objection to the form of the    10:11:44
3 question, but you may answer.    10:11:45
4      **A. Like I was saying, 40 some years, there are**    10:11:48
5 **ups and downs. I think that we were in a period where**    10:11:54
6 **there was a downturn, but we were recovering from the**    10:12:02
7 **-- we certainly weren't at the bottom at the time**    10:12:08
8 **Smith & Wesson contacted us.**    10:12:13
9      **So we had a downturn, when my son found**    10:12:13
10 **employment someplace else, he was valuable to the**    10:12:18
11 **company, and we lost some revenue because of that.**    10:12:22
12 **But, with that said, we started rebounding from that**    10:12:27
13 **period, and as Joe gained experience and got better at**    10:12:30
14 **what he was doing, our revenue started coming right**    10:12:37
15 **back up.**    10:12:42
16      **So I don't look at it in terms of we were**    10:12:42
17 **backed into a corner type of thing. We were in a**    10:12:48
18 **field that was retracting in that the sharpening of**    10:12:53
19 **tools was being done less and less and more companies**    10:12:57
20 **were going to indexable tools, meaning the portion**    10:13:01
21 **that got dull, you could unbolt it and bolt in another**    10:13:05
22 **insert that would be sharp again.**    10:13:09
23      **So as that field of indexable inserts grew,**    10:13:12
24 **Lake Tool would, for that type of business, would**    10:13:18
25 **retract. So it was more of a situation of looking**    10:13:22

Baker, Earl Donald                                          August 14, 2020

10 (Pages 34 to 37)

---

**34**

1  down the road and saying I would probably have enough
2  business for a small shop that, regardless of industry
3  trends, I would be fine, but it was an opportunity to
4  work with a manufacturer that I somewhat idolized, and
5  it would be in my skill set as far as I thought it
6  would be a very good fit for them and for me.
7       Q.  And what was your net worth as of March of
8  2012?
9       MR. LEE:  Objection to the form of the
10  question, but you may answer.
11       A.  I really couldn't say.  It wasn't something
12  that we -- that we calculated.  Some people are all
13  about what they own, what their net worth is.  We -- I
14  really couldn't tell you what it was at that point.
15       Q.  Let me have you look at Exhibit 2, which is
16  a Smith & Wesson document with the title Cell
17  Coordinator.
18            (Exhibit 2 previously marked
19            for identification and referenced
20            herein: Cell Coordinator
21            TELG_001538 - TELG_001540)
22       Q.  Have you ever seen Exhibit 2 before?
23       A.  I have.
24       Q.  Did you see it while you were employed with
25  Smith & Wesson?

---

**35**

1       A.  I may have.
2       Q.  And was it your understanding that this was
3  the job description for your position as cell
4  coordinator?
5       A.  It appears to be, yes.
6       Q.  And when you first started working for
7  Smith & Wesson, your predecessor was Stanley Wnuk,
8  W-N-U-K?
9       A.  Yes.
10       Q.  Is that right?
11       A.  Wnuk, yes.
12       Q.  Wnuk.  When you first started, you worked
13  with Mr. Wnuk for about three months; is that right?
14       A.  Yes.
15       Q.  And you said before that you had not worked
16  with pitch boards before.  Did Mr. Wnuk or other
17  Smith & Wesson employees provide training to you on
18  how to prepare the pitch boards?
19       A.  Yes.  My initial role in hiring, there's
20  normally a period where you're given the scope of what
21  your company is trying to do by your hiring,
22  whether -- whether you're being brought into overall
23  the department, maintain, improve.  And the mandate I
24  was given when I started was to maintain what they
25  considered to be a successful department.

---

**36**

1       So Stanley was tasked with trying to make sure
2  that there was no lag in the successes he had to when
3  I took over.  So it was more of a role in maintaining
4  it the way that it was.  But I wasn't received -- or
5  didn't receive any mandate at that time to change what
6  they considered to be successful.
7       Q.  And how did you learn to maintain the pitch
8  boards?
9       A.  At the time I started, Stanley did not
10  maintain them but Mike Jurga did.  And then before
11  Mike Jurga took over, there was a gentleman named Chet
12  Liska that -- he must have retired shortly before I
13  started, because Chet would come in, and I became
14  acquainted with Chet, you know, on his visits, but
15  Chet Liska maintained the boards for Stanley prior to
16  Mike Jurga taking over.
17       So when I first came on, it wasn't necessarily
18  a function that Stanley himself performed but that
19  Mike had.  And since Mike was staying there, there
20  wasn't a great emphasis put on me maintaining the
21  board.  However, when Flatley became -- interacted
22  with me personally, it seemed evident that he wanted
23  me to maintain the board as opposed to Jurga, so I
24  started taking over those jobs from Mike.  So it was
25  something that Mike Jurga, Dan Durrand, and myself did

---

**37**

1  jointly every morning.
2       Q.  When did -- you said at some point Larry
3  started interacting with you directly.  When did he
4  first start interacting with you directly?
5       A.  Just on a daily basis, every morning at the
6  exact same time, and then we also had a meeting once a
7  week.  But it was just, rather than directing
8  questions to Mike, he was directing questions to me.
9  And, you know, he would tell me, okay, I want this
10  done this way, I want this done differently, but he
11  wasn't directing that to Mike, he was directing that
12  to me.
13       So gradually I just took ownership and started
14  doing it, but, again, it was -- everything that we did
15  in the cutter department was a joint venture.  So even
16  though I say "I," I didn't personally do all those
17  things.  That was Mike Jurga, Dan Durrand, and myself.
18       Q.  And did your interactions with Mr. Flatley
19  increase after Mr. Wnuk left?
20       A.  Did they increase?  No.  The same situation
21  we had, interactions we had with Stanley, met him once
22  a day during that what they called a Gemba Walk,
23  that's where they review the boards.  He dealt with
24  Stanley there.  He had a staff meeting once a week.
25  We had a once-a-week vendor meeting and a once-a-week

---

Baker, Earl Donald                                                    August 14, 2020

11 (Pages 38 to 41)

---

**38**

1  meeting in his office. And he maintained the same
2  frequency with me after Stanley left.
3      Q. Okay. And did you participate in those
4  meetings before Stanley left?
5      A. Yes. We did together. We went -- so all
6  of those same meetings, Stanley never met with
7  Mr. Flatley on those scheduled meetings by himself.
8      So I'm not saying that they didn't ever meet on
9  their -- without me there, but all of those -- at
10  least all of those scheduled meetings that were
11  scheduled for Stanley I was at -- I was at that
12  meeting.
13      Q. So you also started working with RoboCribs
14  once you started with your position as a cell
15  coordinator, right?
16      A. Yes.
17      Q. And how did you learn to work with the
18  RoboCribs?
19      A. There was a -- there were problems when I
20  came in, in that they didn't -- they hadn't even
21  inventoried the Crib 99, which is not necessarily a
22  vending machine, it's just a big room that resembled a
23  cage.
24      So they didn't know how many tools they had.
25  They weren't inventoried. They didn't have them

---

**39**

1  computerized. And they had boxes stacked probably
2  four boxes high on top of the shelves that they
3  hadn't -- they had no idea what was in them.
4      So we had to get an idea of what tools we had.
5  The system when we got there was to make tools as we
6  ran out. We'd have the stock out. We would try to
7  get the stock out taken care of.
8      So there was not a -- I learned the system of
9  the RoboCribs as a daily way to -- to get -- inventory
10  what we had.
11      Q. You mentioned the RoboCribs were different
12  than Crib 99, right?
13      A. Yes.
14      Q. They're almost like vending machine
15  dispensers for tooling, cutter tools, right?
16      A. Yes.
17      Q. And it was a combination of tools that
18  Smith & Wesson made itself and then tools of MSC and
19  Pioneer, correct?
20      A. Yes. Lindco as well.
21      Q. Okay. And how many RoboCribs were there in
22  the cutting department?
23      A. In the cutting department? None.
24      Q. Yes, in the cutting department.
25      A. There were none.

---

**40**

1      Q. How many RoboCribs were you responsible for
2  as the cell coordinator?
3      A. All of them.
4      Q. Okay. And how many were there?
5      A. I believe we had 13 -- 13 vending machine
6  RoboCribs, and then Crib 99, which was not a vending
7  machine.
8      Q. Right. So in the -- in the RoboCrib for
9  the third-party tools, did you come to learn that
10  certain of them were there on consignment?
11      A. We learned that day one.
12      Q. Okay. How did you learn that?
13      MR. LEE: Objection to the form of the
14  question, but you may answer.
15      A. Again, it's a function of our job, you
16  know, how the system works and what tools belong to
17  MSC, how the vending machine works. You learn that
18  day one, because right now -- or as you vended the
19  tool, then it becomes an invoice instantly.
20      So our tools, when we put them in, we put them
21  in in a different fashion so that we weren't charged
22  for them when they were vended out.
23      So, again, as a function of the job, that was
24  90 percent of what we did. So you learned that day
25  one. That's like -- without having that knowledge,

---

**41**

1  you couldn't -- you couldn't work -- you couldn't do
2  your job.
3      Q. And you also understood when you first
4  started working for Smith & Wesson that there were two
5  primary vendors of cutting tools, correct?
6      A. Yes.
7      Q. And that was Pioneer and MSC, correct?
8      A. Yes.
9      Q. And did you understand why there were two
10  primary vendors of cutting tools?
11      A. Yes.
12      Q. What was your understanding?
13      A. It was that in order to keep from having so
14  many different vendors you'd spend -- if you were
15  trying to get the lowest price to the penny, you might
16  have to review hundreds of vendors. There were tons
17  of vendors.
18      So in order to streamline the system, you would
19  have two main vendors and then a number of ancillary
20  or specialized vendors that would do specialized work.
21  So as much as could be done, the bulk of that work
22  would go through those two main vendors.
23      Q. And did you ever see the Alvarez & Marsal
24  study and report concerning tooling?
25      A. Have I ever seen it? Yes.

---

Baker, Earl Donald                                    August 14, 2020

12 (Pages 42 to 45)

### 42

1     Q.  Did you see it while you were employed by   10:26:01
2  Smith & Wesson?   10:26:03
3     A.  I can't say.  I don't recall ever seeing   10:26:06
4  it.   10:26:08
5     Q.  Okay.  Did anybody tell you about it while   10:26:08
6  you were employed at Smith & Wesson?   10:26:10
7     A.  Alvarez & Marsal, no, I don't believe so.   10:26:12
8     Q.  And was it your understanding that MSC and   10:26:19
9  Pioneer signed letters of intent with Smith & Wesson?   10:26:23
10     A.  Yes.   10:26:27
11     Q.  Did you ever see those letters of intent?   10:26:27
12     A.  Yes.   10:26:32
13     Q.  And when did you first see those?   10:26:35
14     A.  I can't say for sure, but my -- I really   10:26:39
15  can't say for sure.  I'm not sure the first time I saw   10:26:44
16  it.   10:26:46
17     Q.  But you were employed by Smith & Wesson,   10:26:48
18  right?   10:26:51
19     A.  I believe so.   10:26:52
20     Q.  Okay.  And you understood that Pioneer and   10:26:54
21  MSC were distributors of tools, not manufacturers,   10:26:58
22  right?   10:27:02
23     A.  That's not necessarily true.   10:27:03
24     Q.  Why not?   10:27:06
25     A.  I visited both of their facilities to see   10:27:08

### 43

1  their manufacturing capabilities so that they were   10:27:13
2  distributors and they also both had a manufacturing   10:27:17
3  facility where they made tools, yes.   10:27:23
4     Q.  And there were certain other companies like   10:27:26
5  Pacific that were just manufacturers, right?   10:27:29
6     A.  I don't necessarily agree with your term   10:27:32
7  "just manufacturers."  I think they also, much like   10:27:41
8  Lake Tool, marketed their product, and they were --   10:27:44
9  did not go through, exclusively, through a   10:27:48
10  distributor.  We dealt with them directly, but yet   10:27:56
11  they manufacture tools just like Pioneer and MSC.   10:27:59
12     Q.  What was your relationship like with   10:28:06
13  Mr. Flatley when you first arrived at Smith & Wesson?   10:28:11
14     A.  Well, very good, I would say.   10:28:14
15     Q.  Uh-huh.  And did it change at some point?   10:28:18
16     A.  Yes.   10:28:21
17     Q.  And when was that?   10:28:22
18     A.  I can't say that it changed abruptly, but   10:28:25
19  there was a period around the EASTEC -- when the   10:28:33
20  EASTEC Trade Show began where I noticed that's when it   10:28:42
21  first started to change.   10:28:46
22     Q.  When was the EASTEC event?   10:28:49
23     A.  Should have been -- I'm not positive.  I'd   10:28:52
24  say June-ish of 2013.  It would have been in the late   10:28:58
25  spring, early -- early summer, but that -- that can   10:29:05

### 44

1  be -- that can be attained through just Googling on   10:29:10
2  EASTEC Trade Show.   10:29:15
3     Q.  And but you did have some challenges with   10:29:16
4  Mr. Flatley in around mid April of 2013, right?   10:29:20
5     MR. LEE:  Objection to form.  Objection to   10:29:28
6  the form of the question, but you may answer.   10:29:30
7     Q.  Let me restate it in case there's any   10:29:32
8  confusion.   10:29:34
9  You did have some challenges with Mr. Flatley's   10:29:35
10  management style by at least mid April of 2013, right?   10:29:40
11     MR. LEE:  Objection to the form of the   10:29:43
12  question, but you may answer.   10:29:45
13     A.  When you say "challenges," if you're   10:29:48
14  working with any individual, you -- there are   10:29:52
15  challenges.  Like I said, I have a successful   10:29:58
16  marriage, but to say that -- there are challenges with   10:30:02
17  that.  There are interpersonal styles that you have to   10:30:07
18  adapt to, and it's a relationship like any other.   10:30:13
19  But as far as were there negative aspects that   10:30:20
20  sent up flags, no.  We had a good working   10:30:24
21  relationship, and you can see through the review that   10:30:29
22  took place in around that time frame, in July -- in   10:30:36
23  June or July of 2013, he sent me his expectations in   10:30:42
24  every aspect.  So we didn't have a bad relationship.   10:30:47
25  As a matter of fact, I was struck with the fact   10:30:53

### 45

1  that we went to a restaurant, and I know it's a   10:30:55
2  strange thing, but Mr. Flatley ordered elk.  I   10:31:00
3  commented that I wasn't an adventure seeker, and I   10:31:08
4  thought it odd that he actually cut a piece of elk   10:31:12
5  with his knife and fork and handed it to me and wanted   10:31:16
6  me to try the elk, and I thought that was very   10:31:21
7  personal.  But I think it was indicative of the   10:31:24
8  relationship that we had at that time.   10:31:27
9  He was a difficult person to deal with in his   10:31:29
10  management style.  Every one of his managers had   10:31:33
11  voiced it to me at some point.  But I don't believe I   10:31:38
12  had any different relationship with Mr. Flatley than   10:31:42
13  any of his other CCs that worked for him.   10:31:46
14     Q.  And was that true throughout your   10:31:51
15  employment?   10:31:53
16     A.  No, it was not.   10:31:54
17     Q.  And when did that change?   10:31:57
18     MR. LEE:  Objection to the form of the   10:32:01
19  question, but you may answer.   10:32:02
20     A.  Again, I said that started to change right   10:32:04
21  around the EASTEC Trade Show, and it was a gradual   10:32:07
22  progression.   10:32:11
23     Q.  Let me refer you to Exhibit 3, which is   10:32:11
24  April 15, 2013 Facebook post by you.   10:32:15
25  (Exhibit 3 previously marked   10:32:19

Baker, Earl Donald                                      August 14, 2020

13 (Pages 46 to 49)

---

**46**

1  for identification and referenced
2  herein: April 15, 2013 Facebook post)                    10:32:19
3  Q.  And in it you reference getting rated by          10:32:19
4  Bill Marshall about evaluating your direct supervisor.   10:32:23
5  Who is Bill Marshall?                                  10:32:27
6  A.  My cousin.                                          10:32:29
7  Q.  And why did you need advice from him about        10:32:32
8  your direct supervisor?                                10:32:34
9  A.  I didn't need advice from him.                     10:32:35
10  Q.  Did you seek advice from him on anything,         10:32:45
11  on any topic?                                          10:32:45
12  A.  No, not really.  I don't believe so.  But I       10:32:48
13  do know that Bill is someone I respect.  He's a plant  10:32:52
14  manager at a shop in New York, was successful in his   10:32:58
15  business, and he feels that, because of my             10:33:04
16  relationship and that I'm open to input, that he       10:33:07
17  shared with me that, if you were making a move, the    10:33:11
18  one thing that -- one factor he would look at was your 10:33:18
19  relationship with your immediate supervisor, and I     10:33:22
20  thought that was good advice.                          10:33:27
21  Q.  And how did that make a huge difference in        10:33:30
22  how -- how much you enjoyed your job?                  10:33:35
23  MR. LEE:  Objection to the form of the                 10:33:38
24  question, but you may answer.                           10:33:39
25  A.  I feel like I did evaluate the fact -- I          10:33:40

---

**47**

1  thought Larry was intelligent and that we had a        10:33:49
2  relationship where I had strengths in one area, he had 10:33:55
3  strengths in another, and that, if we interacted in    10:34:01
4  the way a manager and a subordinate should, I think we 10:34:05
5  would make a formidable team.                          10:34:10
6  And so, based on my initial assessment of              10:34:12
7  Mr. Flatley, I felt like we were going to be a         10:34:16
8  successful team, and I was glad that Bill had given me 10:34:20
9  that advice.                                           10:34:24
10  Q.  Turn to the next page of the Facebook post        10:34:26
11  there saying -- the second post by you.  It starts,    10:34:30
12  "God worked out so many details."  Is that a post that 10:34:37
13  you made on Facebook?                                  10:34:39
14  A.  Yes, it is.                                        10:34:41
15  Q.  And you wrote that yourself?                       10:34:41
16  A.  I guess.                                           10:34:44
17  Q.  And it says, "sold the business in two             10:34:45
18  weeks and shop two weeks later."  Was that an accurate 10:34:48
19  statement -- accurate statement?                       10:34:52
20  A.  Yeah, I think so.                                  10:34:54
21  Q.  And it says, "got asking price for both."          10:34:57
22  Is that an accurate statement?                         10:35:01
23  A.  Yeah, I believe so.  Well, no, I don't             10:35:04
24  believe -- I don't think it is.  When I say "two       10:35:08
25  weeks," I did not get my asking price on the shop, if  10:35:18

---

**48**

1  you want to be accurate.                               10:35:21
2  Q.  But you feel that you got the asking price         10:35:24
3  for the business?                                      10:35:26
4  A.  I got what I offered -- or asked -- was the        10:35:28
5  offering price.                                        10:35:33
6  Q.  So you spoke with the competitor and said          10:35:33
7  I'll sell you the business for $50,000 and they         10:35:37
8  agreed --                                              10:35:41
9  A.  Yes.                                               10:35:41
10  Q.  -- is that right?  Okay.                           10:35:41
11  You suggested this earlier, but did some other         10:35:45
12  employees have difficulty working with Mr. Flatley as  10:35:48
13  a manager?                                             10:35:52
14  MR. LEE:  Objection to the form of the                 10:35:52
15  question, but you may answer.                           10:35:55
16  A.  They had expressed they had.                       10:35:56
17  Q.  Okay.  And what kinds of difficulties did          10:36:00
18  they tell you that they were having with Mr. Flatley's 10:36:06
19  management?                                            10:36:06
20  A.  Tony Martin or Tony Nelson told me when he         10:36:08
21  first was here that he felt Larry was -- rode him      10:36:14
22  harder than the other CCs.  Tony was younger, and I    10:36:22
23  don't know if that was a factor, but he said that      10:36:29
24  Larry was pretty harsh with him and that he had        10:36:32
25  somewhat leveled out and wasn't as bad.                10:36:37

---

**49**

1  Charlie had mentioned that Larry had multiple          10:36:42
2  times forgotten when Charlie had asked for time off    10:36:49
3  and that he said his process was that Larry would      10:36:54
4  forget these details, so he had a habit of asking for  10:37:00
5  the time, getting Larry to put it in writing, and then 10:37:05
6  to remind him he would send emails two weeks out, one  10:37:09
7  week out, and so forth, because Larry would invariably 10:37:13
8  forget that he had given time off.                     10:37:18
9  He also told me that Larry was constantly              10:37:20
10  on him for missing meetings and that -- that Larry was 10:37:25
11  kind of tough, but he had had his difficulties with    10:37:31
12  him.                                                   10:37:38
13  Stanley Wnuk framed him as he didn't personally        10:37:38
14  care for him, called him an SOB, but said that,        10:37:45
15  generally speaking, Larry was tough but fair.  But     10:37:52
16  each one of them, with the exception of Dave           10:37:58
17  Billingsly, had mentioned some tough interactions,     10:38:02
18  some of which, you know, seven years later I can't     10:38:09
19  recall, but they did give details that he had problems 10:38:12
20  with -- they had problems with Larry at different      10:38:17
21  points.                                               10:38:20
22  Q.  And Tony Nelson, Charlie Martin, and Dave          10:38:21
23  Billingsly were all cell coordinators like you, right? 10:38:26
24  A.  Yes.  The ones that you mentioned, those           10:38:30
25  comprised specialty services.  So those were the cell  10:38:35

---

Baker, Earl Donald                                    August 14, 2020

14 (Pages 50 to 53)

50

1    coordinators under Flatley.                                    10:38:39
2         Q.  And you mentioned this earlier, but you met           10:38:44
3    with Mr. Flatley daily to review your pitch board,            10:38:47
4    right?                                                        10:38:50
5         A.  Yes.                                                 10:38:50
6         Q.  And were other people there when -- when             10:38:51
7    the two of you reviewed the pitch boards?                     10:38:55
8         A.  Yes.                                                 10:38:57
9         Q.  Who else was present?                                10:38:57
10        A.  Mike -- there was, on the bottom of the              10:38:59
11   pitch board, there's a sheet that states who is              10:39:04
12   responsible for the board and who should be present.         10:39:08
13   On that sheet was Dan Durrand, Mike Jurga, Derrick           10:39:12
14   Hedley, and myself, and --                                   10:39:21
15        Q.  What was Derrick's last name?                        10:39:24
16        A.  Hedley, H-E-D-L-E-Y.                                 10:39:24
17        MR. LEE:  Sorry.  Whenever is a good point,             10:39:31
18   just a short break.                                          10:39:36
19        MS. BERTRAM:  Yeah, let's do that.                       10:39:38
20        MR. LEE:  Is right now good or do you need              10:39:39
21   -- do you want to wrap up a point or something?             10:39:41
22        MS. BERTRAM:  No, this is good.                          10:39:44
23        MR. LEE:  Okay.  About five minutes.                     10:39:45
24        VIDEO SPECIALIST:  The time is 10:40 a.m.               10:39:48
25   and we're off the record.                                   10:39:52

51

1         (Proceedings recessed)                                   10:39:53
2         VIDEO SPECIALIST:  The time is 10:48 a.m.               10:47:57
3    We're back on the record.                                    10:48:00
4    BY MS. BERTRAM:
5         Q.  Mr. Baker, you said that there were others         10:48:03
6    that were present for the pitch meetings.  Those took       10:48:06
7    place around 8:15 each morning, right?                       10:48:12
8         A.  Yes.                                                 10:48:14
9         Q.  And were Mr. Durrand, Mr. Jurga and Mr.             10:48:14
10   Hedley always present with the pitch meetings with          10:48:20
11   Mr. Flatley?                                                 10:48:21
12        A.  No.                                                  10:48:22
13        Q.  Pardon me?                                           10:48:22
14        A.  No.                                                  10:48:23
15        Q.  Why not?                                             10:48:23
16        MR. LEE:  Object to the form of the                      10:48:26
17   question, but you may answer, if you know.                   10:48:28
18        A.  Why Derrick Hedley wasn't there, I'm aware         10:48:30
19   of what -- he probably missed 180 meetings in a year's      10:48:36
20   time.                                                        10:48:43
21        Q.  What about Mr. Durrand, was he always at           10:48:44
22   the meetings?                                                10:48:47
23        A.  Not always but generally 90 percent.               10:48:48
24        Q.  And what about Mr. Jurga?                           10:48:51
25        A.  I can't remember he ever missing one.              10:48:54

52

1         Q.  Okay.  And Mr. Flatley was there as well,          10:48:57
2    right?                                                       10:49:01
3         A.  Generally, yes.  Again, maybe 95 percent.          10:49:06
4         Q.  And who else would attend the meetings            10:49:07
5    other than the four individuals you've described?           10:49:14
6         A.  Sometimes Bob Francis, sometimes                    10:49:15
7    Mr. Fontaine.  There were a couple other -- Bill Holt       10:49:23
8    attended meetings, and sometimes other engineers, if        10:49:30
9    there was a specific problem, Kris Gallant -- that's        10:49:37
10   as many as I can think right now.                           10:49:46
11        MR. LEE:  Can you spell Kris Gallant's               10:49:48
12   name?                                                       10:49:51
13        A.  Yes.  It's unusual.  I think it has a K --        10:49:51
14   K-R-I-S, and then G-A-L-I -- G-A-L-A-N-T, I believe.        10:49:58
15        Q.  And how often did Mr. Francis attend the         10:50:08
16   pitch board meetings?                                       10:50:12
17        Q.  How often?  Occasionally.                          10:50:14
18        Q.  More than once a week?                             10:50:20
19        A.  No.                                                 10:50:21
20        Q.  More than once a month?                            10:50:23
21        A.  Probably no.                                        10:50:25
22        Q.  Probably what?                                      10:50:31
23        A.  Probably no.                                        10:50:32
24        Q.  Okay.  So maybe every couple of months he         10:50:33
25   attended?                                                   10:50:36

53

1         A.  That's about right.                                 10:50:38
2         Q.  Okay.  And what about Mr. Fontaine, how           10:50:40
3    often did he attend the pitch board meetings?               10:50:42
4         A.  Very seldom until after February of 2014.        10:50:46
5         Q.  And let's focus on the period prior to           10:50:50
6    February of 2014.  How often did Mr. Fontaine attend        10:50:56
7    the meetings, pitch board meetings?                         10:51:02
8         A.  Rarely.                                             10:51:06
9         Q.  And how often did he attend after February       10:51:06
10   2014?                                                       10:51:09
11        A.  Fairly regularly.                                   10:51:15
12        Q.  Now the pitch board for the -- for the           10:51:18
13   cutting department, what was it physically composed        10:51:21
14   of?  Was it wood or whiteboard?                             10:51:25
15        A.  It would be a commercially purchased             10:51:32
16   whiteboard, but it had plastic -- it wasn't just --        10:51:37
17   they started with that and then they added things to        10:51:45
18   that.                                                       10:51:48
19        Q.  Okay.  And there were plastic sleeves that        10:51:48
20   you could put different reports into, right?                10:51:52
21        A.  Correct.                                           10:51:54
22        Q.  And did you write on those reports during         10:51:55
23   the course of a day or during the course of a week?         10:51:59
24        A.  No.  That was updated every morning prior        10:52:03
25   to the pitch board with the nightly numbers, because       10:52:07

Baker, Earl Donald

August 14, 2020

15 (Pages 54 to 57)

---

54

1 the night shift, we ran 24/7, so the night shift
2 numbers wouldn't be available until the morning right
3 before the pitch board.
4     Q.  So new sheets were put in each day; is that
5 right?
6     A.  Yes.
7     Q.  And as things occurred during the course of
8 the day they were updated in handwriting, right?
9     A.  No.
10    Q.  Were they -- were they ever updated?
11    A.  The first thing in the morning.
12    Q.  Okay.  So there was no handwriting at all
13 on your pitch board?
14    A.  There was some.
15    Q.  And which -- which reports on the pitch
16 board were updated in handwriting?
17    A.  A-3 portion of the board.
18    Q.  And what information was added -- let me
19 back up a little bit.  What is the A-3 sheet?
20    A.  That would be your problem worksheet.
21    Q.  It identifies problems that have come up
22 during the course of the workday?
23    A.  That's correct.
24    Q.  And what types of information would you add
25 to it, the A-3?

---

55

1     A.  A tool number, it might be being broken at
2 a regular rate in a certain department, and you would
3 write which engineer was over that department.  So you
4 would identify a problem and who the ownership of the
5 solution to that problem would be.
6     MS. BERTRAM:  John, Mr. Baker, at least on
7 my computer, is -- his image is very, very dark.  Is
8 that that way for you too?
9     MR. LEE:  That's very dark.  I mean darker
10 than you and darker than Linda.
11    Earl, can you do something to bring more light
12 into your room?
13    THE WITNESS:  Sure.
14    MR. LEE:  Either turn on the -- let's see
15 if --
16    THE WITNESS:  I felt these might offer
17 glare.
18    MS. BERTRAM:  Yeah, I think they would.  It
19 just -- it happened, I think maybe the sun went down
20 outside or something like that in North Carolina, but
21 -- or a big cloud came by.
22    THE WITNESS:  I started leaning back.
23    MS. BERTRAM:  Okay.  I think that's -- I
24 think that's the problem.
25    THE WITNESS:  See if I lean forward, is

---

56

1 that different?
2     MR. LEE:  Yeah.  I mean, like Connie is in
3 a bright room.  I can see Connie much -- Connie and
4 Jack much better, but you are definitely darker than
5 Connie, for example, the room is -- just try different
6 lighting.
7     THE WITNESS:  Okay.  Hold on a second.
8     VIDEO SPECIALIST:  Do you want to go off
9 the record?
10    MS. BERTRAM:  I don't think we need to.
11 BY MS. BERTRAM:
12    Q.  So we were talking about pitch boards.  You
13 said that you were expected to update pitch boards
14 daily, correct?
15    A.  Yes.
16    Q.  And at the end of the day what did you do
17 with the reports that were slipped into the laminate
18 sleeves?
19    A.  Nothing.
20    Q.  Were they ever removed?
21    A.  Yes.
22    Q.  By who?
23    A.  By me, and there was one occasion where I
24 expected Mr. Flatley took sheets from the board.
25    Q.  And when you removed the sheets from the

---

57

1 board, where did you put them?
2     A.  In a file in my office.
3     Q.  And how was that file labeled?
4     A.  I can't remember after this many years, but
5 it was labeled with a little tab at the top.  It
6 probably said one category for each different sleeve,
7 which there were 24 sheets, so it would have been
8 labeled pitch board, old pitch board, you know, I
9 can't tell you what it was -- what the exact label
10 was.
11    Q.  And do you know what the other cell
12 coordinators who were supervised by Mr. Flatley, do
13 you know what they did with their slips that were in
14 the laminated packets along their pitch boards?
15    A.  No idea.
16    Q.  When was the last time you saw the file
17 with the whole pitch board sheets?
18    A.  It would have been the last week I worked
19 there.
20    Q.  And where were they at that point?
21    A.  In the credenza to the right of my desk on
22 the far right-hand bottom drawer.
23    Q.  And did you ever remove any of those sheets
24 and take them home with you?
25    A.  I have -- had some in my briefcase.  We had

---

Baker, Earl Donald

August 14, 2020

16 (Pages 58 to 61)

---

**58**

| | | |
|---|---|---|
| 1 | to change the information on there at times, so it was | 10:57:40 |
| 2 | a ongoing process, especially after February. | 10:57:48 |
| 3 | Q. And Mr. Flatley met with the three other | 10:57:51 |
| 4 | cell coordinators each morning as well, right? | 10:57:59 |
| 5 | A. Yes. | 10:58:03 |
| 6 | Q. And you weren't present when he met with | 10:58:04 |
| 7 | the other cell coordinators to discuss their pitch | 10:58:05 |
| 8 | boards, right? | 10:58:09 |
| 9 | A. No. | 10:58:10 |
| 10 | Q. And you don't have any personal knowledge | 10:58:10 |
| 11 | of the discussions he had with them, right? | 10:58:12 |
| 12 | A. No. | 10:58:13 |
| 13 | Q. And as part of your work, did you ever go | 10:58:14 |
| 14 | and review the pitch boards of the other cell | 10:58:20 |
| 15 | coordinators? | 10:58:27 |
| 16 | A. Yes. | 10:58:27 |
| 17 | Q. How often did you do that? | 10:58:28 |
| 18 | A. I would say probably once a month or -- it | 10:58:30 |
| 19 | would vary. There were some periods of times when | 10:58:36 |
| 20 | they were undergoing problems, particularly the | 10:58:41 |
| 21 | departments where we would meet daily at the other | 10:58:45 |
| 22 | boards. | 10:58:47 |
| 23 | Q. Okay. And you indicated that you also met | 10:58:47 |
| 24 | with Mr. Flatley once a week to discuss the | 10:58:51 |
| 25 | performance of the cutting department, right? | 10:58:54 |

**59**

| | | |
|---|---|---|
| 1 | A. No, that isn't right. | 10:58:57 |
| 2 | Q. Did you meet with Mr. Flatley weekly? | 10:59:02 |
| 3 | A. Yes. | 10:59:05 |
| 4 | Q. And for what purpose? | 10:59:05 |
| 5 | A. We discussed projects we were currently | 10:59:07 |
| 6 | working on, and he would -- he would ask what issues | 10:59:12 |
| 7 | we were working on, he would record them in his notes, | 10:59:19 |
| 8 | and he would pull out those notes in a later time and | 10:59:23 |
| 9 | update our progress on -- on those issues. | 10:59:30 |
| 10 | Q. And he had a system for taking notes during | 10:59:34 |
| 11 | those meetings, right? | 10:59:37 |
| 12 | A. Yes. | 10:59:38 |
| 13 | Q. And what was your understanding of his | 10:59:39 |
| 14 | system? | 10:59:41 |
| 15 | A. That he took notes, and then he would at | 10:59:42 |
| 16 | times use different colors for when he would review | 10:59:49 |
| 17 | those same topics from the week prior, but it wasn't | 10:59:56 |
| 18 | every time. A lot of times he used just the same | 11:00:01 |
| 19 | pencil, but he would date at the top his entries. | 11:00:05 |
| 20 | Q. And did he ever provide to you a copy -- | 11:00:10 |
| 21 | did he ever provide to you the actual notes that he | 11:00:14 |
| 22 | had prepared? | 11:00:17 |
| 23 | A. He provided copies and at times he did give | 11:00:18 |
| 24 | me an actual, you know, handwritten pages with his | 11:00:23 |
| 25 | notes, yes. | 11:00:28 |

**60**

| | | |
|---|---|---|
| 1 | Q. Was it his practice to give you a copy or | 11:00:28 |
| 2 | the original of the notes after each meeting? | 11:00:31 |
| 3 | A. I can't say he did every time, but I would | 11:00:42 |
| 4 | say frequently. | 11:00:45 |
| 5 | Q. Who also attended the weekly meetings? | 11:00:47 |
| 6 | A. Generally, it was just myself and him. | 11:00:49 |
| 7 | Q. And where did the meetings take place? | 11:00:53 |
| 8 | A. In Larry's office. | 11:00:56 |
| 9 | Q. And would you agree that Mr. Flatley during | 11:00:59 |
| 10 | those meetings pointed out projects that he expected | 11:01:03 |
| 11 | you to lead? | 11:01:08 |
| 12 | A. I wouldn't say that was a fair | 11:01:15 |
| 13 | characterization. | 11:01:15 |
| 14 | Q. You would say it would not be a fair | 11:01:17 |
| 15 | characterization? | 11:01:20 |
| 16 | A. It would not be, no. | 11:01:20 |
| 17 | Q. Did he describe in his notes the projects | 11:01:22 |
| 18 | that were pending for your department? | 11:01:25 |
| 19 | A. Yes. | 11:01:27 |
| 20 | Q. And did he raise concerns or complaints | 11:01:29 |
| 21 | during those weekly meetings about your performance? | 11:01:35 |
| 22 | A. No. | 11:01:39 |
| 23 | Q. Pardon me? | 11:01:40 |
| 24 | A. No. | 11:01:41 |
| 25 | Q. So he never -- he never raised concerns | 11:01:43 |

**61**

| | | |
|---|---|---|
| 1 | about how you were performing in your position during | 11:01:45 |
| 2 | those meetings? | 11:01:49 |
| 3 | A. "Never" is a rather definitive word, but I | 11:01:50 |
| 4 | would say hardly ever. I don't recall more than a | 11:01:55 |
| 5 | couple, but, again, that wasn't the nature of those | 11:02:06 |
| 6 | meetings. | 11:02:10 |
| 7 | Q. Let me -- let me refer you to Exhibit 4, | 11:02:14 |
| 8 | which is an Excel spreadsheet that contains the | 11:02:18 |
| 9 | substance of texts that were produced by you in this | 11:02:22 |
| 10 | litigation. | 11:02:25 |
| 11 | (Exhibit 4 previously marked | 11:02:26 |
| 12 | for identification and referenced | |
| 13 | herein: Spreadsheet pages 1-10 | |
| 14 | containing substance of texts) | 11:02:27 |
| 15 | Q. Do you have Exhibit 4 in front of you? | 11:02:27 |
| 16 | A. Okay. | 11:02:36 |
| 17 | Q. And you report that Larry went off on you | 11:02:40 |
| 18 | that morning. | 11:02:40 |
| 19 | A. The Exhibit 4 you have is text messages -- | 11:02:43 |
| 20 | Q. Right. | 11:02:46 |
| 21 | A. -- correct? | 11:02:47 |
| 22 | Q. Yes, it is. If you look at December 3rd, | 11:02:47 |
| 23 | 2013, that's the one I'm referencing. | 11:02:51 |
| 24 | MR. LEE: So we need to go to that page, I | 11:02:56 |
| 25 | guess. | 11:02:58 |

---

Baker, Earl Donald

August 14, 2020

17 (Pages 62 to 65)

---

**62**

1    MS. BERTRAM:  It's on the -- it's on the    11:02:58
2  first page.    11:02:59
3    Q.  Do you have that in front of you,
4  Mr. Baker?
5    A.  Yes.
6    Q.  Okay.    11:03:11
7    A.  The first page goes from March to October.    11:03:11
8    Q.  Right.  If you look at the last entry, it's    11:03:14
9  October 3rd, 2013, right?    11:03:16
10    A.  Yes.    11:03:18
11    MR. LEE:  Hold on.  Hold on.  Are we    11:03:30
12  looking at the same one right now?    11:03:31
13    MS. BERTRAM:  This should be 4-A is the one    11:03:33
14  I'm referencing.    11:03:36
15    MR. LEE:  I have two 4s.  That's the -- I    11:03:37
16  have a thick one and a thin one.    11:03:39
17    MS. BERTRAM:  The one I'm relying on, the    11:03:50
18  date, the first date is March 12th, 2013.    11:03:50
19    MR. LEE:  Right, 12:55.    11:03:53
20    MS. BERTRAM:  Yes.    11:03:56
21    MR. LEE:  Okay.  That's the thin one.    11:03:56
22  There's another one called -- let's just make sure of
23  it, because there's another one entitled Exhibit 4.    11:03:58
24    MS. BERTRAM:  Exhibits 4-A and 4-B.    11:04:03
25    MR. LEE:  Okay.  So which one is this, the    11:04:05

---

**63**

1  thin one?  Is that A or B?    11:04:10
2    MS. BERTRAM:  The thin one is A.    11:04:12
3    MR. LEE:  Okay.  Got it.    11:04:14
4    Q.  Let me just back up a little bit,    11:04:23
5  Mr. Baker.  Did you have an opportunity to review    11:04:26
6  Exhibit 4-A prior to your deposition?    11:04:29
7    A.  Yes.    11:04:33
8    Q.  And did you have an opportunity to review    11:04:34
9  Exhibit 4-B as well?    11:04:36
10    A.  Mine are not marked A and B.    11:04:39
11    Q.  Exhibit 4-B is a set of text messages that    11:04:43
12  we sent to you two weeks ago, and we had asked    11:04:47
13  Ms. Baker about them during her deposition.  She said
14  that you had taken them in to work with you to look    11:04:55
15  them over.  And then I thought you had them in front    11:04:58
16  of you when we started -- tried to start your
17  deposition two weeks ago.  Do you know what I'm    11:05:00
18  talking about?    11:05:04
19    A.  Yes.    11:05:04
20    Q.  Okay.  Do you have that with you right now?    11:05:05
21    A.  No, I don't.    11:05:08
22    Q.  Okay.  Let's just focus on Exhibit 4-A and    11:05:10
23  I'll get 4-B over to you.    11:05:14
24    And you said you had a chance to look over    11:05:18
25  Exhibit 4-A.  Does it reflect text messages that were    11:05:20

---

**64**

1  sent and received by your devices?    11:05:24
2    A.  When you say "your devices," you mean me    11:05:30
3  personally?    11:05:35
4    Q.  They reflect text messages that were sent    11:05:35
5  and received by the devices of Ms. Baker and you,    11:05:38
6  correct?    11:05:41
7    A.  Yes.    11:05:42
8    Q.  Let's look at Exhibit 4-A.  The last entry    11:05:43
9  on page 1 you report that "Larry went off on me this    11:05:51
10  morning.  I did nothing.  I told him the drill machine    11:05:54
11  is still down.  He said when will it be fixed.  I said    11:05:58
12  I don't know."    11:06:01
13    Does this reflect communications that you had    11:06:06
14  with Mr. Baker during one of these weekly one-on-one    11:06:07
15  meetings?    11:06:10
16    A.  Yes.    11:06:11
17    Q.  Okay.  And when you say, "I did nothing,"    11:06:11
18  was that -- were you reporting what Larry had said to    11:06:17
19  you, that you had done nothing?    11:06:21
20    A.  I can't remember my state of mind at that    11:06:22
21  time, but I can say whether I said I did nothing in    11:06:25
22  response or that I had done nothing wrong, both would    11:06:31
23  be true, but I can't tell which I meant at that time.    11:06:38
24    Q.  And during these one-on-one meetings he    11:06:42
25  would raise concerns about things that had or had not    11:06:44

---

**65**

1  been done; is that right?    11:06:47
2    A.  Like I said, there weren't -- that could    11:06:50
3  happen.  In this case that is not the case.  This is    11:06:58
4  nothing that I have control over, whether a machine is    11:07:01
5  broken down, but yet Larry would have a fit over the    11:07:05
6  fact that something wasn't being done.  But if a    11:07:11
7  machine is broken down, all I can do is tell the    11:07:16
8  maintenance supervisor, Mr. Duffy, that that needs    11:07:21
9  repaired, and he puts it on his list of priorities.    11:07:25
10    Well, Larry going off on me over someone else    11:07:28
11  not doing their job isn't something that I would    11:07:34
12  consider where he is telling me I haven't done my job    11:07:36
13  properly.  That's where someone else hasn't done    11:07:40
14  something to his satisfaction and he's not happy, but    11:07:44
15  that in no way reflects anything I did.    11:07:47
16    Q.  Now let's look at -- there's a binder of    11:08:02
17  materials that includes your -- portions of your    11:08:02
18  document productions, and they're labeled Plaintiffs'    11:08:04
19  Exhibits, and I want you to turn to Exhibit 66.    11:08:07
20    A.  Okay.  We have five different ones here.
21  Let me find out which ones -- okay.  Plaintiffs'
22  Exhibits, I got it.
23    Q.  I'm sorry.  I referred you to the wrong
24  one.  There should be one more.  There's a single
25  binder that says "Production Documents."

---

Baker, Earl Donald

August 14, 2020

18 (Pages 66 to 69)

---

**66**

1    A. Yes.
2        Q. And if you go to the first tab -- in the
3    lower right-hand corner, Exhibit 66.
4        A. I think you have it incorrect again. The
5    production documents don't have any tabs with numbers.
6    It only has tabs with TELG Production and 07219
7    production. But the one saying Production Documents
8    has no tab 66.
9        Q. Right. I'm asking you to turn to the
10   number 66. That's on the bottom right-hand corner of
11   the document. They're in Bates-stamped number order.
12       MR. LEE: Is this something that we have,
13   Jill and I have?
14       MS. BERTRAM: Yes. It should be in the
15   link, and it's probably called "052715 TELG
16   Production."
17       MR. LEE: Okay. Hold on. Jill is looking
18   for it now.
19       MS. BERTRAM: Okay.
20       MR. LEE: Is this in the last email,
21   Connie?
22       MS. BERTRAM: It should be --
23       MR. LEE: We've got multiple emails from
24   Missy.
25       MS. BERTRAM: They all should go into the

---

**67**

1    same link.
2        MR. LEE: Okay. Hold on.
3        MS. BERTRAM: John, did you find them?
4        MR. LEE: No, we can't -- is it an exhibit
5    number? If there's an exhibit number, we can find it,
6    I think.
7        MS. BERTRAM: There's no exhibit number for
8    it. The tab should say TELG Production, and it's one
9    PDF and they're in Bates-stamp order. So you scroll
10   through it looking on the right-hand side and you'll
11   run into Baker 66.
12       MR. LEE: We don't see it. Can you just
13   have Missy resend it, just that one? Because we can't
14   find the TELG. It's certainly not organized that way
15   or identified that way.
16       MS. BERTRAM: She said that Jill downloaded
17   it. I don't -- I don't want to make Jill download it
18   a second time.
19       MR. LEE: We may have downloaded it. We're
20   just having trouble identifying it.
21       MS. BERTRAM: Right. Right. We're asking
22   what the name of the PDF is.
23   John, do you see that? It should say 052715.
24       MR. LEE: 052715, Jill.
25   Can you tell me what it is? That way, it may

---

**68**

1    not matter to me depending on what it is, if Earl can
2    see it and we know what it is.
3        MS. BERTRAM: These are production
4    documents from Mr. Baker's production to OSHA on May
5    27th, 2015.
6        MR. LEE: Jill, did you download everything
7    that Missy sent you? Okay.
8        Earl, are you able to identify what Connie is
9    referring to?
10       THE WITNESS: Yeah. It's Larry's
11   handwritten notes taken in those weekly meetings.
12       MS. BERTRAM: Are you comfortable with me
13   proceeding while you continue to look, John?
14       MR. LEE: Hold on. We don't have any
15   handwritten notes.
16       MS. BERTRAM: You do. It's within the PDF.
17   The PDF is a single compilation of the production
18   documents ordered in Bates-stamp number.
19       MR. LEE: Are you going to have like a
20   series of questions on this notes list? Because if
21   there is, I would just like to take a little break and
22   get these notes.
23       MS. BERTRAM: Let's go ahead and do that.
24       MR. LEE: Maybe have Missy talk to Jill.
25       MS. BERTRAM: What number should she call

---

**69**

1    her on?
2        MR. LEE: 312-241-1420, and have Missy
3    describe how Jill can find this, these notes.
4        MS. BERTRAM: Right. Because I'm going to
5    have a lot of questions about the materials, the
6    production materials, so you definitely want to have
7    it in front of you. So let's go on a little break
8    right now.
9        MR. LEE: Okay.
10       VIDEO SPECIALIST: The time is 11:15 a.m.,
11   and we're off the record.
12       (Proceedings recessed)
13       VIDEO SPECIALIST: The time is 11:25, and
14   we're back on the record.
15   BY MS. BERTRAM:
16       Q. Mr. Baker, I'd like you to look at the
17   production documents Bates-stamped Baker 66 and Baker
18   67. And you said these are handwritten notes of
19   Mr. Flatley, right?
20       A. Yes.
21       Q. And the first page, which is Baker 66,
22   those are dated May 20th, 2013, right?
23       A. Yes.
24       Q. And you had been with the company less than
25   two months at that point.

---

Baker, Earl Donald

August 14, 2020

19 (Pages 70 to 73)

---

**70**

1  A. That's correct.
2  Q. Would Mr. Wnuk have been in this meeting
3  with you?
4  A. Yes.
5  Q. Okay. And this was one of your weekly
6  meetings; is that right?
7  A. That's correct.
8  Q. Okay. And in the notes it talks about some
9  projects that the department needed to undertake,
10  correct?
11  A. Yes. We -- basically, we discussed what
12  things we were currently working on, and then Larry
13  would note those and then put just action points. At
14  times he would interject something that needed to be
15  done in order to attain that, that goal, but this was
16  mainly asking us what we're working on and giving him
17  action points to check up to make sure we were
18  progressing on those issues.
19  Q. And there's some handwriting at the bottom
20  of that page. Is that your handwriting?
21  A. Yes.
22  Q. Okay. And it says "back." Do you know
23  whether Baker 68 or 69 are what you wrote on the back
24  of that page?
25  A. I don't believe 68 goes with that note.

---

**71**

1  Q. What about 69?
2  A. No, that would be Larry's handwriting
3  again. And so when I wrote "back," that meant my note
4  was not complete, but that that note would then be
5  completed on the back of that sheet.
6  Q. Okay.
7  A. So and -- go ahead.
8  Q. And so the fact that --
9  MR. LEE: Sorry. Did you answer whether 69
10  goes with 66 or not?
11  THE WITNESS: It does not.
12  MR. LEE: Okay.
13  Q. So did Mr. Flatley hand you the notes from
14  the May 20, 2013 meeting during the meeting?
15  A. At times he would, but I couldn't recall
16  seven years ago.
17  Q. Right. But you made notes at the bottom at
18  least, right?
19  A. Yes. So in this case I would say he
20  probably did, but I can't recall.
21  Q. Let's go to page 67 on the next page, and
22  those are additional notes from June 3rd, 2013.
23  A. Yes.
24  Q. And those are all in Mr. Flatley's
25  handwriting, correct?

---

**72**

1  A. It appears to be.
2  Q. Okay.
3  MR. LEE: Just for the -- objection to
4  the -- objection to the form of the question in that I
5  do see -- I also see May 20 and I can't tell. I see
6  two dates there on Baker 67.
7  MS. BERTRAM: Right. What Mr. Baker said
8  is that at times he would take his old notes, annotate
9  them, and then put the new date on it.
10  MR. LEE: Okay.
11  Q. Just for clarity, Mr. Baker, the additional
12  notes on the side in the marginalia, those are the
13  ones from June 3rd, 2013, right?
14  A. Generally speaking, but they are also to
15  the top left of the original note where it says, need
16  something to be done, determination of how much
17  training left, that would have probably been an
18  additional note from the 3rd, but, you know, it's --
19  it's really hard to tell with him, but I believe that
20  was an added note, that the original note ended with
21  Pioneer's inventory, and then he added the note to the
22  right of that.
23  Q. And let's turn to Baker 68.
24  A. Okay.
25  Q. And those are your handwritten notes,

---

**73**

1  right?
2  A. Yes, appears to be.
3  Q. Do you know when you made those?
4  A. No.
5  Q. Let's look at Baker 69. Those are your
6  notes as well, right?
7  A. Yes.
8  Q. And do you know when you made those notes?
9  A. I don't know the exact date, but this would
10  have been a later time. If you look at the second,
11  right down towards the bottom where it says staff
12  meeting 12 -- I don't know if it says 12-12-14 -- that
13  would indicate that it was probably something around
14  December.
15  Q. So there's a reference here to Ed Suraci.
16  Had Mr. Flatley suggested that you take training from
17  him?
18  A. No.
19  Q. Pardon me?
20  A. No.
21  Q. Do you know why you made a reference to
22  Mr. Suraci in your notes?
23  A. If I did at that time, I had never met him,
24  and, to my recollection, in February I had never heard
25  his name. This note, which we can't tell for sure

---

Baker, Earl Donald

August 14, 2020

20 (Pages 74 to 77)

74

1    when this note was made, but if it was made in
2    January, I didn't take note of it.  But Ed had the --
3    his main job, aside from mediating what was going on
4    in February, was to train -- to train supervisors or
5    lead men.
6        So if he's talking about training, it's not
7    training of me as much as trying to find a replacement
8    for Dan Durrand, who was the CNC, and Pavel Tarrawonga
9    was raised as the next possible replacement, and
10   Flatley disagreed with him.  So it has to do with Ed
11   Suraci did do one-on-one training with Pavel
12   Tarrawonga.
13       Q.  So above the reference to December, and I
14   think it's 19-2014, there's a line and above it, it
15   says, "Baldor on back order," B-A-L-D-O-R.  What's
16   Baldor?
17       A.  Which -- which --
18       Q.  It's right above the date that you
19   referenced earlier above "Staff Meeting."
20       A.  Okay.  Baldor is usually an electrical
21   motor.  They're a manufacturer.  So I don't know that
22   specific note.  But if it says, "Baldor on back
23   order," that's probably referencing a machine that was
24   broken and the part had been ordered, but it was on
25   back order, so we were probably just discussing how

75

1    soon the machine might be repaired and brought it back
2    up online.
3        Q.  And then under the reference to staff
4    meeting it says, "ISO," I-S-O, and then on the next
5    line it says, "audit."  Do you know what that's
6    referring to?
7        A.  I do not see ISO anywhere.  Oh, okay.
8        Q.  It's about four lines underneath it.
9        A.  So I don't know for sure.  We're trying to
10   do a forensic examination of handwritten notes of
11   incomplete thoughts from seven years ago.
12       So it's my general impression, but I can't tell
13   you for certainty what it was, but ISO audits,
14   International Standards, there are certain documents
15   like what would be on the pitch board that are
16   maintained forever, and so --
17       Q.  Hold on one second.  Hold on one second.  I
18   have to turn that phone off.
19       MR. LEE:  When we get back, Ms. Court
20   Reporter, if you could just read the last question?  I
21   just want to make sure that we're talking about the
22   same thing here.
23       MS. BERTRAM:  I was going to get rid of
24   that phone call.
25       (Discussion regarding telephone not reported.)

76

1        MS. BERTRAM:  I guess we'll get the
2    question and the answer back.  We were talking about
3    ISO audits.
4        (The record was read by the reporter.)
5        MR. LEE:  Okay.  I got the question.
6        A.  So what I was saying --
7        MR. LEE:  Objection to the form for the
8    record.  Objection to the form of the question, but
9    please go ahead and answer it, if you can.
10       A.  Okay.  What I'm saying there, in my
11   estimation, is that because -- because ISO requires
12   certain safety documents to be kept like what's on the
13   pitch board in some cases forever so that there's an
14   audit trail that, if someone were to be hurt down the
15   road, that they can come back and see that all the ISO
16   regulations were followed and that the audits were
17   done.
18       So that's my notation that ISO is going to look
19   at this so I'm going to keep that.  So I maintain
20   those records.  That's why some of the stuff was in
21   that credenza, that we were required by ISO to keep
22   certain documents forever.  So that's my impression of
23   what that is.
24       But the next thing where it says "audit" does
25   not apply to the ISO.  I think that that audit is --

77

1    pertains to something to do with Jurga.  So it wasn't
2    ISO audit.  ISO is said on the line above, but audit
3    has something to do with Jurga, that Jurga was to
4    audit something.
5        Q.  Is it your understanding that Mr. Flatley
6    met with the other three cell coordinators for weekly
7    meetings?
8        A.  Yes.
9        Q.  And did you attend those meetings as well?
10       A.  No.
11       Q.  Now you received several performance
12   evaluations from Smith & Wesson, right?
13       A.  Yes.
14       Q.  If you can go to Exhibit 5, that's the
15   performance evaluation that you received in June of
16   2013, right?
17       A.  Exhibit 5, is that going back to the
18   other --
19       Q.  Yes.
20       A.  Okay.  All right.  I got it.
21       Q.  And is Exhibit 5 at least a portion of the
22   evaluation that you received in June of 2013?
23       A.  Yes.
24       (Exhibit 5 previously marked
25   for identification and referenced

Baker, Earl Donald

August 14, 2020

21 (Pages 78 to 81)

---

**78**

1  herein: Performance evaluation of

2  June of 2013)     11:39:03

3  Q.  And if you look at that same set of

4  production documents at 490, are those the SMART goals   11:39:06

5  that were provided to you in connection with this   11:39:16

6  evaluation?

7  A.  Right now I do not -- so there are just the   11:39:19

8  two front pages.  I don't have the SMART goals under   11:39:24

9  4.     11:39:31

10  Q.  Right.  To go to the SMART goals, you need   11:39:31

11  to go to page 490.  Did you locate that page?   11:39:33

12  A.  I'm looking.     11:40:05

13  MR. LEE:  Is this the document that begins   11:40:07

14  with Baker 148, Connie?     11:40:09

15  MS. BERTRAM:  Let me check.  It begins --   11:40:14

16  the first one I have is 37.     11:40:19

17  MR. LEE:  Yeah, okay, got it.     11:40:29

18  Q.  Mr. Baker, did you find the page 490?   11:40:32

19  A.  Yes.     11:40:35

20  Q.  Okay.  Go first to 493, which is just a   11:40:35

21  couple pages after it.  Is that the third page of the   11:40:39

22  evaluation that you received in June of 2013?   11:40:40

23  A.  I believe so.     11:40:47

24  Q.  And the handwriting that's on that page is   11:40:48

25  Mr. Flatley's, right?     11:40:53

---

**79**

1  A.  Yes.     11:40:54

2  Q.  And it's signed by Mr. Flatley and   11:40:54

3  Mr. Fontaine; is that right?     11:40:58

4  A.  Yes.     11:40:58

5  Q.  It's also signed by you on July 8th of   11:40:58

6  2013, correct?     11:41:03

7  A.  Correct.     11:41:05

8  Q.  And in terms of the development needs,   11:41:05

9  there are certain action items that are identified in   11:41:11

10  type -- in typewriting, right?     11:41:15

11  A.  No.     11:41:19

12  Q.  At the top of page 493.     11:41:23

13  A.  The next part of the form, that's not   11:41:30

14  typed.     11:41:33

15  Q.  It says, "Earl should attend Armorer School   11:41:33

16  and a problem-solving seminar."     11:41:37

17  A.  On which page?     11:41:40

18  Q.  493.     11:41:41

19  A.  I will mention that this is probably the   11:42:01

20  worst copy of anything.  In Business Objectives,   11:42:04

21  certain lines are totally illegible.     11:42:19

22  Q.  Right.  I'm referring to page 493, which   11:42:19

23  starts "Individual Development Plan," right?   11:42:22

24  A.  Yes.     11:42:26

25  Q.  And it says, in handwriting, "develop a   11:42:27

---

**80**

1  quality initiative with the team leads," right?   11:42:31

2  A.  I can make out certain words, but, again,   11:42:35

3  it's such a poor quality that the typed portion, some   11:42:45

4  of the words are illegible.     11:42:45

5  Q.  Right.  I'm referring to the     11:42:48

6  handwriting that's below the typed portion.   11:42:50

7  A.  Okay.     11:42:52

8  Q.  It says, "develop a quality initiative with   11:42:52

9  the team leads," right?     11:42:55

10  A.  Yes.     11:42:56

11  Q.  And this is a portion of the review that   11:42:56

12  you received in June of 2013, right?     11:43:01

13  A.  Yes.     11:43:03

14  Q.  And they provided a copy of this evaluation   11:43:04

15  to you, correct?     11:43:08

16  A.  That's correct.     11:43:09

17  Q.  Okay.  And if you go back to page 490 to   11:43:10

18  492, those are SMART objectives that were given to   11:43:19

19  you, correct?     11:43:22

20  A.  Yes.     11:43:22

21  Q.  And you received a copy of these?   11:43:22

22  A.  Yes.     11:43:24

23  Q.  And was it your understanding that you were   11:43:35

24  expected to meet these SMART objectives?   11:43:35

25  A.  Yes.  They are objectives.  They are not --   11:43:40

---

**81**

1  there are things that come up in the -- so, as part of   11:43:49

2  management, you have clear objectives, this is what we   11:43:55

3  like to attain.  They aren't mandates and they   11:43:58

4  aren't -- so I just want to clarify that these are the   11:44:00

5  things that we would like to complete.  So in that   11:44:07

6  context, yes.     11:44:12

7  Q.  And after your June 2013 review, you kept   11:44:14

8  having weekly meetings with Mr. Flatley, correct?   11:44:18

9  A.  That's correct.     11:44:20

10  Q.  And let me refer you back to Exhibit 4 in   11:44:24

11  the volume that you've been working with.   11:44:31

12  MR. LEE:  I'm sorry.  Where are we now?   11:44:39

13  Which one are we looking at?     11:44:41

14  MS. BERTRAM:  We are looking at Exhibit   11:44:43

15  4-A.  We're on page 2.     11:44:45

16  A.  Page 4 are text messages again.     11:44:55

17  Q.  Yes.  Actually on page 1 of Exhibit 4-A.   11:44:55

18  And during the course of the meetings at the   11:45:10

19  pitch board and weekly meetings that you had with   11:45:14

20  Mr. Flatley, Mr. Flatley provided you with input   11:45:17

21  concerning your performance, correct?     11:45:21

22  A.  State that again.     11:45:25

23  Q.  After your evaluation in June of 2013,   11:45:25

24  Mr. Flatley continued to provide performance feedback   11:45:34

25  to you through the morning pitch board meetings,   11:45:37

---

Baker, Earl Donald

August 14, 2020

22 (Pages 82 to 85)

---

**82**

1  right?
2      A. Yes.
3      Q. And he also provided to you input
4  concerning your performance and the department's
5  performance through the weekly meetings with
6  Mr. Flatley, right?
7      A. Yes. Well, that wasn't the intent of the
8  meeting, but it was -- he might mention something
9  during those meetings, yes.
10     Q. Let's go to page 315 in the production
11  documents.
12     A. Bates number or page 315?
13     Q. At the bottom right-hand corner, Baker 315.
14     A. Oh, another manual.
15     Q. And that's in your handwriting, correct?
16  Is that yes?
17     A. Yes.
18     Q. Okay. Great. And do you know when these
19  notes were taken?
20     A. No, I don't.
21     Q. Do you know whether they were during a
22  meeting with Mr. Flatley?
23     A. No, I don't.
24     Q. So let's go to the next page, which is page
25  316. About an inch down on the page it says 9-23-13.

---

**83**

1  That was a meeting with Mr. Flatley, correct?
2      A. Yes.
3      Q. And was that a one-on-one meeting or was
4  that a board meeting?
5      A. It's hard to say. Mike Catouli's name is
6  on that meeting note. I don't know if he was at that
7  meeting or not.
8      Q. And does this reflect your notes of that
9  meeting whenever Mr. -- I can't remember how you
10  pronounce his last name -- whether Mike was there or
11  not?
12     A. Yeah, those are some notes I took.
13     Q. Okay. And then lower down on the page
14  there's a light word, Larry, and then there's some --
15  a listing of items under it, "unfocused, not getting
16  anything accomplished, losing credibility, throughout
17  the shop, better pull it together, not data driven,
18  not a team player."
19     Those notes are comments that Mr. Flatley made
20  to you?
21     A. That would be my impression, yes.
22     Q. Okay. And those were made to you on or
23  after September 23rd of 2013?
24     A. I would say yes.
25     Q. Okay. Let's go to the next page, which is

---

**84**

1  317. Do you know what -- those are your handwritten
2  notes, correct?
3      A. On 317?
4      Q. Yes.
5      A. It looks like it, at least some of them,
6  yes.
7      Q. And towards the bottom it says, "done
8  training September 17th to 18th," and then "October
9  8th." Do those notes suggest to you that they were
10  made before September 17th of 2013?
11     A. Yes, I would say so.
12     Q. Okay. And there's a 1 and a 2. Are those
13  in your handwriting?
14     A. It looks like it, yes.
15     Q. And it says, number 1, "August 1, quality
16  initiative." Do you recall what that is referring to?
17     A. Yes. We, in the course of our meetings, we
18  identified that we had quality problems within the
19  department, that we had determined we only had the
20  quality of 66 percent. So our quality initiatives, we
21  implemented certain policies that the operators were
22  to do and that we would monitor and track on our door.
23     So we did get our quality up to 99 percent.
24  And, again, it was just a note to probably was
25  addressed someplace in that meeting, so it was a

---

**85**

1  bullet point for me to just recall what had been
2  mentioned in that meeting.
3      Q. This is a meeting with Mr. Flatley, right?
4      A. Yes. Well, I don't know that. It's
5  impossible to tell from that note whether that was
6  with Flatley or whether that's just -- it really
7  doesn't say what that -- who was there.
8      Q. And then number 2, is it KiZAN?
9      A. Yes.
10     Q. Twice a month. Had Mr. Flatley by that
11  point told you that you needed to do KiZANs twice a
12  month?
13     A. At this point I don't know whether he
14  mentioned it. He had mentioned it a couple of times
15  throughout the thing, but this note is to -- is a
16  note -- I take notes for my purposes, not for somebody
17  else's, so it was to tell me to organize the KiZAN
18  with Bob Francis.
19     Q. Okay. And let's go to the next page, which
20  is page 318, and there's a note February 12th, 2014.
21  Are those notes that you took?
22     A. Yes.
23     Q. And there's also a listing from February of
24  17; is that right?
25     A. Yes.

---

Baker, Earl Donald

August 14, 2020

23 (Pages 86 to 89)

---

**86**

1    Q. And do you know -- these are -- these are    11:51:51
2    your notes, correct?    11:51:54
3    A. Yes.    11:51:54
4    Q. And do you know, on the 12th, when those    11:51:55
5    were taken, for instance, whether they were taken    11:51:59
6    during a meeting?    11:52:01
7    A. No.    11:52:02
8    Q. Do you know when the or in what context the    11:52:04
9    February 17th notes were made?    11:52:08
10    A. No.    11:52:10
11    Q. So let's go to Exhibit 325. I'm sorry.    11:52:12
12    Page 325.    11:52:17
13    A. Okay.    11:52:18
14    Q. Do you know what this document is?    11:52:19
15    A. Yes.    11:52:21
16    Q. What is it?    11:52:21
17    A. So as a part of our -- they would have    11:52:24
18    fiscal-year goals, and we were supposed to turn in    11:52:31
19    fiscal-year goals to Mr. Fontaine. And so these were    11:52:41
20    initiatives that I felt like we needed to do both a    11:52:45
21    short-range and long-range plan, as it were, for my    11:52:52
22    department and what I wanted us to go.    11:52:56
23    Q. And when did you prepare this document?    11:52:59
24    A. I'm not able -- I'm not positive, but I do    11:53:01
25    recall putting this document together and a copy was    11:53:07

---

**87**

1    sent on to Larry, but the primary source for this was    11:53:13
2    Fontaine for his fiscal-year goals.    11:53:19
3    Q. And so you provided it to Mr. Flatley and    11:53:22
4    Mr. Fontaine; is that right?    11:53:25
5    A. Yes.    11:53:26
6    Q. And did you have a meeting with them about    11:53:26
7    it?    11:53:29
8    A. Not in this particular context, no.    11:53:30
9    Q. Do you recall just generally what time it    11:53:33
10    was, whether, for instance, it was after the February    11:53:37
11    2014 review or before it?    11:53:39
12    A. No, I really can't say.    11:53:42
13    Q. And did anybody else work with you on the    11:53:44
14    drafting of this document?    11:53:49
15    A. The team always had input on some of the    11:53:52
16    things that we were doing, so while they were part of    11:53:57
17    this, but no one sat with me and specifically    11:54:02
18    formulated this that I know of.    11:54:05
19    Q. Let's go to the next page, which is 337.    11:54:08
20    And these are your handwritten notes on this page as    11:54:14
21    well, right?    11:54:17
22    A. Okay.    11:54:23
23    Q. Do you know when you made them?    11:54:25
24    A. Not unless there's some date on it, no.    11:54:27
25    Q. In it there's some quotations. Let's look    11:54:33

---

**88**

1    -- there's three items that are numbered in the middle    11:54:37
2    of the page, right?    11:54:40
3    A. Okay.    11:54:41
4    Q. And number 1 is "vision for department";    11:54:41
5    number 2, "not on top of what's going on in the    11:54:45
6    department," and it says "Larry," and then, quote,    11:54:48
7    "communication within department not good, morale    11:54:54
8    poor" ...[network interruption]... is this some input    11:54:58
9    that Mr. Flatley had provided to you?    11:55:01
10    A. Those are statements that he had made at    11:55:05
11    some point.    11:55:10
12    Q. When did he make those statements?    11:55:10
13    A. At some point. He was a -- he was a person    11:55:13
14    that overstated things in order to make some kind of a    11:55:19
15    point. When somebody says nothing has been    11:55:26
16    accomplished since he got here, obviously that's a    11:55:29
17    statement made not literal, because obviously you    11:55:32
18    can't say nothing has taken place in a month, you    11:55:40
19    know. We produce $63 million a month was our sales at    11:55:44
20    that point.    11:55:49
21    So these -- Larry was given to making    11:55:50
22    outrageous statements. These were copies of his    11:55:56
23    statements that he had made at some point, whether on    11:55:58
24    the floor or to me, whatever, and I was addressing    11:56:01
25    them to make sure that I noted what he said. And    11:56:06

---

**89**

1    whether I thought it was ridiculous or relevant, I    11:56:16
2    made a point of copying it down and keeping notes as    11:56:23
3    to why I thought it was ridiculous.    11:56:29
4    Q. Each of these three points or at least the    11:56:34
5    second and the third point have quotes around them.    11:56:36
6    Did you write these down as he was saying them?    11:56:40
7    A. No, that wouldn't -- certain managers view    11:56:44
8    things differently. Some wanted you to take notes as    11:56:48
9    we spoke and others would -- and they would say, if    11:56:53
10    you're not taking notes, you're not listening. There    11:57:00
11    are other managers that tend to feel that, if you're    11:57:03
12    taking notes while they're speaking, you're not    11:57:07
13    listening to them, you're note-taking.    11:57:10
14    So Dan Fontaine was one who was a notetaker.    11:57:13
15    He wanted you to take notes as, if you don't, you're    11:57:21
16    disrespecting me.    11:57:26
17    Flatley was somebody that he wanted -- he made    11:57:33
18    overt gestures and huge statements to make an    11:57:33
19    impression. So if you were taking notes, you    11:57:39
20    weren't -- you weren't getting the side show that he    11:57:44
21    was putting on. So he wanted you to take note of what    11:57:46
22    he was saying and not be taking notes at the same    11:57:51
23    time.    11:57:55
24    Q. And below that, what are "Dan's Top 3"?    11:57:55
25    What does that mean?    11:57:59

---

Baker, Earl Donald                                          August 14, 2020

24 (Pages 90 to 93)

90

1    A. It's hard to say. I mean, it could be Dan      11:58:06
2 Durrand. It could be Dan Fontaine.                   11:58:13
3    Q. Okay. But you don't know? You're               11:58:15
4 reflecting -- is this input that Dan Fontaine provided 11:58:19
5 to you?                                              11:58:22
6    A. It could be.                                   11:58:26
7    Q. Do you remember Dan Fontaine saying to you,    11:58:30
8 "don't manage department micro strategic plan"?     11:58:35
9    A. I don't recall a specific thing on the         11:58:43
10 micro, but the strategic plan might refer to that --  11:58:45
11 that paper you were talking about with the strategic 11:58:54
12 initiatives.                                        11:58:57
13    If that was the strategic plan that that         11:58:57
14 referred to, then that would be Dan Fontaine, but that 11:59:01
15 may be my note saying that he was requiring or wanting 11:59:05
16 me to give him a strategic plan for the department.  11:59:09
17    Q. Number 2 says, "categories realign tooling    11:59:14
18 strategy concern expressed move to Houlton." Had    11:59:19
19 Mr. Fontaine raised concerns about tooling strategies 11:59:25
20 for Houlton?                                        11:59:29
21    A. No. And that's the problem with               11:59:31
22 forensically trying to look at notes and trying to  11:59:34
23 discern what they say. You draw together different  11:59:36
24 thoughts.                                           11:59:44
25    Strategic -- we need tooling categories to       11:59:45

91

1 realize tooling strategies. That's the end of one    11:59:49
2 thought. And then the thing on -- we've got a move to 11:59:51
3 Houlton that we have to plan for, so these are issues 12:00:01
4 that are going to come up.                           12:00:04
5    The tooling strategies that we had, they ran      12:00:07
6 out of tools and then we'd make them. We had to have 12:00:11
7 a strategic plan to have the Robo software predict   12:00:15
8 where we were going. That's what that refers to.    12:00:19
9    So when you jam them all together, it appears     12:00:23
10 to say one thing that it's not saying.               12:00:26
11    Q. Right. And were these goals that had been     12:00:28
12 expressed by Mr. Fontaine?                          12:00:31
13    A. No. Again, Mr. Fontaine and Mr. Flatley       12:00:33
14 had no expertise in tooling. Not to say that they    12:00:37
15 weren't intelligent, bright in their own, I could not 12:00:44
16 do everything they did, but their style of management 12:00:48
17 was to utilize my expertise in tooling and to have me 12:00:53
18 express my goals to them, and they would help me stay 12:01:00
19 on track with completing those goals.                12:01:05
20    But they didn't have tooling knowledge. They     12:01:11
21 didn't know what needed to be done in the department. 12:01:13
22 They would ask me what I felt needed done, and they  12:01:18
23 would keep me on track to make sure we were on, you  12:01:21
24 know, we were progressing towards those goals.       12:01:24
25    Q. So do you think that these, the Top 3, is      12:01:27

92

1 for Dan Durrand?                                     12:01:29
2    A. I think, by reading the context, my guess     12:01:31
3 would be that it was Dan Fontaine.                   12:01:37
4    Q. Okay. So now that we've looked at a number    12:01:40
5 of handwritten notes and they all seem to be on lined 12:01:46
6 paper. Do you recall how you -- how you made notes   12:01:50
7 when you were working with -- at Smith & Wesson?     12:01:55
8    A. Yes. I had --                                 12:01:56
9    MR. LEE: Objection. Objection to the form        12:01:58
10 of the question, but you may answer.                 12:01:59
11    A. I had a notebook that I would keep notes     12:02:05
12 in, and it was taken during one of my office         12:02:11
13 break-ins. So I then got a smaller notebook. So that 12:02:20
14 was my habit. But it's really hard to tell what these 12:02:30
15 came from or where they came from.                  12:02:34
16    Q. Do you recall whether that smaller notebook  12:02:36
17 was spiral bound on the left side?                  12:02:38
18    A. I still have it, so it was not --            12:02:41
19    Q. It was -- pardon me?                          12:02:48
20    A. It was not spiral bound.                      12:02:50
21    Q. Was it bound up at the top --                12:02:53
22    A. No.                                           12:02:56
23    Q. -- like a legal pad?                          12:02:57
24    A. No.                                           12:02:58
25    Q. How was it -- how was it kept together?      12:03:01

93

1    A. It's bound on the right-hand side.            12:03:03
2    Q. Okay. And you say you still have it. You      12:03:06
3 still have the original notebook --                 12:03:10
4    A. Yes.                                           12:03:12
5    Q. -- that these came from?                       12:03:12
6    A. Yes.                                           12:03:13
7    Q. Okay.                                          12:03:13
8    A. Well, not that these came from. These look    12:03:14
9 like a full page, so I don't -- I don't have the     12:03:16
10 notebook that this came from.                        12:03:18
11    Q. Okay. Let's go to Exhibit -- I'm sorry --    12:03:20
12 Bates page 338. Are all these notes that you took?  12:03:42
13    A. Yes.                                           12:03:46
14    Q. And do you know what you're taking notes     12:03:47
15 from or during?                                     12:03:52
16    MR. LEE: Objection, form, but you may           12:03:55
17 answer.                                              12:03:56
18    A. No. It does not list where the notes were    12:04:00
19 taken from.                                         12:04:10
20    Q. There are a couple different, over on the    12:04:11
21 -- on the right-hand side about an inch down, it says, 12:04:17
22 "request for Dan," and then it says, on the left side, 12:04:17
23 "Larry," and then "Dan," and then "Dan and Dan" at the 12:04:20
24 end. Does that suggest to you that they were taken   12:04:23
25 during a meeting with both Larry and Dan?           12:04:26

Baker, Earl Donald                                    August 14, 2020

25 (Pages 94 to 97)

---

**94**

1    A. It's possible.                                12:04:29
2    Q. Let's go to page 339. There's some           12:04:32
3  handwritten notes on this page also. Are those your  12:04:40
4  handwritten notes?                                 12:04:43
5    A. Yes.                                          12:04:44
6    Q. And do you know when they were taken?         12:04:44
7    A. No, I don't.                                  12:04:48
8    Q. And do you recall in what context they were   12:04:51
9  taken?                                             12:04:54
10   A. No, I don't.                                  12:04:54
11   Q. And did you take the notes also on page      12:05:07
12 340?                                               12:05:10
13   A. Yes.                                          12:05:11
14   Q. And do you know when those were taken?        12:05:13
15   A. No, I don't. I -- I also took notes of       12:05:17
16 my -- my own action items, so ...                 12:05:27
17   Q. You also took notes when? I'm sorry.          12:05:31
18   A. On -- on my -- on my own for -- the action   12:05:33
19 items for the day. So these don't necessarily mean  12:05:37
20 that I was in a meeting with anybody.              12:05:39
21   Q. Right. I understand. So you got 341, and     12:05:41
22 those are your notes as well?                      12:05:44
23   A. Yes.                                          12:05:46
24   Q. Do you know when they were made?              12:05:47
25   A. No, I don't, but they refer to making lists  12:05:53

---

**95**

1  of the Robo report.                                12:06:14
2    MR. LEE: Where are you, on page 341?             12:06:19
3    MS. BERTRAM: 341.                                12:06:22
4    Q. So you don't know in what context these      12:06:24
5  notes were made, right?                            12:06:27
6    A. No, but they -- they are incomplete          12:06:27
7  thoughts, so they are probably notes I was just taking  12:06:29
8  for myself, because it doesn't -- there's not enough  12:06:32
9  of a complete thought to even determine what exactly I  12:06:36
10 was talking about, you know, seven years later.    12:06:41
11   Q. So you mentioned Mr. Francis earlier. Did    12:06:49
12 Mr. Francis provide any coaching to you during the  12:06:51
13 course of your employment with Smith --            12:06:54
14 Smith & Wesson?                                    12:06:55
15   A. Yes. I'd have to say Bob Francis was         12:06:56
16 probably the brightest individual I met there.     12:07:01
17   Q. And when did you first start working with    12:07:05
18 him?                                               12:07:08
19   A. I can't remember the first time I met him,   12:07:08
20 but he -- he had a similar background from me in that  12:07:11
21 many of the managers had never operated a machine or  12:07:20
22 kind of worked their way up. They had gone to college  12:07:28
23 and they had no expertise of what I was actually    12:07:30
24 doing, whereas Bob kind of worked his way up through  12:07:35
25 the ranks. I believe he worked with his father, and  12:07:39

---

**96**

1  his father was a machinist as well.                12:07:42
2    So Bob was one that not only had the --          12:07:46
3  acumen learned through higher education, but he also  12:07:51
4  worked his way up. So he -- he had specific knowledge  12:08:01
5  about machining and -- and how things are done.    12:08:10
6    Q. So do you recall whether he started          12:08:14
7  providing coaching to you before your February review?  12:08:17
8    A. I have to explain something that, in -- in   12:08:20
9  my field, if you're not learning and progressing, the  12:08:38
10 field is changing just like the computer field. If  12:08:41
11 you took a computer course in, let's say, 1991, when I  12:08:44
12 started my business, if you didn't keep learning with  12:08:50
13 the computer field, what you knew would be outmoded in  12:08:55
14 a short amount of time.                            12:08:59
15   So the field we're in, it was continuous       12:09:01
16 learning. So I would consider Bob a mentor. Anyone  12:09:04
17 that had knowledge that was in a different sphere that  12:09:11
18 was not my own, I -- and I had good interaction with  12:09:15
19 them, I would consider them somewhat of a mentor.   12:09:18
20   So I learned a lot from Bob just on daily       12:09:21
21 interactions. Then it became more formal after the  12:09:27
22 February review where I was mandated to actually have  12:09:31
23 classes with him. And then Bob would actually give me  12:09:34
24 books to read and -- and have sit-down meetings where  12:09:38
25 we would discuss things.                           12:09:43

---

**97**

1    So I mention all that to say that what I        12:09:45
2  learned from Bob or -- was an ongoing thing from the  12:09:49
3  time I met him, because I -- I deemed him as somebody  12:09:53
4  that was quite knowledgeable and I could glean       12:09:57
5  information from and -- and learn things from.      12:10:01
6    So he taught me things from the first day I met  12:10:06
7  him in how he interacted with people. So that just --  12:10:10
8  I mean, it started out informally but then more     12:10:18
9  formally later.                                    12:10:21
10   Q. Let's focus on the period prior to           12:10:22
11 February, you know, the February 2014 review. When  12:10:26
12 did you first start working informally with         12:10:31
13 Mr. Francis?                                       12:10:35
14   MR. LEE: Objection to the form of the           12:10:36
15 question, but you may answer.                      12:10:37
16   A. Bob, when I took over doing the pitch        12:10:42
17 board, or more of a hands-on approach rather than   12:10:49
18 turning it over to Jurga, I had to start interacting  12:10:52
19 with Bob Francis to find out what was required.     12:10:54
20   So I would say early on was -- was within the   12:11:01
21 first month or two I started talking to Bob, but I  12:11:06
22 don't know for a fact. I can't tell you the day that  12:11:10
23 I -- I met him. And he was very open and -- and kind  12:11:12
24 individual. So he was easy to -- speak with.        12:11:18
25   Q. And do you recall -- do you recall any       12:11:25

---

Henderson Legal Services, Inc.

202-220-4158                     www.hendersonlegalservices.com

Baker, Earl Donald                                      August 14, 2020

26 (Pages 98 to 101)

98

```
 1   other coaching he provided to you prior to your            12:11:27
 2   February 2014 evaluation?                                  12:11:31
 3        A.  Absolutely.  There are dozens of them, but        12:11:38
 4   I don't know what -- I don't know that I could point       12:11:40
 5   to them specifically.  When we held a Unit A -- part       12:11:42
 6   of my teaching style or managing style was to set          12:11:52
 7   goals and get everybody marching in the same               12:11:57
 8   direction.                                                 12:12:01
 9        So when we met those goals, there's a point           12:12:01
10   where you have to -- you take a step back and -- and       12:12:06
11   recognize the people in the department for the things      12:12:12
12   they have done.                                            12:12:16
13        So I would throw a lunch, and one of the              12:12:16
14   conference rooms that was available for the employees      12:12:19
15   for my whole department to meet at and have lunch was      12:12:22
16   in the swish -- "SWashroom," which was Smith & Wesson      12:12:26
17   operating system's room -- which was in the annex of       12:12:38
18   Bob Francis' office.                                       12:12:38
19        So because we met there, it -- it's basically         12:12:40
20   part of his office, so there would be interactions         12:12:46
21   there.  He would give us insight on where we needed to     12:12:49
22   go, you know, what his point of view was, but, again,      12:13:00
23   where I was more of an open book and -- and liked          12:13:00
24   to -- to get information from other people how they        12:13:04
25   were doing it, there were others that -- that didn't       12:13:10
```

99

```
 1   have that kind of style.  They were more prideful and      12:13:15
 2   didn't want anyone telling them what to do, like           12:13:18
 3   Flatley.                                                   12:13:22
 4        Q.  And you said that after your February 2014        12:13:22
 5   review became -- the coaching became more formal; is       12:13:29
 6   that right?                                                12:13:35
 7        A.  Well, he -- he mandated it after February         12:13:35
 8   that I do certain things as more of a remediation for      12:13:41
 9   having a review that way.  Even though it was deemed       12:13:44
10   not to be a formal review, Fontaine said it didn't         12:13:49
11   exist because it was out of cycle in response to           12:13:54
12   Mr. Suraci.                                                12:13:59
13        So I felt like, in order to make the situation        12:14:00
14   better, I did the -- I did the remediation things          12:14:08
15   regardless.  And one of them was he wanted me to have      12:14:14
16   lean training, and there were no courses in the            12:14:21
17   syllabus of the seminars that Flatley had pointed me       12:14:25
18   to, so Flatley agreed to allow Francis to be the           12:14:29
19   source for that training.                                  12:14:37
20        Q.  And --                                            12:14:38
21        A.  We're getting close to lunch.  Did you --         12:14:40
22   have you planned a --                                      12:14:42
23        MR. LEE:  Is there a good time or a subject           12:14:45
24   matter like where you're going?                            12:14:48
25        MS. BERTRAM:  I was planning to go to until           12:14:50
```

100

```
 1   12:30, if that works for the two of you.                   12:14:53
 2        MR. LEE:  Well, fifteen more minutes?                 12:14:56
 3   That's fine.  I mean --                                    12:14:58
 4        A.  I'm good.                                         12:14:58
 5        Q.  Okay.  And so you -- you said -- you -- you       12:14:59
 6   said he mandated coaching.  Is that Larry Flatley who      12:15:03
 7   mandated coaching on lean manufacturing?                   12:15:06
 8        A.  Yes.  There are -- there are a number of          12:15:09
 9   documents that -- where he -- he wrote it.  As a           12:15:11
10   matter of fact, he had already researched different        12:15:15
11   seminars to take, and actually had time set up that we     12:15:31
12   couldn't -- I don't know that you can even get into        12:15:35
13   these seminars, but here's a list of them, and -- and      12:15:35
14   then he told me, you're not going to want to do this       12:15:43
15   shit, that you should just quit.                           12:15:49
16        So those seminars are written on that sheet and       12:15:51
17   there were a number of documents that show the             12:15:54
18   progress of those classes.                                 12:15:59
19        Q.  Did Mr. -- other than lean manufacturing,         12:16:02
20   did Mr. Flatley mandate that you needed any other          12:16:07
21   coaching from Mr. Fontaine -- I'm sorry, from              12:16:11
22   Mr. Francis?                                               12:16:14
23        A.  No, not that I know of.                           12:16:16
24        Q.  And was there any other coaching that             12:16:19
25   Mr. Francis provided to you after your February 2014       12:16:21
```

101

```
 1   review other than the lean manufacturing coaching?         12:16:24
 2        A.  Yes.  He helped and coached with the areas        12:16:27
 3   of his expertise, which was lean.  So when Flatley         12:16:32
 4   would have problems with the pitch board, I usually        12:16:41
 5   sought out instruction from Bob so that what Flatley       12:16:46
 6   was asking was within the sphere and okay with Vice        12:16:54
 7   President Francis.                                         12:16:54
 8        Q.  Now did you also, after your -- after your        12:17:09
 9   June 2014 -- I'm sorry.  After your June 2013             12:17:11
10   evaluation and until February of 2014, the interim        12:17:15
11   evaluation that you received, did you have discussions     12:17:20
12   with human resources?                                      12:17:22
13        A.  Yes.                                              12:17:24
14        Q.  And you contacted them because you thought        12:17:25
15   that Mr. Flatley was being unfair to you, right?           12:17:29
16        A.  Among other things.                               12:17:33
17        Q.  And you felt that Mr. Flatley was                 12:17:34
18   mistreating you, correct?                                  12:17:37
19        A.  Yeah, among other things.                         12:17:38
20        Q.  And you related in your complaint to OSHA         12:17:40
21   about a situation where you had gone to Urgent Care        12:17:45
22   and because of that you missed a meeting.                  12:17:51
23        A.  Yes.                                              12:17:54
24        Q.  Did Mr. Flatley get upset with you about          12:17:54
25   that?                                                      12:17:57
```

Baker, Earl Donald

August 14, 2020

27 (Pages 102 to 105)

---

**102**

1   A. Yes.
2   Q. And that was around September of 2013,
3   right?
4   A. Either August or September.
5   Q. Okay. And your complaint indicates that
6   you reported that conversation with Mr. Flatley to HR;
7   is that right?
8   A. That's correct.
9   Q. Who did -- was that the first time you had
10  reached out to HR about Mr. Flatley?
11  A. I don't believe it was the first time, no,
12  but it was one of the more notable times, yes.
13  Q. Okay. And do you recall the first time
14  that you reached out to HR about -- with concerns
15  about Mr. Flatley?
16  A. I think it was in the -- it would be a few
17  months earlier than that. It would have been the
18  summer of 2013.
19  Q. Okay.
20  A. But the exact date I'm -- without --
21  without access to my computer at work and those type
22  of things, it's some years later, it's hard to -- to
23  say exactly.
24  Q. And who did you -- who did you reach out to
25  at HR at that point in the summer of 2013?

---

**103**

1   A. I went to Ann Glica or Glica, I'm not sure
2   how you pronounce it, and she -- I spoke with her
3   first, and at that point we were -- she was meeting in
4   the -- their offices were being renovated, so we met
5   in the -- they had mobile offices put in the parking
6   lot.
7   So I met Ann in one of those trailers. And
8   because her office wasn't an office -- it was more
9   just like a cubicle in that trailer, we discussed some
10  things that she felt maybe rose to the level of
11  speaking with her boss, Kathy Salvador, which was in
12  the next cubicle.
13  Q. Okay.
14  A. So at that time Kristan Campanella and --
15  and the other HR people were not in that trailer, so
16  it was just basically Ann and Kathy. And so Kathy
17  then took over. We -- we discussed issues relating to
18  my pay increase. That would have happened right
19  around that good review in summer of 2013.
20  Q. So it would have been -- was it before or
21  after your evaluation in June of 2013?
22  A. That would have been right after, because
23  there was a meeting that Ann Glica -- I'm sorry --
24  Anne Bruce had spoke to us about relative to pay, and
25  those things hadn't occurred, so that's was -- would

---

**104**

1   have been the first time I had went to speak with her.
2   Q. And the -- the conversation with Anne
3   Bruce, was that with a group of people or were you
4   talking to her individually?
5   A. Yes, it was -- it was a presentation she
6   made to all salaried people.
7   Q. And what concern -- when you went and spoke
8   with Ann and Kathy, what concerns did you have about
9   your salary?
10  A. I felt that the -- Anne Bruce said that
11  they were going to stop doing merit raises where they
12  just gave -- so it was basically the friend network.
13  You couldn't have a buddy that you -- that worked with
14  you, and you're just going to be given raises, that
15  they were going to be structured within her system and
16  they would be -- there would be no more merit raises,
17  but that everyone would get a certain raise at certain
18  intervals based on market rates of people doing that
19  job within your city and compared nationally.
20  So the question was asked by another CC, what
21  about people who have only been there for a short
22  period of time, would they be eligible for that, and
23  the answer Ms. Bruce gave was affirmative.
24  So when I got that good review, I did not get
25  the -- the cost of living raise that others got. I

---

**105**

1   was close enough with some of the other CCs that they
2   had told me they had gotten their raise but I had not.
3   I went to Ann over the fact that I hadn't got
4   that raise, and we discussed why I believed it was
5   unfair and that I felt that it was possibly an
6   outgrowth of the growing animosity that I -- that
7   Flatley was displaying towards me relative to the
8   Pioneer Tool issues that were occurring.
9   So we went into the issues at EASTEC and some
10  of the tooling things where they were giving -- given
11  favoritism over other companies and whereby there were
12  actual charges that he -- that they should have been
13  billed for or given us a -- they should have actually
14  given us refund on some issues, and Flatley refused to
15  do so. So he was acting unilaterally to wipe off
16  bills for Pioneer that -- that he had no authority to
17  do, and I --
18  Q. Did you --
19  A. I'm sorry. And I felt that was -- that was
20  part of the growing animosity between Flatley and
21  myself, and I thought that me not receiving that raise
22  was -- was an outgrowth of the growing disfavor he had
23  for -- for me opposing him on Pioneer.
24  Q. And do you recall any other issues that you
25  raised with Ms. Salvador or Ms. Glica?

---

Baker, Earl Donald

August 14, 2020

28 (Pages 106 to 109)

---

106

1      A. Any other issues other than what?
2      Q. Other than what you've already described in
3  your testimony.
4      A. I mentioned the issue over the -- when we
5  first went to the barbecue at EASTEC, we went to the
6  conference during the day or the trade show, and then
7  we were invited afterwards to Pioneer Tool for a
8  barbecue.
9      At that barbecue I went with Stan Wnuk and
10  Larry Flatley, and Larry Flatley told me that, if you
11  come back tomorrow night, you'll be the highest paid
12  or the highest ranking Smith & Wesson employee and
13  you'll be sure to win something. And I thought it was
14  a joke. I laughed, and I didn't, you know, I didn't
15  give it much thought.
16      But I related that incident and the fact that
17  when the driver came to my office with an iPad and
18  attempted to hand it to me and said Flatley had won
19  something, I said, that's not my office, I told him
20  where the office was, I wouldn't take it, and so I
21  reported that incident to them. And --
22      Q. Other --
23      A. Go ahead.
24      Q. Other than the incidents surrounding
25  EASTEC, the iPad interaction, the refund that was

---

107

1  refused, and the wiping off of bills, did you raise
2  any other concerns with Ms. Glica or Ms. Salvador
3  during that meeting?
4      A. Yes. We -- we talked about the fact that
5  Josh Burry had a -- one month where he charged
6  $63,000 by -- by Pioneer. We -- I talked to Larry at
7  EASTEC and said -- Burry's complaint was that, when he
8  goes to vend a tool, he opens the door and nothing is
9  in there, but when that vending takes place, we
10  instantly get charged.
11      The tools he was talking about were $300 to
12  $400 each, and he felt that that was a problem in
13  causing the -- his bill to be that high that month,
14  that many of the charges were unfounded.
15      So he's making the claim. I have no way to
16  verify whether that was or wasn't happening. Flatley
17  could not either. So I mentioned at the -- the trade
18  show booth with Larry that, if that was in fact
19  happening, that there were bins that were empty, that
20  there would be more bins that would be empty in
21  that RoboCrib. There were a thousand -- possibly a
22  thousand tools in that RoboCrib. If that happened to
23  the extent he was saying, just by sheer statistics,
24  there should be more empty bins.
25      So he allowed me to go through and vend tools,

---

108

1  and we came up with what turned into be a $9,000
2  refund by Pioneer, but that refund was not -- it
3  didn't ever address the ones that Burry said he should
4  have got.
5      So there was a charge there that they should
6  have refunded us for that they did not, and it was in
7  the tens of thousands of dollars, and it was never
8  addressed and Flatley let it go.
9      So there was that issue. There was another
10  issue that had to do with a Counter Sixth that they
11  sent in and Joe -- there's a document on it -- Joe
12  Codding mentioned that they did not work and it was
13  scrapping parts.
14      So we went to the RoboCrib and every tool in
15  the RoboCrib was -- was bad. They were made by
16  Pioneer. After checking a certain number of tools, I
17  instructed Joe to send them back to Pioneer for
18  repair. He did so. They charged us for those tools
19  again, even though they -- they should not have been
20  charged. They should have repaired them.
21      And then Flatley told me that I -- not to bill
22  them for it. I -- I said that we shouldn't have --
23  or, I mean, not to ask for the refund, just let it
24  alone, it's not my area.
25      So the tools that then they had returned were

---

109

1  still bad. So I took them out of the vending machine
2  and fixed them at no charge. And then there was an
3  interaction between Flatley and I over -- over that
4  issue where he mandated I couldn't pull tools anymore.
5      The issue there was -- and Mr. Cicero
6  mentioned -- they shouldn't -- that I shouldn't have
7  repaired those tools. Anytime it can shut down
8  production, I'm mandated to fix the tools. I can't
9  wait for the vendor to come in and fix their tools.
10  Production takes precedence over everything.
11      So I know I've said more than what your
12  question was. I apologize.
13      Q. And was it your understanding that the
14  tools that needed to be repaired were on consignment?
15      A. There -- they provided multiple tools for
16  us. If they were put in the RoboCrib to be vended
17  out, then those are consignment. But if they deliver
18  them and they're to be put in Crib 99, then it is not
19  consignment, it's -- they are -- the are tools that
20  we will put in as burned. So we buy them all. And in
21  the case where it's something that we own that they
22  resharpen, it would probably have not been a
23  consignment order. They were just sharpening a tool
24  that belonged to us.
25      Q. Were the -- in this particular instance

---

Baker, Earl Donald

August 14, 2020

29 (Pages 110 to 113)

110

1 where the -- where you went in and performed repairs
2 at no charge, were they in the RoboCrib or Crib 99?
3        A. I can't recall at this time.
4        Q. Okay. Did you raise any other concerns
5 during this initial meeting with Ms. Salvador and
6 Ms. Glica about any actions or actions by Larry
7 Flatley?
8        A. There weren't issues -- well, they -- they
9 had to do with -- there were no more issues that came
10 up, let's put it that way, and I can't tell you
11 everything that I mentioned, but I -- those are the
12 major ones, and I can't say that it's inclusive, but
13 basically I did feel that there was a favoritism
14 towards one vendor and that I felt like some of the
15 decisions that Mr. Flatley was making was not in the
16 best interest of Smith & Wesson and -- and its
17 shareholders but had to do with some outside influence
18 that did not -- was not in line with what the
19 normal -- normal fiduciary relationship of a manager
20 to his company.
21        MS. BERTRAM: Let's go ahead and take a
22 break. It's 12:33.
23        MR. LEE: Okay.
24        MS. BERTRAM: How -- how long -- how long
25 do you need for lunch?

111

1        MR. LEE: I need to run out. So how about
2 like -- I would like maybe 40 minutes instead of the
3 normal half an hour, but whatever is good.
4        Earl, you're home, right? Earl doesn't need to
5 run out.
6        THE WITNESS: Yeah.
7        MR. LEE: Okay.
8        MS. BERTRAM: So let's -- let's plan on
9 1:15, then.
10        MR. LEE: 1:15 would be fine. So 45
11 minutes from now or 42 minutes from now.
12        VIDEO SPECIALIST: The time is 12:33 p.m.,
13 and we're off the record.
14        (Proceedings recessed)
15        VIDEO SPECIALIST: The time is 1:30 p.m.,
16 and we're back on the record.
17        EXAMINATION (continued)
18 BY MS. BERTRAM:
19        Q. Mr. Baker, before we took our lunch break,
20 you were talking about a meeting that you had with
21 Ms. Glica and Ms. Salvador. You indicated that you
22 felt that the lack of a salary increase may have been
23 retaliatory, right?
24        A. Yeah, I thought so.
25        Q. And do you know who made the decision with

112

1 respect to your salary?
2        A. According to Ms. Bruce's talk, she wanted
3 to take the subjectivity out of it so make it more
4 streamlined so it would follow a set, set of rules.
5 So that was the initial reason I went there, but I --
6 in a short period of time -- I don't have the emails
7 so I can't tell you when she did -- but I got an email
8 from Salvador saying that you got your raise in your
9 last check, that it had been setting on Larry's desk.
10        So that made it seem as if, my impression was
11 that it wasn't retaliatory based on her talk that --
12 but with some oversight from Flatley, but she did,
13 yeah, by then we had -- we had already entered in --
14 into the phase where I told her the things that I
15 believed were -- were wrong and -- and that became an
16 ongoing thing. There was an incident later on that
17 caused me to talk to them again.
18        Q. Okay. Well, we'll get to that in a minute.
19 I just want to --
20        A. Okay.
21        Q. -- close out the initial discussions. So
22 you talked about your discussions with
23 Ms. Glica and Ms. Salvador. Did you provide any
24 documents to them at that point?
25        A. No, not at that point.

113

1        Q. Did you identify any witnesses that they
2 should talk to?
3        A. Yes, I did mention a couple of people that
4 had told me things that, in my view, of how I was
5 telling them, I didn't feel like I had, you know, had
6 all of this all wrapped up with a bow, that these were
7 things that they needed to look into and investigate.
8        So I had mentioned what was told to me by, you
9 know, different people throughout the shop and some of
10 those things, and -- but I didn't have any documents.
11 So there -- there certainly would have been follow-up
12 people for them to talk to.
13        Q. And which -- which witnesses did you
14 identify during the meeting?
15        A. I can't really recall. I mean, it's so
16 long ago. And also you have to remember that this
17 unfolded in a series of meetings with them, so to
18 differentiate what happened in the third meeting as
19 opposed to what happened in the first meeting, I can't
20 really say for sure.
21        So I don't know which guys that I mentioned --
22 I know that Lamont Parks had mentioned some things to
23 me, Josh Burry, Leo Jendrezak, he mentioned some
24 things, Stanley Kapek, but, again, I can't tell you
25 which ones I mentioned in that initial meeting.

Baker, Earl Donald                                    August 14, 2020

30 (Pages 114 to 117)

---

114

1    Q.  Okay.  And did you specifically ask
2  Ms. Bruce or Ms. Salvador to investigate the issues of
3  Pioneer Tool?
4        MR. LEE:  Objection to the form of the
5  question.  Not Ms. Bruce, Ms. Glica, if --
6    Q.  Okay.  Let me -- let me withdraw that and
7  restate the question.
8        In your discussions with Ms. Glica and
9  Ms. Salvador, did you specifically ask them to
10 investigate the issues surrounding Larry's
11 relationship with Pioneer Tool?
12   A.  No, it wasn't a request on my part.  We had
13 undergone a training called LRN that mentioned how we
14 should go to an official of the company and tell them
15 the things that we wanted, but it never became a
16 question of me asking because before I had -- would
17 even have gotten to that point, Ann referred me to
18 Ms. Salvador because she felt that my boss needs to
19 hear this and you need to talk to Kathy.
20      So I was unaware of it and had the impression
21 that Kathy was somewhat listening from the other
22 cubicle anyways, so we stepped right into the
23 conversation, and she was the one that instructed me
24 that, we're going to look into this, but I don't want
25 you to tell anyone about the Pioneer/vendor aspect

---

115

1  of -- of the things you've told me.  We're going to
2  handle that in a different way, because we want to
3  really discuss how we're going to proceed with that.
4        So she said we can talk openly about the HR
5  ramifications or your mistreatment, but I want you to
6  keep that part quiet because we don't even know who
7  might be involved.
8    Q.  And do you know -- I mean, you've
9  discussed -- let me back up a little bit.
10      Do you know whether they notified anyone,
11 Ms. Glica or Ms. Salvador, notified anyone about your
12 concerns about Pioneer Tool?
13   A.  Not that I'm aware of.
14   Q.  Did they ask you to do anything with
15 respect to those concerns other than not to discuss
16 them?
17   A.  No.  They did send an email a couple of
18 different times.  One that stands out in my mind where
19 they asked how things are going in that regard, which
20 made me think that possibly they were doing things on
21 the other side of things that may not be in my view or
22 wondering if it was having a positive effect, but that
23 was my impression.  But they never told me what they
24 were doing.  They just kind of asked how was -- how
25 were things proceeding on my end.

---

116

1    Q.  Right.  And do you know whether they,
2  either they or someone else they notified, undertook
3  an investigation at that point?
4    A.  No, not that I know of.  They -- they were
5  urging me to take it to Dan Fontaine, and I had some
6  reluctance at that point because I felt like it would
7  escalate to the point where, yeah, it just might get
8  out of control.  So I didn't want to do more by going
9  to Dan Fontaine.
10      Then after subsequent things that happened
11 between Larry and I where I did go back to them, they
12 urged me more strongly to consider the option of going
13 to Mr. Fontaine.
14   Q.  Right.  And I had asked about whether they
15 had done any investigation of -- of your concerns
16 about Pioneer, and you indicated you weren't aware of
17 it.  Is it possible they did do some things or the
18 company did some things at that point to investigate
19 and you just don't know what it is?
20      MR. LEE:  Objection to the form of the
21 question, calls for speculation.  He's already
22 answered.  He doesn't know.
23   Q.  You can answer the question.
24   A.  I'm not sure --
25      John, should I -- am I supposed to answer?

---

117

1        MR. LEE:  Yeah.  Have the question read
2  back, please.
3    Q.  I'll -- I'll rephrase it and make it
4  shorter, if nothing else.
5        Do you know whether or not Ms. Salvador and
6  Ms. Glica undertook any investigation after you
7  provided this information concerning Pioneer Tool?
8    A.  Ms. Glica and Ms. Salvador I -- I feel or
9  felt at the time was -- they were very professional
10 and did not divulge anything they were doing on the
11 other side.  They took my submissions to them, a lot
12 of the things I told them, and I had the impression
13 that they were, because it was in their -- it was in
14 their mind enough to ask me how things were going.
15      So it wasn't something that they had dismissed
16 that I felt they were -- it was still on their mind,
17 so my impression was that they were probably working
18 on it, but I don't feel they owed me an answer.  This
19 had to do with things that were happening against the
20 company interests, not so much with me, and that the
21 only thing that pertained to me was my interpersonal
22 relationships with -- with Larry so that any issue
23 pertaining to Pioneer really is between the company
24 and Pioneer and not me.  And that was just my
25 impression.  They never said that.

---

Baker, Earl Donald

August 14, 2020

31 (Pages 118 to 121)

### 118

1  Q. You said that there came a time when you
2  spoke with them again. You said something else
3  happened. What happened that caused you to reach out
4  to Ms. Glica and/or Ms. Salvador again?
5  A. There was one of the notes that you
6  mentioned about going to gun school earlier in this
7  deposition. The revolver training was supposed to
8  take place on a certain day. I had chest pains that
9  day and went to the company nurse. They -- they
10 wanted me to go to emergency and wanted to call an
11 ambulance. I talked them out of the ambulance and
12 asked if -- if I went straight to an Urgent Care
13 Center, whether they would permit me to drive.
14    I -- I then went down to Larry's secretary's
15 office, Ms. Du Pratt, and told her that, what was
16 going on, and I was going straight to that. And I
17 don't know whether she told Larry about it or not, but
18 I do know that, as soon as I returned to work -- and
19 that was the day of the -- that training, so I missed
20 that revolver training. When I came back to work, we
21 were not in our department. I was in the revolver
22 frame department.
23    Larry yelled at me from 50 feet away to come
24 over. He got within inches of my face, cursing, and
25 he was so angry that I didn't make that training, that

### 119

1  I told him, I -- didn't Linda tell you? I was at the
2  ER. And he said, I don't give an F where you were,
3  and just basically just ripped me to pieces. And I
4  thought it was embarrassing to be out on the floor for
5  him to be screaming like that.
6     And so I went directly from there to HR and --
7  and told them that, A, my treatment or Larry's
8  treatment of me had not improved, and, B, that there
9  were a number of other things that I had witnessed
10 that made me, rather than doubt what I had told them,
11 but reinforced them.
12    Q. And -- and did you meet with both Ms. Glica
13 and Ms. Salvador at that point?
14    A. In that meeting, once I had been passed to
15 Ms. Salvador, I went directly to Ms. Salvador. But
16 they were still in that trailer. So in the process of
17 speaking with Ms. Salvador, Ms. Glica did join the
18 meeting after it started. She rolled her chair over
19 from the other cubicle and became the -- part of the
20 end of that meeting. I don't think it was improper in
21 any way, because she was my designated HR
22 representative and Kathy was her supervisor. So it
23 started with Kathy and ended up with Ann.
24    Q. And then you relayed to them the incident
25 that had happened earlier that day?

### 120

1  A. Yes.
2  Q. With Mr. Flatley, right?
3  A. Yes.
4  Q. Did you raise any other concerns with them
5  during that meeting?
6     MR. LEE: Objection to the form of the
7  question, but you may answer.
8  A. I -- I may have. Again, it's hard to
9  differentiate which things I mentioned at which
10 meeting. I know the early things, because they were
11 the genesis. I know I did tell them some more issues
12 that happened but can't really recall specifically
13 what -- what was in that meeting, because there were
14 others -- other meetings with Kathy and Ann, other
15 incidents.
16    Q. When you say "incidents," are you talking
17 about incidents where Larry treated you in an abusive
18 manner or incidents where you felt that Pioneer Tools
19 was treated more favorably?
20    A. Both.
21    Q. And you don't recall -- you can't recall
22 any specific issue that you raised or specific concern
23 that you raised during this meeting about either HR
24 issues or the Pioneer?
25    A. Yes, the HR issue related to the

### 121

1  commendation that was given to my department for
2  reducing or improving our quality. The first
3  commendation that I was given, I'd just want to note,
4  is at the same time that -- of the notes taken by
5  Mr. Flatley where you said, you know, inferred that he
6  was upset with me. He was giving me commendations at
7  the same time. It's just his style to -- well, I
8  digress.
9     Anyhow, there's a second commendation we got
10 that I went to Mr. Fontaine to have him sign the --
11 get his approval -- and get him to sign the -- the
12 thing, see if it was okay to do. And he said that,
13 since Mr. Flatley was the -- even though Mr. Fontaine
14 had signed the first one, he felt since it was
15 Flatley's department that he wanted Flatley to sign
16 it.
17    So when I went to Flatley's department, there
18 are a couple of emails that reference that Larry --
19 maybe emails or texts -- where I note that Larry
20 doesn't seem too happy, and when I went to that
21 meeting, he -- he was unhinged, don't you ever fucking
22 do this again, blah, blah, blah.
23    And so the gist of it was that Ann Glica or
24 Glica had asked if they could put on the message
25 board -- they had TVs throughout the plant -- she

wanted to put that on the TV board that this department had just improved their quality by this much and -- and she wanted Larry's okay.

So when I met with him, he said, don't you ever F-ing do this again. He -- he didn't want to be a part of it. But also where do we stand on this, he said, proceed with this, don't ever do it again, now get the F out of my office.

So I was -- that bothered me, and I went straight to speak with Kathy, and Ann was part of that meeting instantly. So when I went there, both of them met. And Ann was very upset. So much so that she wanted to go down and get into it with Flatley. And I said, I'm not going to tell you what to do, but I would ask that you wouldn't, because I felt like it was just poking the bear, that he was a disagreeable person. I've had disagreeable bosses before and many of my customers had personalities like that and you just learn to work with them.

And so I felt like just let it blow over and operate within the parameters they gave me and -- and go on with it, but I did want them to -- to know that this is not the way you should treat an employee, and I wanted it on record that this happened, and that I still believed that it was being -- if -- I know

personalities enough to where, if I'm doing something to offend somebody, I just don't go in that area, but because this wasn't -- I felt that this anger was coming from an external force, not from personal interactions with him, not just that we didn't get along type of things, because I know how to deal with people interpersonally. It had to do with there was a background motivation that was making Flatley angry, and I believed that issue was the fact that I opposed favoritism to vendors.

Q. And did Mr. -- when Mr. Flatley became upset and unhinged, as you describe it, did he say why he was upset about the commendation?

A. No, no.

Q. Did he express that he was upset that you had gone around his back and -- and spoken with Mr. Fontaine about it?

A. I don't believe so, but I had -- I do recall he did mention Fontaine in some aspect. I don't really recall what, but I was --

Q. He mentioned what? I'm sorry.

A. He mentioned Fontaine in some regard.

Q. Okay.

A. But -- but I don't remember the contents of the exact thing he said, but I do recall telling him

that it was Dan who told me to come here and have you sign it.

So, again, I don't know what his comment was, but he said something that caused me to respond that, well, it was Dan -- almost like Dan wasn't aware of what was going on. I told him that Dan had -- but I don't know his exact words.

Q. And did you raise any other concerns or issues when you met with Ms. Glica and Ms. Salvador the second time?

A. Yes, I believe I did. There -- there were some ongoing things that had transpired, and I would have to look at like a time frame to know when I said which thing, but there were issues that came up, vending two tools for one, and just a lot of different things that -- sending back the gun drills. And we didn't get into the thing about the gifts for vendors. I think we -- we discussed gifts that were given by Pioneer. I don't believe that the baseball tickets came to my house yet until after I talked to Mr. Cicero.

But there were certainly things that happened on the floor where guys were telling me, Jim Valley, one of the things I think I may have mentioned, Jim Valley had told me that he had a drill that was making

7,000 holes per part before it got dull, and that they forced him to switch to a drill that Pioneer carried, and he was only getting 700 parts -- or 600 parts per drill, and that that extrapolated into a huge investment on the company's part.

And so he told me he had -- had tried to specify on the requisition only this vendor and they still got it from Pioneer. And then he wrote "only this vendor" and circled it, and he still got it from Pioneer.

So he had expressed his feeling with me that there were some underhanded things, and I'm sure I would have mentioned that to him. And that happened shortly after EASTEC, so I'm sure that probably would have been included in our conversations.

Q. Shortly after EASTEC?

A. Yes, when I talked to Jim Valley, I think it was.

Q. Right. And do you recall anything else that you -- any other concerns or issues that you raised with Ms. Salvador and Ms. Glica during the second meeting?

A. There are things that happened around that time, but, again, I'm not sure, you know, when I disclosed them.

Baker, Earl Donald

August 14, 2020

33 (Pages 126 to 129)

---

### 126

```
 1        Q.  And when you met with them the second time,   13:51:35
 2   did you provide any -- any documents to them?           13:51:38
 3        A.  No.  I -- I never took any documents to        13:51:40
 4   them.  The only time documents became involved were     13:51:44
 5   when Mr. Suraci had asked me, do you have               13:51:47
 6   documentation, and he said, send me whatever you have.  13:51:50
 7   And so I didn't provide documents to anyone up to that  13:51:59
 8   point.                                                  13:52:03
 9        Q.  And did you identify the witnesses during      13:52:05
10   your meeting with them?                                 13:52:07
11        A.  Yes, I would have mentioned Jim Valley.  I     13:52:08
12   trusted them enough to where, if somebody had told me   13:52:11
13   something, you know, even somewhat, you know, just      13:52:15
14   between the two of us, I trusted them and their         13:52:19
15   professionalism enough that I would have hesitated to   13:52:24
16   mention that Jim Valley or James Peel had told me that  13:52:27
17   it was mandated that they buy reamers from Pioneer      13:52:32
18   that didn't work as well at 330 apiece when Pacific     13:52:37
19   had a tool that worked far better for 189.  So that     13:52:44
20   would have been probably something I had mentioned as   13:52:48
21   well.                                                   13:52:51
22        Q.  Did you ask them to investigate the            13:52:52
23   concerns and issues that you've described during the    13:52:55
24   second meeting?                                         13:52:57
25        A.  No.  Again, I -- I never asked them to         13:52:58
```

### 127

```
 1   investigate anything.  I felt like, as part of a        13:53:01
 2   manager, there are things that go on above my head      13:53:06
 3   that it's easy to see bad things and say, well, I -- I  13:53:09
 4   think management owes me this or that and to come talk  13:53:15
 5   to me.                                                  13:53:18
 6        I felt my part in it was to let them know what     13:53:19
 7   was going on, because I -- I operated from the          13:53:22
 8   assumption that they would do the proper thing with     13:53:26
 9   what I had, and they didn't owe it to me to come back   13:53:33
10   and tell me that, you know, their progress or           13:53:37
11   anything.  I just -- they would check to see if things  13:53:37
12   were still the same, and they would -- they didn't      13:53:40
13   change, that I still saw a favoritism.                  13:53:44
14        Q.  And do you know whether they under --          13:53:48
15   anyone in HR, anyone in the company at that point       13:53:51
16   undertook an investigation of your concerns about       13:53:54
17   Mr. Flatley or Pioneer Tool?                            13:53:56
18        A.  I -- Kathy did mention in one of the           13:53:58
19   meetings that we -- the first meeting, we'll have to    13:54:01
20   see how we're going to handle this, and she did         13:54:08
21   mention that she was going to talk to somebody above    13:54:10
22   her to see how they were going to handle this.          13:54:13
23        But in one of the meetings said, you know, that    13:54:15
24   we're -- we're looking into it, but I never asked them  13:54:20
25   to look into it, but I -- my impression is that         13:54:23
```

### 128

```
 1   Ms. Salvador had mentioned that she was looking into    13:54:28
 2   it.                                                     13:54:31
 3        Q.  And you don't -- but you don't know what       13:54:34
 4   she did to look into it, right?                         13:54:35
 5        A.  No, I don't.                                   13:54:37
 6        Q.  And did they make any recommendations or       13:54:38
 7   suggestions to you about your relationship with         13:54:42
 8   Mr. Flatley at that point?                              13:54:45
 9        A.  I don't recall them ever making, like,         13:54:46
10   suggestions from -- I never really related something,   13:54:57
11   and I -- I imagine it would be true of anyone that I    13:55:02
12   didn't really mention that, A, I had done this wrong    13:55:07
13   and he did this.                                        13:55:12
14        I gave things from my perspective, and I           13:55:13
15   didn't -- I don't think I gave them any things that I   13:55:17
16   did that, from their perspective, that were             13:55:21
17   correctible.  So they never offered me any advice as    13:55:24
18   to maybe you should do this or should do that.          13:55:27
19        The only -- the only suggestion they gave was,     13:55:34
20   we think that you may -- should take these -- these     13:55:34
21   things to Mr. Fontaine.  So that was their only         13:55:39
22   suggestion to me.                                       13:55:43
23        Q.  Did you at that point talk with                13:55:44
24   Mr. Fontaine about your concerns?                       13:55:47
25        A.  Not until February, early February,            13:55:48
```

### 129

```
 1   February 5th, I believe.                                13:55:52
 2        Q.  Okay.                                          13:55:54
 3        A.  I set up a -- I set up a meeting with Kathy    13:55:54
 4   and told her that I felt like it was time to talk to    13:55:58
 5   Mr. Fontaine, because Larry openly verbally told me,    13:56:01
 6   you should just quit.  And so I talked to Kathy.  She   13:56:07
 7   set up a meeting.  And it progressed from there.        13:56:13
 8        Q.  Okay.  And -- and do you know whether          13:56:18
 9   Ms. Salvador or Ms. Glica told anyone about your        13:56:23
10   concerns about Mr. Flatley or Pioneer Tool?             13:56:28
11        A.  They provided no information on what           13:56:31
12   investigation they were doing.                          13:56:34
13        Q.  And at that point did you report your          13:56:36
14   concerns about Mr. Flatley or Pioneer Tool to anyone    13:56:39
15   else?                                                   13:56:42
16        A.  There are a number of people that I had        13:56:43
17   talked about -- about it, but not in a -- I'm going to  13:56:46
18   say this -- not in the chain of command, not -- not     13:56:56
19   somebody that was in a position higher than myself to   13:56:59
20   be able to do it, to do something about it.             13:57:01
21        Q.  So you were talking with colleagues at your    13:57:03
22   level and subordinates --                               13:57:06
23        A.  Yes.                                           13:57:07
24        Q.  -- below you; is that right?                   13:57:08
25        A.  Yes, and many of them shared similar           13:57:09
```

---

Baker, Earl Donald                                            August 14, 2020

34 (Pages 130 to 133)

130

1   stories that they had either heard or witnessed
2   themselves.  Many of them said that there was -- this
3   kind of stuff has been rumored quite a bit.  And I
4   feel that their culture at Smith & Wesson was a
5   pay-to-play.  They didn't seem as alarmed by it as
6   what I did, but they felt that it had gone on for a
7   while.
8        And I think that it was a pay-to-play society,
9   that the vendors was an unspoken thing, like we expect
10  you to do this, and -- and it was -- it was more
11  commonplace for -- for the people who had been there
12  longer.  Since I came from the outside, I felt that
13  was -- it was totally inappropriate.
14       Q.  Either at the time of your first meeting or
15  your second meeting with Ms. Glica and Ms. Salvador,
16  did you file or make any report with the hotline at
17  Smith & Wesson?
18       A.  No, I didn't, and there were reasons for
19  that.
20       Q.  Did you ever contact the hotline about any
21  of your concerns?
22       A.  No.  And I -- I told Mr. Cicero why I had
23  not.
24       Q.  And why was that?
25       A.  I had a brother-in-law who was once the

131

1   vice president of -- at Rolls Royce.  He told me of
2   his dealings at GE where he actually told me that
3   here's a place where you can report, you can go to the
4   FBI, but -- and that they would give you money for,
5   depending on how big of a deal it was.  And he said
6   they shut down their production for a number of weeks
7   or months investigating.
8        And I told Mr. Cicero, he asked me the same
9   question you just did, and I told him that I didn't
10  want to -- I wanted Smith & Wesson to handle their
11  problem, because I didn't want the company to be hurt.
12  If we dealt -- we were in a bull market where we were
13  doing $63 million in sales a month, shutting us down
14  for three or four months could come into billions of
15  dollars -- or millions -- multiple millions, and I
16  didn't want Smith & Wesson to be hurt.  I wasn't
17  looking for anything I could get out of it.  I just
18  wanted this corrected so that it wasn't happening.
19       Q.  You mentioned that around February 5th you
20  reached out to Kathy Salvador and she scheduled a
21  meeting or a call with Dan Fontaine.  Did you have any
22  communications or interactions with Kathy Salvador or
23  Ann Glica between the second meeting that you've
24  described and when you reached out to Ms. Salvador
25  around February 5th?

132

1        A.  Actually to get this correct, you can go
2   back and -- to what I said, that we had three meetings
3   with them, one pertaining to the first meeting over
4   the pay, the second was missing the class, the third
5   was over the -- the commendation.  And so the February
6   would have been the fourth time.  So -- and, yes,
7   Kathy did call me and say that she had set up a
8   meeting with Dan on the phone.
9        Then I got either a -- I can't recall if it was
10  an email or a call again saying that -- from Kathy
11  Salvador -- saying that she was just asked not to be
12  at the meeting, and she seemed upset by it, because
13  she had been representing me in this matter and she
14  seemed upset that at the last minute she was told not
15  to attend.
16       Q.  Did she tell you anything else during that
17  conversation?
18       A.  No.  No, just that -- I could sense that it
19  was a quandary to her as to why, but -- and that she
20  maybe didn't feel it was right or -- she was holding
21  back something.  That's all I can say.
22       Q.  And did you have any further contact with
23  Ms. Salvador about your concerns about Mr. Flatley or
24  Pioneer after that phone call?
25       A.  We had talked to her somewhat, but Ed

133

1   Suraci became the head -- the main point of contact
2   with HR, but I did interact with her relative to a few
3   meetings.
4        Q.  Relative to what?  I'm sorry.
5        A.  Relative to a few meetings where Mr. Suraci
6   asked her to be present.
7        Q.  Okay.
8        A.  So Suraci was the main contact, but there
9   were a couple of times where he asked Ms. Salvador to
10  sit in on the meeting.
11       Q.  Okay.  And so it sounds like the next
12  interaction involving HR was the meeting with
13  Mr. Fontaine after you reached out to Kathy Salvador
14  on February 5th; is that right?
15       A.  Yes.
16       Q.  And when did that meeting take place?
17       A.  I can't say.  Just a few days after the bad
18  review, and that was the first time I met Mr. Suraci.
19       Q.  Okay.  And who was present at the meeting
20  other than Mr. Fontaine, Mr. Suraci, and you, if
21  anyone?
22       A.  Mr. Flatley.
23       Q.  Okay.  And what happened during the
24  meeting?
25       A.  We -- I felt that it was kind of -- we were

Baker, Earl Donald                                  August 14, 2020

35 (Pages 134 to 137)

---

134

1   going over the -- how we got there type of thing.  We
2   didn't really get into too much of the meat of it.  I
3   felt and expressed to Dan Fontaine that he's a busy
4   man and that -- and that I understood that he didn't
5   have a whole lot of time to develop or devote to it,
6   but Larry was given -- took almost the entire time
7   just railing on me, and I didn't get a chance to
8   mention -- Ms. Glica and Ms. Salvador had told me -- I
9   did just recall something -- the interaction right
10  before the meeting, Ann Glica contacted me and said,
11  we want you to write a rebuttal to the things that was
12  in that review.
13      So it was at her request I did so.  I took it
14  to that meeting.  And Flatley talked the whole time.
15  And a number of the things that he mentioned in the --
16  in that review were just factually wrong.  They
17  were -- they weren't -- they were basically lies.  He
18  said this didn't happen when I had proof in my hand
19  that it did.  He said that the Robo report has been
20  made.  I carried a copy of the Robo report there
21  and -- and mentioned that in Mr. Flatley's own notes
22  that was completed in -- in December of '13.  But even
23  if you look at my first review where it was a good
24  review, in the future goals, if you look in there, it
25  says my review was -- that he wanted it completed by

---

135

1   March of 2014.
2       So I'm being written up in February of 2014
3   saying it's not complete.  A, it is complete, I got a
4   copy of it, and B, you didn't require it to be done
5   until March.
6       So, anyhow, those things came up.  I -- they
7   didn't really give me much audience, so I left there
8   frustrated.  So we set up another meeting.  That day
9   they said, let's quit for now and we'll have another
10  meeting.
11      Q.  Okay.  And when did that meeting take --
12  take place?
13      A.  The second meeting?
14      Q.  Yes, after your review.
15      A.  He said, we're going to give Ed a chance to
16  talk to both of you separately and to use his skills
17  as a mediator to kind of solidify the issues between
18  the two of you and then we'll pick a time to
19  reconvene.
20      So he gave Suraci time to -- to speak with both
21  of us separately and -- and then they called an
22  impromptu meeting when Ed was out out of the shop, and --
23  and so the next meeting Suraci was not even there.
24      Q.  Let me go back to the first meeting
25  following up on your review.  Were there any

---

136

1   discussions during that meeting about any of your
2   concerns about Pioneer Tool?
3       A.  No.  Well, as I was told by Ms. Salvador,
4   to keep it on the HR issues because, as far as I was
5   concerned, she was working on the -- the SOX part of
6   my claims on a separate matter and because she didn't
7   know who was involved.  What if Mr. Fontaine was
8   involved?  Then I might be telling Mr. Fontaine
9   something that she didn't want as part of her
10  investigation.
11      So we kept it based on the fact that
12  Mr. Flatley's issues that he raised there are
13  absolute provable falsehoods, and that it wasn't -- I
14  wasn't being treated fairly, and -- and I felt the
15  other thing would take its own course.  If they found
16  Larry was not involved with it, so be it.  If he was
17  involved with it, let it be what it's going to be.
18  But that wasn't my issue.  I had taken it to
19  management.  It's now management's issue.
20      Q.  And you referred to what Kathy was working
21  on as SOX issues?
22      A.  Yes.
23      Q.  Are you referring to Sarbanes-Oxley?
24      A.  Yes, sir -- yes, ma'am.
25      Q.  And did you or she call them SOX issues at

---

137

1   that time?
2       A.  I did, because -- because of the LRN that
3   we were asked to take was on whistleblowing.  The
4   first was on whistleblowing.  The second one was on
5   ethics.
6       So the first was how you would relate to, if
7   you saw something that was improper.  The second one,
8   on ethics, related to how you interpersonally looked
9   at issues where you're offered something that's -- no
10  one else might know about but you had to have -- be
11  ethical in how you dealt with it.
12      So because we had that LRN, absolutely, we
13  talked about the fact that -- that it was -- we had --
14  I had learned in SOX, XYZ, and that's why I'm bringing
15  it to you.
16      Q.  Okay.  And -- and you -- and you recall
17  specifically saying to Kathy Salvador and/or Ann Glica
18  that you had concerns under SOX, S-O-X?
19      A.  Yes.  Yes, absolutely.
20      Q.  And as you sat there in the meeting with
21  Mr. Flatley after your February evaluation, did you
22  have any reason to believe that he knew that you had
23  raised concerns with HR about Pioneer and his
24  relationship with Pioneer?
25      A.  And what --

---

Baker, Earl Donald

August 14, 2020

36 (Pages 138 to 141)

138

1          MR. LEE:  Objection to the -- objection to

2  the form of the question, but, yeah, I wasn't sure of

3  the timing either.

4          A.  Right.

5          Q.  So you said there were -- we were talking

6  about the first meeting after your evaluation in

7  February of 2014.  As you were sitting -- sitting in

8  that meeting with Mr. Fontaine and Mr. Suraci, did you

9  have any reason to believe that Larry Flatley was

10  aware of your concerns about his relationship with

11  Pioneer?

12          MR. LEE:  Objection to the form of the

13  question, calls for speculation, but you may answer,

14  if you can.

15          A.  There are times when you are more

16  analytical and looking at it from a 2,000-feet view,

17  and other times when it's right in your face and

18  you're looking at how it relates to you personally.

19          I don't know at that time that I was looking at

20  it more of like when someone punches you in the nose,

21  you're not thinking about how -- what drew them to

22  this point, what kind of upbringing did he have.  I

23  was reacting to the actual injustice in the way I was

24  being treated and the falsehoods that were in that

25  thing, so I wasn't thinking as much about the big

139

1  picture.

2          Should I have been?  Possibly.  But at that

3  time I was just interacting with the fact that I had

4  just been punched in the nose and told I should just

5  quit.  I gave up a lot to go there, and I just didn't

6  like to be dismissed in that way.  And I did believe

7  it was for the purpose of SOX, but I didn't even

8  ponder whether or not at that point Flatley was aware

9  of it or wasn't, but I found out shortly thereafter.

10          Q.  And what -- what did you find out shortly

11  thereafter?

12          A.  My office was broken into and my journal

13  was stolen, my briefcase was gone through, and I have

14  reports that it was Flatley that did so.  I called

15  Mr. Suraci right away and even called Mr. -- at his

16  request, I called Mr. Cicero on a Saturday.  So I

17  talked to them both on Saturday when I found out.

18          I left on Friday, and I had to go in to work on

19  Saturday to take care of an issue, and when I got

20  there I found my office ransacked, and I called both

21  of them to let them know.  And at that point I felt

22  certain that Mr. Flatley had been told and that it was

23  now open war.

24          Q.  Let's go back to the second meeting after

25  your February 2014 evaluation.  You indicated that

140

1  Mr. -- Mr. Fontaine and Mr. Flatley were there,

2  correct?

3          A.  Yes.

4          Q.  And Mr. Suraci was not there; is that

5  right?

6          A.  That's correct.

7          Q.  And was anybody else there?

8          A.  No.

9          Q.  Okay.  And where did that meeting take

10  place?

11          A.  In Dan Fontaine's office.

12          Q.  And how long did it last?

13          A.  I felt like it was a fairly short meeting.

14  Dan had mentioned his calendar being full, so it

15  was -- it was a short meeting.

16          Q.  What happened during the meeting?

17          A.  It was the first time I really had a -- an

18  opportunity to express my feelings about the review

19  and the other falsehoods that were in it.  And Dan

20  Fontaine's response was he was getting a little miffed

21  that he was being dragged into this, you know, slap

22  fight.

23          So he took the review and said, this is out of

24  cycle, it isn't anything, it doesn't -- and I -- and

25  he slapped it upside down on his desk.  I told him

141

1  that Mr. Fontaine or Mr. Flatley had taken the first

2  meeting saying his side, I hadn't really explained, so

3  I started going into some of the factual errors.

4          He said, listen, I'm going to tell you -- cut

5  you off right there and say, for our intents and

6  purposes, this thing does not exist, and he slapped

7  his hand on it.  It was turned upside down on his

8  desk.  He said, this thing does not exist.  It -- it

9  never happened.  And I reported that to Ed.

10          Q.  You reported it to who?

11          A.  Ed Suraci.  I don't know if it's Suraci or

12  Suraci.  I always call him Suraci, but I think that's

13  it.

14          Q.  And you had -- you had indicated that HR

15  had suggested that you draft a rebuttal --

16          A.  Yes.

17          Q.  -- to the evaluation in February.  Did you

18  provide that to anyone prior to either of these

19  meetings?

20          A.  Yes.  I --

21          Q.  Who did you provide them to?

22          A.  Mr. Fontaine.

23          Q.  And you provided it to Mr. Flatley as well?

24          A.  I don't recall.  I -- I just honestly don't

25  recall whether I did him or not.  I know Ann got a

Baker, Earl Donald

August 14, 2020

37 (Pages 142 to 145)

---

142

1  copy.                                                    14:14:46
2      Q. Ann Glica?                                        14:14:47
3      A. Yes. And I know that -- I think, my               14:14:48
4  recollection is that I gave one to Mr. Fontaine prior    14:14:53
5  to the meeting, but I know that he certainly had one     14:14:56
6  in the meeting because I think I would have taken a      14:15:00
7  copy with me.                                            14:15:05
8      Q. Right. So let's go to Exhibit 6 in the            14:15:05
9  binder of exhibits.                                      14:15:08
10         (Exhibit 6 previously marked                     14:15:11
11      for identification and referenced
12      herein: Email dated November 7th,
13      2013)                                               14:15:11
14      Q. And this is an email dated November 7th,         14:15:11
15  2013, correct?                                          14:15:21
16      MR. LEE: Did you find it, Earl?                      14:15:39
17      A. The one I'm looking at says -- under 6 is        14:15:41
18  November 7th.                                            14:15:43
19      Q. I may have misspoken. I'm sorry. Is              14:15:46
20  Exhibit 6 a November 7, 2013 email, email exchange,     14:15:46
21  between you, Kathy Salvador, and Ann Glica?              14:15:54
22      A. Yes.                                             14:15:58
23      Q. And let's start at the bottom. That email         14:15:59
24  is from November 5th, correct?                           14:16:03
25      A. Yes.                                             14:16:05

---

143

1      Q. And you talk in the -- in the first line         14:16:05
2  about the option that you recommended. That was         14:16:11
3  talking with Mr. Fontaine, correct?                     14:16:14
4      A. Yes.                                             14:16:15
5      Q. And you said, "After having additional            14:16:16
6  meetings since we spoke, I believe the situation         14:16:19
7  remains equally antagonistic." Which meeting are you    14:16:23
8  referring to in that line?                               14:16:27
9      A. I think they were talking about how my           14:16:28
10  meetings went with Mr. Flatley in his office so         14:16:33
11  that -- there was a meeting where he gave me the false  14:16:38
12  review, and then I've had one meeting with Larry since  14:16:43
13  we last spoke, was what I referred to.                  14:16:46
14      Q. You said that the false review -- at this        14:16:50
15  point, November 2013, you had not received the          14:16:54
16  February 2014 evaluation, right?                         14:16:56
17      A. No. Well, then I'm mistaken. I just              14:16:58
18  didn't pay attention to the time frame.                 14:17:05
19      Q. I -- I've moved around in the timeline with      14:17:07
20  you.                                                    14:17:09
21      A. Okay.                                            14:17:09
22      Q. Do you recall what meeting you're               14:17:11
23  referencing there?                                      14:17:12
24      A. It would have been just a meeting with          14:17:13
25  Larry since I talked to them.                            14:17:17

---

144

1      Q. And in the next paragraph, you say, I            14:17:19
2  think, "I see things as being bleak and must pursue       14:17:22
3  options that give me some level of protection." What    14:17:26
4  were you referring to about protection?                  14:17:29
5      A. I was contemplating going to the -- the --       14:17:31
6  to that submission line, because whether they were       14:17:36
7  working on it or not, I was content with they didn't    14:17:41
8  have to -- they don't owe it to me to keep me informed  14:17:44
9  of what they're finding out, but yet nothing is          14:17:49
10  happening and I'm still having some increasingly         14:17:52
11  negative interactions with Flatley and whatever it is   14:17:57
12  they're doing isn't enough.                             14:18:04
13      So I had thought about going -- getting, A,          14:18:05
14  possibly legal advice, and, B, possibly going to --     14:18:09
15  there are three things that were option -- legal         14:18:16
16  advice, go to the -- that health line, or actually go   14:18:19
17  to the FBI. That had been suggested at some point.       14:18:23
18      Q. And -- but you didn't take any of those         14:18:28
19  options at that point, right?                            14:18:30
20      A. No. I just said I was considering those as       14:18:31
21  some actions that may give me a better level of         14:18:35
22  protection because I gave up so much to go to           14:18:40
23  Smith & Wesson and I didn't -- I didn't want to lose    14:18:43
24  it because I -- I ran into a guy who wasn't ethical in  14:18:46
25  what he was doing.                                       14:18:51

---

145

1      Q. Now in Kathy Salvador's response she again       14:18:54
2  makes the recommendation that you engage Dan Fontaine,   14:18:58
3  correct?                                                 14:19:03
4      A. Yes.                                             14:19:03
5      Q. And she said that he might be able to            14:19:05
6  recommend -- "seeing what, if anything, he might be     14:19:07
7  able to recommend in order to help you achieve your     14:19:10
8  department goals and to help smooth the relationship     14:19:14
9  between you and Larry," right?                            14:19:15
10      A. Yes.                                            14:19:17
11      Q. Was that -- was that a yes? I'm sorry.          14:19:18
12      A. Yes. Yes.                                       14:19:21
13      Q. And then your response is above that,           14:19:28
14  right?                                                  14:19:32
15      A. I don't know if anything -- I don't know if     14:19:32
16  there was anything that occurred in between that. All   14:19:37
17  I know is it's closely on the same day.                 14:19:40
18      Q. And do you know whether you spoke to            14:19:45
19  Mr. Fontaine at that point?                             14:19:47
20      MR. LEE: Objection to form of the                  14:19:49
21  question. About anything or about this or about this    14:19:50
22  recommendation?                                         14:19:55
23      Q. Let me -- let me clarify the question.          14:19:56
24  They had recommended that you engage Dan Fontaine.      14:20:00
25  Did you at that point engage him to talk about your    14:20:04

---

Baker, Earl Donald

August 14, 2020

38 (Pages 146 to 149)

---

146

```
 1   working relationship with Mr. Flatley?            14:20:08
 2       A. I did not.                                 14:20:10
 3       Q. And prior to your evaluation of February   14:20:11
 4   2014, did you meet with or speak with Anne Bruce? 14:20:25
 5       A. No. No. Not -- well, I mean, we -- we had  14:20:29
 6   group meetings.                                   14:20:34
 7       Q. But you did not talk with her individually 14:20:36
 8   about any of your concerns about Larry Flatley or 14:20:38
 9   Pioneer, correct?                                 14:20:41
10       A. No.                                        14:20:42
11       Q. Let's go to Exhibit 7.                     14:20:45
12           (Exhibit 7 previously marked              14:20:47
13           for identification and referenced
14           herein: February 2014 Performance
15           Evaluation)                               14:20:48
16       Q. We talked about your February 2014
17   Performance Evaluation. Is Exhibit 7 a copy of that 14:20:53
18   evaluation?                                       14:20:57
19       A. It is one of the copies.                   14:20:58
20       Q. Okay.                                      14:21:01
21       A. There are noted ones -- there are different 14:21:01
22   ones out there.
23       Q. So this is one piece of the evaluation that 14:21:07
24   you received around February 7th, right?          14:21:09
25       A. I actually received it on February 6th, and 14:21:13
```

---

147

```
 1   then there are some copies dated the 5th, some copies 14:21:18
 2   dated the 7th, but this wouldn't have been the one I 14:21:22
 3   accepted on the 6th because it's dated the 7th. So  14:21:25
 4   this is a subsequent copy after the fact.           14:21:31
 5       Q. Let's go to Exhibit 8. And it's called     14:21:34
 6   "Earl Baker Result - February 7th, 2014," right?   14:21:39
 7           (Exhibit 8 previously marked
 8           for identification and referenced
 9           herein: Earl Baker Result 2/7/14
10           Baker0000110)                              14:21:44
11       A. Yes.                                        14:21:46
12       Q. And this is one of the other pieces of the  14:21:44
13   evaluation that you received from Mr. Flatley at that 14:21:45
14   time?                                             14:21:50
15       A. Yes.                                        14:21:50
16       Q. And go to the next page, which is actually  14:21:51
17   Exhibit 9, but it says, "Earl Baker Result - February 14:21:54
18   7th, 2014, Response." Is this the rebuttal that you 14:22:00
19   drafted? And I note that it goes actually onto a   14:22:04
20   single page that's Exhibit 9. Apparently Exhibit 9 14:22:08
21   tab is a little bit off.                           14:22:12
22       A. Okay.                                       14:22:13
23           (Exhibit 9 previously marked
24           for identification and referenced
25           herein: Earl Baker Result 2/7/14
```

---

148

```
 1   Response)
 2       SW0000112 - SW0000114)                         14:22:14
 3       MR. LEE: Well, hold on. I have three          14:22:14
 4   pages of Exhibit 9; that's -- is that correct?     14:22:18
 5       MS. BERTRAM: The version that I have has      14:22:20
 6   the first two pages of Exhibit 9 under the 8 tab and 14:22:24
 7   one page of Exhibit 9 under the 9 tab. So hopefully 14:22:27
 8   both of yours are correct.                         14:22:31
 9       MR. LEE: Can we just make -- can we just      14:22:34
10   make sure, are you talking about SW 112, SW 113, and 14:22:35
11   SW 114 in the Bates number?                        14:22:40
12       MS. BERTRAM: That is correct.                 14:22:43
13       MR. LEE: Okay. That's what we have as        14:22:44
14   Exhibit 9.                                        14:22:45
15       MS. BERTRAM: Okay.                            14:22:46
16       Q. Mr. Baker, is Exhibit 9 the rebuttal that  14:22:47
17   you drafted at HR's request?                       14:22:49
18       A. Yes, part of it. There was two portions to 14:22:52
19   the rebuttal. One was to the individual markings   14:22:56
20   within the boxes that you showed me on that prior  14:23:00
21   exhibit, and then this is to rebut the -- the addendum 14:23:04
22   thing that he -- that Mr. Flatley attached where it 14:23:10
23   says "Earl Baker Results." So I had one page for   14:23:13
24   each. So my Exhibit 9 rebutted Flatley's, what he  14:23:19
25   wrote in Exhibit 8.                                14:23:23
```

---

149

```
 1       Q. Okay. And your rating in the evaluation,   14:23:23
 2   the overall performance rating, was "does not meet  14:23:50
 3   expectations," correct?                            14:23:54
 4       A. Yes.                                        14:23:55
 5       Q. And you were given 60 days to improve your 14:23:55
 6   performance, right?                                14:23:58
 7       A. Yes.                                        14:23:59
 8       Q. And I know that Mr. Flatley signed the     14:23:59
 9   review. Do you know whether anybody else provided -- 14:24:03
10   any other manager provided input for the review, for 14:24:07
11   the performance improvement plan?                  14:24:10
12       A. I wasn't made aware of it.                 14:24:14
13       Q. And you received the evaluation in person; 14:24:17
14   is that right?                                     14:24:21
15       A. And -- yeah.                               14:24:21
16       Q. And was anybody present for that discussion 14:24:28
17   other than you and Mr. Flatley?                    14:24:30
18       A. No, but I -- I know that Linda du Pratt was 14:24:32
19   in the outer office. You had to go through         14:24:38
20   Ms. du Pratt's office to go into Flatley's office, and 14:24:43
21   I think that she was aware of what transpired because 14:24:49
22   she -- she kind of gave me a look when I walked up. 14:24:54
23       Q. Do you know what, if anything, she was able 14:24:59
24   to hear on the other side of the door?             14:25:01
25       A. No. Well, there was a little bit of -- I   14:25:03
```

---

Baker, Earl Donald                                    August 14, 2020

39 (Pages 150 to 153)

150

1  don't believe I raised my voice at all, but                    14:25:08
2  Mr. Flatley, what he said, you're not -- not going to          14:25:11
3  want to do this shit, you're just going to want to             14:25:14
4  quit, and I think she may have heard that part.                14:25:17
5      Q.  And do you recall anything else that                   14:25:26
6  Mr. Flatley said to you during that meeting?                   14:25:26
7      A.  Yeah.  He had set up a group of meetings,              14:25:29
8  and he said, I don't know if you can even attend this          14:25:35
9  one, it takes place tomorrow in Boston, but -- and             14:25:37
10 then there were some duplicates where they had the            14:25:40
11 same class with a different heading, so he had written         14:25:43
12 down two identical classes, and then I left the                14:25:46
13 office.  I was kind of quiet.  And I went to my office         14:25:52
14 and got into the seminar in Boston.  So the next day I         14:26:03
15 was off to Boston.                                             14:26:03
16     Q.  And do you recall anything else he said to            14:26:12
17 you during that meeting?                                       14:26:14
18     A.  We -- as we went over those things, he                14:26:15
19 was -- he was talking, but I was pretty angry and was          14:26:25
20 just bristling.  It was pretty much his floor.  He was         14:26:30
21 giving the review.  I did not sign it.  And that was           14:26:35
22 pretty much it.  A pretty grim day.                            14:26:46
23     Q.  Now going back to Exhibit 9, which is your            14:26:48
24 rebuttal or one of your rebuttal documents, was               14:26:54
25 that -- do you view that as a complete response to the        14:27:03

151

1  concerns that you have or -- strike that.                      14:27:06
2      Do you agree this as a complete response to the           14:27:09
3  issues raised in the evaluation?                               14:27:11
4      MR. LEE:  Objection to the -- objection to                14:27:14
5  the form of the question, but you may answer.                  14:27:16
6      A.  I don't -- it's like, I'm sure you -- you             14:27:19
7  run into it in your business.  You address the issues          14:27:24
8  at hand, but I don't complete -- I don't view that as          14:27:27
9  a complete, like I gave every answer possible to the           14:27:33
10 thing.                                                         14:27:37
11     I just basically said, you know, pointed out              14:27:37
12 some of the -- the factual errors in what he said, and        14:27:40
13 did I do so in a perfect manner, leaving no stone             14:27:47
14 unturned, I wouldn't say so, there might be some             14:27:50
15 things that I add to it today, but, again, I thought          14:27:54
16 it was a good representation to show that -- that the         14:27:57
17 facts given in his review were fraudulent, he knew            14:28:05
18 them not to be true, and he -- yet he said them anyway        14:28:11
19 and ...                                                        14:28:11
20     Q.  And was there anything important that you            14:28:11
21 left out of the rebuttal?                                      14:28:13
22     MR. LEE:  Objection to the form of the                    14:28:15
23 question, but you may answer.                                  14:28:16
24     A.  Again, if I went over it today, there might          14:28:19
25 be a few things I would add, but I felt this was a            14:28:22

152

1  good representation of what some of the errors in his          14:28:27
2  judgment or in the things that he wrote, and it really         14:28:35
3  wasn't judgment because he didn't believe the things          14:28:40
4  he wrote anyway.  He knew we were literally checking           14:28:44
5  the Robo report every day, every day, yet in that             14:28:47
6  report he said it had never been completed.                    14:28:49
7      When I took a copy of that report to show my             14:28:52
8  superiors that there was an error, they refused to            14:28:56
9  even look at it.  They said, you could have printed           14:29:00
10 that off with a word processor.                                14:29:03
11     So had anyone wanted to look at the things that          14:29:04
12 Mr. Flatley said in that thing and investigated at the        14:29:07
13 time when I had those facts at my fingertip, we could         14:29:11
14 have put this to bed in five minutes, in five minutes,        14:29:16
15 but Mr. Flatley was permitted to put this farce out          14:29:19
16 there.  And then when you start getting to the facts,        14:29:24
17 Mr. Fontaine says it doesn't exist, it never happened.       14:29:27
18 And then only to sign this thing later in July and           14:29:32
19 affirm it and put it in my permanent record.                  14:29:36
20     So the things they did clearly violated HR              14:29:39
21 policy, company policy.  They basically turned the           14:29:44
22 whole system on its head.  They allowed one individual       14:29:49
23 who was acting out in an improper way target and            14:29:54
24 attack me when my -- my department at this time was         14:29:57
25 more than double -- producing more than double of what      14:30:02

153

1  any department or that department had ever done so in         14:30:05
2  the history of the company.                                    14:30:09
3      So my -- there was no question about the                 14:30:12
4  performance of my department or me.  This is                  14:30:14
5  something, a narrative that they have placed after the        14:30:17
6  fact.                                                          14:30:21
7      Q.  Would you agree that the rebuttal only             14:30:24
8  addresses your HR concerns?                                    14:30:26
9      A.  Absolutely.                                          14:30:28
10     Q.  It did not try to address any of the                14:30:30
11 concerns that you had raised about Pioneer and -- and        14:30:34
12 Mr. Flatley's relationship with it, correct?                   14:30:37
13     A.  Yes.  I will say that at the time of this           14:30:40
14 writing I was asked to write this by Ms. Glica.  And I       14:30:44
15 had not met Mr. Suraci yet at this point.  So my only        14:30:49
16 point of contact that I've made my SOX claims to is          14:30:54
17 Ms. Salvador.  She had asked me not to mention any of        14:30:59
18 the SOX-related claims because we don't know who's           14:31:04
19 involved and we may have to find out how we're going         14:31:07
20 to investigate this or how we're going to handle this,       14:31:10
21 is the words she used.                                        14:31:12
22     So I did what I was told to do.  Had I put             14:31:13
23 SOX-related things in there, I would have been deemed        14:31:18
24 as being inappropriate and not listening to the advice      14:31:21
25 of the person that I actually made my submissions to.       14:31:26

Baker, Earl Donald

August 14, 2020

40 (Pages 154 to 157)

---

### 154

1    So I left it in her hands and I did exactly as    14:31:30
2    she said. So I kept it only regarding the way I was    14:31:34
3    treated, and that's what she told me to take to    14:31:38
4    Mr. Fontaine. So I did as I was told.    14:31:42
5        Q. And the HR issues that are raised in your    14:31:45
6    rebuttal, do you have any knowledge of what the    14:31:49
7    company did to look into those concerns?    14:31:51
8        A. No, they didn't -- they didn't keep me    14:31:54
9    apprised.    14:31:58
10       Q. In your discussions about your job and your    14:32:00
11   job performance, did Mr. Flatley or Mr. Fontaine raise    14:32:04
12   any concerns about you conducting safety and 5-S    14:32:15
13   audits?    14:32:21
14       A. When they were at the second meeting where    14:32:22
15   Mr. Suraci was not -- not there, Mr. Flatley -- the    14:32:25
16   meeting ended up with Mr. Flatley mentioning    14:32:28
17   discrepancies on the pitch board.    14:32:36
18       So we went directly from Mr. Fontaine's office    14:32:38
19   to the pitch board, and that was in a whole other    14:32:38
20   plant. So we all walked over. Mr. Fontaine, we went    14:32:48
21   through the whole -- whole board. Mr. Fontaine said I    14:32:55
22   was out of date on my 5-S and safety audits.    14:33:03
23       And I want to correct the record that some of    14:33:03
24   my writings, I was incorrect in saying that I was ten    14:33:05
25   days late. I thought I was supposed to be doing it    14:33:08

### 155

1    every two weeks, so I was ten days out from the date I    14:33:13
2    had done it last, which made it only three days late    14:33:16
3    in actuality.    14:33:20
4        And he became upset, Mr. Fontaine, and said,    14:33:21
5    you know, with shoddy work like this, don't worry    14:33:31
6    about Flatley firing you, I'll fire you myself. And    14:33:31
7    he said I can get a -- a supervisor in that makes far    14:33:36
8    less than you that would keep this board up to date.    14:33:41
9        And, again, I looked at that as just he's going    14:33:44
10   off, he's pissed, and so I contacted Mr., you know,    14:33:49
11   Mr. Francis after that.    14:33:55
12       Q. And did you ever take the position that you    14:33:58
13   didn't have responsibility for the safety or the 5-S    14:34:00
14   audits?    14:34:05
15       A. No, never have, never did.    14:34:05
16       Q. Let me have you look at Exhibit 11.    14:34:07
17       (Exhibit 11 previously marked    14:34:10
18       for identification and referenced
19       herein: Email correspondence from
20       (topmost) E Baker to D Fontaine
21       4/17/2014 SW0000493)    14:34:16
22       MR. LEE: Are we skipping Exhibit 10,    14:34:16
23   Connie?    14:34:19
24       MS. BERTRAM: Yes, for now.    14:34:20
25       Q. Exhibit 11 is an April 17, 2014 email from    14:34:22

### 156

1    you to Mr. Fontaine; is that right?    14:34:26
2        A. Yes.    14:34:28
3        Q. And you saying that you're eating crow    14:34:30
4    again.    14:34:34
5        A. Yes.    14:34:34
6        Q. What do you mean by that?    14:34:34
7        A. So, basically, the disagreement that    14:34:36
8    Mr. Fontaine and I had at the board was I believed I    14:34:40
9    was in compliance because I had been doing the board    14:34:44
10   every two weeks, as I had been trained by Mr. Wnuk.    14:34:46
11       So my position was I was not out of date. And    14:34:51
12   then I -- I told you right afterwards I contacted    14:34:57
13   Mr. Francis, and he told me, in fact, that I was    14:35:01
14   supposed to be doing it every week.    14:35:06
15       I did not know there was even a manual online    14:35:09
16   for how to do the board at that point. So he -- he    14:35:13
17   showed me, he said, you can go on the mainframe and    14:35:17
18   you can pull up how the pitch board is supposed to be    14:35:20
19   run. And in there it says you're supposed to do it    14:35:23
20   every week.    14:35:25
21       So in response to finding out that I was    14:35:27
22   incorrect, I am somebody that will advocate strongly    14:35:30
23   on behalf of my positions. I am not going to shy away    14:35:37
24   from somebody if I believe I'm right.    14:35:41
25       So I was forceful with Mr. Fontaine. But I'm    14:35:43

### 157

1    also somebody that has accountability that, when I    14:35:48
2    found out I was incorrect, rather than pop off to your    14:35:51
3    boss about being right, when I found out I was wrong,    14:35:56
4    I felt like I was eating crow and apologizing to him.    14:36:00
5        And I think I -- I do apologize, yes, I say I'm    14:36:03
6    sorry, because I feel that I found out I was wrong and    14:36:07
7    part of being an accountable adult is you advocate for    14:36:12
8    what you believe is right. If you find out you're    14:36:16
9    wrong, you stand up and take your medicine, and that's    14:36:19
10   what I did.    14:36:22
11       Q. Let's turn to Exhibit 13.    14:36:22
12       (Exhibit 13 previously marked    14:36:24
13       for identification and referenced
14       herein: Earl Baker's Training Program
15       2/4/14 Baker0000096)    14:36:26
16       Q. And that's "Earl Baker's Training Program,"    14:36:26
17   February 4th, 2014; is that right?    14:36:29
18       A. I'm sorry. What are --    14:36:32
19       A. It's Exhibit 13 on the tab.    14:36:34
20       A. Oh, I'm sorry. Yes. All right. Yes.    14:36:37
21       Q. And as a result of your performance review,    14:36:40
22   you were placed on a -- on a performance improvement    14:36:45
23   plan or a training program; is that right?    14:36:47
24       A. Yes. Yes, I called it a remediation    14:36:49
25   program, but yes.    14:36:52

---

Baker, Earl Donald

August 14, 2020

41 (Pages 158 to 161)

158

1    Q.  And was -- did Mr. Flatley provide this
2  remediation plan to you during your evaluation
3  meeting?
4    A.  Yes.  That's -- when he said, you're not
5  going to want to do this shit, you're going to want to
6  quit, this is what he was referring to.
7    Q.  And the remediation plan has some seminars
8  and trainings to go to; is that right?
9    A.  Yes.
10    Q.  And at the bottom it has a listing of four
11  projects, correct?
12    A.  I see three.
13    Q.  There's -- there's a project -- if you look
14  at positions, and then there's three more.
15    A.  Yes, one is given twice.
16    Q.  Right.  Right.  And these were goals that
17  had previously been provided to you by Mr. Flatley
18  during your weekly meetings with him; is that right?
19    A.  Yes.  And, again, I want to stress that you
20  putting it down as goals that Mr. Flatley gave me,
21  again, Mr. Flatley did not have my training, so he
22  didn't mandate goals.  He asked, what things are you
23  working on, and then he would make sure that I was
24  progressing towards the things that we mutually
25  agreed, but it was not a thing where he dictated, this

159

1  is what I want you to do.  It was, what are you
2  working on and why, and then he just was a manager --
3  which I think is a reasonable approach, that he can
4  keep me to the task that I need to be doing without
5  necessarily knowing too much what I'm doing, you know,
6  how to do what I'm doing.
7    So it's a reasonable and I thought smart way to
8  go about it, but I kind of object to it every time
9  it's being mentioned as if these were Flatley mandates
10  that I was given.  No, these were projects I'm working
11  on, and he's just keeping me up to date on progress
12  and making sure we're making progress.
13    MR. LEE:  Can we take a quick five-minute
14  break, Connie, while you're looking for whatever
15  you're looking for?
16    MS. BERTRAM:  That would be great.
17    VIDEO SPECIALIST:  It's 2:39 p.m., we're
18  off the record.
19    (Proceedings recessed)
20    VIDEO SPECIALIST:  The time is 2:50 p.m.,
21  and we're back on the record.
22  BY MS. BERTRAM:
23    Q.  Mr. Baker, if I can have you go to pages
24  351, 352, and 353, and 355 of -- of your production
25  documents.

160

1    A.  Those are Bates numbers you gave?
2    Q.  Yes.
3    A.  Could you give them again?
4    Q.  It starts at 351 and it goes to 354.
5    A.  Okay.  Yeah.
6    Q.  And you described previously a notebook
7  that you -- that you used to take notes?
8    A.  Yes.
9    Q.  And this is the second one that you had,
10  right?
11    A.  Yes.
12    Q.  And did you start using it on March 28th of
13  2014?
14    A.  I'm not sure of the date I first started
15  using it.
16    Q.  Okay.  Are all the handwritten notes on
17  pages 351 through 354 in your handwriting?
18    A.  Yes.
19    Q.  And they have notes for the days March 28,
20  April 17, April 18, April 30; is that right?
21    A.  I see April 18.  I don't see the 30.  That
22  would be on the next page?
23    Q.  That's right.
24    A.  Okay.  Yes.  Do you want me to read them
25  or what notes --

161

1    Q.  Are they all in your handwriting?
2    A.  Yes, they are.  I said that.
3    Q.  And -- and they show notes for those three
4  particular days, right?
5    A.  Yes.
6    Q.  This is, I think, what's called a moleskin
7  notebook; is that right?
8    A.  Yes.
9    Q.  And do you recall making notes in your
10  moleskin other than for these three days?
11    A.  I recall making them for other days, but I
12  can't -- I can't say that I used it, you know, how
13  often I used it.  Probably should have used it more
14  often than I did.
15    Q.  And you said that you still have a copy of
16  this notebook, correct?
17    A.  Yes, I believe I still have this.
18    Q.  And where is that located?
19    A.  In my closet, I believe.
20    Q.  Pardon me?
21    A.  I believe it's in my closet.
22    Q.  And the notes that you made each day, did
23  you make them contemporaneously or after the fact?
24    A.  That day, I think.
25    Q.  So would it be later in the day after you

Baker, Earl Donald

August 14, 2020

42 (Pages 162 to 165)

---

162

1    left work or during the course of the workday?    14:52:48
2        A.  I can't say.  I mean, it could have been    14:52:51
3    either.    14:52:54
4        Q.  Pardon me?    14:52:55
5        A.  It could have been either.  I can't really    14:52:55
6    say.  It's such a long time ago.    14:52:58
7        Q.  Would it be fair to say that they were made    14:52:59
8    within 24 hours of the events described?    14:53:01
9        A.  Oh, yeah, I would say.    14:53:06
10       Q.  And did you ever provide these notes to    14:53:07
11   anybody at Smith & Wesson?    14:53:09
12       A.  No.  They were -- I don't believe so.    14:53:10
13       Q.  We talked about two meetings that you    14:53:18
14   attended with HR and with your supervisors after your    14:53:21
15   February 2014 evaluation.  Did you have any other    14:53:25
16   meetings with HR after the second one that you've    14:53:29
17   already described?    14:53:32
18       A.  About any circumstance or about -- or what?    14:53:34
19       Q.  About Larry Flatley, the HR issues and    14:53:37
20   concerns that you had with respect to Larry Flatley.    14:53:41
21       A.  We had multiple HR issues that they were    14:53:44
22   involved with, one being over the hiring practice, one    14:53:48
23   over Pavel being the successor to Dan Durrand.  It    14:53:55
24   just seemed like we were constantly -- so they -- I    14:54:07
25   needed to get somebody to replace Dan, and Larry    14:54:15

---

163

1    disagreed, so we ended up at HR.    14:54:18
2        Q.  Mr. Baker, I need you to keep your voice up    14:54:21
3    because we're having a real -- I have you on the    14:54:23
4    highest setting for -- for volume, and we're really    14:54:24
5    struggling to hear you.    14:54:29
6        MR. LEE:  Earl, can you -- can you turn it    14:54:30
7    up a little at your end?  Remember we did that this    14:54:33
8    morning?    14:54:36
9        THE WITNESS:  Sure.  I'm not sure how I did    14:54:36
10   it.    14:55:10
11       MR. LEE:  You sound fine to me right now.    14:55:11
12       Q.  Just try and keep your voice up.    14:55:13
13       MR. LEE:  Yeah.    14:55:16
14       A.  I think I might have put my arm in front of    14:55:16
15   the microphone that's on the cord.    14:55:18
16       Q.  Okay.  So let me -- let me focus our -- let    14:55:20
17   me back up a little bit.    14:55:23
18       You received the evaluation.  You had two    14:55:25
19   meetings with your supervisors after that.  During the    14:55:29
20   period between your February review and your June    14:55:36
21   review, did you continue to have weekly meetings with    14:55:43
22   Mr. Flatley?    14:55:43
23       A.  Yes.    14:55:43
24       Q.  And was it just you and Mr. Flatley, or was    14:55:44
25   Mr. Fontaine also participating in those meetings at    14:55:49

---

164

1    that point?    14:55:52
2        A.  We still kept our regular meeting, but --    14:55:53
3        Q.  Pardon me?    14:55:56
4        A.  We still kept our regular meeting --    14:55:57
5        Q.  Okay.    14:55:59
6        A.  -- where it was just the two of us, but    14:56:00
7    there were other occasions where others were involved.    14:56:02
8        Q.  Where others were in there?    14:56:07
9        A.  Yes.    14:56:09
10       Q.  Okay.  I'm really struggling to hear you.    14:56:10
11   And I hate -- I hate interrupting to ask you to repeat    14:56:13
12   yourself.    14:56:16
13       And during the course of those meetings, did    14:56:18
14   Mr. Flatley and/or Mr. Fontaine talk with you about    14:56:21
15   your progress towards the goals that were identified    14:56:25
16   in your remediation plan?    14:56:28
17       A.  Larry at one point involved Mr. Fontaine    14:56:33
18   stating that I had made no progress on those issues    14:56:41
19   and which was false.    14:56:51
20       Q.  Did he -- did he provide you with input on    14:56:51
21   how he perceived that you were performing on your    14:56:59
22   goals in the remediation plan?    14:57:02
23       A.  Who is "he"?    14:57:05
24       Q.  Mr. Flatley.    14:57:06
25       A.  He, like I said, would make -- just out of    14:57:08

---

165

1    these, you know, just exorbitantly fantastic claims,    14:57:16
2    he would overstate things.  No progress had been made    14:57:24
3    on it is what he said to Mr. Fontaine.  And I took    14:57:28
4    with me the proof that what he said was absolutely    14:57:32
5    false.    14:57:37
6        Q.  Do you recall him providing any other input    14:57:40
7    to you on your -- on your progress, on your goals in    14:57:43
8    the remediation plan?    14:57:46
9        A.  Yes.  He made that same claim a number of    14:57:47
10   times, but we had one meeting where we sat down    14:57:51
11   together and Mr. Flatley -- we looked at it -- you and    14:57:57
12   I looked at it about an hour ago -- where Mr. Flatley    14:58:03
13   wrote on there, complete, complete, complete,    14:58:06
14   complete.  And so that's Mr. Flatley's handwriting.    14:58:08
15       So we did have interactions where we spoke    14:58:11
16   about those things, and he wrote "complete."  But    14:58:14
17   Larry is, after the fact, after that meeting where he    14:58:20
18   wrote "complete," went to Dan Fontaine and said I've    14:58:23
19   made no progress on it, and I carried with me a copy    14:58:26
20   of what Mr. Flatley had written, complete, complete,    14:58:31
21   complete, and showed it to Mr. Fontaine, and that    14:58:35
22   ended the conversation.    14:58:39
23       Mr. Fontaine didn't say anything negative    14:58:40
24   toward me, because he saw the proof right in front of    14:58:43
25   him that Mr. Flatley was lying straight to his face.    14:58:45

---

Baker, Earl Donald                                    August 14, 2020

43 (Pages 166 to 169)

---

166

1    Q. So going back, you -- you made a reference              14:58:50
2  to Exhibit 13, which has some handwritten notations on     14:58:51
3  it. The words "complete" are next to three trainings.      14:58:55
4    A. Yes.                                                   14:59:01
5    Q. And then also the M&P Pistol Armorer                   14:59:02
6  School, correct?                                            14:59:08
7    A. Yes.                                                   14:59:08
8    Q. But he doesn't note that any of the                    14:59:10
9  projects -- the four projects at the bottom were           14:59:15
10  complete, correct?                                          14:59:15
11    A. Yes, because the nature of those projects              14:59:16
12  were -- were ongoing things. They weren't like a          14:59:17
13  singular thing, like go to a class. It's -- it's          14:59:22
14  creating a support system to ship M&P slide tools back     14:59:32
15  and forth to Houlton. That isn't a one-time event.         14:59:32
16  That's an ongoing thing. So he wouldn't write             14:59:35
17  "complete." But, in fact, we did complete those          14:59:38
18  things.                                                   14:59:43
19    But when you're saying that nothing had been            14:59:44
20  done yet we can see Mr. Flatley's notations               14:59:48
21  "complete," his credibility on what he says I            14:59:56
22  accomplished on those projects is also subject to the     14:59:59
23  same kind of scrutiny. The guy that's going to lie       15:00:03
24  to you on the first half, you're not going to say, well,  15:00:06
25  he wouldn't lie on the -- he wouldn't lie on the          15:00:09

---

167

1  projects, he just lied on the top.                        15:00:12
2    Q. Let's go to Exhibit 14.                               15:00:15
3    (Exhibit 14 previously marked                           15:00:17
4    for identification and referenced
5    herein: Performance Appraisal 6/5/14
6    Baker0000176 - Baker0000178)                           15:00:18
7    Q. And this is a June 5, 2014 Performance               15:00:18
8  Evaluation that you received, correct?                    15:00:21
9    A. Right.                                               15:00:23
10    Q. And this was completed, to your knowledge,           15:00:25
11  by Mr. Flatley; is that right?                            15:00:28
12    A. Yes.                                                 15:00:29
13    Q. And do you know whether anyone else had             15:00:30
14  input on your evaluation?                                 15:00:32
15    A. No, I don't.                                         15:00:34
16    Q. Pardon me?                                           15:00:35
17    A. No, I don't know.                                    15:00:37
18    Q. And -- and did you meet with Mr. Flatley to         15:00:39
19  discuss the evaluation?                                   15:00:44
20    A. In the -- this review, he forwarded a copy          15:00:49
21  of it, and I met with himself, Ann Glica -- I'm sorry,   15:00:53
22  Anne Bruce -- and Mr. Fontaine. So the review took       15:01:01
23  place with three of us in the room, not just one.         15:01:05
24    Q. And -- and that was on June 18 of 2014,             15:01:08
25  right?                                                    15:01:13

---

168

1    A. I couldn't be certain.                               15:01:14
2    Q. Pardon me?                                           15:01:18
3    A. I'm not certain what date we met.                    15:01:18
4    Q. Where did the meeting take place?                    15:01:20
5    A. Anne Bruce's office.                                 15:01:22
6    Q. And how long did the meeting last?                   15:01:26
7    A. She said it lasted hours in her notes, but          15:01:29
8  it lasted probably about an hour.                         15:01:37
9    Q. And let's look at Exhibit 15.                        15:01:40
10    (Exhibit 15 previously marked                          15:01:42
11    for identification and referenced
12    herein: E. Baker Goals 6/18/14 with
13    handwritten notes
14    Baker0000181 - Baker0000182)                          15:01:42
15    Q. Is this a document entitled "E. Baker Goals        15:01:42
16  - 6/18/14"?                                               15:01:47
17    A. Yes.                                                 15:01:50
18    Q. And this is a two-page document, correct?          15:01:51
19    A. I can't be -- I doubt -- those don't look          15:01:55
20  like the same document, no.                               15:02:06
21    Q. Okay. Let's just focus on the first page,          15:02:08
22  which is Baker 181, the goals document. And this        15:02:10
23  identifies a project plan for you for your June 2014     15:02:22
24  evaluation?                                               15:02:22
25    A. Yes.                                                 15:02:23

---

169

1    Q. And this -- these are your handwritings on          15:02:24
2  this page, correct?                                       15:02:27
3    A. Appears to be.                                       15:02:30
4    Q. Pardon me?                                           15:02:31
5    A. It appears to be.                                    15:02:32
6    Q. Okay. And did you take these notes during           15:02:33
7  your meeting with Ms. Bruce, Mr. Fontaine, and          15:02:36
8  Mr. Flatley?                                              15:02:39
9    A. I can't say when I took the notes. We               15:02:40
10  could have taken them during there, could have been my   15:02:45
11  notes afterwards. I don't -- I don't recall.             15:02:51
12    Q. And do your notes reflect the substance of         15:02:51
13  your communications during the meeting with Ms. Bruce    15:02:54
14  and Mr. Fontaine and Mr. Flatley?                        15:02:58
15    A. Yes, they appear to be.                             15:03:01
16    Q. Pardon me?                                          15:03:01
17    A. Yes, they appear to be.                             15:03:03
18    Q. Okay. And did you discuss these goals with         15:03:04
19  Mr. Flatley and Mr. Fontaine during the meeting?         15:03:09
20    A. It wasn't a discussion. They -- they gave          15:03:12
21  me these goals, and we didn't go into a great deal of   15:03:21
22  discussion.                                              15:03:28
23    Q. And do you recall what happened during the         15:03:30
24  course of the meeting with Ms. Bruce, Mr. Flatley, and   15:03:34
25  Mr. Fontaine?                                            15:03:37

---

Baker, Earl Donald                                    August 14, 2020

44 (Pages 170 to 173)

---

**170**

1    MR. LEE: Objection to the form of the                    15:03:38
2  question, but you may answer.                              15:03:40
3    **A. Yeah, I recall.**                                   15:03:42
4    Q. You don't recall anything that happened               15:03:44
5  during the meeting?                                        15:03:46
6    **A. Yeah, I said, yes, I recall.**                      15:03:46
7    Q. Okay.                                                 15:03:48
8    **A. You asked me did I recall, and yes.**              15:03:49
9    Q. I'm just struggling because I'm having a              15:03:50
10 really hard time hearing you.                              15:03:52
11   And what happened during the meeting?                    15:03:54
12   **A. We went down the portions of the review. I**        15:03:56
13 **had also written a rebuttal. There were issues that,**   15:04:06
14 **again, were factually incorrect. I had listed and I**    15:04:14
15 **had sent a copy of this to Mr. Flatley and to Anne**     15:04:17
16 **Bruce and to Mr. Fontaine prior to the meeting, and**    15:04:24
17 **they said you had listed eight factually incorrect**     15:04:28
18 **things on the review. For the time purposes of this**    15:04:33
19 **review, we're not going to talk about all eight.**       15:04:37
20 **We'll allow you to speak on one issue and one issue**    15:04:41
21 **only.**                                                  15:04:44
22   **And so I spoke to them about the timeliness of**       15:04:48
23 **-- of contacting the slide department on the slide**     15:04:56
24 **surface issue and showed them that -- told them that I** 15:05:00
25 **had responded right away and that they were talking to** 15:05:06

---

**171**

1  me about why I hadn't responded earlier. I was at my       15:05:12
2  brother-in-law's funeral. And no one called me during      15:05:17
3  that time frame to tell me there's a problem.              15:05:20
4    **And as far as I was concerned, it would -- it**        15:05:24
5  **had been resolved before I left. And it was the exact**  15:05:27
6  **same problem that happened months earlier. Yet,**        15:05:30
7  **again, Mr. Flatley, rather than fix the thing, based**   15:05:35
8  **on what had happened in the prior situation, allowed**   15:05:40
9  **it to fester so that he could point a finger**           15:05:43
10 **afterwards.**                                            15:05:47
11   **And, as a matter of fact, when we got to the**         15:05:48
12 **point afterwards, he told me and ordered me not to say** 15:05:52
13 **anything. So he was creating the situations so that**    15:05:55
14 **he could write them up. He tells me not to respond at**  15:05:59
15 **all and then writes me up for not responding quickly**   15:06:03
16 **enough. He tells me to restock all the carbide, which**  15:06:06
17 **allowed -- which was a hundred thousand dollar**         15:06:11
18 **expenditure, and then he writes me up for being a**      15:06:14
19 **hundred thousand dollars over budget.**                  15:06:17
20   **So those were the issues that we discussed.**          15:06:20
21 **It's in the rebuttal. And they didn't permit me to**     15:06:23
22 **even go into those things.**                             15:06:27
23   Q. Let's go to the second page of Exhibit 15.           15:06:31
24 Are those your handwritten notes?                          15:06:32
25   **A. Yes.**                                              15:06:34

---

**172**

1    Q. And I'll note that that's at page 182 of              15:06:35
2  your production.                                           15:06:39
3    Do you recall when you made those notes?                 15:06:40
4    **A. No, I don't, but I do notice that --**              15:06:42
5    MR. LEE: I'm sorry. I'm sorry. Which one                 15:06:46
6  are we on right now? I'm sorry.                            15:06:47
7    MS. BERTRAM: The second page of Exhibit                  15:06:49
8  15, which is Bates stamped 182.                            15:06:51
9    MR. LEE: Okay. Did we establish that                     15:06:53
10 these two pages are -- belong together?                    15:06:57
11   MS. BERTRAM: He indicated they do not                    15:07:01
12 belong together.                                           15:07:04
13   MR. LEE: Okay. Got it.                                   15:07:05
14   **A. If you notice, the first page is not lined.**       15:07:05
15 **The second page is lined from a notebook. So they**      15:07:08
16 **cannot be from the same page.**                          15:07:10
17   Q. Right. But my question is, do you know                15:07:15
18 when you prepared these handwritten notes on the           15:07:18
19 second page of Exhibit 15?                                 15:07:20
20   **A. No, I can't -- I can't tell you.**                  15:07:23
21   Q. Pardon me?                                            15:07:25
22   **A. No, I cannot tell you when they were made.**        15:07:27
23 **There's no dates on it.**                                15:07:30
24   Q. Let's go to Exhibit 16.                               15:07:31
25   (Exhibit 16 previously marked                            15:07:34

---

**173**

1  for identification and referenced                          15:07:34
2  herein: Earl Baker 2014 Review                             
3  Rebuttal Baker0000172 - Baker0000175)                      
4    Q. Is this the rebuttal that you've described?           15:07:34
5    **A. Yes.**                                              15:07:40
6    Q. And did you draft this yourself?                      15:07:41
7    **A. Yes.**                                              15:07:43
8    Q. And was anybody else involved in drafting            15:07:43
9  it?                                                        15:07:46
10   **A. Not that I'm aware of.**                            15:07:47
11   Q. And did anybody review it before you                 15:07:49
12 provided it to Smith & Wesson?                              15:07:52
13   **A. Not that I'm aware of.**                            15:07:55
14   Q. Pardon me?                                            15:07:57
15   **A. Not that I'm aware of.**                            15:07:58
16   Q. And who did you provide this to at                    15:07:59
17 Smith & Wesson?                                             15:08:03
18   **A. As I said, I gave a copy to Mr. Flatley,**          15:08:04
19 **one to Anne Bruce, and one to Mr. Fontaine.**            15:08:09
20   Q. Did you provide it at the meeting?                    15:08:12
21   **A. I emailed it prior to the meeting and then**        15:08:15
22 **carried a copy to the meeting figuring that I didn't**   15:08:18
23 **want to hand it out when I was there, I wanted a**       15:08:22
24 **chance to -- to go over it so that we would all**        15:08:24
25 **discuss it together.**                                   15:08:27

---

Baker, Earl Donald

August 14, 2020

45 (Pages 174 to 177)

---

**174**

1 And all it ended up doing was it caused them to
2 realize we don't want to go into these issues if we're
3 going to railroad Earl, so they just told me I could
4 talk about one issue. Sorry. That's my -- my
5 impression.
6 Q. And after you received the remediation plan
7 and met with Mr. Fontaine, Mr. Flatley, and Ms. Bruce,
8 did you continue to have your weekly meetings with
9 Mr. -- Mr. Flatley?
10 A. Yes. I had my regular meetings with him,
11 and for people that said that we were losing control
12 of the department, I still met Mr. Flatley every day
13 at the pitch board and wished him good morning. If
14 you were visiting that department from -- and didn't
15 know anything that went on, you would not have known
16 that we had an issue, because I felt like any personal
17 issue I had with him is -- has nothing to do with my
18 job. I could do my job just fine, and any personal
19 issues I have with Larry, when I punched out, those
20 punched out with me. And then when I came back in, I
21 had the responsibility of that company to represent
22 Smith & Wesson in the best possible light. And for a
23 supervisor of that company, you don't want to have cat
24 fights when you're representing somebody else. That's
25 a personal issue.

---

**175**

1 And so, yes, we had the meetings up until the
2 day I left, and we also had our daily pitch board
3 meetings. But I will note that, after things got
4 difficult, Larry had never missed more than one pitch
5 board meeting up to that point, but towards the end
6 Larry was missing the pitch board meetings fairly
7 regularly.
8 Q. And when he was unable to go, did somebody
9 else go instead of him --
10 A. No.
11 Q. -- like Mr. Fontaine?
12 A. We were standing there at 8:15, and he
13 could have emailed us ahead of time. And a lot of
14 times we would just stand there and he would never
15 show up. We would just go back to work. A few times
16 he would email us ahead or text ahead and say no
17 meeting today.
18 Q. Did -- after you received the remediation
19 plan and the evaluation, did you continue to receive
20 coaching from Mr. Francis?
21 A. We -- I did in that he gave me books to
22 read. So Bob was not somebody who took that
23 responsibility lightly and said, we'll just mail it
24 in. No, he took the responsibility and gave me a book
25 to read on Toyota and one on lean systems. And so he

---

**176**

1 would stop back and ask me if I read this or read
2 that. So, yes, my interaction took place with
3 Mr. Francis up until the day I left.
4 Q. And did you continue to receive coaching
5 from Mr. Suraci after you received this evaluation and
6 the remediation plan?
7 MR. LEE: Objection to the form of the
8 question, but you may answer.
9 A. I had interaction with -- with Mr. Suraci
10 up to a certain point, but I would believe -- I can't
11 tell you the exact date, but there came a certain date
12 where I never talked to him again. He just was -- was
13 gone.
14 And even when we had this last review meeting,
15 he said, come down to my office and tell me how it
16 went. I went down and told him that it went horribly.
17 And he said, did they offer you to be moved to another
18 department, and I said no. And he asked me again, are
19 you sure they didn't ask you to be moved to another
20 department, and I said no, I'm quite certain they did
21 not offer me anything of the sort.
22 And that was the end of the conversation, and I
23 don't believe I talked to Mr. Suraci again after that
24 time.
25 Q. And about three weeks after your meeting

---

**177**

1 with Ms. Bruce, Mr. Fontaine, and Mr. Flatley, you
2 took some vacation leave; is that right?
3 A. Yes.
4 Q. And that followed a meeting with
5 Mr. Cicero, correct?
6 A. Correct.
7 Q. That was around July 4th; is that right?
8 A. Yes.
9 Q. Okay. What precipitated that meeting, if
10 you know?
11 A. He called me on the phone and said he
12 wanted to talk. So we went to his office, and I
13 think, as the meeting unfolded, both of us saw where
14 we were heading. He told me, what if Flatley gave
15 bids to other companies, Smith & Wesson still got to
16 buy at the cheapest rate, so what, you know, what's
17 the harm to Smith & Wesson? What if Larry did break
18 into your office? What's the harm to Smith & Wesson?
19 What if Larry had done these things, you know, what's
20 the harm?
21 And we -- I tried to show him -- I said that --
22 that the review that we -- that I was given, I wasn't
23 permitted to even address the factual errors in it,
24 and I said, for one, the -- the RoboCrib report that
25 he said I never created, and he goes on and on saying

---

Baker, Earl Donald

August 14, 2020

46 (Pages 178 to 181)

---

**178**

it's a great thing, I went to hand him a copy of it
and Mr. Cicero said, I don't even need to see that,
you can -- you could with a word processor make
whatever.

So he -- at that point I realized he wasn't
there to investigate.  He really wasn't interested in
facts or the truth.  He was -- he had an agenda.  So
at that point I kind of shut down.  And he said he
wanted to talk about terms for separation.

So at that point he laid out what they would
do, that he would talk to his boss.  But he offered me
something like two weeks severance or something like
that, which that was a joke.

And I was upset because at this point, as I'm
faced with the prospect of -- I gave up my entire
company and sold it at a loss to come here just for a
bunch of clowns to -- to shove me out the door like
this.  I was pissed.

And so I -- my reaction was I'm not going to
waste any more energy trying to tell you what the
truth is because you're not interested in the truth.

So I asked for -- I had vacation time.  I said
I'd like to take this vacation time and think about
your offer.  And they said normally it's customary to
ask for vacation time ahead of time, is that something

**179**

you can make happen.

He said, let me check into it and I'll get back
with you.  I went back to my office, started working,
and I got a call from him saying, yep, it's cleared,
you can take vacation.

Q.  Were there any discussions at that meeting
about offering you six months of severance?

A.  No.

Q.  There weren't?

A.  No.

Q.  Did you propose to him paying you six
months of severance?

A.  No.  What I proposed he -- he thought was
preposterous.

Q.  What did you propose?

A.  He said I'll give you two -- or we can give
you two weeks' severance, and we had been talking
about Sarbanes for some time, so I said I did some
research and the average Sarbanes settlement in that
year was something like $700,000, and I said, I'll
give Smith & Wesson a hometown discount, so I wanted
$400,000.

He kind of laughed, said I'll talk to my boss
about it.  And then he later called me while I was on
vacation.  I was actually en route from Connecticut to

**180**

Ohio.  And he may have mentioned the six months at
that point, but six months was never mentioned by him
or me in that meeting.

Q.  Now you said that you guys had been talking
about SOX for some time, had been a part of the
discussion for some time.  Was that in discussions
between you and Mr. Cicero?

A.  Yes.

Q.  And when did you first raise with him
Sarbanes-Oxley?

A.  It had been part of the conversation from
day one, because I would have never even known what
Sarbanes-Oxley was had it not been for the LRN I took.
But because they educated me on what the laws were,
what was proper and what wasn't proper, I was just
following through what they mandated that I took.  So
from day one this was part of the narrative.  And
Mr. Cicero was aware of that.

Q.  There was an employee in Mr. Flatley's
department called Ron O'Brien, right?

A.  Yes.

Q.  And the two of you over time became
friends; would that be fair to say?

A.  Yeah, I'd say so.

Q.  And you shared with him information about

**181**

your concerns about Pioneer, right?

A.  We had mutual concerns.  He had told me
about a -- an email he had sent prior.  And Ron was a
person that, whether you like him or not, he was 100
percent all about what's good for Smith & Wesson.

So there were a number of ideas that benefitted
me that came from Ron O'Brien.  When I left, we were
working on a program that would save Smith & Wesson
nearly $10 million a year.  Dan Fontaine thought it
had enough merit.  He had me meet with Steve Winewski
and set up a panel where we would discuss these
issues.  That whole entire idea was a Ron O'Brien
idea.

Q.  And now -- and you and Mr. O'Brien talked
about the types of claims that you could potentially
assert against Smith & Wesson, right?

A.  No.

Q.  Did you text with him about the potential
claims that you could assert against Smith & Wesson?

A.  We texted and we didn't talk about
things -- I may or may not have -- not to my
recollection, but I may have mentioned some things,
but the issue with Ron was he was about doing the
right thing for the company.  He was a company man all
the way and to this day still is.

---

Baker, Earl Donald

August 14, 2020

47 (Pages 182 to 185)

---

182

1   But I -- I will -- as far as characterizing
2   what we discussed, I'll talk specifically about things
3   but I don't know generalities, how you could
4   generalize about the things we talked about.
5       Q.  Did the two of you discuss or communicate
6   about a potential Age Discrimination Employment Act,
7   ADEA?
8       A.  Not that I recall.
9       Q.  Did the two of you discuss a potential
10  False Claims Act claim against the company?
11      A.  Not that I'm aware of.
12      Q.  And did the two of you share information
13  about Sarbanes-Oxley -- potential Sarbanes-Oxley
14  claims against the company?
15      A.  We had talked about different areas, yes,
16  that relate to vendors not -- vendors that are getting
17  contracts not based on what's best for the company but
18  based on some outside influence, yes.
19      Q.  For how long did you take vacation leave
20  after your conversation with Mr. Cicero?
21      A.  Seven years ago, I really don't recall.  I
22  know we went back to Ohio, but how long it took place
23  I can't recall.
24      Q.  And at some point you returned; isn't that
25  right?

---

183

1       A.  Yes.
2       Q.  And when you returned, you returned to
3   work, correct?
4       A.  Yes, mm-hmm.
5       Q.  And you were back at work for maybe a
6   couple of days; is that correct?
7       A.  Sure.  I know I came back to work.  I know
8   that there was a communication to me by Mr. Cicero
9   wanting to know where we were at with the separation
10  agreement and what was palatable and what was not.
11      And at one point he said, well, if we
12  can't come to agreement, you'll have to come back to
13  work, which made it look as if he looked at that as --
14  it seemed almost like -- I don't know what he was
15  thinking.  It just showed -- so, yeah, so from day one
16  I was, as I told Mr. Debney in my letter to him, that
17  my goal is -- has nothing to do with my personal
18  thing.  I wanted this to be corrected for the company
19  and for me to go back to my work.
20      And now that they had poisoned the well by
21  telling Larry, I told him I'd let the whole thing go
22  away from my behalf, if they would just take care of
23  the issues so that the board members were not being
24  cheated and that I wasn't working under Larry and we'd
25  be fine.  So it wasn't about a personal issue.  And we

---

184

1   discussed it in the last meeting with Mr. Cicero.
2       But when he said, hey, if we can't work this
3   out, you're going to have to come back to work, so I
4   just came back to work.  But I think he made it almost
5   as if a threat, like you wouldn't want this to happen,
6   and like he had already moved on from that page or
7   something.
8       And so after I got back, I think it -- it
9   surprised him that I would go back to work in that
10  situation.  And after a couple days he approached me
11  about going on paid leave -- well, he didn't approach
12  me.  It was a mandate.  He wanted me to go on paid
13  leave, but he said it was for my protection.
14      Q.  And when did that conversation with
15  Mr. Cicero take place about your paid administrative
16  leave?
17      A.  Without having the emails in front of me, I
18  couldn't tell you exactly, but what you said it being
19  within a few days after coming back, sounds about
20  right, but I can't tell you for certain.
21      Q.  And where did this conversation with
22  Mr. Cicero take place about administrative leave?
23      A.  On the phone.  I was in my office, and I
24  got a call from Mr. Cicero, and he -- he mentioned
25  that you're being put on paid leave for your own

---

185

1   safety effective immediately.  And I gathered up a few
2   things that were in my -- that was in my office -- my
3   briefcase, my immediate effects -- and he said he
4   didn't want it to appear like I was being fired or
5   whatever, so not to make a scene.
6       So I didn't want to carry too much out of my
7   office and have my guys upset, because it's all about
8   making sure that my department functioned after I
9   left.  You know, don't make a big scene out of the
10  thing.
11      So I took my -- a few of my things that were --
12  that wouldn't make it look conspicuous, and I went out
13  the back way, went home, and that was it.
14      Q.  And do you recall anything else that
15  Mr. Cicero said during that telephone conversation?
16      A.  No.  I mean, it was pretty short and sweet
17  that, you know, he -- that I was being put on paid
18  administrative leave for my -- my benefit or for my
19  safety, I believe he said, and so ...
20      Q.  And you were on -- given administrative
21  leave from July until September 23rd or 24th, right?
22      A.  That's correct.
23      Q.  And let me have you turn to Exhibit 17.
24      (Exhibit 17 previously marked
25  for identification and referenced

---

Baker, Earl Donald                                    August 14, 2020

48 (Pages 186 to 189)

---

186

1    herein: Email with attached letter
2    dated 9/23/2014 to Earl Baker from
3    Anne Bruce
4    Baker0000535 - Baker0000536)                    15:26:44
5    Q.  Which is a September 23, 2014 email from     15:26:44
6    Ms. Bruce to you.                               15:26:49
7    A.  Yes.                                         15:26:50
8    Q.  And is this the termination notice that you  15:26:52
9    received from Ms. Bruce?                         15:26:55
10   A.  No, I don't believe it is.                   15:26:57
11   MR. LEE:  Which one are we on, Connie?           15:26:59
12   MS. BERTRAM:  I'm on Exhibit 17.                 15:27:03
13   MR. LEE:  Okay.                                  15:27:05
14   A.  I don't believe that's the right one.  At    15:27:07
15   least in my -- my recollection, the -- the termination  15:27:10
16   letter that I got from her went into a longer    15:27:14
17   explanation and it culminated in my termination. 15:27:20
18   Q.  So this -- this document came from your      15:27:29
19   production.  It's Baker 536 down in the lower    15:27:29
20   right-hand corner.                               15:27:34
21   A.  Mm-hmm.                                       15:27:35
22   Q.  Do you deny that you received Exhibit 17?    15:27:36
23   A.  Yeah, I -- no, I don't deny that I received  15:27:39
24   it, but I -- I believe that the termination came  15:27:41
25   with -- came to me in email form, but it had a letter  15:27:50

---

187

1    voicing her rationale for my termination.         15:27:53
2    So this may be a page that went with it, but,      15:27:59
3    if that's the case, it's just one -- one of two,   15:28:04
4    so ...                                            15:28:06
5    Q.  It's true that you don't know who drafted     15:28:10
6    Exhibit 17, right?                                15:28:12
7    A.  No, I have no idea.  Well, I would say it     15:28:16
8    was probably Anne Bruce.  It came from Anne Bruce's  15:28:19
9    email, so I would say that she did.               15:28:22
10   MR. LEE:  Are we talking about the first          15:28:25
11   page of Exhibit 17 only?                          15:28:27
12   MS. BERTRAM:  No, I'm talking about the           15:28:29
13   second page, the termination letter dated September  15:28:31
14   23.                                               15:28:34
15   MR. LEE:  Oh, okay.                               15:28:34
16   A.  The one I'm looking at says, "Enclosed        15:28:35
17   you'll find a notice of termination separating your  15:28:39
18   employment," so that --                           15:28:42
19   Q.  I'm talking about the letter that's on the    15:28:43
20   second page of Exhibit 17.                        15:28:45
21   A.  Oh, yes.  Okay.  I was on the other one.  I   15:28:46
22   was on Bates 535.  So I didn't think that was the  15:28:51
23   termination letter.  536 is the termination letter  15:28:54
24   that I was referring to.                          15:28:58
25   Q.  Okay.  And -- and you don't know who          15:29:01

---

188

1    drafted the termination letter on page 536, right?  15:29:03
2    A.  It's got her signature on it.                 15:29:08
3    Q.  Right, but you -- you don't have personal     15:29:14
4    knowledge as to who drafted it.                   15:29:14
5    A.  No.                                           15:29:16
6    Q.  And you don't know who provided any input     15:29:16
7    in the letter or who reviewed it, right?          15:29:21
8    A.  No.                                           15:29:23
9    Q.  And you don't know when she started          15:29:25
10   drafting the termination letter, right?          15:29:27
11   A.  No.                                           15:29:28
12   Q.  And you would agree that you were not        15:29:31
13   involved in Smith & Wesson's decision to terminate  15:29:31
14   your employment.                                  15:29:33
15   A.  When you say I was not involved, what do     15:29:37
16   you mean?                                         15:29:39
17   Q.  You didn't -- you didn't participate in the  15:29:39
18   decision.  You weren't ...[network interruption]...  15:29:41
19   termination, right?                              15:29:45
20   A.  No.                                           15:29:45
21   Q.  And you don't know who made the decision to  15:29:46
22   terminate you, right?                            15:29:49
23   A.  Now or then?                                  15:29:50
24   Q.  Then you did not, right?                      15:29:52
25   A.  No.                                           15:29:53

---

189

1    Q.  And you don't know who else was involved in  15:29:55
2    the decision to terminate your employment, right?  15:29:58
3    A.  I knew people who were involved, yes.         15:30:05
4    Q.  But do you have personal knowledge that      15:30:09
5    they were involved, either because you saw them, heard  15:30:12
6    them, or they told you?                          15:30:16
7    A.  No.                                           15:30:19
8    Q.  So who do you know was involved in the       15:30:19
9    decision?                                         15:30:23
10   A.  Well, I would say that -- that              15:30:23
11   Mr. Flatley's false reviews would make him involved,  15:30:31
12   because it was on the basis of those that I was let  15:30:32
13   go.  So in -- in your estimation he may not be   15:30:35
14   involved in this letter or the ultimate decision, but  15:30:38
15   in a way he's involved because he wrote false things  15:30:43
16   about me.                                         15:30:46
17   Q.  So that's -- that's your presumption based   15:30:49
18   on the fact that you received the evaluations, right?  15:30:51
19   A.  No.  Ms. Bruce mentions in this letter what  15:30:54
20   it was based on, and if those -- she mentions things  15:30:58
21   in there, talking about my submissions as well, that  15:31:04
22   she has based my termination in part on my submissions  15:31:08
23   and in part on those reviews based on, which I've told  15:31:13
24   you, are based on false information that I wasn't able  15:31:18
25   to attain.  So that makes Flatley a part of that  15:31:22

---

Baker, Earl Donald                                            August 14, 2020

49 (Pages 190 to 193)

---

190

1  termination, because he was the one that provided
2  those false reviews.
3       Q.  Do you know if anybody else was involved in
4  this decision?
5       A.  Well, I think Dan Fontaine is involved
6  because he was -- he was at that last review meeting,
7  and he affirmed that review even though he didn't look
8  at the details of the falsehoods.
9       So there's an old saying that only -- only a
10  fool proceeds without knowing all the details.  And I
11  feel like they proceeded without either knowing the
12  details or caring what they were, and that -- that
13  tells me that it was pretense to go through that
14  review process if they had already determined what
15  they were going to do.  They don't want to look at the
16  evidence to show that what they were purporting as
17  being true was false, then it's either pretext or
18  they're foolish.  Which is it?
19       Q.  And do you know if anybody else was
20  involved in the decision?
21       A.  Everyone who was above me was involved in
22  that decision in some manner, because you either stand
23  up and say, this isn't right, or you let it occur, and
24  then they're involved.
25       So in my mind they're involved because they

---

191

1  didn't stand up for me.  And HR's job is to make sure
2  that every person is handled and -- and treated
3  with the same actions or -- how would I want to say --
4  with the same treatment that the company policy
5  dictates, and they did not do that.
6       And so HR is involved by not -- not keeping the
7  company code of ethics and by not keeping the
8  company's system of -- of discipline and by subverting
9  the whole process and having a different set of rules
10  for me than what they had for other people.
11       So, yes, they're involved.  So other people
12  were involved.  And if -- if all it takes is for --
13  I'm not saying that evil took place -- I'm saying the
14  quote is, there's a quote, I think it's by a man in
15  the 900s that said, all it takes for evil to exist is
16  for good men to do nothing.  So if there were people
17  that did not do their job in this process, yes,
18  they're involved in my firing.
19       Q.  And you said everyone above you, correct?
20       A.  Well, everyone above me that did not --
21  that's what their job is, is to have input on -- on my
22  continued employment.  And so if they did not stand up
23  and they did not follow company policy, yeah, they're
24  involved.
25       Q.  And so it would be your position that

---

192

1  Mr. Debney was involved in the decision?
2       A.  Yes, absolutely.
3       Q.  Does he know -- do you know if he even knew
4  that you were being terminated?
5       A.  I know that he was apprised of the
6  situation.  That's exactly why I sent him the email.
7  I didn't want him to say, well, gee, no one ever told
8  me about what was going on.
9       So I felt like I exhausted all of my resources
10  with the people that -- that I had dealt with up to
11  that point, and they didn't have the backbone to stand
12  up for what's right.  And so if it was going to go
13  down, it wasn't going to go down without him not
14  having any knowledge of it.
15       So that's why I sent him the emails, so that he
16  had no deniability saying, gee, I didn't know this
17  happened to Earl, had I known I would have said
18  something.
19       So I was -- a last ditch effort to say, listen,
20  if you want to stand up for what's right, Mr. Debney,
21  this is what's happening, I'm not trying to convince
22  you it happened, I'm just telling you for a fact, this
23  happened because I was there and I saw it, I witnessed
24  it, he said these things, these things happened.  Now
25  it's up to you to act or let it happen.  And so

---

193

1  Mr. Debney was involved in this decision, if nothing
2  else, by his complicity.
3       Q.  Back to my question.  Do you know that he
4  knew that you were terminated or a decision had been
5  made to terminate you?
6       A.  I think at some point, yes, he knows.  He
7  has to -- he has to replace my position, so at some
8  point he knows that I'm gone.
9       And to your point, you're trying to make some
10  decision about when he knew, what -- I'm not getting
11  your distinction.  But he's the CEO.  He's responsible
12  for what happens under him.  I brought the -- the
13  attention -- all these issues to his attention.
14       So he's involved.  He's responsible.  So just
15  like when things come to my view and I do nothing, I'm
16  partially responsible either by complicity or by
17  action.  And so, yes, everyone above me was involved
18  in my termination.
19       MR. LEE:  Connie, it's 3:37 my time.  How
20  about a quick break?  I don't know how much more you
21  have left, but can we take a quick break?
22       MS. BERTRAM:  Yeah, that's fine.
23       VIDEO SPECIALIST:  The time is 3:37 p.m.
24  We're off the record.
25       (Proceedings recessed)

---

Baker, Earl Donald

August 14, 2020

50 (Pages 194 to 197)

---

194

VIDEO SPECIALIST: The time is 3:46 p.m., and we're back on the record.

MS. BERTRAM: Could you please read back the last question and response, unless the response is very long? Maybe the last question.

MR. LEE: Just the last question.

(The record was read by the reporter.)

BY MS. BERTRAM:

Q. You don't know when the company made the decision to terminate your employment, correct?

A. No.

Q. Did you give a response? I'm sorry.

A. No. I didn't know.

Q. And you don't know the information that the company considered in making the decision to terminate your employment, right?

A. She lists a few things in her termination letter, but, other than that, I don't know.

Q. Now as we proceed, I want to make certain that we understand some terminology so that we can go through some issues kind of based in different buckets.

We talked about some HR issues, some concerns about HR issues that you've raised. We'll talk about them some more as well.

---

195

For concerns where you felt that you were mistreated or not treated fairly, would you be comfortable calling those the HR concerns?

A. For the purposes of this talk, that would be fine, but if I feel that those HR concerns were predicated by vendor-related concerns, then as long as you make the distinction that they're interrelated, but just for the purposes of knowing which things we're talking about, you can label it whatever you like.

Q. Okay. And we have another bucket, which is allegations of inappropriate conduct with respect to vendors, right?

A. Yes.

Q. And those concerns center on a particular vendor that's Pioneer Tool, right?

A. I think they were the biggest offender, but I point to an email I made to Larry where vendors were taking -- they were all taking tools that Smith & Wesson purchased. After they were vended out and they were dull, instead of going back to my department to sharpen, the vendors were permitted to take those back out of the shop themselves, so no accounting was made for those and they were able to resell them over and over again. That issue pertained

---

196

to Lindco, Pioneer, and MSC. All three of them were doing that practice.

So I made an email to Larry saying that this was -- was bad things. I said I wasn't aware of how much it really -- how big the issue was, but was just letting him know that this is a practice that could lead to exorbitant charges and we're allowing them to take our cutters without ...

So that one was not a Pioneer issue as much as it was all three of the vendors that were in that RoboCrib were doing that.

Q. So -- so would it be fair to call those concerns vendor concerns without tying it to Pioneer?

A. Yes.

Q. Okay. And then would it also be fair to say that you had some security and safety concerns?

A. Safety and security for the company or for myself?

Q. In your discussions with Mr. Cicero and Mr. Suraci did you raise concerns that you -- you felt unsafe?

A. Mr. Suraci, in our conversations, there were a number of times towards the end, the pressure I was under, where I got emotional, which is not my nature, and he asked me -- he mentioned that he

---

197

thought maybe I had PTSD. I think he had a military background. I don't know anything about, you know, the symptoms of that.

But he asked me at that point, because I had gotten emotional, I just got choked up, if I felt in danger, and I said yes. I even mentioned it to, I think, Anne Bruce in an email that, by letting Mr. Flatley know of my submissions, that she would put me in danger.

So yes, I get what you're saying. That category would be safety issues.

Q. Okay. So there's three buckets, then -- vendor concerns, HR concerns, and safety concerns. Is that fair?

A. Yes.

Q. And while you were working for the company, did you collect evidence relating to those concerns?

A. I collected -- I collected documents because there was a point where my computer had been compromised and documents were deleted. If it were not for a -- just a coincidental circumstance, that that computer had been -- basically, it just died, and so IT gave me another computer, but backed up everything that was on the hard drive and put it in a file on that hard drive.

---

Baker, Earl Donald

August 14, 2020

51 (Pages 198 to 201)

---

198

1  After my office had been broken into, it was
2  made aware that -- or I found -- Mr. Suraci asked for
3  me to send him emails that corroborate the things that
4  I told him.  So when I looked for a number of them,
5  they weren't there.  And I knew that they existed, and
6  it took some time before I realized that they were on
7  that backup.  So I emailed him which ones had been
8  deleted.
9  And so from that point on, any interaction I
10  had with Mr. Cicero and Mr. Suraci, I would tell them
11  I'm deleting this email and then I would delete it
12  just because, if Mr. Flatley broke into my office and
13  found that email, he would know I was informing on
14  him, and that would be a scorched earth policy.
15  So I was protecting the documents for
16  Smith & Wesson's sake, but by saying it's evidence,
17  that makes it sound like it was all predicated on some
18  legal proceeding for my part.  Up to the day I left, I
19  was still offering them -- I even told Anne Bruce, I'm
20  willing to forget all this and come back to work, and
21  she seemed amiable to that.
22  So, again, I just want to stress that this was
23  not evidence from a standpoint that I'm looking to sue
24  somebody or whatever.  It was just a way to protect
25  those documents because, again, in that LRN it said

---

199

1  that there was an up to 20-year jail penalty for
2  destroying evidence in a Sarbanes case.  So I was
3  protecting the company interests by making sure I had
4  duplicate copies of those emails.
5  Q.  And you said that you, with notice to Ed
6  Suraci and/or Rob Cicero, told them you were deleting
7  emails.
8  A.  Yes.
9  Q.  But you forwarded those to your home email
10  before you deleted them, right?
11  A.  Yes.
12  Q.  So you retained certain -- you retained a
13  copy and that they couldn't be located on your
14  computer; is that right?
15  A.  Again, if I was doing it for my purposes,
16  why would I tell Mr. Suraci and Mr. Cicero that I was
17  doing so?  I can't be doing it against their interest
18  if -- if I'm telling them that I'm doing so.
19  So I was letting them know, being up front,
20  aboveboard, and saying emails where I'm disclosing
21  that I'm the guy whistleblowing and that I don't want
22  Mr. Fontaine -- or Mr. Flatley to know, I'm letting
23  you know I'm deleting this email.  But that's
24  different than the emails that were deleted off the
25  mainframe from a long time ago.

---

200

1  Q.  I think you're reading way too much into my
2  question, so let me -- let me go at this in a
3  different approach.  You produced documents in the
4  OSHA proceeding, correct?
5  A.  Yes.
6  Q.  And you also produced -- made some
7  supplemental productions in this case, correct?
8  A.  Yes.
9  Q.  And in those productions there were emails
10  and also vendor documentation and other documents
11  related to your work for Smith & Wesson, correct?
12  A.  Yes.
13  Q.  And how did you get those?  How did you
14  obtain copies of them?
15  A.  Some, like you said, I forwarded to my
16  wife.  Others I had in my briefcase.  And I may have
17  been carrying those home because I didn't want them to
18  disappear.  But when I was told, you're being placed
19  on leave and you're to leave the -- I wasn't even
20  allowed to finish the day out, just pick up your stuff
21  and leave -- some of those documents were in my
22  possession in that briefcase when I left.
23  It wasn't forethought in taking them.  It was
24  just I didn't want to leave them in that office if my
25  office was being broken into.  They had purchased a

---

201

1  motion-activated clock radio for my desk but never
2  installed it until after I left, even though they --
3  they showed me how to use it, they never installed it.
4  So I felt that office was compromised, so I
5  didn't leave certain documents that I didn't want to
6  disappear until after they secured that office.  And
7  so I had them in my briefcase, and when they told me
8  to go home, they came with me.
9  Q.  And when did you first start emailing
10  documents to yourself and removing paper copies of
11  documents?
12  A.  I couldn't tell you the time, but they were
13  aware of it.  They could see, you know, I told them in
14  email and anything that I forwarded from my
15  Smith & Wesson server, they had -- they were aware of
16  it.  And they even were aware when I talked to people
17  within the company.
18  So there wasn't things done in secret.  I had
19  talked to Kelly Rathman a few times, and they called
20  her in the office the next day, those type of things.
21  So there wasn't -- there wasn't anything clandestine
22  in what I was doing.  I told them I'm emailing them
23  but I'm trying to protect the documents.
24  Q.  Is it fair to say that you retained and/or
25  emailed to yourself all of the evidence that you

---

Baker, Earl Donald

August 14, 2020

52 (Pages 202 to 205)

---

**202**

1  thought was relevant to the three different categories          15:59:15
2  of claims we've talked about?                                    15:59:20
3  A. No.                                                           15:59:21
4  Q. Security --                                                   15:59:21
5  A. Not even close.                                               15:59:23
6  Q. Let me -- let me finish the question.                         15:59:24
7  A. Okay. Sorry.                                                  15:59:26
8  Q. Is it fair to say that, by the time you                       15:59:26
9  left the company, that you retained or forwarded to              15:59:32
10 your home email address or personal email address all           15:59:34
11 of the evidence that you considered to be relevant to            15:59:38
12 your claims?                                                     15:59:40
13 A. No.                                                           15:59:41
14 Q. What portion of the evidence did you retain                   15:59:46
15 or forward to your personal email?                               15:59:49
16      MR. LEE: Objection to the form of the                       15:59:52
17 question, but you may answer.                                    15:59:54
18      A. In my estimation maybe 5 or 10 percent of                15:59:55
19 what I needed. I didn't -- I didn't foresee this                 15:59:59
20 ending in a -- in the negative fashion it did. I was             16:00:03
21 even told by Mr. Suraci that I want you to know you're           16:00:10
22 doing a service to the company, and I commend you for            16:00:14
23 what you're doing, and this -- this is not going to go           16:00:17
24 badly with you.                                                  16:00:20
25      So my every expectation was that it wouldn't                16:00:20

---

**203**

1  end up in a termination. I knew that was against the             16:00:25
2  law, and it wasn't even in my judgment at that point.            16:00:28
3  I'm fairly naive in the fact that I try to believe the           16:00:33
4  best in people, but I thought Mr. Cicero and                     16:00:36
5  Mr. Suraci and those that I was submitting things to             16:00:43
6  were going to operate within the best interests of              16:00:46
7  Smith & Wesson, and, if they did so, there's no reason          16:00:49
8  to -- that I would be separated. But I don't -- I                16:00:53
9  think that I had some -- I was a bit naive in                    16:00:59
10 believing that they would do the right thing. So I              16:01:05
11 didn't protect myself. I didn't gather nearly enough            16:01:08
12 documents to protect myself.                                     16:01:14
13      Q. But for the documents you did send to your               16:01:17
14 personal email or take home, where did you keep the              16:01:20
15 files, the documents with the data?                              16:01:25
16      A. The ones that I -- I forwarded, they were                16:01:29
17 within our email, so I didn't make printouts of it.              16:01:32
18 There was a file that I had in my closet that was in             16:01:38
19 a, like a Staples box where you get a ream of paper.             16:01:44
20      Q. Mm-hmm.                                                  16:01:50
21      A. I had it in a folder that said "Old                      16:01:51
22 Invoices."                                                       16:01:54
23      Q. That said what? I'm sorry.                               16:01:55
24      A. "Old Invoices." And that was what was                    16:01:57
25 written on the manila file. I had them stuck in that             16:02:00

---

**204**

1  and that sat in my closet. The only time I ever                 16:02:05
2  referred to those was at the point that it became a              16:02:09
3  legal situation.                                                 16:02:12
4      I was told by The Employment Law Group that                  16:02:15
5  anything that I had that was even a scrap of paper               16:02:18
6  that I wrote down Smith & Wesson on was considered               16:02:22
7  evidence and that I was to forward it to them, and so            16:02:25
8  I did so.                                                        16:02:28
9      Q. Why did you have the box of old invoices in               16:02:30
10 your closet?                                                     16:02:35
11      A. I had no other -- I had no other -- I just               16:02:35
12 said that I thought anything that was destroyed that             16:02:41
13 was evidence in a Sarbanes case was against the law              16:02:44
14 and you could be imprisoned for it. It was in my                 16:02:48
15 briefcase when I was sent home. And I -- I know I                16:02:51
16 can't get rid of it, but what do you do with it? So              16:02:58
17 it just sat there.                                               16:03:02
18      So I produced every document to you in                      16:03:04
19 discovery, and, again, to this day, now I have a huge            16:03:06
20 bin full of documents in there that's part of                   16:03:14
21 discovery that I retained a copy of.                             16:03:17
22      Q. So for the old invoices, it's your claim                 16:03:20
23 that they were in your briefcase the day that you were           16:03:25
24 put on administrative leave ; is that right?                     16:03:29
25      A. That's correct. And they had probably been               16:03:31

---

**205**

1  in there for -- I don't even know -- I'd speculate               16:03:33
2  maybe a month.                                                   16:03:37
3      Q. What's that --                                            16:03:41
4      A. They had been in my briefcase for, I would               16:03:41
5  guess, maybe as long as a month prior that, when my             16:03:45
6  office was broken into, that file was in my office,             16:03:47
7  and I did not -- from the time that my briefcase was            16:03:51
8  gone through, I didn't leave my briefcase at the                16:03:55
9  office. And if there were sensitive documents that              16:03:58
10 I -- would prove that something underhanded was going           16:04:03
11 on that could be used in a Sarbanes case, I didn't              16:04:08
12 want to leave them there until they secured that                16:04:12
13 office.                                                          16:04:14
14      So I put that in that file, and every night              16:04:15
15 when I went home, that file that said "Old Invoices"            16:04:18
16 was in my briefcase. And so when I went home, I went            16:04:24
17 home with me. So the last day I was sent packing, I             16:04:27
18 took that thing home.                                            16:04:30
19      Now they didn't tell me that was my last day.             16:04:32
20 They just said this is for your safety. So they even            16:04:35
21 called the next day and said, well, people seem to              16:04:38
22 think you're fired, and we want you to know you're not          16:04:44
23 fired. And why would you give people that impression?           16:04:45
24      So I had every inclination that I would return           16:04:49
25 to work and those files would return with me. But it            16:04:53

---

Baker, Earl Donald

August 14, 2020

53 (Pages 206 to 209)

206

1     was their choice while I was on administrative    16:04:58
2     leave -- they never saw my face again. They just --    16:05:01
3        Q. You said that you didn't want to leave    16:05:05
4     critical evidence in your office until it was secured.    16:05:08
5     Why did you consider the old invoices to be critical    16:05:10
6     evidence?    16:05:13
7        A. Because there were -- there are evidences    16:05:15
8     in there that -- of the things that Leo had discussed    16:05:20
9     of vendors being able to get a sweet deal from    16:05:27
10     Smith & Wesson under the prior regime. And so the old    16:05:34
11     invoices, there are a number of them in there, that    16:05:41
12     said "no charge."    16:05:44
13        Now can a company that's a publicly owned    16:05:48
14     company -- who has the authority to say there's no    16:05:53
15     charge for this? And that's -- so did I know they    16:05:57
16     were evidence? No. I just thought they were possible    16:06:02
17     evidence.    16:06:04
18        But, again, at this point I felt like the    16:06:05
19     people who were handling that investigation probably    16:06:12
20     had gotten all they needed on their own. But if they    16:06:15
21     need this evidence as part of that ongoing    16:06:18
22     investigation, I wanted to make sure it was secure.    16:06:23
23     And so that's why I -- that's why I had it in my    16:06:26
24     briefcase.    16:06:30
25        There isn't anything, as it turns out, I feel,    16:06:32

207

1     groundbreaking in there, but I didn't read through    16:06:35
2     that whole thing. I just carried it around with me    16:06:41
3     because I didn't want that to fall into anybody else's    16:06:44
4     hands. I wanted it to be public record of who got a    16:06:46
5     sweet deal and who got tools for free. And I -- I    16:06:50
6     didn't think it was right to just leave it there.    16:06:53
7        Q. Were there other items of critical evidence    16:06:56
8     that you took from that office so that it wouldn't be    16:06:59
9     destroyed or removed or taken from you?    16:07:04
10        A. No, not really, none that I can think of.    16:07:06
11        Q. Did you provide the old invoices, whether    16:07:08
12     originals or copies, to Mr. Cicero in connection with    16:07:11
13     his investigation?    16:07:15
14        A. No. Well, he -- if he had required that --    16:07:16
15     if I had found something in there that I felt to be of    16:07:23
16     a suspicious nature, I would have supplied it to him.    16:07:32
17     Well, to be honest, I felt like the last few months I    16:07:35
18     was dodging attack after attack from Mr. Flatley, and    16:07:41
19     I really didn't have as much time to devote to the --    16:07:46
20     remember the three buckets -- I had so much going on    16:07:49
21     in the HR bucket that I didn't give -- have as much    16:07:54
22     time to think about what is in the Sarbanes bucket.    16:07:58
23     So I -- my focus was over here, and I didn't    16:08:04
24     really have time to research it there, you know. I    16:08:09
25     felt like they had enough hard evidence that I hadn't    16:08:13

208

1     heard from -- I had told Mr. Cicero about the TVs, the    16:08:18
2     account that I was given about the TVs, and about the    16:08:24
3     baseball tickets, and yet I hadn't heard from those    16:08:28
4     things.    16:08:32
5        And, to me, those are far more smoking guns    16:08:33
6     than some company that got tools reground for free,    16:08:39
7     but if he needed some proof that some of these    16:08:41
8     companies actually did get a sweet deal because of    16:08:45
9     other things he found, then those might be important.    16:08:47
10        Q. Did you ever tell Mr. Cicero that you had    16:08:55
11     these old invoices?    16:08:58
12        A. No, I didn't. And I -- I -- to be honest,    16:09:00
13     didn't even -- at the time I left, I hadn't even    16:09:05
14     thought about them. It was something I put in my    16:09:10
15     briefcase at the time of a break-in. I threw stuff in    16:09:13
16     that day into the briefcase that I could think of, and    16:09:16
17     I kind of forgot I had them, to be honest. I was    16:09:21
18     actually surprised that I had them.    16:09:25
19        Q. And -- and all of those were original    16:09:27
20     documents, right?    16:09:30
21        A. I don't know that for a fact. Some of them    16:09:32
22     looked like they were mimeographs but -- or, I mean,    16:09:38
23     Xeroxes -- but it could have been that's how Stanley    16:09:42
24     had stored them as a -- maybe he made a copy of an    16:09:45
25     actual invoice, but I didn't make copies of them.    16:09:50

209

1     Those were actual -- some of them appeared to be    16:09:53
2     copies of an original, but I didn't make the copy.    16:09:56
3        Q. And we looked at some notes that you    16:10:00
4     prepared while you were employed by Smith & Wesson,    16:10:03
5     right?    16:10:06
6        MR. LEE: You mean at the deposition today?    16:10:08
7        MS. BERTRAM: Yeah, at the deposition    16:10:10
8     today.    16:10:11
9        Q. We've been looking at some handwritten    16:10:12
10     documents that you prepared while you were employed by    16:10:15
11     the company, correct?    16:10:16
12        A. Yes.    16:10:17
13        Q. Did you also have something that you    16:10:17
14     referred to as your "Rain Man" journal?    16:10:20
15        MR. LEE: What journal? What was that?    16:10:26
16        MS. BERTRAM: "Rain Man."    16:10:28
17        MR. LEE: Did you say like Dustin Hoffman    16:10:31
18     "Rain Man"?    16:10:36
19        MS. BERTRAM: Yes.    16:10:37
20        MR. LEE: Okay.    16:10:37
21        A. It may have been something I said in jest,    16:10:37
22     but that would be -- "Rain Man" would be referred to    16:10:40
23     in the part of the book where he -- Dustin Hoffman has    16:10:44
24     his neck grabbed in a restaurant and he said, February    16:10:50
25     4th, grabbed and hurt and pulled my neck.    16:10:53

Baker, Earl Donald

August 14, 2020

54 (Pages 210 to 213)

---

210

1  So if I said that, it was in jest more or less
2  referring to the fact that these were documented
3  abuses by Larry that on this date he said such and so,
4  on this date he did -- but it would relate to the HR
5  bucket, the abuses, which I considered to be
6  retaliation or harassment because of my whistleblower.
7      Q.  You had retained counsel by July of 2014,
8  right?
9      A.  Yes.
10     Q.  And I don't remember her -- her name, but I
11 recall that her first name is Tani; is that right?
12     A.  Yeah, Tani Sapperstein.
13     Q.  Sapperstein?  Okay.
14     A.  Yes.
15     Q.  And you only engaged her for literally
16 about 14 days, right?
17     A.  No, actually about a day.  My first meeting
18 with her, she said -- her very first question was what
19 is Sarbanes --
20     MR. LEE:  Whoa.  I don't want you to
21 discuss anything that you discussed with your
22 attorney.  Even if it's funny or just meaningless,
23 just don't go into anything where you were discussing
24 with your attorney.
25     A.  Yes.  Yes.

211

1      Q.  And did she do something -- did she reach
2  out to the company on your behalf?
3      A.  I don't know that she did.  Right after
4  hiring her, after that first meeting, I was -- I
5  terminated her as my counsel.
6      Q.  Right.  And then in early August, you
7  retained The Employment Law Group, correct?
8      A.  That's correct.  I don't know the exact
9  date, but I did -- I did retain them, yes.
10     Q.  We'll run into that in a little bit.
11 And The Employment Law Group advised you that
12 you had an obligation to retain all relevant documents
13 for the litigation, right?
14     A.  Yes.
15     MR. LEE:  Objection.  Objection.  Don't go
16 into anything where, you know, any lawyer that you
17 were working with.
18     Q.  But you knew -- you knew that you had an
19 obligation to retain relevant documents, right?
20     A.  Yes.
21     Q.  And as you mentioned before, The Employment
22 Law Group produced documents in your possession in
23 2015 in the OSHA proceeding, correct?
24     MR. LEE:  Objection to the form of the
25 question, calls for speculation.

212

1      Q.  Is it your understanding that The
2  Employment Law Group produced all relevant evidence in
3  2015 in the OSHA proceeding, right?
4      MR. LEE:  Objection to the form of the
5  question, calls for speculation.
6      Q.  Is that correct?
7      A.  It's my understanding they had.
8      Q.  And you knew at the time that The
9  Employment Law Group was considered one of the top law
10 firms in the country for whistleblower cases, correct?
11     A.  Can you ask that again?
12     Q.  You concluded, you believed that The
13 Employment Law Group was considered one of the top law
14 firms in the country for whistleblower claims,
15 correct?
16     A.  That was my belief.
17     Q.  Okay.  And, in fact, you said that you
18 thought that God had brought Scott Oswald to you;
19 isn't that right?
20     A.  Yes, I said that.
21     Q.  And you indicated that there are additional
22 documents that you feel are relevant to your claim
23 that you didn't end up -- that did not end up in your
24 possession either in your email or through the removal
25 of hard-copy documents, correct?

213

1      A.  Correct.
2      Q.  And what other documents do you feel are
3  relevant to the Sarbanes-Oxley bucket that we've been
4  talking about that did not end up in your possession?
5      A.  So the early emails between myself and
6  Kathy Salvador, I don't believe I have.  I thought in
7  the OSHA proceeding the judge had said there's public
8  interest to knowing the interaction between Buck
9  Upson, Pioneer Tool, and Larry Flatley, and that was
10 never provided.  And there are probably more that I
11 can think of in just this little brief thing off the
12 top of my head, but there are quite a few documents
13 that I really wish I had but that I do not.
14     Q.  Let me refer you to Exhibit 19 in the
15 tabbed packet that you have.
16         (Exhibit 19 previously marked
17         for identification and referenced
18         herein: Amended Complaint for Relief)
19     A.  Okay.
20     Q.  And Exhibit 19 is a copy of the original
21 OSHA complaint that was filed on your behalf, correct?
22     A.  It looks to be, yep.
23     Q.  And you reviewed this complaint before it
24 was filed with OSHA, right?
25     A.  At that time, yes.

---

Baker, Earl Donald                                        August 14, 2020

55 (Pages 214 to 217)

214

1     Q. And when was the first time you reviewed a
2  draft of Exhibit 19?
3     A. The first time?
4     Q. Right.
5     A. I don't see the date on the document, but
6  it would have been within days of when it was filed.
7     Q. Did you review it before it was filed?
8     A. My recollection was that I, in fact, I did.
9     Q. And how long before it was filed did you
10  review it?
11     A. If -- if I was provided a copy, it would
12  have been a day or so.
13     Q. And it's accurate to say that The
14  Employment Law Group waited to file this complaint
15  until, like, late September, right?
16     MR. LEE: Objection to form of the
17  question, calls for speculation.
18     A. Yeah, I would say you'd have to ask The
19  Employment Law Group what -- what they were -- whether
20  they delayed it or not. I don't know.
21     Q. You reported to friends and family in your
22  text messages in mid September that the complaint
23  was -- that you were waiting to file a complaint until
24  late September; isn't that right?
25     A. There was a theory that Smith & Wesson was

215

1  playing out the string in that there was a -- just
2  searching for the right term in my head -- statute of
3  limitations on a Sarbanes claim, and that -- that
4  there may be a reason why I was placed on extended
5  leave for so long that didn't make sense, but if they
6  were trying to wait until a -- the statute of
7  limitations had taken place on the Sarbanes
8  submission, that we wanted to give Smith & Wesson
9  every opportunity to bring me back to work, and that
10  was the rationale for, it's -- it's the -- the last
11  possible day, we don't want statute of limitations to
12  run out, so we filed. But we gave every opportunity
13  for that -- for Smith & Wesson to do the right thing
14  and allow me to go back to work. And, in fact, Anne
15  Bruce was in discussions with me about coming back to
16  work, and we have documents to support that.
17     Q. You said that the -- that there were
18  discussions about Sarbanes-Oxley going back some time
19  where you were raising Sarbanes-Oxley issues. When
20  did you first suspect or conclude that Smith & Wesson
21  was violating any of the laws enumerated in Section
22  806 of Sarbanes-Oxley?
23     MR. LEE: Objection to the form of the
24  question. Don't discuss anything that you discussed
25  with lawyers before, not -- not even your previous

216

1  lawyers.
2     A. So, okay, what was -- is that question
3  still posed or --
4     Q. Yes. Your counsel is just saying don't
5  respond to any extent that it requires the disclosure
6  of attorney-client protected communications.
7     A. Okay.
8     Q. If you have an answer to that that does
9  not --
10     A. Yes. Could you tell me the question again?
11     Q. Let me -- let me break it down so it's --
12  When did you first suspect that Smith & Wesson
13  had engaged in actions that violated any of the laws
14  in Section 806 of Sarbanes-Oxley?
15     A. I -- after you, please.
16     MR. LEE: Objection, calls for speculation
17  to the point -- to the extent Mr. Baker has an
18  understanding of whatever is the law that you just
19  stated, Section 806 or whatever.
20     Go ahead.
21     A. From the standpoint of Smith & Wesson
22  breaking this law, what I reported was a person within
23  the facility exhibiting undue influence on the
24  purchases of the company's vendors. So that I don't
25  conclude as Smith & Wesson doing anything wrong. That

217

1  is an individual within Smith & Wesson was the nature
2  of my claim.
3     Q. And when did you first -- and that was
4  Mr. Flatley, correct?
5     A. Yes.
6     Q. And when did you first suspect that he was
7  engaging in actions as an individual that violated
8  Sarbanes-Oxley?
9     A. My first -- my first suspect or when I
10  first suspected it?
11     Q. Yes.
12     A. My very first week at the first vendor
13  meeting, as I'm walking back from the vendor meeting,
14  there was an opportunity for Victor Matos, who was a
15  representative of MSC, to speak with me alone without
16  anyone else in that hearing. And he told me that they
17  had -- he was only getting $20,000 a year in work from
18  Smith & Wesson, and that that abruptly changed,
19  that 99 percent of the work went to MSC -- or to
20  Pioneer, and it was right after they told
21  Smith & Wesson that Pioneer had been billing eight
22  days a week. And he said right after I -- we blew the
23  whistle on them, we lost all our work and we had to
24  lay off a night shift.
25     And I proceeded to tell him that, well, it's a

Baker, Earl Donald

August 14, 2020

56 (Pages 218 to 221)

---

### 218

1  new day, and that every decision I make will be on
2  behalf of Smith & Wesson.  So if you offer the best
3  service and the best price, you can count on me to act
4  fairly to your company as well as to Pioneer.
5       So from that day on, it was my -- was -- caused
6  me to suspect something is not right, that someone is
7  billing eight days a week, and for the company to
8  whistleblow on the other company, they then in turn
9  lost all their work.
10      So that's within the first week.  So that would
11  be the first inclination I had that something was
12  wrong.  And I told that to Mr. Cicero.  And I can't
13  recall at what point I got baseball tickets sent to my
14  house, but, you know, as things unfold, you get people
15  inducing you to -- sending you things that you've
16  never asked for and it's not proper for you to take,
17  or inferring that you're going to receive something at
18  a banquet just because you're Smith & Wesson, those
19  are things that can't be ignored.
20      And at -- at some point it gets to a tipping
21  point where you say, you know, everything that you
22  hear is not necessarily true, and everything that you
23  hear is not necessarily some big conspiracy, but at
24  some point those things hit a tipping point where the
25  balance shifts and you think this is not right and

### 219

1  something is -- should be done about it.  And, you
2  know, so you asked for the first point, that's the
3  first point.
4       Q.  And when did you hit that tipping point?
5       A.  For me, the -- the banquet thing at
6  Pioneer, the barbecue, was the point.  So that --
7  that was pretty much it for me.  But, again, it's like
8  certain things -- it's a gradual thing, but if -- if I
9  were to define one point, it was right around that
10  time.
11      Q.  In your discussions with Mr. Cicero you
12  raise concerns about a company called -- or a vendor
13  called Rhode Island Carbide; is that right?
14      A.  Yes.
15      Q.  And what was the concern that you raised
16  with Mr. Cicero about Rhode Island Carbide?
17      A.  I had said that there was a -- there was a
18  vendor that I just -- part of the Houlton project was
19  a $60 million expansion.  So we had to get a lot of
20  tooling for that project.  We knew that the current
21  vendors that we had, we could swamp them with one
22  order.  Pioneer and MSC alone, with us, wouldn't be
23  enough to -- to make enough tools for that $60 million
24  expansion, so we had to involve other vendors.
25      So Rhode Island Carbide was one that I visited,

### 220

1  because we wanted to look at -- at their machine that
2  we were thinking of purchasing.  But in going there,
3  we saw that they were -- I liked how the shop was set
4  up, and we allowed them to quote the job.
5       So for the Houlton project, we had a huge
6  order.  I'd just be guessing at the number.  Let's say
7  it's a $60, $70,000 order.  We met with Larry Flatley,
8  myself, Andrew Dziobek, Mike Jurga, myself, and
9  Derrick Hedley, went to most of those meetings, but we
10  would meet daily on the Houlton project towards the
11  end to make sure they had enough tools and everyone
12  was on the same page of what we were ordering, what we
13  were buying.
14      So it was determined we needed a certain tool.
15  We said Rhode Island Carbide does those for us,
16  they're cheaper from them.  They were charging 39.
17  Our in-house price was 46.  Rhode Island Carbide was
18  doing them cheaper than what we could ourselves, but,
19  again, we couldn't even do them ourselves because of
20  the volume of work required.
21      That very next day I got an email from Derek
22  Upson stating he'd like to bid on those type of tools.
23  He said he saw them being loaded in the RoboCrib up in
24  Houlton, Mass.  It was a strange email, because the
25  only time that Derek Upson himself ever solicited work

### 221

1  was he has a salesman and he has a representative, Tim
2  Hebert, his only job is to represent Pioneer to us.
3  He is their liaison.
4       So he didn't go through them, but Upson wants
5  that type of work.  He bids on it and bids $19.  It's
6  strange in that they had produced the tool before
7  Rhode Island Carbide started doing it at $65 apiece,
8  and he's just saying, I'd like to bid and here's my
9  bid, $19, under the price that it can even be produced
10 for.  He's losing money on it.
11      And I asked Mr. Cicero.  This is suspicious,
12 because why would a company, without any knowledge
13 that somebody else is getting this tool, lower their
14 bid from $65 to $19 unless he's been told there's this
15 huge order out there he can get, which, if he was,
16 violates company policy.  You're not allowed to tell
17 people that someone else is getting work so you can
18 bid on it.
19      So I looked at that as an unfair trade practice
20 and violated company policy to tell Mr. Upson that
21 there's this huge order of tools he can get if he
22 just, you know, would talk to me about those tools.
23      Q.  Did you know that Mr. Flatley told Pioneer
24 about the pricing that had been offered by Hassay
25 Savage?

Baker, Earl Donald

August 14, 2020

57 (Pages 222 to 225)

---

**222**

1    A. The Hassay Savage situation?

2    Q. I'm sorry. I'm sorry. Let me -- let me

3    strike that. I just -- I just misspoke.

4    Do you know that Mr. -- do you know with

5    personal knowledge that Mr. Flatley provided the

6    pricing information to Rhode Island Carbide?

7    A. I deduced it, but I do not know for a

8    certainty. Flatley and myself were the only ones that

9    had that information.

10    Q. So let me refer you to Exhibit 25 in the

11    tabbed group.

12    (Exhibit 25 previously marked

13    for identification and referenced

14    herein: Email correspondence from

15    (topmost) E Baker to E Suraci sent

16    3/26/2014)

17    Q. This is a group of documents with the Bates

18    ranges of 214 --

19    A. Yes, I see them.

20    Q. -- 216, and it also includes SW 166 through

21    67 and SW 224 through 226 and SW 231 through 192 and

22    SW 193, 194 -- there's more than I thought -- and SW

23    358. Is that right?

24    A. Yes. I see them all.

25    Q. Okay.

---

**223**

1    MR. LEE: So what -- I'm sorry. Sorry.

2    Are we on an exhibit number, or are you on a Bates

3    number right now?

4    MS. BERTRAM: It's Exhibit 25, and I was

5    just reading off the Bates numbers --

6    MR. LEE: Okay. Got it.

7    MS. BERTRAM: -- on the documents that are

8    grouped together in Exhibit 25.

9    MR. LEE: Got it.

10    Q. Now, first, the first -- first set is --

11    the first couple pages are an email communication

12    between you and Pioneer Tools, right?

13    A. Yes. Well, at the bottom of the page. At

14    the top of the page, it's a forward of mine to Ed

15    Suraci, correct?

16    Q. That's right. So -- but if you go to the

17    bottom of page 215, there's an email there, at 3:55

18    p.m., where you requested from Mr. Upson some quotes

19    for tools at Houlton, right?

20    A. That was after Mr. Upson solicited me that

21    he would like to bid on those tools. He shouldn't

22    have known -- even known we were -- we had those tools

23    to bid unless Mr. Flatley let him know that we had 300

24    tools being bid out at $40 apiece.

25    Q. Yeah, but my simple question was, did you

---

**224**

1    ask him for a quote for the tools that are specified

2    in the email?

3    A. After he solicited me and I talked to

4    Mr. Suraci, yes.

5    Q. And on your email from 5-21, which is a

6    couple inches down on -- on page 215, you asked for

7    one more tool, correct?

8    MR. LEE: Where are we right now, on SW

9    215?

10    MS. BERTRAM: Yeah, 215, the first full

11    email that's there. It's about 3 inches down on the

12    page.

13    MR. LEE: At 5:21 p.m., that's the one

14    you're pointing to?

15    MS. BERTRAM: Yes.

16    MR. LEE: Okay.

17    A. And -- and what was the question?

18    Q. The -- you asked him to quote 25 pieces of

19    T11709-01 as well, correct?

20    A. Yes.

21    Q. And then Mr. Upson responds back at 5:27

22    with the solicitation that you've described already in

23    your -- in your testimony, correct?

24    A. I don't see the 5:27.

25    Q. It starts at the bottom of page 214 and

---

**225**

1    then goes over to the top of 215.

2    A. Oh, at 5:27 p.m. I thought you said March

3    27th. Okay. I see it.

4    Q. Okay. Okay. And that's the solicitation

5    that you've described in your testimony, correct?

6    A. Yeah, that's it.

7    Q. And in your response you agreed to let him

8    bid for the items and identified exactly which tools

9    you were looking for, correct?

10    A. Yes.

11    Q. And then in the email that you forwarded to

12    Mr. Suraci, did you describe all of the concerns that

13    you had with respect to this potential transaction?

14    MR. LEE: Objection to the form of the

15    question, but you may answer.

16    A. I don't know that I -- I expressed all of

17    my concerns. So my only issue is with the term "all."

18    I expressed my concerns with him and some of the

19    concerns off the top of my head that I, first of all,

20    don't think he should have been aware that we were

21    bidding that tool out, but now that he did know, I had

22    no problem with him bidding the tool, but, again, I

23    posed the question, what would cause a business to --

24    to quote $19 on one that they had been producing for

25    $65, if someone had not given him the bid and the

---

Baker, Earl Donald

August 14, 2020

58 (Pages 226 to 229)

226

1    amount.
2        Q. And that's your speculation, correct?
3        A. It's a question based on human nature and
4    22 years in the business. What would cause a company
5    to reduce their price by that much, from $65 to $19?
6        Q. Let's look at the second email, the second
7    group of emails in Exhibit 25, and it starts on page
8    166 and goes to 167.
9        A. Yes.
10       Q. At the top that's an email that you
11   forwarded to Mr. Suraci, correct?
12       A. Yes.
13       Q. And you said that the price that Pioneer
14   had charged before was $65, correct?
15       A. Yes.
16       Q. And the basis for the $65 number was that
17   screenshot that had been provided to you by Erica
18   Matos, correct?
19       A. No, that wasn't the basis for it. The
20   basis for it was I actually had that document or that
21   quotation in my hand at the time I called Mr. Cicero
22   and told him that I have the -- the bid in my hand,
23   because Mr. Cicero speculated, well, possibly Derek
24   was soliciting a tool that he hadn't made before. And
25   I said, no, he's made it, and he charged $65.

227

1        And I posed the same question to him I just did
2    to you. What would cause a business to go from that
3    to that? He said, let's take this up again tomorrow
4    morning. And that night my office was broken into and
5    that document was taken.
6        So this is a document to prove that -- so when
7    we -- I tried to get another copy of it off SAP, it
8    didn't exist. SAP says, we don't have a record of you
9    ever ordering that tool from Pioneer, especially at
10   $65. They have no record of that tool.
11       So I'm frustrated. So I talk to Erica Matos in
12   accounts payable. Accounts payable has record that
13   they paid the invoice. And I forwarded it to
14   Mr. Cicero to show him that the database in purchasing
15   had been altered, because I had an SAP document in my
16   hand saying that they had produced that tool for $65
17   apiece, and now that was stolen and it's no longer in
18   SAP.
19       That is a SEC violation to alter the database
20   of purchasing in a publicly held company, and this is
21   proof that that took place.
22       Q. Describe the invoice that you had in your
23   hand to show the price previously paid by
24   Smith & Wesson.
25       A. It was -- it was in the form of a -- it was

228

1    an SAP form printed out that -- sometimes we needed
2    to -- to keep reference in the office, it would be in
3    a file like I described, that old invoice file, that
4    let's say they would bid on a job that I didn't -- I
5    wasn't aware that they had actually produced for us
6    before, I would leaf through and find out, oh, okay,
7    they made this, so the price would be in this range.
8        But I keep that just so that -- I can't -- we
9    had 13,000 different tools. If I were to bid a tool
10   to Rhode Island Carbide, how do I know that they're in
11   the ballpark of what someone else charged. It would
12   be that file. So that's the file I had that showed
13   that we had been buying that tool from Derek Upson for
14   $65.
15       Q. What was the name -- I mean, what was the
16   name of the document within SAP, do you recall?
17       A. No, but it's -- it was just a common
18   purchase order document.
19       Q. And did you print it out?
20       A. I already had a copy of it that I would
21   imagine Stanley had printed out and it was in that
22   file. So at the time we were soliciting tools to be
23   made outside at Rhode Island Carbide, I probably
24   referred to that document to know whether or not
25   their -- their price was even in line.

229

1    If Pioneer's was cheaper, I wouldn't have given
2    the order to -- to Rhode Island. So I just used that
3    to confirm that Rhode Island's price was good. If
4    Pioneer's was better, they would have got the work.
5        So that was the nature of why I had it in the
6    office. So I didn't print it out specifically for
7    this issue. I actually already had it in the office.
8        Q. I'm confused. I thought you said that you
9    found it on SAP; is that right?
10       A. No. It's an SAP document, so it had to
11   come out of SAP because an SAP document looks
12   different than an AS400 document.
13       Q. So it was a document from SAP that somebody
14   else had printed out.
15       A. Yes.
16       Q. Okay. And where did you find it within the
17   paper files?
18       A. Well, it was someplace in the drawer. It
19   probably --
20       Q. Do you recall how it was filed in the
21   drawer?
22       A. Stanley kept a file of current tools that
23   were -- were bidding out on a regular basis. And so
24   the confirmation of it was even in Derek Upson's
25   email. He says of a tool they produced before so --

Baker, Earl Donald

August 14, 2020

59 (Pages 230 to 233)

---

230

1    Q. Right, but he didn't identify in his email      16:42:24
2  what the price was, right?                           16:42:26
3    A. He does in one, yes.                            16:42:28
4    Q. He does in one?                                 16:42:30
5    A. Yes, he does.                                   16:42:31
6    Q. Which email?                                    16:42:35
7    A. I don't know if you have it here, but in        16:42:35
8  one email he tells somebody that -- I think we were  16:42:38
9  doing it for $35.                                    16:42:41
10   Q. For what? I'm sorry.                            16:42:43
11   A. I think he says that, I think we were doing     16:42:45
12 them for 35 is his comment, but he was doing them for 16:42:56
13 65.                                                  16:42:56
14   Q. So you're assuming that's just a typo?          16:42:59
15   A. Well, I -- I don't know. I just was            16:42:59
16 saying -- you mentioned that he never gives the price. 16:43:02
17 I was just saying, that, yes, in one of the emails he 16:43:06
18 does give a price that he thinks he's charging, but   16:43:08
19 I didn't speculate whether it was a typo or what.     16:43:15
20 It's just that he was incorrect in what he stated.    16:43:18
21   Q. I think we just misunderstood each other.       16:43:22
22 I was -- I was -- I thought you had said that he had  16:43:24
23 quoted a price of $65.                                16:43:27
24   A. No, he --                                       16:43:32
25   Q. And do you recall when -- the date of the      16:43:33

---

231

1  purchase order that you had found in the drawer?     16:43:46
2    A. No, I don't, but if -- since it was an SAP      16:43:49
3  document, you can tell what the implementation of SAP 16:43:53
4  was and extrapolate from that, that it had to be at   16:44:00
5  least after a certain date. I don't know what that    16:44:00
6  date might be, but you would be able to find out.      16:44:04
7    Q. And do you recall whether -- do you recall      16:44:07
8  the number of units that were being purchased for $65 16:44:09
9  a unit?                                              16:44:09
10   A. No, I don't. I did remember the -- to be        16:44:14
11 honest, in a couple of my writings to Ed, I mentioned 16:44:17
12 65 and I think once I may have said 62. It was just   16:44:21
13 my recollection varied a little bit, but I was just   16:44:26
14 trying to communicate the overall theme of things     16:44:31
15 that, yeah, well, they had made it before and it was  16:44:36
16 in that price range.                                 16:44:40
17   Q. And do you know whether the -- the units        16:44:46
18 that were sold for $65, whether they were on a -- on a 16:44:48
19 rush basis?                                          16:44:52
20   A. It didn't say rush, but I would have no         16:44:56
21 idea.                                                16:44:58
22   Q. And did you have any further communications     16:45:00
23 with Mr. Suraci about Rhode Island Carbide?           16:45:02
24   A. We had a lot of talks about them.               16:45:07
25   Q. Let's go to the next document, which is         16:45:15

---

232

1  224.                                                 16:45:17
2    A. What is the Bates number?                       16:45:21
3    Q. It's 224.                                       16:45:23
4    MR. LEE: We are still in Exhibit 25?                16:45:26
5    MS. BERTRAM: That's correct.                        16:45:30
6    A. It's not the next document, it's two           16:45:33
7  documents over.                                      16:45:33
8    Q. Right, two pages.                               16:45:33
9    A. Okay.                                           16:45:35
10   Q. And if we look at the top, this is an email     16:45:43
11 that you sent to Mr. Suraci on March 27, 2014?        16:45:47
12   A. Mm-hmm. Yes.                                    16:45:51
13   Q. Let's turn to page 231, which is three more     16:45:52
14 pages beyond that one. This is further email          16:46:09
15 communications with Mr. Suraci about Rhode Island     16:46:09
16 Carbide, correct?                                    16:46:12
17   A. It's either --                                  16:46:28
18   MR. LEE: Objection to the form of the              16:46:28
19 question, but may I have it read back, please? I      16:46:28
20 didn't quite understand it.                           16:46:28
21   (The record was read by the reporter.)             16:46:48
22   A. The bottom email is the exact same email,      16:46:48
23 so it's not a further communication.                 16:46:50
24   Q. Referring you to the top, which is March        16:46:52
25 27th, 2014 at 5:27 p.m.                              16:46:56

---

233

1    A. No, I would say that that is --                16:46:59
2  Rhode Island Carbide is mentioned in there, but it's  16:47:04
3  talking more in terms of Pioneer in my estimation.    16:47:06
4  That's Carl and Ted. That's Pioneer. So it -- it      16:47:15
5  involves Rhode Island Carbide, but it's about, in my  16:47:18
6  estimation, it's about -- the topic is about Pioneer. 16:47:23
7    Q. In that -- in this email at the top you        16:47:23
8  refer to Andrew Dziobek, D-Z-I-O-B-E-K? Is that       16:47:30
9  right?                                               16:47:39
10   A. If you pronounce it like it's Joe Beck,         16:47:39
11 like J-O-B-E-K, then that's the phonetical way.       16:47:41
12   Q. All right. So did you talk with             16:47:47
13 Mr. Dziobek about Pioneer's pricing?                  16:47:49
14   A. Yes, I did.                                     16:47:57
15   Q. And when did you speak with him?                16:48:00
16   A. Right after this happened. I couldn't --        16:48:00
17 after the document was missing from my desk, I tried  16:48:04
18 to pull it up on SAP. Because it was a fairly new     16:48:08
19 system to all of us, we -- I thought, well, maybe I'm  16:48:11
20 doing something wrong. So I elicited his help in      16:48:15
21 trying to get that document. He could not pull it up  16:48:18
22 either. He said, let me get back with you. He        16:48:21
23 checked with his boss and said it is nowhere in SAP.  16:48:29
24   Q. And did he say that the system was wiped        16:48:34
25 clean?                                               16:48:36

---

Baker, Earl Donald

August 14, 2020

60 (Pages 234 to 237)

---

**234**

1  A. Those weren't the words he used -- he said
2  it's -- it is not -- well, let's see. The exact words
3  he used is, we have no record in SAP that that tool
4  was ever ordered from Pioneer.
5  Q. And also look at SW 192 and SW 358, which
6  should be the rest of the emails in this packet. The
7  question that I'd ask you is do you recall any
8  additional communications with Mr. Suraci about
9  Rhode Island Carbide?
10  A. Do I recall any? I don't, but that
11  doesn't -- I don't know that there would be any need
12  for it, so I don't know. I don't recall.
13  Q. And did you provide all of these email
14  communications to Mr. Cicero as well?
15  A. I believe I did, yes.
16  Q. And do you recall providing any other
17  evidence to Mr. Suraci or Mr. Cicero relating to the
18  Rhode Island Carbide issue?
19  MR. LEE: Objection to the form of the
20  question, but you may answer.
21  A. I may have. My intent was to do whatever
22  they asked and anything that they needed to make the
23  conclusion. So if they required further things, I
24  would send it. But in the same token, I knew they
25  were both busy people and had other things to do other

---

**235**

1  than this, so I wanted to give them what they needed
2  without giving them -- burdening them with more than
3  they needed.
4  Q. You don't recall anything else that you
5  provided to them --
6  A. No.
7  Q. -- other than what's in Exhibit 25; is that
8  right?
9  MR. LEE: Object -- objection to the form
10  of the question, but you may answer.
11  A. Not that I recall.
12  Q. And you described pulling this invoice from
13  paper files in your office.
14  A. That's correct.
15  Q. You described -- you described trying to
16  find the invoice on AS400 system and then going to
17  Ms. Matos for -- for the legacy. You talked about
18  getting information from Andrew Dziobek; you talked
19  about getting information from Ms. Matos; and you
20  talked about looking at the invoice; and then you also
21  had email communications with Pioneer.
22  Did you do anything else to investigate your
23  concerns about the Rhode Island Carbide bidding?
24  A. No. I -- my point, again, was just to
25  point out that I felt something inappropriate happened

---

**236**

1  in the bidding process, that they were made aware that
2  there was a bid and that they would reduce their price
3  so much I felt that it was suspect, that there was
4  something improper happening in the bidding process.
5  So that was the nature of bringing it to their
6  attention. But, again, when you're working on -- I
7  have a thousand things to do. I had to do those
8  things and make sure my department is productive,
9  which I did.
10  The issue is I kind of handed this thing off to
11  them. They can run with it as much as they want.
12  But, again, it wasn't my function of my job to
13  investigate things. It was my job to let them know
14  what was going on so they could investigate, and my
15  job was to make that department function at its
16  highest level and that's what I did.
17  So once I gave it to them, unless they asked
18  for something else, I didn't spend a whole lot of time
19  on it.
20  Q. And did you ever talk with Rhode Island
21  Carbide about your concerns?
22  A. Yes, but in the context, I got a call from
23  Derrick -- I think it's Derrick Wilde -- his last name
24  is Wilde for sure -- from Rhode Island Carbide, and he
25  asked me if I knew a Derek Upson. I said yes, I do,

---

**237**

1  and he said that somebody named Derek Upson has been
2  looking into his profile on LinkedIn and he wanted to
3  know if I knew him.
4  I told him that was Derek Upson from Pioneer
5  and so we -- we did discuss who Derek Upson was, and I
6  did have occasion to, while I was on paid
7  administrative leave, Mr. Wilde called me and said,
8  "Since the day you've left, I've not received another
9  order, what's going on?"
10  I told him I was on paid leave and that, you
11  know, I wasn't in charge of that anymore, but I told
12  him he had the best price, the best delivery, good
13  quality, I wouldn't worry about it. But I was wrong.
14  After I was terminated, I talked to him a year later
15  and he said he never got another job from
16  Smith & Wesson so ...
17  Q. And did you report your conversation with
18  the representative of Rhode Island Carbide to anyone
19  at Smith & Wesson?
20  A. I believe I mentioned it to Mr. Cicero.
21  Q. Are you certain or do you just think you
22  did?
23  A. I'm pretty certain, but I'm not sure.
24  These are conversations that took place over seven
25  years. I told him a number of things, and, basically,

---

Baker, Earl Donald

August 14, 2020

61 (Pages 238 to 241)

**238**

1 I tried to tell him anything that he felt was relevant
2 or that I felt was relevant.  At the time I thought he
3 was operating on behalf of Smith & Wesson and its
4 board of directors, and I did not believe that any
5 longer, but I -- at the time I was there to help him
6 in any way I could.
7     Q.  Do you contend that anyone at
8 Smith & Wesson violated Sarbanes-Oxley in connection
9 with the situation with Rhode Island Carbide?
10    A.  I don't know.  I think that would be more
11 of a legal question.  I --
12    MR. LEE:  Don't -- don't discuss anything
13 that you and I discussed.
14    THE WITNESS:  Yes, sir.
15    Q.  So you don't know who within
16 Smith & Wesson -- do you contend that anyone at
17 Smith & Wesson violated Sarbanes-Oxley in connection
18 with the bidding with Rhode Island Carbide?
19    MR. LEE:  Objection to the form of the
20 question.
21    Again, if you can answer that question without
22 going into the discussions that you and I have had,
23 you may answer that, but with respect to the
24 discussions that you and I have had about Rhode Island
25 Carbide, don't discuss that.

**239**

1     A.  Again, I -- I just want to state that I --
2 I think your question is calling for me to make a
3 legal conclusion that I'm not qualified to make.
4     Q.  So you -- you're not willing to tell me
5 whether you thought that this was a Sarbanes-Oxley
6 violation?
7     MR. LEE:  Objection to the form of the
8 question, you -- asked and answered.  He's not
9 required to be a legal expert on SOX.  He just needs
10 to find a lawyer who does.
11    Q.  Who do you -- who do you contend engaged in
12 inappropriate conduct in connection with the
13 Rhode Island Carbide situation?
14    A.  I -- I don't know that my purview would be
15 complete to say who everyone was that was involved.  I
16 do feel that company policy was violated and that
17 possibly some Sarbanes things were violated by
18 Mr. Flatley, and then anyone who would have covered
19 up.  The wiping of that database broke SEC rules, to
20 my knowledge, and anyone that would be involved in
21 doing that has violated that law.
22    Q.  And in your description to Mr. Suraci, you
23 indicated that Pioneer had access to the database that
24 you felt had been wiped; is that right?
25    MR. LEE:  Objection to the form of the

**240**

1 question, misstates the witness's prior testimony.
2 But objection to the question -- objection to form.
3     Answer it, if you can.
4     A.  That's incorrect in that I do not believe
5 that -- Pioneer has control of the AutoCrib database,
6 which is used to bill us.  That is not the database
7 that was wiped clean.
8     Q.  Okay.
9     A.  So -- so --
10    Q.  So Pioneer did not have access to the AS400
11 that you looked at; is that right?
12    A.  No.  And the AS400 was not altered.  It was
13 the SAP.
14    Q.  Do you know that -- Pioneer Tool did not
15 have access to AS400 or SAP, correct?
16    A.  That's correct.
17    Q.  So who do you contend -- who do you contend
18 wiped the information from AS400 or SAP?
19    A.  This is like a -- like a iceberg.  Ninety
20 percent of it's below water.  I saw things that --
21 that struck me as being inappropriate.  I didn't have
22 a view of what was below water.  I don't know who
23 would have done so or who would have had the ability
24 to do so.  All I know is that those have to be
25 maintained, ever since Enron, to make sure that

**241**

1 someone is not cooking the books.
2     So, to me, this was an egregious violation of
3 the law to alter that database.  I don't know who
4 could have done it or who did do it, but it behooves
5 everyone that I told about this to do something with
6 that information, and that's -- that's what I was
7 hoping would happen.
8     Q.  And you say that there was an egregious
9 violation of the law to delete the information in the
10 database.  What -- what law did it violate?
11    A.  SEC laws.  There's supposed to be
12 transparency.  Because the whole reason that Sarbanes
13 was -- was made, was out of the Enron thing where they
14 had cooked the books and their -- their stock was not
15 worth what everyone thought it was and it devalued the
16 stock.  So when Enron went belly-up, a lot of people
17 lost their pensions and everything from it.
18    So Sarbanes was grown out of -- of that
19 atmosphere where it made it a -- punishable by 20
20 years to destroy documents in -- in a Sarbanes case.
21 And those books in a publicly held company are
22 regulated by SEC, and they have to report every SEC --
23 to the SEC any violation, which not only did but
24 actually could have resulted in -- in somebody
25 changing the books of the company.  Those have to be

Baker, Earl Donald

August 14, 2020

62 (Pages 242 to 245)

242

1  reported by the CFO to the SEC.
2  And so this thing that I gave to Mr. Cicero
3  should have been reported to the SEC.  And he may
4  have.  It's not his job to tell me about it.  But
5  that's why I think it's so serious.  This is something
6  that needed to be reported to the SEC.
7  Q.  And do you know what, if anything,
8  Mr. Cicero did to investigate your concerns about
9  Rhode Island Carbide?
10  A.  He gave me a report at the end that said no
11  violations had occurred, which I know could not be
12  true based on the evidence he was presenting.
13  Q.  And why do you feel that way, that it could
14  not be true?
15  A.  He mentioned that he found no evidence of
16  bids, of one vendor being favored over another.
17  Pioneer was getting $85,000 a week, and I had a
18  representative of MSC saying he was getting $20,000 a
19  year.  Rhode Island -- or Pioneer had a 16 percent
20  discount and MSC had a 24 percent discount.  If you
21  just reverse those numbers, they saved nearly half a
22  million dollars.  So to say that there was not any
23  favoritism on vendors, that's false mathematically.
24  Secondly, when there's a report of changing the
25  database and -- and no conclusion was given on what

243

1  occurred, then, basically, that is a false statement
2  to say there was nothing.
3  And on the third and most important point, I
4  had mentioned to him about bids being given to -- that
5  were given to Flatley by MSC.  He handed those bids to
6  Pioneer and Pioneer mailed them to MSC customers in
7  order to destroy their business.
8  There was a lawsuit that was ensuing, and
9  Mr. Cicero mediated in that dispute.  So to say that
10  no bids were ever given from one company to another,
11  he knows that to be a falsehood because he mediated a
12  lawsuit or a pending lawsuit between MSC and Pioneer
13  whereby Flatley gave a MSC bid to Pioneer, which would
14  mean that he was giving favoritism to one and that he
15  had given a bid.  That violated two of the statements
16  within Mr. Cicero's comments.  So it's false.  I'm
17  sorry --
18  Q.  You don't know what Mr. Cicero did to
19  investigate the -- the concerns about Rhode Island
20  Carbide, correct?
21  A.  I did not then.
22  MS. BERTRAM:  So, John, you had asked me an
23  appropriate question for a Friday afternoon, which is
24  how much longer I anticipated being.  I'm not being
25  critical of Mr. Baker.  I'm not one to fuss at

244

1  witnesses for giving, you know, more information than
2  I have asked for, but it does take more time, and --
3  and I know he really, after six years, really wants to
4  share all of his information with us, but we are, you
5  know, not running out of seven hours, but running out
6  of time.  How do you feel about continuing it, the
7  deposition?
8  MR. LEE:  Well, it's 5:00.  And when Earl
9  wants to give you an answer, he's going to give you an
10  answer, whether you want it or not.
11  THE WITNESS:  I do apologize for the fact
12  that -- we talked about the different buckets.  There
13  are some of the buckets that I'm more passionate about
14  than others.  I am somewhat of a Boy Scout and I
15  believe certain things should and shouldn't happen.
16  And I will, as I said, advocate for and on my behalf,
17  and sometimes I get too passionate, so I apologize.
18  MS. BERTRAM:  That's -- I mean, again, I'm
19  not -- I'm not fussing at you at all.  I'm just -- I'm
20  just stating the reality that it's taking me more time
21  to take the deposition because you are expressing your
22  passion and providing a lot of information in
23  response.
24  MR. LEE:  Well, it's 5:00 his time, your
25  time too, 4:00 our time.  Yes, I mean, continue it,

245

1  and we'll deal with -- well, you're not -- both sides
2  are going to have the same -- same issues with respect
3  to hours and stuff like that, but we can deal -- we
4  don't need to deal with that right now, so ...
5  MS. BERTRAM:  I've got more than two hours
6  of material, and I don't see any reason to keep people
7  here past 7:30, 8:00 on a Friday.
8  MR. LEE:  That's fine.  We'll -- we'll get
9  a -- we'll get a different date.  Just -- this doesn't
10  need to be on the record.  We can go off the record.
11  MS. BERTRAM:  Okay.
12  MR. LEE:  Remember the guy that I told you
13  that Earl --
14  THE REPORTER:  Counsel, wait.  Do you want
15  to --
16  MS. BERTRAM:  Why don't we close the
17  record, give her a chance to close the record.
18  VIDEO SPECIALIST:  The time is 5:07 p.m.
19  We're off the record.
20
21  //
22  (The deposition of EARL DONALD BAKER adjourned
23  at 5:07 p.m.)
24  //
25

Baker, Earl Donald

August 14, 2020

63 (Pages 246 to 247)

246

1       ACKNOWLEDGMENT OF DEPONENT

2

3           I, _____, do hereby

4       acknowledge that I have read and examined the

5       foregoing testimony, and the same is a true, correct

6       and complete transcription of the testimony given by

7       me, and any corrections appear on the attached Errata

8       Sheet signed by me.

9

10      _____  _____

11      (DATE)        (SIGNATURE)

12

13          NOTARIZATION  (If Required)

14

15      State of _____

16      County of _____

17

18      Subscribed and sworn to (or affirmed) before me on

19      this _____ day of _____, 20_____, by

20      _____, proved to me on the

21      basis of satisfactory evidence to be the person who

22      appeared before me.

23

24      Signature: _____

25          (Seal)

247

1       CERTIFICATE OF REPORTER

2           I, Linda S. Kinkade, Registered Diplomate

3       Reporter, Certified Realtime Reporter, Registered

4       Merit Reporter, Registered Professional Reporter,

5       Certified Shorthand Reporter (CA), and officer duly

6       authorized to administer oaths and/or affirmations, do

7       hereby certify that prior to the commencement of

8       examination the deponent herein was duly sworn by me

9       to testify truthfully under penalty of perjury;

10          I FURTHER CERTIFY that the foregoing is a true

11      and accurate transcript of the proceedings as reported

12      by me stenographically, to the best of my ability;

13          I FURTHER CERTIFY that I am neither counsel for

14      nor related to nor employed by any of the parties to

15      this case and have no interest, financial or

16      otherwise, in its outcome.

17          IN WITNESS WHEREOF, I have hereunto set my hand

18      this 23rd day of August 2020.

19

20

21      _____

23      Linda S. Kinkade, RDR CRR RMR RPR CSR

24

25

Baker, Earl Donald - Vol. II                    September 25, 2020

248

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

WESTERN DIVISION

```
------------------------------
EARL DONALD BAKER,            :
                              :        Civil Action No.
     Plaintiff,               :
                              :        3:19-cv-30008-MGM
vs.                           :
                              :
SMITH & WESSON CORP.,         :
                              :
     Defendant.               :
------------------------------
```

REMOTE VIDEOTAPED DEPOSITION OF

EARL DONALD BAKER

Taken by Defendant

September 25, 2020

9:36 A.M. - 5:04 P.M. EASTERN

Reported by:  Eileen M. Dunne,
              Court Reporter and
              Notary Public

Baker, Earl Donald - Vol. II

September 25, 2020

2 (Pages 249 to 252)

---

**249**

APPEARANCES

On behalf of the Plaintiff:

JOHN LEE, ESQ.
Lee & Breen, LLC
188 Industrial Drive
Elmhurst, Illinois 60126
(312) 241-1240
Jlee@leebreenlaw.com

On behalf of the Defendant:

CONNIE N. BERTRAM, ESQ.
Bertram LLP
7032 Benjamin St
McLean, VA 22101
(703) 627-1649
Cbertram@bertramllp.com

Also present:
Joe Townsend, videographer

---

**250**

INDEX

DEPONENT                          PAGE

Called by the Defendant:

EARL DONALD BAKER

Examination by Ms. Bertram          252

EXHIBITS

NUMBER       DESCRIPTION          PAGE
Exhibit 4B   Text messages         403

---

**251**

P R O C E E D I N G S
* * * * *

THE VIDEOGRAPHER:  Here begins Volume 2 in the videotaped deposition of Earl Donald Baker taken in the matter of Earl Donald Baker v. Smith & Wesson Corporation in the U.S. District Court for the District of Massachusetts, Western Division, Case No. 3:19-cv-30008-MGM.

Today's date is September 25th, 2020, and the time is 9:40 A.M. Eastern.  This deposition is being conducted remotely.  The witness is located at 142 Carolina Avenue in Holden Beach, North Carolina 28462.

The court reporter is Eileen Dunne.  The videocamera operator is Joe Townsend, myself.  Both are on behalf of Henderson Legal Services.

Will counsel please introduce themselves and state whom they represent.

MR. LEE:  John Lee, L-e-e, representing the Plaintiff.

MS. BETRAM: Connie Betram representing Smith & Wesson.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness after which we can proceed.

---

**252**

EARL DONALD BAKER,
being duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

THE DEPONENT:  I do.
EXAMINATION
BY MS. BETRAM:

Q.  Good morning, Mr. Baker.  Again, I'm Connie Betram and I represent Smith & Wesson in the case.  Today is the continuation of your deposition and we're going to be using some of the exhibits that I provided to you prior to that -- prior to that deposition.  Do you have those with you this morning?

A.  You provided some at my last deposition.  I received no further materials from you.

Q.  Right.  We -- apparently, FedEx misrouted the second set, and they're going to arrive around 10 o'clock this morning.  But we're mainly going to be using the exhibits I previously provided to you.  So do you have those in front of you?

A.  I have them.

Q.  Now, during your prior deposition, we talked about your initial meeting with Mr. Suraci in February of 2014.  After that meeting, did you provide to Mr. Suraci some emails with information

---

Henderson Legal Services, Inc.

Baker, Earl Donald - Vol. II                                    September 25, 2020

3 (Pages 253 to 256)

253

1    that you thought was relevant to your concerns?
2        **A.  Yes.**
3        Q.  And did he ask you to draft a summary of
4    your concerns that provided all of the details?
5        **A.  I don't remember that specific request.  He**
6    **may have.**
7        Q.  Look at Exhibit 29, and that's not the
8    Plaintiff's exhibits, but it's the one that says
9    Smith & Wesson Exhibits with the tabs on the side.
10       MR. LEE:  This is -- Connie, this is part
11   of what you went before?  Yeah, I see it now.
12       MS. BERTRAM:  Yes.
13       MR. LEE:  Okay, okay.
14       THE DEPONENT:  What exhibit number?
15   BY MS. BERTRAM:
16       Q.  The bound set.
17       **A.  Okay.  What exhibit number?**
18       Q.  Twenty-nine.  Smith & Wesson.
19       **A.  Okay.**
20       Q.  Exhibit 29 is a March 12, 2014 email from
21   Ms. Baker to you, correct?
22       **A.  Twenty-nine -- okay.  Yeah.  The second**
23   **page of 29.  The first page just says forwarded.**
24       Q.  Are you looking at Smith & Wesson exhibits?
25       **A.  It just says Follow up, Flagged on the**

254

1    **first page of 29.**
2        Q.  I think you might be looking at Exhibit 29
3    in the Plaintiff's exhibits.  The one that we have --
4        **A.  No.  It's Smith & Wesson Exhibit -- Smith &**
5    **Wesson Exhibit 29 is M00968.  Plaintiff's Exhibit 29**
6    **and the first page says all -- no content, just**
7    **Follow Up Flag, Flag Status.**
8        Q.  Okay.  And that is an email from Ms. Baker
9    to you dated March 12, 2014, correct?
10       **A.  That's the first page.  Do you want me --**
11   **the second page --**
12       Q.  I'm asking what's on the first page,
13   Mr. Baker.  Is that what's on the first page?
14       **A.  The second page starts a summary, yes.**
15       Q.  I'm asking about the first page -- page,
16   Mr. Baker.  Is the first page an email from Ms. Baker
17   to you dated March 17, 2014 [sic]?
18       **A.  This audio through the phone isn't working.**
19   **She just talked and I didn't hear one thing.  So we**
20   **have to switch to something else.  This is not**
21   **working.**
22       MS. BETRAM:  Okay.  Let's take a break to
23   work on the audio.
24       (A break was had.)
25       THE VIDEOGRAPHER:  Back on the record.  The

255

1    time is 9:51 A.M.
2    BY MS. BERTRAM:
3        Q.  Now, Mr. Baker, if you refer to the first
4    page of Exhibit 29, it's a March 12, 2014 email from
5    Ms. Baker to you, correct?
6        **A.  Yes.**
7        Q.  And the subject is -- the subject line is
8    Information for Ed, correct?
9        **A.  Yes, Information for Ed.**
10       Q.  And the remaining pages of the exhibit,
11   were those attachments to that -- to that email?
12       **A.  It may have been something I wrote on my**
13   **laptop on Word and I had her forward it from home to**
14   **my email address.**
15       Q.  Okay.
16       **A.  Is what I would surmise.**
17       THE COURT REPORTER:  Okay.  Could you turn
18   up the volume a little bit more or speak a little
19   louder?
20       THE DEPONENT:  Sure.
21       THE COURT REPORTER:  Thanks.
22   BY MS. BERTRAM:
23       Q.  And -- and you -- you hand -- you provided
24   this by hand to Mr. Suraci, correct, this document?
25       **A.  I don't recall how I --**

256

1        Q.  Did you --
2        THE COURT REPORTER:  I'm sorry.  I didn't
3    hear that.
4        **A.  I don't recall how I delivered it.**
5        Q.  And did you provide it to him at some
6    point?
7        **A.  Yes.  I would -- I would assume.**
8        Q.  And you provided it to him on or about
9    March 12th of 2014?
10       **A.  I have no idea when I would have report --**
11   **given it to him.**
12       Q.  Did this document include a description of
13   all of your concerns about Pioneer Tool as of
14   March 12th, 2014?
15       **A.  I wouldn't characterize any document I had**
16   **as being all my concerns, and I wouldn't do so in**
17   **this case.**
18       Q.  Let me refer you to the last page, which is
19   971.
20       **A.  Yes.**
21       Q.  And you said at the end, These are the
22   things that I have witnessed, correct?
23       **A.  Yes.**
24       Q.  And so does this exhibit reflect the things
25   that you had witnessed as of March 17 of -- or

Baker, Earl Donald - Vol. II                     September 25, 2020

4 (Pages 257 to 260)

---

257

1    March 12 of 2014?
2        A.   They -- they comprise a summary of some of
3    the things I witnessed, yes.
4        Q.   Let's look at the first one.  It relates to
5    a company called Pacific.  Is that right?
6        A.   It starts out with Josh Bury, yes.
7        Q.   Okay.  And what was your concern with
8    respect to Pacific at that time?
9            MR. LEE:  Objection to the form --
10   objection to the form of the question, but you
11   may answer.
12       A.   Can you repeat it?
13       Q.   What was your concern with respect to
14   Pacific at that time?
15          MR. LEE:  Yeah, Earl, as we did it before,
16   there's a slight lag technologically.
17          THE DEPONENT:  Okay.
18          MR. LEE:  Pause, let me finish my
19   objection, and then you can go ahead and answer
20   so that we don't talk over each other.
21          Okay.  So my objection was objection to the
22   form, but you may answer.
23          THE DEPONENT:  Your question is saying what
24   problem I had with Pacific.  I didn't have a
25   problem with Pacific.

---

258

1    BY MS. BETRAM:
2        Q.   Okay.  My question is why did you
3    summarize -- you said that -- on the last page that
4    these were "things that I have witnessed."  Why did
5    you include this paragraph concerning Pacific in your
6    summary?
7        A.   The problem brought forth in that first
8    paragraph is that -- not a problem with Pacific.
9    It's a problem with our purchasing decision to pay
10   330 for an inferior product, 330 to 440 for tools
11   that I was getting from -- or that Smith & Wesson was
12   getting from Pacific for 189 that performed
13   perfectly.
14          So the problem is we made a purchasing
15   decision to pay in some case more than double for a
16   tool that performed inferiorly.
17       Q.   And how did you become aware of the
18   situation?
19       A.   Josh Bury, and his -- his lead person,
20   James, approached me with this information.
21       Q.   When did they approach you?
22       A.   Many times.  So I would imagine it was
23   fairly early on that they spoke with me.  I would say
24   it would probably be in April of 2013 was the first
25   time they talked to me, and they talked with me on

---

259

1    this issue continually throughout my employment.
2        Q.   And was this the first time that you had
3    raised this concern with human resources?
4        A.   No.
5        Q.   When before March 12th did you raise this
6    concern?
7        A.   Many times with Ann Glica, Kathy Salvador.
8    I had raised it with Mr. Flatley.  I'd raised it a
9    number of times.  It's hard to tell over a year's
10   time how many people I talked to.
11       Q.   And did you do any type of investigation
12   of -- of this concern?
13       A.   Yes.  I talked to some people about it.
14       Q.   Who did you speak with?
15       A.   Andrew Dziobek.  He was our purchaser.
16       Q.   Did you do anything else to investigate the
17   situation?
18       A.   Not that I can think of off the top of my
19   head.
20       Q.   And when did you stalk -- talk with Andrew
21   Dziobek?
22       A.   It would have been probably in April.
23       Q.   Of 2013?
24       A.   2013.  And then ongoing.  This became an
25   ongoing issue all the way up through the whole time I

---

260

1    was there.
2        Q.   And do you recall anything that Andrew told
3    you about your concerns?
4        A.   He told me that, yes, in fact, they were
5    paying 189 and that when the requisitions came to
6    him, it was switched over to -- that the initial
7    requisition was for Pioneer but it had been switched
8    over to Pioneer and he was just fulfilling the
9    requisition as it was presented to him.
10       Q.   Now, I think you may have misspoken.  Did
11   you -- you said the initial requisition was for
12   Pioneer Tool and then it was switched over to Pioneer
13   Tool.  Did you mean Pacific?
14       A.   Yes.  Thank you.
15       Q.   And did he say when that happened?
16       A.   No.  He was nonspecific.
17       Q.   And did you do anything -- other than
18   speaking with Andrew Dziobek over a period of time,
19   did you do anything else to investigate this
20   situation?
21       A.   Andrew approached me about bringing Pacific
22   to our facility.  And the owner and his assistant
23   flew in from Oregon and they spent a number of days;
24   I can't recall how many.  And that -- that helped our
25   investigation into their company as a supplier.

---

Baker, Earl Donald - Vol. II                      September 25, 2020

5 (Pages 261 to 264)

---

261

1      Q.   Okay.  And did the company start purchasing
2   tools from Pacific after the -- after that meeting?
3      A.   We had been purchasing on a piecemeal
4   basis.  When Pioneer could not perform, we would
5   order tools from them throughout our time there.  But
6   it was on a one- and two-piece basis.
7      Q.   Right.  Did the -- did the purchasing
8   increase after they came to the facility for the
9   meeting?
10      A.   I don't believe so.
11      Q.   Okay.  And you said that you raised these
12   concerns with Larry Flatley, Ann Glica, and Kathy
13   Salvador.  Do you recall what you told them about the
14   situation?
15      A.   Just what I'm telling you and what's
16   written.
17      Q.   Do you recall providing any documentation
18   to them to support your concerns or to -- that they
19   could consider in addressing your concerns?
20      A.   They didn't ask for any and I did not
21   provide any that I can recall.
22      Q.   Is it fair to say that Exhibit 29 fully --
23   fully describes your concerns with respect to the
24   purchasing of Pioneer Tools over Pacific Tools?
25      MR. LEE:  Objection to the form of the

---

262

1   question.  Misstates the witness's prior
2   testimony, but you may answer.
3      A.   As I previously stated, no document that I
4   know of fully comprises all of my concerns.
5      Q.   Is there any information that you provided
6   to Smith & Wesson other than what is summarized in
7   paragraph 1 of Exhibit 29 that you recall providing
8   to the company?
9      MR. LEE:  Objection to the --
10      A.   Yes.
11      MR. LEE:  Objection to the form of the
12   question, but you may answer.
13      A.   Yes, I provided many documents.
14      Q.   Do you recall which documents you provided?
15      A.   Many.
16      Q.   Do you recall any of them?  What -- what --
17   let me just go back.
18      To whom did you provide documents relating
19   to the situation with Pacific?
20      A.   Tom Walsh, Bob O'Donnell, Josh Bury, James
21   Peele.  And those are some I can recall.  There may
22   be others.  But off the top of my head, that's the
23   ones I can think of.
24      Q.   And during what period did you provide
25   documents to them relating to this concern?

---

263

1      A.   From April of 2013 through June of 2014.
2      Q.   Do you recall any of the documents that you
3   provided to them?
4      MR. LEE:  Objection to the form of the
5   question, but you may answer.
6      A.   I -- I can recall many documents.  There
7   were many documents.  And we have a quite extensive
8   record of my emails and documents I provided.  And I
9   would just refer to those.
10      Q.   And do you know whether the company ever
11   investigated or looked into your concerns regarding
12   purchasing from Pacific?
13      A.   My role as a -- as a person that cared
14   about Smith & Wesson was to bring to their attention
15   the problems I saw.  I did not feel it was my duty,
16   nor do I feel that they felt it was their duty to
17   inform me what they were investigating and were not
18   investigating.  So I had no scope of what they were
19   doing on their end.
20      Q.   So if they did an investigation, you don't
21   know what they did or what they concluded, right?
22      A.   I was provided an investigation report at
23   the end with Mr. Cicero.  So that would indicate they
24   had done an investigation, but other than that poorly
25   worded statement, I had no indication that they had

---

264

1   done some -- some investigation.
2      Q.   Now, did you consider the situation with --
3   let me back up a little bit.
4      Is it your -- is it your view that by
5   purchasing tools from Pioneer as opposed to Pacific
6   that Smith & Wesson was violating Sarbanes-Oxley?
7      MR. LEE:  Objection to the form of the
8   question, but you may answer.
9      A.   We had millions of dollars of purchases.
10   Not every purchase would fall under that category.
11   There are some purchases that would fall into the
12   category of being contrary to the interests of Smith
13   & Wesson that were purchased from Pioneer.
14      Q.   Again, is it your view that the purchasing
15   of tools from Pioneer Tool over Pacific was one of
16   those purchases that was a violation of
17   Sarbanes-Oxley?
18      MR. LEE:  Same -- same objection, but you
19   may answer.
20      A.   It's possible that those were motivated by
21   external motivations other than the best interests of
22   Smith & Wesson.
23      Q.   And why do you think it's possible that
24   they were motivated by external interests?
25      A.   Having owned a business for 22 years, it's

---

Baker, Earl Donald - Vol. II                    September 25, 2020

6 (Pages 265 to 268)

265

1  contrary to popular business practices to pay double
2  for a product that is far inferior and has a slower
3  delivery time. It does not seem on the surface to be
4  motivated simply by what's best for the company.
5      Q.  Are you aware of any statements by anyone
6  at Smith & Wesson that would support your belief that
7  it's possible that there were external motivate --
8  let me strike that and start over.
9      Are you -- can you point to any statement
10 by any representative of Smith & Wesson that supports
11 your view that it's possible that there were
12 motivations, external motivations?
13     MR. LEE:  Objection to the form of the
14 question.  Misstates the -- the witness's prior
15 testimony, but you may answer.
16     A.  Yes, there were many.
17     Q.  Specific as to purchasing -- not purchasing
18 from Pacific, are you aware of any statements?
19     A.  Yes.
20     Q.  What statements can you point to to -- to
21 support your suggestion that there were elicit
22 motivations with reference to Pacific?
23     MR. LEE:  Objection to form, but you may
24 answer.
25     A.  Again, there are a multitude of statements.

266

1  So my answer to this question by no means embodies
2  everything that was said to me.  It's just what I can
3  think of off the top of my head.
4      Mr. Suraci, in presenting the evidence to
5  me, told me personally, Where there's smoke, there's
6  fire, and I believe there's definitely fire here.  So
7  that statement belied the fact that he believed there
8  were motivators outside of -- motivations outside the
9  best interests of Smith & Wesson.
10     Now, James Peele --
11     THE COURT REPORTER:  Motivations outside
12 what?
13     THE DEPONENT:  That there were motivations
14 outside the best interests of Smith & Wesson.
15     THE COURT REPORTER:  Thank you.
16     THE DEPONENT:  James Peele mentioned many
17 instances -- instances where he had felt it was
18 being -- his department was being hampered by the
19 purchasing policies and that his requisitions
20 were being crossed out and Pioneer was put in
21 place of the actual provider he wished to receive
22 the tools from.
23     Josh Bury mentioned things.  Jim Valley
24 mentioned issues of his purchasing.  Tom Walsh
25 mentioned concerns.  And it's just like too many

267

1  to summarize in -- in one sitting.
2      Again, I would refer to the documentation
3  of the emails that we sent to Mr. Suraci as being
4  more of a complete -- a complete answer to your
5  question.
6  BY MS. BETRAM:
7      Q.  You said that there were statements.  First
8  of all, you first indicated that there was a
9  statement by Rob Cicero, Where there is smoke, there
10 is fire.  Was that statement specific to Pacific or
11 about vendors generally?
12     MR. LEE:  Objection to the form of the
13 question.  Misstates the witness's prior
14 testimony, but you may answer.
15     A.  I believe you misstated or I did.  I didn't
16 say Mr. Cicero.  I said Mr. Suraci said that.
17     Q.  Okay.  I -- I probably just misheard you.
18 I apologize.
19     When Mr. Ed --- Mr. Suraci made that
20 statement, do you know whether he was referring to
21 Pacific in particular or to the vendor policy in
22 general?
23     A.  I -- I couldn't say what he was referring
24 to.
25     Q.  With respect to Mr. Peele, Mr. Valley, Mr.

268

1  Bury and Mr. Walsh, were any of their statements
2  specific to Pacific?
3      A.  I believe Mr. Peele, Mr. Bury, and possibly
4  Mr. Walsh were in the context of Pacific.
5      Q.  Okay.  And do you recall any of the
6  specific statements that they've made with respect to
7  Pacific?
8      A.  As far as word for word, I do not.
9      Q.  Do you recall generally any of the
10 statements that they made concerning Pacific?
11     A.  Yes.  They said that their -- Pacific's
12 work better.  When Thompson/Center was brought --
13 bought by Smith & Wesson, they used exclusively
14 Pacific and they had been switched over on their
15 requisitions to Pioneer and they performed -- did not
16 perform as well.  We had documented problems with
17 them, documented through the emails you've been
18 provided.  And you can see by the prices listed in
19 Exhibit 29 that we were paying in some cases more
20 than double.
21     Q.  When was Thompson/Center purchased by Smith
22 & Wesson?
23     A.  I do not know.
24     Q.  And Pacific is a -- a manufacturer; is that
25 right?

Baker, Earl Donald - Vol. II

September 25, 2020

7 (Pages 269 to 272)

269

1    **A.  Yes, I would say.**
2    Q.  Okay.  And do they distribute their own
3    tools or do they sell through a distributor?
4    **A.  No, they -- they sold directly to us.  I**
5    **don't know their relationships with other companies.**
6    Q.  Okay.  And the tools that were provided by
7    Pioneer Tool, were they -- were they manufactured by
8    Pioneer Tool or another manufacturer?
9    **A.  I am not positive, but it's my recollection**
10   **that they were produced by an outside supplier and**
11   **sub -- subcontracted to an outside supplier by**
12   **Pioneer.**
13   Q.  Now, was Thompson/Center purchased before
14   you started working at Smith & Wesson?
15   **A.  Yes.**
16   Q.  Do you know how many years it was before
17   you were -- before you started working for the
18   company?
19        MR. LEE:  Objection to form.  Asked and
20   answered.  Calls for speculation.  But if you
21   can, you may answer.
22   **A.  As I answered before, I -- I do not know**
23   **when they were purchased.**
24   Q.  But it was your understanding that the
25   purchasing policy changed around the time of the

270

1    purchase of Thompson Center based on the information
2    that was provided to you?
3        MR. LEE:  Objection to the form of the
4    question, but if you know the answer, you can
5    answer.
6    **A.  I know that the policy changed.  I do not**
7    **know the timing of when it changed.**
8    Q.  Okay.  And we were talking -- you indicated
9    that you felt that the decision, this change, may
10   have been motivated by external interests.  And we
11   talked about some of the people who made statements
12   to you.  Are you aware of any other evidence that
13   supports your statement that it's possible that the
14   purchasing decisions were motivated by external
15   interests?
16        MR. LEE:  Objection to the form of the
17   question, but you may answer.
18   **A.  As I said before, we -- we have quite a few**
19   **documents in this -- this case, many of which speak**
20   **to your question that there are many evidences that**
21   **would point to outside influences.  From my business**
22   **practice and my schooling, I believe that price,**
23   **delivery, and quality are the major factors involved**
24   **in procuring something for the best interests of your**
25   **company.  Looking at those three items alone --**

271

1    **price, delivery, and quality -- making those**
2    **assessments, we would not have made many of the**
3    **purchases that Smith & Wesson made.**
4    Q.  And you indicate that there were -- that --
5    that individuals may have been motivated by external
6    interests.  Who do you claim was improperly
7    motivated; which individuals with respect to Pacific?
8    **A.  You -- you infer that I made judgments as**
9    **to who the parties were that may have been improperly**
10   **influenced.  My -- my goal in bringing this to**
11   **management isn't to impose my beliefs on them, but**
12   **just to communicate facts that I see and**
13   **conversations and things that were told to me.**
14       **I was told specifically that individuals**
15   **were involved.  I passed that information on to -- to**
16   **my bosses and in some cases even to some of the**
17   **people that later made implicated by things that I**
18   **was told.  So I just did my best to do what was best**
19   **for Smith & Wesson.**
20   Q.  And who do you think were improperly
21   motivated by external interests?
22   **A.  You're asking for my opinion?**
23   Q.  In -- in your view, who do you contend were
24   motivated by improper external influences?
25       MR. LEE:  Object to the form of the

272

1    question.  Asked and answered.  But if you can,
2    you may answer.
3    **A.  Again, my -- my view wasn't to -- to**
4    **investigate to the point of finding out who might be**
5    **profiting or what motivations might be involved.  My**
6    **focus was purely on tooling procurement, which was my**
7    **department, that I felt like there are some forces**
8    **below the surface that are motivating these purchases**
9    **that are not -- clearly not in the interests of Smith**
10   **& Wesson and that it behooved management to do the**
11   **investigation to find out why those purchases were**
12   **made in the manner they were.**
13       **So, again, though I might have inclinations**
14   **by certain things that I witnessed every day, my**
15   **focus wasn't on who was -- who was profiting and who**
16   **was changing things; more so just to make sure that**
17   **if the practice stopped and we started purchasing in**
18   **the best interests of Smith & Wesson, my job is done.**
19   Q.  What were the -- in your view, what
20   external interests were motivating the individuals
21   with respect to purchasing Pioneer over Pacific?
22   **A.  I think Smith & Wesson had a pay-to-play**
23   **society where gifts were being given.  I had told**
24   **Mr. Cicero about TVs being delivered to individuals.**
25   **I made a lot of submissions that talked of different**

Baker, Earl Donald - Vol. II                    September 25, 2020

8 (Pages 273 to 276)

273

1  gifts to different people.  We spoke of baseball
2  tickets being sent to me and gave them to Mr. -- or
3  gave an account of that and a gift card to Mr. Suraci
4  and told all of it to Mr. Cicero.
5      Q.  Did you present any other evidence to
6  support your belief that there were improper external
7  motivations for the purchasing decisions?
8      A.  Yes.
9          MR. LEE:  Objection to the form of the
10  question, but you may answer.
11      A.  Yes, many.
12      Q.  What other evidence?
13      A.  Well, I --
14          MR. LEE:  Objection -- well, objection to
15  the form of the question, but you may answer.
16      A.  I gave accounts of -- direct accounts of
17  what people told me.  I also told Kathy Salvador and
18  Ann Glica of an interaction with a Pioneer driver who
19  attempted to deliver a gift to Mr. Flatley.  He said
20  so.  And it was -- now, I did not see him take that,
21  but coupled with the comments that were made by
22  Mr. Flatley just days before that they would get
23  preferential treatment at a drawing during the time
24  of EASTEC, that the significance in mentioning it was
25  it showed a quid pro quo between gifts and

274

1      Mr. Flatley's comment to me that because we were the
2  higher ranking Smith & Wesson people, we would
3  receive gifts.
4      Q.  Other than the quid pro quo between gifts
5  and purchasing, are you aware of any other evidence
6  that supports your view that there were inappropriate
7  or -- let me strike that.
8          Other than the kid -- quid pro -- quid pro
9  quo environment where employees were given gifts, can
10  you point to any other evidence that supports your
11  view that employees were motivated by external
12  forces?
13          MR. LEE:  Objection to the form of the
14  question, but you may answer.
15      A.  Again, I -- I point to the email record
16  that we have that document many, many incidences
17  where purchases and/or times when there should have
18  been refunds to Smith & Wesson for poor quality,
19  incorrect delivery that should have been refunded
20  back to Smith & Wesson that were not.
21          So it's not just purchases.  It's
22  everything having to do with the -- the purchase,
23  value stream where you buy and you receive what you
24  had requisitioned.  And -- and in many cases, we did
25  not ask for certain vendors to pay for their mistakes

275

1  while other vendors did.
2      Q.  Other than gifts and the failure to provide
3  refunds, is there any other evidence that you can
4  point to to support your assertion that there were
5  improper motivations with respect to purchasing from
6  Pioneer over Pacific?
7      A.  There are -- I had mentioned some specific.
8  There are also -- those are micro, and there are also
9  macro evidences that would indicate that the
10  purchases even from a far view don't pass the smell
11  test.
12          When -- as Mr. Smith mentions that Pioneer
13  was offering a 16 percent discount and that MSC,
14  which had a larger capacity to deliver quicker had a
15  24 percent discount, it does not pass the smell test
16  that given the numbers I was provided, which I have
17  no way of attesting to whether they're correct or
18  not, that $4.4 million in business was given to the
19  company that had the smaller discount and that at the
20  time I arrived, I was told that MSC was receiving
21  $20,000 a year in purchases where if you just do the
22  simple math, they would save nearly a half million
23  dollars by switching their purchases to the entity
24  that had the largest discount.
25          That's against every business practice that

276

1  I know of.  And that corroborated with testimony of
2  the micro infractions that I talked about from
3  Mr. Valley, Mr. Bury, Mr. Peele, and the things that
4  I heard.
5      Q.  Are you aware --
6          THE VIDEOGRAPHER:  I'm sorry to --
7  BY MS. BETRAM:
8      Q.  -- of any other --
9          THE VIDEOGRAPHER:  -- sorry to interrupt.
10  This is the videographer.  Mr. Baker, could you
11  just tilt your laptop screen down a little bit so
12  you'll be more centered?  Thank you.
13  BY MS. BETRAM:
14      Q.  Are you aware of any other evidence that
15  supports your contention that Smith & Wesson
16  employees were motivated by inappropriate external
17  influences?
18      A.  Again, I'd point to the -- to the record of
19  the documents we have.
20      Q.  Anything else that you can recall as you're
21  sitting here today?
22      A.  You're -- you're asking me to recall to
23  memory some 2,000 documents.  While I can speak with
24  specificity to -- to many, if not all, of those
25  documents, for me to recall by memory all thousands

Baker, Earl Donald - Vol. II                    September 25, 2020

9 (Pages 277 to 280)

---

277

1  of documents to tell you for this answer, it's
2  impossible.  Beyond my scope.
3      Q.  Let's go to the second paragraph.  It talks
4  about Hassay Savage; is that right?
5      A.  Yes.
6      Q.  And there were certain -- there were three
7  different broaches that you were looking into; is
8  that right?
9      A.  Yes, that's correct.
10      Q.  And you talk about filling out a -- a
11  Kaizen sheet showing how much was saved.  Do you have
12  that Kaizen sheet?
13      A.  That Kaizen sheet was filled out by Andrew
14  Dziobek, and I do not have that.
15      Q.  Okay.
16      A.  Andrew -- Andrew would have that.
17      Q.  And the company ended up purchasing from
18  Hassay Savage; isn't that right?
19      A.  What time do you mean?
20      Q.  After -- there's some email communications,
21  and the company, while you were employed there, did
22  -- did make purchases from Hassay Savage, right?
23      A.  They were the main supplier before -- on
24  broaches before we switched to Pioneer.  So they were
25  -- we purchased from them prior, and then after this,

---

278

1  we purchased from them on a small scale.
2      Q.  And you said before they were switched
3  over -- let me just strike that.
4          When did they stop becoming the main
5  vendor?
6      A.  I am unaware of the time frame.
7      Q.  Was it before your employment?
8      A.  Yes.
9      Q.  And with respect to the three broaches,
10  they were dual sourced between Pioneer Tool and
11  Hassay, correct?
12      A.  When I brought -- not when I re -- I
13  started there, no.
14      Q.  After the email communications that you
15  describe in this paragraph, they were dual sourced,
16  correct?
17      A.  For a time.
18      Q.  You raised concerns -- was it your concern
19  that Mr. Flatley had provided the Hassay Savage quote
20  numbers to Pioneer Tool?
21      A.  I was told so.
22      Q.  Who told you that?
23      A.  Carl Hynes from Pioneer.
24      Q.  And when did he tell you that?
25      A.  During the time of the -- Mr. Flatley and

---

279

1  Mr. Dziobek were negotiating the terms back and
2  forth.  The initial price at that time for these
3  broaches was $770.  Mr. Cicero has argued that that
4  pricing is incorrect.  But that pricing fluctuated.
5  Pioneer lowered their bid as soon as we got the bid
6  from Hassay.  They then lowered it again once they
7  found out that it was going to be dual -- I'm sorry.
8  They increased it again after they found that it was
9  dual sourced.
10          So he can say the price was 500 and
11  whatever.  The fact remains that at the point that
12  this was initiated, they were charging 770 for that
13  broach.  We quote a quote from Hassay Savage for 398.
14  There were -- there were definite influences that
15  came to bear to make sure it was dual sourced, and
16  they weren't based in truth.
17      Q.  What was the basis for the 770 number that
18  you just identified?
19      A.  That's what it showed on the computer at
20  the time we got the bid from Hassay Savage.
21      Q.  And which computer are you talking about?
22      A.  The computer in my office, the main
23  database, SAP.
24      Q.  And you said that Carl Hynes -- that you
25  spoke with Carl Hynes about this.  What did he tell

---

280

1  you?
2      A.  He told me, yes, Flatley did give him the
3  amount of Hassay's bid and that's why he bid the
4  dollar less.  But as the negotiations increased, he
5  changed his bid once he realized that he was
6  virtually guaranteed half of the order by Flatley
7  that he raised his price because he was going to lose
8  money at the dollar -- dollar a broach over what
9  Hassay Savage bid.
10      Q.  And when did -- when did Mr. Hynes tell you
11  this?
12      A.  At the time that that negotiation was going
13  on.
14      Q.  And did you provide that information to
15  Mr. Cicero.
16      A.  Yes, I did.
17      Q.  And do you know whether Mr. Cicero spoke
18  with Mr. Hynes?
19      A.  No, I do not.
20      Q.  For his investigation?
21      A.  No, I do not.
22      Q.  And do you know what Mr. Hynes said to
23  Mr. Cicero, you know what I -- you don't know what
24  Mr. Hynes said to Mr. Cicero if they spoke, correct?
25      A.  No.

---

Baker, Earl Donald - Vol. II                    September 25, 2020

10 (Pages 281 to 284)

---

281

1    Q.  And what -- the conversation with
2  Mr. Hynes, was that a telephone call or an in-person
3  discussion?
4    A.  In person in my office.
5    Q.  Okay.  Was anybody else there?
6    A.  Mike Jurga may have been involved, but I --
7  I don't know if he was or not.
8    Q.  Okay.  And did you document your discussion
9  with Mr. Hynes; did you take notes?
10    A.  I was standing inside the door of my
11  office.  I -- I did not have the ability to take
12  notes at that time.  Mr. Hynes was standing and I was
13  standing.  We were off to the left of my office.  I'm
14  not sure if Mike Jurga was sitting in the chairs of
15  my office.  It's my recollection he may have.  But I
16  did document by telling Mr. Cicero and Mr. Suraci.
17        And I think you'll find that I have email
18  records to Mr. Suraci explaining the situation to
19  him.  He was HR, so he didn't understand purchasing
20  much, so I think there is a detailed explanation of
21  how the process went to him.
22    Q.  So you said that you had the conversation
23  with Mr. Hynes.  You looked at the price within the
24  SAP.  Did you do anything else to investigate your
25  concerns about purchasing from Pioneer or the bidding

---

282

1  by Pioneer -- let me just strike that.
2        Did you do anything else to investigate
3  your concerns about Hassay Savage?
4    A.  Again, it's not my view that it's my role
5  in having concerns for my company to be the sole
6  investigator for what was going on within the
7  company.  I trusted those within the company to do
8  their job as well.  It was my job to -- to point out
9  to them there was something that was not being done
10  correctly or in the best interests of Smith & Wesson.
11  And I trusted people to do their job to investigate.
12  I didn't feel -- my job was to make sure that my
13  department produced and that -- that was the things I
14  was hired for.  I wasn't hired to investigate
15  impropriety.  That's what HR, legal, and Mr. Suraci
16  were tasked to do.
17    Q.  Did you provide any other information to
18  Mr. Cicero and Mr. Suraci other than your conversation
19  with Carl Hynes and the price that you identified in
20  SAP?
21    A.  I did many things.  I showed them
22  documents.  I gave them things.  So you're asking did
23  I do anything than -- other than tell them.  Yes, I
24  did everything I could to make sure they had the
25  information.

---

283

1    Q.  And what documents did you show them?
2    A.  You have copies of all of them.  There's
3  quite an extensive email record of what we -- I gave
4  them.  And some things that weren't document -- or
5  were not emails that were items like gift cards or
6  baseball tickets, they were provided with other
7  evidences other than emails, but they're referred to
8  in the emails.
9    Q.  I'm talking about the -- the situation with
10  Hassay Savage and the -- and the -- and the pricing
11  and dual sourcing other than your conversation with
12  Karl Hynes and the price in SAP.  Did you -- some
13  emails.  Did you provide any other documents or
14  information to Mr. Cicero or Mr. Suraci?
15    A.  Other information other than what I told
16  them?  No, I gave them my information.  A lot of it
17  was verbal and others were emails.
18    Q.  And do you know what Mr. Cicero or
19  Mr. Suraci did in connection with their
20  investigations with respect to the Hassay Savage
21  issue?
22    A.  I was provided information in Mr. Cicero's
23  investigation report claiming that I was incorrect on
24  certain issues.  But he was misinformed.  He had not
25  researched diligently enough to have a good scope of

---

284

1  what he was even saying.
2    Q.  And what leads you to believe that he
3  hadn't researched diligently?
4    A.  He said he had in that investigation
5  report, but by virtue of the context -- or content of
6  what he said, he hadn't -- obviously, he didn't
7  research enough.
8    Q.  And what -- what specifically do you
9  contend he did not research sufficiently?
10    A.  He gave the price like a picture in a
11  moment of time and said, No, it was this.  Well, that
12  wasn't -- that price was up here, went down, went
13  back up a little bit.  It was all over the place as
14  that negotiation went on.  He's arguing that point.
15  He said also that respect -- we were comparing apples
16  to oranges in that Pioneer's was a consignment order.
17  If he reads the -- if he reads what the bid says, so
18  was -- so was Hassay Savage's.  So he was -- he was
19  in error in what he said.
20    Q.  You said if -- if he had read -- I think
21  you said a vin?  Is that right?  I think I missed a
22  word that you said.  You said if he had looked at it,
23  he would have seen that Hassay Savage was consignment
24  also.  What was the word that you used?
25    A.  I don't know.  You can ask the reporter to

---

285

1  read it back.
2      THE COURT REPORTER:  I missed that word
3  too.
4      MS. BETRAM:  Why don't you read back what
5  you heard and we can see if that helps Mr. Baker
6  insert the word that we couldn't hear.
7      (Whereupon, the answer was read back by the
8  reporter.)
9  BY MS. BETRAM:
10    Q.  If he read what the something said.  Was
11  there another document that Mr. Cicero should have
12  reviewed in comparing the prices of the two vendors?
13      MR. LEE:  I -- well, first of all,
14  objection to the form of the question.  But,
15  Eileen, can you finish reading whatever it is
16  that Earl said the last time and then we can go
17  to Connie's question because I didn't --
18      MS. BETRAM:  Oh, I -- I thought she was
19  done.
20      MR. LEE:  Oh.
21      (Whereupon, the answer was read back by the
22  reporter.)
23      THE DEPONENT:  That word is "bid."
24      THE COURT REPORTER:  Bin, b-i-n?
25      THE DEPONENT:  B-i-d.

286

1      THE COURT REPORTER:  Oh, bid.
2      THE DEPONENT:  That Hassay Savage gave us a
3  bid or a quote to do those parts at a certain
4  amount.  If he had read that bid correctly and/or
5  the negotiations that Mr. Flatley and Mr. Dziobek
6  did over the issue, he would have found that
7  Hassay Savage was a consignment bid just as
8  Pioneer's was.
9      He would have also found that it's nonsense
10  to say that we're going to give half of the order
11  to Pioneer because we aren't sure whether Hassay
12  Savage can supply these.  And because it's a
13  critical thing, we want to make sure, so we're
14  going to give -- we're going to pay for half of
15  the order at a higher price.
16      That's nonsense considering that that
17  design was a Hassay Savage design and they made
18  that part for years.  That is a -- a
19  justification for -- that covers up a purchase
20  that is contrary to Smith & Wesson's interests.
21      MR. LEE:  Whenever it's good for you --
22  sorry, Connie.  Whenever it's good for you, I,
23  personally, would like a five-minute break but
24  whenever it's good for you.
25      MS. BERTRAM:  That's fine for me.

287

1      MR. LEE:  Okay.  Earl --
2      THE VIDEOGRAPHER:  Stand by.
3      MR. LEE:  -- when you leave -- when you
4  leave to --
5      THE VIDEOGRAPHER:  Sorry.  I'm going to
6  read us off the record.
7      MR. LEE:  Oh, sorry.  Go ahead.  When you
8  leave --
9      THE VIDEOGRAPHER:  Going off the record at
10  10:39 A.M.
11      MR. LEE:  You should mute it and then
12  unmute it when you come back.  That's all.
13      (A break was had.)
14      THE VIDEOGRAPHER:  Back on the record at
15  10:48 A.M.
16  BY MS. BERTRAM:
17    Q.  Mr. Baker, we were talking about Hassay
18  Savage, and you indicated that you had received an
19  investigation report from Mr. Cicero.  Other than
20  invest -- that investigation report, do you know --
21  do you have knowledge of what Mr. Cicero did to
22  investigate your concerns about Hassay Savage?
23    A.  No.
24    Q.  And let's look at the next paragraph in
25  Exhibit 29.  And it addresses fixing tools in the --

288

1  in the crib.  And you talk about repairing and
2  restocking tools.  And I'll give you a chance to look
3  through that if you need to.
4    A.  Yeah, I'm familiar with the situation.
5    Q.  Okay.  Is this a -- a complete summary as
6  of March 12th of your concerns about restocking of
7  the Pioneer tools in the crib?
8    A.  No, that is not complete at all.  But it's
9  representative of what I -- of some of the problems.
10    Q.  And what -- what were your problems with
11  the restocking issue -- fixing -- repairing and
12  restocking I guess we would say.
13    A.  Relative to this tool that was mentioned
14  here and in Cicero's -- Mr. Cicero's report?
15    Q.  What do you mean by that?
16    A.  I just mean is your question talking in
17  generalities or this specific thing mentioned?
18    Q.  Well, let's focus on what you raised with
19  Mr. Cicero with respect to the repair -- the
20  inspection and repair of tools in the RoboCrib.  What
21  concerns did you raise with him about that?
22    A.  Well, in this case, we found a problem with
23  the tool.  It was with all of the tools.  And we sent
24  them back at one point to Pioneer on one case, and
25  they repaired them, but just gave them back repaired,

289

1   but they didn't refund any of the money that we had
2   spent to vend out all of these cutters.  So the price
3   that they got for -- for making the tools, we -- we
4   paid them twice.  And I was told it wasn't my concern
5   by Mr. Flatley.  That wasn't being done for other
6   vendors and it should not be a standard business
7   practice.
8         So in respect to Mr. Cicero, I don't know
9   what he did to investigate.  All I can tell you is
10  his conclusion was misinformed.  He said I should not
11  have fixed them, but I should have given them back to
12  the vendor.  When every tool that we have is bad,
13  they have to have -- it would take days or even weeks
14  to send it back to a vendor and have them repair the
15  tools.  We couldn't go without tools for weeks.  So I
16  have to -- and there are documents that enforce -- or
17  reinforce what I'm saying -- by Mr. Fontaine that
18  said no action is taken -- or should be taken that
19  puts production in jeopardy.
20        So I was required by my job to repair some
21  of these tools where we accepted the cost and send
22  the balance of the tools back to Pioneer for repair.
23  They should have been returned at no charge to us
24  because we had -- we had sent them tools that they
25  sent us incorrectly.  They re -- should repair them

290

1   and give them back to us at no charge.
2         They should also refund all of the vends
3   for cutters that were made incorrectly.  That --
4   that's business.  You provided an inferior product
5   that did not work.  It's your job to refund the
6   money.
7         Q.  Are you done with your response?
8         A.  Yes.
9         Q.  Okay.  And how do you know that Smith &
10  Wesson was charged twice for -- for the defective
11  tools?
12        MR. LEE:  Objection --
13        A.  That's not --
14        MR. LEE:  Objection to the form of the
15  question, but you may answer.
16        A.  I don't --
17        MR. LEE:  Okay.
18        THE DEPONENT:  Go ahead.
19        MR. LEE:  You could answer if you --
20  objection to the form of the question.  You may
21  answer if you can.
22        THE DEPONENT:  In knowing how the system
23  works, anything that comes out of the vending
24  machine is -- as soon as it's vended, we purchase
25  it.  So any outgoing from the vending machine is

291

1   a charge.  So we vended them all out and when we
2   return them to the vendor and they just restock
3   the vending machine, then now they're ready to
4   vend again a second time and there's going to be
5   a second charge for each of those tools.
6         We need to receive a credit memo from
7   Pioneer stating that you were not charged for
8   those tools that you initially vended that were
9   incorrect.  We received no such credit memo, and
10  when I brought it to Mr. Flatly's attention, he
11  said not to be concerned with it.
12  BY MS. BETRAM:
13        Q.  And do you have any documents that support
14  your belief that Smith & Wesson was charged twice for
15  these defective tools?
16        A.  Yeah.  I just explained the function of how
17  that -- that machine works.
18        Q.  Right.
19        A.  There was no way around it.
20        Q.  Right, but you don't know whether any
21  adjustments were made; is that right?
22        A.  I was told there was no credit issued for
23  those tools.  And when I brought it to my -- the
24  attention of my boss, he said none was issued, but I
25  wasn't to concern myself with it.  And that is a

292

1   concern of my job description.
2         Q.  And did -- who told you that -- that Smith
3   & Wesson had not been given a credit?
4         A.  Andrew Dziobek.
5         Q.  And when did he tell you that?
6         A.  At the time that those tools came back in.
7   I checked to see if we were issued a credit.  He said
8   we had not.  I told Mr. Flatley, and Mr. Flatley said
9   not to be concerned with it.
10        Q.  And -- and I'll -- I'll ask the question
11  again.  Did you ever see any documents that showed
12  that Smith & Wesson was charged twice for those
13  tools?
14        MR. LEE:  Objection to the form of the
15  question.  Asked and answered.  But you can
16  answer it again if you want to.
17        A.  In a general sense, yes.  We're -- we're
18  issued by budgetary measures what is vended out and
19  charged to our departments accordingly.  And that
20  goes on the pitch board.
21        So, yes, there were documents that would
22  indicate that we were charged for them just as the
23  program works that every time something is vended
24  out, you get charged for it.
25        Now, the way the system works is did we

Baker, Earl Donald - Vol. II

September 25, 2020

13 (Pages 293 to 296)

---

293

1  receive a credit for the tools that were mis-vended
2  because they were defective.  And that source would
3  be with Andrew Dziobek.  So just as I said on the
4  pitch boards, every vend would be summarized on the
5  monthly budget.
6          Also, any credits would be summarized on
7  the monthly budget.  So not only did Andrew Dziobek
8  tell me that information was on the pitch board, it
9  would be public consumption.  So did I have
10  documents, documentation, that no -- nothing had
11  transpired?  Everyone in that plant could see
12  documentation that no credit was given if they so
13  desired.
14          Q.   And did you ever look just to confirm that
15  no credit was given?
16          A.   I had no reason to believe that Mr. Dziobek
17  would not have told me the truth.
18          Q.   When did you remove the tools from the
19  RoboCrib to fix them?
20          MR. LEE:  May I have that -- that was -- I
21  -- I didn't hear that.  What -- I didn't hear the
22  -- Eileen, can you read the question back to me
23  if you heard it?
24          (Whereupon, the question was read back by
25  the reporter.)

---

294

1          MR. LEE:  Okay.
2          A.   I did not remove the tools from the
3  RoboCrib.  The department themselves vended all of
4  the tools out trying to find a good one.  So I didn't
5  vend them out.  The department that was using them
6  vended them out.
7          They then are the property of Smith &
8  Wesson.  So I repaired them so that they had tools to
9  do and sent the balance back to Pioneer.  Those are
10  now Smith & Wesson tools.  Those should not be placed
11  back in the vending machine because that would
12  indicate that they were the property of Pioneer.  And
13  each time they were vended then, there would be a
14  charge, us buying it a second time.
15          Q.   Which department vended out the defective
16  tools?
17          A.   I believe that was slide department, but
18  six years removed, I -- I'm not 100 percent certain.
19          Q.   Which employee vended them out?
20          A.   That wouldn't have been of my -- that would
21  not be something I knew or would know.  They were
22  vended out over many shifts or it could have been
23  multiple shifts.  That isn't something I would ever
24  be made aware of.  Mr. Dziobek had that information,
25  and he would notify me when one specific individual

---

295

1  vended a huge number of tools so that it looked
2  disproportionate to the -- what his usage should be
3  so that we could then speak with the cell coordinator
4  of that department and let him know that this
5  transpired and that -- for him to investigate.
6          So I never really dealt with the
7  individuals within another department other than my
8  own.
9          Q.   Over what period were they vended out by
10  the --
11          A.   You'd --
12          Q.   -- slide team?
13          A.   You would have to refer to that -- that
14  document.
15          Q.   What month was it?
16          A.   I -- I -- I can't tell you for sure what
17  month.  I know it would have been fairly early on.
18  It would have been someplace around the spring or
19  summer of 2013.  But I'm unsure.  I would refer you
20  to the document.  I'm sure it would have a date.
21          Q.   And how did it come about that you,
22  yourself, were fixing the tools?
23          A.   Like I said, we -- they vended them out and
24  then we collect -- my department collects those tools
25  to -- and when it was determined that the tools were

---

296

1  defective and that none of them worked, we -- we sent
2  those back to Pioneer.  And that -- that was part of
3  my job -- job function.
4          But they need some tools to continue pro --
5  production while those tools are being sent back to
6  Pioneer and being repaired by Pioneer.  So I fixed in
7  my department a number of tools so production could
8  continue while he sent the rest back.
9          Does that answer -- I'm not a hundred
10  percent sure what your question was.
11          Q.   And you said that --
12          MR. LEE:  Oh -- sorry, Connie.  Earl, if
13  you're not sure what the question was, you should
14  maybe ask Connie or something but you know -- in
15  other words -- I mean, the record is going to be
16  messy.  So go -- if you understand the question,
17  just please go ahead and answer.  If you don't
18  know the question or you're not certain of it,
19  ask for clarification or whatever.  Okay?
20          THE DEPONENT:  Thank you.
21          MR. LEE:  Yeah.
22  BY MS. BETRAM:
23          Q.   You said that defective tools were vended
24  over multiple shifts.  For how many days or weeks or
25  months were defective tools being vended out?

Baker, Earl Donald - Vol. II

September 25, 2020

14 (Pages 297 to 300)

---

297

1    A.  I have no idea.
2    Q.  How often is there a Pioneer Tool -- or how
3    often was there a Pioneer Tool representative there
4    to stock while you worked for the company?
5    A.  They would stock tools daily, but I
6    wouldn't necessarily see them.
7    Q.  You talked about Mr. Cicero.  Other than
8    Mr. Cicero, did you raise concerns about the
9    defective tools with anyone else?
10   A.  Members of my team, I'm sure, and
11   Mr. Flatley and Mr. Dziobek.
12   Q.  And when did you raise concerns with
13   Mr. Dziobek?
14   A.  I -- I would refer again to the email
15   record.  It would have been at the time that we
16   returned those tools and I inquired about whether a
17   credit memo had been issued.
18   Q.  And you said that he indicated it had not.
19   Do you recall any information -- other information
20   that Mr. Dziobek provided to you about the faulty
21   tools?
22       MR. LEE:  Objection to the form of the
23   question, but you -- you may answer.
24   A.  He wouldn't have information relative to
25   the -- to tools being defective.  He would only have

---

298

1    information relative to procurement and subsequent
2    payment for tools.  So it would be that area that I
3    -- I had talked to him.
4    Q.  Let me just be more clear.  What else did
5    Mr. Dziobek say to you about the tools in question?
6       MR. LEE:  Objection to the form of the
7    question, but you may answer if you can.
8    A.  He -- he said nothing about the tools.
9    Again, his area only affects the dollars and cents of
10   purchasing.
11   Q.  What did he tell you about the purchasing
12   of the tools?
13   A.  That no credit memo had been issued.
14   Q.  What else did he tell you?
15   A.  Nothing.
16   Q.  And other than what you've already
17   described in your testimony, what did Mr. Flatley say
18   to you about the defective tools?
19   A.  I think I've already stated it.
20   Q.  And what information did you provide to Rob
21   Cicero about the defective tools?
22   A.  Everything I told you just now.
23   Q.  And do you recall any of the documents that
24   you provided to him about this issue?
25   A.  At the time I spoke with Mr. Cicero, we

---

299

1    discussed it and then they asked me to forward to
2    them any documents that I had that spoke on the
3    issues.  So I believe the email records that I
4    forwarded to him, I forwarded emails that described
5    it.  So that would be in our -- our production record
6    and Mr. Cicero's incoming emails.
7    Q.  And did you meet and talk with Mr. Cicero
8    in person regarding the defective -- defective tools?
9    A.  We met in regard to the general overall
10   issue of vendors being -- vendor purchases being
11   possibly influenced by gifts and so forth.  And we
12   met a number of times, some with Mr. Suraci present
13   and a few without Mr. Suraci.  And then we had some
14   interaction through email.  So we didn't meet
15   specific to the one issue, but in the general
16   meeting, this was mentioned.
17   Q.  And what information did you provide to
18   Mr. Cicero about the -- the defective tool issue?
19   A.  Again, like I said, we -- in that meeting,
20   I did not take documents with me.  He requested a
21   meeting.  Said to come to him after hours so as no
22   one would see it.  We met.  And then he asked me to
23   forward things afterwards to him to document what I
24   had on those issues.
25       I then forwarded documents, which you have

---

300

1    in your record and which Mr. Cicero has in his record
2    of what documents I forwarded to him.
3    Q.  Yeah.  Again, just the narrow question:
4    What verbally -- do you recall what you said to him
5    verbally during those meetings about the defective
6    tool issue?
7    A.  Everything that I just told you.  That they
8    were vended out, they were incorrect, we sent -- we
9    fixed a number of them so we could continue
10   production, and that we sent them back to Pioneer to
11   be repaired.
12       Pioneer subsequently put them back in the
13   vending machine, which would create another charge as
14   they were vended.  So we were, in fact, vending and
15   paying for the same tool twice even though we only
16   received a good tool once.  And once we purchased it,
17   the tool belonged to Smith & Wesson.
18       So there were financial and accounting
19   improprieties.  I brought it to Mr. Flatley.  I told
20   him that I brought it to Mr. Flatley's attention, and
21   I was told to forget about it.
22   Q.  Did you provide any other information to
23   Mr. Cicero in his investigation other than what
24   you've already described in your testimony?
25   A.  About this issue or about any issue?

---

Baker, Earl Donald - Vol. II

September 25, 2020

15 (Pages 301 to 304)

301

1    Q.  About this issue.
2    A.  No.  Just what I've described.
3    Q.  You indicated that you felt that
4  Mr. Cicero's conclusion was misinformed.  After you
5  received his investigation report, did you provide
6  any additional evidence to him or provide any
7  additional information to him concerning this issue?
8    A.  I was provided his document when I was on
9  paid leave and I did not have interaction with
10  Mr. Cicero after I was placed on paid leave.  They
11  had shut down my email and my phone, and so I did not
12  interact with Mr. Cicero after the fact.
13    I know that it was my job to report things
14  that I saw that I felt were harming Smith & Wesson.
15  I did so, and I don't know what Mr. Cicero did to
16  investigate.  All I know is his conclusions are in
17  contrast to what the facts are.  They -- the
18  conclusions he makes are incorrect and many of the
19  assertions he makes are incorrect.
20    So what he did in his investigation to
21  arrive at the wrong conclusions, I can't say.  All
22  I can tell you is that he has errors and false
23  statements made in his conclusion that -- it was
24  either an error in judgment or an error in how he
25  investigated.  But he clearly dismisses many of the

302

1  things I said that he said he found no evidence of.
2  I gave him evidence.
3    So I would just say that his investigation
4  was greatly in error and that I find out, you know,
5  through the documents you provided in discovery that
6  he didn't even investigate.
7    So I think his investigation was a sham,
8  but that's after the fact.  While I worked at Smith &
9  Wesson, I wasn't -- I wasn't privy to what he
10  investigated, but I can tell you right now it wasn't
11  very much.  He -- he was aware of TVs given.  He
12  didn't investigate.  He was aware of baseball tickets
13  given.  He doesn't seem to care.  And instead he
14  argued with me and said that I had recanted, which
15  was also an -- in error.
16    All I told him was that it may not -- there
17  could have been another vendor that gave me the
18  tickets other than Pioneer.  So that is not
19  recanting.  I still got tickets sent in the mail.  It
20  just may not have been Pioneer.  It was part of
21  the pay to play that went on at Smith & Wesson.  And
22  instead in the investigation, he -- he puts a false
23  claim in there that I recanted that I had been given
24  the tickets.  It wasn't the fact at all.
25    I'm just trying to be fair.  If it wasn't

303

1  Pioneer but it was another vendor, I want them to be
2  open to that possibility when they do the
3  investigation.
4    Q.  Now, other than what you've just described
5  with respect to the TVs and the tickets, what else
6  supports your view that Mr. Cicero did not even
7  investigate your allegations?
8    A.  A conversation I had with Mr. Goode where
9  he had told me that -- that he had sent a bid to
10  Pioneer -- or to Smith & Wesson and charged less than
11  his catalog price because the volume -- he was giving
12  them a discount because he wanted to increase his
13  business.  That bid, he says, was provided to
14  Mr. Flatley.
15    He said that bid was given to Pioneer, and
16  Pioneer illegally sent that -- that bid to other MSC
17  customers and told them that MSC is giving a smaller
18  discount and going under the -- the price to Smith &
19  Wesson and they don't do that with you.  They did
20  that in order to destroy MSC business with their
21  other customers.
22    Mr. Goode tells me that he was going to sue
23  Pioneer and when the lawsuit took place or was -- was
24  to take place -- well, basically, he told me that
25  much of it.  I told that to Mr. Cicero.

304

1    After, Mr. Cicero dismissed it as having
2  not found any evidence that any vendor was being
3  given preferential treatment or that no bids were
4  given from one place to another.
5    That isn't correct based on what Mr. Hynes
6  told me.  And in this particular situation, when I
7  talked to Mr. Goode by phone, after I received the
8  report from Mr. Cicero saying that there -- he found
9  no evidence of bids being given to one company or
10  another, Mr. Goode then told me that that he
11  considered to be a lie because he had asked when
12  there was a lawsuit pending.
13    Mr. Cicero acted as a mediator between
14  Pioneer and MSC to avoid a lawsuit, which would set
15  -- which would indicate that Mr. Cicero was deceptive
16  in what he said in his investigation report.  There
17  not only was evidence that bids were taken from MSC
18  and given to Pioneer to create a competitive
19  imbalance but that Mr. Cicero was aware of it having
20  mediated the dispute.
21    Q.  And when did you speak with Mr. Goode after
22  you received the report?
23    A.  It would have been in the phone dump of my
24  phone.  I was actually at a tractor supply store and
25  I called Mr. Goode by accident.  We exchanged a few

305

pleasantries.  Asked him how he was doing and his
family.  And he asked how things were going with
Smith & Wesson, and I had told him that Mr. -- I told
him of Mr. Cicero's investigation report, and that's
when he told me that he believed that to be a lie by
Mr. Cicero in that Mr. Cicero had acted as a
mediator.

Q.  And do you have personal knowledge of what
Mr. Goode said to Mr. Cicero during the course of the
investigation of your concerns?

A.  He said he did not talk -- that Mr. Cicero
has never talked to him since he started the
investigation.  He said he was asked nothing.

Q.  Did he tell you that he had not been
contacted at all by Mr. Cicero?

A.  That's what he had told me, yes.

Q.  And with respect to the fixing of the --
fixing -- you know, fixing the defective tools in the
RoboCrib, did you consider that to be a violation of
Sarbanes-Oxley?

MR. LEE:  Objection to form of the
question, but you may answer if you can.

A.  I -- I believe it -- it constitutes deep
fraud in the company or fraud in that we're being
charged something that we should not have been.  And

306

when brought to their attention, if they turn a blind
eye to mischarges, the fact that I feel that there
were -- it wasn't a onetime thing but it was a
systematic approach, and having been aware that there
were gifts given and I believe there to be a quid pro
quo, yes, I believe that they're part of the SOX
claim.

Q.  And let me go back for a minute.  You said
that Mr. Goode had told you that he (garbled audio)
--

THE COURT REPORTER:  I'm sorry.
Ms. Bertram --

MR. LEE:  Yeah, your -- your -- like your
sound is garbled.  I -- like you come in and out.

MS. BETRAM:  Okay.  Can you hear me now?

MR. LEE:  Now is good.  Now is really good.

BY MS. BETRAM:

Q.  When did Mr. Goode tell you that he had
sent a bid to Smith & Wesson and that Smith & Wesson
-- I'm sorry -- and that Smith & Wesson had -- let me
start over.

When did Mr. Goode tell you that Smith &
Wesson had shared its bid with Pioneer and then
Pioneer then shared it with the customers of MSC?

A.  It would have been either June or July of

307

2014.  I -- but I believe Victor Matos had mentioned
it somewhat earlier, maybe a couple months earlier,
with less specificity than what Mr. Goode gave me.
But that would have been summer of 2014.

Q.  Okay.  And was it before you went on
administrative leave?

A.  Yes.  So I -- I did actually, after having
spoken with Mr. Goode, had a meeting with Mr. Cicero.
So it would have been prior to the last meeting I had
with Mr. Cicero.

Q.  So let's look at paragraph 4 of Exhibit 29.
That's on the -- the next page.

MR. LEE:  Just to be sure, the next page
being?

MS. BERTRAM:  Nine seventy.

MR. LEE:  Okay.

BY MS. BERTRAM:

Q.  You talk about in this paragraph the fact
that you received an email from Pioneer questioning
why MSC got more regrinds than Pioneer.  And then two
days later, you received a review from Larry.

Do you contend that the email from Pioneer
questioning the regrinds is some sort of fraud or any
other violation of Sarbanes-Oxley?

MR. LEE:  Objection to the form of the

308

question, but you may answer.

A.  Which document are we looking at?

Q.  Right --

MR. LEE:  Bottom right-hand corner.  Bottom
right-hand corner, there's a document number --

THE DEPONENT:  Yeah.

MR. LEE:  -- Earl.  And she said 970, I
think Connie said.

BY MS. BETRAM:

Q.  That's right.  This is the first full
paragraph on that page.

A.  Oh, okay.  So it's the fourth paragraph of
970?

MR. LEE:  No, the first paragraph of 970.

BY MS. BETRAM:

Q.  The first paragraph.

A.  Okay.  The question is?

Q.  Is it your position that Pioneer's email
questioning why MSC got more regrinds than it is
fraud or some other violation of Sarbanes-Oxley?

A.  No.

MR. LEE:  Objection to --

THE DEPONENT:  I'm sorry.

MR. LEE:  Objection to the form of the
question, but you may answer.

Baker, Earl Donald - Vol. II                          September 25, 2020

17 (Pages 309 to 312)

---

309

BY MS. BETRAM:
 Q.  And do you have any personal knowledge that
Pioneer told Larry Flatley about the regrind issue,
that they had concerns about the regrinds?
 A.  I would have to see the email.  But I
did -- I did inform him of the email, so there was
discussion.
 Q.  When did you inform Larry Flatley of the
email from Pioneer?
 A.  I think it would have been that day.  I --
I'm not sure if it was that day or whether this
transpired at the end of the day and I talked to him
the next day, but I know that there was conversation
on it.
 Q.  And do you know when Mr. Flatley drafted
his review?
 A.  The first draft?
 MR. LEE:  Objection to -- objection to the
form of the question, calls for speculation, but
you may answer if you can.
 A.  The -- we received a -- a bad review out of
cycle that had multiple dates.  The first one that I
received was dated the same day as the email even
though he presented it to me the next day.
 Now, there had been subsequent drafts after

---

310

this where he has either revised it, typed it,
whatever, but it has later days on it.  But the very
first one that I received had the same date that it
was drafted, the same date of the email.
 Q.  But you don't know when he started drafting
it, correct?
 A.  No.
 Q.  And you don't know when he completed it,
correct?
 A.  I -- I know when it was dated.
 Q.  Let's look at the next paragraph which
relates to Benchmark.
 THE COURT REPORTER:  Relates to what?
 MS. BETRAM:  Relates to Benchmark,
B-e-n-c-h-m-a-r-k.
BY MS. BETRAM:
 Q.  I'll give you a chance to look over that.
 A.  Third paragraph?
 Q.  Yes.  Right after the one we were just
talking about.
 A.  Okay.
 Q.  And do you contend that this paragraph
relating to Benchmark describes any fraud or
violation of Sarbanes-Oxley?
 A.  I believe that this shows an anomaly that

---

311

may be connected with the other things that I
reported.  Again, it's not my -- my view that it's my
job to investigate, but it was certainly an oddity
that I'm doing business with a company and Larry
questions every time I send an order to Benchmark.
 Then Larry suggests I send something to
Benchmark, and when I do, it's now being represented
by Pioneer Tool.  I've never in my entire history of
working, which I currently worked -- had worked
43 years in a machine shop.  I've never seen a vendor
who was doing business with you then reverts to being
represented by somebody else and then -- then takes a
lesser amount from you.
 So it represents an anomaly that may, in
fact, be connected with some of the influence
peddling that I believe was going on at Smith &
Wesson.
 Q.  Okay.  So let's back up a little bit.
Benchmark is a manufacturer, correct?
 A.  Yes.
 Q.  And -- and at some point, were they selling
tools -- selling their own tools to others as a
distributor as well?
 A.  I -- I don't know what they did to others;
they didn't tell me that.  All I know is they were

---

312

dealing directly with me.  They were selling tools
and grinding tools for us, yes.
 Q.  And for how long were they dealing directly
with you?
 A.  I can't say.  I'm sure your -- your
purchasing records would -- would have that
information.
 Q.  Was it a period of months or weeks?
 A.  I can't say.  We're -- we're talking six
years ago.  All I know is that we had dealt with them
for a time.
 Q.  Um-hmm.  Did they have a salesperson that
came to your facility?
 A.  No.  They actually invited us to their
facility where I met them and viewed their facility.
So Ryan Mooring was the primary contact at Benchmark.
 Q.  Okay.  And in your description, you say, A
week later, Turpin Sales visits with Benchmark.  Who
is Turpin Sales?
 A.  I have no clue.  He's -- he's somebody that
showed up.  Mr. Turpin showed up with Ryan Mooring
apparently.  I wasn't -- I didn't even recall that
Ryan had visited, but if you say so ...
 Q.  And who is Ryan again?
 A.  Ryan Mooring is -- was at the time a person

---

Baker, Earl Donald - Vol. II

September 25, 2020

18 (Pages 313 to 316)

313

1 that did design work and so forth.  He actually
2 designed some of the tools at Benchmark.  So I met
3 him when I -- I visited there.  If, in fact, he
4 visited us as well, so be it.
5      Q.  Okay.  And when did Turpin Sales visit with
6 Ryan Mooring and inform you that Pioneer was a
7 representative for Benchmark?
8      A.  He didn't represent that when he visited.
9 We got a -- I got a call from -- from Mr. Dziobek,
10 and subsequently Mr. Mooring saying that now they
11 were represented by Pioneer.
12      Q.  And when was that?
13      A.  I don't know.  You'd have to -- I'd refer
14 you to the email record.  I -- there are emails in
15 the discovery that would nail that date down for you.
16      Q.  Was it in 2013 or 2014?
17      A.  To be honest, I -- I really don't even know
18 for sure of the dates.
19      Q.  Okay.  And -- and you -- you find this odd.
20 Did you do anything to investigate what you
21 considered to be an odd situation?
22      A.  Yes.  I -- I -- I called Ryan Mooring, and
23 he indicated that there were some things behind the
24 scenes he couldn't tell me, but, yes, in fact, we
25 were -- he was going to be now under the auspices of

314

1 Pioneer and that from that point forward, I would
2 make my requests for Benchmark's services through
3 Pioneer, but that he wasn't at liberty to share
4 everything that was going on.  But he just confirmed
5 that, yes, from his standpoint that was factual that
6 I should contact them.
7      Q.  And did you do anything else to investigate
8 the situation?
9      A.  I -- I asked around to find out.  I think I
10 talked to Jim Valley about it and asked whether or
11 not -- from time to time, engineers would deal
12 directly with their tooling vendors even though it
13 came through the -- the regrinds and so forth would
14 come through the auspices of my department, but many
15 times engineers would speak with the suppliers on
16 their own.
17          So Jim Valley was one who was very
18 proactive in his -- his tooling purchases.  So I felt
19 that if any engineer would have talked to them, he
20 would have.  I think Jeremy Cherpose (phonetic) was
21 another one that had tools coming from Benchmark.
22 And I think Mr. Carrere (phonetic), another engineer,
23 was dealing with -- or Benchmark through their
24 project that was called Cold Turkey.  So those
25 engineers would have interaction, and so I did talk

315

1 to them.
2      Q.  And you said Jim Valley and Jerry Cherpose,
3 and who was the third person that you identified?
4      A.  Mike Carrere.
5      Q.  And did Mr. Valley, Mr. Cherpose or
6 Mr. Carrere provide any information as to why Pioneer
7 Tools was representing Benchmark as of --
8      A.  They -- they thought it was odd and that
9 they hadn't seen anything like it, but they knew the
10 same as I did but voiced similar concerns for -- they
11 didn't understand the -- the switch over.
12      Q.  And did you raise concerns about the
13 situation with Benchmark with Mr. Cicero or
14 Mr. Suraci or anyone else at Smith & Wesson?
15      A.  With both of them, yes.
16      Q.  And what did you tell them about the
17 situation?
18      A.  Just what I've told you.
19      Q.  And did you provide any documentation to
20 them supporting your concerns?
21      A.  I don't recall whether I forwarded
22 documents but enough just to reinforce the
23 truthfulness of what I just told you, that there was
24 an email record for everything I said.  So I might
25 have provided that, but I can't tell you for certain

316

1 I did.
2      Q.  And -- and do you know what Mr. Cicero or
3 Mr. Suraci did in their investigation of this
4 concern?
5      A.  As I said many times before, it was not my
6 function or did I view it as my function to know what
7 they were doing in their investigation.  They did not
8 share it with me.
9      Q.  And -- and do you know what information any
10 of the witnesses may have provided to them about this
11 situation -- about this concern, I should say?
12      A.  I believe I just answered that.
13      Q.  If you'd look at paragraph 6 -- hold on one
14 second.
15          MR. LEE:  Are we still on that page 970,
16 Connie?
17          MS. BERTRAM:  We are.
18 BY MS. BERTRAM:
19      Q.  It's the last paragraph.  I'll give you a
20 chance to read through that last paragraph that
21 starts, I met with Eric -- Derek Upson.
22      A.  Yes.
23      Q.  Now, you end this paragraph saying, That
24 ended the meeting.  I have not brought up the subject
25 to Larry since I can't figure out the significance of

Baker, Earl Donald - Vol. II                           September 25, 2020

19 (Pages 317 to 320)

---

317

1    the outburst.
2        And this -- this relates to a $50,000
3    invoice.  Did -- did you consider this situation you
4    describe in this paragraph to be fraud or some other
5    violation of Sarbanes-Oxley?
6    A.  No.  It was a normal function of -- of how
7    they worked, how the company worked.
8    Q.  And did you say no?  I'm sorry.  I just
9    didn't hear the first word.
10   A.  No, it was not unusual or anything
11   fraudulent in what was described in that dead and
12   dying tool issue.
13   Q.  And let's go to the next page, which has
14   the last -- last paragraph.  And this relates to
15   EASTEC.  And I'll give you a chance to read through
16   that.  Let me know when you're done.
17   A.  Okay.
18   Q.  Do you consider the concern described in
19   this paragraph on page 0971 to be fraud or any
20   violation of Sarbanes-Oxley?
21       MR. LEE:  Objection to the --
22   A.  Yes.
23       MR. LEE:  -- form of the -- objection.
24   Objection to the form of the question, but you
25   may answer.

---

318

1        THE DEPONENT:  Sorry.
2        MR. LEE:  Okay.
3        THE DEPONENT:  Yes.
4    BY MS. BERTRAM:
5    Q.  I've seen various summaries of this
6    document.  But are -- are you aware of any other
7    documents that support your concern about the EASTEC
8    barbecue and raffle?
9        MR. LEE:  Objection to the form of the
10   question, but you may answer.
11   A.  Can you please restate the question?
12   Q.  Let me just ask a better question.
13       Did you do anything to investigate your
14   concerns about the EASTEC raffle?
15   A.  I don't believe my function was to
16   investigate.  My -- my function was to report things
17   that I felt were improper.  I did report this and --
18   to multiple people starting right after it occurred.
19   And so I -- I did no more investigation.
20   Q.  And you initially raised concerns with
21   Ms. Glica and Ms. Salvador; is that right?
22   A.  Yes.
23   Q.  And did they subsequently tell you that
24   they thought that you were just, quote, venting?
25   A.  No.

---

319

1        MR. LEE:  Objection to the form.
2    BY MS. BERTRAM:
3    Q.  What was your response?  I'm sorry.
4    A.  No.
5    Q.  Did they tell you that they -- let's just
6    back up a little bit.  What did you tell them -- tell
7    them about the incident?
8    A.  What is listed there is pretty much a
9    summary of what I had mentioned.  Those are the facts
10   as they -- as they occurred.  The only thing I would
11   add to it was that I told them that in and of itself
12   none of that is a violation from the standpoint that
13   -- a vendor is allowed to offer gifts.  And I didn't
14   actually witness anyone receive gifts.
15       What -- the reason I was bringing that to
16   their attention was Mr. Flatley's comment that if I
17   attended and was the highest ranking Smith & Wesson
18   employee there, I would win something.  And when -- I
19   found it odd that Mr. -- or the representative for
20   Pioneer had gone through and noticed that my name
21   wasn't even entered.  I wasn't allowed to receive
22   anything, so I didn't enter.  He would not have known
23   that unless he was looking through the box in order
24   to find my name.
25       So it was odd that he knew the next day I

---

320

1    hadn't entered and he entered for me.  I felt to
2    facilitate exactly what Mr. -- Mr. Flatley said.  And
3    the fact the next day -- or, you know, I don't know
4    if it was the next day -- the subsequent working day,
5    the person came to deliver a gift to Mr. Flatley.
6    Knowing the prior, the action during, and what was
7    said to me prior by Mr. Flatley, the actions of
8    Pioneer throughout the next day of putting my name in
9    and the subsequent delivery of a gift to Mr. Flatley,
10   to me, indicated a quid pro quo that I felt that it
11   gave more credence to Mr. Flatley's assertion that I
12   would win something.  It showed that there was
13   something underhanded going on there that was below
14   the scenes.  And -- and I thought they should be
15   aware of it.
16       They then didn't tell me they thought I was
17   venting.  They told me they thought it was serious
18   and that she said that she wasn't surprised --
19   knowing -- having known Mr. Flatley for a while, she
20   wasn't surprised.  I don't know the context of that
21   -- that comment, but that's what she said.  And she
22   asked me to not share the Pioneer issue with anyone
23   else because we don't know who might be involved and
24   that she was going to look into it.  And that -- that
25   was what she said at the end.

---

Baker, Earl Donald - Vol. II

September 25, 2020

20 (Pages 321 to 324)

---

321

1    Q.  And who said, Don't share this because we
2  don't know who might be involved?
3    A.  Ms. Salvador.
4    Q.  And do you know what she or Ms. Glica did
5  to look into the situation at that point?
6    A.  As -- as I've stated before, I -- I -- I
7  did not concern myself with what they were doing on
8  their end to do their job.  I did my job by reporting
9  it.  What they did, I didn't look at.
10      And I -- you must understand that I -- I'm
11 not trying to be a pain when I keep saying this.  It
12 was the overall view of interactions between them
13 that they didn't even imply that there was any
14 obligation on their behalf to report their
15 conclusions or anything back to me.  They just felt
16 like they were going to investigate.
17      Because I think we had an overall view that
18 the party being harmed was Smith & Wesson, not
19 necessarily me.  So their responsibility was to do
20 the right thing for Smith & Wesson based on the
21 information I provided.  So that was the object of
22 everyone's concern was Smith & Wesson, not me.
23   Q.  And do you know what Kathy Salvador said to
24 Mr. Cicero, Mr. Suraci, or any -- anyone else
25 involved with the investigation about what you told

---

322

1  them at the time about the raffle?
2    A.  I do not know what she did say.  I do know
3  of admissions that some of the things Mr. Suraci
4  indicated he heard from me for the first time, so he
5  said he would double back and find out why Kathy had
6  not mentioned a certain portion to him and see if she
7  had documented it.
8    Q.  And you don't know what Mr. Glica, if
9  anything, said to Mr. Suraci or others doing the
10 subsequent investigation?
11   A.  You mean Ms. Glica?
12   Q.  Yes.
13   A.  No, I had no -- like I said, they didn't
14 report what they did investigation -- they --
15 investigation-wise.  But I wasn't aware of any --
16 when I recounted to Mr. Suraci the things I told
17 Ms. Glica, he made no indication that anything had
18 been omitted with that interaction, however, he did
19 with Ms. Salvador.
20   Q.  And do you know what Ms. Salvador said to
21 Mr. Suraci after he circled back to her to ask for
22 clarification?
23   A.  No.  He -- Mr. Suraci did not report to me
24 what he was finding out.
25   Q.  And when did you first raise this concern

---

323

1  with Mr. Suraci?
2    A.  He was brought on shortly after the
3  February out-of-cycle review.  Initially,
4  Ms. Salvador was to attend the meeting with
5  Mr. Fontaine, and she called and told me by phone
6  that she was asked not to attend and that someone
7  else would be there.  She did say she was surprised
8  by it, and I -- I may have told her at that time that
9  I had some concerns that I was going to be there
10 without HR representation in an issue where I felt
11 like I was being lied about and which was an HR
12 concern.
13      MS. BETRAM:  I'll move to strike as
14 nonresponsive.
15      Eileen, could you read the question that I
16 asked Mr. Baker?
17      (Whereupon, the question was read back by
18 the reporter.)
19      MS. BETRAM:  I'll move to strike as
20 nonresponsive.
21 BY MS. BETRAM:
22   Q.  And, Mr. Baker, we went through your
23 communications with Ms. Salvador and Ms. Glica during
24 the first day of your deposition.  I'm asking you
25 when, a date or a date range, you first raised this

---

324

1  issue with Mr. Suraci.
2      We are -- this deposition is going to go on
3  forever if we don't start listening to the questions
4  and confining our responses to the question that's
5  been asked.
6      MR. LEE:  Objection to the form --
7    A.  I --
8      MR. LEE:  Objection to the form of the
9  question, but you may answer.
10   A.  I mentioned the scenario about Mr. Suraci
11 in order to say Mr. Suraci's involvement started with
12 that meeting with Mr. Fontaine.  In some time
13 subsequent to that, I told him.  I cannot tell you
14 the first time I mentioned it because my interactions
15 with Mr. Suraci happened on a daily basis after that
16 meeting.  So it would be sometime after the meeting
17 with Mr. Fontaine.
18   Q.  And did you also raise this concern with
19 Mr. Cicero when you spoke with him?
20   A.  Which concern?
21   Q.  The concern about the raffle?
22   A.  Yes.
23   Q.  And when did you first raise that concern
24 with him?
25   A.  The first -- the first time I met him.

---

325

```
1        Q.  Okay.  We talked about that.
2            Did you provide any documents to Mr. Cicero
3    or Mr. Suraci that supported your concerns about the
4    raffle?
5        A.  I gave them what documents I had, but that
6    was more a personal interaction.  I don't know that
7    there were documents.
8        Q.  Do you recall any of the documents that you
9    provided to them on the raffle issue?
10       A.  No, but they would be in the record,
11   whatever I did provide.
12       Q.  And did you identify Buddy Upson when you
13   spoke with Mr. Suraci and Mr. Cicero about the raffle
14   situation?
15       A.  You have mixed two names together.  I don't
16   know a Buddy Upson.
17       Q.  You said in your -- in the paragraph, you
18   said that someone named Buddy spoke with you.  What
19   -- what's Buddy's last name?
20       A.  I don't know.  He's the shop manager, but
21   his last name is not Upson.
22       Q.  Okay.  And -- did you identify Buddy
23   when you spoke with Mr. Cicero or Mr. Suraci?
24       A.  I -- I cannot recall whether I mentioned
25   his name.
```

326

```
1        Q.  And Stanley Wnuk was also present when you
2    had this conversation with Mr. Fontaine about the
3    raffle, right?
4            MR. LEE:  Object to the form of the
5        question.  Misstates the witness's prior
6        testimony, but you may answer.
7        A.  You -- you have mixed up the names.  The --
8    they -- there was never a meeting with Mr. Wnuk and
9    Mr. Fontaine and I.
10       Q.  I probably just misstated Mr. Flatley's
11   name.  When you were at the event the first night and
12   Larry allegedly made these statements to you about
13   the raffle, was Stanley Wnuk there?
14       A.  Yes.
15       Q.  Okay.  And did you identify his name as a
16   potential witness to Mr. Suraci or Mr. Cicero?
17       A.  Yes.
18       Q.  And do you know whether they spoke with
19   him?
20       A.  I -- I do not know what -- whether they --
21   who they investigated.
22       Q.  Okay.  So you don't know if they spoke with
23   Buddy or Mr. Flatley about this either, right?
24       A.  I do not.
25       Q.  And you don't know what they did to
```

327

```
1    investigate your concerns about the raffle, correct?
2        A.  I've answered it numerous times that they
3    did not share who they investigated or what -- who
4    they talked to to me.
5        Q.  So Mr. Cicero reported to you that
6    Mr. Flatley did not receive the iPad that you had
7    seen in the hands of the Pioneer Tool employee,
8    right?
9        A.  He mentions that in the report.
10       Q.  Right.  And your basis for believing that
11   the iPad was for Mr. Flatley was based on the fact
12   that you saw the salesperson holding an iPad in his
13   hand?
14       A.  He held it out as if he were giving it to
15   me and expecting me to give it to Mr. Flatley.  And
16   he did not mention that Mr. Flatley had won an iPad.
17   He is holding out an iPad and said, Mr. Flatley has
18   won something, and -- and tried to hand it to me.  I
19   did not take it.  It's not my job to go deliver it.
20       But, as I told Mr. Cicero, I have no
21   knowledge that Larry didn't do the right thing and
22   accept it.  I said I have no -- no vision of what
23   happened after  he left my office.  Mr. Flatley may
24   have done the right thing.  All I'm saying is that
25   his comment prior to the raffle that if you were the
```

328

```
1    highest ranking, you would win, and Mr. -- and
2    Buddy's entering -- finding  -- going through and
3    trying to look for my name and didn't find it and
4    adding my name and this subsequent delivery of an
5    iPad showed quid pro quo.
6        I didn't see anything improper in the
7    actual raffle.  They're allowed to give away prizes.
8    We're not allowed to receive them.  And I -- I
9    witnessed no one receiving a prize.  Why I mentioned
10   it to them and why it's important, it demonstrates
11   quid pro quo in my mind.
12       Q.  The -- the -- the iPad that the sales
13   representative was holding out that you observed, was
14   it in a box or was it just the iPad itself?
15       A.  No, it was in a box.  In my recollection, I
16   believe it was in a box.
17       Q.  And if the sales representative represented
18   to Rob Cicero or Ed Suraci that the iPad was his own,
19   do you have any -- any reason to dispute that?
20           MR. LEE:  Objection to the form of the
21       question, calls for speculation, but if you can
22       answer, you can answer.
23       A.  I -- I can't even speculate.  I -- I don't
24   know if such conversation even -- even took place and
25   what was represented.  So it's a hypothetical that I
```

Baker, Earl Donald - Vol. II

September 25, 2020

22 (Pages 329 to 332)

329

1   -- I have no clue what someone may or may not have
2   represented or whether it may or may not have been
3   correct. Again, I wasn't --
4       Q. You don't know --
5       A. -- brought into their -- I wasn't brought
6   into their investigation. I just saw the result of
7   their investigation, which I felt to be highly
8   flawed.
9       Q. And you don't know what the sales
10  representative said to Mr. Cicero or Mr. Suraci about
11  the iPad, right?
12      A. I -- I just stated as such. I just
13  answered that.
14      Q. And you don't know what Mr. Flatley said to
15  Mr. Cicero or to Mr. Suraci during their
16  investigation about the iPad?
17      A. You can ask me every person at the shop and
18  the answer is going to be the same. They did not
19  tell me about what their investigation -- what they
20  did during their investigation. So you can ask me
21  every name of the people at Smith & Wesson am I aware
22  of what he said to Mr. Cicero, and the answer is
23  going to be the same. They did not share the
24  information of who they investigated, who they spoke
25  to. All I know is the conclusion they came to is

330

1   incorrect.
2       Q. And what is your basis for contending that
3   the conclusion with respect to the iPad was
4   incorrect?
5       A. I said that the investigation report was
6   incorrect. They had misrepresented some things in
7   there relative to the iPad. I didn't -- they said,
8   Oh, Mr. Flatley didn't receive the -- well -- and
9   that somehow inferred that their conclusion was
10  nothing wrong occurred. If they looked at -- just as
11  you prompted me on not listening to the question,
12  they didn't listen to what -- what I had testified.
13      I told them that I never saw Mr. Flatley
14  receive anything improper. So I didn't witness
15  anything improper. What I witnessed was a series of
16  events that pointed to quid pro quo where a vendor is
17  fixing a raffle to give -- give something to the
18  higher ranking Smith & Wesson people. And they, in
19  turn, said the answer to the -- to my -- what I had
20  told them was that Flatley claims he never received
21  it.
22      Well, that isn't even the question at hand.
23  The question at hand was were they giving improper
24  gifts to people at Smith & Wesson and did they
25  receive them. And if his very -- in -- in subsequent

331

1   documents, you find that, yes, items were received by
2   Smith & Wesson employees contrary to company policy
3   and contrary to the law. So his -- his conclusions
4   are incorrect because he answers a different question
5   than what was posed.
6       Q. You said -- when we first started talking
7   about this paragraph, you indicated that you felt
8   that this was a -- that the situation you described
9   involving the raffle was a violation of
10  Sarbanes-Oxley. Why do you consider that to be a
11  violation of Sarbanes-Oxley?
12          MR. LEE: Objection to the form of the
13      question, but you can answer if you can.
14      A. I don't believe you're correct in that --
15  that I said this was evidence of a violation of SOX.
16  I said if it demonstrates quid pro quo, quid pro quo
17  does. But in and of themselves, the fact that took
18  place, I didn't view anyone giving or receiving
19  anything improper. What I said was that I felt like
20  the -- if there was a quid pro quo demonstrated in
21  those series of events, that can be evidence of
22  improper influence taking place by a vendor to the
23  people that direct the purchases at Smith & Wesson.
24      Q. Let me have you go to Exhibit 28. That's
25  -- this is in that same binder that you were just

332

1   looking at. I'll give you a chance to look at the
2   exhibit.
3       A. I see it.
4       Q. Exhibit 28 is a March 7, 2014 email from
5   you to Mr. Suraci, correct?
6       A. I'm sorry. I was on the wrong page. Okay.
7   Yes.
8       Q. And the first line says, Ed, I was given a
9   gift card from a representative of one of our
10  vendors.
11      Who provided the gift card to you?
12      A. Carl Hynes.
13      Q. And how did he provide it to you?
14      A. He handed it to me in a card.
15      Q. What kind of card?
16      A. A holiday card.
17      Q. And when did he provide that card to you?
18      A. I would assume prior to the holidays.
19      Q. And by "the holidays," you're talking about
20  the Christmas holidays?
21      A. Yes.
22      Q. And why were you providing the card to
23  Mr. Suraci at this point?
24      A. Because I wasn't sure what to do with it.
25  It was deemed inappropriate based on the LRN

Baker, Earl Donald - Vol. II                           September 25, 2020

23 (Pages 333 to 336)

333

1  training.  LRN is a training that we were required to
2  take that listed the -- that anything above a nominal
3  value was in violation of gifts.  That then would be
4  considered a bribe, that amount, after I had to refer
5  to it.  So if it was under the amount of nominal, it
6  wouldn't be improper.  But if it was above the
7  amount, it would be deemed improper.
8         So based on the LRN training, which I had
9  to go back and look at, it was $99.  This gift card
10  was for $100.  So was it actually considered nominal
11  or was it -- was it considered above nominal?  So in
12  my estimation, I determined that it was above the
13  amount.
14         There was also the issue that -- my primary
15  job at Smith & Wesson was running my department.  I
16  put that in my briefcase, and I can honestly say I
17  didn't really look at it for a while.  I went to
18  investigate to see if it was nominal or not.  Once I
19  determined that it was above the nominal amount --
20  there's got to be a cutoff someplace.  They
21  determined it would be $99, so in my mind, it was
22  above.  So I provided it to him.
23         This letter was written after the fact as
24  well.  I gave the card to Mr. Suraci.  And then
25  subsequently, he asked me to write an email that

334

1  would give him some documentation to turn the thing
2  in.  So the email wasn't written at the same time I
3  gave him that -- that envelope.  He asked me after
4  the fact that he needed an email that would represent
5  to whoever he was going to give this thing to a trail
6  so that they -- he could represent to whoever he was
7  giving it to that this is how we -- he -- he ended up
8  with it.
9         So I hope that answers your question.
10     Q.  When did you originally provide the gift
11  card to Mr. Suraci?
12     A.  Sometime between the holiday and when this
13  was written.  I can't even tell you the number of
14  days afterwards he said could you -- could you
15  provide me the email so I'll -- I'll have something.
16  So I went back to my office and sent him this email.
17     Q.  And did you -- and do you know what
18  Mr. Suraci did with the gift card?
19     A.  No, I do not.
20     Q.  And did you talk with Mr. -- Mr. Cicero
21  also about the gift card?
22     A.  I may have.  The gift card was part of the
23  impetus behind -- Mr. Suraci felt that we needed to
24  escalate my submissions to the point where legal
25  would be involved.  It wasn't my determination to

335

1  bring Mr. Cicero in.  It was Mr. Suraci after he
2  mentioned the statement where there's smoke, there's
3  fire.  And he believed in his mind that -- or
4  represented to me and in his mind, this represented
5  something that made it more serious that he felt
6  legal should be involved.  And because it was going
7  to be a confidential submission, he even asked my
8  permission if he could involve Mr. Cicero, and I told
9  him yes.
10     Q.  And earlier in your testimony, you said
11  that the gift card had been deemed inappropriate
12  under the LRN.  Who deemed it inappropriate?
13     A.  Based on what I saw in the LRN, it
14  mentioned -- I wasn't sure if the -- it mentioned the
15  exact amount.  If my recollection was correct, and it
16  was, that it mentioned an amount of $99.  Anything
17  above that was not -- was considered not nominal in
18  their terms.  So based on what I read, it was my
19  determination that the LRN had considered that above
20  the limit for a nominal value.
21     Q.  And did you speak with Mr. Cicero about the
22  gift card?
23     A.  As I mentioned, I -- since that was the
24  impetus for me to talk to Mr. Cicero, I believe I may
25  have.

336

1     Q.  And do you know what Mr. Cicero or
2  Mr. Suraci did to investigate the situation with the
3  gift card?
4     A.  No, I do not.
5     Q.  And do you consider the gift card to be a
6  violation of Sarbanes-Oxley?
7     A.  Had I accepted it and used it, I believe it
8  would have.
9     Q.  Why do you believe that?
10     A.  Because if I'm accepting gifts that are
11  above nominal value and I am someone who directs
12  purchases at Smith & Wesson, it may inadvertently
13  influence me towards that vendor.  That's why the
14  company had put that into their -- their company
15  policy.
16     Q.  Um-hmm.  Now, you also raised a concern
17  about the receipt of Red Sox -- your receipt of Red
18  Sox tickets, right?
19     A.  Yes.
20     Q.  Did you determine that they were not
21  provided to you by Pioneer?
22     A.  I didn't determine who they were provided
23  by.
24     Q.  When did you first receive the tickets?
25     A.  I can't tell you the date.

Baker, Earl Donald - Vol. II                September 25, 2020

24 (Pages 337 to 340)

---

337

1    Q.  What year was it?
2    A.  I don't -- I really don't know the date.
3  So it'd either be late '13 or early '14.  I really
4  don't know.
5    Q.  This was not related to the raffle, right?
6    A.  No.
7    Q.  Okay.  How did you receive them?
8    A.  In an envelope addressed to my -- my house
9  or my apartment.  And no return address, just a blank
10  envelope with tickets in --
11       THE COURT REPORTER:  Say that again.  Just
12    a blank envelope?
13       THE DEPONENT:  Just a blank envelope sent
14    to my apartment.
15  BY MS. BERTRAM:
16    Q.  And did you do anything to determine who
17  had sent them to you?
18    A.  No.  I told my boss.
19    Q.  You told Larry Flatley?
20    A.  I'm not sure who I -- I told specifically.
21  I know I -- I couldn't receive them.  I tried to even
22  give them to -- to members of the upper management.
23  And -- so I -- I -- I mentioned it to a number of
24  people.  I even believe I -- I mentioned it to
25  Mr. Debney.

---

338

1       THE COURT REPORTER:  Mr. Who?
2       THE DEPONENT:  Mr. Debney was the CEO.
3  BY MS. BERTRAM:
4    Q.  When and how did you tell him about it?
5    A.  I walked to his office, said I have tickets
6  to the -- to the game.  It was provided by a vendor.
7  I could not go.  Would he be interested in them?  And
8  in that fashion, I offered the tickets figuring I
9  felt like it wasn't my -- wasn't something I could
10  do, but if someone else received them and they were
11  from a vendor, but yet they had no -- no knowledge of
12  that vendor, they wouldn't be influenced by that
13  vendor.
14       So I tried to give it to Mr. Debney, all
15  the members that were in the upper office, they could
16  not go, but then a member of our safety team could go
17  and did take the tickets.
18    Q.  Who was that?
19    A.  I don't recall his name exactly.  I only
20  had brief interactions with him, but I had to go
21  pretty far down the chain before I found somebody
22  that was available.
23    Q.  And how do you know that the tickets were
24  provided to you by a vendor?
25    A.  You're -- good point.  I -- I don't know

---

339

1  for a fact.  You get baseball tickets in the mail and
2  based on other circumstances taking place within the
3  company, that was my assumption.
4       THE COURT REPORTER:  Okay.  Hold on for a
5    second.
6  BY MS. BERTRAM:
7    Q.  And --
8       THE COURT REPORTER:  Mr. Baker, can you
9    just speak up a little?  I'm having a hard
10    time --
11       THE DEPONENT:  Sure.
12       THE COURT REPORTER:  Thanks.
13  BY MS. BETRAM:
14    Q.  And -- and did you talk with Mr. Suraci
15  about the Redskins tickets?
16    A.  Red Sox?
17    Q.  Red Sox.  Sorry.
18    A.  Okay.  Yes, I -- I mentioned it to
19  Mr. Cicero and Mr. Suraci.
20    Q.  Did you consider the tickets to be a
21  violation of Sarbanes-Oxley?
22    A.  They could be.
23    Q.  And how would that -- how would they be a
24  violation of Sarbanes-Oxley?
25    A.  If I accepted them and I was directing

---

340

1  purchases at Smith & Wesson, it could be used as a
2  leverage to gain favoritism by some vendor at some
3  point.
4    Q.  And -- and do you know what the face value
5  of the tickets were?
6    A.  I don't know what the face value was.
7    Q.  Do you know if it was over $100?
8    A.  My assumption would be yes.  And this was
9  during their first World Series run.  So I would
10  imagine the street value of them at that time would
11  probably be in the thousands.
12    Q.  Right.  But you don't know how much the
13  individual or company that purchased them paid for
14  them, correct?
15    A.  No, but I -- I -- I believe it was above
16  the $100 apiece, which would violate the $99 nominal
17  value that I was taught.
18    Q.  And you said that you mentioned the tickets
19  to Mr. Cicero and Mr. Suraci.  I take it from your
20  prior testimony that you do not know what they did to
21  investigate?
22    A.  No.
23       MS. BETRAM:  Do we want to go ahead and
24    take a break for lunch now?  It's -- it's 12 --
25    12:12.

---

**341**

1    MR. LEE:  Sure.  How much time would you
2  like, Earl?
3    THE DEPONENT:  Jan, we're going to take a
4  lunch.  What -- how much time do you want?
5    Whatever you think, John, is fine.  I'm at
6  home, so it's easier for me to get food.
7    MR. LEE:  Okay.  Why don't we just get back
8  together in about half an hour.
9    MS. BERTRAM:  Sounds good.  So that would
10  be about 12:45.
11    MR. LEE:  Sure.
12    MS. BETRAM:  Okay.  See you then.
13    THE VIDEOGRAPHER:  Going off the record at
14  12:12 P.M.
15    (A lunch break was had.)
16    THE VIDEOGRAPHER:  Back on the record at
17  12:50 P.M.
18  BY MS. BETRAM:
19    Q.  Mr. Baker, if you could turn to Exhibit 32.
20  And I'll give you a chance to read through it.
21    (Sotto voce discussion.)
22    A.  Okay.
23    Q.  Exhibit 32 is a March 18, 2014 email from
24  you to Mr. Suraci, right?
25    A.  Yes.

**342**

1    Q.  And you were forwarding an email that you
2  sent to Mr. Flatley earlier that day, right?
3    A.  Yes.
4    Q.  And did you provide this to Mr. Suraci to
5  show your performance in terms of cost savings or
6  because of any concern of fraud?
7    A.  I felt more as if it was something that
8  needed to be looked into.  Are we paying too much for
9  all of these things?  I just felt that this was an
10  exorbitant thing, and since we were talking about
11  overpayment to vendors, I felt this might be
12  something that needed to be looked into.
13    Q.  Okay.  And you were talking about the
14  Mosher grinding wheels; is that right?
15    A.  Yes.
16    Q.  And was Mosher the one that was potentially
17  charging too much for the grinding wheels?
18    A.  Yes.
19    Q.  And so Pioneer Tool was not involved in
20  this situation, right?
21    A.  No.
22    Q.  It looks like you were looking at other
23  wheels that could be tested to net a savings.  Did
24  you ever identify those wheels?
25    A.  Yes.  We -- we got some competitive bids

**343**

1  that were quite a bit less and we -- we felt maybe
2  that had been pay -- paying too much.  And I can say
3  that there were a lot of incidences where we were
4  constantly looking for a way to save and there were a
5  number of vendors that were, let's say, paying more
6  than what I would pay if it was mine, but I don't
7  know that all of them rose to the level of being
8  exorbitant enough to be -- have someone else look
9  into it.
10    Q.  And did you feel that Mosher was engaging
11  in fraud on Smith & Wesson?
12    A.  I thought it might be just based on the
13  numbers I list in that email.
14    Q.  And did you make a determination beyond the
15  email that you forwarded to Mr. Suraci?
16    A.  I did actually bring it up with the vendor,
17  and he seemed to believe that it wasn't an apples to
18  apples comparison.  And so he seemed to justify, you
19  know, why they were charging more.  I -- I don't know
20  if it's a hundred percent that way, but I -- I felt
21  it -- it made enough of an explanation that it fell
22  into that gray area.  It possibly might be an
23  overcharge but maybe went from that area of
24  overcharge to possibly just -- you know, from fraud
25  to overcharge.

**344**

1    Q.  Right.  And what in your mind
2  differentiated between a situation where it was fraud
3  as opposed to overcharging?
4    A.  I can't say that I quantified.  I -- I know
5  if you're overcharged a little bit, it's a subjective
6  view that, Gosh, this is -- their prices at this
7  store are high, whereas in contrast, if it were
8  double or triple what you're paying someplace else,
9  you know, you might feel, Gee, that's robbery.  You
10  know, somebody's -- you know, it's like fraudulent
11  what they're charging.
12    And I guess it's that subjective line
13  between just paying too much -- 90 percent of what
14  they paid was -- was maybe towards the upper range in
15  the prices.
16    Q.  Did you find that kind of across the board
17  at Smith & Wesson?
18    A.  I -- I do believe --
19    MR. LEE:  Objection -- objection to the
20  form of the question as to across the board at
21  Smith & Wesson.  Earl was a -- in the cutter
22  department.  So objection to the form of the
23  question, but you may answer if you can.
24    THE DEPONENT:  I do think that across the
25  board, I didn't really see, you know, all of what

Baker, Earl Donald - Vol. II

September 25, 2020

26 (Pages 345 to 348)

345

1 they purchased.
2     But just going experientially, the things
3 that I did see, the one thing that Mr. Francis
4 told me about boxes being purchased at 10 times
5 what he sourced them for made me at least believe
6 that it was across the board.
7     There is also a conversation between myself
8 and Mr. O'Brien where he inferred that even the
9 contracts for facilities, let's say, working on
10 the air conditioner, that he felt there were some
11 improprieties that might rise to the level of
12 fraud, but he never gave me details, and that was
13 not in my view, so I never reported the -- you
14 know, the things he was asserting myself.
15 BY MS. BETRAM:
16     Q.  What was Mr. O'Brien's position when --
17 when you were working at Smith & Wesson?
18     A.  He was a pre-setter.
19     Q.  And he didn't work in the cutter
20 department, right?
21     A.  Yes.  Physically, he worked in a different
22 department, but he was part of our -- our -- my
23 department in that I offered cutter support.  And
24 pre-setter sets the tools to a given length.  So that
25 was part of cutter support.  So he was in my

346

1 department, yes.
2     Q.  And did -- did he report to you?
3     A.  Yes.
4     Q.  And did you do performance evaluations for
5 him?
6     A.  Yes.
7     Q.  Is that true during the entire period that
8 you worked at Smith & Wesson?
9     A.  Yes, I believe so.
10     Q.  Okay.  Let's go to Exhibit 33, the very
11 next one.  I'll give you a chance to review it, and
12 let me know when you're done.
13     A.  Okay.  I'm familiar with it, yes.
14     Q.  Okay.  Exhibit 33 is a May 14, 2014 email
15 from you to Mr. Cicero, right?
16     A.  Yes.
17     Q.  And -- and what was your understanding of
18 what -- and we'll call him I guess Leo J. -- what
19 information he provided to you?
20     A.  My understanding was that Leo is -- is
21 Mr. Jendrezak.  We'll just go by Leo.
22     Q.  Okay.
23     A.  He was telling me that he felt there was a
24 reason for the animosity between -- that was going on
25 in -- in the cutting department between Mr. Flatley

347

1 and myself.  It -- it just followed an incident where
2 Flatley was openly hostile and he -- every -- when
3 you're dealing with people, you can find little
4 reasons that, Oh, I may have said this to make -- to
5 cause that reaction.  But when there's no cause and
6 effect relationship, you can't figure out why
7 somebody is going off, it was Leo's assertion that he
8 felt the animosity that Mr. Flatley was displaying
9 was -- had to do with I had interrupted what he
10 believed a fraudulent arrangement between he and
11 Pioneer.
12     Q.  And -- so you spoke with him on May 14 of
13 2014?
14     A.  Yes.
15     Q.  Was that the first time that he had
16 explained that view to you?
17     A.  No.  No.  He had -- he had mentioned it
18 much prior and, in this instance, he reiterated and
19 stated it in a more strong terms.  And at this point,
20 we were already -- I had already been talking to
21 Mr. Cicero.  And so when he mentioned this, it stood
22 out in my mind as being an important piece of
23 information to pass on to Mr. Cicero because he
24 talked in terms of more of a firsthand account of
25 things, whereas mine was, you know, a mixed bag of

348

1 things I had seen, you know.  And so -- and it was of
2 my beliefs.
3     This, I --
4     THE COURT REPORTER:  It was what?  Sorry.
5 It was what?
6     THE DEPONENT:  It was -- these -- that the
7 things I had submitted up to this point were my
8 beliefs.  And I felt like by telling Mr. Cicero
9 about Leo and what he had said, it might give him
10 someone else to talk to that may have more
11 firsthand information on some of the fraudulent
12 things that he had witnessed.
13 BY MS. BETRAM:
14     Q.  Why did you feel that Leo had more direct
15 information than you?
16     A.  He saw what took place before I was here
17 and mentioned a tool that we were making for Pioneer
18 and then reselling -- them reselling it back to us at
19 an exorbitant price.  And that he mentioned in his
20 terms -- and -- and I can't tell you for sure about
21 whether his accounts were true.  I'm just telling --
22 reporting what he said.
23     Q.  Um-hmm.
24     A.  But he said he had witnessed, you know,
25 money being put under Mr. Wnuk's door and that he had

Baker, Earl Donald - Vol. II                September 25, 2020

27 (Pages 349 to 352)

349

1  mentioned there were certain people that would have
2  more information -- I think he mentioned Stanley
3  Kapek, a friend of Stanley Wnuk's, that would have
4  more inside information.
5      Q.   And did Mr. -- did Leo tell you anything
6  else that supported his views regarding Pioneer
7  Tools?
8      A.   He didn't tell me specifically, but he had
9  mentioned that -- that some of this stuff was
10 generally known to people who worked there prior to
11 my arrival.
12     Q.   And did you talk with Stanley Kapek about
13 the information that Leo provided to you?
14     A.   I did.
15     Q.   Okay.  When did you speak with him?
16     A.   It would have been right after this.
17     Q.   And what did Mr. Kapek say?
18     A.   Mr. Kapek had related to me that Stanley
19 would always preach something to the point where it
20 was like a refrain that he would tell them, Only
21 Pioneer work, only Pioneer work.
22         So I asked him how would Smith & Wesson
23 have enough tools to -- to continue if he was telling
24 you to only work on Pioneer.  It didn't make sense to
25 me.  And he said, Well, if we're making Smith &

350

1  Wesson tools for Pioneer because they have our
2  proprietary design, they could only be sold back to
3  us.  So if we only did Pioneer work, it would go in
4  the vending machine and we would purchase it back.
5  And he didn't say there was a -- a profit involved,
6  but it was inferred that if Pioneer ordered a tool
7  and sold it back to us that it would be at a higher
8  price.
9          Now, that's -- that's kind of what he was
10 laying out.  And the new information I got from
11 Stanley was that Mr. Wnuk was constantly telling
12 them, Only work on Pioneer tools.
13     Q.   And -- and what do you mean only work --
14 did he explain what he meant by only work on Pioneer
15 tools?
16     A.   Yes, that on each machine, there was a
17 priority list of what tools we needed to work on
18 every day.  You know, they needed to be directed
19 on -- on working on things that were relevant to our
20 needs.  And so he was saying that if they had a
21 choice to work on a need that was for Smith & Wesson
22 to keep us running on our tool, and that choice was
23 between working on our tool or doing outside work for
24 Pioneer, he wanted them to concentrate on putting
25 those on the highest priorities to do the Pioneer

351

1  work.
2          And that didn't make sense to me until he
3  explained then that Pioneer work he was talking about
4  would then be issued back to us through the RoboCrib
5  so production wouldn't -- wouldn't suffer any for
6  lack, that just rather than using a tool that we
7  produced that was ours that would be cheaper, they
8  would be vending a tool from Pioneer that we had made
9  but, yet, because Pioneer own -- owned it, would cost
10 Smith & Wesson more.
11     Q.   And did Mr. Kapek explain to you the basis
12 for the information that he was telling you?
13     A.   No.  When I approached him, I said -- I
14 told him what Leo had told me and explained that he
15 told me that you were friends with Mr. Wnuk and might
16 have some firsthand information.  But I just let him
17 talk, and that's what he -- that's what he related to
18 me.  So I prefaced it by saying, Here's what I wanted
19 to talk to you about, and this was his reply.
20     Q.   And did he say when this happened that
21 Smith & Wesson was making tools that were -- let me
22 just back up and -- and make it more simple.
23         Did he say when this was happening that --
24     A.   Yes.
25     Q.   When -- when was that?

352

1      A.   He -- he had -- he had mentioned that it
2  was prior to my arrival but was nonspecific about
3  dates.  And so Mr. Wnuk was there for 43 years, so I
4  knew it happened prior to me being there.  What --
5  what caused the shift, whether it was when Stanley
6  retired, I don't know.  I just knew it was a practice
7  that was no longer being done when I got there.
8          And we -- Mr. Wnuk and I worked together
9  for a number of months, but Stanley indicated that it
10 wasn't currently going on anymore.
11         MR. LEE:  Can I -- there are two Stanleys.
12 You -- you -- you kept go --
13         THE DEPONENT:  Yes.
14         MR. LEE:  So Stanley Wnuk and Stanley
15 Kapek.
16         THE DEPONENT:  Yes.
17         MR. LEE:  Not that it matters.  I don't
18 care about -- the record is the record, but you
19 mentioned Stanley a number of times, and I wasn't
20 sure which Stanley you were talking about.
21         THE DEPONENT:  I'm sorry.  Yes.
22         MR. LEE:  That's all right.
23         THE DEPONENT:  Stanley Kapek was telling me
24 about practices that happened when Stanley Wnuk
25 controlled the department.  I hope that clarifies

Baker, Earl Donald - Vol. II

September 25, 2020

28 (Pages 353 to 356)

353

1    it.
2    BY MS. BETRAM:
3        Q.  I understand.  And did Ms. -- did -- did
4    Leo tell you the basis for the information he
5    provided to you about repurchasing tools?
6        A.  He said he personally witnessed an envelope
7    which he confused as money being passed under the
8    door, and he mentioned one tool in particular that he
9    said Dwayne Reese worked on that Dwayne had found out
10   in some fashion -- I don't even know how -- that we
11   were producing it for -- for Pioneer and charging
12   them $3 a cover.  They were, in turn, selling it back
13   to Smith & Wesson in the vending machine at $40
14   apiece.
15          I did talk to Dwayne Reese, but I don't
16   have any documentation on those numbers but passed
17   the information on to Mr. Cicero and Mr. Suraci to --
18   for them to investigate and find out if they talked
19   to these individuals and maybe could link up their
20   account with past purchases and so forth so that I
21   felt like I was giving them the basis for them to
22   investigate.
23       Q.  All right.  And what was the tool that --
24   that Leo described, if there's one tool?
25       A.  Yeah, I -- I don't know what -- what the

354

1    tool was.  The information I just told you was
2    basically what he said.  It was kind of general
3    terms.  He said there was one tool that Dwayne was
4    doing and they found out this was the price we
5    charge, this was the price we -- you know, what we
6    sold it back.
7           And I -- when I asked Dwayne, he didn't
8    tell me any specific numbers but had confirmed what
9    Leo said that in his view, this was what was
10   happening, and that he had found out that it was --
11   that we were getting $3 and that they were selling it
12   back at 40.  So I don't know where he got his
13   information.
14          And, again, I didn't feel I was the prime
15   investigator of this thing.  I -- I felt like I -- it
16   did color my belief and made me feel that I had done
17   the right thing by going to Mr. Cicero and Mr. Suraci
18   and Ms. Salvador and Ms. Glica to let them know what
19   I had heard so that they could then look into the
20   matter and then talk to Mr. Reese and Mr. Jendrezak,
21   Leo, and -- and Mr. Kapek.
22       Q.  So Leo said he did not know what was in the
23   envelope, right?
24       A.  No, he did not.
25       Q.  And did --

355

1        A.  He made the assumption, but I -- I
2    corrected him.  I said, Did you actually see money?
3    And he said, No, it was just an envelope.
4        Q.  And did he say when he saw the envelope go
5    underneath the door?
6           THE COURT REPORTER:  Did --
7        A.  No, he didn't tell me a time frame.
8           THE COURT REPORTER:  Did he say when he saw
9    the envelope what?
10          MS. BETRAM:  Go under the door.
11          THE COURT REPORTER:  Thank you.  And what
12   was your answer?
13          THE DEPONENT:  No he didn't mention any
14   time frame.
15          THE COURT REPORTER:  Thank you.
16   BY MS. BETRAM:
17       Q.  And did he say when the tool -- you know,
18   when the situation happened with the one tool that
19   Dwayne Reese had worked on?
20       A.  No, it was -- it was all pretty much
21   nebulous, just indicated that it was before I got
22   there.
23       Q.  Okay.  And did -- did you say that you
24   spoke with Mr. Reese?
25       A.  Yes, I did.

356

1        Q.  Okay.  And when did you speak with him?
2        A.  It would have been within the same day I --
3    I spoke to Mr. Kapek and probably would have been
4    within 24 hours of -- of speaking to Leo.  The only
5    thing I'm unsure about and could vary a day here or
6    there because Leo worked kind of halfway into the
7    afternoon shift where Mr. Kapek and Mr. Reese worked
8    first shift.  So I probably heard this from Leo late
9    in first shift and Mr. Kapek and Mr. Reese may have
10   gone home.  So I may have talked to them the next day
11   rather than that day.
12       Q.  And what did Mr. Reese say to you?
13       A.  Just that he confirmed the general details
14   that there was a tool and he said that -- he had
15   mentioned those amounts, the same as Mr. -- as Leo
16   said, the $3, sold it for 40, which led me to believe
17   that they had possibly talked about this in the past.
18   And the way I took it was that Mr. Reese must have
19   mentioned this to either Lamonte Parks who worked
20   right side by side with Leo or he possibly had told
21   Leo himself.  I'm not sure.  But that was my -- my
22   belief and my assumption.
23       Q.  And did Mr. Reese say anything else to you
24   when you spoke with him?
25       A.  No.

Baker, Earl Donald - Vol. II

September 25, 2020

29 (Pages 357 to 360)

---

357

1  Q.  And did you obtain any documents relating
2  to this concern?
3  A.  No, I did not.
4  Q.  And I take it that you passed along the
5  names of Leo, Mr. Reese and Mr. --
6  A.  Kapek?
7  Q.  -- Kapek to Rob Cicero and to Mr. Suraci?
8  A.  Yes.
9  Q.  And other than what you've described, do
10 you recall the information that you provided to them?
11 A.  I don't believe I had any more specific
12 information to provide.
13 Q.  Okay.  And I take it from your prior
14 testimony, you don't know what they did to
15 investigate that concern?
16 A.  No, I didn't.
17 Q.  And if -- if -- you don't know if they
18 spoke with the three witnesses that you identified,
19 right?
20 A.  I -- I did hear from Dwayne.  I asked him
21 had they talked to him, and he said no.  I had
22 similarly done the same thing with Leo.  I don't
23 believe I asked Stanley.  But at the time I talked to
24 Leo, they had not.  I was told after the fact when I
25 was on paid leave by Mr. Parks, who called and said

---

358

1  that -- told me that Leo had been called in and that
2  as soon as he got out, he said Mr. Flatley had
3  pointed at Leo as he walked into the building in a
4  threatening way as if to say, I'm going to get you.
5  And those were Mr. Park's words.  So I believe I
6  did -- because I wasn't there, I care for the people
7  that worked for me, I considered them my friends, I
8  felt bad that I couldn't do anything to shield them,
9  so I sent a -- an email to Mr. Suraci expressing what
10 I just told you.
11 Q.  And when did you speak with --
12 A.  With who?
13 Q.  -- Mr. Reese and Leo, and they said they
14 had not yet been contacted; what date was that?
15 A.  I really couldn't say.  I don't recall.
16 Q.  Was it before you went on administrative
17 leave?
18 A.  Yes.
19 Q.  And you don't know what Leo said to
20 Mr. Suraci or to Mr. Cicero about this concern,
21 right?
22 A.  I do not.
23 Q.  And do you consider this, if true, to be a
24 violation of Sarbanes-Oxley?
25 A.  Absolutely.

---

359

1  Q.  And why is that?
2  A.  It perpetrates a fraud that there is no
3  reason for -- for us to sell a tool to a vendor that
4  can only be used by law to us other than it's a
5  profit scheme.  There's no -- if we can produce the
6  tool because we need it, why involve a third party to
7  add a markup to a tool that we produce and we use and
8  only we can use?  So if this was true, it would be,
9  in my mind, unequivocally fraud.
10 Q.  So let's go to Exhibit 34, which is the
11 next one.
12 A.  Okay.
13 Q.  And there are a couple of different emails
14 that's in this group.  And the first two relate to
15 .213 gun drills; is that right?
16 A.  Yes.
17 Q.  And the first one is dated April 17, 2014
18 from you to Ed Suraci, correct?
19 A.  Yes.
20 Q.  And the second one is that same date,
21 again, from you to Mr. Suraci, correct?
22 A.  Yes.
23 Q.  Oh, actually, they're -- look at it.
24 They're the same -- same document.
25 A.  No.  I -- I -- I -- I beg to differ.  I

---

360

1  misread it.  One is May of '13 and one is April of
2  '17, correct?
3  Q.  No, I think you're looking at the -- the
4  date.  They're both -- they're the same document.
5  One was printed by Rob Cicero and one was printed by
6  Anna Hart is the only difference between the two of
7  them.
8  MR. LEE:  Which -- we're talking about
9  Exhibit 34.  Are we comparing it to another
10 exhibit or are we --
11 MS. BETRAM:  No, I was just pointing out --
12 MR. LEE:  It's still within -- yeah.
13 There's two printouts.  One says Cicero and one
14 says Anna Hart.
15 MS. BETRAM:  Right.
16 BY MS. BETRAM:
17 Q.  So let's -- let's focus on the substance.
18 Mr. Baker, in that, you talk about kind of blanket
19 orders, blanket purchase orders for drills; is that
20 right?
21 A.  Yes.
22 Q.  And your concern here was that they were
23 automatically providing the drills, but there was now
24 excessive inventory, correct?
25 A.  Yes.

---

Baker, Earl Donald - Vol. II

September 25, 2020

30 (Pages 361 to 364)

**361**

1     Q.  And did you consider this to be fraud or a
2  violation of Sarbanes-Oxley or was this more of kind
3  of a performance concern or an FYI on your part?
4     A.  It -- it could be both.  It was something
5  that in my mind if -- if we were overpaying to that
6  vendor, we also had blanket orders through that same
7  vendor that we had five years of surplus already on
8  hand and we had them coming in weekly and sometimes
9  monthly.  So it speaks to both.  One was the state of
10  disarray when I got there that no one is watching the
11  henhouse, so to speak.  And it possibly could be a
12  case where a vendor was profiting more so than what
13  they deserved because we were overbuying.
14     So, again, that's not for me to determine
15  whether or not it was a case of poor performance on
16  Mr. Wnuk's part or whether it was a case of, you
17  know, over-purchasing in order to give, you know, one
18  customer more business.  I -- I don't -- I don't know
19  that.
20     Q.  So when did you become aware of the
21  purchase order -- the blanket purchase order issue
22  for the .213 drills?
23     A.  All of the drills were overflowing.  And
24  when I came in -- and when you say when, I'm trying
25  to preface it by when I first came in, I was tasked

**362**

1  with getting Robo 99 computerized.  So as I went
2  through that thing to put these items into the
3  computer, I realized that we had so many that we
4  literally had to extend our cage to another room in
5  order to house them all.  They just were stacked in
6  boxes.
7     And so by entering them into the computer,
8  which then became our -- our computerized system, we
9  found these.  So it was both a claim of showing how
10  bad it was when I got there and this was a
11  performance claim that, yes, I -- I found all this
12  and corrected these purchases but felt that it -- it
13  needed purview of somebody investigating the case to
14  look at it and say why were we purchasing --
15     And -- and this is -- these drills are $300
16  apiece.  So when we had a seven-year supply, we're
17  talking enough drills to fill a small room.  So
18  overage.  So this was not like a small thing.  This
19  would have been hundreds and hundreds of thousands of
20  dollars.
21     Q.  And did you ever, yourself, investigate how
22  it came about that Smith & Wesson had so many drills?
23     A.  Again, I didn't -- I didn't investigate
24  like the reasoning behind it.  I just investigated
25  well, why do we have so many, and it turned out that

**363**

1  we had -- we had blanket orders where they just came
2  in automatically.  No one had to send a requisition
3  for them.  So that this blanket order had been set up
4  between Mr. Wnuk and the vendor and Mr. Flatley.
5  Because normally -- well, in every case, any purchase
6  by Mr. Wnuk would have to be approved by Mr. Flatley.
7     Q.  Um-hmm.
8     A.  So whether he, Mr. Flatley, was aware that
9  those purchases were being made, you know, still
10  going -- ongoing, you would think so.  But one thing
11  was certain: He signed for it initially.
12     Q.  And did you ever determine -- did you ever
13  uncover any evidence as to whether this was
14  intentional on Mr. Wnuk's part?
15     A.  No, I didn't.
16     THE COURT REPORTER:  Intentional on whose
17  part?
18     MS. BETRAM:  Mr. Wnuk, W-n-u-k.
19     THE COURT REPORTER:  Thank you.
20     THE DEPONENT:  No.
21  BY MS. BETRAM:
22     Q.  And I take it you passed along this
23  information to Mr. Suraci.  Did you also pass it
24  along to Mr. Cicero?
25     A.  I -- I did.

**364**

1     Q.  And do you know what they did to look into
2  this concern?
3     A.  No, I do not.
4     Q.  So let's look at the -- the next doc --
5  next document, same exhibit.  And I'll give you a
6  chance to read through the three of them.  They're
7  kind of different things, but they're, you know,
8  related to each other.  These are about the -- right,
9  that's also about the .213.  Let me go forward to
10  the .915 gun drills.
11     MR. LEE:  Are we still in Exhibit 34,
12  Connie?
13     MS. BERTRAM:  We are.  We're -- we're at --
14     MR. LEE:  Just down?  Just way down?
15     MS. BETRAM:  -- 355.  We're at 355 on the
16  bottom.
17     MR. LEE:  Okay.  Got it.
18     THE DEPONENT:  Okay.  Your question?  I'm
19  sorry.
20  BY MS. BETRAM:
21     Q.  This raises some issues about another type
22  of drill that was -- that was on purchase order,
23  correct?
24     A.  Yes.  All of the different sizes would be
25  the same scenario in that --

Baker, Earl Donald - Vol. II

September 25, 2020

365

1    Q.   Okay.
2    **A.   Yeah, they're all the same -- all -- all**
3    **the same type.**
4    Q.   Okay.  I understand.
5         Go to Exhibit 35.  And I'll give you a
6    chance to look over that.
7    **A.   Okay.**
8    Q.   This raises a concern about whether the
9    company was mischarged for a particular tool; is that
10   right?
11   **A.   Yes.**
12   Q.   And this is an issue that had been raised
13   by Mr. Branco, correct, B-r-a-n-c-o?
14   **A.   Yes, um-hmm.**
15   Q.   And there's a -- included in the chain is
16   an email dated May 30th, 2013 from him to you,
17   correct?
18   **A.   Yes, that's correct.**
19   Q.   And he just asked a question as to whether
20   the company was being charged for two new tools,
21   correct?
22   **A.   Yes.**
23   Q.   And then Steve Wasielewski asked Andrew
24   Dziobek to look into this, right?
25   **A.   Yes.**

366

1    Q.   And do you know what Mr. Dziobek determined
2    based on looking at the records for this?
3    **A.   I -- I don't know specifically relative to**
4    **this email.  I -- I know what he said in general, but**
5    **he wasn't referring to this one.**
6         **So I had a conversation with -- with Andrew**
7    **where he mentioned in general, but I don't believe he**
8    **had actually looked at Steve's email yet.  But he was**
9    **saying in general that could be -- he -- where the**
10   **machine defaults to giving them one of our tools**
11   **first as -- as opposed to Pioneer's.  But he wasn't**
12   **sure in this specific case because he hadn't actually**
13   **investigated the exact tool Steve was speaking about.**
14   **But he -- he gave that to me as a possible**
15   **explanation for what was happening.**
16   Q.   And do you know what he determined once he
17   looked into the issue?
18   **A.   No, I do not.**
19   Q.   And was this an issue that you raised with
20   Mr. Cicero or Mr. Suraci?
21   **A.   I did.**
22   Q.   And other than this email, did you provide
23   any other evidence to them?
24   **A.   Any other evidence in general or on this**
25   **issue?**

367

1    Q.   On this issue.  I'm sorry.
2    **A.   On this issue, no.  I did not provide**
3    **anything else.**
4    Q.   And do you know what conclusions they
5    reached in looking into this concern?
6    **A.   I'm sorry.  Could you repeat that?  My**
7    **earpiece was bothering me.**
8    Q.   No problem.  Do you know what conclusions
9    they reached based on -- actually let me strike
10   that.
11        Do you know what they did to look into this
12   issue?
13   **A.   No, I do not.**
14   Q.   And do you know what they concluded?
15   **A.   I don't know if it mentions this in**
16   **Mr. Cicero's conclusion or not.  I -- I can't recall.**
17        THE COURT REPORTER:  Mr. Baker, if you
18   could just keep your voice up.
19        THE DEPONENT:  Okay.  Thank you.
20        THE COURT REPORTER:  Thanks.
21   BY MS. BETRAM:
22   Q.   At some point, did you become aware of a
23   concern that Smith & Wesson had been paid -- charged
24   eight days for seven days of vending on the RoboCrib?
25   **A.   Yes, ma'am.**

368

1    Q.   And when did you obtain information about
2    this concern?
3    **A.   On two occasions; one, Victor Matos told me**
4    **about it and then later on, Mr. Goode, Al Goode, told**
5    **me the same scenario.**
6    Q.   Okay.  And when did Mr. Matos tell you
7    that?
8    **A.   It would have been months earlier.  So I**
9    **heard the first account from him.  And since**
10   **Mr. Goode was Victor Matos's boss, I only saw him on**
11   **maybe a quarterly basis.**
12   Q.   Um-hmm.
13   **A.   So it would have been a couple of months**
14   **after that that I spoke to Mr. Goode.**
15   Q.   And Victor Matos was with M -- M -- MC --
16   MSC, correct?
17   **A.   Yes.  Yes.**
18   Q.   Okay.  And do you recall when he told you
19   about this concern about the eight-day billing
20   situation?
21   **A.   I -- I don't recall the exact date, no.**
22   **And it -- it's a long time ago, and had you asked me**
23   **years ago, I might.  I'd have a recollection.  But I**
24   **can't tell you the exact date he told me.**
25   Q.   And what did -- what did Mr. Matos tell you

Baker, Earl Donald - Vol. II                    September 25, 2020

32 (Pages 369 to 372)

---

369

1  about the eight-day billing situation?
2       A.  The account he gave me was that -- that
3  Pioneer was billing Smith & Wesson eight days a week
4  and that it resulted in a couple of hundred thousand
5  dollars in overcharges so that they were charging
6  from Sunday through Sunday so that they were charging
7  Sunday twice.
8       And that went on for such a long time with
9  no one realizing it that they had -- they had
10 informed MSC -- or I mean informed Pioneer -- God, I
11 keep getting the wrong -- they informed Smith &
12 Wesson, and that because of that information, that
13 their work was -- workload was cut by Mr. Flatley so
14 much so that he -- they had to lay off an entire
15 night shift of their plant in -- in Chicopee,
16 Massachusetts because the work they had been getting,
17 they had gradually added another shift, and that
18 after they informed on Pioneer doing this, that there
19 was a reprisal against his company, MSC, and work was
20 taken away, and they had to lay off their entire
21 night shift.
22      That account would have been fairly early
23 in September 2013, but the exact date, I don't know.
24 But it -- it was very early in the -- my being at
25 Smith & Wesson.

---

370

1       Q.  And did he -- did Mr. Matos tell you when
2  they informed Smith & Wesson of the eight-day billing
3  issue?
4       A.  No.  No.  He did -- he told me that it
5  happened prior to me being there, but the time frame
6  of when that happened, I wasn't aware.  But he did
7  say that at the time that occurred, that's when they
8  took Ed Prystupa from being the purchaser in that
9  department and they hired Andrew Dziobek.  And so
10 Andrew had -- was hired -- I think you can find from
11 his testimony what -- what his date of hire was, but
12 that would give you the date of when he was referring
13 to.
14      Q.  And did Mr. Matos tell you anything else
15 about the eight-day billing concern?
16      MR. LEE:  Objection to form of the
17 question, but you may answer if you can.
18      A.  To my recollection, that's the gist of what
19 he told me.
20      Q.  Okay.  And you said that you spoke with Al
21 Goode several months later; is that right?
22      A.  Yes.
23      Q.  And what did Mr. Goode tell you?
24      A.  He reiterated the fact that -- he just re
25 -- reclaimed -- or rehashed the same account that I

---

371

1  got from Victor.  I -- I -- in that case, I didn't
2  learn any new information.  Just said the same thing
3  as Victor said and probably did not mention the
4  having to lay people off or the reprisal of taking
5  work away.  He just told me the -- the scenario that,
6  yes, they had told Smith & Wesson about the billing.
7  And he mentioned the eight days a week.
8       Q.  And other than speaking with Mr. Matos and
9  speaking with Mr. Goode, did you do anything to
10 investigate this concern?
11      A.  I re -- I recounted -- or told the incident
12 to Mr. Cicero, and Mr. Cicero told me that was old
13 news and --
14      Q.  Um-hmm.
15      A.  -- that was the end of it.
16      Q.  And do you know what Mr. Cicero did to look
17 into your concern?
18      A.  In -- in this concern, he had related to me
19 that it was old news and it was already handled.
20      Q.  Um-hmm.  And did you ever obtain any
21 documents related to the -- the eight-day billing
22 concern?
23      A.  No.
24      Q.  And other than speaking with Mr. Cicero,
25 did you raise this concern with anybody else at Smith

---

372

1  & Wesson?
2       A.  No.
3       Q.  Pardon me?
4       A.  No.
5       Q.  Okay.  And when did you speak with
6  Mr. Cicero about this?
7       A.  I -- I had a few personal meetings with
8  him.  I -- I don't know which one it was.  My
9  inclination would be that it was one of the later
10 ones.  But I do know that it was not a phone
11 conversation or text.  It was when I was sitting in
12 his office I recounted it to him.
13      Q.  And are you aware of an internal audit that
14 was conducted relating to the eight-day billing
15 issue?
16      A.  I am aware of an internal audit report but
17 only over the last few weeks.
18      Q.  It's not something that you saw when you
19 were employed by Smith & Wesson?
20      A.  No.
21      Q.  And as you were speaking with the
22 representatives of MSC about this issue, did they
23 inform you that the problem had resulted in MSC
24 overcharging for tools?
25      A.  They actually had a different account than

---

Baker, Earl Donald - Vol. II

September 25, 2020

33 (Pages 373 to 376)

---

373

1  what Mr. Cicero gave in his report. Or I -- I --
2  maybe an email that I read from Mr. Upson, Derek
3  Upson, to Mr. Cicero explaining that this was an
4  overcharge paid to MSC but that is stark -- starkly
5  contradicted by what Mr. Goode told me.
6      Q.   Right. And you only -- you only saw what
7  Mr. Upson had to say in connection with discovery in
8  this case, correct?
9      A.   That's correct, yes.
10     Q.   So one of the concerns that you raised
11  earlier in this deposition and then during your prior
12  day of deposition was that a vendor was providing --
13  had provided 10 TVs --
14     A.   Yes.
15     Q.   -- to employees of Smith & Wesson. When
16  did you first become aware of that concern?
17     A.   I was approached by a former driver of
18  Pioneer. I don't know when it was. It would have
19  been late in the situation when my wife and I were at
20  a Walmart. But I -- I don't -- I don't know the
21  date. It would just be late in the process.
22     Q.   It was in 2014; is that right?
23     A.   Yes. Yeah, it'd be 2014 after I had been
24  talking to Mr. Cicero. I recounted it to him. If it
25  happened prior to -- I know it was at least during

---

374

1  the period where I was speaking with Mr. Sura -- or
2  Cicero making him aware of the details.
3      Q.   Um-hmm. Now, how did you know that he was
4  -- hold on one second. I've just got to open a door.
5          How did you know that the person that
6  approached you and your wife in the Walmart was a
7  former driver for Pioneer Tools?
8      A.   All I -- all I was aware was that's what he
9  purported. He did know the names of the individuals,
10  and it had to have been somewhat prior to my
11  employment because he -- he mentioned the owner sent
12  him to get the tools where these -- or the TVs where
13  he sent them, and he mentioned that person as being
14  Buck Upson. Right along the time when I started at
15  Smith & Wesson, Buck Upson was transferring owner --
16  ownership of Pioneer Tool to -- from himself to his
17  nephew, Derek Upson. I even attended his retirement
18  party. So it happened just as I came on.
19          So I know that the account the person was
20  telling me about transpired prior to my arrival.
21      Q.   What else did the person say who approached
22  you in the Walmart parking lot?
23      A.   No, it was actually in the store. I'm
24  sorry.
25      Q.   Okay. And what else did he say?

---

375

1      A.   He -- he told me that he was told to pick
2  up 10 TVs. He said one or two of them may have been
3  for Colt, which is another manufacturer. So he
4  wasn't sure of the number, one or two. So the actual
5  number that went to Smith & Wesson would have been
6  eight or nine TVs. And he said he was instructed to
7  deliver them directly to the bosses' homes but not to
8  bring them to the plant.
9      Q.   Did he identify the names of the Smith &
10  Wes -- Smith & Wesson managers who received them?
11     A.   I asked him that. He said he didn't know
12  names. He only had their home addresses.
13     Q.   And did he provide their home addresses to
14  you?
15     A.   No. He -- he didn't recall addresses. He
16  just said the -- said, yeah, he didn't know any
17  names. He just delivered them to their houses.
18     Q.   And how did he know that they were Smith &
19  Wesson managers?
20         MR. LEE: Objection to the form of the
21  question. Calls for speculation. But if you can
22  answer, you can answer.
23  BY MS. BETRAM:
24     Q.   Let me just rephrase the question.
25         Did he say how he knew that they were eight

---

376

1  or nine managers at Smith & Wesson?
2      A.   I -- I don't know how he -- you know, I --
3  I just passed it on as here's what was said to me,
4  and I -- I assumed that Mr. Cicero and possibly
5  someone else in security at Smith & Wesson would
6  investigate and find out the veracity -- he had a lot
7  of details that seemed to be correct, and I thought
8  they would investigate to find out whether, in fact,
9  it -- it -- it did occur.
10     Q.   And how did he approach you?
11     A.   It was weird. It was -- I -- I actually
12  made a police report with the Enfield Police because
13  I thought it was odd that a person approached me as I
14  was exiting -- I was actually in checkout. He
15  approached me as I was exiting, and he was coming in
16  the door. And then he said he -- he knew me. He
17  recognized me. And I had never seen him before. And
18  I told him he had been -- must have been mistaken. I
19  -- I'm originally from Ohio. And he then said that
20  he worked for Pioneer Tool and that he thinks he saw
21  me at Smith & Wesson.
22         He worked there prior to my arrival. He
23  couldn't have seen me.
24     Q.   Um-hmm.
25     A.   So when I left -- so I -- after our

---

Baker, Earl Donald - Vol. II                    September 25, 2020

34 (Pages 377 to 380)

377

1  encounter, he mentioned an individual at Smith &
2  Wesson, Buddy Duval that I had never met before and I
3  had never heard the name.  So I just passed that off
4  and I went to -- you know, purchased my items, went
5  to my car.  I noticed then he got in his car and
6  followed me to Enfield, Connecticut.  I was in
7  Windsor Locks, Connecticut at the Walmart.  He
8  followed me into Enfield.
9           I thought it was odd that someone who had
10  never met me, thought he knew me, gave me specific
11  information about Pioneer Tool, and then followed me
12  back towards my house.  If he was coming into the
13  store as I was exiting, how was he able to get to his
14  car at the same time as I was if he had purchased
15  something?  There wouldn't have been time for him to
16  wait through a line and purchase something.  He had
17  to -- as soon as he got done talking to me, he had to
18  exit and get in his car at the same time I did in
19  order to leave at the same time.
20           I thought that was odd, and I didn't
21  understand what it was, but I did make a police
22  report on it.  I went to the Enfield Police
23  Department and made a report.
24           The issue was I told Mr. Cicero at the time
25  believing he was actually investigating things and

379

1       Q.  And was anybody else present when this
2  person approached you in the Walmart?
3       A.  Yes, my wife.
4       Q.  And did she say anything --
5       A.  No.
6       Q.  -- to him?
7       A.  She -- she didn't -- she didn't even stay
8  for the whole conversation.  I don't recall if she
9  had to go pay for what we were buying or -- or what
10  it was, but I know that she was there for part of the
11  conversation, but she didn't hear all of it.
12           He had -- it was somewhat of a natural
13  conversation.  He -- he seemed sincere about what he
14  was saying because he was talking about things that
15  he did with his friend, Buddy Duval.
16           So I -- I included that information to
17  Mr. Cicero just so he would have some context to what
18  was shared, but I never heard of a Buddy Duval.  And
19  I did ask a few people when I got back, and they had
20  never heard of Buddy Duval.
21       Q.  And did he --
22       A.  Now --
23       Q.  Did he say that he had delivered a TV to
24  Buddy Duval?  What -- what was --
25       A.  No, no.

378

1  thought that he would -- he would have enough
2  information to look into it.
3       Q.  So how long of a drive is it from the
4  Walmart to Enfield, Connecticut?
5       A.  Not long.  It's -- it's probably only a
6  couple exits.
7       Q.  Okay.  And did you record the license plate
8  number for the person who approached you?
9           THE COURT REPORTER:  I'm sorry.
10  Ms. Bertram, you're breaking up for me.  I don't
11  know if it's for anybody else.
12           MS. BETRAM:  I'll restate the question.
13           THE COURT REPORTER:  Thank you.  That
14  sounds better too.
15  BY MS. BETRAM:
16       Q.  Did you record the name of the license
17  plate of the person who'd approached you at the
18  Walmart?
19       A.  No, I did -- didn't have an opportunity to
20  do so.
21       Q.  Why is that?
22       A.  I didn't see it.  I -- I -- he wasn't close
23  enough for -- for me to see it.
24       Q.  Did you take a picture of him?
25       A.  No, I did not.

380

1       Q.  Okay.
2       A.  Buddy Duval was --
3       Q.  What did he say about Buddy?
4       A.  He was actually was saying that Buddy Duval
5  and he hung out together, and he was mentioning his
6  name as if he thought possibly I would know Buddy
7  Duval.  But I -- I didn't.  And I mentioned the name
8  just so that it would provide context for Mr. Cicero
9  to investigate further if there was, in fact, a Buddy
10  Duval there.
11           After I was on paid leave, ironically,
12  Smith & Wesson hired Buddy Duval.
13       Q.  How do you know that?
14       A.  It was in the -- it was in a news release.
15  He was a -- he had some expertise.  I think he was
16  the coach of the Olympic -- United States Olympic
17  team in shooting and that Smith & Wesson had hired
18  him.  The gentleman he spoke of with Mr. Duval was an
19  older gentleman.  So I don't know if that was, in
20  fact, Buddy Duval's father that also worked at Smith
21  & Wesson.  I really didn't know.  But, at that point,
22  I was on paid leave, and I -- I felt at that time
23  it's interesting, but I felt Mr. Cicero would look
24  into it.
25       Q.  And did the person who approached you give

Baker, Earl Donald - Vol. II

September 25, 2020

35 (Pages 381 to 384)

381

1  you his name?
2      A.  He did.  He -- he mentioned his first name,
3  and for the life of me, my wife and I can't recall
4  it.  I -- I -- we've grilled each other a few times
5  and we just -- I -- I just don't recall.  Some
6  stranger meets you in a Walmart.  I -- I didn't want
7  to go back and say, What, again, was your name?  So I
8  didn't re-ask him, but at the time, I actually felt
9  like I remembered going out and I just can't recall
10 his name.  But if he was, in fact, a driver for
11 Pioneer when Buddy -- when -- when Buck Upson owned
12 it, I'm sure that they could be -- his name could be
13 ascertained if Mr. Cicero wanted to find it.
14     Q.  And other than passing along information
15 about the statements that this person said --
16 statements that -- that this person made while he was
17 in the Walmart, did you provide any additional
18 information to Mr. Cicero about this?
19     A.  No, just --
20         MR. LEE:  Objection -- objection to the
21     form of the question, but you can answer.
22     A.  Just contextually what I told you.
23     Q.  Um-hmm.  And do you know what he did to
24 look into your concerns?
25     A.  No, I do not.

382

1      Q.  I'm going to have you look at Exhibit 37.
2  Do you have that in front of you?
3      A.  There's a problem with my book.  When 37 --
4  I turn that page, there is no document between tab 37
5  and tab 38.
6      Q.  Look under tab 38 and see if there is a
7  March 13, 2014 email from Anne Bruce to Kathy
8  Salvador and Ed Suraci.
9      A.  No, 38 is pretty much the declaration of
10 Mark Smith.  So it doesn't have that email.  I'll --
11 I'll go back one possibly to 36; do you think?
12     Q.  I don't have that statement.  So I think
13 you might be looking at the wrong set.  These are the
14 -- these -- these are the Smith & Wesson exhibits.
15     A.  Yup, Smith & Wesson exhibit.  There's --
16         MR. LEE:  Yeah, Earl -- Earl wouldn't have
17     our exhibits.  I didn't send it to him.  So the
18     exhibits he'd have in the binders would be the
19     ones that you sent to him.
20         MS. BETRAM:  Okay.  But I had previously
21     sent him some of the Plaintiff's exhibits.
22         MR. LEE:  Oh.
23         MS. BETRAM:  Yes.
24     BY MS. BETRAM:
25     Q.  Are you looking -- looking at 37?  Because

383

1  I'm -- I'm looking at it right now and the other ones
2  matched up.
3      A.  There is no document between 37 and 38 --
4  tab 38 in my binder.  The tabs exist, but there's no
5  document in between it.
6      Q.  Okay.  So let me just ask a broader
7  question.  There's a -- a sequence of emails from
8  March 13, 2014 between various HR representatives.
9  Did you ever hear that a vendor called H & M had
10 provided TVs to Smith & Wesson managers?
11     A.  No.  I had no interaction with H & M at
12 all.  When I saw that document -- I know which
13 document you're speaking of.
14     Q.  Um-hmm.
15     A.  I have -- had never had interactions with H
16 & M.
17     Q.  Okay.
18     A.  Whether the -- I do know in the document
19 the person that was giving the account that he had
20 returned the TV was reluctant to give the vendor and
21 she pressed him some to get it.  I don't know if
22 we're talking about the same scenario or whether, in
23 fact, another vendor had given it.  In my mind,
24 either could be true because I do believe there was a
25 pay-to-play atmosphere at Smith & Wesson where not

384

1  only was that common knowledge among -- or not
2  knowledge, but rumor throughout the plant that
3  vendors were giving inappropriate gifts, but that
4  also while I was on paid leave, Smith & Wesson
5  basically paid a $2 million fine to the S -- FCC for
6  bribing individuals in a foreign country purchasing
7  firearms for their police force.  So I think that it
8  would be indicative of the pay-to-play atmosphere
9  they had.
10     Q.  The -- the allegations regarding H & M, you
11 were not aware of them until you received our
12 production, correct?
13     A.  That's correct.
14     Q.  And earlier in the deposition you said that
15 (inaudible) showed that there were gifts (inaudible).
16 Is that right?
17     A.  Pardon?  Could you say that again?  You
18 were garbled.
19     Q.  Earlier in the deposition, you said that
20 there were -- that our production showed that there
21 -- there were gifts of TVs.
22     A.  Yes.
23     Q.  Is that right?
24     A.  Yes.
25     Q.  And is that -- is -- is that assertion

Baker, Earl Donald - Vol. II                    September 25, 2020

36 (Pages 385 to 388)

385

1  based on this exhibit that you saw in production?
2      A.  Yes.  It was based on that.
3      Q.  Okay.  Now, during the first day of your
4  deposition, we talked about Road Island Carbide and
5  (inaudible).
6          THE COURT REPORTER:  Ms. Bertram, when
7  you're speaking that way, it gets garbled.  So I
8  heard "Rhode Island" and not what you said after
9  that.
10         MS. BETRAM:  Yeah, I'm sorry.  I turned
11  away from you.  I'll -- I'll talk towards the --
12  the computer.
13         THE COURT REPORTER:  Thank you.
14         MS. BETRAM: Can you hear me fine now?
15         THE COURT REPORTER:  Yes.
16         MS. BETRAM: Okay.
17  BY MS. BETRAM:
18     Q.  We had been talking about Rhode Island
19  Carbide.  What did you do, if anything, to
20  investigate your concerns about Rhode Island Carbide?
21         MR. LEE:  Objection to the form of the
22  question, but you may answer if you can.
23         A.  I don't see my role as being an
24  investigator.  So if you speak kind of specifically,
25  I can tell you what maybe I did.  I just don't

386

1  understand.
2      Q.  Did you do anything to look into your
3  concerns about Rhode Island Carbide?
4          MR. LEE:  Objection -- same objection, but
5  you may answer if you can.
6          A.  I -- I was gathering facts.  So I had the
7  belief that a large order being placed with Rhode
8  Island Carbide was then given by Mr. Flatley to
9  Derek Upson or to somebody at Pioneer.  In response,
10  Derek Upson sent me an email soliciting work for a
11  large purchase order or a requisition that I had
12  already -- I had just sent to Flatley.
13         Flatley was the only one that knew about
14  it.  And in the normal course, he would have signed
15  it and passed it on to Dziobek.  Instead, this one,
16  he held onto, and then I get an email from Mr. Upson,
17  you know, soliciting to bid for that -- that order.
18         And so as far as what I did to investigate,
19  I checked just to find out whether or not Mr. Flatley
20  had sent that requisition to Andrew Dziobek.  He had
21  not.  He had held it for some reason.  And I thought
22  that was suspicious, and I got Mr. Suraci -- Suraci
23  involved.
24     Q.  And how do you know that Mr. Flatley held
25  on to the invoice?

387

1      A.  That's what I was told by Mr. Dziobek.  The
2  normal process of things was I wrote the requisition.
3  It was given to Mr. Flatley.  He would approve it and
4  forward it on to Mr. Dziobek for purchase.  In this
5  case, I sent it to him, and it should have already
6  been at Mr. Dziobek, but instead, I got a
7  solicitation from Mr. Upson.
8      Q.  And Mr. Upson explained to you that he had
9  seen that Rhode Island Carbide was providing a
10  particular tool when they were stocking the
11  RoboCribs, right?
12     A.  Yes.
13         THE COURT REPORTER:  They were stocking
14  what?
15         MS. BETRAM:  The Robocrib.  It's R-o-b-o,
16  dash, C-r-i-b.
17  BY MS. BETRAM:
18     Q.  And do you have any reason to doubt that
19  what Mr. Upson said was accurate?
20     A.  Yes.
21     Q.  And why is that?
22     A.  Mr. Upson was saying he saw this tool being
23  put into the RoboCrib, which is not the function of
24  the owner.  Secondly, if we were purchasing these
25  tools, how then did he see us putting in tools that

388

1  I'm just now requisitioning?
2          So had I just purchased them and he put
3  them in, it was more plausible than me just
4  requisitioning some, meaning we didn't have any and
5  I'm requisitioning some from Rhode Island Carbide to
6  augment what we currently produced at Smith & Wesson.
7  So it was my belief that there would have been none
8  of those tools for him view.
9      Q.  And do you have personal knowledge that
10  Mr. Flatley told Mr. Upson that there was a pending
11  purchase order for purchasing tools from Rhode Island
12  Carbide?
13     A.  My personal knowledge would be that I know
14  the system of how it works.  My requisitions are seen
15  by no one other than my boss and Mr. Dziobek.  So if
16  someone else were to have given that information to
17  Pioneer, it would have to have been myself,
18  Mr. Flatley, or Mr. Dziobek.  I know I hadn't, and I
19  talked to Andrew and he -- he stated he had not.  So
20  by -- by simple deduction, I'm left with Mr. Flatley.
21     Q.  But you did not overhear Mr. Flatley tell
22  Mr. Upson about the order, right?
23     A.  No, ma'am.
24     Q.  And you didn't see an email where he
25  provided information to Mr. Upson regarding the

Baker, Earl Donald - Vol. II

September 25, 2020

37 (Pages 389 to 392)

---

**389**

1 order, correct?
2     A. No.
3     Q. And -- I'll just strike that.
4         And you indicated that you passed this
5 along to Mr. Cicero, correct?
6     A. I passed it along to Mr. Suraci for sure,
7 and I think Mr. Cicero. In my mind, they were almost
8 synonymous, that I knew if I gave it to Mr. Suraci,
9 he would give it to Mr. Cicero and vice versa. Or
10 I -- I don't know that Cicero shared everything with
11 Suraci, but I felt like everything I told Mr. Suraci
12 went to Mr. Cicero. So if I told one and not the
13 other, I felt like the information would get to the
14 same source or same place.
15     Q. And we've already reviewed email
16 communications relating to this at our -- during our
17 prior deposition. Did you identify the names of any
18 witnesses that you thought that Mr. Cicero or
19 Mr. Suraci should speak with?
20     A. In the course of it, when the -- the -- the
21 prior quote that -- or the prior price that I had in
22 hand disappeared and I had to get a copy out of the
23 other database. I think that would indicate that
24 they should probably talk to accounts payable and
25 possibly check with Mr. Cuvitch (phonetic) who is

---

**390**

1 security at the plant to find out who took that paper
2 from my office.
3     Q. And we talked about during -- that during
4 the first day of your -- of your deposition.
5         We talked about some of the inquiry that
6 you did about this issue before -- before or around
7 the time that you spoke with Mr. Cicero about it or
8 Mr. Suraci about it. Did you ever look back at the
9 -- the invoices that were in the file that you
10 maintained, the old vendor invoice file that you had
11 at home?
12     A. I -- I had looked through it. If -- if
13 that's the question, yes.
14     Q. And did you identify the price that Pioneer
15 Tool had charged for this tool, the tool in question?
16     A. In that list, no.
17     Q. Did you -- did you look for it in
18 connection with this particular issue?
19     A. No.
20     Q. I take it from your prior testimony, you
21 don't know what Mr. Suraci or Mr. Cicero did to look
22 into your concerns about Rhode Island Carbide?
23     A. No.
24     Q. And do you consider this concern -- let me
25 -- let me back up.

---

**391**

1     Q. Is it your view that Smith & Wesson
2 violated Sarbanes-Oxley with respect to the issues
3 surrounding Rhode Island Carbide?
4         MR. LEE: Objection to the form of the
5 question, but you may answer if you can.
6     A. I -- I think that it was a transaction that
7 would cause me to want to look into those claims,
8 yes, and viewed in totality, yes, it is just one of
9 many incidences that would seem to point to
10 violations of SOX. Or -- basically SOX worthy or
11 fraudulent -- a claim of fraud on the -- on the
12 company I worked for. And so my submission of that
13 and my subsequent release turns it into a SOX claim.
14 But at the time I gave it, it was -- it was just my
15 belief that there was fraudulent activity happening
16 within the plant, and this was one incident.
17     Q. Now, you said that something turned it into
18 a Sarbanes-Oxley violation. I didn't hear what you
19 said.
20     A. The thing that I believe turned it into
21 that was when I made the submission that I felt like
22 was part of a -- a fraud so that they would
23 investigate. And then when I was subsequently
24 terminated because of those submissions that I feel
25 that makes it a SOX -- SOX claim.

---

**392**

1     Q. And I understand that your position is that
2 you believe (inaudible) --
3         THE COURT REPORTER: All right. It's --
4 you're garbled.
5         MS. BETRAM: Let me start over.
6         THE COURT REPORTER: Yeah, if you're just a
7 little louder, I think it comes out clear.
8 BY MS. BETRAM:
9     Q. I understand, Mr. Baker, that you believe
10 that your termination violated section 806 of
11 Sarbanes-Oxley.
12     A. Yes.
13         MR. LEE: Objection. Objection to --
14 BY MS. BETRAM:
15     Q. But --
16         MR. LEE: Objection to the form of the
17 question, but he can answer if he can. Obviously
18 he's not a lawyer and he's not required to know
19 all that stuff, but if you can answer it, you can
20 try to answer it.
21         THE DEPONENT: Yes. Based on my limited
22 knowledge of -- and what I surmised from the
23 training I got at Smith & Wesson (inaudible). I
24 -- I --
25         THE COURT REPORTER: Say that again.

Baker, Earl Donald - Vol. II

September 25, 2020

38 (Pages 393 to 396)

393

1  THE DEPONENT: -- I believe that.
2  THE COURT REPORTER: Sorry. Based on the
3  training I got ...
4  THE DEPONENT: At Smith & Wesson, I was
5  required to take LRN training. But based on
6  that, my belief is that it is a violation of 806
7  in SOX, but --
8  BY MS. BETRAM:
9  Q. Okay.
10  A. -- that's just based on that.
11  Q. Let's put 806 to the side. Is it your
12  position that your allegations relating to Rhode
13  Island Carbide were a substantive violation of
14  Sarbanes-Oxley, for instance, wire or mail fraud?
15  MR. LEE: Objection to the form of the
16  question. He doesn't even know what that is.
17  Like I said, you -- he could -- he could try to
18  answer whatever he thinks is -- his understanding
19  of SOX is or 806 is, but he's not required to
20  know that stuff. The case law is pretty clear on
21  that. But if you could try to answer it, you
22  could try it.
23  MS. BETRAM: Objection to the coaching.
24  MR. LEE: It's not coaching.
25  BY MS. BETRAM:

394

1  Q. Mr. -- Mr. Baker, do you know what wire
2  fraud is?
3  A. I -- I know what the term implies.
4  Q. Do you know what mail fraud is?
5  A. Yes. Yes.
6  Q. And is it your position that -- actually,
7  let me take -- just take a second. Actually, let's
8  make -- let me strike that.
9  Now, you mentioned boxes that cost 10 times
10  as much as they should have. When did you become
11  aware of that concern?
12  A. Mr. Francis asked to meet me at a
13  restaurant. He wanted to meet offsite for lunch. So
14  we met at a restaurant, and he said someone that was
15  a -- that had prior -- previously worked for him was
16  now moved up to a more prominent position and came to
17  him with concerns over sourcing of boxes that he felt
18  was incorrect. So it was during summer of -- or late
19  spring/early summer of 2014.
20  Q. And when did you speak with Mr. Francis?
21  A. At that meeting in late September of 2014.
22  Q. And who was Mr. Francis's source for his
23  concerns about the box costs?
24  A. There were 1,500 people who worked at Smith
25  & Wesson. I knew the guy's name who worked for him,

395

1  a very likable fellow, and I can picture him, but I
2  can't recall his name.
3  Q. So he was someone who reported to
4  Mr. Francis; is that right?
5  A. Yes. Yes.
6  Q. Okay. And you just can't remember his
7  name?
8  A. Yes.
9  Q. And did Mr. Francis indicate that he had
10  reported this concern to anybody at Smith & Wesson?
11  A. At the time he mentioned it to me, he said
12  that he had done some investigation on his own and
13  confirmed that he had sourced the box at 99 cents
14  apiece and that they were charging $9.90 is what he
15  told me.
16  Q. And when you say he had sourced, are you
17  talking about Mr. Francis had sourced the box?
18  A. Yes.
19  Q. Okay. And -- and after he provided this
20  information to you about the box cost, did you then
21  tell Mr. Suraci or Mr. Cicero or anybody else at
22  Smith & Wesson about this concern?
23  A. I don't -- I don't have any specific
24  recollection that I did. I can't say for certain,
25  but the timing of it -- all I can tell is my

396

1  inclination was that this was somewhat more of a
2  hearsay thing from Mr. Francis even though he was a
3  vice president and believed he -- he was very capable
4  of pursuing it on his own.
5  So I -- I -- my inclination is that I might
6  not have, but it's possible I did.
7  Q. Okay. Now, are you aware of a report
8  prepared by Alvarez & Marsal relating to tooling
9  costs?
10  A. Only after -- the first time I heard of
11  them was in Mr. Cicero's investigation report
12  analysis.
13  Q. And have you ever reviewed the report?
14  A. No. I've -- I've heard it referred to.
15  Q. Pardon me?
16  A. No. I -- I -- in the documents, they refer
17  to it, and that's my only knowledge of -- of them.
18  Well, other than research.
19  Q. And what do you mean by research?
20  A. I know that that's -- that's a company that
21  Mr. Smith worked for prior to coming to Smith &
22  Wesson.
23  Q. Right. But while you were at Smith &
24  Wesson, did you ever hear that an outside company had
25  made recommendations for tooling costs at Smith &

397

1    Wesson?
2        A.  I had not heard the name when I was on the
3    floor, but I received the investigation report while
4    I still worked for Smith & Wesson.
5        Q.  Okay.  So that was the first that you
6    learned that such an evaluation had been done by a
7    their party?
8        A.  Yes.
9        Q.  When did you first learn that Smith &
10   Wesson had a letter of intent with Pioneer?
11       A.  I knew at sometime through the -- through
12   the employment.  I can't tell you specifics of when,
13   but that there was a somewhat agreement between
14   vendors.  And it may have been told to me from a
15   vendor.  But it -- I was aware that there was a
16   specific document that delineated who would stock the
17   crib and who would get paid for stocking the crib.
18   And even that -- well, that -- that's -- that answers
19   your question.
20       Q.  And was it your understanding that MSC had
21   a letter agreement with Smith & Wesson as well?
22       A.  Yes, all vendors.
23       Q.  Okay.  And did you ever review any of the
24   letters of intent?
25       MR. LEE:  Objection to the form of the

398

1    question --
2        A.  Not --
3        MR. LEE:  Objection to the form of the
4    question as to when, but --
5        A.  Yes.
6        MR. LEE:  -- you can answer.
7        A.  Yes.  Not during the time I -- I worked
8    there, but in discovery, I have.
9        Q.  Okay.  So you did not review any of the
10   letters of intent while you were employed by the
11   company?
12       A.  No.
13       Q.  And did you ever request a copy of it or a
14   copy of any of them?
15       A.  No.  That's kind of a legal agreement and
16   kind of out of my realm of expertise.
17       MS. BETRAM:  Why don't we take a break.  I
18   have at this point about an hour and a half.
19       Mr. Baker, I had sent to your home some
20   additional exhibits and I wanted to see if they'd
21   arrived at your home.
22       THE DEPONENT:  I'm sitting about 20 feet
23   from the door.  Let me ask my wife.
24       MR. LEE:  Take a quick break -- take a
25   quick break.  Go check to see --

399

1        THE DEPONENT:  Okay.
2        MR. LEE:  -- if the documents are there.
3    If they're there, open them up obviously, you
4    know, that --
5        THE DEPONENT:  Okay.
6        MR. LEE:  All right?
7        MS. BETRAM:  That sounds like a good plan.
8        THE DEPONENT:  All right.  Thank you.
9        MS. BETRAM:  Okay.  Thank you.
10       THE VIDEOGRAPHER:  Going off the record --
11   going off the record at 2:15 P.M.
12       (A break was had.)
13       THE VIDEOGRAPHER:  Back on the record at
14   2:29 P.M.
15   BY MS. BETRAM:
16       Q.  So, Mr. Baker, you talked about attending
17   the LRN training regarding ethics.  You knew when you
18   were employed by Smith & Wesson that they had a
19   24-hour anonymous ethics line, correct?
20       A.  Yes, our -- our reporting line, yes.
21       Q.  And did you ever make a report on that
22   anonymous hotline?
23       A.  That was something I -- I discussed with
24   Mr. Cicero that he told me our conversation would be
25   confidential, and I was taken to Mr. Cicero by

400

1    Mr. Suraci.  He was the one that said he would like
2    to escalate it because he thought it was possibly
3    serious and wanted to know if it was okay to involve
4    Mr. Cicero.  So that was the genesis of going there.
5        But I had thought about the line, but, as I
6    told Mr. Cicero, I didn't want to do anything that
7    would harm Smith & Wesson, as what I believed my
8    brother-in-law suggested, going to the FBI, I thought
9    that that would be harmful to Smith & Wesson, and I
10   wanted what was in their best interest.
11       Q.  And do you know whether anybody ended up
12   going to the FBI to raise concerns about Smith &
13   Wesson?
14       A.  I know that in some of the texts which
15   you've been presented, Mr. O'Brien has mentioned the
16   FBI or mentioned that he was going to do so.  But I
17   never inquired whether he actually had or whether it
18   was just something he said.
19       Q.  And did he tell you what he was going --
20   what he planned to go to the FBI to complain about?
21       A.  No, he did not.
22       Q.  Did you ever report your concerns about
23   Smith & Wesson to the SEC?
24       A.  No, I did not.
25       Q.  And did you ever report them to any other

Baker, Earl Donald - Vol. II

September 25, 2020

40 (Pages 401 to 404)

---

401

¹ governmental entity other than OSHA?
² **A.  No, I did not.**
³ Q.  So you said that the package arrived from
⁴ FedEx.  And in it are a couple different categories
⁵ of documents.  If you could pull out -- there's a new
⁶ set of text messages.  Basically, it's just a
⁷ consolidation of what had been Exhibit A and Exhibit
⁸ B in the prior materials that I sent to you.  And
⁹ what we did is we combined them into a single set of
¹⁰ text messages that we're going to call Exhibit 4B.
¹¹ **A.  Okay.  I have that.**
¹² Q.  Do you have that document in front of you?
¹³ **A.  Yes.**
¹⁴ MR. LEE:  So which one is this?
¹⁵ MS. BERTRAM:  So it's -- it's still marked,
¹⁶ John, as Exhibit 4.
¹⁷ MR. LEE:  Okay.
¹⁸ MS. BETRAM:  It was in a zip file that
¹⁹ Missy sent over.  It should be something like
²⁰ Consolidated Set of Text Messages.
²¹ MR. LEE:  Yeah, I -- I have them.  I just
²² -- just -- let's just make sure that we -- is
²³ this already -- I -- it's marked as Exhibit 4, at
²⁴ least the version I have right in the upper
²⁵ right-hand corner.

---

402

¹ MS. BETRAM:  It should be Exhibit 4B.
² We'll correct it and send it over to the court
³ reporter.
⁴ THE DEPONENT:  Should I -- Connie, it
⁵ doesn't say 4B.  Should I write 4B on this?
⁶ MS. BETRAM:  It doesn't matter because your
⁷ set is not going to go to the court reporter.
⁸ It's a (inaudible) set.
⁹ MR. LEE:  So there is already a 4, and
¹⁰ you're saying 4B is -- 4B includes 4; it's just a
¹¹ more consolidated better, more legible copy.
¹² MS. BETRAM:  Yeah, we never ended up using
¹³ it.  There was also a --
¹⁴ MR. LEE:  Okay.
¹⁵ MS. BETRAM:  -- 4A.
¹⁶ MR. LEE:  Oh.
¹⁷ MS. BETRAM:  And it was just a
¹⁸ miscommunication between Missy and me.  I had
¹⁹ asked her to combine 4 and 4A and she just gave
²⁰ you -- there were two sets and I asked -- I had
²¹ them merged.  And that's 4 --
²² MR. LEE:  Well, it wasn't even marked
²³ before then.  So actually --
²⁴ MS. BETRAM:  Oh --
²⁵ MR. LEE:  -- as far as the -- yeah.

---

403

¹ Actually --
² MS. BETRAM:  That may not have gotten --
³ MR. LEE:  -- as far as the record is
⁴ concerned, it doesn't exist until now, right?
⁵ MS. BERTRAM:  Well, let's just make this 4B
⁶ just because --
⁷ MR. LEE:  Okay.
⁸ MS. BETRAM:  -- it's easier for me to
⁹ recall because it's the third consol -- it's the
¹⁰ third set and it's the consolidated set.
¹¹ MR. LEE:  Okay.
¹² (Exhibit 4B marked for identification)
¹³ BY MS. BERTRAM:
¹⁴ Q.  Did you find that, Mr. Baker?
¹⁵ **A.  Yes.**
¹⁶ Q.  And I'm just going to ask you a couple of
¹⁷ questions quickly about some of the text messages
¹⁸ that are in here.
¹⁹ If you look at line 16, there is a text
²⁰ from you to Jan.  It says, Meeting with Kathy in 15
²¹ minutes.
²² That's the conversation we already
²³ discussed about October 3rd, 2013, correct?
²⁴ **A.  Yes.  Now, when we say we discussed, we**
²⁵ **discussed making submissions.  There were submissions**

---

404

¹ **prior to this, but this would have been one of the**
² **meetings that -- with her --**
³ Q.  Okay.
⁴ **A.  -- yes.**
⁵ Q.  Okay.  The pause is just me scrolling
⁶ through the document because I have an electronic
⁷ version and I marked the ones -- go to entries 82 and
⁸ 83.  There's communications between you and your wife
⁹ about a safety audit and who was there during the
¹⁰ pitch board.
¹¹ Did you ever record any of your
¹² conversations with Mr. Flatley?
¹³ **A.  No.**
¹⁴ Q.  Did you ever record your conversations with
¹⁵ anybody at Smith & Wesson?
¹⁶ **A.  No.**
¹⁷ Q.  Go to 140.  That's 1-4-0.  I don't think I
¹⁸ was clear.  Did you find it?
¹⁹ **A.  It's taking -- I have big fingers.  It's**
²⁰ **sometimes hard to get the pages.  I'm there now.**
²¹ Q.  Okay.
²² **A.  Okay.**
²³ Q.  It's a text message from your wife to a
²⁴ group of folks.  And it says, One of Dad's files, he
²⁵ calls it his Larry file, had all of its contents

---

Baker, Earl Donald - Vol. II                          September 25, 2020

41 (Pages 405 to 408)

---

405

1  still intact in the briefcase except for one of the
2  papers that was left out on Dad's desk.
3          Do you know what file she's referring to?
4          MR. LEE:  Objection to the form of the
5  question.  It calls for speculation, but if you
6  can answer it, you can answer it.
7          A.  I had been documenting some of the
8  things -- the interactions between me and Larry that
9  made me believe he was possibly being influenced by a
10 vendor.  I had that in a file.  But then when my
11 office was broken into, that file was taken from my
12 briefcase and gone, but one of the papers that was in
13 that file was left on my desk.
14         Q.  So the -- the Larry file was one of the
15 things that was removed when someone came in your
16 office; is that right?
17         A.  Yes.
18         Q.  Okay.  Go to line 190.
19         A.  Okay.
20         Q.  In the third sentence, it says, Earl did go
21 all -- all to HR back in August, but the woman didn't
22 file any paperwork.
23         Do you know what woman Ms. Baker is
24 referring to?
25         MR. LEE:  Objection.  Hold on.  Line 1 --

---

406

1  did you just read from line 190, Connie?
2          MS. BETRAM:  I was reading from the third
3  sentence in the entry in 190.
4          MR. LEE:  So this is May 15, 2014?
5          MS. BERTRAM:  Yes.
6          MR. LEE:  Okay.  It begins, It's been a
7  real eye opener?
8          MS. BETRAM:  Yes.
9          MR. LEE:  Okay.  Okay.  I was looking at
10 the one below that.  I thought the one below that
11 was 190.  Okay.  Go ahead.  What was the -- I'm
12 sorry.  Go ahead now.  I got -- I'm at the right
13 place.
14 BY MS. BETRAM:
15         Q.  In the third sentence, do you know who she
16 is referring to by "the woman didn't file any
17 paperwork"?
18         MR. LEE:  Objection to the form of the
19 question.  Calls for speculation, but if you
20 answer it, please do.
21         A.  In the context of this, I -- right now, I'm
22 unsure of who she's talking about.
23         Q.  Did Kathy Salvador and Ann Glica ever tell
24 you that they didn't file any paperwork relating to
25 your concerns that you raised in 2013?

---

407

1          A.  Let's see.  My -- I -- I could only
2  speculate that.  I don't really know.
3          MR. LEE:  Objection to the form.  Earl, her
4  question is separate.  You're still on the last
5  question.
6          THE DEPONENT:  Okay.
7          MR. LEE:  Can you read the last question
8  back, Eileen?
9          (Whereupon, the question was read back by
10 the reporter.)
11         THE DEPONENT:  No, they never told me that.
12 BY MS. BETRAM:
13         Q.  And did Ann Glica or Kathy Salvador ever
14 tell you that they thought that you were just going
15 into their offices to vent?
16         A.  No, they never said that to me.
17         Q.  Look at line 206 or entry 206.
18         A.  Yes.  Okay.  I have it.
19         Q.  Hold on a second.  The music just came on
20 really loud in the other room.  Okay.  Never mind.
21         Do you see entry 206?
22         A.  Yes.
23         Q.  And you're talking about a guy from
24 Balzers.  Do you recall who you're referring to
25 there?

---

408

1          A.  Yes. I'm trying to remember his name.  But,
2  yeah, I know who the person is.  His name is escaping
3  me, but he's a friend on -- on -- he's an associate
4  on LinkedIn with me.
5          Q.  And Balzers was a vendor of Smith & Wesson
6  while you worked there, right?
7          A.  Yes.
8          Q.  And was he your contact at Smith & Wesson?
9          A.  He came in to consult on -- and give a
10 seminar on how we might be able to improve tool
11 longevity at Smith & Wesson.
12         Q.  Is that how you met him?
13         A.  I don't know who first told me about him,
14 whether it was just a cold call on his part, but we
15 could -- we needed the information he had.  It
16 would -- it would help our engineers to know -- our
17 technology as far as coating, we were using a coating
18 that was good back in the '80s, and it wasn't the
19 most current or -- so there would be advancements
20 that would have occurred in that field that if we
21 employed would save us money.  So he came into the
22 seminar for us.
23         Q.  And when did that seminar take place?
24         A.  I -- I couldn't tell you the time.  My
25 guess would be either late 2013 or early 2014.

---

Baker, Earl Donald - Vol. II                          September 25, 2020

42 (Pages 409 to 412)

---

409

1     Q.   And did you reach out to him to assist you
2  in looking for a job in -- in May of 2014?
3        A.   It -- it's possible.  I don't deny that.
4  You know, throughout my career, if I felt like, you
5  know, it might be good to look for other employment,
6  I -- I looked at other opportunities that might be
7  there.  But to your question was he a vendor of Smith
8  & Wesson, we did our coating through two other
9  suppliers, not Balzers.
10       Q.   So is it fair to say that by May 29th,
11 2014, that you were actively looking for other
12 employment?
13       MR. LEE:  Objection to the form of the
14       question.  Misstates the witness's prior
15       testimony, but you may answer.
16       A.   When you say I was actively looking, I
17 don't know if I would characterize it that way.  But
18 had I looked at other opportunities throughout my
19 time with Smith & Wesson, the answer is yes, I did.
20       Q.   And when did you start looking for other
21 opportunities while you were employed at Smith &
22 Wesson?
23       A.   I really couldn't put a time frame on it.
24 I mean, it's -- it's something that a lot of times
25 with the way that emails are today, I still get

---

410

1  recruiters from Florida.  I didn't live in -- I
2  haven't lived in Florida for five years, but I still
3  get job opportunities that would pop up on my phone.
4  So do I look at them, yes, and if it's -- if it's
5  something I feel fits my, you know, fits my skill
6  set, it might be something I look at.  It doesn't
7  mean that I'm, you know, disloyal or looking to move.
8  It just means that, you know, I was approached with
9  an opportunity and I looked at it.
10       Q.   And you were looking for other
11 opportunities while you were at Smith & Wesson in
12 2013, right?
13       A.   No.  There is a difference between looking
14 for opportunities and looking at other opportunities.
15 I looked at other opportunities, but I -- I wasn't
16 actively seeking jobs.  If you -- and in my mind, if
17 I put my name out on LinkedIn as looking for work or
18 -- that's where I'm actively seeking.  But I haven't
19 put anything out there.
20       But there might be recruiters that knew I
21 had, you know, put a resume in some place that they
22 have gotten wind of and they may contact me and send
23 job opportunities.  That's them soliciting me.  But
24 me putting my name on job markets, I know that I -- I
25 don't -- I just don't believe I did that when I was

---

411

1  at Smith & Wesson.
2        Now, when I was on paid leave and -- and I
3  was sitting there, I -- I may have looked at the
4  computer more than I did when I was currently at a
5  job all day.
6        Q.   But it's true you made applications for
7  employment while you were still employed by Smith &
8  Wesson before you went on administrative leave,
9  right?
10       A.   I can think of one, yes.
11       Q.   And that was MSC, right?
12       A.   No.
13       Q.   What -- what was the one that you recall?
14       A.   There was an opportunity in Florida at
15 Piper, the -- they make Piper small aircraft.  They
16 -- I was aware of that opportunity, and I believe I
17 sent my resume there.
18       Q.   And when was that?
19       A.   Yeah, I -- I really wouldn't know a time
20 frame.
21       Q.   And --
22       A.   I think I even -- I think I even mentioned
23 it to Mr. Suraci.  So I -- I -- so it would --
24       MR. LEE:  Mr. who?
25       A.   -- have had to have been in 2014.

---

412

1        MR. LEE:  Sorry -- sorry, Earl.  You --
2  your answer got garbled.  I don't know if
3  Eileen got it, but you said you mentioned it
4  to Mr. somebody.  What was the name again?
5        THE DEPONENT:  Suraci.
6        MR. LEE:  Oh, okay.
7        THE DEPONENT:  But -- so I didn't meet him
8  in two thousand -- until 2014.  So it would have
9  had to have been sometime in 2014.
10 BY MS. BETRAM:
11       Q.   And you also interviewed for positions
12 while you were still employed by Smith & Wesson
13 before you went on administrative leave, right?
14       A.   In -- not that I can recall.
15       Q.   And at some point, you started talking with
16 MSC about employment, right?
17       A.   After I was placed on leave or terminated,
18 one of the two, I did -- yeah, I would -- I would say
19 I was on administrative leave when I talked to them.
20       Q.   I'm scrolling.  Go to entry 251.  Do you
21 see that entry?
22       A.   Yes.  I'm -- I'm reading it.  Sorry.
23       Q.   Okay.  Let me know when you're done.
24       A.   Okay.
25       Q.   And that's a June 14, 2014 email from you

---

Baker, Earl Donald - Vol. II                    September 25, 2020

43 (Pages 413 to 416)

413

1  to Mr. O'Brien, correct?
2      A.  Yes.
3      Q.  And you said, We then argued about how to
4  collect the information.
5          Who was arguing?
6      A.  It would have been Steve Wasielewski and
7  myself.  We had a group.  As part of our ongoing cost
8  savings ideas, Ron O'Brien had an idea to save us in
9  our estimation that would have amounted to a $10
10 million per year savings.  And we were fleshing out
11 how to implement that in Steve's department first.
12 After having run the idea by Mr. -- I believe
13 Mr. Fontaine and Mr. Flatley, we thought -- he put
14 together a group containing Mr. Wasielewski and
15 thought it would be good to try to implement it in
16 his department.
17         So this was just fleshing out the details
18 of how we try to implement Ron's idea.
19     Q.  Okay.  And what was Ron's idea?
20     A.  The -- in looking at the mainframe that
21 records tool life, it -- the machines actually will
22 tell you when to change inserts.  So ideally the
23 interim set them to set an alarm at a hundred percent
24 used to tell you to change the insert.
25         Because no one was monitoring this, Ron did

414

1  a study and found that the average number -- or the
2  average percentage used at the time they changed the
3  insert was 25 percent or somewhere around 20 percent,
4  which meant that the employees would have less
5  distractions during their workday if it had fresh
6  tools in it.
7          So they would come in and change the tools
8  as soon as they came in even though they'd only used
9  20 percent of the life of that tool, which was
10 meaning that we were wasting 70-some percent of the
11 useful tool life.
12         So he determined that if we would only
13 change the tools when we -- they were in the
14 90-percent range plant-wide, extrapolating that by
15 the -- the amount we spent on tools, it would amount
16 to a $10 million a year savings.  That was his idea.
17     Q.  And other than you and Mr. Wasielewski and
18 Mr. O'Brien, was anybody else working on this
19 project?
20     A.  There were other members of that panel,
21 some of which I had never met before.  I believe they
22 worked for Mr. Wasielewski, but I don't -- I don't
23 recall their names.
24     Q.  And who was the team reporting to?
25     A.  I was the lead on that because I brought

415

1  the idea to management and they said yes, go for it.
2      Q.  And were you doing what's called a Kaizen?
3      A.  It could be a -- considered a Kaizen, but
4  in this particular case, we -- we had not deduced any
5  savings yet.  So down the road, there may have been a
6  -- a Kaizen event around this, but at this point, we
7  were just going through normal channels to propagate
8  an idea that might save us a lot.
9      Q.  So go to entries 263, 264, and 265.
10     A.  All right.  I'm there.  I'm just reading.
11     Q.  Yeah.  Just read through those three
12 entries.  They're all related to each other.
13     A.  Okay.  I've read them.
14     Q.  And those are text communications from you
15 to Chet Lewis at Balzers, right?
16     A.  Yes, that -- that is the individual that
17 we -- we spoke about earlier, Chet Lewis.
18     Q.  And they were --
19     A.  I couldn't remember his name.
20     Q.  And they were all sent on June 19 of 2024
21 [sic]?
22     A.  Yes.
23     Q.  And you were inquiring about employment
24 with Balzers, correct?
25     A.  Yes.

416

1      Q.  And in the third one, you state, I will
2  think through who might be a good person to advocate.
3  Smith does 20,000 a year in -- 20,000 in coating a
4  year.  Is that right?
5      A.  Yes.  That was relative to coating, yes.
6      Q.  And Mr. Lewis had asked you who might be
7  able to help Balzers get some of the coating work,
8  right?
9      A.  Yes.
10     Q.  Okay.  Did you identify a person who might
11 be an advocate?
12     A.  No.  And the reason, this is just prior to
13 me going on paid leave.  So I stand corrected on my
14 -- my recollections.  But I went on paid leave within
15 days, I think, of this.  Or I don't know even know.
16 This may have actually been on paid leave.  I don't
17 know.
18         Anyhow, if I'm talking to him about this
19 job, I was the guy who -- who set out the coating.
20 But if I'm talking to him about a job, it might not
21 be -- I might not be the best source to advocate for
22 him to be a vendor.  So I was just going to -- I put
23 him off until I found a source that I felt could be
24 objective in making the best decision for Smith &
25 Wesson.  So I just felt ethically I'm not going to

417

advocate for him, but I'll look for somebody that
might.
Q. Go on to the entries 276 through 280.
A. Okay.
Q. And those are email communications -- I'm
sorry, text communications between you and Ms. Baker
and then you and Mr. Goode at MSC, correct?
A. Yes.
Q. And they're dated June 23rd, 2014?
A. Yes.
Q. And at that point, you and Ms. Baker were
looking at positions for you at MSC, right?
A. No, there's a difference. Ms. --
Mrs. Baker, my wife, found a job at -- that was being
advertised at MSC. She texted me to tell me about
it, and I told her, You have my resume, so apply.
And then I told her that I could ask Al about it.
         So this is just prior to my being put on
paid leave. I felt like the handwriting was on the
wall, and I better start looking at other
opportunities. But that's -- that's the gist of it.
But I wasn't the one who found the thing at MSC.
That was Jan.
Q. And the -- the text that was sent on
June 23rd to Mr. Goode, was that the first time that

418

you reached out to him about potential employment
with MSC?
A. The texts that we're showing here were
between me and Jan. What texts are you referring to?
Q. Look at line 279.
A. Oh, yeah, that is -- yup. That's from me
to Al Goode.
Q. Right. Was that the first time that you
reached out to him about potential employment at MSC?
A. Yeah, I believe so.
Q. I'm going to refer you to line 290.
A. Okay.
Q. This is an email -- a text, I'm sorry, from
your wife to a group and it's dated June 30 of 2014,
correct?
A. Yes.
Q. And it says, Dad's interview went excellent
today.
         What interview was she referencing?
A. I'm not even sure what one it would be.
Obviously, I didn't get the job.
Q. Look at the next line, 291. It says, MSC
Industrial. Does that refresh your recollection?
A. Yeah, it possibly was. I mean, it's right
at the same time, so I would think that it might be

419

an MSC job in -- in Tampa. But the only thing I
would say is with MSC, I never got to an interview
with M -- MSC that -- on my recollection. I don't
recall ever interviewing where -- I may have put in
for something, but I don't recall ever being
interviewed by them. So that's why I'm -- I'm
reluctant to say that those were the exact same
thing.
Q. Look at the next entry, which is 292, and
it's a text dated July 1st, 2014 to Scott Fuller,
right?
A. Um-hmm.
Q. And Scott is with MSC, correct?
A. Okay.
Q. Is that right?
A. Yes.
Q. Okay. And you say, I wanted to thank you
for taking your time to come meet with me.
         Did you meet with Mr. Fuller around that
time?
A. I -- I met with Mr. Fuller. He --
Mr. Goode brought him along. We had a meal at a
restaurant in Massachusetts to which he introduced me
to Scott Fuller, which was his boss. So this, I'm
thanking him for doing that, and, apparently, you

420

know, we had clicked to apply to jobs with MSC at
these various locations. And I was probably just
reaching out to him, thank you for meeting -- so we
didn't meet him based on a specific job. That was
just an introduction that Al made and I was trying to
leverage that meeting with Scott Fuller, Al's boss,
into possibly getting some influence by him to see if
I could actually get an interview in these other job
opportunities.
Q. Look down at the bottom of that page, the
entry 296. It's a text message from Ms. Baker to
David Wylie dated July 2nd, 2014.
A. Okay.
Q. In the second sentence, it says, They tried
to offer (inaudible) --
         THE COURT REPORTER: I'm sorry,
Ms. Bertram. I can't hear you.
BY MS. BETRAM:
Q. It says, They tried to offer a pitiful
severance package and he said no way, so they're
renegotiating.
         Was that a severance package that was
offered to you by Smith & Wesson?
A. Mr. Cicero in one of our meetings before I
went on paid leave offered me two weeks' severance or

Baker, Earl Donald - Vol. II

September 25, 2020

45 (Pages 421 to 424)

---

421

1  something like that.  It was -- it was like some
2  pitiful amount, two weeks or whatever.  And my reply
3  was -- at that point was $400,000.  And he said, Why
4  did you arrive at that figure?  And I said, I did
5  some research on Sarbanes-Oxley settlements and that
6  the average settlement was over 700 grand and that I
7  felt like I'm giving them a discount over what would
8  be normal.  And he said he would take that to his
9  boss.
10      So that's her -- and we discussed that in
11  my prior deposition.  This is her recounting
12  secondhand from her to her brother of the same thing
13  that I told you about.
14      Q.  In the next sentence -- well, after the
15  next sentence, it says, He's on vacation for then
16  exit two weeks.  I guess that's "the next two weeks."
17      Is it true that you went on vacation for
18  two weeks at that point?
19      A.  Yes.  Mr. Cicero documented that, that he
20  said -- you know, I told him that I would -- had
21  vacation time.  I'd like to take it and kind of
22  reconsider where I'm -- I'm at with the company.
23  Mr. Cicero and I had a conversation that was not
24  good.  He's -- so I -- I asked for -- I said, I know
25  it's customary to get -- to put in for vacations a

---

422

1  certain time ahead of time.  I said, I won't be able
2  to do that.  Would it be all right if I took my
3  vacation.  And Mr. Cicero said yes, I'll work that
4  out.
5      So I did take a vacation, a two-week
6  vacation, right over the 4th of July type weekend,
7  and that's what this refers to.
8      Q.  And she says next, For now, we're moving
9  back to Ohio until he gets another job.
10      Did you at that point move back to Ohio?
11      A.  That -- no, we did not.  That was my --
12  that was her best guess at that point what we would
13  probably do.
14      Q.  And did you not move back to Ohio at some
15  point while you were on administrative leave?
16      A.  No.  No.  We -- we moved back to Ohio in
17  December of 2014.  December 14th to be exact.
18      Q.  And let's go to entry 301, and I'll give
19  you a chance to read it.  It's a little longer than
20  some of the others.
21      A.  Okay.
22      Q.  This is an email dated July 9, 2014 from
23  you to Mr. Fuller at MSC, right?
24      A.  Yes.
25      Q.  And you're, again, reaching out about

---

423

1  potential employment with MSC, right?
2      A.  Yes, or -- or the possibility of him
3  pulling a few strings so that I might be considered
4  more than just clicking on the website.
5      Q.  And you said -- you say to him in the next
6  to the last line, I had a second interview with
7  Guhring, G-u-h-r-i-n-g, Guhring --
8      A.  Um-hmm.  Yes.
9      Q.  -- yesterday.  What's Guhring?
10      A.  Guhring --
11      Q.  A person or a company?
12      A.  Guhring is a grind house that -- they make
13  -- their primary thing is drills and those type of
14  things.  So it would be in my wheelhouse as far as my
15  experience, and so I did interview with them, and it
16  eventually led to a third interview, which I thought
17  I would get, and I did not.
18      So, at this point, they were just phone
19  conversations.
20      Q.  Go to entry 311.  This is a July 12, 2014
21  text.
22      A.  Okay.
23      Q.  So Mr. O'Brien had sent an -- an email to
24  Anne Bruce, right?
25      A.  Okay.  I read it.

---

424

1      Q.  And do you recall that Mr. O'Brien sent an
2  email to Ms. Bruce?
3      A.  Ron had told me a couple different
4  occasions that he sent something.  So I'm not sure
5  exactly what it's referring to.  He had told me that
6  he had sent something to Ms. Bruce.  He also told me
7  that he -- he had sent something to Mr. Debney.
8      So I -- I am -- I would assume that it
9  references that.
10      Q.  And --
11      THE COURT REPORTER:  What was the last name
12  you said?  Sent something to Mr. What?
13      THE DEPONENT:  Debney.
14      MS. BETRAM:  Debney.
15      THE COURT REPORTER:  Debney.
16      THE DEPONENT:  Debney was the CEO.
17      THE COURT REPORTER:  Oh, okay.  Thank you.
18  BY MS. BETRAM:
19      Q.  And did you -- did you review any of
20  Mr. O'Brien's emails before he sent them to Ms. Bruce
21  or Mr. Debney?
22      A.  On -- there was at lease one occasion where
23  he had.  Ron had a tendency to -- at the time he
24  called me, I think he was maybe inebriated, and he
25  had written an email and asked me if I would look at

---

Baker, Earl Donald - Vol. II                September 25, 2020

46 (Pages 425 to 428)

---

425

¹ it.  I don't know if that happened more than one
² occasion.  I know that -- it's possible it could have
³ happened more than once.  But I do recall at least
⁴ one occasion where he asked me to review what he had
⁵ written.
⁶    Q.  And did you make any revisions to his
⁷ drafts?
⁸    A.  I -- I think I did, but I don't know.  Ron
⁹ was prone to writing things in all caps and -- you
¹⁰ know, he was a friend and he was -- he wasn't in the
¹¹ best of shape when he wrote the things.  So I may
¹² have made some suggestions, but I can't recall
¹³ specifically if I had.
¹⁴    Q.  Did you write any portion of the emails
¹⁵ that Mr. O'Brien sent to Ms. Bruce or to Mr. Debney?
¹⁶    A.  I -- I may have rewritten part -- parts of
¹⁷ it because I don't -- like I say, what he told to me
¹⁸ verbally, I don't think he was successful in putting
¹⁹ it into words, so I may have helped him put it in a
²⁰ legible form, if you will.
²¹    Q.  Go to entry 328.  You were providing some
²² in -- this is a July 12th, 2014 email from you to
²³ Ms. Baker.  It relates to -- is that related to a job
²⁴ offer that you'd received at that point?
²⁵    A.  It appears as such, but I -- I don't know

---

426

¹ specifically which one it was.  But I know the -- the
² numbers that I'm referring to and what it meant about
³ the bonus.
⁴    Q.  And in or around July 12, 2014, did you
⁵ receive a job offer?
⁶    A.  It may have been in -- in connection with
⁷ Guhring, but I did not receive the job offer, no.
⁸    Q.  Okay.  Do you know why --
⁹    A.  They did --
¹⁰    Q.  - why you did not -- go ahead.  I'm sorry.
¹¹    A.  Go ahead.  I -- I just was saying that, as
¹² I said, I did receive a subsequent email or interview
¹³ with Guhring after, but in the end result, I did not
¹⁴ get the job.
¹⁵    Q.  And do you know why you did not receive
¹⁶ that position?
¹⁷    A.  I know what I was told.
¹⁸    Q.  What were you told?
¹⁹    A.  That there was just too much going on with
²⁰ the Smith & Wesson thing that, you know, they just
²¹ passed.
²²    Q.  Okay.  Did they ever discuss with you
²³ compensation or benefits that they would be offering?
²⁴    A.  I don't know that they did.  If this is
²⁵ about that, then they would have.  But my

---

427

¹ recollection is they were pretty serious.  They
² actually flew me to Milwaukee.  But I don't know if
³ we -- to be honest, if we got to the point of
⁴ discussing money.
⁵    Q.  Um-hmm.  Go to entry 360.
⁶    A.  Okay.
⁷    Q.  Entry 360 is a July 27, 2014 text from
⁸ Ms. Baker to your daughter, Katie Barnett, right?
⁹    A.  Um-hmm.
¹⁰    Q.  Is that a yes?
¹¹    A.  What was it, three --
¹²    Q.  Three sixty.
¹³    A.  Oh, I was reading the wrong one.  I'm
¹⁴ sorry.
¹⁵    Q.  Okay.
¹⁶    A.  Yes, it's from me to Ron O'Brien.
¹⁷    Q.  I'm looking at 3-6-0 that starts, Still
¹⁸ employed and still on paid leave.
¹⁹       MR. LEE:  Yeah, I think you were looking at
²⁰    359, Earl.  The same date, but it's the one below
²¹    that, I think.
²²    A.  It's gotten a little bit dark here.  It's
²³ cloudy.  Let me turn the light on.
²⁴    Q.  The one I see that says 360 is -- is
²⁵ July 21st, 2014, between me and Ron O'Brien:  I agree

---

428

¹ that they have a time bomb on their hands and they
² better start doing their job or else.
³       MR. LEE:  Okay.  Hold on.  Are you looking
⁴    at Exhibit 4, line 360?
⁵       THE DEPONENT:  Yes, I believe so.
⁶ BY MS. BETRAM:
⁷    Q.  Are you looking at the same set of texts
⁸ that we were just looking at?
⁹    A.  Yeah, no different book.
¹⁰       MR. LEE:  So the hard copy and what
¹¹    you and I are looking at, Connie, must be a
¹²    little different.
¹³       MS. BETRAM:  Right.
¹⁴ BY MS. BETRAM:
¹⁵    Q.  Is this part of the set that you just
¹⁶ received by Federal Express?
¹⁷    A.  Yeah.  I'm in the same book.  I just
¹⁸ flipped a few pages.
¹⁹    Q.  Okay.
²⁰    A.  Three six -- 361 is -- starts out, Rebecca
²¹ complained to me that she can't get overtime.
²²    Is that what your 361 says?
²³       MR. LEE:  No.  Our --
²⁴       MS. BETRAM:  No.
²⁵       MR. LEE:  -- 361 says, Ugh, I don't -- I

---

Baker, Earl Donald - Vol. II

September 25, 2020

47 (Pages 429 to 432)

---

### 429

1  know you got -- I know guys like Larry and blah,
2  blah, blah, so ...
3        MS. BETRAM:  Well, let's -- let's --
4        MR. LEE:  We're just looking at -- yeah,
5  we're looking at two different documents.
6  BY MS. BETRAM:
7        Q.   Yeah.  Let's -- let's -- let's go by the
8  date, which is -- it's in date -- date and time
9  order.  Look at July 27, 2014 at 11:11 P.M.
10       A.   Okay.  July 27th.  Okay.  I got it.
11       Q.   Okay.  And Ms. Baker tells your daughter,
12  Larry told a plumber at Smith & Wesson that he's
13  going to tear Dad's head off and S -- -- -- down his
14  neck.  Someone reported it to HR.
15            Do -- do you know the name of the plumber
16  that she references in her text?
17       A.   When I was told the scenario by Lamonte
18  Parks, he just mentioned that it was a plumber but
19  did not give me his name.
20       Q.   And when did Mr. Parks report this to you?
21       A.   I'm not sure when, but it would have been
22  shortly after I was on paid leave and I told
23  Mr. Suraci, and I'm sure there would be an email to
24  that effect.
25       Q.   And the last line says, Someone reported it

### 430

1  to HR.  Do you know who reported it to HR?
2       A.   I don't know what she's referring to there.
3  I think Mr. Parks had a talk with -- with somebody,
4  but then later I received a phone mail -- or phone
5  call from Mr. Cicero saying he had recanted.
6       Q.   Go to July 30, 2014 at 7:42.
7       A.   Okay.
8       Q.   It starts, Ed Prystupa.  Is that right?
9       A.   Yes.
10            MR. LEE:  Sorry.  Which one are we at?
11  What's the date and the -- at least the number
12  that you have -- you and I have, Connie?
13            MS. BERTRAM:  The number that I have is
14  371.
15            THE DEPONENT:  That's -- that's what I've
16  got.
17            MS. BERTRAM:  Okay.
18  BY MS. BETRAM:
19       Q.   So it says, Ed Prystupa was the guy who
20  pulled me aside and told me to order from Pioneer.  I
21  then emailed Debney because it to be strange.  You
22  have my email.
23            This is from Ron to you, correct?
24       A.   Yes.
25       Q.   Do you know what he's referring to as to

### 431

1  "the guy that pulled me aside"?
2       A.   Yes.  I -- I may have asked him -- his
3  initial claims were that he was ordered to only order
4  from Pioneer, and he sent an email to Mr. Debney
5  saying that it -- he was being ordered to order from
6  a higher-priced vendor.  At the time, I don't know if
7  I knew where it came from, but he's answering a
8  question that I may have posed to him as to who was
9  it that told you to order from Pioneer.  Because that
10  would be important in if somebody is directing his
11  purchases away from what his consideration should be
12  in price, availability, and quality.  And so in
13  answer to that query, he is saying Ed Prystupa was
14  the guy that pulled him aside, you know.  You can
15  read the email.
16       Q.   And did you ever talk with Ed Prystupa
17  about what Mr. O'Brien told you?
18       A.   No.  Ed was associated with our department
19  when Stanley was in play.  But when Stanley still was
20  at the office, and we shared the office, Ed Prystupa
21  was a friend and would come by and visit him daily, a
22  few times a day.  So I would talk to Ed casually.
23            But once Stanley left, I very seldom ever
24  saw Ed.  So -- so I -- I never -- never really had
25  much interaction with Ed Prystupa after Stanley left.

### 432

1       Q.   Let's go to entry 386.  This is an
2  August 1st, 2014 text from Ron O'Brien to you.  It
3  states, Not a problem.  Just tell me what you want to
4  do and when you want me to do it.  We need fact and
5  not fiction.  I'll give Smith notice of any impending
6  actions.
7            Do you know what Mr. O'Brien is referring
8  to in this text?
9       A.   Is -- is that from Ron to me?
10       Q.   It appears to be, yes.
11       A.   I have no clue what he's talking about.
12       Q.   But at that point, you were on
13  administrative leave, right?
14       A.   Yes.
15       Q.   And Mr. O'Brien was still working for the
16  company?
17       A.   Yes.
18       Q.   Did you ever ask him to gather any
19  information or documents relating to your claims?
20       A.   I don't know that I did specifically, but
21  I -- I don't think that -- you know, it's possible
22  that I could have, but I don't believe that I did.
23       Q.   Do you recall him providing any documents
24  to you while you were on administrative leave?
25       A.   No, no.  He never gave me any documents,

Baker, Earl Donald - Vol. II                                September 25, 2020

48 (Pages 433 to 436)

---

433

1  and I don't recall asking for any.  But, no, he never
2  gave me any documents.
3      Q.  Let me just -- I have one quick question
4  back at 371, the text related to Ed Stripe -- Pry --
5      A.  Prystupa.  Okay.
6      Q.  That relates to events in 2010, correct?
7      A.  Pardon?
8      Q.  That -- that relates to events in 2010,
9  correct?
10      A.  I have --
11      MR. LEE:  Objection to form.
12      A.  -- no clue.
13      Q.  Do you know -- do you know the date of the
14  events described by Mr. O'Brien to you?
15      A.  No.
16      Q.  Go to entry 396.  It's a -- an August 4,
17  2014 text message from you to Ron.
18      A.  Okay.
19      Q.  And you say, I emailed Debney that Larry
20  said he would F us, and if we screamed about it, he
21  would pour sand on it next time.
22      What was the source of that alleged
23  statement by Larry Flatley?
24      A.  He was sitting next to me.
25      Q.  And when did -- when did he allegedly make

---

434

1  that comment?
2      A.  I don't know the exact date, but it would
3  have been in 2013 because I -- I took that -- that
4  comment to HR and spoke to Kathy Salvador about it.
5      Q.  And when he made that comment, was anybody
6  else present?
7      A.  Yes.
8      Q.  Who else was there?
9      A.  Dave Billingsly, Tony Nelson, and Charlie
10  Martin.
11      Q.  And was the comment, as you understood it,
12  directed to you or to the entire group?
13      A.  I thought it was directed to the entire
14  group, but it had a -- it was meant to have a higher
15  significance to me.  We had just had a -- a little
16  bit of a talk where he was kind of like warning me
17  type of thing about well, I don't know.  That's it.
18  I don't even know how it would be even -- how you
19  could say it.  It just -- he was kind of puffing his
20  chest up and like -- he knew that there was
21  allegations made related to vendor improprieties, and
22  I think he was asserting his authority.
23      So he left that meeting, went directly into
24  the staff meeting, which Mr. Billingsly, Tony Nelson
25  -- and Charlie Martin said something, and his reply

---

435

1  to all of us was that, I will F you in the ass and
2  that if you scream about it, I will pour sand on it
3  the next time, which I felt it applied to the
4  conversation just prior with me, and that he was
5  telling the group if anyone were to whistle blow or
6  to take information to management about me, I will F
7  you and -- and if you tell them about what I'm doing
8  to you, I'll pour sand on it and do it again.
9      So it was a -- it was a warning to all of
10  us, Don't F with me, and I will take you out.
11      Q.  And the -- the three individuals that you
12  mentioned other than Mr. Flatley were the three other
13  cell coordinators, correct?
14      A.  Under Larry, yes.
15      Q.  Okay.  And so you reported these comments
16  to HR?
17      A.  Yes.
18      Q.  And do you know whether they spoke to the
19  other cell coordinators about these two alleged
20  comments?
21      A.  At the time, it was not -- I didn't hear
22  anything for months.  Then when Mr. Suraci became
23  involved, it came up in one of our conversations and
24  he says, Well, this is the first time I'm hearing
25  about it.  And then he said he was going to circle

---

436

1  back with Kathy to find out if she had documented it.
2  And my recollection is that at that point in February
3  that it had -- I remember telling him I thought that
4  it was six months prior to that.  So if you backtrack
5  six months from February, that was when the statement
6  was made.
7      But they never got back to me to find out
8  if Kathy had, in fact, documented it.  But at some
9  point, I believe, Anne Bruce told me that the
10  individuals that she asked that were in that meeting
11  didn't recall.  She didn't say it didn't happen.
12  They said they didn't recall.  So from my standpoint,
13  that told me that they're just not saying.  Somebody
14  doesn't say that to another -- you're not a man; you
15  don't -- you may not get this.  But one man does
16  not say that to another man you wouldn't recall
17  it.
18      Q.  And -- and you don't know -- you don't have
19  personal knowledge of what the other cell
20  coordinators told Ms. Bruce or anyone reporting to
21  Ms. Bruce, right?
22      A.  No.  I did -- I did get a report from her
23  that they said they didn't recall that statement.
24  That's -- that's all I know.
25      Q.  Go to the entry for 424.

---

Baker, Earl Donald - Vol. II                     September 25, 2020

49 (Pages 437 to 440)

437

1          MR. LEE:  424, did you say?
2          MS. BETRAM:  Yes, at the very top of one of
3     the pages.
4   BY MS. BETRAM:
5     Q.   Do you see that entry?
6     A.   Yup.
7     Q.   It's from Ms. Baker to Judy Hively; is that
8   right?
9     A.   Yes, um-hmm.
10    Q.   And who is Ms. Hively?
11    A.   It's my wife's twin sister.
12    Q.   Okay.  She says in the second sentence,
13  Meanwhile, we moved out of our apartment yesterday
14  and put everything into storage.
15    A.   Um-hmm.
16    Q.   Our way to Chicago -- on our way to Chicago
17  to stay with Mike and Lisa for a bit.
18         Did you move out of your apartment in --
19    A.   We moved out of our apartment --
20    Q.   -- move out of your apartment at that
21  point?
22    A.   We moved out of our apartment in Enfield
23  because the lease was up and we didn't know if we
24  wanted to stay there.  We were also on paid leave, so
25  we -- since things were up in the air at this point,

438

1   I was interviewing everywhere at other places, I
2   didn't know if things would work out with Smith &
3   Wesson, and we'd have to find another apartment or
4   whether or not we were going to be, in fact, offered
5   a job elsewhere and move there.
6          So, in the interim, we decided to go stay
7   with our daughter in Chicago.
8     Q.   Okay.
9     A.   I think it explains that in 426.
10    Q.   Go to 460.  This is an August 21, 2014 text
11  from you, it looks like, to Pavel, is that right,
12  P-a-v-e-l?
13    A.   Pavel Tarrawonga, yes.
14    Q.   I've only got one question on this.  Did --
15  did -- did Pavel ever respond back to you to your
16  recollection?
17    A.   I don't believe he did.
18    Q.   And do you know whether your attorney has
19  ever spoken with him?
20    A.   I don't believe they did because he didn't
21  respond back.  The number that we were looking for
22  to -- for -- to see if Pavel had, I ended up getting
23  through another source.  So that would leave me to
24  believe that Pavel never contacted me back.
25    Q.   Go to entry 475.

439

1     A.   Okay.
2     Q.   And that's an email from you.  Do you know
3   the phone number that you were sending that to, who
4   that was?
5     A.   No, I don't even know whose that number is.
6     Q.   Okay.  It says, Smith & Wesson never called
7   back and my attorney now feels they're trying to run
8   out the clock.  My attorney started to assemble
9   things to file on -- things to file Monday.
10         And this is dated September 16, 2014.  At
11  that point, was your attorney starting to put
12  together your filing before OSHA?
13    A.   I -- I assume that that's what that means.
14  You'd have to --
15         MR. LEE:  Objection.  First of all --
16    A.   -- talk to him.
17         MR. LEE:  -- don't -- yeah, objection to
18  the form of the question.  Earl, you should not
19  go into any discussion you had with lawyers.
20         THE DEPONENT:  Gotcha.
21         MR. LEE:  I mean, if you know what he did
22  at that point in time or -- and all that, that's
23  fine.  But do not go into any communications
24  between you and your lawyer, even back then.
25  BY MS. BETRAM:

440

1     Q.   Go to entry 504 and 505.  And those are
2   emails or texts of your -- of your wife referring to
3   you getting a job in Ohio -- Cleveland, Ohio.  Did
4   you receive a job offer at that point?
5     A.   No.  As it turned out, no.
6     Q.   Okay.
7          MS. BETRAM:  That's all I have on -- on
8   this exhibit.  If you want to take a break, this
9   would be a nice place to take a break because I'm
10  just about to go into another topic, which I'll
11  try to move through really quickly.  But I didn't
12  want to get halfway into it and then -- or just a
13  couple questions into it.
14         So why don't we just --
15         MR. LEE:  That's fine.
16         MS. BETRAM:  Okay.
17         MR. LEE:  I'll -- yeah, that's fine.
18         THE VIDEOGRAPHER:  Going off the record at
19  3:37 P.M.
20         (A break was had.)
21         THE VIDEOGRAPHER:  Back on the record at
22  3:50 P.M.
23  BY MS. BERTRAM:
24    Q.   Mr. Baker, do you contend that anyone at
25  Smith & Wesson retaliated against you with respect to

441

1  your June of 2013 performance evaluation?
2          MR. LEE:  Objection to the form of the
3  question, but you may answer if you can.
4      A.  Yes.
5      Q.  Who retaliated against --
6          MR. LEE:  Can -- hold on.  Hold on.  Can
7  you have that question read back, please.  Pay
8  attention to the dates, please.  I thought I
9  heard it correctly, but ...
10         (Whereupon, the question was read back by
11 the reporter.)
12         THE DEPONENT:  I -- I believe that
13 evaluation is full of untruths and --
14         MR. LEE:  June of 2013.  The question was
15 June of 2013.
16         THE DEPONENT:  I'm sorry.  I had the wrong
17 date.
18         MR. LEE:  That's why -- that's why I was --
19 you know, that's why --
20         THE DEPONENT:  Okay.
21         MR. LEE:  -- I was objecting.
22         THE DEPONENT:  I'm sorry.
23 BY MS. BETRAM:
24     Q.  Let me ask -- let me re-ask the question.
25     A.  Yes, please.  I'm sorry.  My head is

442

1  somewhere else.
2      Q.  Do you contend that anyone at Smith &
3  Wesson retaliated against you in connection with your
4  June of 2013 performance evaluation?
5      A.  No.
6      Q.  Do you contend that anybody at Smith &
7  Wesson retaliated against you with respect to your
8  June 2014 interim performance evaluation?
9          MR. LEE:  What was the date again?
10         MS. BETRAM:  I think I may have misspoken.
11         MR. LEE:  Yeah, that's -- that's -- I think
12 you said June and you said interim.  That's why I
13 was -- objection to the form of the question.
14 BY MS. BETRAM:
15     Q.  Right.  I'll strike that question and
16 re-ask it.
17         Do you contend that anyone at Smith &
18 Wesson retaliated against you with respect to your
19 February 2014 interim evaluation?
20         MR. LEE:  Objection --
21     A.  Yes.
22         MR. LEE:  Objection -- let me do my
23 objection but you can -- objection to the form of
24 the question, and to the extent Mr. Baker
25 understands the legal standards for retaliation,

443

1  he may answer if he can.
2      A.  I -- I don't know the legal standard of it,
3  but I feel that the untruths in that document were a
4  form of retaliation against me.
5      Q.  And who do you contend retaliated against
6  you in connection with that evaluation?
7      A.  I believe Mr. Flatley that wrote the
8  evaluation put many false statements in there that
9  can be proven false, and those who refused to look
10 into it are complicit and, therefore, a part of that
11 retaliation.
12     Q.  And who do you contend refused to look into
13 the concerns about the evaluation?
14     A.  I can mention at least one name, but I
15 would assume there are many more that -- that falls
16 under the auspices of their job as HR representatives
17 to look into these things.  But when I tried to take
18 documents to show Mr. Cicero to show that they were
19 false claims, Mr. Cicero refused to look at them.
20     Q.  So is that the one name that you could
21 identify?
22     A.  Yes.
23     Q.  So other than Mr. Flatley and Mr. Cicero,
24 do you contend that anybody else retaliated against
25 you in connection with your February 2014 evaluation?

444

1      A.  I feel people in general have.  Possibly
2  Mr. Fontaine because he told me that he would not
3  look at the evidence that I presented to him, turned
4  the review on -- over on his desk upsidedown and
5  said, As far as we're concerned, this doesn't exist.
6  It -- it's nothing.  It doesn't exist as far as the
7  company is concerned.  It was an outer cycle.  It
8  doesn't exist so we don't need to discuss it.
9          But later on, he signed that review and it
10 went into my thing.  So I believe he used it as a
11 form of retaliation against me.
12     Q.  Do you (inaudible) --
13         THE COURT REPORTER:  I didn't hear that.
14 BY MS. BETRAM:
15     Q.  Do you contend that anyone else retaliated
16 against you in connection with that evaluation?
17     A.  Possibly, but none that I can mention
18 specifically.
19     Q.  What is the basis for your contention that
20 Mr. Flatley, Mr. Cicero, and Mr. Fontaine potentially
21 retaliated against you?
22     A.  If --
23         MR. LEE:  Objection -- objection to the
24 form of the question, but you may answer.
25     A.  If someone says something about you that is

Baker, Earl Donald - Vol. II                    September 25, 2020

---

445

1  totally untrue, it's prove -- it's probable that it's
2  based on false statements, but those in a management
3  position that has the ability to look at and rescind
4  those refuse to view or take action on your behalf,
5  that is a form of retaliation, specifically based on
6  the fact that we had an HR policy that mandated that
7  certain actions be taken to avoid that situation.
8       So when that action isn't taken, and the
9  only thing that I knew that -- that I did or was told
10  about was reporting what I perceived to be wrongdoing
11  in the company in respect to bribes and vendors and
12  vendor allocation.
13       So my performance in my department was
14  double what it had been prior to me being there, both
15  -- in every measure.  And I was being singled out and
16  treated differently than other people in the -- the
17  shop.  And so I am only left with one conclusion,
18  that it had to do with my submissions that someone
19  was giving more work to one vendor based on gifts and
20  affiliations that weren't in the best interest of
21  Smith & Wesson.
22       Q.   And why do you believe that the actions of
23  these three individuals were because of your concerns
24  about vendor (inaudible) --
25       THE COURT REPORTER:  I'm sorry.  I can't --

---

446

1  I'm just not hearing you.  It's garbled.
2  BY MS. BETRAM:
3       Q.   What is the basis for your belief that they
4  retaliated against you based on your concerns about
5  vendors as opposed to any other potential motive?
6       A.   I -- as I explained, I -- I can demonstrate
7  by the pitch board and -- which is the measure that
8  we determine of each department that my production
9  had more than doubled, which in my industry, if you
10  can get a 20 percent increase in production, that's
11  phenomenal.  To have 115 percent increase in
12  production, it's unheard of.
13       And in the same place, to increase quality
14  by 30 percent and to set up a computerized system
15  that made us more efficient, by performance, I knew
16  that there was -- that the things that Flatley was
17  saying were total falsehoods.
18       So they didn't have anything specific that
19  -- that would explain their actions that made me
20  stand out enough to where I'm being singled out,
21  judged by a different set of criteria than anyone
22  else in the shop other than the fact that I made
23  submissions that I believed that fraud was -- had
24  taken place at Smith & Wesson and that purchases were
25  being directed contrary to the company's interests.

---

447

1       Q.   And let's focus on the three different
2  individuals that you identified.  Why do you believe
3  that Mr. Flatley was aware of your allegations of
4  fraud when he prepared your February 2014 evaluation?
5       A.   He's the one that wrote the false things
6  right off the bat.  The things that I had -- the
7  documents that I produced have implied that if he
8  wasn't a part of the problem, that he certainly
9  should be and he would be aware of it.
10       So when you have someone that is acting to
11  make one vendor prominent that's not the cheapest,
12  it's not the best, and you have gifts being given and
13  he tells me about a quid pro quo, I feel anyone's
14  reasonable assumption would be that he's involved
15  and that any action that wasn't warranted by my
16  performance would be fruit from that -- that
17  individual in the form of retaliation.
18       Q.   I don't think you're understanding my
19  question.  We're -- we're focusing on an evaluation
20  that was prepared in February of 2014, correct?
21       A.   Yes.
22       Q.   Do you know whether Mr. Flatley even knew
23  about your allegations of fraud when he prepared his
24  evaluation?
25       A.   Well, I -- I understood your question to

---

448

1  say what would make you think that.  So do I have
2  specific information that he knew?  At that time, no.
3       Q.   And what about Mr. Fontaine; do you have
4  specific information that he was aware of your
5  allegations of fraud as of February of 2014 when the
6  evaluation was prepared?
7       A.   I have no way of either knowing that he
8  had, but his actions seemed to imply that he did.
9       Q.   And for Mr. Cicero, you didn't speak with
10  him until late March or early April of 2014, right?
11       A.   I think that's right.
12       Q.   And do you have any reason to believe that
13  he was aware of your allegations of fraud when the
14  evaluation was prepared in February of 2014?
15       A.   At that time, he wasn't even privy to it
16  until I spoke with him.  But if he's charged with
17  doing the investigation and he doesn't want to look
18  at evidence that I'm trying to present to him,
19  physical proof, and he doesn't want to see it, then
20  that tells me his investigation isn't interested in
21  truth or proof.  It's not deductive reasoning; it's
22  inductive reasoning.  He's got a conclusion that he
23  wants things to fit to.  He doesn't want to look at
24  all the evidence and make a conclusion.  He's
25  rejecting the evidence.

---

449

1        So I don't know of any investigation where
2   a person would say, I don't really want to see the
3   evidence.  I just want to make a conclusion.  That
4   tells me that that person isn't interested in truth;
5   he's interested in a preset agenda.
6        Q.   Are you aware of any witness that will
7   support your contention that you were subjected to
8   retaliation through your February 2014 interim
9   evaluation?
10       MR. LEE:  Objection -- objection to the
11  form of the question, but you could answer if you
12  want, if you can.
13       A.  I don't spend a whole lot of my time
14  thinking about what might be in somebody else's mind.
15  And -- but if you're asking for it, I would say that
16  I feel that many people that saw what took place at
17  Smith & Wesson would conclude that I had been
18  retaliated against.
19       Q.   And who are those people by name?
20       A.  I would say Ed Anischik, Peter Lemlin,
21  Lamonte Parks, Leo Jendrezak, Stanley Kapek, Stanley
22  Wichorik, Dwayne Reese, Mike Jurga.  I -- I think
23  that, you know, anyone that saw what unfolded would
24  conclude that I had been retaliated against.
25       Q.   And other than the evaluation itself, can

450

1   you identify any exhibits that support your
2   contention that you received your interim -- interim
3   evaluation February of 2014 because you complained
4   about fraud with respect to vendors?
5       A.  You want documented evidence or you're
6   talking about my -- that's -- whether that's my
7   assessment?
8       Q.   What documents support your view that you
9   were subjected to retaliation in connection with your
10  February 2014 interim evaluation?
11       MR. LEE:  Objection to the form of the
12  question, but you could answer if you can.  We
13  saw at least one today, but go ahead.  I mean --
14       MS. BERTRAM:  Let's not coach the witness,
15  John.  Come on.
16       MR. LEE:  You're the one who asked.  You're
17  the one who asked how -- what is the evidence of
18  his concerns and that he knew.  Well,
19  there are emails about it, but that's --
20       MS. BERTRAM:  Are -- are you testifying
21  now, John, or is the witness testifying?
22       MR. LEE:  No, no, no.  I -- I -- I said
23  I --
24       MS. BERTRAM:  You don't have to --
25       MR. LEE:  -- object --

451

1       MS. BETRAM:  Let's not coach the witness
2   any further.
3       MR. LEE:  No, no, no.  I objected --
4       MS. BETRAM:  I mean, you can give him the
5   exhibit numbers, so maybe that would help him
6   out.
7       MR. LEE:  Okay.  You want me --
8   BY MS. BETRAM:
9       Q.   One twenty-three, one forty-one -- flip
10  around.  Look for them.  John wants you to find some
11  exhibits, Mr. Baker.  Don't you think you can answer
12  your questions on your own?
13       MR. LEE:  No --
14       A.  Well, it sounds by the numbers you give
15  that now you're trying to help me too.
16       Q.   I made them up.  I made them up.
17       MR. LEE:  Okay.
18  BY MS. BETRAM:
19       Q.   Okay.  I'm going to ask a question, and
20  we're not going to have any more coaching.
21       Other than the evaluation, itself, is there
22  any piece of evidence, any documentary evidence you
23  can point to to support your contention that you were
24  retaliated against in connection with your
25  February 2014 evaluation?

452

1       MR. LEE:  Same objection.  Objection to the
2   form of the question.  But go ahead and answer if
3   you can.
4       A.  I think that in order to answer it
5   correctly, it's like I'd have to put myself in -- in
6   the position of each -- each and every person I just
7   mentioned and say see how much of what they saw is
8   relevant.  But I feel that the totality of what I've
9   got screams.  It doesn't just hint that there was
10  retaliation; it screams that there was.
11       So I can go through each and every person
12  and then their purview, how much of the items did
13  they see and determine whether they could have
14  deduced that conclusion from what they knew.
15       My view is that all those people I
16  mentioned would be privy to the things that were in
17  these documents that would show that I was retaliated
18  against.  But as far as do I know what one specific
19  document that says let's retaliate against Earl, I --
20  I can only say that Mr. Suraci's view was that I was
21  being -- that the review was fraudulent and that I
22  was -- Suraci was -- said that I was being
23  subversively undermined by Mr. Flatley.
24       So I guess that would be one document that
25  would say that.

Baker, Earl Donald - Vol. II

September 25, 2020

53 (Pages 453 to 456)

---

453

1    Q.  Do you contend that you were retaliated
2  against in connection with your June 2014 performance
3  evaluation?
4          MR. LEE:  Same objection.  You can answer
5      if you can --
6      A.  I'm sorry, but I thought that's what I just
7  answered.
8      Q.  We were talking about the February 2014
9  interim evaluation.
10     A.  Oh, okay.  Gotcha.  The answer would be the
11  same there.
12     Q.  Now, you had --
13     A.  That yes --
14     Q.  You had indicated that Mr. Flatley, Mr. --
15  possibly Mr. Fontaine, and Mr. Cicero retaliated
16  against you with respect to the February 2014
17  performance evaluation.  Do you contend that anyone
18  else retaliated against you in connection with the
19  June 2014 evaluation?
20         MR. LEE:  Objection to the form of the
21     question.  It misstates the witness's prior
22     testimony, but you could go ahead and answer.
23     A.  I -- I believe that Ms. Bruce became more
24  prominent in that last review and that I do believe
25  her actions make her part and parcel of the

---

454

1  retaliation that took place.
2      Q.  Anyone else?
3      A.  Well, anyone that was associated with it.
4  I can't see behind the -- the scenes which -- which
5  person, but when an injustice is being perpetrated
6  against you, anyone whose job it is to keep that from
7  happening, may, in fact, be part and parcel of it.
8  So I can't tell you a conclusive list because as time
9  will tell, you'll find out who might -- possibly find
10  out who might be aware that did nothing and was
11  complicit in their -- their inaction to keep me from
12  losing my job when all I did was report wrongdoing by
13  somebody that has been subverting the truth.
14     Q.  And what actions did you take that you
15  contend led you to be retaliated against in
16  connection with the June 2014 performance evaluation?
17         MR. LEE:  Objection to the form of the
18     question, but you may answer.
19         Can I have that question read back?
20         (Whereupon, the question was read back by
21     the reporter.)
22         MR. LEE:  Object to the form of the
23     question, but you can answer if you can.
24         THE DEPONENT:  Yeah, I'm not sure I
25     understand.  Could you read it one more time?

---

455

1          (Whereupon, the question was read back by
2      the reporter.)
3          THE DEPONENT:  I reported improprieties to
4      Ann Glica, to Kathy Salvador, and those I believe
5      led to Mr. Flatley finding out through whatever
6      means that I had mentioned on him, and so the
7      start of it was my -- my submissions to Ms. Glica
8      and Ms. Salvador of improprieties that I
9      perceived went on.
10  BY MS. BETRAM:
11     Q.  And what evidence do you have that
12  Mr. Flatley was aware that you had reported
13  improprieties?
14     A.  I have direct testimony to me from
15  Mr. Cicero that he -- he was told.  And I have emails
16  of Ms. Bruce threatening to tell him.  Even though I
17  was promised confidentiality, they violated it.
18         And I was told directly that he was made
19  aware by Ms. Glica -- or by Ms. Bruce and -- and
20  Mr. Cicero.
21     Q.  Well, let's unpack this a little bit.  You
22  said there's direct testimony by Rob Cicero that
23  Larry Flatley was told.  What are you referring to?
24     A.  He told me.  I mean testimony to me.  I
25  just -- I'm -- I'm -- I don't know what terms to use

---

456

1  all the time.  He told me flat out that he had talked
2  to Larry about it.  And then I was told that Anne
3  Bruce had told him as well.
4      Q.  And what did Mr. Cicero say (inaudible)?
5      A.  What did he say what?  I'm sorry.
6      Q.  What did Mr. Cicero say that he had told
7  Mr. Flatley about your concerns?
8          THE COURT REPORTER:  I'm not -- you're
9      garbled.
10  BY MS. BETRAM:
11     Q.  What did Mr. Cicero tell you that he had
12  told Mr. Flatley about your concerns?
13     A.  He said he told him everything.  He said in
14  order to investigate this thing, I had to at some
15  point talk to him.  And I told him that wasn't what
16  you told me when you -- when I first met with him in
17  his office that he said we would hold this in
18  confidentiality.  And I feel that that ended up
19  causing a scorched earth policy for me in that
20  Flatley was made aware of what I told about him.
21         And -- and he retaliated, just as that
22  statement you asked about me about whether he had
23  said he was going to do to -- to me and those who
24  screamed about it.  He followed through on those
25  words.  So when he knew that I had done this, then he

---

Baker, Earl Donald - Vol. II

September 25, 2020

54 (Pages 457 to 460)

---

457

1   did exactly what he said metaphorically.  He tried to
2   screw me.
3       Q.   So -- and I just want to be clear on this.
4   When Rob Cicero -- Cicero told you that he had spoken
5   with Larry Flatley, right?
6       A.   Yes.
7       Q.   And he told you that he had spoken to him
8   in connection with his, Rob Cicero's, investigation,
9   right?
10      A.   He said he talked to him in regards to my
11  allegations.
12      Q.   Um-hmm.  But did he -- did he tell you that
13  he had revealed to Mr. Flatley what your allegations
14  were?
15      A.   Yes.
16      Q.   And what did he tell you; what did
17  Mr. Cicero tell you that he had told Mr. Flatley?
18      A.   Everything.
19      Q.   The word "everything" came out of his
20  mouth?
21      A.   No, I don't know -- the inference was I
22  told him everything.  He said I had to -- everything
23  that I investigated was what the inference was.  He
24  said, I had to ask him about the things that you
25  said.  That's part of what I do when I investigate.

---

458

1           So that -- the inference or my
2   understanding was everything that I told him was
3   purview to be then investigated and asked of Larry
4   Flatley.
5           So that wasn't what I was told when I made
6   those submissions to Mr. Cicero.  And what he did was
7   spoil any possibility of a good relationship between
8   me and Mr. Flatley.  The same as -- I've stated the
9   exact same thing in email form to Ms. Bruce when I
10  told her that if she continued and told Mr. Flatley
11  that it would poison my situation with him and that
12  my -- my good per -- I was hoping that my good
13  performance over time would -- would win that
14  relationship.  And if Larry was exonerated of any
15  wrongdoing that it would forever poison my
16  relationship with him even if he was exonerated.
17          So I asked her not to do so and even made
18  -- mentioned safety of my family.  They disregarded
19  that and told him anyways.  I have no clue of when
20  they told Mr. Flatley.  All I know is I made
21  submissions to Ms. Glica and Ms. Salvador, and then I
22  got retaliated.  Later on, I'm told that Mr. Flatley
23  was made aware of my submissions, and then now I'm
24  receiving retaliation because of it.
25          So I have no clue when they told Larry.

---

459

1   All I know is they told me that they did tell him.
2       Q.   So with respect to Ms. Glica, do you have
3   any reason to believe that she told Mr. Larry Flatley
4   about your concerns?
5       A.   I don't have specific reasons to believe
6   that she had, but I -- like I said, I -- I've been
7   told after the fact that he was told.  So how that
8   information got to him, I have no view of that.
9       Q.   Do you have any reason to believe that
10  Kathy Salvador told Mr. Flatley about your concerns?
11      A.   Mr. Flatley was told nos.  These are the
12  people that I gave the information to, so I guess
13  that would constitute a reason to believe they may
14  have.
15      Q.   Now, you said you were told that he,
16  Mr. Flatley, was made aware of your concerns.  Who
17  told you that?
18      A.   Mr. Cicero.
19      Q.   Anyone else?
20      A.   No, I believe that was it.
21      Q.   Okay.  Now, you had mentioned Ms. Bruce.
22  And I know there is an email where you claim that she
23  was going to tell Mr. Flatley, right?
24      A.   Yes.
25      Q.   And you objected to that, correct?

---

460

1       A.   Yes.
2       Q.   And do you know whether she told
3   Mr. Flatley after you objected?
4       A.   I was told by Mr. Cicero she had.
5       Q.   And what did he say about that?
6       A.   Just when he told me that he had talked to
7   Larry in the course of the investigation that he --
8   he said he believed that -- I asked him directly
9   whether she had, and he said he believed she had.
10      Q.   And did Ms. Bruce ever say that she had
11  spoken with Mr. -- Mr. Flatley?
12      A.   I'd only spoken with Ms. Bruce a couple of
13  times, and so there would have been no conversation
14  whereby that took place.  When I spoke to her,
15  somebody was -- I never spoke to her privately where
16  no one else was there.
17      Q.   Other than the documents and witnesses
18  you've already described, are there any additional
19  witnesses or exhibits that you claim support your
20  contention that you were retaliated against in
21  connection with your June 2014 performance
22  evaluation?
23      A.   Yeah, I --
24          MR. LEE:  Objection to the -- wait.
25      Objection to the form -- objection to the form of

---

Baker, Earl Donald - Vol. II                                    September 25, 2020

55 (Pages 461 to 464)

461

1   the question.  Asked and answered.  But you can
2   answer it.
3        A.   I -- I believe there are thousands of
4   documents that are in -- are in the exhibit here that
5   say exactly what you just asked.  So, yes, there are
6   many, many, many examples that would lead someone to
7   believe there was retaliation on me for my
8   submissions.
9        Q.   And sitting here today, do you remember any
10  particular document that relates to the June 2014
11  evaluation?
12       MR. LEE:  Objection to the form of the
13  question.
14  BY MS. BETRAM:
15       Q.   Let me restate the question because --
16       MR. LEE:  Okay.
17  BY MS. BETRAM:
18       Q.   -- I think it was incomplete.
19       Are you aware of any exhibits or witnesses
20  that in particular support your contention that you
21  were retaliated against in connection with your
22  June 2014 performance evaluation?
23       MR. LEE:  Objection to the form of the
24  question.  Asked and answered.  But you could
25  answer.

462

1        A.   The question is am I aware of them?  Yes,
2   and I've enumerated them in the last response.
3        Q.   So you can't identify any particular
4   document that relates to your contention that you
5   were retaliated against in connection with your
6   June 2014 performance evaluation?
7        MR. LEE:  Same objection.
8        A.   There are many documents that point to the
9   fact that I pointed out eight factual errors in that
10  review.  And when I was -- had a face-to-face meeting
11  with the individuals, I was told I -- I only can
12  discuss one.  So if -- I would just say if anyone had
13  eight things said about them that they could prove to
14  be false and you're -- you're going to only let them
15  bring up one, and then at the -- the conclusion of
16  you bringing up the one, they said, We're going to
17  sign and affirm this evaluation, I don't believe
18  there is any other way to see that as a form of
19  retaliation against me based on my submissions to
20  that company.
21       And the document that Ms. Bruce sent to me
22  of my termination where she mentions my -- my
23  submissions to them over the months as -- in that
24  document, she mentions it and makes it part and
25  parcel of my termination.

463

1        Q.   What do you mean?
2        A.   And so that document would absolutely make
3   it clear that I'm being retaliated against in part
4   because of that.
5        Q.   Which document are -- are you referring to
6   of Ms. Bruce?
7        A.   The termination letter.  She mentions my
8   submissions.  And -- and if that is even part of the
9   reason for my termination, then it shows that -- that
10  there's term -- that I was terminated in part because
11  of making my submissions.  That is not correct.  I
12  shouldn't be held whether it's even one-tenth or one
13  one-thousandth of the reason I was let go because it
14  then begs the question that if that wasn't, was that
15  the last straw that broke the camel's back or was it
16  99 percent of why I'm being --
17       I don't care which it is.  All I know is
18  because she mentioned it in my termination, it means
19  it was part of the consideration that I was let go.
20  So that document does definitively, in my mind, say I
21  was retaliated against for making submissions of
22  fraud that went on at Smith & Wesson.
23       Q.   Do you contend that you were retaliated
24  against by being denied a bonus?
25       A.   Yes.

464

1        Q.   Who retaliated against you in connection
2   with denying you a bonus?
3        A.   First of all, I know that -- I don't know
4   who made the decision, but I do know that I got a
5   call from Carl Hynes when I was at my doctor telling
6   me that he was at a meeting with Larry Flatley, and
7   that Larry Flatley was bragging that he kept my bonus
8   among other things.
9        And the purpose for his call was he told me
10  to get a lawyer and never come back to work at Smith
11  & Wesson was his suggestion.  He actually even said,
12  If you don't know a lawyer, I will provide you a name
13  of my attorney; he's good.
14       So even the people at -- at Pioneer felt
15  my -- my -- that I was retaliated against at Smith &
16  Wesson and was actually encouraging me to get an
17  attorney because the things that we had heard from
18  Larry today, which he didn't enumerate.  All he did
19  was say that Larry was bragging about keeping my
20  bonus among other things, that I needed to get out of
21  Smith & Wesson; it wasn't good for me there.
22       So that led me to believe I was retaliated
23  against and that someone had kept my bonus as part of
24  retaliation.
25       Q.   And did you report Mr. Hynes' statement to

465

1  Ed Suraci, Rob Cicero, or anybody else at Smith &
2  Wesson?
3      A.  I did.
4      Q.  To whom did you report it?
5      A.  Mr. Cicero.
6      Q.  And do you know what Mr. Cicero did to
7  review your concern with respect to Mr. Hynes?
8      A.  I knew what he said.
9      Q.  And what did Mr. Cicero say?
10     A.  He said, I cannot believe that someone from
11 Pioneer would do that.  I just don't believe it.
12     Q.  And did Mr. Cicero say anything else in
13 response?
14     A.  No.
15     Q.  And do you know what Mr. Cicero did to look
16 into your concern about what Mr. Hynes had said?
17     A.  I know I never got the bonus.
18     Q.  Do you what Mr. Cicero did to look into
19 your concern about what Mr. Hynes said to you?
20     A.  No, I do not.
21     Q.  Do you know what conclusions he reached in
22 connection with his investigation concerning the
23 statement that Mr. Hynes made to you?
24     A.  He did not mention it in his investigation
25 conclusions.

466

1      Q.  And can you point to any other witnesses or
2  evidence that support your contention that you were
3  retaliated against in connection with the denial of a
4  bonus by Smith & Wesson?
5      MR. LEE:  Objection to the --
6      A.  Uh --
7      MR. LEE:  Objection to the form of the
8  question.  Subject to the objection, you can
9  answer if you can.
10     A.  In discovery, there was a memo to Ms. Bruce
11 asking her if she had informed me that my bonus had
12 been kept.  And I had not ever received such
13 notification.
14         So it implied that it was a topic of
15 discussion amongst Ann Bruce and someone else at
16 Smith & Wesson about my bonus, which would lead me to
17 believe that it was part and parcel of -- of my --
18 the retaliation against me for submitting things
19 about a fraud that was going on at Smith & Wesson.
20     Q.  Anything else that you can point to in
21 terms of witnesses or documents that support your
22 contention that your denial of a bonus was
23 retaliatory?
24     A.  Nothing I can point to document-wise, no.
25     Q.  Do you contend that you were denied a raise

467

1  as a consequence of -- well, because you complained
2  about Pioneer?
3      THE COURT REPORTER:  Complained about what?
4      MS. BETRAM:  Let me restate the question
5  because I got an email while I was talking and --
6  and I -- I think I may have missed a word.
7  BY MS. BETRAM:
8      Q.  So do you contend that you were denied a
9  raise because you complained about Pioneer Tools?
10     MR. LEE:  Object to the form of the
11 question, but you -- you may answer if you can.
12     A.  I'm going to an -- answer this in a little
13 bit roundabout way that they told us -- Ms. Bruce
14 told every salaried employee that heretofore raises
15 -- there will be no more merit raises, but the raises
16 will take place on certain schedules and that you'd
17 be paid according to what your job is paid throughout
18 the -- throughout the country.
19         So that raise was part of the new policy.
20 At this point, as long as you got a good review, you
21 would get a raise at that time.  And there was also
22 part and parcel of that agreement with the employees
23 that if you're salary, you would get a bonus based on
24 company figures and, you know, so that you were
25 eligible for the raise up to five percent.

468

1          So that was a record year that should have
2  been and was a five percent bonus given to all
3  employees.  And I was excluded from the raise and the
4  bonus.  The only reason I was given was it -- not --
5  it wasn't direct.  All I knew was I was given a
6  fraudulent review that had eight false statements in
7  it.  I wasn't able to refute them because I wasn't
8  given the opportunity.  And because of that, I lost
9  out on the raise and the bonus.
10         So they can tell me why I didn't -- my
11 performance was above others in my department, and I
12 was discriminated unfairly and not even allowed to
13 address all eight reasons why that -- that review was
14 not factual.
15     Q.  Were you eventually -- did you eventually
16 receive a raise in 2014?
17     A.  No.
18     Q.  Did you receive a raise in 2013?
19     A.  Yes.
20     Q.  Okay.  And when was your raise in 2013?
21     A.  It was supposed to take place in July, and
22 that would constitute another time that I went to
23 Ms. Glica and Ms. Salvador to -- to ask why I had
24 been -- not gotten it.  And I got a -- either a call
25 or an email back from Kathy Salvador saying that

Baker, Earl Donald - Vol. II                          September 25, 2020

57 (Pages 469 to 472)

---

469

1  it -- it was on Larry's desk.  He hadn't signed it.
2  But you will have the raise in your next check.
3          So going to them, they followed through,
4  and I got it.  So whether it was an oversight or
5  whether it was part and parcel of the retaliation
6  that was taking place, I cannot say from my view.
7  All I know is I didn't have it, I went to them, and
8  then I got it.
9      Q.   Do you contend that that 2013 raise was
10 retaliatory?
11     A.   I believe that the fact that I didn't get
12 it when everyone else got it could have been
13 retaliate -- retaliation.
14     Q.   And why do you think that?
15     A.   When everyone else gets a raise but you
16 don't, and the only difference between me and them
17 was I made a submission and they didn't, that led me
18 to believe that.
19     Q.   And what submission had you made by July of
20 2013?
21     A.   I had told Kathy Salvador by that time of
22 what transpired at the barbecue and that there were
23 different things that took place that led me to
24 believe that purchases were being directed unfairly
25 to the vendors.

---

470

1      Q.   Do you contend that you were ever subjected
2  to discipline at Smith & Wesson?
3          MR. LEE:  Objection to the form of the
4      question.  Ever?  Or just at a particular time
5      or -- objection to the form of the question.
6  BY MS. BETRAM:
7      Q.   Were you ever given -- is it your position
8  that you were given discipline while you were
9  employed at Smith & Wesson?
10     A.   Not that I can think of, no.
11     Q.   Now, I know that you were placed on leave,
12 it sounds like in July of 2014.  Do you know who made
13 the decision to place you on leave?
14     A.   No, I don't.
15     Q.   And is it your contention that that
16 decision was retaliatory?
17     A.   Yes.
18     Q.   And who do you contend retaliated against
19 you in connection with the decision to place you on
20 leave?
21     A.   I think that --
22         MR. LEE:  Object -- objection to the form
23     of the question, but you could -- calls for
24     speculation, but you can answer.
25     A.   I think the person whoever it would be that

---

471

1  was responsible for putting me on leave would be the
2  one responsible for the retaliation.  But since I
3  don't know the first person, I don't know the answer
4  to the second person either.  Whoever was responsible
5  for putting me on leave was guilty of retaliating
6  against me for having made the submission, but I
7  don't know the -- who that individual was.
8      Q.   What leads you to believe that the decision
9  to place you on leave was retaliatory?
10     A.   Because --
11         MR. LEE:  Objection -- objection to the
12     form of the question, but you may answer if you
13     can.
14     A.   Because I was told that it was -- by
15 Mr. Cicero that I was being put on leave for my
16 safety, and then after being on there for three
17 months, nearly three months, I talked to an attorney,
18 and my attorney believed that Smith & Wesson was
19 simply trying to run out the clock, as it were,
20 because there was a statute of limitations on
21 Sarbanes submissions.  And that I believed that my
22 time on paid leave was a way for Smith & Wesson to
23 simply beat the clock and run out my time of -- you
24 know, statutory time for my submissions so that they
25 could do -- it'd be a legal thing but avoid breaking

---

472

1  the law.
2      Q.   Now, I understand that your -- your
3  attorney may have espoused that view.  Are you aware
4  of any other evidence in terms of documents or
5  witnesses that support your view that Smith & Wesson
6  was trying to run out the clock on your statute of
7  limitations by placing you on administrative leave?
8          MR. LEE:  Objection to the form of the
9      question.  And if your belief comes from any
10     discussions you had with your lawyer, I'm going
11     to direct you not to answer that question.
12         MS. BETRAM:  I'm asking for him -- his
13     beliefs other than what his counsel may have told
14     him.
15         MR. LEE:  Okay.  That's fair.
16         THE DEPONENT:  I believe that I did look at
17     things online that seemed to confirm that
18     opinion.
19 BY MS. BETRAM:
20     Q.   And what did you look at online that
21 supported that view?
22     A.   Six years later, I have no clue what, but I
23 know at that time, I -- I felt that my -- those
24 documents that I read would -- seemed to indicate
25 that I was being singled out over my colleagues at

---

Baker, Earl Donald - Vol. II                         September 25, 2020

58 (Pages 473 to 476)

473

1  work simply because I was the only one that made
2  submissions. I was the only one placed on leave, and
3  the only differentiation I could find between me and
4  them was I had told them that my boss might have been
5  involved in fraud in my company.
6      Q. And the documents you're referring to are
7  the things that you looked at online which you can't
8  recall now?
9      A. Yes.
10     Q. Okay. Can you offer any other witnesses or
11 documents that support your view that you were placed
12 on leave because you reported fraud on the part of
13 Smith & Wesson?
14     A. No.
15         MR. LEE: Objection -- objection to the
16     form of the question. Misstates the witness's
17     prior testimony, but you may answer if you can.
18         MS. BETRAM: He answered.
19     A. I'm -- I'm unaware of any -- anything else
20 other than what was already mentioned or mentioned by
21 my attorney.
22     Q. And you do contend that you were retaliated
23 against because you reported what you considered to
24 be fraudulent conduct at Smith & Wesson, right?
25     A. Yes.

474

1      Q. And who do you contend -- do you know who
2  made the termination decision? Let me strike that
3  and start over.
4         Do you know who made the decision to
5  terminate you?
6      A. No.
7      Q. And do you know the basis for their
8  decision to terminate you?
9      A. If I take my -- the letter of termination
10 from Anne -- Anne Bruce to be factual, then it was
11 partially because I made submissions and partially
12 because of the other things that she mentions in
13 that -- that letter.
14     Q. But other than what you read in that
15 letter, you don't know why the company terminated
16 you, right?
17     A. No, that was -- that was their
18 communication to me of why I was let go. But even in
19 that, it lists my submissions.
20     Q. Who do you contend retaliated against you
21 by making the termination decision?
22     A. I don't know who made it, so I wouldn't
23 know that.
24     Q. And what's the basis for your belief that
25 you were retaliated against in connection with the

475

1  termination decision.
2         MR. LEE: Objection to the form of the
3     question, but you may answer if you can.
4      A. I was singled out over every other employee
5  on a number of points, and the only difference that I
6  could be -- I could deduce in my head was that I had
7  made a submission and they hadn't.
8      Q. Anything else?
9      A. No, other than the thousands of documents
10 we have.
11     Q. Did anyone ever tell you that you were
12 terminated because you raised concerns about Pioneer
13 Tool?
14     A. I told you the only communications about
15 reasons for termination that were given to me by the
16 company was contained in that termination letter. So
17 the answer would be that letter never mentioned
18 Pioneer Tools, so they didn't tell me that.
19     Q. Now, you said that you felt that you had
20 been singled out on a number of points. What points
21 are you referring to?
22         MR. LEE: Objection to the form --
23     A. I --
24         MR. LEE: Objection to the form of the
25     question, but you may answer if you can.

476

1      A. I was told by the plant manager, Dan
2  Fontaine, that I was no longer allowed to seek help
3  from HR and that any problem I had, I needed to take
4  it to Mr. Flatley. I asked him, What if the problem
5  is a problem with Mr. Flatley? He said that still
6  pertains, that you need to report it to Mr. Flatley.
7         That is contrary to the employee handbook,
8  everything that the company policy states regarding
9  these things, and yet they did it anyways.
10        I was also told that they didn't take
11 away -- that raises wouldn't be given on a merit
12 basis anymore. And after disciplining Mike Jurga at
13 -- was in agreement with Mr. Fontaine, he told me
14 I should write him up. His write-up was rescinded.
15 I was never talked to. And they offhand -- not only
16 did they rescind his write-up for being insubordinate
17 to me, they gave him a raise. I was asked who did
18 this, and they told me it was -- it was Mr. Flatley
19 that did so.
20        So my deduction is based on what Mr. Suraci
21 said that I -- he was poisoning my people and using
22 them against me, that he had urged Mr. Jurga to be
23 insubordinate with me, and when he did so, he made
24 sure that he didn't get a write-up in his personnel
25 file and ended up getting a raise for having been

Baker, Earl Donald - Vol. II                    September 25, 2020

59 (Pages 477 to 480)

---

477

1    insubordinate to his boss.
2            That, to me, is different than any other
3    person in the -- the plant, as is telling them they
4    can't go to HR.
5            And I had a different standard as far as my
6    pitch board.  I was told it was the best in the
7    plant, and they were -- they talked to me about one
8    incident where I was three days late on my -- my
9    board, but yet they audited that board on a level
10   that was different than everyone else in the company.
11   But even though they did check it every day, they
12   never found another error of that board, yet they
13   still mentioned that thing as being like I had a
14   deficiency on my board.
15           So I don't care which way you look at it.
16   There were a number of ways that I was discriminated
17   and treated different than every other employee at
18   Smith & Wesson.  And the only difference that I can
19   deduce of why that occurred to me and not other
20   people was I was the one that -- that brought these
21   submissions to them and told them that I believe
22   fraud to be going on in that company.
23       Q.  And were you singled out on any other
24   points in your view?
25           MR. LEE:  Objection to the form of the

---

478

1    question, but you may answer if you can.
2       A.  No, just general everyday courtesies that
3    on a daily basis, they don't treat you the same.  So
4    there are probably more than I can bring to mind
5    right now, and I'm sure I'll think of some later, but
6    I think what I -- I have said is indicative of the
7    type of treatment that I got that was different.
8       Q.  Now, you said that you were told by Dan
9    Fontaine that you were no longer allowed to seek
10   assistance from HR.  When did he say that to you?
11      A.  That would have been a February meeting
12   where Mr. Suraci was -- was out of the plant.
13   Mr. Flatley said, Come with me, took me over to Dan's
14   office, and we had a discussion.  In that discussion,
15   I was told I was not allowed to seek any more HR
16   assistance in this matter and I had to take all
17   things up with Mr. Flatley.
18      Q.  And was anybody else present other than
19   you, Mr. Flatley, and Mr. Fontaine?
20      A.  No.
21      Q.  And did they -- did they say that's with
22   respect to your performance issues or with respect to
23   any issue?
24      A.  With respect to any issue because I even
25   asked what if I have a problem with something between

---

479

1    me and Mr. Flatley.  They said, yes, you bring that
2    up to Mr. Flatley.
3       Q.  And did they explain why you should not go
4    to HR anymore with issues?
5       A.  They didn't give a reason for it.  It was
6    just a direct order.
7            MS. BETRAM:  This would be a good spot for
8    a break because I'm about to go into another
9    topic.
10           MR. LEE:  Fair enough.
11           THE VIDEOGRAPHER:  Going off the record at
12   4:47 P.M.
13           (A break was had.)
14           THE VIDEOGRAPHER:  Back on the record at
15   5:03 P.M.
16           MS. BERTRAM:  While we were off the record,
17   counsel discussed the continuation of Mr. Baker's
18   deposition.  We agreed to work together in order
19   to reduce the burden as much as possible on
20   Mr. Baker trying to find a time after hours or
21   perhaps on the weekends to resume his deposition
22   so he doesn't have to take -- so he -- so -- to
23   reduce the impact on him and his work.
24           We can go off the record.
25           MR. LEE:  Okay.  That's fine.

---

480

1            THE VIDEOGRAPHER:  Going off the record at
2    5:04 P.M.
3            (A discussion was held off the record.)
4            MR. LEE:  I don't need it expedited.  I'll
5    take a copy regular.
6            MS. BETRAM:  We'll do it expedited.
7            (SIGNATURE RESERVED.)
8            (THE DEPOSITION ADJOURNED AT 5:04 P.M.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

481

ACKNOWLEDGMENT OF DEPONENT

I, _____, do hereby
acknowledge that I have read and examined the
foregoing testimony, and the same is a true, correct
and complete transcription of the testimony given by
me, and any corrections appear on the attached Errata
Sheet signed by me.

_____    _____
(DATE)            (SIGNATURE)

NOTARIZATION  (If Required)

State of _____
County of _____

Subscribed and sworn to (or affirmed) before me on
this _____ day of _____, 20____, by
_____, proved to me on the
basis of satisfactory evidence to be the person who
appeared before me.

Signature: _____
            (Seal)

482

CERTIFICATE OF REPORTER
STATE OF NORTH CAROLINA )
COUNTY OF WAKE            )
      I, Eileen M. Dunne, the officer before whom
the foregoing videotaped remote deposition was taken,
located in Wake County, North Carolina at the time of
deposition, do hereby certify that the witness whose
testimony appears in the foregoing deposition was
duly sworn by me via videoconference according to the
emergency video notarization requirements contained
in G.S. 10B-25; that the witness was located in
Brunswick County at the time of deposition; that the
testimony of said witness was taken by me to the best
of my ability and thereafter reduced to typewriting
under my direction; that I am neither counsel for,
related to, nor employed by any of the parties to the
action in which this deposition was taken, and
further that I am not a relative or employee of any
attorney or counsel employed by the parties thereto,
nor financially or otherwise interested in the
outcome of the action.

_____
EILEEN M. DUNNE
Notary Public # 201314900195

483

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(WESTERN DIVISION)


EARL DONALD BAKER,                  )
                                    ) Case No.
          Plaintiff,                ) 3:19-cv-30008-MGM
                                    )
v.                                  )
                                    ) Volume 3
SMITH & WESSON CORP.,               )
                                    )
          Defendant.                )
_____     )




          Videotaped Deposition of EARL DONALD BAKER

                  (Taken by Defendant)

                       Remotely

            Saturday, October 10, 2020




     Reported by:  Cindy A. Hayden, RMR, CRR

**484**

A P P E A R I N G

ON BEHALF OF PLAINTIFF:
 JOHN YO-HWAN LEE, ESQ.
 Lee & Breen, LLC
 188 Industrial Drive
 Suite 403
 Elmhurst, IL  60126
 312.241.1240
 jlee@leebreenlaw.com

ON BEHALF OF DEFENDANT:
 CONNIE N. BERTRAM, ESQ.
 Bertram Law LLP
 1717 K Street, NW
 Suite 900
 Washington, DC  20006
 703.627.1649
 cbertram@bertramllp.com

Also Present:  Isaac Horner, Videographer

**485**

VIDEOTAPED DEPOSITION OF EARL DONALD
BAKER, a witness called on behalf of Defendant,
remotely, before Cindy A. Hayden, Notary Public, in
and for the State of North Carolina, given
remotely, on Saturday, October 10, 2020, commencing
at 2:06 p.m.

**486**

I N D E X
                          PAGE
EXAMINATION BY MS. BERTRAM          488

E X H I B I T S

(No newly proffered exhibits.)

**487**

P R O C E E D I N G S
* * *
 THE VIDEOGRAPHER:  Here begins
Volume 3, Disc 1, in the video deposition of Earl
Baker, taken in the matter of Earl Donald Baker v.
Smith & Wesson Corporation in the United States
District Court for the District of Massachusetts,
Western Division, Case Number 3:19-cv-30008-MGM.
 Today's date is October 10th, 2020, and
the time on the video monitor is 2:06 p.m. Eastern
Daylight Time.  This deposition is being held
remotely via videoconference.
 The court reporter is Cindy Hayden on
behalf of Henderson Legal Services.  The
videocamera operator is Isaac Horner on behalf of
Henderson Legal Services.
 Will counsel please introduce
themselves and state whom they represent, beginning
with the party noticing the deposition.
 MS. BERTRAM:  Connie Bertram, counsel
for Defendant Smith & Wesson.
 MR. LEE:  John Lee, L-E-E, counsel for
Plaintiff Earl Baker.
 THE VIDEOGRAPHER:  Will the court
reporter please swear in the witness.

Baker, Earl Donald - Vol. III

October 10, 2020

3 (Pages 488 to 491)

---

**488**

```
 1                    * * *                           02:06:36
 2              EARL DONALD BAKER,                     02:06:36
 3       having been first duly sworn, was examined and 02:06:36
 4            testified as follows:                    02:06:47
 5                    * * *                             02:06:47
 6              EXAMINATION                            02:06:47
 7    BY MS. BERTRAM:                                  02:06:47
 8       Q.  Welcome back, Mr. Baker.  Again, I'm     02:06:50
 9    Connie Bertram, and I represent Smith & Wesson in 02:06:53
10    this case -- prior day of your deposition, you said 02:06:56
11    that you had mentioned Sarbanes-Oxley to HR     02:07:01
12    representatives of Smith & Wesson when you raised 02:07:05
13    concerns about -- Flatley --                    02:07:08
14           MR. LEE:  Sorry to interrupt --          02:07:08
15           (Reporter clarification.)                02:07:08
16           (Off-the-record conference.)             02:07:08
17    BY MS. BERTRAM:                                 02:07:36
18       Q.  Mr. Baker, again, I'm Connie Bertram,    02:07:36
19    and I represent the defendant, Smith & Wesson, in 02:07:38
20    this case.  During the prior day of your        02:07:41
21    deposition, you indicated that you had mentioned 02:07:44
22    Sarbanes-Oxley to HR representatives at Smith &  02:07:48
23    Wesson.  That occurred in -- in mid of 2013,    02:07:52
24    correct?                                        02:07:56
25       A.  That's correct.                          02:07:57
```

---

**489**

```
 1       Q.  And do you recall the words that you     02:07:58
 2    said to them about Sarbanes-Oxley?              02:08:01
 3       A.  Yes.  I had referenced the LRN that I    02:08:05
 4    had been asked to take as a member of Smith &   02:08:13
 5    Wesson.  All salaried employees had to take a   02:08:16
 6    course on whistle-blowing, and in there was where 02:08:18
 7    I -- I learned what Sarbanes-Oxley was.         02:08:24
 8           So since that was -- had taken place     02:08:26
 9    basically concurrent with me going there, I     02:08:32
10    referenced Sarbanes-Oxley, the things in there, 02:08:37
11    and -- and why I believed the things that I     02:08:41
12    witnessed needed to be reported.  And so it was -- 02:08:46
13    it was mentioned in the context of comparison,  02:08:50
14    comparing it to the LRN.                        02:08:54
15       Q.  And you said that you gave reference to  02:08:55
16    the things in there.  What -- what are you      02:08:59
17    referring to?                                   02:09:01
18       A.  "In there," mentioned a number of       02:09:02
19    things, one being what was deemed to be an      02:09:06
20    appropriate gift, what was -- it used a term,   02:09:11
21    "nominal" thing was okay, and it quantified that 02:09:16
22    nominal value as being $99.                     02:09:19
23           It -- it mentioned what type of things   02:09:24
24    to -- were worthy of being reported, what the law 02:09:27
25    provides for and what the protections are for the 02:09:32
```

---

**490**

```
 1    person that is -- you know, is talking about those 02:09:38
 2    things.                                         02:09:42
 3           So I felt -- you know, we had mentioned  02:09:42
 4    the confidentiality in each of the meetings,    02:09:46
 5    whether it was HR or Mr. Cicero, and I was assured 02:09:49
 6    there would be confidentiality.  But that's pretty 02:09:55
 7    much the context of what I -- you know, what I told 02:09:59
 8    them.                                           02:10:02
 9       Q.  Let me -- let me break this up a little  02:10:03
10    bit so that -- that your testimony is clear.    02:10:05
11           You indicated that you had mentioned     02:10:08
12    Sarbanes-Oxley to Kathy Salvador, correct?      02:10:11
13       A.  Yes.                                     02:10:13
14       Q.  What did you say to her specifically     02:10:13
15    concerning Sarbanes-Oxley?                      02:10:17
16       A.  Well, I basically said that there were   02:10:18
17    indications that things were going on, that there 02:10:28
18    were issues taking place that were not --       02:10:30
19    basically, decisions were being made within Smith & 02:10:35
20    Wesson that weren't -- they weren't decisions made 02:10:40
21    in the best interests of Smith & Wesson.        02:10:43
22           And I believe that to be part and        02:10:45
23    parcel of the fact that people were accepting gifts 02:10:50
24    that were not appropriate, based on what we had 02:10:55
25    gone through in -- both in the company policy and 02:11:00
```

---

**491**

```
 1    also in that -- that LRN course that we took.   02:11:04
 2       Q.  And did you use -- use the words         02:11:11
 3    "Sarbanes-Oxley" when you spoke with Kathy      02:11:13
 4    Salvador?                                       02:11:15
 5       A.  Yes.  Yes.                               02:11:16
 6       Q.  Okay.  And what did you say              02:11:17
 7    specifically about Sarbanes-Oxley?              02:11:19
 8       A.  Just what I just said, that -- that it   02:11:21
 9    gave the scope of what things were considered to be 02:11:27
10    inappropriate actions that needed to be reported 02:11:34
11    and what things were not.  And so based out of that 02:11:36
12    context, I told her issues that I felt needed to be 02:11:39
13    reported and looked into.                       02:11:43
14           And I also mentioned that there were     02:11:46
15    gifts being given that were outside the scope of 02:11:52
16    what our company policy allowed and what was    02:11:55
17    reinforced with that LRN training, and that I felt 02:12:01
18    there was a definite quid pro quo between the two 02:12:05
19    in that it was mentioned to me that -- that there 02:12:10
20    was a connection between the gifts and how the  02:12:15
21    vendors were being treated.                     02:12:19
22           So, to me, the -- the barbecues at       02:12:21
23    Pioneer was definitely a watershed mark for me in 02:12:27
24    that I was aware of transactions that took place 02:12:32
25    that weren't in the best interests of Smith &   02:12:35
```

---

492

1  Wesson.  And there were gifts being given and
2  received that weren't within the company policy,
3  and that the statement that connected the two --
4  because I didn't actually see people receiving
5  gifts.  I heard, you know, a lot of different
6  stories.  But when Mr. Flatley told me that if I
7  had shown up to that meeting and -- the barbecue
8  and I was the highest-ranking Smith & Wesson
9  officer there on that given evening, that I would
10  surely win something.
11         And to me, that demonstrated a quid pro
12  quo.  And it gave context to all of the little
13  things that were being done that weren't in the
14  best interest of Smith & Wesson, where we were --
15  we were losing money, not getting -- when a vendor
16  did something incorrectly, we didn't -- we didn't
17  ask for credits back that we should have, and
18  those things weren't proper.
19         But like I said, that gave context to
20  why that was happening in that I was told by my
21  boss, a director that was just under a vice
22  president that was telling me that there was a
23  pay-to-play society going on at Smith & Wesson with
24  the vendors and that all I had to do was do certain
25  things to be a part of that gift-giving system.

493

1  And that's what I told her.
2         Q.  And do you recall any sentence that you
3  said to Kathy Salvador that included the words
4  "Sarbanes-Oxley" in it?
5         A.  No.  I -- I remember contextually what
6  was said at that thing.  But as far as, you know,
7  remembering sentence for sentence over six years
8  ago is a little bit hard to -- hard to say with
9  certainty.  I know in context what I said, but I
10  cannot give you word for word of every sentence
11  that was mentioned that had "Sarbanes-Oxley" in it.
12         Q.  You said in your testimony it
13  identified what needs to be reported.
14         A.  Yes.
15         Q.  By "it," you mean the LRN, right?
16         A.  Yes.  The LRN differentiated between
17  simple gripes you had around the shop or things
18  that you didn't -- didn't think were appropriate
19  treatment of management to subordinates, didn't
20  necessarily construe an action that was part of
21  Sarbanes-Oxley.
22         However, if those negative treatments
23  of the employees were in connection with the fact
24  that someone had -- had given information or was in
25  an effort to suppress that type of information,

494

1  then it did become a SOX claim.
2         So, again, you know the legal aspects
3  of it far better than I.  It just showed to a
4  novice, such as myself, which things are SOX-worthy
5  and which things were not.
6         And in this case, I pointed out to
7  Kathy which things were Sarbanes-Oxley-related, and
8  it just boiled down to a simple thing for me, is:
9  These actions weren't right, and I reported them.
10  And all I had to do was -- that LRN was -- just let
11  me know that I was on the right track and I was
12  doing the proper thing.
13         Q.  So it's -- it's your testimony that you
14  thought that things were SOX-worthy --
15         MR. LEE:  Objection.
16  BY MS. BERTRAM:
17         Q.  -- based on the information -- the LRN
18  training; is that right?
19         A.  Yes.
20         Q.  And you testified earlier that you also
21  used the words "Sarbanes-Oxley" when you spoke with
22  Ann Glica; is that right?
23         A.  Yes.
24         Q.  And those were during conversations
25  also in mid-September of 2013, right?

495

1         A.  Yes.  Those were actually on the same
2  day initially.  At the time, they were in a
3  trailer.  So they were in just little cubicles
4  adjoining one another.  So once I had mentioned
5  Sarbanes-Oxley to Ann, she felt that it might be
6  wise to involve her boss, which was Kathy Salvador,
7  in the conversation.  So we wheeled our chairs from
8  one cubical to the next, and we began talking to
9  Kathy.
10         Q.  Did you say anything different to Ann
11  Glica about Sarbanes-Oxley than what you've already
12  described about your conversations with Kathy
13  Salvador?
14         A.  As far as I recall, yes -- or, no,
15  nothing different, but --
16         Q.  Okay.
17         A.  -- but -- it was the same.
18         Q.  You indicated -- is it your testimony
19  that you also had conversations with Ed Suraci
20  about Sarbanes-Oxley?
21         A.  More than one occasion, yes.
22         Q.  Okay.  And what did you say to
23  Mr. Suraci about Sarbanes-Oxley?
24         A.  I first recounted my conversations with
25  Ms. Glica, Ms. Salvador, and -- so that was the

**496**

1    basis. So in recalling that conversation, of
2    course, Sarbanes was -- was brought up.
3        It was also brought up in the context
4    of emails, and that after I was on paid leave, I
5    kept getting calls from employees that -- that had
6    worked -- you know, had been in my department that
7    told me that Leo was being harassed and -- I'm not
8    sure, other than harassed or bothered by
9    Mr. Flatley.
10       He had -- they had said that he had
11   pointed at him as he walked across the floor and,
12   using their words, said that he was pointing to
13   them as if to say, "I'm going to get you," and that
14   they got into a shouting match where vulgar
15   language was being used on the floor openly in
16   front of everybody else and that it related to what
17   Leo had said regarding the -- the improper gifts
18   that he saw in his account. He saw money being
19   passed under Stanley Wnuk's door.
20       And so I emailed Mr. Suraci right away
21   and told him that I thought he was being harassed
22   and that I told him that I felt like that the --
23   the harassment of Leo was SOX-worthy. I mentioned
24   SOX because I mentioned something about the 30 --
25   third-party harassment around zone of influence;

**497**

1    that, basically, I just quoted what I Googled
2    online, but said that it wasn't right the way he
3    was being treated just for having given information
4    regarding fraud at Smith & Wesson. And I felt like
5    Mr. Flatley's treatment fell in the category of
6    harassment for the purpose of -- of silencing him
7    in a SOX submission. And so I not only tell
8    Mr. Suraci that, but I mentioned in the email SOX.
9        Q. And do you recall any specific
10   statements that you made to Mr. Suraci about
11   Sarbanes-Oxley, any specific sentences that you
12   used?
13       A. No. It's just recounting what I had
14   told Ms. -- Ms. Glica and Salvador.
15       MR. LEE: Sorry. Can you pause or at
16   least slow down your answer, so that if I have an
17   objection, I can jump in and make an objection?
18   I'll just make a record of it?
19       THE WITNESS: Absolutely. Sorry.
20       MR. LEE: It wasn't your fault. I was
21   trying to make an objection, and I realized I was
22   on mute.
23       THE WITNESS: Oh, okay.
24       BY MS. BERTRAM:
25       Q. And, Mr. Baker, you said that you

**498**

1    mentioned Sarbanes-Oxley in an email while you were
2    on administrative leave?
3        A. Yes.
4        Q. Do you recall any communications with
5    Smith & Wesson about -- where you mentioned
6    Sarbanes-Oxley prior to that email?
7        A. There --
8        MR. LEE: Objection to form of the
9    question. Asked and answered.
10       But you may answer.
11       THE WITNESS: There are so many
12   documents that -- that pertain to this case. Off
13   the top of my head, I can't recall a specific one
14   to tell you. I just know that -- that there are
15   mentions of Sarbanes-Oxley throughout some of the
16   emails. I -- I'd have to go through them to -- to
17   get the specific ones.
18   BY MS. BERTRAM:
19       Q. Do you recall mentioning Sarbanes-Oxley
20   in writing before you retained the Employment Law
21   Group as your counsel?
22       A. Yeah. That email to -- to Mr. Suraci
23   would be one, for sure. And, again, I would have
24   to -- to go through mentally and try and recall
25   which other ones where I did mention

**499**

1    Sarbanes-Oxley.
2        I know we -- we did discuss it with
3    Mr. Cicero, in a meeting with Mr. Cicero,
4    Mr. Suraci and myself, where we -- Smith -- SOX
5    was -- was the primary focus in what we talked
6    about. It was mentioned a number of times.
7        Q. Right. But I was asking about written
8    documents, written communications that you provided
9    to the company. Can you recall any specific
10   written communications prior to your -- your email
11   regarding the DOJ where you referenced that
12   statute?
13       A. There may have been other ones. Again,
14   it would be in that -- that email record that's out
15   there that exists. And if that -- if we found an
16   email in there, if it was a Smith & Wesson email,
17   that would have occurred prior to bringing on the
18   Employment Law Group, because as soon as they put
19   me on paid leave, they suspended my access to my
20   email and the plant.
21       Q. And I take it's your testimony that you
22   also said to Rob Cicero that -- or made reference
23   to -- to Sarbanes-Oxley in your conversations with
24   Mr. Cicero; is that right?
25       MR. LEE: Objection --

500

1    THE WITNESS:  Yes.
2            MR. LEE:  Objection to the form of the
3    question.
4            You've got to give me a chance to make
5    my objection.  Then you can answer.
6            Objection to the form of the question.
7            You may answer.
8    BY MS. BERTRAM:
9        Q.  I'm going to restate the question
10   because it --
11           MR. LEE:  Yeah.
12   BY MS. BERTRAM:
13       Q.  -- got a little jumbled anyway.
14           MR. LEE:  And, actually, you got -- you
15   went, like, in and out a little bit, too.
16           MS. BERTRAM:  Okay.
17           MR. LEE:  I figured out what the
18   question was, but --
19   BY MS. BERTRAM:
20       Q.  In your conversations with Mr. Cicero,
21   did you make reference to Sarbanes-Oxley?
22       A.  Yes, we -- we mentioned it in a number
23   of contexts.  One of the reasons that comes -- one
24   of the things that we mentioned at first was the
25   fact that -- initially, I was talking to Mr. Suraci

501

1    about the -- the going-on relating to the
2    harassment by Mr. Flatley.
3            In doing so, we brought up -- I brought
4    up the context that there was a reason why he was
5    harassing me in that way and that I had been told
6    by Mrs. -- Ms. Salvador not to mention the aspect
7    relating to vendor gifts and vendor influence on
8    the decisions being made and that that was a
9    context that made a lot of what was going on
10   between Mr. Flatley and myself -- it gave it
11   context.
12           So it was Mr. Suraci's view that this
13   was serious.  His exact words were:  Where there's
14   smoke, there's fire.  And I'd say there's
15   definitely smoke.  If -- he asked whether or not it
16   would be okay to escalate this to the next level
17   and speak with someone at legal.
18           Prior to that conversation, I had never
19   heard of Mr. Cicero, and I told him it was okay.
20   Mr. Suraci then escalated this to -- to be more of
21   a formal claim with legal department.  And up to
22   that point, I had been just talking to HR.  And in
23   some cases, even, I spoke to Mr. Flatley about some
24   of the issues, and Mr. Suraci.
25           After he involved Mr. Cicero,

502

1    Mr. Cicero set up a meeting.  So initially, even
2    the introductions while we were talking had to do
3    with the fact that Mr. Cicero was brought in by
4    Mr. Suraci for the express purpose that he believed
5    it to be a SOX-worthy situation and that he felt it
6    needed to be escalated just beyond you telling your
7    supervisor and -- and/or management to -- you need
8    to talk to somebody in legal because I think this
9    is important.  So initially, it started out talking
10   about Sarbanes-Oxley.
11           One other issue that I know for sure we
12   discussed SOX in length was a conversation whereby
13   Mr. Cicero had admitted that he had broken my
14   confidentiality and told Mr. Flatley that I had
15   implicated him in my submissions to him,
16   Mr. Suraci, and HR.  I was not happy with that
17   because it violated what he had told me in our
18   initial meeting.
19           And I said that that was the reason I
20   believe that my -- the harassment by Mr. Flatley
21   escalated exponentially after that point and that I
22   was angry with him for doing that.  And he
23   explained that it was part of his investigation,
24   that he felt like it's too tough to investigate
25   without having let Mr. Flatley know what I had told

503

1    him.  So he had told him.
2            And I -- I asked him that -- you know,
3    we discussed the fact that harassment under the
4    guise of or for the express purpose of knocking me
5    back because I've informed on some of the
6    activities that I believed to be against the
7    interest of the -- the shareholders, and fraud in
8    some cases, that it was wrong for him to harass me,
9    and that when he told him, all he did was make that
10   grow.
11           And he told me at that point that he
12   was sure that Mr. Flatley wasn't harassing me
13   because he had warned him and said that my
14   submissions were made in good faith and with the
15   interest of Smith & Wesson in mind; and that
16   because of this, he was assured that -- after
17   admonishing Mr. Flatley of this, that he was
18   assured by Mr. Flatley that no more harassment
19   would take place because of it.
20           But that whole explanation, the whole
21   conversation was in the context of Sarbanes-Oxley
22   and harassment due to me implicating him with some
23   of the things I told them.
24           MS. BERTRAM:  John, I can't take a
25   proper deposition in this situation.  You're on

Baker, Earl Donald - Vol. III                    October 10, 2020

7 (Pages 504 to 507)

504

1    mute, by the way.                                            02:29:53
2         MR. LEE:  Hold on.  Hold on one second.                02:29:54
3    Okay.  Now I'm on.                                          02:29:57
4         MS. BERTRAM:  Right.  I -- I can't take                02:29:59
5    a proper deposition in this situation.                      02:30:01
6         MR. LEE:  You're breaking up.                          02:30:01
7         MS. BERTRAM:  I'm asking about --                      02:30:04
8         MR. LEE:  You're -- you're breaking up.                02:30:05
9    You're breaking up.                                         02:30:06
10        MS. BERTRAM:  Okay.  I'm -- I'm -- I                    02:30:07
11   honestly should not be in a situation where I can't         02:30:09
12   take a proper deposition.  Because I'm asking when          02:30:13
13   something happened, and I get five minutes of               02:30:16
14   testimony.  And I'm sitting here, like, cutting             02:30:19
15   topics out because we're not going to have time to          02:30:21
16   cover them, and that's not fair to me or to my              02:30:24
17   client.                                                     02:30:27
18        I'm going to take a break, and talk                    02:30:29
19   with Mr. Baker.  I asked him what he said about             02:30:31
20   Sarbanes-Oxley.  You know, what did you -- what did         02:30:34
21   you say that you -- you know, but I'm getting the           02:30:37
22   same testimony I got before that's completely               02:30:40
23   nonresponsive.                                              02:30:43
24        And I -- I don't think it's fair after                 02:30:46
25   all this time in the litigation, all the                    02:30:49

505

1    preparation, taking time off on a Saturday                  02:30:52
2    afternoon to finish this deposition to sit here,            02:30:54
3    listen to him say whatever he wants to say in               02:30:58
4    response to my questions.  And I can't cover entire         02:31:05
5    topics because he provides 5-, 10-, and sometimes           02:31:05
6    even 15-minute responses to simple yes-no                   02:31:08
7    questions, date questions; questions about, you             02:31:11
8    know, what did you say about this topic in -- in            02:31:14
9    it.                                                         02:31:17
10        And I -- and I -- you know, he seems to                02:31:18
11   think that he has -- if he's talking about context,         02:31:20
12   it gives him license to say whatever he wants to.           02:31:23
13   He needs to respond to the question that's been             02:31:26
14   asked.  This is day, what, four?  And I haven't             02:31:28
15   covered entire topics.  I've never seen this                02:31:31
16   before.                                                     02:31:34
17        MR. LEE:  I disagree with what you                     02:31:35
18   said.  I thought he answered the question.  Yeah,           02:31:36
19   it was wordy, but he answered it.                           02:31:39
20        Now, do you want to take a break and                   02:31:40
21   you want me -- you want me to remind him to just            02:31:41
22   answer the question and be more succinct about it,          02:31:44
23   I'll do that.  I've been doing that forever.                02:31:47
24   But -- and I'm sure you did that with Suraci.  In           02:31:49
25   fact, you did it with Suraci on the record.  But,           02:31:52

506

1    again, we'll take a break --                                02:31:54
2         MS. BERTRAM:  I mean, maybe Ed was                     02:31:56
3    providing a little context with a sentence or two.          02:31:59
4    I'm pondering whether I need to go to the judge to          02:32:00
5    get an order from the judge for him to respond to           02:32:03
6    my questions.                                               02:32:06
7         MR. LEE:  He did respond to your                       02:32:06
8    question.  If you want to go to the judge, go to            02:32:07
9    the judge.  I -- I --                                       02:32:09
10        MS. BERTRAM:  Why don't you -- why                     02:32:10
11   don't you talk with him.  The record is going to be         02:32:11
12   clear.  He's not --                                         02:32:13
13        Mr. Baker, this is not funny.  This is                 02:32:15
14   a serious matter.  You are under oath, and I just           02:32:17
15   want to get answers to my questions.  I've been             02:32:21
16   waiting --                                                  02:32:23
17        MR. LEE:  He gave you --                               02:32:23
18        MS. BERTRAM:  -- six long years to ask              02:32:24
19   these questions, and -- and I don't think --                02:32:25
20        MR. LEE:  He gave you -- he gave you                   02:32:26
21   answers.  He gave you answers to your question.             02:32:27
22   And if you want to take a look at -- if you want to         02:32:30
23   compare Suraci and -- and Baker, we can.  But I             02:32:33
24   don't -- and if you want to go to the judge, you            02:32:36
25   can --                                                      02:32:39

507

1         MS. BERTRAM:  I want -- I want to get                  02:32:39
2    this solved.  If I ask for a date, give me a date.          02:32:40
3    If I ask a yes-no question, give me a yes or a no.          02:32:44
4    I understand there might be a sentence or two of            02:32:47
5    explanation.                                                02:32:51
6         When I ask what you said to Ed Suraci,                 02:32:52
7    you don't need to tell me about every single                02:32:54
8    conversation you had with Ed Suraci.                        02:32:59
9         MR. LEE:  Why not?                                     02:32:59
10        MS. BERTRAM:  We've already got                        02:33:00
11   testimony on the record.                                    02:33:01
12        MR. LEE:  Why not -- whoa, whoa, whoa.                 02:33:02
13        MS. BERTRAM:  There's a federal act                    02:33:03
14   called Sarbanes-Oxley.  I have not gotten that              02:33:06
15   answer.  I've heard about LRN.  I've heard about            02:33:09
16   every conversation that he's had now for the third          02:33:11
17   or fourth time.                                             02:33:14
18        You're -- this is a waste of my time.                  02:33:15
19   It's a waste of my client's time.  It's exquisitely         02:33:16
20   expensive to be doing this, and I just want answers         02:33:21
21   to my questions.                                            02:33:23
22        So talk to your client.  Let's take a                  02:33:23
23   five-minute break.                                          02:33:26
24        MR. LEE:  You may not like answers                     02:33:27
25   to -- to -- you may not like his answers, but he's          02:33:29

508

1  answering your questions.
2       All right. We'll take a break.
3       MS. BERTRAM: I actually -- I actually
4  like his answers, if you'd like to know. I just
5  want answers -- answers that marry up with my
6  questions.
7       THE VIDEOGRAPHER: Going off the record
8  at 2:33.
9           * * *
10      (Whereupon, there was a recess in the
11  proceedings from 2:33 p.m. to 2:41 p.m.)
12          * * *
13      THE VIDEOGRAPHER: Going on the record
14  at 2:41.
15  BY MS. BERTRAM:
16      Q. Mr. Baker, you said that Mr. Suraci
17  said that he felt that it was a SOX-worthy
18  situation. Did he use the words "SOX-worthy" when
19  he spoke with you?
20      A. I --
21      MR. LEE: Objection to the form of the
22  question.
23      But you may answer.
24      THE WITNESS: I don't recall if he used
25  those actual words.

509

1  BY MS. BERTRAM:
2      Q. Okay. And is it your understanding
3  that he said that it was SOX-worthy because it was
4  within the language outlined in the LRN?
5      MR. LEE: Objection to the form of the
6  question. Calls for speculation.
7      But you may answer.
8      THE WITNESS: I don't know in what
9  context he thought. I would assume he took that
10  training, but I'm not positive he did. I -- I
11  think everyone that was salaried took it.
12  BY MS. BERTRAM:
13      Q. No, but did he ever tie the two -- in
14  his conversations with you, did Mr. Suraci tie the
15  categories of conduct in the LRN to whether
16  something was SOX-worthy?
17      MR. LEE: Objection to the form of the
18  question.
19      But you may answer.
20      THE WITNESS: I'm unsure how much he
21  tied together. I was --
22  BY MS. BERTRAM:
23      Q. I'm asking what he said to you. Did he
24  ever say that he felt it was SOX-worthy because
25  what you were describing was within the conduct

510

1  prohibited by company policy?
2      A. That's my belief. That was part of our
3  conversation. Which exact words he used, six years
4  later I can't say. But it was implicit that that
5  was what we were discussing, and that's what he
6  implied, yes.
7      Q. And did you ever say to any Smith &
8  Wesson employee that the conduct that you were
9  describing was illegal, fraudulent or constituted a
10  securities violation?
11      A. Yes.
12      Q. Okay. When did you say that for the
13  first time? Let me -- actually, let me break it
14  down a little bit so we can have clear testimony.
15      Did you ever say that you felt that the
16  conduct of Larry Flatley and Pioneer issues was
17  illegal?
18      A. I believe I did.
19      Q. And who did you say that to?
20      A. Any number of people, but I can't off
21  the top of my head single out one.
22      Q. Okay. So you can't identify a single
23  person that you said this conduct is illegal to?
24      A. I would say that I probably did with
25  Kathy Salvador, Ann Glica, Mr. Suraci, Mr. Cicero,

511

1  probably some of my colleagues, possibly Jim
2  Valley, possibly Josh Burry, his lead person James
3  Peel and possibly -- there may be some others, but
4  those are the ones I can think of that I would have
5  mentioned that to.
6      Q. But do you have a specific recollection
7  of using the word "illegal" to any of those people
8  in your conversations with them about the Pioneer
9  situation?
10      A. Any or all of them and most assuredly
11  Glica, Salvador, Suraci, Cicero, and I would think
12  Burry and James Valley, for sure.
13      Q. And -- and --
14      A. The other ones, possibly.
15      Q. And to focus things a little bit, let's
16  not -- I'm not asking about people at your level or
17  below. I'm talking about folks in HR or legal that
18  you were communicating with about Pioneer.
19      MR. LEE: You're -- you're breaking up.
20  You -- you -- towards the end, you broke up.
21      MS. BERTRAM: Okay. It may be me
22  waving my hands.
23      MR. LEE: You want to -- yeah, I don't
24  know. You're -- you're fine right now, and then --
25      MS. BERTRAM: Okay.

Baker, Earl Donald - Vol. III

October 10, 2020

9 (Pages 512 to 515)

---

**512**

1    MR. LEE:  -- sometimes -- right --    02:45:32
2    right now, it's great.    02:45:32
3    MS. BERTRAM:  Okay.  I'll stop waving    02:45:34
4    my hands around.    02:45:35
5    BY MS. BERTRAM:    02:45:37
6    Q.  With respect to those individuals at HR    02:45:38
7    and legal, did you identify the conduct that you    02:45:44
8    believed to be illegal?    02:45:45
9    A.  Yes.    02:45:47
10    Q.  What conduct did you identify as    02:45:48
11    illegal?    02:45:50
12    MR. LEE:  Objection.  Asked and    02:45:52
13    answered.    02:45:53
14    But you may answer again.    02:45:53
15    THE WITNESS:  By -- there were    02:45:55
16    situations where vendors were charging double or    02:46:00
17    what I considered very exorbitant costs.  There    02:46:04
18    were ones who did things that -- they took tools    02:46:09
19    out of the shop without -- without any    02:46:14
20    accountability and then were selling them back    02:46:20
21    again as new, or at least had the ability to do so.    02:46:23
22    There were instances where they did    02:46:29
23    tools incorrectly, and when we turned them back, we    02:46:31
24    got no credit for them.  There were also ones --    02:46:34
25    empty bins in the vending machine that was brought    02:46:39

---

**513**

1    to their attention, and I was told not to -- not to    02:46:42
2    worry about it, and no credit memo was ever issued    02:46:45
3    for that.  And these, in many cases, amounted to    02:46:49
4    tens of thousands of dollars per incident.    02:46:53
5    BY MS. BERTRAM:    02:46:57
6    Q.  And did you ever say to any of the    02:46:58
7    folks you communicated with in HR or legal that you    02:47:01
8    believed the conduct was fraudulent?    02:47:05
9    A.  I believe all of them.    02:47:08
10    Q.  You believe that you did?    02:47:11
11    A.  Yes.    02:47:13
12    Q.  Do you recall the specific words that    02:47:13
13    you used in saying that any conduct was fraudulent?    02:47:14
14    A.  I probably just said that it was    02:47:19
15    fraudulent, that it wasn't -- that we were not --    02:47:26
16    we were getting cheated at Smith & Wesson, and I    02:47:36
17    don't believe that the actions taken -- taken were    02:47:40
18    in the best interest of Smith & Wesson.  So    02:47:42
19    those --    02:47:42
20    Q.  I'm asking --    02:47:42
21    A.  -- were the words.    02:47:42
22    Q.  -- you, Mr. Baker, about the words that    02:47:43
23    you used.    02:47:45
24    MR. LEE:  Objection.    02:47:45
25    THE WITNESS:  What I just said are the    02:47:46

---

**514**

1    words I used.    02:47:48
2    MR. LEE:  Object -- yeah, wait until --    02:47:49
3    wait until I can object.  Okay.  Wait -- just give    02:47:51
4    it a little pause.  I think there's probably a    02:47:53
5    technological reason for a little pause as well.    02:47:56
6    There's probably a little time before I hear it.    02:47:59
7    Objection to the form of the question.    02:48:01
8    Asked and answered.  Badgering the witness.    02:48:03
9    You may answer.    02:48:06
10    THE WITNESS:  Again, you asked what    02:48:08
11    words I used.  Those are the words I used.    02:48:10
12    BY MS. BERTRAM:    02:48:12
13    Q.  So it's your testimony under oath that    02:48:12
14    you said to representatives of Smith & Wesson's HR    02:48:14
15    department, legal department that this conduct is    02:48:19
16    fraudulent.  We're getting cheated.  Is that your    02:48:23
17    testimony?    02:48:28
18    A.  Yes.    02:48:29
19    Q.  Did you ever say to any representatives    02:48:29
20    of the human resources or legal department that any    02:48:33
21    conduct on the part of Smith & Wesson employees    02:48:37
22    constituted a securities violation?    02:48:40
23    MR. LEE:  Objection to the form of the    02:48:45
24    question.    02:48:46
25    But you may answer.    02:48:47

---

**515**

1    THE WITNESS:  I believe I did so with    02:48:50
2    Mr. Cicero.    02:48:51
3    BY MS. BERTRAM:    02:48:53
4    Q.  And do you recall what you said to    02:48:54
5    Mr. Cicero about any alleged securities violation?    02:48:56
6    A.  I told him that if the -- that altering    02:49:00
7    the database was, I thought, a -- a violation of --    02:49:15
8    and I didn't know whether I used "security fraud,"    02:49:15
9    but I know I said fraud against the shareholders    02:49:24
10    because I felt that changing the database was    02:49:24
11    illegal from a context of the SEC.    02:49:30
12    Q.  And who do you contend changed the    02:49:37
13    database?    02:49:46
14    A.  I don't know who changed it.    02:49:47
15    MR. LEE:  Object -- wait until --    02:49:48
16    THE WITNESS:  Sorry.    02:49:49
17    MR. LEE:  Wait until -- that's all    02:49:50
18    right.  Your --    02:49:52
19    Objection to the form of the question.    02:49:53
20    But you may answer.    02:49:55
21    THE WITNESS:  I don't know who changed    02:49:56
22    the database.    02:50:00
23    BY MS. BERTRAM:    02:50:01
24    Q.  And did you ever say to anyone in the    02:50:03
25    human resources or legal department at Smith &    02:50:07

---

Baker, Earl Donald - Vol. III

October 10, 2020

10 (Pages 516 to 519)

---

516

| | |
|---|---|
| 1 | Wesson that you felt that any -- any conduct was |
| 2 | required to be disclosed to the SEC? |
| 3 | MR. LEE: Can I -- can I have that |
| 4 | question -- you -- you were garbled. |
| 5 | But if -- if, Cindy, you heard it, then |
| 6 | you can read it back to me. |
| 7 | Towards the end, you got garbled a |
| 8 | little bit. |
| 9 | Did you hear it, Cindy? |
| 10 | MS. BERTRAM: Let me ask a simpler |
| 11 | question, John. |
| 12 | MR. LEE: Okay. |
| 13 | MS. BERTRAM: I'll strike the -- |
| 14 | MR. LEE: Yeah, there's something -- |
| 15 | there's something about -- right now, when you |
| 16 | said, "Let me ask a simpler," you were fine. But |
| 17 | it must be the way you're, like -- I don't know |
| 18 | where your mic is, but you kind of like -- there -- |
| 19 | periodically where it just gets garbled a little |
| 20 | bit. |
| 21 | MS. BERTRAM: Okay. I'm trying to stay |
| 22 | closer, not wave my hands and not turn my face. |
| 23 | BY MS. BERTRAM: |
| 24 | Q. So did you -- did you ever tell anyone |
| 25 | at Smith & Wesson in the human resources or legal |

---

517

| | |
|---|---|
| 1 | department that you felt that information needed to |
| 2 | be disclosed to the SEC? |
| 3 | A. I don't believe so. |
| 4 | Q. Did you ever tell anyone at Smith & |
| 5 | Wesson in the human resources or legal department |
| 6 | that you felt that information had to be disclosed |
| 7 | in an SEC filing? |
| 8 | A. No, I did not. |
| 9 | Q. What was your understanding of |
| 10 | Sarbanes-Oxley when you worked for Smith & Wesson? |
| 11 | MR. LEE: Objection to the form of the |
| 12 | question. |
| 13 | But you may answer. |
| 14 | THE WITNESS: I -- I believe that I -- |
| 15 | I explained where I -- I found out about |
| 16 | Sarbanes-Oxley. Without repeating the same, what |
| 17 | specifically do you need? |
| 18 | BY MS. BERTRAM: |
| 19 | Q. What was your understanding of what |
| 20 | Sarbanes-Oxley prohibited while you were employed |
| 21 | by Smith & Wesson? |
| 22 | MR. LEE: Objection to the form of the |
| 23 | question. |
| 24 | But you may answer. |
| 25 | THE WITNESS: It prohibited taking |

---

518

| | |
|---|---|
| 1 | bribes and what was constituted in a bribe and |
| 2 | which actions being taken constituted fraud or |
| 3 | actions against the interest of the company that |
| 4 | you work for. |
| 5 | You have a fiduciary relationship, and |
| 6 | you should be acting in -- in concert with what's |
| 7 | best for your company, not -- not to -- for any |
| 8 | personal gain or for, you know, any other interest |
| 9 | outside of what's good for the company. |
| 10 | BY MS. BERTRAM: |
| 11 | Q. And how did you gain that knowledge? |
| 12 | A. Through the LRN. And then they did a |
| 13 | second -- right after I made the submission to |
| 14 | Kathy Salvador and Ann Glica, they did a second LRN |
| 15 | that was not quarterly, but it was on ethics. And |
| 16 | I believe that they made us take that in response |
| 17 | to the fact that I made a submission to Kathy, and |
| 18 | right away they came out with a thing on ethics |
| 19 | that we were required to take. |
| 20 | Prior to that, all LRNs were quarterly. |
| 21 | So we weren't really due one for another quarter. |
| 22 | But as soon as I made my submission, at the order |
| 23 | of Mr. Debney, they did another one on ethics right |
| 24 | away. So both of those covered those -- that area. |
| 25 | Q. And did you have any other base of |

---

519

| | |
|---|---|
| 1 | knowledge regarding Sarbanes-Oxley while you were |
| 2 | employed by the company? |
| 3 | A. Yes. I did some research after the |
| 4 | fact, and I got a -- an email from my |
| 5 | brother-in-law, who was the president of |
| 6 | Rolls-Royce, and he -- he gave me some information. |
| 7 | You have some emails from him. And, of course, |
| 8 | verbally he -- he gave me information. |
| 9 | Q. When you say that you did some research |
| 10 | after the fact, what do you mean when you say |
| 11 | "after the fact"? |
| 12 | A. After the LRN training, throughout the |
| 13 | process of -- after I had made a submission with |
| 14 | Kathy Salvador and it progressed to the point |
| 15 | through Mr. Suraci to Mr. Cicero, at the point |
| 16 | where Leo got harassed, I knew it wasn't proper |
| 17 | what was going on, but I didn't know contextually |
| 18 | how to deal with it. So I researched and found a |
| 19 | thing that talked about harassment of third |
| 20 | parties, and I put that in the email to Mr. Suraci. |
| 21 | But I -- I learned that wording that I used in |
| 22 | there through an Internet search. |
| 23 | Q. And as you indicated, the -- you -- you |
| 24 | produced the emails from your brother-in-law, |
| 25 | correct? |

---

Baker, Earl Donald - Vol. III

October 10, 2020

11 (Pages 520 to 523)

---

520

1    A. Yes.
2    Q. Okay. You mentioned that
3 Sarbanes-Oxley prohibits taking bribes. What was
4 the basis for any claim on your part while you were
5 employed by the company that anybody at the company
6 was taking bribes?
7         MR. LEE: Objection to the form of the
8 question.
9         But you may answer.
10        THE WITNESS: They were receiving gifts
11 from a vendor, which is inappropriate when they're
12 the person responsible for divvying out who gets
13 what work. And if the amount goes beyond a nominal
14 amount, it's improper. And it's also listed in
15 our -- our company handbook. It wasn't proper.
16 People were doing it. And there were many more
17 situations where there was reports of people doing
18 it.
19        So I didn't always see from A to B
20 where they actually received it in their hand, but
21 when you see something inappropriate, it -- it was
22 my responsibility as a good employee to report it
23 to my bosses. If it -- if it was proved to be
24 untrue, whatever, that's -- that's in their realm.
25 I needed to take the information I have and give it

---

521

1 to them.
2 BY MS. BERTRAM:
3    Q. And we talked about the -- the gifts
4 that were given in connection with the -- the
5 biggies, right?
6    A. Yes.
7    Q. Other than those -- we talked about a
8 gift card that you gave to HR in March of 2014,
9 correct?
10   A. Yes.
11   Q. Other than those two sets of gifts, do
12 you have any direct personal knowledge of any other
13 gifts that were given to Smith & Wesson employees?
14   A. I received many thirdhand accounts.
15   Q. And the thirdhand accounts were from
16 employees at your level or below, correct?
17   A. Yes. There was also one firsthand
18 account.
19   Q. What was -- what was the firsthand
20 account?
21   A. In June, I think, of 2014, an
22 engineer -- I believe it was Mark Edgar -- was
23 escorted out with armed guards from his office and
24 terminated, and I was told it was because he was
25 accepting bribes. Then it was some connection with

---

522

1 some dealings in Europe. I don't know the
2 specifics. But I did watch them escort him out of
3 the building. His office was a couple hundred feet
4 from mine. So I saw the hoopla, and that was what
5 I was told.
6    Q. And what was his name, again? It was
7 Edgar; is that right?
8    A. I believe it was Mark Edgar.
9    Q. Okay. And who told you that he was
10 being terminated for taking bribes?
11   A. I am not positive, but I believe it was
12 Jeremy Beu, who was his -- his supervisor in
13 Jeremy's area. So I -- I believe it may have been
14 Jeremy -- or Jeremy may have been Mark Edgar's
15 boss.
16   Q. And other than Mr. Beu, what he said to
17 you, you don't have any personal knowledge of why
18 Mr. Edgar was terminated?
19   A. No.
20   Q. Do you believe that Smith & Wesson
21 engaged in any mail fraud, wire fraud, bank fraud
22 or securities fraud?
23        MR. LEE: Objection to the form of the
24 question.
25        But you may answer.

---

523

1        THE WITNESS: I don't pretend to be --
2 I'm not a lawyer, so I don't know all the legal
3 implications. I do know that if there was fraud
4 taking place and it extended to Houlton, Maine,
5 that's across state lines. So I don't know, you --
6 you know. You'd have to research that. I -- I
7 don't know specific laws.
8 BY MS. BERTRAM:
9    Q. Do you have any other reason to believe
10 that the conduct that you complained about at
11 Smith & Wesson violated any mail, wire, bank or
12 securities fraud?
13        MR. LEE: Objection to the form of the
14 question. It misstates the witness's prior
15 testimony. He's testified that he does not know.
16        But you may answer the question.
17        THE WITNESS: As I explained, I don't
18 know what laws would be involved. But if there was
19 fraudulent activity relating to vendors and
20 appropriate -- against the interest of the company,
21 that if that extended to Maine, our other plant,
22 that that would constitute possibly fraud in those
23 areas, wire fraud.
24 BY MS. BERTRAM:
25    Q. Did you ever allege to anybody at

---

Baker, Earl Donald - Vol. III

October 10, 2020

12 (Pages 524 to 527)

524

1  Smith & Wesson that -- that its conduct constituted    03:00:42
2  mail, wire, bank or securities fraud?    03:00:47
3      **A.  I don't know for certain.  I may have,**    03:00:50
4  **but I can't recall anything for -- specific.**    03:00:53
5      Q.  Okay.  Is it your position that    03:00:59
6  Smith & Wesson violated any federal laws regarding    03:01:05
7  fraud against shareholders with respect to the    03:01:05
8  conduct you complained about?    03:01:08
9      MR. LEE:  Objection to the form of the    03:01:10
10  question.  He's answered that question that he    03:01:11
11  doesn't know.    03:01:13
12      But you may answer it again.    03:01:15
13      THE WITNESS:  I don't know    03:01:16
14  specifically.  But I do think that -- in my heart,    03:01:17
15  that the things I described did rise to that level.    03:01:21
16  BY MS. BERTRAM:    03:01:27
17      Q.  And is it your position that any    03:01:27
18  conduct about which you complained violated any --    03:01:30
19      MR. LEE:  You completely broke up.  I,    03:01:37
20  like -- yeah, even Cindy didn't hear it.    03:01:37
21      MS. BERTRAM:  Okay.    03:01:39
22      MR. LEE:  Like, half of your    03:01:42
23  question -- it's really weird.  When you said    03:01:43
24  "Okay," it's perfectly fine.  And if some --    03:01:45
25  somehow, like -- like, the last second half of that    03:01:48

525

1  question, like, I heard nothing.    03:01:51
2      MS. BERTRAM:  Okay.  I'm glad you    03:01:53
3  stopped me because I do want to have a clear    03:01:56
4  record.    03:01:59
5  BY MS. BERTRAM:    03:01:59
6      Q.  Did you ever -- is it your position    03:01:59
7  that any of the conduct you complained about    03:02:01
8  violated any rule or regulation of the SEC?    03:02:04
9      MR. LEE:  Objection.  I think what -- I    03:02:08
10  didn't hear the second-to-last word -- couple of    03:02:10
11  words.    03:02:12
12      But objection to the form of the    03:02:12
13  question.  Asked and answered.    03:02:13
14      But you may answer again, if you heard    03:02:15
15  the question, Earl.    03:02:18
16      MS. BERTRAM:  Cindy, did you hear a    03:02:20
17  complete question?    03:02:29
18      THE REPORTER:  Yes, but it is garbly at    03:02:30
19  times.  "The SEC" was the last two words.    03:02:30
20      MS. BERTRAM:  Yeah.  I said Securities    03:02:31
21  and Exchange Commission.    03:02:31
22      MR. LEE:  Can you -- Cindy, can you    03:02:31
23  just read the question back?  That way, we know.
24      (The following question was read back:
25      Q:  Did you ever -- is it your

526

1  position that any of the conduct you complained    03:02:47
2  about violated any rule or regulation of the SEC?)    03:02:47
3      MR. LEE:  Okay.  Cindy was very clear,    03:02:47
4  and that's what I thought what the question was    03:02:49
5  from the way your lips were moving, but -- "you"    03:02:50
6  being Connie.    03:02:54
7      But, Earl, if you understood the    03:02:55
8  question.    03:02:56
9      Same objection.  Objection to the form    03:02:57
10  of the question.  Asked and answered.    03:02:58
11      But you may answer it again.    03:02:59
12      THE WITNESS:  Again, I don't know the    03:03:02
13  laws pertaining to the SEC.  But it's my    03:03:05
14  inclination that if the database was altered, yes,    03:03:09
15  and that was reported, that that would possibly    03:03:12
16  violate SEC regulations, depending on what they did    03:03:16
17  with it.    03:03:21
18  BY MS. BERTRAM:    03:03:22
19      Q.  Is it fair to say that you disagreed    03:03:22
20  with certain of the decisions to purchase tools    03:03:25
21  from Pioneer Tool?    03:03:28
22      MR. LEE:  Objection to the form of the    03:03:29
23  question.    03:03:30
24      But you may answer.    03:03:31
25      THE WITNESS:  I disagreed with the    03:03:34

527

1  proportioning and also not holding accountability    03:03:43
2  to the quality and delivery of the tools for many    03:03:43
3  vendors, Pioneer being included.    03:03:47
4  BY MS. BERTRAM:    03:03:51
5      Q.  And by "proportioning," you're talking    03:03:51
6  about the percentage of tools that were purchased    03:03:54
7  from Pioneer Tool, correct?    03:03:56
8      A.  Yes.    03:03:58
9      Q.  And is it fair to say that you aired    03:03:59
10  those concerns in your communications with    03:04:06
11  Smith & Wesson?    03:04:09
12      A.  Yes.    03:04:14
13      Q.  Now, you've made reference to    03:04:15
14  Mr. O'Brien a couple of times.  Were there any    03:04:17
15  other employees, to your knowledge, that raised    03:04:22
16  concerns about Pioneer Tools other than Mr. O'Brien    03:04:26
17  and you?    03:04:28
18      A.  Yes.    03:04:30
19      Q.  Who else raised concerns, to your    03:04:31
20  knowledge?    03:04:34
21      **A.  I think I had mentioned in deposition**    03:04:34
22  **before, James Peel, Josh Burry, Jim Valley, Dwayne**    03:04:37
23  **Reese, Mr. Jendrezak, Lamonte Parks, just all in**    03:04:47
24  **the documents -- in my deposition I -- before I --**    03:04:57
25  **I think I had mentioned all those men.**    03:04:59

**528**

```
1     Q.  And what was Mr. Reese's first name?         03:05:03
2     A.  Dwayne.                                      03:05:07
3     Q.  I want to make certain I have all of         03:05:09
4  the names.  It's your contention -- it's your       03:05:13
5  understanding that James Peel, Josh Burry, Jim      03:05:16
6  Valley, Dwayne Reese, Lamonte Parks and the         03:05:20
7  individual we've been calling Leo J. --             03:05:23
8     A.  Yes.                                          03:05:26
9     Q.  -- also raised concerns about                03:05:27
10 Pioneer Tools; is that right?                       03:05:29
11    A.  Yes.                                          03:05:32
12    Q.  Okay.  And when -- when did Mr. Peel         03:05:33
13 raise concerns about Pioneer Tool, to your          03:05:34
14 knowledge?                                           03:05:38
15    A.  I would guess it was the late spring,        03:05:40
16 early fall of -- early summer of 2013.              03:05:48
17    Q.  And what was Mr. Peel's position at          03:05:55
18 that time?                                           03:05:55
19    A.  He was lead man in Josh Burry's              03:05:59
20 department, which would have been TC Barrel.        03:06:04
21    Q.  And do you know whether he's still with      03:06:08
22 the company?                                         03:06:09
23    A.  I do not know.                                03:06:10
24    Q.  Okay.  And when you left the company,        03:06:12
25 he was still working for Smith & Wesson, correct?   03:06:16
```

**529**

```
1     A.  Yes.                                          03:06:19
2     Q.  To your knowledge, when did Mr. Josh        03:06:19
3  Burry raise concerns about Pioneer Tool?            03:06:25
4     A.  On or about the same time.                   03:06:28
5     Q.  And do you know if he's still with          03:06:31
6  Smith & Wesson?                                      03:06:33
7     A.  It's my belief he is not.                    03:06:34
8     Q.  Okay.  Do you know when he left?            03:06:38
9     A.  He left while I was still there, but I      03:06:39
10 don't know if he's come back.  But he had left, I   03:06:43
11 would say, early '14.                                03:06:48
12    Q.  And do you know why he left?                 03:06:51
13    A.  I know his wife was a recruiter and         03:06:53
14 that he looks at a lot of different jobs.  So I     03:06:59
15 assumed it was just he found a better opportunity.  03:07:03
16    Q.  What about Mr. O'Brien?  Is he still        03:07:08
17 with the company?                                    03:07:10
18    A.  Yes, as far as I know.                       03:07:11
19    Q.  Do you know what his position is?           03:07:13
20    A.  I think I do, but I don't know for          03:07:15
21 certain.                                             03:07:17
22    Q.  Okay.  And when did Mr. Valley raise        03:07:20
23 concerns about Pioneer Tool, to your knowledge?     03:07:26
24    A.  That, for certain, would have been          03:07:29
25 early in -- it would have been the spring of 2013.  03:07:33
```

**530**

```
1     Q.  And do you know if Mr. Valley is still      03:07:41
2  with the company?                                    03:07:43
3     A.  I do not.                                     03:07:45
4     Q.  Was he still there when you left the        03:07:47
5  company in September of 2014?                        03:07:50
6     A.  Yes.                                          03:07:52
7     Q.  And what about Dwayne Reese?  When did      03:07:52
8  he raise concerns about Pioneer Tool, to your       03:07:55
9  knowledge?                                           03:07:57
10    A.  I was told -- let's see.  I'm not           03:07:58
11 certain the exact time, but it was in coordination  03:08:05
12 with -- I was sent to him to verify something, and  03:08:09
13 that's when he voiced his concerns.  But I'm not    03:08:14
14 positive of the time frame.                          03:08:17
15    Q.  And did -- do you know who he voiced        03:08:18
16 his concerns to?                                      03:08:22
17    A.  He voiced his concerns to me.               03:08:23
18    Q.  Do you know whether he voiced his          03:08:27
19 concerns to others?                                  03:08:29
20    A.  I know he at least talked to a few          03:08:31
21 people.  That's why they had pointed me to him      03:08:35
22 to -- that I needed to speak to him.               03:08:39
23    Q.  And do you know whether he ever spoke       03:08:42
24 to anyone in human resources, the legal department  03:08:44
25 or called the hotline with respect to his concerns  03:08:48
```

**531**

```
1  about Pioneer Tool?                                 03:08:51
2     A.  I don't, no.                                 03:08:52
3     Q.  And what about James Peel?  Do you know     03:08:57
4  whether he complained to HR, legal or the hotline   03:08:59
5  about his concerns about Pioneer Tool?             03:09:02
6     A.  I -- I know that he has complained or       03:09:04
7  he had mentioned that he complained quite a bit,    03:09:08
8  but to whom, I wouldn't know.                        03:09:09
9     Q.  What about Josh Burry?  Do you know who     03:09:11
10 he complained to?                                    03:09:15
11    A.  Again, I know he had complained to a        03:09:16
12 number of people.  He did mention specifically he   03:09:19
13 had talked to Tom Walsh.  But the other people, I   03:09:24
14 wouldn't be aware of exactly who.                   03:09:27
15    Q.  Okay.  And do you know whether             03:09:29
16 Mr. Reese is still with the company?               03:09:33
17    A.  I do not.                                    03:09:35
18    Q.  And when did Mr. Parks complain about       03:09:36
19 Pioneer Tools, to your knowledge?                   03:09:43
20    A.  I would say early spring and               03:09:45
21 periodically throughout.                             03:09:51
22    Q.  Early spring of 2013 or --                  03:09:55
23    A.  Yes.                                          03:09:58
24    Q.  -- 2014?                                     03:10:00
25    A.  '13.                                          03:10:00
```

Baker, Earl Donald - Vol. III                    October 10, 2020

14 (Pages 532 to 535)

532

1  Q.  And do you know who he complained to?  03:10:01
2  A.  I do not.  03:10:03
3  Q.  He's still with the company, right?  03:10:06
4  A.  I really don't know.  03:10:10
5  Q.  Okay.  And what about Leo J.?  When did  03:10:12
6  he raise -- first raise concerns about Pioneer  03:10:16
7  Tool?  03:10:20
8  A.  I don't know when he first raised --  03:10:20
9  Q.  To your knowledge -- to your knowledge,  03:10:25
10  when did he first raise concerns?  03:10:26
11  A.  The only thing I'm aware of is when he  03:10:28
12  first raised the -- the issue with me.  But who he  03:10:31
13  talked to first or any time frame before me, I  03:10:36
14  don't know.  03:10:39
15  Q.  Now, you explained that you raised  03:10:40
16  concerns that he had been harassed for providing  03:10:44
17  information.  Do you know who he complained to  03:10:47
18  before he was harassed?  03:10:51
19  MR. LEE:  Objection.  Sorry.  Objection  03:10:52
20  to the form of the question.  I think I -- do -- I  03:10:55
21  think I got everything.  So long as Cindy got the  03:10:58
22  question and Earl understood the question, that's  03:11:01
23  fine.  03:11:03
24  But objection to the form of the  03:11:04
25  question.  03:11:04

533

1  But you may answer.  03:11:05
2  MS. BERTRAM:  That was a terrible  03:11:07
3  question, so I'm going to withdraw it.  03:11:09
4  BY MS. BERTRAM:  03:11:12
5  Q.  And do you know who Mr. Leo J.  03:11:12
6  complained to?  03:11:14
7  A.  I don't know firsthand.  I was told  03:11:15
8  that he had spoken with Mr. Cicero.  03:11:19
9  Q.  And do you know if he's still with the  03:11:24
10  company?  03:11:31
11  A.  I had heard he was not.  03:11:34
12  Q.  Do you know when he left?  03:11:36
13  A.  No.  It would have been after I left.  03:11:38
14  Q.  Do you know why he left?  03:11:42
15  A.  I believe health.  I was told health.  03:11:43
16  Q.  Now, we previously have looked at a  03:11:48
17  letter from 2010 that Mr. O'Brien sent to  03:11:54
18  Mr. Debney, right?  03:11:59
19  A.  Okay.  Yes.  03:12:00
20  Q.  And when did you first become aware of  03:12:02
21  the 2010 letter that Mr. O'Brien sent?  03:12:04
22  A.  He sent it to me, but I don't remember  03:12:07
23  the time frame.  03:12:13
24  Q.  He sent it to you -- to you by email or  03:12:15
25  by text?  03:12:18

534

1  A.  Don't know.  It was electronic, but I  03:12:20
2  don't know whether it was email or text.  03:12:23
3  Q.  You don't know what Mr. Debney did with  03:12:31
4  that letter, right?  03:12:31
5  A.  No.  03:12:32
6  Q.  You don't know who he provided it to,  03:12:32
7  right?  03:12:35
8  A.  No.  03:12:35
9  Q.  And you don't know whether the company  03:12:37
10  did anything, and if so, what it did in response to  03:12:37
11  that letter, correct?  03:12:41
12  A.  No.  03:12:43
13  MR. LEE:  Yes, she's correct, or, no,  03:12:49
14  she's not correct or --  03:12:50
15  THE WITNESS:  She's correct that I  03:12:52
16  don't know --  03:12:54
17  MR. LEE:  No.  03:12:54
18  THE WITNESS:  -- the specific reaction.  03:12:56
19  I don't know the specific reaction they had.  03:12:59
20  MR. LEE:  Earl, where is your mic?  03:13:15
21  Where is your mic?  03:13:18
22  THE WITNESS:  It hangs on the --  03:13:18
23  MR. LEE:  Okay.  03:13:18
24  THE WITNESS:  -- earphone things.  03:13:19
25  MR. LEE:  Okay.  03:13:20

535

1  BY MS. BERTRAM:  03:13:20
2  Q.  If you can go to Plaintiff's Exhibit  03:13:21
3  227.1.  03:13:24
4  MR. LEE:  Hold on.  Let me find it.  03:13:25
5  Did you say 227.1?  03:13:40
6  MS. BERTRAM:  Yes, plaintiff's --  03:13:44
7  MR. LEE:  Is this -- is this in that  03:13:44
8  pile called "TELG Production," T-E-L-G Production?  03:13:46
9  MS. BERTRAM:  No.  It's a document that  03:13:51
10  you used with our witnesses.  It's in the  03:13:53
11  plaintiff's exhibit group.  03:13:55
12  MR. LEE:  Which -- tell me which one it  03:13:59
13  is, because instead of finding it -- let's see.  03:13:59
14  Hold on.  03:14:02
15  MS. BERTRAM:  It's Exhibit 2 -- 227.1.  03:14:03
16  Let me just double-check it.  03:14:06
17  MR. LEE:  Okay.  03:14:06
18  THE WITNESS:  If I may, that number  03:14:11
19  doesn't correlate with any of the numbers on the  03:14:12
20  books I have that say "Plaintiff's Exhibits."  03:14:15
21  MR. LEE:  That's why -- and I -- that's  03:14:18
22  why I was wondering.  There's a folder that I have  03:14:20
23  called "TELG Production."  03:14:22
24  MS. BERTRAM:  It's not in there.  03:14:25
25  MR. LEE:  Okay.  03:14:26

Baker, Earl Donald - Vol. III

October 10, 2020

15 (Pages 536 to 539)

---

**536**

1    MS. BERTRAM:  It is in a binder --          03:14:34
2  let's see where the cover is -- that says -- it   03:14:39
3  does not have -- it does not have tabs.  At least  03:14:47
4  my version of it looks like this.  And one volume  03:14:50
5  goes through Exhibit 199, and another starts with  03:14:57
6  200.  The next one starts with 200.              03:15:03
7          MR. LEE:  Supplement for -- hold on.      03:15:06
8          MS. BERTRAM:  Actually, the cover looks   03:15:12
9  like this.  It has "Exhibit 200" up in the upper   03:15:14
10  right-hand corner.                               03:15:17
11  BY MS. BERTRAM:                                  03:15:22
12      Q.  Do you see that, Mr. Baker?             03:15:22
13      A.  The book that you showed, I have no      03:15:28
14  book that says that.  I -- I have one that says   03:15:30
15  "Smith & Wesson Exhibits" --                     03:15:34
16      Q.  No.  It's just -- look for one that      03:15:36
17  says --                                          03:15:36
18      A.  -- "Plaintiff's Exhibits" --             03:15:36
19      Q.  Hold on.  Rather than pulling them all   03:15:40
20  up, look for one that has a label that says      03:15:43
21  "Plaintiff's Exhibits."  Put those three aside.  03:15:45
22  And it should, in numerical order, be in that    03:15:48
23  group -- in one of those binders.  They're --    03:15:51
24  they're in exhibit order.                        03:15:53
25      A.  Okay.  I'm looking for 200?              03:16:05

---

**537**

1      Q.  22 -- 227.1.                             03:16:12
2          MR. LEE:  I obviously don't have the     03:16:23
3  binders --                                       03:16:25
4          THE WITNESS:  I got it.                   03:16:26
5          MR. LEE:  Okay.                           03:16:26
6  BY MS. BERTRAM:                                  03:16:30
7      Q.  So you have it?  This is a July 16,      03:16:30
8  2014, email from you to Mr. Debney, right?       03:16:30
9      A.  Yes.                                      03:16:36
10      Q.  And you attach to that a document        03:16:38
11  called "Cutter Cost Savings Analysis," correct?  03:16:40
12      A.  Yes.                                     03:16:44
13      Q.  And you forwarded that to him within     03:16:46
14  one hour of receiving the first draft of the     03:16:48
15  Cutter Cost Savings Analysis from Mr. Francis,   03:16:55
16  right?                                           03:16:57
17      A.  I -- I can't say for certain on the      03:16:59
18  timing.  I -- I don't recall now.                03:17:00
19      Q.  Well, let's -- let's look at the         03:17:05
20  exhibit.  It's called "Cutter Cost Savings       03:17:06
21  Analysis," correct?                              03:17:10
22      A.  Yes.                                     03:17:11
23      Q.  And it has the document number in the    03:17:12
24  lower right-hand corner M00787, right?           03:17:14
25      A.  Yes.                                     03:17:25

---

**538**

1      Q.  And that was -- this was created on an   03:17:25
2  Excel spreadsheet by Mr. Francis, correct?       03:17:27
3      A.  Yes.                                      03:17:30
4      Q.  And he inputted the data into the Excel   03:17:30
5  spreadsheet, right?                              03:17:34
6      A.  Yes.                                      03:17:35
7      Q.  It's your understanding that the Excel   03:17:36
8  spreadsheet had macros in it that computed certain 03:17:39
9  results, correct?                                03:17:42
10      A.  Yes.                                     03:17:43
11      Q.  And the information -- the numbers that  03:17:44
12  are in the second page of Deposition Exhibit 227.1 03:17:47
13  are numbers that you supplied to Mr. Francis,    03:17:52
14  right?                                           03:17:55
15      A.  Yes.                                     03:17:55
16      Q.  And to your knowledge, he didn't         03:17:56
17  double-check any of the numbers that you provided 03:17:59
18  to him, right?                                   03:18:01
19      A.  My -- he did double-check in that he     03:18:02
20  called me back two or three times to check with  03:18:06
21  numbers and so forth.  So it was a process that  03:18:13
22  took days.  So he didn't just get numbers and call 03:18:18
23  back.  He -- there was some back-and-forth so    03:18:20
24  that -- it was my understanding he was looking at 03:18:25
25  numbers and wanting to make sure that the numbers 03:18:27

---

**539**

1  in there were correct.                           03:18:30
2      Q.  But those communications occurred after  03:18:31
3  you sent the email to Mr. Debney, correct?       03:18:33
4      A.  I -- no, I don't believe so.             03:18:37
5      Q.  Okay.  Well, let's look at -- this       03:18:39
6  should be around the same area.  Let's first look 03:18:47
7  at Exhibit 225 of that same binder.              03:18:51
8          MR. LEE:  Just to make the record        03:19:11
9  clear, Connie, if this is also Defendant's 225,   03:19:13
10  that's fine, but the reason why I was confused,   03:19:16
11  it's Plaintiff's 225.                            03:19:18
12          MS. BERTRAM:  That's correct.            03:19:20
13          MR. LEE:  Okay.                          03:19:23
14          MS. BERTRAM:  I keep saying that, but    03:19:23
15  maybe it's going out.                            03:19:25
16  BY MS. BERTRAM:                                  03:19:28
17      Q.  Are you at Plaintiff's Exhibit 225,      03:19:28
18  Mr. Baker?                                       03:19:30
19      A.  No, I haven't found it yet.  My book     03:19:31
20  goes from 227 to 22 -- I'm sorry.  It goes from  03:19:40
21  217, and the very next one is 227.               03:19:48
22      Q.  You might be looking at an old version   03:20:33
23  of the notebook that I sent to you.              03:20:37
24      A.  Okay.  This is the one -- the last one   03:20:40
25  that I received.                                 03:20:42

---

Baker, Earl Donald - Vol. III

October 10, 2020

16 (Pages 540 to 543)

---

540

1      MR. LEE:  Connie, this is                                03:21:04
2  Plaintiff's 217 that you're referring to, right?              03:21:05
3      MS. BERTRAM:  Hold on.  I have -- I                       03:21:16
4  have it as Exhibit 225.  It's in that same binder             03:21:17
5  that Mr. -- Mr. Baker just held up, this one that             03:21:22
6  starts with 200.                                              03:21:28
7      MR. LEE:  Okay.  It's a three-page --                     03:21:28
8  three-page email, right?                                      03:21:30
9      MS. BERTRAM:  That's correct.                             03:21:31
10     MR. LEE:  Or a email and a chart,                         03:21:32
11 right?                                                        03:21:34
12     MS. BERTRAM:  Correct.                                    03:21:34
13     MR. LEE:  Can you just send it to him?                    03:21:35
14     MS. BERTRAM:  It's right in the binder                    03:21:38
15 he was just holding up.                                       03:21:40
16     THE WITNESS:  I -- I can show --                          03:21:40
17     MS. BERTRAM:  This binder right here.                     03:21:42
18 I have a identical copy to what he has.                       03:21:43
19     THE WITNESS:  That's --                                   03:21:43
20     MS. BERTRAM:  That's not the right one.                   03:21:47
21 That's an old version.  There should -- there's one           03:21:49
22 starting at -- at 200.                                        03:21:53
23     THE WITNESS:  The other one that I have                   03:21:57
24 says "Plaintiff's Exhibits" starts with 251 -- or             03:21:59
25 281.                                                          03:22:02

---

541

1      MS. BERTRAM:  That's one that goes in                     03:22:03
2  the middle between those two because they don't               03:22:05
3  match up.                                                     03:22:12
4      THE WITNESS:  There is not another one                    03:22:14
5  that says "Plaintiff's Exhibits" other than those             03:22:14
6  two.  I have two that say "Plaintiff's Exhibits."             03:22:16
7  The other one says "Smith & Wesson Exhibits,"                 03:22:19
8  "Smith & Wesson Exhibits," "Smith & Wesson                    03:22:24
9  Exhibits," and one that says "Baker's Text                    03:22:24
10 Message."  Those are the ones provided.                       03:22:28
11     MS. BERTRAM:  Okay.  Well, we sent you                    03:22:30
12 three shipments of them, and I asked that they all            03:22:33
13 be available.  But I'll -- I'll go ahead and                  03:22:35
14 publish this, if I can.  It will just take me a               03:22:37
15 minute to pull it up.                                         03:22:43
16     MR. LEE:  While you're doing that, I'm                    03:22:48
17 going to take a quick run.                                    03:22:49
18     MS. BERTRAM:  Okay.                                       03:22:52
19     MR. LEE:  It will take less than two                      03:22:52
20 minutes.                                                      03:22:54
21     THE VIDEOGRAPHER:  Shall we go off the                    03:22:54
22 record?                                                       03:22:55
23     MR. LEE:  You don't have to.  Just wait                   03:22:56
24 until I get back.  I'm just going to put it in mute           03:22:58
25 and just run to the boys' room.                               03:23:01

---

542

1      MS. BERTRAM:  Now, how am I going to be                   03:24:21
2  able to share this document given the fact that you           03:24:23
3  guys are in control of the Zoom?  Are you able to             03:24:25
4  share with me the ability to share?                           03:24:28
5      THE VIDEOGRAPHER:  If you have a PDF,                     03:24:31
6  you should be able to just drag it into the chat,             03:24:33
7  and we'll be able to download it that way.                    03:24:36
8      MS. BERTRAM:  I'd like to share -- oh,                    03:24:39
9  I see, share my screen.                                       03:24:40
10     THE VIDEOGRAPHER:  No.  Actually,                         03:24:42
11 drag -- if you drag the document into the Zoom                03:24:44
12 chat, we'll be able to download it onto our                   03:24:47
13 computers.                                                    03:24:50
14     MS. BERTRAM:  I can't drag it given the                  03:25:36
15 system that I have them in, the litigation                    03:25:40
16 manager --                                                    03:25:40
17     MR. LEE:  You know what?  If -- if Jill                  03:25:40
18 were here, she'd be able to pop it up on the                  03:25:41
19 screen.  Let me see -- but I don't have it                    03:25:44
20 digitally.  You're -- this is the Francis/Earl                03:25:46
21 Baker email exchange of July 16; subject matter:             03:25:51
22 Cost Savings in Cutter, right?  That's what                   03:25:57
23 you're --                                                     03:26:06
24     MS. BERTRAM:  Right.                                     03:26:11
25     MR. LEE:  Can you, like, show it up on                  03:26:11

---

543

1  the screen, like, in your -- with your hands and             03:26:14
2  maybe ask him?  Because I don't mind.                         03:26:14
3      THE VIDEOGRAPHER:  Ms. Bertram --                        03:26:16
4      MS. BERTRAM:  I'd like to share to                      03:26:16
5  Zoom, but I was told I shouldn't do that.                     03:26:19
6      THE VIDEOGRAPHER:  Would -- would you                   03:26:22
7  like to go off the record for a moment and we                 03:26:22
8  can --                                                        03:26:23
9      MS. BERTRAM:  No.                                       03:26:23
10     MR. LEE:  Yeah.  Sure.                                  03:26:23
11     MS. BERTRAM:  How is that going to fix                  03:26:23
12 things?  I don't mind this being on the record.              03:26:25
13     THE VIDEOGRAPHER:  You can try sharing                  03:26:26
14 your screen.  I just wanted to make sure that it             03:26:27
15 didn't affect my video when you did that.  But if            03:26:29
16 you would like to do that on the record, we can.            03:26:33
17     MR. LEE:  Oh --                                         03:26:34
18     THE VIDEOGRAPHER:  I'm sorry?                           03:26:34
19     MR. LEE:  -- I see.  Okay.  Hold on.                    03:26:35
20 If -- if -- if Connie -- because it's such a -- you          03:26:35
21 know, it's a two -- two -- two-page email --                 03:26:38
22 two-page email with a little attachment or a                 03:26:39
23 one-page -- yeah, it's a page -- two-page email              03:26:42
24 with -- if Connie shows it -- like, holds it up --           03:26:44
25 holds the email up on the screen, will it be caught          03:26:47

---

Henderson Legal Services, Inc.

202-220-4158                www.hendersonlegalservices.com

**544**

1  on the video or no, or is it -- 03:26:52
2          THE VIDEOGRAPHER:  It will not be 03:26:54
3  legible. 03:26:56
4          MR. LEE:  Oh. 03:26:56
5          THE VIDEOGRAPHER:  Ms. Bertram, you can 03:26:57
6  try sharing your screen of the -- of the document. 03:26:58
7          THE WITNESS:  I can see that. 03:27:14
8          MS. BERTRAM:  Do you see it? 03:27:15
9          THE WITNESS:  Yes. 03:27:17
10  BY MS. BERTRAM: 03:27:18
11      Q.  Okay.  Exhibit 225 is the first email. 03:27:18
12  It's a July 16, 2014, email from you to 03:27:22
13  Mr. Francis, correct? 03:27:27
14      **A.  Yes.** 03:27:28
15      Q.  And was this the first time that 03:27:31
16  Mr. Francis provided to you a draft of the cutter 03:27:33
17  savings chart? 03:27:37
18      **A.  I can't be sure if it was the first** 03:27:40
19  **time or not because we -- he shared a couple of** 03:27:42
20  **copies, I think.  But this is one place where he** 03:27:46
21  **shared a copy.** 03:27:51
22      Q.  He says:  Take a look at the 03:27:56
23  spreadsheet.  I tried to summarize your numbers, 03:27:58
24  correct? 03:28:00
25      **A.  Yes.** 03:28:01

**545**

1      Q.  And the email below that, you had sent 03:28:02
2  to Mr. Francis on July 15, 2014, right? 03:28:05
3      **A.  Yes.  Or 15.** 03:28:11
4      Q.  And these are the numbers that you used 03:28:11
5  to generate the analysis that you have described to 03:28:17
6  Mr. Francis, correct? 03:28:20
7          THE VIDEOGRAPHER:  I believe 03:28:34
8  Mr. Baker's video is locked up. 03:28:35
9          MS. BERTRAM:  Okay.  I thought he was 03:28:37
10  reading. 03:28:39
11          MR. LEE:  Earl, can you hear us? 03:28:39
12  Evidently not. 03:28:41
13          THE VIDEOGRAPHER:  Would you like to go 03:28:52
14  off the record and troubleshoot this? 03:28:53
15          MS. BERTRAM:  Okay. 03:28:54
16          MR. LEE:  Yeah.  Do you -- do you want 03:28:55
17  Mr. Baker's phone number so you can call him up and 03:28:56
18  sort of guide him through this? 03:28:59
19          MS. BERTRAM:  That would be a good 03:29:00
20  idea. 03:29:01
21          MR. LEE:  Yeah. 03:29:01
22          THE VIDEOGRAPHER:  Going off the record 03:29:01
23  at 3:29. 03:29:02
24              * * * 03:29:04
25          (Whereupon, there was a recess in the 03:29:04

**546**

1  proceedings from 3:29 p.m. to 3:40 p.m.) 03:33:29
2              * * * 03:40:44
3          THE VIDEOGRAPHER:  Going on the record 03:40:44
4  at 3:40. 03:40:48
5  BY MS. BERTRAM: 03:40:51
6      Q.  Do you see the exhibit? 03:41:03
7      **A.  Yes.  My -- yes, I do.** 03:41:04
8          MS. BERTRAM:  Okay.  So, Cindy, could 03:41:04
9  you read back the question that was pending when 03:41:10
10  Mr. Baker froze up. 03:41:12
11          THE WITNESS:  And, Connie, for your -- 03:41:21
12  your record, my wife just found the book that you 03:41:21
13  were -- 03:41:21
14  BY MS. BERTRAM: 03:41:21
15      Q.  Okay. 03:41:21
16      **A.  -- speaking of.** 03:41:24
17      Q.  Okay.  Good.  So if you could open it 03:41:25
18  up to 225. 03:41:28
19          THE REPORTER:  Are you ready for the 03:41:37
20  question?  The last -- 03:41:42
21          MS. BERTRAM:  Let Mr. Baker get to the 03:41:42
22  exhibit first. 03:41:42
23          THE WITNESS:  I'm -- I'm there. 03:41:53
24          MS. BERTRAM:  Okay.  Good. 03:41:54
25          (The following question was read back: 03:41:54

**547**

1      Q:  And these are the numbers that you 03:41:54
2  used to generate the analysis that you have 03:41:55
3  described to Mr. Francis, correct?) 03:41:55
4          THE WITNESS:  Yes. 03:41:55
5  BY MS. BERTRAM: 03:41:56
6      Q.  And do you have a recollection of 03:41:58
7  providing any production and cost savings numbers 03:42:05
8  to Mr. Francis before your email of July 15, 2014? 03:42:11
9      **A.  I believe I did.** 03:42:15
10          THE VIDEOGRAPHER:  Ms. Bertram, sorry 03:42:16
11  to interrupt.  Can you unshare your screen?  I 03:42:18
12  believe it's affecting Mr. Baker's video. 03:42:21
13          MS. BERTRAM:  Oh, that's a good point. 03:42:24
14  We don't need it anymore. 03:42:25
15          THE VIDEOGRAPHER:  Thank you. 03:42:26
16          MS. BERTRAM:  Okay. 03:42:27
17  BY MS. BERTRAM: 03:42:31
18      Q.  And did you share any -- strike that. 03:42:33
19          Did you provide to Mr. Francis any 03:42:40
20  production and cost savings numbers before your 03:42:44
21  July 15 email? 03:42:48
22          MR. LEE:  Objection to the form of the 03:42:50
23  question. 03:42:51
24          But you may answer. 03:42:52
25          THE WITNESS:  I believe I did. 03:42:54

548

```
 1   BY MS. BERTRAM:                                    03:42:57
 2        Q.  Do you specifically recall any            03:42:58
 3   documents that you provided to him or any numbers  03:42:59
 4   that you provided to him?                          03:43:01
 5        A.  We worked together on the pitch board     03:43:03
 6   quite extensively.  So there would have been       03:43:07
 7   numbers that were on the pitch board that were     03:43:16
 8   shared with him.  And then he also had access to   03:43:16
 9   them, so -- that would be my recollection.         03:43:18
10        Q.  Do you have any reason to believe that    03:43:22
11   he accessed the company's databases to confirm your 03:43:25
12   numbers between July 15, 2014, and July 16, 2014,  03:43:28
13   to double-check your numbers?                      03:43:34
14        MR. LEE:  Objection to the form of the        03:43:36
15   question.                                          03:43:37
16        But you may answer.                           03:43:37
17        THE WITNESS:  Could you ask that again?       03:43:39
18   BY MS. BERTRAM:                                    03:43:42
19        Q.  Do you have any reason to believe that    03:43:42
20   Mr. Francis accessed the company's databases or    03:43:44
21   records to confirm your numbers between receiving  03:43:48
22   your email on July 15, 2014, at 8:50 p.m. and      03:43:51
23   sending the spreadsheet to you on July 16, 2014, at 03:43:55
24   11:17 a.m.?                                         03:43:59
25        MR. LEE:  Objection.                          03:44:01
```

549

```
 1        THE WITNESS:  Yes.  I have every reason        03:44:02
 2   to believe, Bob being who he is and having access   03:44:03
 3   to these numbers, that he wouldn't have published   03:44:06
 4   anything without -- without verifying it.           03:44:09
 5   That's -- you said, do I have any reason to         03:44:14
 6   believe?  Yeah.  Knowing Bob, I believe it was all  03:44:16
 7   checked.                                            03:44:20
 8   BY MS. BERTRAM:                                     03:44:20
 9        Q.  Do you have any personal knowledge that    03:44:20
10   he checked those databases or numbers?              03:44:21
11        A.  No, I don't.                               03:44:23
12        Q.  Let me ask you a couple of questions       03:44:25
13   about your email from July 15.  In the second line, 03:44:26
14   you talk about cutter production, and you said it   03:44:31
15   was 5,701 per month.  That included both regrinds   03:44:36
16   and new tools, correct?                             03:44:41
17        A.  Yes.                                       03:44:44
18        Q.  And --                                     03:44:44
19        A.  I think so.  I'm sorry.                    03:44:44
20        Q.  And if you go down two more paragraphs,    03:44:47
21   it says:  Total Smith & Wesson grind value of      03:44:50
22   6.4 million divided by 98,119 tools.  And then you  03:44:54
23   provide a computation there.  What is the 98,119?   03:44:57
24   What does that number reflect?                      03:45:01
25        MR. LEE:  Objection to the form of the        03:45:05
```

550

```
 1   question.                                          03:45:07
 2        But you may answer.                           03:45:07
 3        Are we on the one, two -- third               03:45:08
 4   paragraph down in that July 15 -- okay.            03:45:10
 5        THE WITNESS:  My recollection, not            03:45:14
 6   having the other sheets in front of me, but if you 03:45:16
 7   look at the pitch board in the production monthly  03:45:19
 8   of the department, and you take those numbers      03:45:24
 9   monthly and add them up, it comes to that number.  03:45:29
10        So that would be in those -- those           03:45:32
11   other documents that show, like, a bar graph on    03:45:35
12   them.  It's just the adding of each month together 03:45:38
13   came up with a total.                               03:45:42
14   BY MS. BERTRAM:                                     03:45:43
15        Q.  And was that for the annual year or for   03:45:43
16   the fiscal year?                                    03:45:46
17        A.  I believe that all the numbers on that    03:45:46
18   were on fiscal year.                                03:45:49
19        Q.  And in the last paragraph, you mention    03:45:50
20   a 33 percent quality improvement.                   03:45:54
21        A.  Uh-huh.                                    03:45:57
22        Q.  Now, that measure had changed during      03:45:58
23   your employment, correct?                           03:46:00
24        A.  Yes.                                       03:46:01
25        Q.  When did it change?                        03:46:01
```

551

```
 1        A.  I can't tell you the exact number, but    03:46:03
 2   I -- going back to that sheet, I'm sure the quality 03:46:08
 3   sheet that was on the pitch board, it would tell   03:46:11
 4   you when that changed.                              03:46:14
 5        Q.  And you adopted procedures where --       03:46:17
 6   where you tested tools, correct?                    03:46:20
 7        A.  Yes.  Uh-huh.                              03:46:22
 8        Q.  And did you test both new cutter tools    03:46:24
 9   and regrinds?                                       03:46:27
10        A.  Yes.                                       03:46:28
11        Q.  Okay.  And for the new tools, exactly     03:46:29
12   what measurements did you use in assessing the     03:46:32
13   quality of new tools?                               03:46:35
14        A.  There's a tool that checks the -- the     03:46:36
15   angles that are produced on the tool, both primary 03:46:42
16   and secondary.  And the operators were required to 03:46:44
17   check one tool from each lot and then record it on 03:46:50
18   a sheet.  And then if the lot size was large       03:46:56
19   enough, they might be required to check, let's say, 03:47:00
20   every hundred pieces or something.                  03:47:04
21        I don't -- I -- I don't know the              03:47:07
22   specifics number requirement, but that's how the  03:47:08
23   quality process was written, that they check one  03:47:12
24   from each lot.  If it was a larger lot, a few times 03:47:16
25   within that lot.                                    03:47:19
```

552

1    Q.   And what was the name of the tool that            03:47:22
2  was used to test quality?                                03:47:24
3    A.   It's -- it was produced by Weldon Tool            03:47:25
4  Company, but I think it was -- it was just called a      03:47:31
5  geometry checker.  But they also had the ability         03:47:35
6  to -- we had a tool that had its own room that was       03:47:38
7  made by Walter Company that you would load the tool      03:47:41
8  in, and it would give you a computer readout of          03:47:47
9  everything on that tool, angularity, runout, all         03:47:50
10  those issues.                                            03:47:54
11    Q.   And for each tool that was tested out            03:47:55
12  of the lot, did you use both the -- the tool that        03:48:00
13  tested angle and then also the -- the Weldon             03:48:05
14  machine?                                                 03:48:09
15    A.   No, we -- we didn't -- we didn't --              03:48:10
16         MR. LEE:  Object to the form of the              03:48:12
17  question.  Misstates the witness's prior testimony.      03:48:14
18         But you may answer.                              03:48:16
19         I think he said "Walter," not "Weldon."          03:48:19
20  But it doesn't matter.                                   03:48:21
21         THE WITNESS:  We -- we did have a                03:48:22
22  Weldon machine and a Walter.  I mentioned both.          03:48:24
23         So the issue with the -- which machine           03:48:27
24  they used, we didn't dictate to them which of the        03:48:30
25  two machines they used.  Some people had the             03:48:33

553

1  ability to use either.  All I said was I wanted a        03:48:36
2  check to be done, and they could do it -- they           03:48:40
3  could determine their figures based on either            03:48:43
4  method, just as long as they recorded the method --      03:48:47
5  recorded what they got on the tool on the quality        03:48:52
6  sheet.                                                   03:48:55
7  BY MS. BERTRAM:                                           
8    Q.   And how many angles did the Weldon               03:48:57
9  machine test?                                            03:49:00
10    A.   Hundreds, maybe.                                 03:49:03
11    Q.   For each individual tool?                        03:49:04
12    A.   Yeah, it did hundreds.                           03:49:06
13    Q.   How many -- how many angles did it              03:49:08
14  test?                                                    03:49:10
15    A.   Primary, secondary angle on the                 03:49:11
16  circumference, the helix angle, the primary and         03:49:16
17  secondary on the end, the gash angle.  So it --         03:49:19
18  it -- it may be an exaggeration to say hundreds,         03:49:24
19  but it -- probably 20, 30 per tool.                      03:49:28
20         The Weldon machine only checked the              03:49:31
21  primary and secondary clearance angles.  So it          03:49:34
22  checked less than the other one -- than the Walter       03:49:39
23  machine.                                                 03:49:42
24    Q.   And how many -- what percentage of the          03:49:45
25  tools were tested by the Weldon machine as opposed       03:49:51

554

1  to the Walton [sic] machine?                             03:49:54
2    A.   I can't really say.  It was up to the            03:49:55
3  operator.  I didn't dictate which they used, just        03:50:01
4  that they had checked the angles by one method or        03:50:05
5  the other.                                                03:50:06
6    Q.   And how were the results of the testing          03:50:06
7  reported by the machine operators?                       03:50:11
8    A.   We -- we had a quality sheet that they           03:50:15
9  had recorded it on, and -- which actually evolved a      03:50:21
10  little.  So there were a couple versions of it.          03:50:24
11    Q.   And how many angles did the Walton              03:50:30
12  [sic] machine test?                                      03:50:32
13    A.   The Walter?  The Walter --                       03:50:35
14    Q.   Walter.  Sorry.                                  03:50:35
15    A.   The Walter checked many.  I'm saying            03:50:37
16  50, a hundred.  I don't know.  A lot of angles;          03:50:40
17  whereas, the Weldon only checked the primary and         03:50:46
18  secondary clearance angles of -- of the end and the     03:50:50
19  side.                                                    03:50:51
20    Q.   Let's go to the third page of                   03:50:54
21  Exhibit 225.  And this was the Cost -- Cutter Cost       03:50:59
22  Savings Analysis that Mr. Francis provided to you,       03:51:01
23  correct?                                                 03:51:02
24    A.   Yes.                                             03:51:02
25    Q.   Was there ever any other version of

555

1  this analysis, to your knowledge?                        03:51:05
2    A.   Yes.  This was the only version I had.           03:51:07
3  You notice where it says "Cutter" incorrectly?           03:51:11
4    Q.   Yes.                                              03:51:14
5    A.   That's the one that I had that                   03:51:15
6  Mr. Francis provided to me.  He later presented his      03:51:18
7  version of this to the company where that                03:51:23
8  correction has been changed.  So I now have a            03:51:27
9  version with the corrected spelling, but I know          03:51:36
10  which version came to me through production from         03:51:38
11  Smith & Wesson because it's spelled correctly,           03:51:41
12  whereas the only version I had was a preliminary         03:51:44
13  version that is misspelled.                              03:51:48
14    Q.   And so this is the preliminary version          03:51:52
15  that's on the third page of Exhibit 225, right?          03:51:55
16    A.   Yes.                                             03:51:58
17    Q.   Okay.  If you could turn to                     03:51:58
18  Exhibit 233.1.                                           03:52:07
19    A.   I hate to say this --                           03:52:23
20         MR. LEE:  What was the -- what was              03:52:23
21  the -- what was the number, again?                       03:52:25
22         MS. BERTRAM:  233.1 of the plaintiff's          03:52:26
23  exhibits.                                                03:52:28
24         MR. LEE:  233.1.  Okay.                         03:52:29
25         THE WITNESS:  I've got 232, and the             03:52:38

Baker, Earl Donald - Vol. III                               October 10, 2020

20 (Pages 556 to 559)

556

```
1   next page is 234.                                      03:52:41
2   BY MS. BERTRAM:                                        03:52:47
3       Q.  It is probably --                              03:52:47
4       A.  Then it goes to 236.                           03:52:47
5   BY MS. BERTRAM:                                        03:52:47
6       Q.  -- the other one that says "Plaintiff's        03:52:49
7   Exhibits."  Let me find that.                          03:52:52
8       A.  There's a 236 that has the same -- the         03:52:53
9   finished version of that.  Is that what you're         03:52:56
10  looking for?                                           03:52:59
11      Q.  Which one are you referring to?                03:52:59
12      A.  236 is the Cutter Cost Savings Analysis        03:53:01
13  finished version with the corrected spelling.          03:53:05
14      Q.  Okay.  So hold on.  236?                        03:53:08
15      A.  Yes.                                            03:53:15
16          MR. LEE:  The one -- the one that              03:53:17
17  Connie was looking for, 232, is --                     03:53:19
18          THE WITNESS:  She wanted 233.                  03:53:24
19          MR. LEE:  Oh, 233 --                           03:53:24
20          THE WITNESS:  There is no --                   03:53:26
21          MR. LEE:  I see.  233.1 is what she            03:53:26
22  wanted, and that one --                                03:53:30
23          MS. BERTRAM:  I'll find that one               03:53:31
24  because it's in the documents we sent to Mr. Baker.    03:53:33
25  But he mentioned 236.                                  03:53:36
```

557

```
1           MR. LEE:  Okay.  I'm looking at my             03:53:38
2   version.  The 233.1 still has the misspelling,         03:53:40
3   C-U-U-T-E-R, and then 236 has the corrected            03:53:44
4   spelling, C-U-T-T-E-R.                                 03:53:49
5           MS. BERTRAM:  Right.  Right.  That's           03:53:51
6   what he was pointing out.  So I want to talk for --    03:53:52
7   with him for a minute about Exhibit 236 since he       03:53:54
8   pointed it out.                                        03:53:58
9   BY MS. BERTRAM:                                        03:54:02
10      Q.  This is the more final version; is that        03:54:02
11  right, Mr. Baker?                                       03:54:04
12      A.  Yes.                                            03:54:05
13      Q.  And that was provided to you by               03:54:05
14  Mr. Francis on July 20, 2014?                          03:54:07
15      A.  No.  The final version I only received        03:54:09
16  through production from Smith & Wesson.  He never      03:54:14
17  provided me the final version.                         03:54:16
18      Q.  Okay.  But he did provide to you the          03:54:21
19  version that's attached to Exhibit 236, right?         03:54:23
20      A.  No.  I -- I -- the only one I ever got         03:54:26
21  was the incorrect spelling version.                    03:54:30
22      Q.  So let's -- let's look at Exhibit 236.         03:54:36
23  Let's look at the email itself.  And this is           03:54:38
24  from -- you know, the -- the first page is marked      03:54:45
25  M783, right?                                            03:54:49
```

558

```
1       A.  Yes.                                           03:54:59
2       Q.  And that is an email that Mr. Francis         03:54:59
3   sent to you on July 20th, 2014, right?                 03:55:01
4       A.  Yes.                                           03:55:03
5       Q.  And it says that there's two                  03:55:04
6   attachments:  Cutter Cost Saving Kaizen, Lean          03:55:08
7   Management Results in F1 -- FY14 and an FY14.xls.      03:55:15
8           Is the next page of that exhibit, which       03:55:26
9   is stamped 784, the attachment to the exhibit -- to   03:55:26
10  the email on Page 236 -- I'm sorry -- on              03:55:33
11  Exhibit 236?                                           03:55:38
12      A.  What was your question?                        03:55:40
13      Q.  Let me just state it again.                    03:55:42
14          Is the document marked 784, which is          03:55:48
15  the second page of Plaintiff's Exhibit 236, the       03:55:53
16  attachment to the July 20, 2014, email that          03:55:56
17  Mr. Francis sent to you?                               03:56:00
18      A.  I do not believe so.                           03:56:01
19      Q.  And that's because the spelling is           03:56:04
20  corrected; is that right?                              03:56:09
21      A.  Yes.                                            03:56:10
22      Q.  And when was the first time that you          03:56:11
23  saw the cost savings analysis with the spelling       03:56:16
24  corrected?                                             03:56:16
25      A.  I believe it was through production           03:56:19
```

559

```
1   after the -- we had made the filing with OSHA.  And   03:56:32
2   we received it in production from Smith & Wesson.      03:56:32
3       Q.  Now, did you find Exhibit 233.1?              03:56:36
4       A.  No.  Again, in the book that you're           03:56:41
5   that I'm in now with the feather, "Plaintiff's        03:56:56
6   Exhibit," it goes from 232.2 to 234.  There is no     03:56:59
7   233, if it's chronologically listed.                  03:57:05
8       Q.  It's in this document that begins with       03:57:19
9   Exhibit 200 -- this set of exhibits, which -- which   03:57:22
10  we've referenced already in this deposition.          03:57:28
11      A.  Okay.  It's in a different book, then,        03:57:30
12  than this one?                                         03:57:33
13      Q.  It's in this book that has the cover          03:57:34
14  just like this, beginning with Exhibit 200.           03:57:36
15      A.  Okay.  I'm looking in this book.  There       03:57:58
16  is no -- it goes straight from --                      03:58:05
17      Q.  I know that.                                   03:58:08
18      A.  -- 232 --                                       03:58:08
19      Q.  Just set -- set that aside, Mr. Baker.        03:58:09
20  I know it's not in there.                              03:58:10
21      A.  Okay.                                           03:58:11
22      Q.  It's the original set of plaintiff's          03:58:11
23  exhibits that I sent to you prior to the deposition   03:58:14
24  on -- it -- it was from the first day of your         03:58:17
25  deposition.  And you've -- you've -- you've waved     03:58:23
```

Baker, Earl Donald - Vol. III                                October 10, 2020

21 (Pages 560 to 563)

---

560

1  those around.  I know you have them.  And                 03:58:23
2  there's Exhibit --                                        03:58:25
3      A.  Okay.  So tell me what book and what             03:58:25
4  number.  I told you there --                              03:58:28
5      Q.  I just told you, and I'll tell you                03:58:30
6  again.  Plaintiff -- the original set of                  03:58:32
7  plaintiff's exhibits that I sent to you prior to          03:58:34
8  the first day of your deposition.  And if you turn        03:58:36
9  to 233.1, it is in there.  It's a three-volume set,       03:58:45
10  which does not have a feather, I don't think.            03:58:45
11     A.  You'll have to be more specific or               03:59:43
12  share it because this book, those -- has a tab that      03:59:45
13  says 233.  The very first page is 232.2, and it          03:59:47
14  goes up through -- the next page is 251,                 03:59:52
15  Exhibit 251.                                             03:59:57
16     Q.  Hold up what you're referencing.                 03:59:58
17     A.  (Witness complied.)                              03:59:58
18     Q.  I was looking at the tabs.                       04:00:07
19     A.  The tabs say -- it goes from 233 --              04:00:08
20  there's a 233 tab --                                     04:00:13
21         MS. BERTRAM:  I -- I understand.  You            04:00:15
22  don't have to tell me what tabs to advance it.  If       04:00:16
23  you can't find the exhibit, I'll -- I'll share it        04:00:18
24  with you.                                                04:00:20
25         THE WITNESS:  All right.                         04:00:22

---

561

1  BY MS. BERTRAM:                                           04:01:36
2      Q.  I've shared with you Exhibit 233.1.               04:01:37
3  And let's first look at the email at the top.             04:01:40
4  Actually, let's go down to the second email.  This       04:01:44
5  is a July 16, 2014, email that you sent to                04:01:53
6  Mr. Debney, the CEO of Smith & Wesson, right?            04:01:56
7      A.  Yes.                                              04:01:59
8      Q.  And you represent to the CEO:  I have             04:02:00
9  included for your viewing a copy of data of cost          04:02:04
10  savings to Smith & Wesson accomplished in my first      04:02:06
11  year, correct?                                           04:02:09
12     A.  Yes.                                              04:02:09
13     Q.  And is this the only cost -- cost               04:02:10
14  saving analysis that you provided to Mr. Debney?         04:02:17
15     A.  I believe so, yes.                               04:02:19
16     Q.  And I'm going to take you back up to             04:02:21
17  the top of Exhibit 233.1.  This is a July 18, 2014,      04:02:25
18  email from you to someone with the email address        04:02:30
19  nema64@nema@yahoo -- or .nema@yahoo.com.  Whose         04:02:34
20  email address is this?                                   04:02:40
21     A.  I don't have nema64 on mine, but I               04:02:47
22  would -- I can only guess that it was Ron O'Brien,      04:02:52
23  but I don't know that for certain.  Ron changed his     04:03:01
24  emails quite a bit.                                      04:03:05
25     Q.  Okay.  And the email below that is a            04:03:07

---

562

1  July 16, 2014, email from you to                          04:03:09
2  ron_88@comcast.net.                                       04:03:16
3      A.  Okay.                                             04:03:16
4      Q.  Is that right?                                    04:03:18
5      A.  Yes.                                              04:03:20
6      Q.  And at one point, that was Mr. --                 04:03:22
7  Mr. O'Brien's email, right?                               04:03:25
8      A.  Yes.  But I don't know for certain who          04:03:27
9  nema64 is.                                                04:03:41
10         THE VIDEOGRAPHER:  Sorry to interrupt,           04:03:43
11  Ms. Bertram.                                             04:03:45
12         MS. BERTRAM:  Uh-huh.                            04:03:45
13         THE VIDEOGRAPHER:  Just to let you               04:03:46
14  know, when you're screen-sharing, it does cause          04:03:46
15  some lag in Mr. Baker's video.  I just wanted to         04:03:49
16  make you aware of that.  Thank you.                      04:03:52
17  BY MS. BERTRAM:                                          04:03:55
18     Q.  And during the period that you were              04:04:09
19  coordinating with Mr. Francis about the cost -- the      04:04:16
20  cutter savings analysis, you were consulting with        04:04:16
21  counsel; is that right?                                  04:04:19
22         MR. LEE:  Objection to the form of the           04:04:19
23  question.                                                04:04:21
24         But you may answer.                               04:04:24
25         THE WITNESS:  I don't believe so.                04:04:25

---

563

1  BY MS. BERTRAM:                                           04:04:30
2      Q.  Is there any other reason that you'd             04:04:30
3  meeting with counsel other than your potential           04:04:32
4  dispute with Smith & Wesson?                             04:04:35
5          MR. LEE:  Objection to the form of the          04:04:37
6  question.                                                04:04:38
7          But you may answer.                              04:04:39
8          THE WITNESS:  I had one consultation            04:04:41
9  with an attorney, and she didn't know what               04:04:46
10  Sarbanes-Oxley was.  So I terminated her, and then      04:04:52
11  I got another attorney.  The time frame of which        04:04:58
12  attorney, whether -- my -- it's my belief that that     04:05:02
13  was in between the two attorneys.  So I had an          04:05:07
14  attorney prior to that, but it lasted one meeting.      04:05:12
15  So I don't believe I was with counsel at this time.     04:05:18
16  BY MS. BERTRAM:                                          04:05:23
17     Q.  Look at Smith & Wesson Exhibit 70.             04:05:25
18  It's in the third binder of exhibits.                   04:05:31
19     A.  What would the title be on the front?          04:05:44
20  "Plaintiff's Exhibits"?                                  04:05:47
21         MR. LEE:  No.  It would be --                   04:05:51
22  BY MS. BERTRAM:                                          04:05:51
23     Q.  "Smith & Wesson Exhibits."                     04:05:51
24         MR. LEE:  -- "Defendant Smith & Wesson        04:05:52
25  Exhibits."                                               04:05:52

---

Baker, Earl Donald - Vol. III

October 10, 2020

22 (Pages 564 to 567)

564

1    THE WITNESS:  Okay.  And what number?    04:06:04
2    70?    04:06:07
3    BY MS. BERTRAM:    04:06:08
4    Q.    70.    04:06:08
5    MR. LEE:  Just to make sure that I have    04:06:14
6    the right one, Connie, is this the one that says:    04:06:15
7    Cost Savings of Increased Production in Cutter?    04:06:17
8    MS. BERTRAM:  Yes.    04:06:21
9    THE WITNESS:  Yes.    04:06:23
10    MR. LEE:  Okay.    04:06:23
11    THE WITNESS:  Got it.    04:06:23
12    BY MS. BERTRAM:    04:06:23
13    Q.    Okay.  Focusing on this first page of    04:06:24
14    Exhibit 70, are you familiar with that document?    04:06:27
15    A.    Yes.    04:06:30
16    Q.    What is it?    04:06:31
17    A.    We had to provide cost savings to    04:06:32
18    Mr. Fontaine as a -- as a part of our fiscal year    04:06:40
19    goals.  They always tried to, you know, get cost    04:06:47
20    savings.  So I produced that and gave him a copy.    04:06:52
21    But this was -- I don't know.  It would have been    04:07:01
22    while I was still at Smith & Wesson.  So it would    04:07:04
23    be -- this would predate the -- the cost savings    04:07:07
24    sheet we looked at from Mr. Francis.    04:07:13
25    Q.    And do you recall what month you    04:07:17

565

1    prepared it?    04:07:20
2    A.    Not really.  I'm sure it would be on my    04:07:21
3    mainframe at Smith & Wesson when I actually created    04:07:23
4    it.    04:07:27
5    Q.    Right.  But you produced this document    04:07:27
6    to us in the litigation.    04:07:29
7    A.    Okay.    04:07:32
8    Q.    Do you know whether you have a soft    04:07:32
9    copy of this document in your possession?    04:07:35
10    A.    I probab -- what do you mean "soft    04:07:37
11    copy"?    04:07:42
12    Q.    Electronic version.    04:07:42
13    A.    No.  This would have been done while at    04:07:44
14    work, so this would be on the mainframe at    04:07:47
15    Smith & Wesson.    04:07:51
16    Q.    Oh, okay.  And -- and you don't recall    04:07:52
17    what month you provided it to Mr. Flatley?    04:07:54
18    A.    No.    04:07:57
19    Q.    Was it -- did you provide it to him    04:07:59
20    before you went on administrative leave?    04:08:01
21    A.    Oh, far before -- yes, a long time    04:08:03
22    before.  My -- my recollection, that this was    04:08:06
23    produced maybe February and March of 2014, I think.    04:08:09
24    But I'm -- I'm just guessing.    04:08:16
25    Q.    And when was the end of the fiscal    04:08:19

566

1    year?    04:08:21
2    A.    I'm not positive, it's been so long.    04:08:21
3    But I think it started in May and went through    04:08:27
4    June.  But we had to give part of our goals for the    04:08:32
5    upcoming year.  So it could have been March, April,    04:08:41
6    something around then.  I don't know.    04:08:47
7    Q.    Now, we had looked at the cutter --    04:08:49
8    cutter savings document that you provided to    04:08:54
9    Mr. Debney in mid-July.    04:08:56
10    A.    Uh-huh.    04:08:56
11    Q.    Did you ever provide this analysis to    04:08:58
12    anybody else at Smith & Wesson?    04:09:00
13    MR. LEE:  Objection to the form of the    04:09:03
14    question.  "This analysis" being the one that he    04:09:06
15    sent to Debney or the one that we're looking at,    04:09:06
16    Exhibit 70?    04:09:08
17    MS. BERTRAM:  Good point.  Let me    04:09:09
18    strike that and ask it again.    04:09:11
19    BY MS. BERTRAM:    04:09:12
20    Q.    The analysis that you provided to    04:09:12
21    Mr. Debney on July 16th of 2014, did you provide    04:09:14
22    that document to anybody else at Smith & Wesson    04:09:19
23    other than Mr. Debney?    04:09:22
24    A.    I do not believe so.    04:09:24
25    Q.    If you could go to Exhibit 42 of the    04:09:33

567

1    Smith & Wesson exhibits.  It's the second -- the    04:09:36
2    second binder of exhibits.    04:09:50
3    A.    Okay.  I've got 42.    04:09:51
4    Q.    And --    04:09:51
5    MR. LEE:  Hold on.  Hold on.  Hold on.    04:09:55
6    Hold on.  Let me get there.    04:09:56
7    MS. BERTRAM:  Okay.    04:09:57
8    MR. LEE:  Forty -- got it.    04:10:07
9    BY MS. BERTRAM:    04:10:09
10    Q.    And starting on Page 3 of Deposition    04:10:09
11    Exhibit Number 42, this is a copy of a letter that    04:10:13
12    you received from Mr. Cicero on or about    04:10:16
13    August 20th, 2014, right?    04:10:21
14    A.    Yes.    04:10:23
15    Q.    And in your email dated August 28th to    04:10:24
16    Mr. Cicero, you stated that you disagreed with    04:10:34
17    Smith & Wesson's finding; is that right?    04:10:41
18    A.    Yes.    04:10:43
19    Q.    And in your email, you don't cite any    04:10:44
20    specific disagreement with Mr. Cicero's various    04:10:47
21    findings, right?    04:10:51
22    A.    In that email, no.    04:10:52
23    Q.    And in that email, you didn't suggest    04:10:54
24    any further documents for Mr. Cicero to review,    04:10:56
25    correct?    04:11:00

568

| | | |
|---|---|---|
| 1 | **A. No.** | 04:11:00 |
| 2 | Q. And you don't suggest any additional | 04:11:01 |
| 3 | witnesses he should speak with as well? | 04:11:06 |
| 4 | **A. No, I -- not at that time.** | 04:11:06 |
| 5 | Q. And when you sent this email out, you | 04:11:09 |
| 6 | were represented by counsel at the Employment Law | 04:11:16 |
| 7 | Group, correct? | 04:11:18 |
| 8 | **A. Yes.** | 04:11:19 |
| 9 | Q. And they had recommended that you | 04:11:19 |
| 10 | include a statement in this email that you were | 04:11:24 |
| 11 | prepared to return to work; is that right? | 04:11:27 |
| 12 | MR. LEE: Objection -- objection to the | 04:11:28 |
| 13 | form of the question. | 04:11:29 |
| 14 | And do not answer that question. Do | 04:11:30 |
| 15 | not -- do not go into any discussion you had or any | 04:11:32 |
| 16 | recommendation or anything between you and your | 04:11:35 |
| 17 | counsel. | 04:11:37 |
| 18 | BY MS. BERTRAM: | 04:11:39 |
| 19 | Q. Mr. Baker, you told friends and | 04:11:40 |
| 20 | relatives that you included that statement in your | 04:11:41 |
| 21 | email because your -- your -- your counsel | 04:11:44 |
| 22 | recommended a kissing-your-cousin approach, | 04:11:48 |
| 23 | correct? | 04:11:52 |
| 24 | MR. LEE: Object -- same objection. | 04:11:52 |
| 25 | BY MS. BERTRAM: | 04:11:55 |

569

| | | |
|---|---|---|
| 1 | Q. You can answer the question. | 04:11:55 |
| 2 | MS. BERTRAM: He -- he provided this | 04:11:56 |
| 3 | information through texts and otherwise to third | 04:11:57 |
| 4 | parties that were not part of any privilege. He, | 04:12:00 |
| 5 | therefore, waived the privilege as to any | 04:12:03 |
| 6 | communications about the -- that language that's | 04:12:06 |
| 7 | included in the letter. | 04:12:07 |
| 8 | MR. LEE: I disagree. He needs to | 04:12:09 |
| 9 | knowingly, willingly waive the attorney-client | 04:12:12 |
| 10 | privilege, and he did not. | 04:12:15 |
| 11 | MS. BERTRAM: He did knowingly and | 04:12:16 |
| 12 | willingly waive the attorney-client privilege | 04:12:18 |
| 13 | because the Employment Law Group sent him a lengthy | 04:12:20 |
| 14 | letter explaining to him that if he provided | 04:12:23 |
| 15 | communications from the Employment Law Group to | 04:12:26 |
| 16 | third parties, that it would waive the privilege. | 04:12:28 |
| 17 | MR. LEE: Same -- | 04:12:31 |
| 18 | MS. BERTRAM: And seeing that he did | 04:12:32 |
| 19 | that repeatedly through text and through email and | 04:12:35 |
| 20 | through verbal communications, I'm entitled to ask | 04:12:39 |
| 21 | him about why he included this sentence in the | 04:12:41 |
| 22 | letter. | 04:12:43 |
| 23 | MR. LEE: Same objection. | 04:12:43 |
| 24 | Same direction. Do not go -- | 04:12:45 |
| 25 | I don't know how you know if the | 04:12:48 |

570

| | | |
|---|---|---|
| 1 | Employment Law Group advised Mr. Baker of this or | 04:12:49 |
| 2 | that. That certainly is attorney-client privilege. | 04:12:52 |
| 3 | You are direct -- | 04:12:59 |
| 4 | MS. BERTRAM: I know that -- | 04:12:59 |
| 5 | MR. LEE: You're direct -- let me | 04:12:59 |
| 6 | finish. | 04:13:00 |
| 7 | MS. BERTRAM: I know that through | 04:13:00 |
| 8 | Mr. Baker's own -- own text messages. | 04:13:02 |
| 9 | MR. LEE: I understand that. | 04:13:03 |
| 10 | And my -- my direction to -- to the | 04:13:05 |
| 11 | witness is, do not go into any discussions between | 04:13:08 |
| 12 | you -- any discussions, any communications between | 04:13:11 |
| 13 | you and your counsel. | 04:13:14 |
| 14 | The Employment Law Group, whoever that | 04:13:18 |
| 15 | is, any recommendations, any communications that | 04:13:20 |
| 16 | you had with -- between you and your counsel, do | 04:13:24 |
| 17 | not discuss it, do not testify about it. | 04:13:27 |
| 18 | BY MS. BERTRAM: | 04:13:30 |
| 19 | Q. Are you accepting your counsel's | 04:13:31 |
| 20 | instruction not to answer my questions? | 04:13:32 |
| 21 | A. I am. | 04:13:33 |
| 22 | Q. Now, you've spoken at some length about | 04:13:34 |
| 23 | your conversations with Mr. Cicero about certain of | 04:13:56 |
| 24 | your concerns about Pioneer, right? | 04:13:59 |
| 25 | A. Yes. | 04:14:02 |

571

| | | |
|---|---|---|
| 1 | Q. And it's your understanding that | 04:14:04 |
| 2 | Mr. Cicero investigated each of your complaints, | 04:14:06 |
| 3 | right? | 04:14:09 |
| 4 | MR. LEE: Objection to the form -- | 04:14:11 |
| 5 | THE WITNESS: Could you ask that again? | 04:14:12 |
| 6 | MR. LEE: Objection to the form of the | 04:14:13 |
| 7 | question. Calls for speculation. | 04:14:14 |
| 8 | But you may answer. | 04:14:15 |
| 9 | Can you have the question read back, | 04:14:17 |
| 10 | please? | 04:14:18 |
| 11 | MS. BERTRAM: And the response, please. | 04:14:?? |
| 12 | (The following question was read back: | 04:14:?? |
| 13 | Q: And it's your understanding that | 04:14:?? |
| 14 | Mr. Cicero investigated each of your complaints, | 04:14:?? |
| 15 | right?) | 04:14:?? |
| 16 | THE REPORTER: And the answer I heard | 04:14:39 |
| 17 | on top of the objection was yes. | 04:14:39 |
| 18 | THE WITNESS: I said, could you ask the | 04:14:39 |
| 19 | question again? I didn't -- | 04:14:42 |
| 20 | THE REPORTER: Sorry. | 04:14:43 |
| 21 | MS. BERTRAM: That's not what you said | 04:14:44 |
| 22 | on the record, Mr. Baker. You said yes -- | 04:14:44 |
| 23 | THE WITNESS: Okay. | 04:14:46 |
| 24 | MR. LEE: That's fine. I said I | 04:14:51 |
| 25 | object. I said it calls for speculation. And | 04:14:53 |

Baker, Earl Donald - Vol. III

October 10, 2020

24 (Pages 572 to 575)

---

**572**

1  you're asking him questions about his understanding    04:14:55
2  based on what. And I made my objection, and    04:14:57
3  Earl -- Mr. -- Mr. Baker stated what he stated on    04:15:01
4  the record about having the question read back. So    04:15:04
5  that's the record.    04:15:08
6      MS. BERTRAM: Let me --    04:15:08
7      MR. LEE: If you want to ask him    04:15:09
8  again --    04:15:09
9      MS. BERTRAM: So that the record is    04:15:09
10  clear, let me -- let me reask a similar question.    04:15:10
11  BY MS. BERTRAM:    04:15:13
12      Q. Mr. Baker, it's your understanding that    04:15:14
13  Mr. Cicero investigated your concerns, correct?    04:15:17
14      MR. LEE: Objection to the form of the    04:15:21
15  question. Calls for speculation.    04:15:22
16      But you may answer.    04:15:24
17      THE WITNESS: It's my understanding he    04:15:25
18  said he did. But I -- when I say I object to his    04:15:29
19  conclusions, I, in that, without going into    04:15:34
20  specifics, feel he did not investigate thoroughly.    04:15:38
21  And I -- I disagreed with his conclusions because I    04:15:42
22  don't believe he did a thorough job, or he would    04:15:48
23  have come up with the right conclusion.    04:15:49
24  BY MS. BERTRAM:    04:15:51
25      Q. And Mr. Cicero met with you multiple    04:15:52

---

**573**

1  times during the course of his investigation,    04:15:54
2  right?    04:15:56
3      A. Yes.    04:15:57
4      Q. And it's your understanding that he    04:15:59
5  interviewed certain witnesses in connection with    04:16:04
6  his investigation, correct?    04:16:06
7      MR. LEE: Objection to the form of the    04:16:08
8  question. Calls for speculation.    04:16:09
9      But you may answer.    04:16:11
10      THE WITNESS: It's my belief that he    04:16:13
11  did talk to some. But whom, he didn't tell me who,    04:16:17
12  when, where. He did his independent investigation    04:16:22
13  outside of my view.    04:16:27
14  BY MS. BERTRAM:    04:16:29
15      Q. Right. And you don't know who he spoke    04:16:29
16  with or what they've said, right?    04:16:31
17      A. No, I do not.    04:16:32
18      Q. And you provided emails and other    04:16:34
19  documents to Mr. Cicero for his investigation,    04:16:40
20  right?    04:16:43
21      A. At his request, yes.    04:16:43
22      Q. And would you agree that you provided    04:16:45
23  to Mr. Cicero all of the emails, documents and    04:16:49
24  other evidence that you relied upon at the time to    04:16:52
25  conclude that Smith & Wesson had violated    04:16:56

---

**574**

1  Sarbanes-Oxley?    04:17:00
2      MR. LEE: Objection to the form of the    04:17:00
3  question.    04:17:02
4      But you may answer.    04:17:03
5      THE WITNESS: I disagree with the    04:17:05
6  characterization that "all" encompasses all of the    04:17:07
7  documents that were relevant to that dispute.    04:17:10
8      As you'll see in the emails, there were    04:17:15
9  four different office break-ins that I reported to    04:17:17
10  management, some in which those documents were    04:17:22
11  erased from my computer as I was trying to provide    04:17:28
12  them to Mr. Suraci and Mr. Cicero. So whether that    04:17:32
13  comprises all, I couldn't say for certain.    04:17:36
14  BY MS. BERTRAM:    04:17:41
15      Q. Would it be fair to say that you    04:17:41
16  provided to Mr. Cicero all of the documents to    04:17:42
17  which you had access that you considered relevant    04:17:47
18  to his investigation?    04:17:49
19      MR. LEE: Objection to the form of the    04:17:50
20  question.    04:17:52
21      But you may answer.    04:17:52
22      THE WITNESS: As I said, I feel that    04:17:54
23  some of them were taken out of my computer, beyond    04:17:57
24  my view. So I provided what I could obtain, still    04:18:01
25  after the break-ins, and he used those to conduct    04:18:08

---

**575**

1  his investigation.    04:18:13
2  BY MS. BERTRAM:    04:18:15
3      Q. Now, you've also talked -- testified at    04:18:32
4  length about some of your conversations    04:18:35
5  with Ms. Bruce, correct?    04:18:36
6      A. Yes.    04:18:39
7      MR. LEE: You broke up. You broke up    04:18:39
8  towards the end. What was --    04:18:40
9      Can you -- Cindy, can you read the    04:18:45
10  question and answer back for me?    04:18:46
11      MS. BERTRAM: Let me -- let me restate    04:18:47
12  it --    04:18:48
13      MR. LEE: Yeah.    04:18:48
14      MS. BERTRAM: -- because I can ask a    04:18:48
15  better question.    04:18:49
16  BY MS. BERTRAM:    04:18:50
17      Q. It's your understanding, Mr. Baker,    04:18:50
18  that Ann Bruce investigated certain of your    04:18:52
19  concerns as well, right?    04:18:55
20      MR. LEE: Objection to form.    04:18:55
21      But you may answer.    04:18:56
22      THE WITNESS: It's my understanding    04:18:59
23  that after the fact she said she investigated, but    04:19:01
24  I wasn't aware of any investigation she was doing    04:19:05
25  during the time that I can recall.    04:19:10

---

Baker, Earl Donald - Vol. III

October 10, 2020

25 (Pages 576 to 579)

---

576

BY MS. BERTRAM:

Q.  And -- and it's your understanding that Mr. Suraci, Ms. Salvador and other employees in the human resources department were working with her on her investigation, right?

A.  Yes.

MR. LEE:  Objection to --

THE WITNESS:  Sorry.

MR. LEE:  Objection to form.

But you may answer.

Calls for speculation.

THE WITNESS:  I believe they were investigating into the case.

BY MS. BERTRAM:

Q.  And they had met with you, as you testified, to discuss your concerns, right?

MR. LEE:  Objection to the form of the question.

But you may answer.

THE WITNESS:  They did meet with me a number of times.

BY MS. BERTRAM:

Q.  And you provided extensive documentation to them in support of your concerns, right?

---

577

A.  Yes.

Q.  And you identified the names of witnesses that you felt that they should speak to in connection with their investigation, right?

A.  I did.

Q.  And -- but you don't know who they spoke with, which witnesses they spoke with, right?

MR. LEE:  Objection to the form.  Calls for speculation.

But you may answer.

THE WITNESS:  I was aware of some of them.  I was also aware of some people who I gave their name to them, and they said that they had never been talked to.

BY MS. BERTRAM:

Q.  Right.  But you understand that they did meet with certain witnesses in connection with their investigation, right?

A.  Yes.

Q.  And you don't know what those witnesses said to the HR representatives that were conducting the investigation, right?

A.  No.

Q.  Now, we've looked at some of the text messages of your communications about your efforts

---

578

to look for a job before you were terminated by Smith & Wesson --

MR. LEE:  Sorry to interrupt, Connie, but, again, for some reason, you're breaking -- you -- you're okay for a while, then you gar -- gets garbled.  And I think I know what you're asking.  So, so long as the court reporter and Earl hears, I'm okay, because I think I'm -- I -- I can read your lips, too, but --

Cindy, did you get everything?

THE REPORTER:  She didn't finish the question yet, I don't believe.

MR. LEE:  Yeah, but -- but you're not -- you're -- what you're hearing is not garbled at all?

THE REPORTER:  I mean, it's garbled a little bit, but I'm able --

MR. LEE:  Okay.

THE REPORTER:  -- to read her lips some, too.

MR. LEE:  Well, we don't want you to make a record reading somebody's lips.

MS. BERTRAM:  Let me -- I'm going to ask him more --

MR. LEE:  You know what?  So -- okay.

---

579

When you laughed, and when you just said it, you were crystal clear, and -- there's something about the way -- just your movement and where the mic must be.

MS. BERTRAM:  I'm so close to the end, I'm not going to move again.

MR. LEE:  We don't want a record with lip -- lip -- lipreading.

MS. BERTRAM:  I -- I completely agree.

BY MS. BERTRAM:

Q.  Mr. Baker, can you hear me?

A.  I can now.

Q.  What did you do to reach out to potential employers before you were terminated by Smith & Wesson?

A.  I was -- I -- I did contact a number of places after my last deposition.  I kind of looked at the timeline, and there were a couple that I did look at.  I had relatives telling me that, you know, I should -- should probably cover my bases to look for other employment as well just in case it didn't go well.

Q.  And what steps did you undertake in looking for other employment during that period?

A.  I didn't -- I don't believe I put my

---

Baker, Earl Donald - Vol. III

October 10, 2020

26 (Pages 580 to 583)

580

| | |
|---|---|
| 1 | name on a job board, but I would from time to time | 04:23:19 |
| 2 | peruse things. My wife -- I think she did look | 04:23:25 |
| 3 | through job openings and might text or email me to | 04:23:31 |
| 4 | make me aware, hey, there's a job with this or | 04:23:37 |
| 5 | that, and -- so it was -- it was kind of a | 04:23:40 |
| 6 | piecemeal approach. | 04:23:43 |
| 7 | Q. And through those efforts, did any | 04:23:44 |
| 8 | employer express an interest in employing you? | 04:23:49 |
| 9 | MR. LEE: Objection -- | 04:23:53 |
| 10 | THE WITNESS: Yeah, the -- | 04:23:54 |
| 11 | Sorry. | 04:23:54 |
| 12 | MR. LEE: Objection to form of the | 04:23:54 |
| 13 | question. Calls for speculation. | 04:23:55 |
| 14 | But you may answer as far as you know. | 04:23:57 |
| 15 | THE WITNESS: I -- I did get a message | 04:24:00 |
| 16 | back from a couple people saying that they had -- | 04:24:04 |
| 17 | they would like a copy of my résumé or, you know, | 04:24:11 |
| 18 | kind of taking it to the next step, so that at | 04:24:14 |
| 19 | least the preliminary conversation they were | 04:24:17 |
| 20 | interested enough to inquire further. | 04:24:20 |
| 21 | BY MS. BERTRAM: | 04:24:23 |
| 22 | Q. And which companies expressed an | 04:24:23 |
| 23 | interest in you during that period? | 04:24:26 |
| 24 | A. I believe that the gentleman that | 04:24:28 |
| 25 | worked for Balzers, he had -- he had asked me to | 04:24:35 |

581

| | |
|---|---|
| 1 | forward him my résumé. I did speak with Guhring, a | 04:24:42 |
| 2 | drill company. | 04:24:51 |
| 3 | Q. How do you -- how do you spell that? | 04:24:52 |
| 4 | A. It's G-U-R-H [sic] -- it's got an H in | 04:24:53 |
| 5 | there. It's like a German word. | 04:24:58 |
| 6 | G-U-E-R-H [sic] -- I'm not positive. I -- | 04:25:06 |
| 7 | Q. Gurling or -- | 04:25:08 |
| 8 | A. Yeah, Gurling [sic]. | 04:25:09 |
| 9 | Q. Okay. | 04:25:11 |
| 10 | A. They're a drill manufacturer, and they | 04:25:12 |
| 11 | have an office in -- I think it was Bloomington, | 04:25:14 |
| 12 | Connecticut, which was probably the same distance | 04:25:25 |
| 13 | from my apartment as Smith & Wesson was. | 04:25:27 |
| 14 | Q. And you've testified that you spoke | 04:25:31 |
| 15 | with MSC as well, right? | 04:25:32 |
| 16 | A. I put out some feelers, and my wife | 04:25:33 |
| 17 | found something on a job board online for MSC that | 04:25:42 |
| 18 | we applied for. | 04:25:47 |
| 19 | Q. And what about Melin, M-E-L-I-N, Tool? | 04:25:48 |
| 20 | A. Yes. | 04:25:53 |
| 21 | Q. Did you have communications with them? | 04:25:53 |
| 22 | A. I -- I did. | 04:25:56 |
| 23 | Q. And so other than MSC, Melin Tool, | 04:26:00 |
| 24 | Balzers and Gurling [sic], did you have expressions | 04:26:06 |
| 25 | of interest from any other employer prior to your | 04:26:10 |

582

| | |
|---|---|
| 1 | termination? | 04:26:12 |
| 2 | A. I may have. | 04:26:15 |
| 3 | MR. LEE: Objection to the form of the | 04:26:15 |
| 4 | question. | 04:26:16 |
| 5 | But you may answer. | 04:26:17 |
| 6 | THE WITNESS: I may have. I didn't | 04:26:18 |
| 7 | actually recall a lot of them until I read through | 04:26:20 |
| 8 | the text messages. So there may be others, but I'd | 04:26:27 |
| 9 | say those were the ones that expressed interest or | 04:26:31 |
| 10 | stood out in my mind. | 04:26:36 |
| 11 | BY MS. BERTRAM: | 04:26:38 |
| 12 | Q. Okay. Let's focus on Gurling [sic] | 04:26:38 |
| 13 | first. | 04:26:42 |
| 14 | A. I'm sorry. It's Guhring, no L. | 04:26:42 |
| 15 | Q. Guhring? | 04:26:47 |
| 16 | A. Yes. | 04:26:49 |
| 17 | Q. Okay. And when did you communicate | 04:26:49 |
| 18 | with them about a potential position? | 04:26:51 |
| 19 | A. I believe it was while I was on paid | 04:26:54 |
| 20 | leave. I can't tell you the exact month but would | 04:26:57 |
| 21 | guess it would be late July. | 04:27:03 |
| 22 | Q. And did you discuss a particular | 04:27:08 |
| 23 | position with them? | 04:27:10 |
| 24 | A. Yes. | 04:27:12 |
| 25 | Q. What position? | 04:27:13 |

583

| | |
|---|---|
| 1 | A. They had a plant manager opening at the | 04:27:14 |
| 2 | Bloom -- Bloomfield or Blooming -- it's the town | 04:27:24 |
| 3 | close to Enfield. I -- I can't remember exactly | 04:27:28 |
| 4 | the town name. | 04:27:32 |
| 5 | Q. Was that in Connecticut or | 04:27:32 |
| 6 | Massachusetts? | 04:27:37 |
| 7 | A. It was in Connecticut. | 04:27:38 |
| 8 | Q. Okay. | 04:27:38 |
| 9 | A. I lived in Connecticut. So it was | 04:27:40 |
| 10 | about equal distance. Instead of going north, they | 04:27:41 |
| 11 | would go south. | 04:27:44 |
| 12 | Q. And were there any discussions about | 04:27:46 |
| 13 | the compensation or benefit -- benefits that that | 04:27:47 |
| 14 | position would offer? | 04:27:51 |
| 15 | A. We may have. I knew they were | 04:27:52 |
| 16 | interested enough that they may have. | 04:28:00 |
| 17 | Q. And did you -- did you have an | 04:28:03 |
| 18 | interview with them, either by phone or in person? | 04:28:04 |
| 19 | A. Both. | 04:28:10 |
| 20 | Q. You had both. | 04:28:11 |
| 21 | Okay. And did you withdraw from | 04:28:11 |
| 22 | consideration from that position at any point? | 04:28:15 |
| 23 | A. No, not that I know of. | 04:28:18 |
| 24 | Q. Okay. Did you ever receive an offer | 04:28:20 |
| 25 | from them? | 04:28:22 |

**584**

1    A. No.
2    Q. Do you know why you were not offered a
3  position?
4         MR. LEE: Objection. Objection to the
5  form of the question. Calls for speculation.
6         If you know, you can answer.
7         THE WITNESS: I don't know
8  specifically. I had every expectation that I would
9  get the job because they paid a good expense to fly
10  me to Milwaukee and speak with more corporate-type
11  people. But in the end, I -- I didn't get the job.
12  BY MS. BERTRAM:
13    Q. And did they offer any compensation or
14  benefits to you or discuss with you the
15  compensation, benefits that would be offered by the
16  position?
17    A. Knowing the level of -- of interview we
18  were at, they may have, but I don't -- can't say
19  for certain they did.
20    Q. And other than the text messages that
21  you reviewed, are there -- do you have any other --
22  other documents relating to your efforts to secure
23  employment with Guhring?
24    A. Any document that I had, I would have
25  forwarded in discovery. So you -- you really have

**585**

1  everything I've got.
2    Q. And you also spoke with Balzers, right?
3    A. Yes.
4    Q. During what period did you speak with
5  them?
6    A. I -- I want to correct that statement.
7  I didn't really have a speak -- I didn't speak with
8  Balzers. I spoke with Chet Lewis, but it was more
9  on a personal level-type thing. But as far as the
10  people that would actually have the authority to
11  offer you a -- or offer me a job, I never spoke
12  with those people.
13    Q. Okay. And did you ever have any
14  discussions with Chet or anyone else there about
15  any particular position with the company?
16    A. No. But I didn't know of any openings,
17  and that was probably the nature of my
18  communication with -- with Chet, was to find out if
19  he was aware of any openings. And he asked for a
20  résumé, and that was pretty much all that it was.
21    Q. Okay. And you also spoke with Melin
22  Tools, M-E-L-I-N?
23    A. Yes.
24    Q. And what -- what kind of -- what kind
25  of job -- I'm sorry. Strike that.

**586**

1         What is Melin Tool?
2    A. Melin Tool was formally a -- used to be
3  Weldon Tool that made that Weldon fixture I was
4  talking about, and they also make their own brand
5  of -- of cutter. So they've been around a number
6  of years. And they had a position that would be
7  in -- as a liaison between them and the end user to
8  optimize the use of those cutters.
9    Q. Did you say cars, C-A-R-S?
10    A. Cutters. Cutters.
11    Q. Cutters. Okay.
12    A. Sorry. My voice is getting raspy.
13    Q. And during what period did you talk
14  with them?
15    A. It would have been in the same time
16  frame. I think it was after I had spoken to
17  Guhring, but it would -- would have been in or
18  around the same period of time while I was on paid
19  leave.
20    Q. And did you participate in an interview
21  with them?
22    A. Yes, I did.
23    Q. When did that take place?
24    A. I don't know the specific time. Just
25  around those months, but I don't know exact --

**587**

1    Q. Was it before you left Smith & Wesson?
2    A. I would have been on paid leave, but
3  it's possible it could have either been the end of
4  the paid leave or after my termination. I can't --
5  can't recall which, but it was right towards that
6  very end period.
7    Q. And did they offer you employment?
8    A. No.
9    Q. And do you know why they did not offer
10  you employment?
11    A. No --
12         MR. LEE: Objection to form. Objection
13  to form.
14         If you know, you may answer.
15         THE WITNESS: They didn't communicate
16  anything to me as why I didn't get it.
17  BY MS. BERTRAM:
18    Q. I'm going to refer you to Exhibit 4,
19  which is the text messages that we were looking at
20  during your deposition on September 25th.
21    A. Okay.
22    Q. And look at the entry for September 22.
23         MR. LEE: September 22, 2014?
24         MS. BERTRAM: Yes.
25         THE WITNESS: Okay. There are a number

Baker, Earl Donald - Vol. III                    October 10, 2020

28 (Pages 588 to 591)

---

**588**

1  of them.                                                    04:33:48
2  BY MS. BERTRAM:                                             04:33:49
3       Q.  Okay.                                              04:33:49
4            MR. LEE:  Hold on.  Hold on.  Let me              04:33:50
5  get there.  September 22.                                   04:33:52
6  BY MS. BERTRAM:                                             04:34:10
7       Q.  Look at the entry for Line 504, which             04:34:10
8  is -- should be at the bottom of the page.                 04:34:12
9       A.  Uh-huh.                                            04:34:14
10           MS. BERTRAM:  John, are you there yet?            04:34:15
11      MR. LEE:  Yeah, I'm there.                             04:34:17
12           MS. BERTRAM:  Okay.                               04:34:18
13  BY MS. BERTRAM:                                            04:34:18
14      Q.  And it's an email from your wife to                04:34:19
15  David Wylie, right?                                        04:34:21
16      A.  Yes.                                               04:34:24
17      Q.  And it says:  Earl --                              04:34:25
18           MR. LEE:  Objection.  It's a -- it's a            04:34:25
19  text.  It's not an email.  But go ahead.                  04:34:27
20  BY MS. BERTRAM:                                            04:34:29
21      Q.  And in the text, she states:  Earl got            04:34:29
22  the job in Ohio.  He just found out today; is that        04:34:32
23  right?                                                     04:34:36
24      A.  Yes.                                               04:34:36
25      Q.  Did you receive a job offer from                   04:34:37

---

**589**

1  Melin Tools on September 22nd?                              04:34:40
2       A.  No.                                                04:34:44
3       Q.  Pardon me?                                         04:34:46
4       A.  No, I did not.                                     04:34:47
5       Q.  Okay.  Do you know why she would be                04:34:49
6  representing that if you did not?                           04:34:50
7       A.  A lot of the -- the conversations --              04:34:54
8  you asked what -- what was exactly what you asked,         04:34:58
9  again?                                                      04:35:04
10      Q.  Do you know why she would be                       04:35:04
11 representing that to -- in a text message if that          04:35:06
12 was not the case?                                           04:35:10
13      A.  Yeah.  Because I flew out to -- to                 04:35:12
14 Cleveland to meet the owners of Melin, and the             04:35:17
15 interview went well.  And he told me at that point         04:35:23
16 that I'm considering you for two different -- two          04:35:34
17 different positions.  I'm not sure which, but like         04:35:34
18 everything was -- it was my expectation.                    04:35:38
19           So as her texts go, I communicate what           04:35:41
20 I'm hearing and putting my spin on it.  So I'd             04:35:47
21 probably told her I got the job based on what he's         04:35:52
22 saying.  I'm going to consider you for one of two          04:35:55
23 jobs.                                                       04:35:57
24           Then I got back, and he never called             04:35:59
25 for a week.  So I eventually called him back, and I        04:36:01

---

**590**

1  got the message they were going another way.  But         04:36:06
2  if I had gone based on what he had implied at that         04:36:09
3  point, that I was going to be hired for either one        04:36:13
4  of the two positions.  But that never happened.           04:36:16
5       Q.  And both of the positions were going to          04:36:20
6  be in Cleveland; is that right?                            04:36:21
7       A.  One would be a job in Cleveland.  The            04:36:23
8  other was a job that would be meeting their                04:36:28
9  customers.  So it would be more of a salesman type        04:36:31
10 of thing where you're out on -- working out              04:36:35
11 logistics at their plant.  So that could be done          04:36:38
12 from any number of areas.  So you wouldn't                 04:36:41
13 necessarily have to live in Cleveland to do it.           04:36:45
14      Q.  And with respect to either of the                 04:36:50
15 positions that you've discussed with Melin Tool,          04:36:53
16 did they identify any compensation or benefits            04:36:56
17 associated with the positions?                             04:37:02
18      A.  It's my recollection I don't believe            04:37:04
19 they did.  Many of the interviews I have -- but I         04:37:06
20 can't tell you the specifics this long back -- but        04:37:11
21 they would ask me what my compensation currently          04:37:14
22 was.  I would tell them, and they would proceed           04:37:17
23 with kind of, we're -- we're kind of in that range,      04:37:21
24 but I didn't know if it'd be a little bit less or a      04:37:26
25 little bit more.                                           04:37:30

---

**591**

1            But if they were nowhere in the range            04:37:31
2  of what I was making at Smith & Wesson with an            04:37:33
3  interview, they would pretty much tell -- tell me         04:37:36
4  up front it would be a nonstarter, that they --          04:37:39
5  they couldn't come close to that pay.                     04:37:43
6            In this case, I think I provided my             04:37:45
7  information, and -- but I don't believe I got a          04:37:47
8  specific number from them.                                04:37:52
9       Q.  Did you receive any job offers from any          04:37:54
10 employers prior to your termination from Smith &          04:37:57
11 Wesson while you were employed by the company?           04:38:00
12      A.  No.                                               04:38:02
13      Q.  Could you -- did you withdraw from               04:38:03
14 consideration for any position before you were           04:38:11
15 terminated by Smith & Wesson?                             04:38:16
16      A.  Not that I can recall.                           04:38:18
17           MS. BERTRAM:  I don't think I have              04:38:22
18 additional questions, but let's take a five-minute      04:38:24
19 break so I can double-check my notes.                    04:38:27
20      MR. LEE:  That's fine.                               04:38:29
21           THE VIDEOGRAPHER:  Going off --               04:38:30
22      MR. LEE:  I'm going to break -- okay.               04:38:30
23           THE VIDEOGRAPHER:  Going off the record       04:38:34
24 at 4:38.                                                  04:38:35
25           * * *                                           04:38:37

---

Baker, Earl Donald - Vol. III

October 10, 2020

29 (Pages 592 to 594)

592

| | |
|---|---|
| 1 | (Whereupon, there was a recess in the |
| 2 | proceedings from 4:38 p.m. to 4:44 p.m.) |
| 3 | * * * |
| 4 | THE VIDEOGRAPHER: Going on the record |
| 5 | at 4:44. |
| 6 | MS. BERTRAM: I don't have any |
| 7 | additional questions. |
| 8 | MR. LEE: Okay. Signature is reserved. |
| 9 | Thank you. |
| 10 | Well, for a Saturday afternoon, that |
| 11 | wasn't so bad, Earl, was it? |
| 12 | THE WITNESS: No, it's not too bad. |
| 13 | MR. LEE: And everybody else, too, |
| 14 | thanks for working on a -- on a weekend. Have a |
| 15 | good weekend, everybody. |
| 16 | MS. BERTRAM: Thank you. |
| 17 | THE VIDEOGRAPHER: Going off the record |
| 18 | at 4:44. |
| 19 | - - - |
| 20 | (Read and sign reserved.) |
| 21 | - - - |
| 22 | (Deposition concluded at 4:44 p.m.) |
| 23 | - - - |
| 24 | |
| 25 | |

Timestamps (right column of page 592): 04:38:37, 04:43:56, 04:43:57, 04:43:57, 04:44:03, 04:44:07, 04:44:08, 04:44:09, 04:44:12, 04:44:14, 04:44:15, 04:44:15, 04:44:20, 04:44:20, 04:44:22, 04:44:24, 04:44:24, 04:44:25

593

CERTIFICATE OF REPORTER

I, Cindy A. Hayden, Registered Merit Reporter and Notary Public for the State of North Carolina at Large, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location stated on Page 1 of this transcript; that the deponent was duly sworn to testify to the truth, the whole truth and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof. Witness my hand, this 12th of October, 2020, at Concord, Cabarrus County, North Carolina.

_____

Cindy A. Hayden,
Registered Merit Reporter
Notary Public
State of North Carolina at Large
My Commission expires:
April 7, 2022

594

ACKNOWLEDGMENT OF DEPONENT

I, _____, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached Errata Sheet signed by me.

_____     _____
(DATE)          (SIGNATURE)

NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20_____, by _____, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____

(Seal)