# Plaintiff's Response Exhibit 2



Discovery Deposition Of

# STEPHEN LAWRENCE FLATLEY

August 19, 2020

Earl Donald Baker v. Smith & Wesson Corp.

No. 3:19-cv-30008-MGM

Court Reporter: Cindy Splayt

**Paszkiewicz Court Reporting**
**1900 E. Golf Road**
**Suite 950**
**Schaumburg, IL  60173**
**Phone: (847) 598-0322 / (855) 595-3577 toll-free**

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

EARL DONALD BAKER,        )
                          )
            Plaintiff,    )
                          )
            vs.           )   Case No. 3:19-cv-30008-MGM
                          )
SMITH & WESSON CORP.,     )   Honorable Mark G. Mastroianni
                          )
            Defendant.    )


        VOLUME 1 - PAGES 1 - 261


        Videotaped deposition of

STEPHEN LAWRENCE FLATLEY, appearing via Zoom, taken

before CYNTHIA A. SPLAYT, CSR, pursuant to the Rules

of the Massachusetts Superior Court and Massachusetts

Code of Civil Procedure, thereof pertaining to the

taking of depositions.  The witness is located at 1500

Main Street, Suite 2700, Springfield, Massachusetts,

commencing at the hour of 9:15 a.m. CST on the 19th

day of August, A.D., 2020.

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 2

```
 1   APPEARANCES:

 2          LEE & BREEN, LLC
            By:  MR. JOHN Y. LEE
 3          188 Industrial Drive, Suite 403
            Elmhurst, IL  60126
 4          (312) 241-1420, (630) 748-0399 (Fax)
            jlee@leebreenlaw.com
 5
               Appeared via Zoom on behalf of the
 6             Plaintiff,

 7
            POLSINELLI, P.C.
 8          By:  MS. CONNIE N. BERTRAM
                 MR. JACK BLUM
 9          1401 Eye ("I") Street, N.W., Suite 800
            Washington, D.C.  20005
10          (202) 777-8921, (202) 783-3535 (Fax)
            cbertram@polsinelli.com
11          jack.blum@polsinelli.com

12             Appeared via Zoom on behalf of the
               Defendant.
13

14   Also present via Zoom:

15          Mr. Michael Skasick - Videographer.

16          Ms. Jill Magiera - Paralegal Lee & Breen.

17          Ms. Ann Makkiya - Smith & Wesson in-house

18                         counsel.

19

20

21

22

23   REPORTED BY:  CYNTHIA A. SPLAYT, CSR

24   CSR NO.:  084.003295
```

Paszkiewicz Court Reporting
847.619.7155

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 3

```
 1                    I N D E X

 2   WITNESS                      EXAMINATION

 3   STEPHEN LAWRENCE FLATLEY

 4        By Mr. Lee (Direct)              6

 5

 6

 7
                    E X H I B I T S
 8
                   (No exhibits marked.)
 9

10

11

12
     NUMBER                          FIRST REF'D
13
     Plaintiff's Deposition Exhibit
14
     No. 185   E-mail string - starting 6/17/14
15            5:51 p.m. - M00875-M00881          211

16   No. 279   Letter dated 9/15/14 to Earl Baker
              SW0000618-SW0000629               124
17
     No. 281   Letter dated 9/19/14 to Earl Baker
18            SW0000606-SW0000617               124

19   No. 294   Stephen Lawrence Flatley Declaration   25

20   No. 307   Commendation for Lamonte Parks
              Baker 0000046                     136
21
     No. 308   Commendation for Mike Jurga
22            Baker 0000047                     136

23   No. 309   Typewritten note - Baker 0000360    136

24   No. 343   Distribution list                 40
```

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 4

 1  No. 345   Handwritten notes
                SW0000925-SW0000926                    239
 2
    No. 346   E. Baker 2014 Review Results of Prior Year's
 3            Objectives - SW0000794-SW0000791      242

 4  No. 347   Earl Baker 2014 Review Rebuttal
                SW0000921-Sw0000924                    243
 5
    No. 348   Schneeberger Machine OA
 6            SW0000720-SW0000723                    246

 7  No. 350   Earl's Ideas for Improvements.  Cutter
              Department Strategies for Success
 8            SW0000933                              248

 9  No. 351   Earl Baker 2014 Review Rebuttal
                SW0000808-SW0000814                    251
10
    No. 356   Earl Baker's Performance Appraisal dated
11            6/25/13 - Baker0000001-Baker0000006   133

12  NOTE:  Exhibits attached.

13

14

15

16

17

18

19

20

21

22

23

24

STEPHEN LAWRENCE FLATLEY
August 19, 2020

---

Page 5

1      THE VIDEOGRAPHER:  We are now on the record.
2  This is the videotaped deposition of Larry Flatley.
3  Today's date is August 19th, 2020.  The time is 8:33
4  a.m. Central time.  All attorneys present will be
5  indicated on the stenographic record.
6           The court reporter will now swear in
7  the witness.
8      THE COURT REPORTER:  Before we proceed, I
9  will ask counsel to agree on the record that under the
10 current National Emergency pursuant to Section 319 of
11 the Public Health Service Act, there is no objection
12 to this deposition officer administering a binding
13 oath to the witness remotely via Zoom.  Please state
14 your name and your agreement on the record starting
15 with the noticing attorney.
16     MR. LEE:  John Lee, L-e-e, on behalf of the
17 Plaintiff, we so agree.
18     MS. BERTRAM:  Connie Bertram on behalf of
19 Smith & Wesson, we agree as well.
20     THE COURT REPORTER:  Please raise your right
21 hand, Mr. Flatley.
22          (Witness sworn.)
23     STEPHEN LAWRENCE FLATLEY,
24 called as a witness herein, having been first duly

---

Page 6

1  sworn, was examined upon oral interrogatories and
2  testified as follows:
3      MS. BERTRAM:  John, before we get started, I
4  want to make certain that Ann is in the room.  Larry,
5  is Ann there?
6      THE WITNESS:  Yes.
7      MS. BERTRAM:  Okay.  Thank you.
8      MR. LEE:  Oh, Ann, the assistant general
9  counsel Ann.  Okay.  I got it.
10          DIRECT EXAMINATION
11 BY MR. LEE:
12     Q.   Would you state your name for the record,
13 please, and spell it.
14     A.   **My name is Stephen Lawrence Flatley,**
15 **F-l-a-t-l-e-y.**
16     Q.   And where do you reside, Mr. Flatley?
17     A.   **Currently, I reside at 238 Elizabeth Drive**
18 **in Ludlow, Massachusetts, 01056.**
19     Q.   And is that the only residence you have?
20     A.   **No.**
21     Q.   Okay.  There's another residence?
22     A.   **Correct.**
23     Q.   And what is the address of that other
24 residence?

---

Page 7

1      A.   **114 Route 28 in West Harwich, Mass.**
2      Q.   Do you have one -- do you use one residence
3  as your primary residence and the other residence as a
4  rental or something like that?
5      A.   **No.  It's a vacation home.**
6      Q.   Oh, okay.  So the second home was the
7  vacation home, the first home is the rental -- is your
8  primary residence?
9      A.   **Correct.**
10     Q.   And how far is that primary residence from
11 Springfield, Illinois -- I mean, Springfield,
12 Massachusetts?
13     A.   **Primary residence, I would say ten miles.**
14     Q.   Okay.  How about the vacation home, how far
15 is that from Springfield, Mass?
16     A.   **It's 2 hours and 15 minutes roughly.**
17     Q.   Okay.
18     A.   **Just say, roughly, it's 140 miles.**
19     Q.   Okay.  Do you -- are there particular times
20 when you go to the vacation home?
21     A.   **No.**
22     Q.   Okay.  Just whenever you feel like it?
23     A.   **It's just mostly the summertime.**
24     Q.   Sure.  Okay.  And you are retired now, sir,

---

Page 8

1  are you?
2      A.   **Correct.**
3      Q.   Okay.  And do you reside at your primary
4  residence with anybody?
5      A.   **My wife.**
6      Q.   Okay.  And what is her name?
7      A.   **Nira Flatley.  That's N-i-r-a, Flatley.**
8      Q.   Okay.  When did you retire from
9  Smith & Wesson?
10     A.   **September 2016.**
11     Q.   And did you retire of your own volition?
12     A.   **Yes.**
13     Q.   And how old were you when you retired?
14     A.   **65.**
15     Q.   Okay.  I'm going to first have you go
16 through your personal background a little bit just
17 starting with your college.  Where did you go to
18 college?
19     A.   **University of Hartford.**
20     Q.   When did you graduate from University of
21 Hartford?
22     A.   **1974.**
23     Q.   Okay.  Starting in 1974, can you give us a
24 little history of your occupation.  You started at

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 9

1  Smith & Wesson in March of 1980, correct?
2      A.    Correct.
3      Q.    So between 1974 and 1980, what did you do?
4      A.    Well, I was recruited out of college to go
5  work at Avco Lycoming in Stratford, Connecticut, and,
6  unfortunately, that job only lasted about four months
7  because they had an economic downturn, and they
8  had -- it had layoffs.
9      Q.    Sorry for apologizing, sir.  What did you
10  study at Hartford College?  What was your major?
11     A.    Mechanical engineering.
12     Q.    Okay.  So graduating, you had a degree in
13  mechanical engineering?
14     A.    And a minor in environmental engineering.
15     Q.    Okay.  And after Hartford College, did you
16  have any other formal education?  And I mean by that,
17  other than training.
18     A.    Yes.  I had -- got a master's degree in
19  finance from Western New England University now.  It
20  was Western New England College when I went there.  It
21  is Western --
22     Q.    Okay.
23     A.    -- New England University now.
24     Q.    Yes, sir.  And you did that while you were

Page 10

1  working, correct?
2      A.    Correct.
3      Q.    Okay.  And we'll get to that later.  I want
4  to just fill in this chronologically.  So you
5  graduated from Hartford College in 1974, and you had a
6  downturn, mid '70s downturn, I take it?
7      A.    Yes.
8      Q.    The oil crisis and so on?
9      A.    Yeah.  It was more of a financial downturn
10  for everybody, so, then, I just couldn't really find
11  any jobs.  There was no real jobs available, so I
12  found part-time employment as a -- as a bartender in
13  the Hartford area until roughly 1976, and I became
14  employed by Combustion Engineering in Windsor,
15  Connecticut.
16     Q.    And what did you do at Combustion
17  Engineering?
18     A.    I was a quality control engineer for their
19  nuclear division.
20     Q.    Okay.  And how long did you do that?
21     A.    Roughly -- well, I left there to go work at
22  Smith & Wesson, so that's roughly three-and-a-half
23  years.
24     Q.    Okay.  So -- and when you started at

Page 11

1  Smith & Wesson, what was your first position?
2      A.    It was a quality control engineer.
3      Q.    In what department?
4      A.    Quality Control.
5      Q.    Okay.  And if you could give us a chronology
6  of your positions starting with 1980 through until
7  when you retired as much as you can remember the
8  history?
9      A.    Well, I worked for Quality Control for about
10  a year, year-and-a-half, and then I was put on a
11  special projects, which we called the XM9 project,
12  which the United States government for the Army wanted
13  to replace their 1911 pistols with nine millimeter
14  pistols, and Smith & Wesson was making a submittal of
15  samples to have tested down in Aberdeen in Maryland,
16  and I was part of the team that worked on that to get
17  the samples together and to comply with all the
18  regulations and to put forth our best effort at the
19  time for the Army.
20     Q.    And from when to when did you do that?
21     A.    I can't --
22     Q.    The best -- your best recollection.
23     A.    I'm going to say from -- basically, 1981 in
24  June until June of 1982, I think it was.

Page 12

1      Q.    Okay.
2      A.    And I'm not exactly 100 percent sure on
3  that.
4      Q.    That's fine.
5            Now, after that project, what was your
6  position at Smith & Wesson?
7      A.    Well, I went back and -- went back into the
8  Quality Control, Engineering Department.  Then within
9  a short amount of time, I was deemed a potential for
10  further advancement within Smith & Wesson, so I got a
11  special job working for the vice president of
12  operations as project management coordinator for him.
13  I was his representative in all the new products being
14  developed within Smith & Wesson.
15     Q.    And what -- and from when to when did you do
16  that?
17     A.    Well, that was roughly 1982 to 1984.  I'm
18  not exactly 100 percent sure on the dates.
19     Q.    Sure.  And -- sure.  And who was the vice
20  president of operations at that point that you
21  reported to?
22     A.    It was a person by the name of Bob Metzger
23  (phonetic).
24     Q.    Okay.  And -- and then from 1984, I take it,

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 13

1  your position changed.  What did it change to?
2     A.   Well, I went into operations.  I went into
3  the Screw Department as a foreman.  What they call as
4  a team leader now in Smith & Wesson.  Worked there for
5  roughly four months, and then after that, I went into
6  the Hard Fitting or Assembly area for about six
7  months.
8     Q.   Okay.
9     A.   Again, as a foreman.
10    Q.   Okay.
11    A.   From there, I decided to take a slight left,
12 and I went to work in the Product Engineering Division
13 within Smith & Wesson developing a lot of their new
14 products as a senior product engineer developing,
15 among other things, the -- the Sigma pistols.  We put
16 together the ten millimeter pistol for the FBI, a
17 number of new products that Smith & Wesson offered to
18 our consumers.
19    Q.   Okay.  And from when to when did you do
20 that?
21    A.   I don't remember the exact dates.  It's,
22 like, '88 to '92, '93 roughly.
23    Q.   Okay.  So -- and in '92, '93, what was your
24 next position?

Page 14

1     A.   Okay.  Then I went on to become the process
2  line manager for what they called Supplier Services,
3  which we ended up calling Specialty Services.
4     Q.   Okay.
5     A.   I had -- at that time, you know, it
6  was -- part of my job was to oversee the Heat Treat
7  Department, the Forging Department, the Finishing
8  Department and the Cutting Tool, Manufacturing and
9  Regrinding.
10    Q.   Okay.  And what was -- when you say
11 "oversee," what was your job?  Specifically, what was
12 your job?
13    A.   I was responsible for those departments for
14 their operation as well at that time I also had
15 Customer Service was also part of my domain.
16    Q.   Okay.  And from that position, what was your
17 next position?
18    A.   Well, then I went on.  I was the
19 Smith & Wesson operating system, Lean -- project
20 management at Lean manager for the company for that
21 was roughly about a year.
22    Q.   And what year -- during what year that you
23 can recall were you a project manager for Lean?
24    A.   1999.

Page 15

1     Q.   Okay.  And when you say you were the project
2  manager, did you report to anybody at Lean in 199 --
3     A.   Yes.
4     Q.   -- in 1999?
5     A.   The vice president of operations.
6  Ken Chandler, who was my particular boss, and
7  Jeff East (phonetic).
8     Q.   Okay.  And after your year or so as the
9  project manager of Lean, what was your next position?
10    A.   Went back to being the process line manager
11 for Specialty Services.
12    Q.   And so we're at -- we're at about 2000ish?
13    A.   Correct.
14    Q.   Okay.  So how long were you back as a
15 process line manager at Specialty Services?
16    A.   Until I retired.
17    Q.   Okay.  So from 2000 to 2016, you were a
18 process line manager at Specialty Services, correct?
19    A.   Correct.
20    Q.   And I apologize.  I didn't write it all
21 down, but the -- those process line Specialty
22 Services, I'd like you to, if it changed, you can tell
23 me from, say, 2000 until 2016, but, really, what I'd
24 like to focus on is the, you know, the last six years

Page 16

1  or so of your tenure there.  You said you were -- you
2  were overseeing Forge, Heat Treat, and what were the
3  other departments?
4     A.   Finishing.
5     Q.   Finishing?  I'm sorry.  I didn't catch that.
6  What was that again?
7     A.   Finishing and Plating was one department.
8     Q.   Okay.  Finishing and Plating.
9     A.   And Cutter, Grinding and Manufacturing.
10    Q.   Cutter, Grinding and Manufacturing.
11         And you mentioned Customer Service, is
12 that a department or is that something separate?
13    A.   That was -- that was a department, but I no
14 longer had responsibility for Customer Service.
15    Q.   Okay.  So four departments, Finishing and
16 Plating; Forge; Heat Treat; Cutter, Grinding,
17 Manufacturing?
18    A.   Correct.
19    Q.   And that was -- those are the four
20 departments that you oversaw from 2000 until 2016?
21    A.   Yes.  There was --
22    Q.   At some point -- at some point, you said you
23 got --
24    A.   Let me clarify something, John.  There was

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 17

1  one other department that we had for a short amount of
2  time when there was a downturn in, I think, the early
3  2000s, we actually started manufacturing components
4  for outside vendors, and we made parts for outside
5  companies, but that only lasted a year,
6  year-and-a-half.
7     Q.  Okay.  That was in the early 2000s?
8     A.  Correct.
9     Q.  Okay.  Now, during this time period, can
10 you -- let's go back now reverse chronologically.  In
11 2016, who was the VP of operations that you reported
12 to?
13    A.  It was Mark Smith.
14    Q.  And who was --
15    A.  I take that back, John.  I actually reported
16 to Dan Fontaine, who was the manager of operations.
17 VP of operations was Mark Smith.
18    Q.  Got it.
19         So you didn't report directly to
20 Mark Smith; you reported to Dan Fontaine?
21    A.  Correct.
22    Q.  And is that true throughout -- well, let me
23 ask it to you this way.  How many -- how many process
24 line managers were there that reported to

Page 18

1  Dan Fontaine?
2     A.  I think there's three of us.  There was
3  three.
4     Q.  Okay.  You were one of the three?
5     A.  Correct.
6     Q.  Who were the other two?
7     A.  John Pliska and Tom Walsh.
8     Q.  And what -- department is probably the wrong
9  word.  What did they oversee, John Pliska and
10 Tom Walsh?
11    A.  Their responsibility -- John Pliska was
12 responsible for all of Assembly.
13    Q.  Okay.
14    A.  And Tom Walsh was responsible for all
15 manufacturing within Smith & Wesson.  All part
16 manufacturing.
17    Q.  Okay.  And Dan Fontaine, is it correct to
18 call him a plant manager or is that not the correct
19 terminology?
20    A.  I guess that's apropos.  That's a good
21 description.
22    Q.  Okay.  Okay.  So -- and how many departments
23 did Pliska have, John Pliska have under him?  And same
24 question with respect to Tom Walsh.  Let's just start

Page 19

1  with John Pliska.  You had -- you had four
2  departments, and in the early 2000s, you had a fifth
3  part for outsiders, outside --
4     A.  Right.
5     Q.  -- concerns.  How many departments did
6  John Pliska have?
7     A.  I don't know.
8     Q.  Okay.  How about Tom Walsh?
9     A.  I couldn't give you an actual number.
10    Q.  Okay.  Now, let's go back to -- at some
11 point, you had mentioned you got a master's in finance
12 and while you were working.  Just roughly from when to
13 when did you go to school?
14    A.  Oh, roughly 1978 to 19 --
15    Q.  Your best recollection is fine.
16    A.  I'm trying to think here.  Oh, it was -- oh,
17 I take it back.  It was 1987 to 1994.
18    Q.  Okay.  In the 16 years that you were a
19 process line manager, did Fontaine at some
20 point -- did Mr. Fontaine at some point report to you?
21    A.  No.
22    Q.  Okay.  What was his position before he
23 became the plant manager?
24    A.  He was a process line manager for revolvers.

Page 20

1     Q.  So he was the same level as you --
2     A.  Correct.
3     Q.  -- process line manager?
4         And what -- process line manager for
5  revolvers, did that fall under either John Pliska or
6  Tom Walsh?
7     A.  No.
8     Q.  It's just a whole separate deal?
9     A.  Right.  At that time, his position actually
10 reported to Ken Chandler.  We all reported to
11 Ken Chandler at that point.
12    Q.  And when was that?
13    A.  I can't remember the date.
14    Q.  Okay.  Not the date, but when did -- when
15 did Mr. Fontaine go from process line manager to plant
16 manager?
17    A.  I don't remember the date, John.
18    Q.  Okay.  Do you remember approximately what
19 year?
20    A.  You want an approximate answer?
21    Q.  Yeah.  Approximate what year?
22    A.  2008.  2006, 2008.
23    Q.  That's good enough.
24         Now, when -- let's go -- during the

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 21

1  period of the 2010s, let's just stick for now for 2010
2  through 2016, who was the cell coordinator for
3  Finishing and Plating?
4      A.   Charlie Martin.
5      Q.   How about for Forge?
6      A.   Well, we had a number of different people in
7  there.  I think it was either Frank Liebenow or
8  Gene Reid (phonetic) was in 2010.
9      Q.   Okay.  How about -- did that change?
10     A.   To change when?
11     Q.   To someone else.  Cell coordinator for
12  Forge.
13     A.   Between 2010 and 2016?
14     Q.   Correct.
15     A.   Yes.  We went from Gene Reid.  We -- Tony
16  Nelson was in there.  There was a person that went to
17  HR.  I forgot his name.  He was in there a short
18  amount of time, too, and then the final cell
19  coordinator I had in Forging was Charlie Martin.
20     Q.   Okay.  And when did -- when did it change
21  from Tony Nelson to Charlie Martin, if you recall?
22     A.   2013 roughly.  2012, 2013.
23     Q.   Got it.
24          How about Heat Treat, who was the cell

Page 22

1  coordinator?
2      A.   Dave Billingsley.
3      Q.   How about Cutter, Grinding, Manufacturing
4  went from Stan Wnuk to Earl Baker?
5      A.   Correct.
6      Q.   And from Earl Baker to who?
7      A.   Bob O'Donnell.
8      Q.   Bob O'Donnell.  Okay.
9          And that happened when Mr. Baker was
10  terminated, correct?
11     A.   After he was terminated, yes, Bob became the
12  cell coordinator.
13     Q.   Sure.
14          Okay.  And do you know, by any chance,
15  whether Mr. O'Donnell has a relative that also works
16  at the company?
17     A.   Yes.
18     Q.   He has a sister that works at the company,
19  right?
20     A.   Correct.
21     Q.   Kathy Salvador?
22     A.   Correct.
23     Q.   Okay.  Now, are you the one who chose
24  Mr. Bob -- Mr. O'Donnell?

Page 23

1      A.   No.
2      Q.   To -- who chose Mr. O'Donnell?
3      A.   We were having a downsizing -- not a
4  down -- but a change of personnel.  We were -- we felt
5  as a management team that the -- that the people in
6  the departments were needed to be changed a little
7  bit, get a different perspective of the company, so as
8  a point, they tried to put people into their strengths
9  outside of their present job, so Bob was selected by
10  Dan because of his strength in machining and cutting
11  tools to go into that job.
12     Q.   Okay.  So -- and Bob O'Donnell prior to
13  becoming the cell coordinator at Cutter, Grinding and
14  Manufacturing, was he in the Cutter, Grinding,
15  Manufacturing Department?
16     A.   No.
17     Q.   What was he in?
18     A.   He was in Pistol Barrel I think it was.
19     Q.   And you said we made the decision.  Who is
20  "we"?
21     A.   Well, it was the management team of Dan,
22  Tom, Tom Walsh and John Pliska.
23     Q.   Did you have any input in choosing
24  Mr. O'Donnell?

Page 24

1      A.   No, because the shake-up was going to be
2  occurring in Tom's and John's areas where they were
3  swapping the perspective cell coordinators into new
4  positions.
5      Q.   Okay.  And was this something that was
6  decided by Dan Fontaine or was it that came down from
7  HR or is it something that came down from Mark Smith,
8  if you know?
9          MS. BERTRAM:  Objection to the form of the
10  question.
11  BY MR. LEE:
12     Q.   If you know.  You can answer.
13     A.   You want to know who made the decision?
14     Q.   Who made -- you said there was just going to
15  be a shake-up where people from different areas were
16  going to be tried in different new areas, correct?
17     A.   That was a conscious effort by Dan Fontaine
18  to help strengthen our -- our -- and train our
19  management staff.
20     Q.   Okay.  So that decision was made by
21  Dan Fontaine?
22     A.   Right.
23     Q.   As far as you know?
24     A.   Correct.

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 25

1    MR. LEE: Okay.
2        (The witness was tendered
3        previously marked Plaintiff's
4        Exhibit 294.)
5    BY MR. LEE:
6    Q.  Now, I'm going to show you what's been
7  marked as Exhibit 294, and as you are being handed
8  Exhibit 294, prior to this deposition, did you review
9  any documents?
10   A.  Yes.
11   Q.  Okay.  And what did you review?
12   A.  I couldn't name everything.  It's a lot of
13 e-mails and the things that I had written myself.
14   Q.  Okay.  Is this -- the
15 Declaration of -- first of all, let's just mark it.
16 Exhibit 294 is entitled Declaration of Stephen
17 Lawrence Flatley, correct?
18   A.  Correct.
19   Q.  Is this one of the documents that you
20 reviewed?
21   A.  Yes.
22   Q.  Okay.  And when did you review it?
23   A.  In fact, I actually reviewed it yesterday.
24   Q.  Okay.  And upon having reviewed it

Page 26

1  yesterday, is there anything in this
2  Declaration -- first of all, if you flip to page
3  13 -- I'm sorry.  Page 14, is that your signature that
4  you signed in June of 2015?
5    A.  Correct.
6    Q.  Is there anything that you wish to change or
7  modify or make more accurate or complete in this
8  Exhibit No. 294?
9        MS. BERTRAM:  I'm going to object to the
10 form of the question as compound.  Larry, you can go
11 ahead and answer it.  Make certain you read through
12 the entire document.
13       And, John, while he's doing that, as
14 kind of a procedural matter, I don't have that
15 exhibit, so I have all of the previously marked
16 exhibits, and I have the ones that Jill sent over this
17 morning, but I don't have that number, so as you
18 introduce them, if Jill could send me and Missy a
19 copy, that would be great.
20       MR. LEE:  Sure.  Jill will send it to you
21 and send a -- send a copy to Missy.
22 BY MR. LEE:
23   Q.  I'm going to break up the question,
24 Mr. Flatley.  You reviewed this thing yesterday,

Page 27

1  correct?
2    A.  Correct.
3    Q.  And you identified your signature, correct?
4    A.  Correct.
5    Q.  Is there anything that you wish to change to
6  make it more accurate?
7    A.  I think, John, I should go through it
8  because this isn't my copy.  I don't know where this
9  copy came from.  I don't know if it's the same as my
10 copy, so I should go through it just to be sure.
11   Q.  Sure.  While you're reviewing it, let me ask
12 you this.  Other than that this is not your copy that
13 you reviewed yesterday, is this thing -- is this
14 from -- from the content that's typed up, is any
15 different from what you reviewed yesterday?
16   A.  So far, no.
17   Q.  Okay.  If you could go ahead and finish
18 reviewing it all the way to page 14 to make sure that
19 it was the same thing that you reviewed yesterday.
20 When you're done, Mr. Flatley, my first question is
21 going to be is this -- other than that you reviewed
22 your copy and not this copy, is this -- is this the
23 same Declaration that you reviewed yesterday?
24   A.  Okay.  Initially, I did the review.  What

Page 28

1  was the question, again, please?
2    Q.  Is this the same Declaration that you
3  reviewed yesterday?
4    A.  It appears so, yes.
5    Q.  And you reviewed that in preparation for
6  today's deposition?
7    A.  Correct.
8    Q.  Is there anything that you wish to change to
9  make it more accurate?
10   A.  No.
11   Q.  Is there anything that you wish to change to
12 make it more complete?
13   A.  No.
14   Q.  Okay.  Now, if you could go to page 2.
15 Direct your attention to paragraph 10, you say at the
16 very bottom -- if you could just read paragraph 10 to
17 yourself, you say you assigned Mr. Baker three
18 critical projects, correct?
19   A.  Correct.
20   Q.  When did you assign these projects?
21   A.  I can't give you exact date.
22   Q.  Yeah.  I don't expect you to.  Was it
23 shortly after Mr. Baker began?
24   A.  Well, after he went through his transition

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 29

1    with Mr. Wnuk and had a chance to familiarize hisself
2    with the operation of the department, we start -- we
3    started discussing these assignments.
4        Q.   Okay.  So these assignments, how long -- how
5    long did he have the transition training with Mr. Wnuk
6    and then getting used to the department?  How long did
7    that take?  Your best recollection is fine.
8        A.   I remember it was about three weeks.
9        Q.   Okay.  So after he started and then three
10   weeks of transition, you started discussing these
11   projects with Mr. Baker?
12       A.   Correct.
13       Q.   Now, when you say discussed, orally or did
14   you do any discussion in writing?
15       A.   Well, initially, we started orally.
16       Q.   Okay.  Did they change at some point?
17       A.   Well, I had -- yes.  I documented some of
18   this in other pieces of paper that were given to
19   Mr. Baker.
20       Q.   Okay.  Now, we'll get there.  When you say
21   you documented and then you gave it to Mr. Baker, are
22   you talking about handwritten notes?
23       A.   Not notes.  It was a sheet.  It was a called a
24   S.M.A.R.T. engineering sheet or S.M.A.R.T. sheet that

Page 30

1    I filled out with these --
2        Q.   Got it.  Got it.
3        A.   -- projects.
4        Q.   Other than -- other than the S.M.A.R.T.
5    sheet, did you communicate with Mr. Baker in any other
6    written form regarding these three projects?
7        A.   I don't think so.
8        Q.   Okay.  So other than orally, the
9    communications with Mr. Baker regarding the three
10   projects that are mentioned in paragraph 10 of
11   Exhibit 294 is in S.M.A.R.T. sheets, correct?
12       A.   Correct.
13       Q.   And S.M.A.R.T. sheets is a Smith & Wesson
14   form, am I correct?
15       A.   Correct.
16       Q.   Okay.  Now, let's go to project number 1.
17   Using Smith & Wesson's RoboCrib, AutoCrib computer
18   software, was this your idea?
19       A.   Yes.
20       Q.   Okay.  And how did you come to this idea?
21       A.   We had just started using the RoboCribs.  I
22   think we had bought approximately 10 RoboCribs to use
23   in our manufacturing floor for the issuing of tools,
24   and it seemed to be working very well, so I wanted to

Page 31

1    expand upon the software that was available rather
2    than to come up with a whole new system that was
3    outside what we were presently using, so I figure it
4    was the perfect lead-in to work with our vendor, who
5    at the time was Pioneer who owned the software, and
6    himself.  We had a close working relationship anyway,
7    so I figured that would be an easy project to -- to
8    implement.
9        Q.   Okay.  So how -- when did you -- when did
10   Smith & Wesson purchase these RoboCribs and the
11   Pioneer software?
12       A.   I disagree.  Smith & Wesson never purchased
13   the software.  I think it was --
14       Q.   I misspoke.  You said Pioneer managed the
15   software, and it's their own software, correct?
16       A.   It wasn't theirs.  It was RoboCrib.
17       Q.   Okay.  So when did -- when did
18   Smith & Wesson purchase the RoboCrib?
19       A.   Its approximate date, I'm guessing --
20       Q.   Your best -- your best recollection is all
21   we could ask for.
22       A.   I'm guessing it was, like, the 2012, 2011
23   time frame.
24       Q.   Okay.  So between 20 -- whether it was 2011

Page 32

1    or 2012, Mr. Baker began in the first quarter of 2013
2    at Smith & Wesson, correct?
3        A.   Correct.
4        Q.   So was Mr. Wnuk working with the RoboCrib
5    software in 2011 or 2012?
6        A.   He was working with it to help stock the
7    machines, and we were just learning about them.  It
8    was new to all of us, so we were just getting
9    our -- our -- getting up to speed with what it was
10   capable of, the reports it was capable of generating,
11   how we could actually use it in our situation, so we
12   were, basically, gathering data.
13       Q.   Okay.  Now, in gathering this data, who
14   negotiated the deal with Pioneer, do you recall?  Were
15   you involved in that?
16       A.   No.
17       Q.   Okay.  The RoboCribs themselves were
18   purchased and outright owned by Smith & Wesson,
19   correct?
20       A.   It was a combination of -- of, first, they
21   were bought by Pioneer and installed in our -- in our
22   plant, I think the initial ones, and then later on, we
23   were paying for them.  Smith & Wesson was paying for
24   them, but the initial ones were owned by Pioneer.

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 33

1    Q.   Okay.  And then how about the software, was
2  it always Smith & Wesson's -- strike that, Pioneer's
3  software that was managing the AutoCrib?
4    **A.   Pioneer was managing the AutoCrib software,**
5  **correct.**
6    Q.   And did that ever change during your tenure
7  at Smith & Wesson?
8    **A.   Yes.**
9    Q.   When did that change?
10   **A.   With -- I don't know -- I don't remember the**
11  **date.  There was an audit done for security reasons.**
12  **The software was being used in our plant, but Pioneer**
13  **had access to it, so, then, they had a gateway into**
14  **our -- our software within the company, so they made**
15  **it so that this -- they had Pioneer give the software**
16  **to Smith & Wesson to manage on our own to keep the**
17  **security intact within the company.**
18   Q.   Correct.  I'm asking do you know when that
19  happened?  Do you recall when that happened?
20   **A.   No, I don't remember the date because I**
21  **wasn't really involved with that.**
22   Q.   Okay.  Well, did it happen before you
23  retired?
24   **A.   Yes.**

Page 34

1    Q.   Okay.  Do you recall how much -- how much
2  before you retired that happened?
3    **A.   No.**
4    Q.   Okay.  And you weren't involved in that, and
5  you said there was an audit done, correct?
6    **A.   Correct.**
7        MS. BERTRAM:  Objection.  Compound.  That's
8  two questions.
9  BY MR. LEE:
10   Q.   Sure.
11       There was an internal audit done by the
12  Audit Department, correct?
13   **A.   Correct.**
14   Q.   And in response to the Audit Department and
15  for security reasons, you just described the change
16  from management of the software by Pioneer to
17  management of the software by Smith & Wesson, right?
18   **A.   Correct.**
19   Q.   Who was involved in that transition from
20  management of software by Pioneer to Smith & Wesson?
21       MS. BERTRAM:  Objection to the extent it
22  calls for speculation.
23  BY MR. LEE:
24   Q.   If you know.

Page 35

1    **A.   I don't know.**
2    Q.   Okay.  And you were just told that it
3  happened?
4    **A.   I read from the discovery of some documents**
5  **it had happened.  I didn't really know about it at the**
6  **time.**
7    Q.   Okay.  Did you know about it before you
8  retired?
9    **A.   At the -- at the very end, yes, just before**
10  **I retired.**
11   Q.   Did you hear that from somebody or did you
12  read something that advised you that that's what
13  happened?
14   **A.   It came up in general conversation with**
15  **Andy Dziobek, the Purchasing --**
16   Q.   Andy -- I'm sorry.  Andy, what's his name?
17   **A.   Dziobek.**
18   Q.   Dziobek?
19   **A.   Dziobek.  Yeah.  Dziobek.**
20   Q.   Okay.  The purchaser, Andy Dziobek?
21   **A.   Correct.**
22   Q.   Okay.  So Andy told you that?
23   **A.   Correct.**
24   Q.   Okay.  Now, with respect to -- you said you

Page 36

1  were all learning or getting used to this software.
2  Who is we?  Who is getting -- who was getting used to
3  the Pioneer software?
4    **A.   I don't think it was the software more than**
5  **the function of the machines and how they worked, how**
6  **they issued tools, how to replenish the machines.**
7  **There was a lot of -- a lot of a learning curve going**
8  **on in terms of the function of the machines themselves**
9  **as opposed to the worry about the software.  The**
10  **software was -- at that point, that wasn't an issue.**
11  **We were learning more about how the machines work.**
12   Q.   Okay.  How --
13   **A.   How could we implement that within our**
14  **manufacturing facility.**
15   Q.   Okay.  And you said "we."  Who is "we"?
16   **A.   I think everybody in the plant.  Everybody,**
17  **the operators, the cell coordinators of all**
18  **departments using them, they were all learning how**
19  **it -- how it worked.**
20   Q.   Okay.  So if cell -- that includes the cell
21  coordinators of all the departments that reported to
22  you?
23   **A.   No.  They weren't involved because they**
24  **didn't have a need for the tools in the machines.  The**

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 37

1  only one that had anything to do with it was
2  Stan Wnuk.
3      Q.  Okay.  And, in other words, it was the
4  Cutter, Grinding, Manufacturing Department?
5      A.  Heat Treat had no need for cutting tools.
6      Q.  Sure.
7      A.  As did Finishing and Plating or Forging.
8      Q.  Okay.  So when you say we were all getting
9  used to it, you're talking about really the Cutter
10 Department?
11     A.  No.  I'm talking about Smith & Wesson in
12 general.
13     Q.  Okay.  And that certainly included the cell
14 coordinator and the operators of the Cutter
15 Department?
16     A.  Correct.
17     Q.  And you?
18     A.  Not the operators because they really didn't
19 use it.  It was the operators in the Manufacturing
20 facility had to take tools out of the machine.
21     Q.  Okay.
22     A.  They had to scan their I.D.s to be able to
23 retrieve tools that were -- that were stocked in there
24 on consignment.

Page 38

1      Q.  Okay.  And -- and other than the cell
2  coordinators and the operators, who else -- who else
3  at Smith & Wesson was getting used to the -- how the
4  AutoCrib functioned?
5          MS. BERTRAM:  Objection.  Asked and
6  answered.
7  BY MR. LEE:
8      Q.  You, for example?  Is that a yes or no?
9      A.  Yeah.  I was learning about it, yep.
10     Q.  Sure.
11         How about Mr. Fontaine, was he involved
12 in learning about the AutoCrib?
13     A.  That, I can't say.
14     Q.  Okay.  Well, for example, did you ever
15 report to Mr. Fontaine about the functioning of the
16 AutoCrib?
17     A.  I don't remember.
18     Q.  Okay.  Fair enough.
19         And how long did it take Smith & Wesson
20 to learn the functioning of the AutoCrib?
21         MS. BERTRAM:  Objection.  Vague.
22 BY MR. LEE:
23     Q.  You can answer, if you can.
24     A.  I really can't answer it because, you know,

Page 39

1  it's -- new wrinkles come up all the time.  I guess
2  you're learning all the time.
3      Q.  Sure.
4          How long did it take you?
5          MS. BERTRAM:  Objection.  Asked and
6  answered.
7  BY MR. LEE:
8      Q.  No.  The first question I asked was
9  Smith & Wesson, but, now, you testified that
10 Smith & Wesson and the cell coordinators and the
11 operators in Manufacturing and so on were getting used
12 to the functioning of the RoboCrib, correct?
13     A.  Correct.
14     Q.  And that included you --
15     A.  Correct.
16     Q.  -- correct?
17         So how long did it take you to learn
18 the functioning of the RoboCrib?
19         MS. BERTRAM:  Objection.  Vague.
20         THE WITNESS:  I felt I was learning right up
21 until the time I retired because it was always
22 something new that we tried to implement with the
23 machine to try and make it better.
24 BY MR. LEE:

Page 40

1      Q.  Okay.
2          MS. BERTRAM:  Hey, John -- I'm sorry.  Go
3  ahead.  Larry, go ahead and finish your answer.  I'm
4  sorry.
5          THE WITNESS:  I'm done.
6          MS. BERTRAM:  Okay.  John, why don't we take
7  just a five- to ten-minute break.  I need to make some
8  technology adjustments on my end.
9          MR. LEE:  Okay.  Fair enough.
10         MS. BERTRAM:  Great.  Okay.
11         THE VIDEOGRAPHER:  All right.  Stand by,
12 please.  The time is 9:27 a.m. Central time.  We are
13 off the record.
14         (Recess.)
15         THE VIDEOGRAPHER:  The time is 9:36 a.m.
16 Central time.  We are back on the record.
17         (The witness was tendered
18          previously marked Plaintiff's
19          Exhibit 343.)
20 BY MR. LEE:
21     Q.  We're going to come back to Exhibit 294,
22 Mr. Flatley, but I'm going to direct your attention to
23 Exhibit 343.
24         Yeah.  If you could just set it aside

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 41

1  in the same order so that we don't mess it up or, you
2  know, we don't mix it up because we're going to go
3  back to it.
4          Showing you what's been marked as
5  Plaintiff's Exhibit 343.
6      A.   Yes.
7      Q.   Have you ever seen this document before?
8      A.   Yes.
9      Q.   When?
10     A.   Yesterday.
11     Q.   Okay.  Prior to yesterday, did you -- did
12  you review this document while you were a
13  Smith & Wesson employee?
14     A.   No.
15     Q.   Okay.  Just -- if you turn to the second
16  page, sir, it has a distribution list, right, that
17  goes from Mr. Debney to Buchanan, Cicero, Smith and
18  all the way down to Miss Bruce, correct?
19     A.   Correct.
20     Q.   And I note that even your name is not any
21  and even Mr. Fontaine's name is not on the
22  distribution list, correct?
23     A.   It appears so.
24     Q.   Yeah.  So during your employment at

Page 42

1  Smith & Wesson, you never saw this document?
2      A.   No, I did not.
3      Q.   Did you know that there had been an audit
4  while you were -- while you were an employee at
5  Smith & Wesson?
6      A.   No.
7      Q.   Fair enough.  You can put that away now.
8          Now, going back to learning about the
9  RoboCrib during -- after it was installed and before
10  your retirement, was there a particular training
11  session or a formal learning opportunity for you or as
12  well as anybody -- others at Smith & Wesson about
13  learning the functionality of the RoboCrib?
14     A.   Exactly what are you asking?
15     Q.   Okay.  I'm going to direct your attention
16  back to the bottom of page 2 and top of page 3 of
17  Exhibit 294, and the three projects that you had
18  discussed with Mr. Baker --
19     A.   Right.
20     Q.   -- number 1 was using the RoboCrib, right?
21     A.   Correct.
22     Q.   And the software.
23          My question was -- and you testified
24  about the learning process for you as well as the

Page 43

1  others and you testified -- correct?
2      A.   Yes.
3      Q.   Now, my question is more specific to the
4  learning process.  Other than sort of on-the-job
5  learning, was there any kind of a formal or a training
6  about the RoboCrib software or the functionality of
7  the RoboCrib?
8      A.   Since Pioneer Tool was the owner
9  of the initial machines and the software, they were
10  more than willing to have one-on-one trainings.  They
11  did the initial training of all the people, but any
12  additional training or help or troubleshooting or
13  project planning, they were more than happy to
14  participate in.  All they had to do was just give them
15  a call.
16     Q.   Okay.
17     A.   They were the resident experts.
18     Q.   Pioneer was, right?
19     A.   Correct.
20     Q.   Okay.  And so Pioneer would explain or train
21  whenever Smith & Wesson employees wanted it?
22     A.   Yes.
23     Q.   And who was the person at Pioneer who did
24  that?

Page 44

1      A.   I couldn't tell you.  I don't know.
2      Q.   Okay.  Would a Smith & Wesson employee, if
3  they needed -- they wanted training or wanted
4  something explained from Pioneer, was there a process
5  by which they would do that?  In other words, come to
6  you or just pick up the phone, e-mail them?
7      A.   Pioneer had people in Smith & Wesson on a
8  daily basis, kept refilling the machines, doing any
9  kind of maintenance, whatever.  If anybody wanted
10  anything, they could either see that person, they
11  could call Pioneer or they could call their
12  Smith & Wesson sales rep for Pioneer, call Hynes to
13  get any help that they needed.
14     Q.   Okay.  But from --
15     A.   There were several avenues they could go to
16  attain training.
17     Q.   Okay.  So was there a process within
18  Smith & Wesson by which you directed your employees
19  to, say, go to this person or go to that person or
20  use -- use e-mail or just pick up the phone?  Was
21  there a process that you set forth?
22          MS. BERTRAM:  Objection to the form and
23  asked and answered.
24  BY MR. LEE:

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 45

1    Q.   My question is was there some process that
2  you set forth --
3    **A.   No.**
4    Q.   -- with respect to learning -- okay.
5        Let me -- just for clarification of the
6  record, let me finish the question and then you can
7  answer it so that we have a clearer record because you
8  answered in the middle of the question because you
9  knew what my question was going to be.
10       Okay.  For the process of
11 Smith & Wesson employees to gain help from Pioneer on
12 the AutoCrib functionality and software, was there a
13 process that you set forth under which a
14 Smith & Wesson employee could seek that training or
15 help?
16   **A.   No.**
17   Q.   Okay.  Whether you set it -- whether you set
18 it or not, was there any kind of a process or was it
19 pretty much just on-the-job, they're there every day,
20 Pioneer is there every day type of a thing?
21       MS. BERTRAM:  Objection to the form.  There
22 are about four questions in there and asked and
23 answered.
24 BY MR. LEE:

Page 46

1    Q.   You can answer.
2    **A.   Which question?**
3    Q.   Okay.  You said you didn't set forth a
4  formal procedure for asking questions to Pioneer or
5  getting training from Pioneer about the AutoCrib.  Did
6  anybody else at Smith & Wesson set forth such a
7  procedure?
8    **A.   Are you -- let me clarify.  Are you asking**
9  **was there a formal process to getting training --**
10   Q.   Yes.
11   **A.   -- on the machine?**
12   Q.   Yes.
13   **A.   There was nothing written for it.**
14   Q.   Okay.  Now, was there anything informal or
15 not written?
16   **A.   Multiple -- multiple ways of getting it.**
17 **Not only did we have the representative in there, but**
18 **even once a month -- or once a week, I had a tool**
19 **meeting with our major suppliers of tooling, whether**
20 **it's MSC, Lindco, Pioneer, Andy Dziobek, Earl and**
21 **myself and an engineer from our Engineering**
22 **Department, we had a weekly meeting to discuss cutter**
23 **problems or cutter situations and our needs and our**
24 **wants, and it was, basically, a session just to have a**

Page 47

1  **face-to-face to talk about things going on, and at**
2  **that time, Carl Hynes was there, and he would have**
3  **been more than happy, if the question was asked of him**
4  **about training, with the major players in cutting**
5  **tools, he would have been more than happy to arrange**
6  **training for anybody.**
7    Q.   Okay.  Fair enough.
8        Now, if you go to page number 3 of
9  Plaintiff's Exhibit 294, there's a second project that
10 you discussed with Earl Baker, correct?
11   **A.   Correct.**
12   Q.   And you said conduct -- "conducting
13 problem-solving exercises with the team leaders in
14 the" cutting department -- "Cutter Department,"
15 correct?
16   **A.   Correct.**
17   Q.   Who are the team leaders in the -- that you
18 are referring to there in the Cutter Department?
19   **A.   It was -- one of them was Mike Jurga.**
20   Q.   Okay.
21   **A.   Then there was a second team leader.**
22 **Danny Durant (phonetic).**
23   Q.   Okay.  When you say "conduct problem-solving
24 exercises," did you have any specific exercises in

Page 48

1  mind?
2    **A.   No.**
3    Q.   Did -- was there something that within
4  Smith & Wesson that -- that -- that the employees
5  could refer to to formulate such exercises?
6    **A.   Yes.**
7    Q.   And what is that?
8    **A.   The Smith & Wesson operating system with**
9  **Bob Francis.  He was -- his position was responsible**
10 **helping employees with problem-solving exercises,**
11 **training, whatever was needed to be able to get**
12 **employees up to speed in terms of their knowledge of**
13 **problem-solving and how to do it.**
14   Q.   Okay.  Now, you mentioned Mr. Francis.  The
15 best that you can recall, when you were there -- when
16 you retired, was Mr. Francis still at Smith & Wesson?
17   **A.   I don't remember.**
18   Q.   Okay.  Do you remember when you first became
19 aware of Mr. Francis while you were an employee of
20 Smith & Wesson?
21   **A.   Do I remember -- what was the question?**
22   Q.   Sure.
23       Do you remember when you first became
24 aware of Mr. Francis when you were an employee at

STEPHEN LAWRENCE FLATLEY
August 19, 2020

1  Smith & Wesson?
2      A.  I remember we were actually introduced when
3  he was first hired.  I don't know what the actual date
4  was, but when he was hired, I met him.
5      Q.  Okay.  And when was that approximately?
6  Your best recollection.
7      A.  I don't even remember.
8      Q.  Was it 10 years before you retired, 20 years
9  before you retired, 5 years before you retired?
10     A.  My best --
11         MS. BERTRAM:  Objection.  Compound.
12  BY MR. LEE:
13     Q.  Your best recollection.
14     A.  I'd say 2011 or '12.
15     Q.  Okay.  And when you were introduced to
16  Mr. Francis when he was hired, what -- what were you
17  introduced to as -- strike that.  Bad question.
18         What was his job, Mr. Francis?
19     A.  Mr. Francis was the person in charge of the
20  Smith & Wesson operating system and training and
21  implementation.
22     Q.  Okay.  Is that -- was that a new position or
23  was there a predecessor to Mr. Francis?
24     A.  That was -- his job was one that was

1  basically on and off for many years.  Actually, I
2  served in that function, you know, before 2010, and
3  there was other people that did it and hired --
4      Q.  Sorry to -- sorry to interrupt you.  You
5  mentioned that you -- my recollection, you had, like,
6  one year with Lean or something like that.  Is that
7  what you are referring to?
8      A.  Yes.
9      Q.  Okay.  So --
10         MS. BERTRAM:  And John, John, before you
11  continue with your questions, I understand that you
12  want to ask follow-up questions, but you need to let
13  him finish his response before you interject and start
14  asking about what is a partial response.
15  BY MR. LEE:
16     Q.  Correct.  I will reask it, sir.  Prior to
17  Mr. Francis being hired for what you just described as
18  his job, my question was was there a predecessor to
19  Mr. Francis?  And you were giving us your answer.
20     A.  I don't remember the actual person before
21  him, but there was -- but that function had many
22  different forms.  We -- like I said, I did it.  We had
23  consultants in to do it.  It had many different forms
24  over the years, and that was just the latest

1  initiative that the company had embarked upon to get
2  that function operational.
3      Q.  Okay.  And when you say "that function," are
4  you talking about Lean?
5      A.  Lean, correct.
6      Q.  Okay.  Best you could -- what is Lean?
7      A.  Lean is trying to take -- make the -- your
8  operations more efficient, to take out any waste and
9  unneeded operations or actions out of a particular
10  items, to organize, you know.  It could be the 5S, it
11  could be safety audits, it could be problem-solving,
12  Kaizens, you know.  Nothing that's -- the Kaizens
13  themselves are nothing dramatic, long, drawn-out
14  projects.  They're very something short, concise that
15  works within people's knowledge and that they can work
16  on very easily in a short duration, so it takes many
17  different forms.  You're just trying to make the
18  operations better.
19     Q.  Okay.
20     A.  Make them more efficient.
21     Q.  Sure.
22         Now, going back to -- you had
23  mentioned, okay, seeking out Mr. Francis as one thing
24  that is -- that was available at the company for

1  project number 2.  Was there anything else available
2  at the company that you could think of for project
3  number 2 that's listed on top of page 3 of Plaintiff's
4  Exhibit 294?
5      A.  Other than people's experience like myself
6  and other managers that had been through it, Bob was
7  the most qualified to help lead a team and to show
8  them how to do it.
9      Q.  Okay.  "Bob" being Bob Francis?
10     A.  Correct.
11     Q.  Okay.  Now, I'm going to move on to project
12  number 3 at the top of page number 3 of Exhibit 294,
13  "creating a system to increase the utilization of the
14  Company's Schneeberger tool grinding machine."  Do you
15  see that?
16     A.  Yes.
17     Q.  Okay.  First of all, the Schneeberger tool
18  grinding machine, who was involved in purchasing that,
19  the making the decision to purchase that?
20     A.  It was an Engineering decision.  I guess
21  it's part of our strategic plan to bring Thompson
22  Center fire rifles to Smith & Wesson.  Part of
23  the -- integral part of that process to build a long
24  gun is to make barrels, and to make barrels, you need

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 53

1   both gun drills and reamers to machine the holes in
2   the barrels.  Now, our capabilities were nonexistent
3   when we first got the Thompson Center product line and
4   put the barrel-making process in-house, so --
5       Q.   When -- when did you get the Thompson
6   Center?  You said it was nonexistent.  Again, your
7   best recollection of the timing when you got the
8   Thompson Center business?
9       A.   You know, John, I don't really remember the
10  dates.  I know we had bought the company first.
11      Q.   Okay.
12      A.   And they operated up in their plant in New
13  Hampshire for a while.  How long it was, I don't
14  remember.  Then they moved the company down and
15  integrated it into our business in Springfield.  I
16  don't remember the dates.
17      Q.   Okay.
18      A.   It was prior to 2013.
19      Q.   Got it.
20           And was the Schneeberger machine
21  purchased prior to 2013?
22      A.   Yes.
23      Q.   Okay.  And were there problems with the
24  Schneeberger machine?

Page 54

1           MS. BERTRAM:  Objection.  Vague.
2           THE WITNESS:  Yes.
3   BY MR. LEE:
4       Q.   And what were --
5       A.   Yes.
6       Q.   And what were the problems?
7       A.   The one that I'll always remember is that
8   the head was -- the head was broken or nonoperational
9   100 percent from the beginning when we bought the
10  machine.
11      Q.   Okay.
12           MS. BERTRAM:  Larry, can you say what you
13  just said?  I couldn't hear what you said because you
14  were talking down.
15           THE WITNESS:  The only problem that I know
16  about the Schneeberger machine was that after a stated
17  amount of time of having the machine, we had a
18  technician come in, and because we were -- couldn't
19  make parts.  It turns out that the head was broken,
20  and it had been broken since we had received it, and
21  he was there to fix it.
22  BY MR. LEE:
23      Q.   Okay.  And do you recall when the person
24  came and fixed the broken head on the Schneeberger?

Page 55

1       A.   No.  I don't know the date.
2       Q.   Okay.  If not the date --
3       A.   It was after Earl was hired.
4       Q.   Sure.
5           So prior to the head being broken, was
6   the Schneeberger machine working?
7       A.   It worked, but we couldn't get consistent
8   parts off the machine, consistently good parts.
9       Q.   Okay.  And do you know why the
10  Smith & Wesson couldn't consistently get good parts
11  out of the Schneeberger?
12      A.   No.
13      Q.   Okay.
14      A.   Other than the head -- turning out that the
15  head needed to be repaired.
16      Q.   Sure.  We'll get to the broken head, but I'm
17  trying to figure out before discovering the broken
18  head, I'm trying to figure out whether you had any
19  information as to why Smith & Wesson was not getting
20  good production out of the Schneeberger?
21      A.   No.  We kept trying, and it turned out we
22  had to get the technician in to help us.
23      Q.   Okay.  So as far as you knew -- do you know
24  how the head was broken or when it was broken?

Page 56

1   That's -- that's compound.  Before she objects, I'm
2   going to break that up.
3           Do you know when the head got broken in
4   the Schneeberger?
5       A.   All I know is when -- when we received it,
6   it was broken.
7       Q.   Okay.  So it was basically a defect in the
8   machine when you purchased -- when you got the
9   Schneeberger?
10      A.   Correct.
11      Q.   How did it -- do you know how it came about
12  that this Smith & Wesson discovered this broken head?
13      A.   We had -- we just after many tries of trying
14  to get good consistent parts that worked in our
15  process off the machine, we finally had the technician
16  come in and -- from the company, from the Schneeberger
17  company, and he did a -- did a full check on the
18  machine to find out the root cause of our problem.
19      Q.   And did the broken head get fixed?
20      A.   Yes.
21      Q.   And after the broken head got fixed, did
22  Smith & Wesson get the production it wanted out of the
23  Schneeberger?
24           MS. BERTRAM:  Objection.  Vague.

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 57

1  BY MR. LEE:
2      Q.  You can answer.
3      **A.  We got good parts off it but not the**
4  **quantity of parts we wanted or the variety.**
5      Q.  Okay.  And do you know why you got good
6  parts but not the variety or the quantity?
7      **A.  It was Earl's project to get better**
8  **utilization of the machine.  It was Earl's project to**
9  **complete.**
10     Q.  I understand.  My question to you is you
11 just testified that after the broken head got
12 fixed --
13     **A.  Right.**
14     Q.  -- you got good parts but not the variety or
15 the quantity that Smith & Wesson wanted, correct?
16     **A.  Correct.**
17     Q.  My question is do you know why after fixing
18 of the broken head you got good parts but not the
19 quantity and the variety?
20         MS. BERTRAM:  Objection.  Asked and
21 answered.
22 BY MR. LEE:
23     Q.  Go ahead and answer.
24     **A.  It was the problem of scheduling the machine**

Page 58

1  **for operations.  It was a matter of getting the**
2  **programs completed.  It was a matter of getting the**
3  **proper material in, determining what our needs were.**
4  **There was a host of things that as part of the project**
5  **that should have been worked on to figure out how to**
6  **get the machine up and running.**
7      Q.  Okay.  Other than what you just mentioned,
8  do you know any other reason why you couldn't get the
9  variety and the quantity that you wanted out of the
10 Schneeberger?
11         MS. BERTRAM:  Objection.  Asked and
12 answered.
13 BY MR. LEE:
14     Q.  You just -- you just listed a whole bunch of
15 operational reasons why you weren't getting the
16 quantity -- you weren't getting the quantity and the
17 variety out of the Schneeberger, correct?
18     **A.  Correct.**
19     Q.  My only question is other than what you just
20 listed, do you know any other reason why the
21 Schneeberger was not yielding the variety or the
22 quantity that you wanted?
23     **A.  That was five years ago, and that's the best**
24 **of my recollection.**

Page 59

1      Q.  Fair enough.
2          I'm going to ask it to you this way
3  now.  Do you know any engineering reasons why the
4  Schneeberger was not yielding the variety or the
5  quantity that you wanted?
6      **A.  A big part of that was having the programs**
7  **to run the machine.**
8      Q.  Other than that, do you know any
9  other -- any engineering reasons why the Schneeberger
10 was not yielding the quantity or the variety that you
11 wanted?
12     **A.  That was five years ago.  That's the best of**
13 **my recollection.**
14     Q.  Fair enough.
15         Now, I'm going to direct your attention
16 to paragraph 11, Mr. Flatley.  You say in that
17 paragraph -- please read that to yourself.  In the
18 last sentence, you say, "I took detailed handwritten
19 notes during our meetings.  Attached hereto as
20 Exhibit B are true and correct copies of handwritten
21 notes from my weekly meetings with Mr. Baker."  Do you
22 see that?
23     **A.  Yes.**
24     Q.  Okay.  And if you turn to page -- Exhibit B,

Page 60

1  you see a bunch of handwritten notes that you took,
2  correct?
3      **A.  Correct.**
4      Q.  Now, did you ever give copies of your
5  handwritten notes to Mr. Baker?
6      **A.  To my recollection, no.**
7      Q.  Okay.  Did you ever discuss with him the
8  contents of your handwritten notes during your weekly
9  meetings?
10     **A.  These notes were the result of my 1:00**
11 **o'clock meeting every Monday with Mr. Baker every**
12 **week, and we discussed what was going on in the Cutter**
13 **Department.  These notes are the result of our actual**
14 **discussions we had every week about the projects and**
15 **things that were going on within the department that**
16 **we talked about.**
17     Q.  Okay.
18     **A.  This -- everything that's on these sheets is**
19 **actually discussed with Mr. Baker during our Monday**
20 **meetings.**
21     Q.  Okay.  Now, I'm going to direct your
22 attention to paragraph 12.  Please read that to
23 yourself.
24         MS. BERTRAM:  What's the Exhibit No. again,

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 61

1  John?
2      MR. LEE:  294.  Plaintiff's Exhibit 294.
3  It's Mr. Flatley's Declaration.
4      MS. BERTRAM:  Right.
5      THE WITNESS:  Yes.
6  BY MR. LEE:
7      Q.   Now, you say in here towards the bottom, it
8  says -- or from the middle of the paragraph to the
9  bottom, it says, if you complete -- "If you compare
10  the notes on the same page in different colors
11  (reflecting separate meetings), you will note that I
12  repeatedly raised the same performance and project
13  status concerns with Mr. Baker during my weekly
14  meetings with him."  Do you see that?
15     A.   Yes.
16     Q.   Other than in your notes, are there any
17  other communications of what you described here as
18  performance and project status concerns?  Did you ever
19  e-mail Mr. Baker?
20     A.   That's kind of a broad question, Mr. Lee.
21  Could you --
22     Q.   I'm just trying to get at you said you had
23  weekly meetings and these are notes from your weekly
24  meetings?

Page 62

1      A.   Correct.
2      Q.   And you say in here that you raised
3  performance and project status concerns with
4  Mr. Baker --
5      A.   Correct.
6      Q.   -- during the weekly meetings with him.  My
7  only question is other than these notes and whatever
8  oral communications you had with Mr. Baker reflected
9  in these notes, are there any other written
10  communications between you and Mr. Baker regarding
11  performance and project status concerns?
12     A.   Yes.
13     Q.   And what are those written communications?
14     A.   The performance appraisals that I had
15  completed with Mr. Baker.
16     Q.   Okay.  Other than those performance
17  appraisals, are there any other written communications
18  of performance and project status concerns that you
19  communicated to Mr. Baker other than these notes?
20     A.   To my recollection between the performance
21  appraisals and these notes, those are all I remember.
22     Q.   Okay.  So if I -- if I look for
23  communications of performance and project status
24  concerns from you to Mr. Baker, they would either be

Page 63

1  in the performance evaluations, formal performance
2  evaluations, or these notes, correct?  There aren't
3  any other documents communicating that to Mr. Baker?
4      MS. BERTRAM:  Objection.  Vague as to the
5  term "documents."
6  BY MR. LEE:
7      Q.   Let me rephrase it.  You just identified
8  these notes as reflecting meetings of -- weekly
9  meetings with Mr. Baker and oral communications you
10  had in those meetings, correct?
11     A.   Correct.
12     Q.   And you also identified performance
13  evaluations, formal performance evaluations, that you
14  did for Mr. Baker as a communication of performance
15  and project status concerns, correct?
16     A.   Correct.
17     Q.   Other than those two, are there any other
18  written communications between you and Mr. Baker
19  regarding his performance and project status concerns?
20     A.   To the best of my memory, no.
21     Q.   Now, if you look at the last sentence, "In
22  addition, if you compare the notes for different
23  months, you will again note that I raised many of the
24  same performance and project status concerns month

Page 64

1  after month."  Am I correct?
2      A.   Correct.
3      Q.   And so if we were to look for the many of
4  the same performance and project status concerns month
5  after month, they are contained in Exhibit B to
6  Plaintiff's Exhibit 294, is that correct?
7      MS. BERTRAM:  Objection to the form.
8  BY MR. LEE:
9      Q.   Is that correct?
10     A.   Yes.  These are my notes from our meetings,
11  correct.
12     Q.   Okay.  Now, other than these notes marked as
13  Exhibit B to Plaintiff's Exhibit 294, are there any
14  other communications from you to Mr. Baker with
15  respect to the same performance and project concerns
16  month after month?
17     A.   Wasn't that question already answered?
18     Q.   I don't think so, but you can answer it.
19     A.   As I said, the best --
20     MS. BERTRAM:  Objection.  Asked and
21  answered.
22  BY MR. LEE:
23     Q.   You may answer.
24     A.   Again, to the best of my memory, I don't

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 65

1   remember anything else.
2       Q.   Fair enough.
3            I'd like -- if you flip the page, sir,
4   and go to page 4 of Plaintiff's 294, you say -- first,
5   please read paragraph 13 to yourself.  My first
6   question is first sentence says, "Although I tried to
7   mentor and provide constructive feedback to Mr. Baker,
8   it became clear that Mr. Baker had an excuse for
9   everything and was simply not keeping up."  First of
10  all, do you have any specifics with respect to
11  everything?
12           MS. BERTRAM:  Objection.  Vague and
13  compound.
14  BY MR. LEE:
15      Q.   Well, it's in your Declaration.  You said he
16  had an excuse for everything, so what's everything?
17           MS. BERTRAM:  Objection to the form of the
18  question.  You can answer it, if you can.
19           THE WITNESS:  When I said -- when I wrote
20  everything in here, I meant all the performance for
21  the projects that he was assigned and daily operating
22  procedures that he was to accomplish and he did not
23  meet the expectations.  Again, he had an excuse for
24  those expectations not being met and not meeting his

Page 66

1   own deadlines that he established for himself to get
2   things done.
3   BY MR. LEE:
4       Q.   I understand.
5            Other than in the abstract, do you have
6   any specifics that you can recall with respect to what
7   you refer to as everything?
8            MS. BERTRAM:  Objection to the form of the
9   question.
10  BY MR. LEE:
11      Q.   You can answer.
12      A.   As we've mentioned, it was the -- it was
13  conducting the problem-solving.  It was the increased
14  utilization of the Schneeberger machine.  It was using
15  the AutoCribs.  It was maintenance of the pitch board.
16      Q.   Okay.  I just identified -- you just
17  identified four of them.  We already discussed three
18  of them, the problem-solving, AutoCrib and
19  Schneeberger, correct?
20      A.   Correct.
21      Q.   And you mentioned the pitch board, and we'll
22  get to that.  Now, anything else -- any other
23  specifics with respect to what you mean by everything
24  in paragraph 13, line 2?

Page 67

1       A.   You can add in --
2            MS. BERTRAM:  Objection.  Vague.
3   BY MR. LEE:
4       Q.   Go ahead.
5       A.   You could say the getting tools to Houlton
6   and ordering the proper amount of tools.  There
7   was -- there was being -- coming to meetings on time
8   and actually being at every meeting.
9       Q.   Okay.  We got six now.  Anything else?
10      A.   And, also, initially, when we went over to
11  the new Human Resource software and he had to make
12  corrections and okay the hours of the employees, he
13  had a very difficult time in the beginning, and he
14  just had excuses for that, why it wasn't done
15  properly.
16      Q.   Anything else?
17      A.   That's -- no.  That's it.
18      Q.   Okay.  So you identified seven of them, so
19  we'll go through one by one.  We've already discussed
20  the three of them, right, the problem-solving, the
21  AutoCrib and the Schneeberger, right?
22      A.   Yes.
23      Q.   And then you mentioned Houlton, meetings, HR
24  software and the pitch board?

Page 68

1       A.   Correct.
2       Q.   That makes it seven, right?
3       A.   Yes.
4       Q.   Okay.  Now, you say in here he consistently
5   failed to keep his daily pitch boards up-to-date or to
6   complete required safety and compliance audits.  Do
7   you see that?
8       A.   Correct.
9       Q.   Okay.  How many people did pitch boards for
10  you that you reviewed?
11      A.   For me?
12      Q.   Yeah.
13      A.   Four.
14      Q.   And they are Mr. Nelson, Mr. Billingsley?
15      A.   Yep.
16      Q.   Mr. Baker?
17      A.   Correct.
18      Q.   And who is the fourth?
19      A.   Mr. Martin.
20      Q.   Got it.
21           Tell me what a pitch board is, first of
22  all.
23      A.   A pitch board is, basically, it gives you a
24  simple, concise picture of how metrics within the

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 69

1  department are the results of operation. Now, they
2  talk about safety. They talk about the 5S program.
3  They talk about manufacturing, quantities, problems, a
4  variety of things.
5      Q.  You mentioned safety, 5S, manufacturing,
6  quantities and problems. That's five. Can you think
7  of anything else?
8      A.  That's all I remember at this point.
9      Q.  That's good. That's fair enough.
10         So these are boards where data on
11  safety and data on 5S and data on manufacturing and
12  data on quantities and data on problems are basically
13  displayed on the board, correct?
14     A.  Correct.
15         MS. BERTRAM: Objection. Vague and
16  compound.
17  BY MR. LEE:
18     Q.  Okay. And who -- who puts the pitch board
19  together every day?
20     A.  The responsibility for the pitch board was
21  the cell coordinator in each department. Who actually
22  put their hands on it, it was -- it was the cell
23  coordinators' responsibility to -- to have it done,
24  and whether he did it or one of his people, I didn't

Page 70

1  know. It's just the cell coordinators'
2  responsibility.
3      Q.  Okay. And the data that is displayed, how
4  is it displayed on a pitch board?
5          MS. BERTRAM: Objection. Vague.
6  BY MR. LEE:
7      Q.  You may answer.
8      A.  It was a couple different ways. It was
9  either -- it was either a yes or no, a chart. It
10  might be a Kaizen worksheet. It's a variety of ways.
11     Q.  Okay.
12     A.  Depending upon the situation or what was
13  needed on their particular board. Not every
14  department was exactly the same.
15     Q.  Okay.
16     A.  So there was a difference between Heat Treat
17  and Cutting Tool.
18     Q.  Okay.
19     A.  So the boards were very similar on most of
20  the items, but there were a few different things on it
21  because there are different ways they operate.
22     Q.  And where would the cell coordinator get the
23  data to put on the pitch board?
24         MS. BERTRAM: Objection. Vague.

Page 71

1  BY MR. LEE:
2      Q.  If you know. If you don't know, you don't
3  know.
4      A.  They collected data themselves.
5      Q.  Okay.
6      A.  They're collecting the data and posting it
7  on the boards.
8      Q.  And collect the data from where? Where is
9  the data located?
10         MS. BERTRAM: Objection. Vague and
11  compound.
12         THE WITNESS: As per our -- our agreement
13  with what was supposed to be on the board, they
14  collected the data themselves, whether -- they're
15  responsible for having it collected. Whether they
16  actually did it, had their people do it, it was just
17  what we agreed to to be on the board was what they
18  were collecting.
19  BY MR. LEE:
20     Q.  Okay. Take quantity, for example, where
21  would the data for quantity come from so that the cell
22  coordinator could put it on the pitch board?
23         MS. BERTRAM: Objection. Vague. John, it
24  might help if you clarify. Are you talking about the

Page 72

1  Cutter Department board or all four of the boards?
2  BY MR. LEE:
3      Q.  All four of the boards.
4      A.  It varies.
5      Q.  Okay. Let's start with Cutter. Where would
6  the quantity data for the Cutter Department come from?
7      A.  The data would have to be collected.
8      Q.  From where?
9      A.  In some manner by the cell coordinator. How
10  he determined to do it was up to them.
11     Q.  Okay. So you had no input into how the cell
12  coordinator collects data on quantity, is that
13  correct?
14     A.  What we would do we would discuss what was
15  to be on the board, and then there was the cell
16  coordinators' responsibility to determine how he was
17  going to collect that data because he had already
18  agreed that that's what he was going to put up.
19     Q.  Okay. So my only question is do you know
20  where he got that data from to put on the pitch board?
21         MS. BERTRAM: Objection. Vague and
22  compound. John, can you clarify what data and what
23  quantities you're talking about?
24  BY MR. LEE:

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 73

1    Q.   You just mentioned -- you just mentioned
2    that in the Cutter Department on the pitch board would
3    be data on quantity, correct?
4    **A.   Yep.**
5    Q.   Quantity of what?
6    **A.   Production of cutting tools.**
7    Q.   Okay.  So where would he get the quantity of
8    production of cutting tools data to put on the pitch
9    board?
10   **A.   What I remember is that he'd have the**
11   **operators people listing of what they produced, and**
12   **he'd use that as a production quantity.**
13   Q.   And when the operators produced tools, where
14   would the -- how would the operators input that data?
15   **A.   I'd be speculating if I was to answer**
16   **because I wasn't involved in the data collection.**
17   Q.   I understand.  If you know, you know.  If
18   you don't know, you don't know.  My only question is
19   you said, for example, Mr. Baker in the Cutter
20   Department would collect the quantity of tools being
21   manufactured by his operators, right?
22   **A.   Yeah.**
23   Q.   And the quantity of tools being produced by
24   his operators, that data, where is it inputted so that

Page 74

1    Mr. Baker could collect it, do you know?
2    **A.   I don't know.  That was Mr. Baker's duties**
3    **to put the number up.  I don't know how he -- how he**
4    **collected it.**
5    Q.   Okay.  So you don't know whether Mr. Baker
6    put it into the computer?  You don't know whether he
7    had a sheet?  You don't know whether he put -- wrote
8    it on a piece of paper?  You don't know?
9    **A.   The only --**
10   MS. BERTRAM:  Objection.  Vague and
11   compound.  Are you talking about on the board itself,
12   how he posted the information for Mr. Flatley to
13   review?
14   BY MR. LEE:
15   Q.   Okay.  Let's stick with the data, the
16   quantity data, the quantity of tools being produced.
17   You testified you don't know how Mr. Baker collects
18   that data, correct?
19   **A.   Correct.**
20   Q.   Okay.  Once he collects it, he puts that
21   quantity data together to put on the pitch board,
22   correct?
23   **A.   Correct.**
24   Q.   And do you know where he puts that

Page 75

1    information to be put on the pitch board?  Does he
2    just simply write it on the pitch board or does he put
3    it on a piece of paper to print -- pin it up on the
4    pitch board?
5    **A.   He had a chart that he was populating with**
6    **the information.**
7    Q.   Okay.  And do you know how he created that
8    chart?
9    **A.   I don't understand the question.**
10   Q.   Okay.  Who created that chart?
11   **A.   Earl.**
12   Q.   Okay.  And the data -- do you know, for
13   example, what he used to create that chart?  Was it
14   handwritten?  Was it a graph from a computer,
15   generated by a computer?
16   MS. BERTRAM:  Objection.  Vague and
17   compound.
18   BY MR. LEE:
19   Q.   Go ahead.
20   **A.   It was handwritten.**
21   Q.   He wrote a handwritten chart on quantity of
22   tools being produced and he put that on the pitch
23   board every day?
24   **A.   Correct.**

Page 76

1    Q.   Okay.  Are you sure about that?
2    **A.   Yes.**
3    Q.   And then do you know -- and that's
4    put up every day, correct?
5    **A.   It was supposed to, yes.**
6    Q.   Okay.  And then after it's on the pitch
7    board, do you know where it goes?
8    MS. BERTRAM:  Objection.  Calls for
9    speculation.
10   THE WITNESS:  I don't understand the
11   question.
12   BY MR. LEE:
13   Q.   The data that was on the pitch board, right,
14   you said it was handwritten by Mr. Baker on the
15   quantity, right?
16   **A.   On the chart, correct.**
17   Q.   Yeah.  And then when he takes that down from
18   the pitch board, where does it go, do you know?
19   **A.   No.**
20   Q.   Is that true with respect to safety, 5S,
21   manufacturing and problems, same, would your
22   questions -- would your answers be the same?
23   MS. BERTRAM:  Objection.  Vague and
24   compound.  Which answers?

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 77

1  BY MR. LEE:
2    Q.  Well, we just -- we just used quantity as an
3  example, right, of what's on the pitch board, right?
4    **A.  Correct.**
5      MS. BERTRAM:  Correct.
6  BY MR. LEE:
7    Q.  And in the Cutter Department?
8      MS. BERTRAM:  Right, and he said that it was
9  on a piece of paper, it was in a chart form, that it
10 was handwritten and that he did not know what happened
11 to it.
12     MR. LEE:  You're not supposed to testify,
13 Connie.
14     MS. BERTRAM:  So there's four -- there's
15 four questions embedded in your question.
16     MR. LEE:  Let me -- I know.  I know you're
17 coaching the witness, and you can --
18     MS. BERTRAM:  No.
19     MR. LEE:  And you can try to coach him, if
20 you want, but let me just ask the witness a question.
21 BY MR. LEE:
22   Q.  Now, you mention --
23     MS. BERTRAM:  Ask a clear question.
24 BY MR. LEE:

Page 78

1    Q.  Okay.  We just discussed the quantity
2  portion of the pitch board for the Cutter Department,
3  correct?
4    **A.  Correct.**
5    Q.  And you said there's a handwritten chart on
6  the quantity portion of the pitch board, right?
7    **A.  Correct.**
8    Q.  Now, with respect to manufacturing, what is
9  the data on the manufacturing portion of the pitch
10 board for the Cutter Department that is put up on the
11 pitch board?
12   **A.  I don't understand the question.  What is**
13 **manufacturing?**
14   Q.  You're the one who mentioned that category.
15 Am I -- am I -- am I wrong, that manufacturing is not
16 one of the categories on the pitch board?
17   **A.  Correct.  It was production with the**
18 **quantities.**
19   Q.  Oh, okay.  So --
20   **A.  That was the manufacturing.  It was**
21 **quantities produced.**
22   Q.  Okay.  Now, how about with safety, what is
23 the data that is put on the safety portion of the
24 pitch board?

Page 79

1    **A.  What I remember was they used to have to do**
2  **an audit, weekly audit, and they'd have results of**
3  **that audit that they'd have on the pitch board.**
4    Q.  And how would he do -- and Mr. Baker is the
5  one who does the audit?
6    **A.  Mr. Baker was responsible for the board,**
7  **which that was part of.  Who he actually had do the**
8  **audit, I don't know.  I don't know who was assigned to**
9  **that task or who did it.  All I know is there**
10 **was -- there was an audit that was done on the board.**
11   Q.  Okay.  And what is the audit that is done,
12 do you know?
13   **A.  The safety audit or the 5S?**
14   Q.  Let's stick with safety.  Safety audit, what
15 is the audit that's done?
16     MS. BERTRAM:  Objection.  Vague.
17     THE WITNESS:  It was -- it was a specific
18 audit sheet for his department that he was to use.
19 BY MR. LEE:
20   Q.  Okay.  And in that audit sheet, it's filled
21 out, correct?
22   **A.  Correct.**
23   Q.  And it's in a handwritten form?
24   **A.  If I remember correctly, yes.**

Page 80

1    Q.  Okay.  And then after the audit sheet is
2  displayed on the pitch board, do you know what happens
3  to it?
4      MS. BERTRAM:  Objection.  Calls for
5  speculation.
6  BY MR. LEE:
7    Q.  If you know?
8    **A.  I don't know.**
9    Q.  Okay.  With respect to 5S, what is -- first
10 of all, what is 5S?
11   **A.  It was part of the Lean system where it had**
12 **the sort, clean, sweep, sustain.  There was a number**
13 **of different things that they were doing, and that**
14 **was, again, audited on the board as part of the**
15 **cleaning and then make sure that it was sustained.**
16   Q.  Okay.  After an appropriate break, we'll
17 show you some of these.  Okay.  And the Cutter
18 Department also does this, fills out this form, 5S
19 audit form, correct?
20   **A.  Correct.**
21   Q.  And then displays it on the audit board -- I
22 mean, the pitch board?
23   **A.  Correct.**
24   Q.  And then after it is displayed, do you know

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 81

1  where it is maintained?
2      A.   I don't know.
3      Q.   Okay.  How about the problems, is there a
4  form for that, too?
5      A.   I'm not -- I don't really remember what form
6  he actually used.  I don't remember what the form was.
7      Q.   Okay.  Fair enough.
8           Now, did different departments have
9  different forms?
10     A.   Yes.
11     Q.   So Forge had a different form, Heat Treat
12  had a different form and Cutter had a different form?
13     A.   Correct.
14     Q.   Okay.  And did Forge have to do safety
15  audits?
16     A.   Yes.
17     Q.   Same thing with 5S, they had to do safety
18  audits?
19     A.   Correct.
20     Q.   And Heat Treat also had to do safety audits
21  and 5S?
22     A.   Correct.
23     Q.   And same thing with Finishing and Plating as
24  well?

Page 82

1      A.   Correct.
2      Q.   Did the safety audit forms and the 5S forms
3  used by the different departments, were they the same
4  forms?
5      A.   If my memory serves me correctly, yes.
6      Q.   Okay.  And with respect to safety and 5S
7  forms used by the various departments, once they are
8  displayed on the board, pitch board, do you know what
9  happens to them?  Where do they go?
10     A.   Again, I don't --
11          MS. BERTRAM:  Objection.  Asked and
12  answered.
13  BY MR. LEE:
14     Q.   I only asked about the Cutter Department.
15  With respect to all of the departments, the Finishing
16  and Plating, the Forge, the Heat Transfer and the
17  Cutter Departments, once the safety audit form and the
18  5S forms are displayed on the pitch board, do you
19  know --
20     A.   It was -- it was the Heat Treat Department.
21     Q.   I'm sorry?
22     A.   No, I don't know where they put the boards
23  after they were --
24     Q.   Okay.

Page 83

1      A.   -- done.
2      Q.   Who reviews the pitch boards?
3      A.   I used to go around every day to review.
4      Q.   Right.  Every morning, right?
5      A.   Correct.
6      Q.   Does Mr. Fontaine?
7      A.   Occasionally.
8          MS. BERTRAM:  Objection.  Vague as to time
9  period.
10  BY MR. LEE:
11     Q.   Okay.  Did he -- did Mr. Fontaine also
12  review pitch boards with you?
13     A.   Occasionally.
14     Q.   Okay.  How about Mr. Francis?
15     A.   Occasionally.
16     Q.   Okay.  Are there -- is there a manual for
17  how to fill out -- how to do the pitch board?
18     A.   No.
19     Q.   So who teaches the cell coordinators how to
20  do -- who teaches them how to do it, the pitch boards?
21     A.   It was a collaborative between the cell
22  coordinator and myself using what forms we had in
23  Smith & Wesson that was created in some cases by the
24  Safety Department, in some cases by Bob Francis and

Page 84

1  sometimes it was just a generic form.  We used
2  whatever we needed, and we discussed what would be on
3  the board to what was pertinent and important in the
4  department to what they could collect for data
5  readily.
6      Q.   Okay.  And so on the pitch boards, what was
7  Bob Francis' role in coming up with what should end up
8  on the pitch board and what kind of data should be
9  displayed on the pitch board?
10     A.   Again, Bob wasn't there to tell us what to
11  put on it.  That was -- what was put on the board was
12  something that was talked about between the cell
13  coordinator and myself on what was pertinent to
14  managing the department.  Bob just came by as a -- as
15  a consultant expert on the topics to discuss
16  what -- what we might do for the board or, you know,
17  ways to improve the board.  He was more of a
18  consultant than actually telling us what to put on it.
19     Q.   Okay.  When you say "the topics," what do
20  you mean?  Are you talking about the safety and the 5S
21  and the quantity and the problems?
22     A.   Right.
23     Q.   Okay.  And was that -- was that part of
24  Mr. Francis' job?

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 85

1    A.   Yes.
2    Q.   Now, I'd like you to take a look at the
3   paragraph 15 to yourself of Exhibit 294.
4    A.   Okay.
5    Q.   Now, and it says here, it says, "When I
6   conducted a Pitch Board meeting with Mr. Baker, I
7   anticipated that, if the Department's goals were met,
8   there would be a limited discussion.  However, if the
9   goals were not met, I expected Mr. Baker to document
10  the reasons they were not met and initiate
11  countermeasures to identify the root cause of the
12  missed goals."  Do you see that?
13   A.   Correct.
14   Q.   Now, did you communicate that to Mr. Baker,
15  what you anticipated and what you expected?
16   A.   Yes.
17   Q.   And did you do that orally or in writing?
18   A.   Orally.
19   Q.   Okay.  And did you orally direct him to
20  document the reasons why objectives were not met and
21  to initiate countermeasures?
22   A.   Correct.  Short and concise.
23   Q.   Okay.  And what documents would Mr. Baker
24  generate to do that?  Is that a form?  Is that an

Page 86

1   e-mail?
2        MS. BERTRAM:  Objection to the form.
3   BY MR. LEE:
4    Q.   Well, let me ask it.  You said in the last
5   two lines -- in the last two lines of paragraph 15,
6   "However, if the goals were not met, I expected
7   Mr. Baker to document the reasons they were not met
8   and initiate countermeasures to identify the root
9   cause of the missed goals."  Do you see that?
10   A.   Yes.
11   Q.   First of all, do you have any specific goals
12  in mind that he should have documented that were not
13  met?
14   A.   Yes.
15        MS. BERTRAM:  Objection.  Vague.
16  BY MR. LEE:
17   Q.   You can answer.
18   A.   Each one of the charts had goals on them of
19  what the expectations were.  If there was a Kaizen on
20  the board, that might talk about the problems and the
21  timing of when things were being done, due dates.
22  There could be if there was a problem with the safety
23  or the 5S audit, if something wasn't met on the
24  audits, those would be somehow documented by

Page 87

1   Mr. Baker, whether it was jotted down on the sheets
2   themselves, the charts.  Some way.  It was very much
3   informal on it.  You know, he just needed to have
4   something up there, what was he planning on doing, how
5   was he going to fix it or identify the cause and
6   correct it.
7    Q.   Oh, okay.  So you're just saying he needs to
8   have a document on the pitch board saying how he's
9   going to reach a particular objective if it's missed,
10  is that what you are saying?
11   A.   No.
12   Q.   Okay.
13   A.   What I'm saying is it could be in any form.
14   Q.   Okay.
15   A.   But whether it's a separate sheet, whether
16  he just wanted to write it on the production chart.
17  It could be any way he wanted to put the information
18  up there.  It's just that it had to be, you know, what
19  was his plan.
20   Q.   Okay.
21   A.   What was he planning to put.
22   Q.   And --
23   A.   The majority of it was probably more verbal
24  than it was written, you know.  He would

Page 88

1   explain -- well, he was supposed to explain what he
2   was planning on doing and have rough notes to help
3   guide him through it.
4    Q.   Okay.  And that's what he would explain to
5   you every morning?
6    A.   Correct.
7    Q.   Okay.  I'd like you to read paragraph 16 to
8   yourself.  It's at the bottom of page 4 and goes up on
9   to the top of page 5.
10   A.   Okay.
11   Q.   Okay.  The first sentence says, "Although I
12  instructed Mr. Baker to complete and update his Pitch
13  Board daily, Mr. Baker often did not complete this
14  essential task."  Do you see that?
15   A.   Correct.
16   Q.   And did you ever reprimand him for that?
17   A.   Define reprimand.
18   Q.   Discipline him.  You're saying -- you're
19  telling him to do something every day, and he often
20  failed to do it.  Did you -- did you reprimand him or
21  discipline him?
22   A.   What do you mean by discipline?
23        MS. BERTRAM:  Objection.  Vague.
24  BY MR. LEE:

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 89

1    Q.   Write him up.
2         MS. BERTRAM:  Same objections.
3         THE WITNESS:  I didn't write him up for
4    this.
5    BY MR. LEE:
6    Q.   Okay.
7    **A.   I didn't write him up on a daily basis, and**
8    **when he went to performance review, I might have**
9    **mentioned it.**
10   Q.   I understand.
11        Now, you said you didn't write him up
12   on a daily basis, but you mentioned it at the
13   performance review, so he's failing on a daily basis,
14   and you did not send him a single document or an
15   e-mail disciplining him or reprimanding him?
16        MS. BERTRAM:  Objection.  Argumentative.
17   Asked and answered.
18   BY MR. LEE:
19   Q.   Can you answer the question?
20   **A.   I never said that he failed every day.**
21   Q.   Okay.  So you said he often failed, right?
22   **A.   Right.**
23   Q.   And did you send him an e-mail --
24   **A.   No.**

Page 90

1    Q.   -- or a note -- let me finish the question.
2         Did you send him an e-mail or a note or
3    communicate in written form in any way that he is
4    often failing at his daily task?
5    **A.   No.**
6    Q.   Okay.  And then the next sentence says, "As
7    a result, I had to continually remind him to complete
8    and update his Board and often completed parts of it
9    for him."  When you say -- first of all, when you say
10   "continually remind him," are you talking about every
11   single day you're reminding him?  Or do you say -- and
12   you say you used the word "often."  How often is this
13   happening?
14   **A.   I couldn't tell you specifically how often,**
15   **but it was much more frequently than should have been.**
16   Q.   Okay.  I understand.
17        Now, when you say you often completed
18   parts of it for him, what parts did you complete for
19   him?
20   **A.   Some cases, I actually did the 5S audit and**
21   **the safety audits when he hadn't had it done.**
22   Q.   Anything else?
23   **A.   Also, too, some of the Kaizens or the**
24   **projects that were up on the board that should have**

Page 91

1    **been completed, when he wasn't available to do it,**
2    **make sure it was followed up on because it was**
3    **overdue.**
4    Q.   Okay.  You mentioned Kaizen.  What is a
5    Kaizen?
6    **A.   Kaizen is a group process to analyze a**
7    **problem or a situation and come up with, you know,**
8    **root cause analysis and correcting the root cause**
9    **problem that's -- that the team was working on.  It's**
10   **a, like, a group think.**
11   Q.   Got it.
12        Where would -- when you filled -- when
13   you would do 5S and safety audit portions for him,
14   where would you get the data based on what you would
15   fill out the 5S or the audit form for him?
16   **A.   I'd walk through the department.**
17   Q.   And, now, take a look at the next
18   sentence.  "Even when Mr. Baker updated his Board, he
19   frequently lacked crucial details.  For example,
20   Mr. Baker would report on the Board at 8,000 tools had
21   been processed, when he should have stated that, for
22   example, 4,000 new tools had been produced and 4,000
23   regrinds had been processed."  Do you see that?
24   **A.   Correct.  Yep.**

Page 92

1    Q.   Okay.  Is this a specific example that you
2    have in mind or are you just kind of coming up with a
3    sample type of kind of detail that you are thinking
4    of?
5    **A.   This was very specific.**
6    Q.   Okay.  So on a very specific date, you said
7    he had 8,000 up when it should have said 4,000 new
8    tools, 4,000 regrinds, right?
9    **A.   Right.**
10   Q.   And you said this happened often?
11   **A.   Well, it took him a while to finally get the**
12   **breakdown that we needed.**
13   Q.   Okay.
14   **A.   I don't remember how long it took, but it**
15   **was very pertinent information.**
16   Q.   Okay.  And where would he get the data to
17   get this detail?
18   **A.   Again, when we talked about the production**
19   **chart, this is the production details.**
20   Q.   Okay.  And you also -- other than this
21   production detail example that you mentioned, you say
22   even when Mr. Baker upheld -- updated his board, he
23   frequently lacked crucial details.  Can you think of
24   any other crucial details that Mr. Baker lacked on his

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 93

1  pitch board?  You gave one example there, right?
2      A.  Yeah.  It's been a while, you know --
3      Q.  Sure.
4          So other than that one example you gave
5  in paragraph 16, can you think of any other specific
6  instances of crucial details that were missing from
7  Mr. Baker's pitch board?
8      A.  Kaizens, for example, of problem-solving on
9  the board, he would not have the next level of details
10 of what was going to be done and when it was going to
11 be done, and a lot of times when he did have that, the
12 items weren't completed on the time that he said it
13 would be.
14     Q.  Okay.  And so did you write him up for that?
15     A.  No.
16     Q.  Do you -- who -- who came up with the 5S and
17 the safety audits?  I'll withdraw that question and
18 ask it to you this way.
19         Read paragraph 17 to yourself,
20 Mr. Flatley.  It says, "Prior to Mr. Baker's arrival
21 at the Company, Smith & Wesson implemented 5S and
22 safety audits for all of the departments in
23 production."  Do you see that?
24     A.  Yes.

Page 94

1      Q.  Okay.  So I'm focusing on the words
2  "Smith & Wesson implemented."  Who designed or who
3  came up with this 5S and safety audit implementation?
4      A.  The 5S was a Lean initiative that we had
5  started.  I don't know exactly where the form came
6  from or who developed it, but it was out of a Lean
7  initiative, and the safety audit came from our Safety
8  Department.
9      Q.  Okay.  You state -- take a look at paragraph
10 18, "Mr. Baker failed to timely complete his 5S and
11 safety audits.  Indeed, despite repeated direction
12 from Mr. Fontaine and me, Mr. Baker took the position
13 that he did not have an obligation to complete regular
14 5S or safety audits."  Do you see that?
15     A.  Yes.
16     Q.  Did Mr. Baker tell you that he doesn't have
17 to do this 5S or safety?
18     A.  I don't remember the exact conversation that
19 we had about it.
20     Q.  Okay.  So what is -- I guess I'm trying
21 to -- let me ask the question this way.  How did
22 Mr. Baker take the position that he did not have an
23 obligation to complete regular 5S or safety audits?
24     A.  If my memory serves me correctly, it was a

Page 95

1  situation that he felt he didn't have to do it every
2  week when that was the agreement and expected.
3      Q.  Okay.  And so that was discussed with you?
4      A.  Yes.
5      Q.  Okay.
6      A.  And Mr. --
7      Q.  Okay.
8          THE COURT REPORTER:  I'm sorry.  And Mr.
9  who?
10         THE WITNESS:  Mr. Fontaine.
11         MR. LEE:  Okay.  I think I know which one
12 you're talking about.  Okay.  Now, I'm going to ask
13 you to -- well, you know what, before -- this is a
14 whole new topic, so before we move on to paragraph 19.
15 Let's take a five-minute break.
16         MS. BERTRAM:  That sounds good, John.  Thank
17 you.
18 BY MR. LEE:
19     Q.  Yeah.  And, Mr. Flatley, if you could go
20 ahead and read, it's kind of painstaking, but we're
21 going to go through paragraph 19, paragraph 20 and
22 then so on, so it will go faster if you have time, you
23 know, after the break, take a -- you know, review it.
24     A.  Okay.

Page 96

1      Q.  Thanks.
2          THE VIDEOGRAPHER:  All right.  Stand by,
3  please.  The time is 10:49 a.m. Central time.  We are
4  off the record.
5          (Recess.)
6          THE VIDEOGRAPHER:  The time is 11:04 a.m.
7  Central time.  We are back on the record.
8  BY MR. LEE:
9      Q.  Directing your attention to paragraph 19 of
10 Exhibit -- Plaintiff's Exhibit 294, Mr. Flatley, whose
11 idea was it to have Mr. Baker implement the use of the
12 RoboCrib, AutoCrib computer software for crib 99?
13         MS. BERTRAM:  Objection.  Asked and
14 answered.
15 BY MR. LEE:
16     Q.  And your answer is?
17     A.  It was myself.
18     Q.  Okay.  And how was he supposed to implement
19 the use of the RoboCrib computer software for crib 99?
20     A.  That was up to Mr. Baker to decide in his
21 project layout of how he was going to use it.
22     Q.  And this was communicated -- okay.  We went
23 through that before.
24         Now, in paragraph 20, you say -- did he

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 97

1    ever do it?  Did Mr. -- was -- was the Robo -- was
2    Robo report ever generated for crib 99?
3        A.   You have to be a little more specific.
4        Q.   Okay.  Did -- did Mr. Baker ever implement
5    the use of the RoboCrib computer software for crib 99?
6        A.   Not to my expectations.
7        Q.   Okay.  But he did -- he did
8    generate -- okay.  Where -- where did he fall short?
9        A.   It was quite a few tools in this crib that
10   we affectionately called later on crib 99.  It
11   was -- I don't even know the number.  There were quite
12   a few of number of tools in there, though, and I think
13   by the number of tools in there, there was -- he was
14   being overwhelmed by the sheer number, so I thought
15   the best idea was that they could look at our top 100.
16   What are our 100 most used tools that come out of that
17   crib?  We called it the top 100 list, so I asked him
18   instead of taking on the whole entity, just to take on
19   the top 100.  Try to make it more of a bite rather
20   than taking on the whole elephant, and he never really
21   got a system up and running to use the software to
22   both receive and issue cutting tools.  The only
23   way -- the only way -- if you did that, you
24   computerized it, it would keep track of the inventory

Page 98

1    automatically, but Earl seemingly progressed to
2    actually having somebody go in every morning and check
3    the actual inventory and correct the software with the
4    amount that they actually counted in the morning.  It
5    never actually came to a full usage of issuing and
6    receiving.
7        Q.   Okay.  So he did -- you're saying he got
8    none of it done or he only got part of it done and
9    never got full usage?
10       MS. BERTRAM:  Objection.  Asked and
11   answered.
12   BY MR. LEE:
13       Q.   Go ahead.
14       MS. BERTRAM:  Go ahead, Larry.
15       THE WITNESS:  Only part of it done.
16   BY MR. LEE:
17       Q.   Okay.  What part of it did he get done?
18       A.   This getting a report on the top 100.
19       Q.   Okay.  And with respect to not getting the
20   rest of it done, did you give him input into how he
21   could get it done?
22       A.   It wasn't up to me.  That was his project.
23       Q.   Okay.  So the answer is you didn't give him
24   any input, correct?

Page 99

1        A.   Correct.
2        Q.   Okay.  Now, with respect to getting it done,
3    did you give him a deadline?
4        A.   No.
5        Q.   Okay.  In paragraph 20, you say,
6    "Mr. Baker's failure to implement" -- last sentence,
7    "Mr. Baker's failure to implement the computer
8    inventory system led to tool stock outs, and a host of
9    other issues effecting production, and relegating the
10   system to the prior antiquated process."  Do you see
11   that?
12       A.   Yes.
13       Q.   Okay.  First, what is the host of other
14   issues?
15       A.   Well, production issues.  If we didn't have
16   the tool or you had to wait for a tool, you weren't
17   able to run the machines that you needed to run, and
18   you didn't have a good way to anticipate ordering.
19   You didn't have a good idea of what our usage was.  We
20   had a problem where, you know, if we didn't have the
21   tool that we needed, we had to expedite it through one
22   of our vendors, they -- they might be overloaded.
23   They might not be able to meet other obligations
24   because of an expedited order for tools that were

Page 100

1    stocked out of our inventory that should have been
2    there or what could have been a scheduling situation
3    with our own machines where we couldn't meet our own
4    expectations because of the stock outs that we had to
5    refill.
6        Q.   Got it.
7             Now, with respect to relegating the
8    system to the prior antiquated process, what was the
9    prior antiquated process?
10       A.   Basically, somebody would see if they're out
11   of something, they would order it or they got low,
12   they'd order it, but it was a manual system.
13       Q.   Okay.  So are you saying that crib 99 ran on
14   a manual system?
15       A.   Correct.
16       Q.   Throughout your entire time there, crib 99
17   ran on a manual system?
18       A.   It wasn't fully automated.  His project
19   intended to fully automate the process of ordering and
20   issuing, and he was given the task to do it and
21   allowed to just come up with the time frame and the
22   action items to complete that and give me due dates of
23   when he would -- he was going to get the action items
24   done.  I didn't dictate to him when he had to get it

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 101

1  done.  He was supposed to give me a listing of what he
2  was going to do and when he was going to do it so we
3  could fabricate a full timeline.
4      Q.  Okay.  So you did have some form of an
5  automatic system, right?  You didn't go back to a
6  complete manual system?
7      A.  At the end, the only ones that we could get
8  a report and see what the snapshot was of what we had
9  now.  After they did the inventory, I could see a
10  report on it now.  We couldn't see the report before,
11  but when they did the inventory, adjusted the
12  inventory, I could read a report.
13      Q.  Okay.  And when did that -- when did that
14  system of getting the inventory and getting you the
15  report, when did that get done?
16      A.  I don't exactly remember the time they did
17  it.
18      Q.  Okay.  Would your notes show you, tell you?
19      A.  I don't know.
20      Q.  Got it.
21          And you said that you did not set
22  deadlines and he was supposed to set deadlines for
23  himself.
24      A.  Correct.

Page 102

1      Q.  Okay.  Did you have -- direct him to any
2  timeline that you wished for, whether that is doable
3  or not?
4      A.  My manufacturing -- or my management style
5  is not to dictate to my employees when they had to get
6  things done because then they could say I failed
7  because you told me to do it in such and such a time.
8  My style is to allow the employee to develop their own
9  action item list putting dates that they felt they
10  were comfortable with in terms of completing on their
11  own, and then we'd work through and see how long it
12  takes to finish a project based on what they felt they
13  could accomplish.
14      Q.  Fair enough.
15          Okay.  I'd like you to take a look at
16  paragraph 21 and read it to yourself.  It has to do
17  with Schneeberger, and we discussed Schneeberger
18  before, but I have a very specific question having to
19  do with the support.
20      A.  All right.
21      Q.  Okay.  Last sentence, last two sentences
22  says, "I asked Mr. Baker to obtain the support that he
23  needed from engineering and other departments, develop
24  plans to implement the making of" same

Page 103

1  tools -- "sample tools, and establish a testing
2  procedure and timeline.  However, Mr. Baker claimed
3  that engineering would not support his efforts."  Do
4  you see that?
5      A.  Yes.
6      Q.  Number one, my question is when Mr. Baker
7  claimed that Engineering would not support his
8  efforts, how did he communicate that to you?  Was that
9  oral or in writing?
10      A.  If he had a problem with Engineering, and
11  when he did, because I didn't -- I never knew that he
12  had -- he said in there that no support, he would tell
13  me verbally, and I would go see the Engineering people
14  to get him some help.  I would ask, you know, talk to
15  my counterpart in Engineering to make sure that they
16  were there to help Earl.
17      Q.  So I just want to double check.  Okay.  When
18  Mr. Baker was claiming to you that Engineering would
19  not support his efforts, he said that to you orally?
20      A.  Yes.
21      Q.  Okay.  It was not in writing?
22      A.  No.
23      Q.  Okay.  The best that you can recall, tell
24  me -- tell me what he said to you, what Mr. Baker said

Page 104

1  to you when he claimed that Engineering would not
2  support his efforts?
3      A.  I have -- I don't remember at all.
4      Q.  Okay.  But you do remember that Mr. Baker
5  claimed that the Engineering would not support his
6  efforts, right?
7      A.  Yes.
8      Q.  Okay.  Did you ask him why Engineering was
9  not supporting his efforts?
10      A.  No.
11      Q.  Did you ask him who at Engineering was not
12  supporting his efforts?
13      A.  Well, I knew who the person responsible for
14  this Schneeberger machine is.
15      Q.  Okay.  And who was that?
16      A.  Derrick Hedley.
17      Q.  Okay.  And so did you ask him why
18  Derrick Hedley was not supporting him?
19      A.  We probably -- I don't remember.
20      Q.  Okay.  Did you go talk to either
21  Derrick Hedley or Derrick Hedley's boss as to why
22  Mr. Hedley was not supporting Mr. Baker on the
23  Schneeberger?
24      A.  I just remember --

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 105

1    MS. BERTRAM:  Objection.  Assumes facts that
2  are not established in evidence.  He wasn't, in fact,
3  not helping him.
4  BY MR. LEE:
5    Q.  I'll withdraw that question and ask it to
6  you this way.  When Mr. Baker claimed that Engineering
7  would not support him, what did you do?
8    A.  I went to talk to both Mr. Hedley and
9  his -- and his boss.
10    Q.  And his boss is who?
11    A.  Craig Mariani.
12    Q.  Okay.  So tell me what conversation you had
13  with Mr. Hedley with respect to why Engineering was
14  not supporting him?
15    A.  I can't remember the exact discussion, but
16  my intent was to go in there and ask that he go out
17  there and support Mr. Baker.
18    Q.  Okay.  Same thing with Mr. Mariani, do you
19  recall what conversation you had with Mr. Mariani with
20  respect to Mr. Hedley supporting Mr. Baker on the
21  Schneeberger?
22    A.  I don't remember the conversation, but,
23  again, my intent was to get Mr. Baker the support that
24  he needed.

Page 106

1    Q.  Okay.  So did he end up getting the support
2  that he needed?
3    A.  As far as I know, he did.
4    Q.  And do you recall what that support is?  Do
5  you know?
6    A.  I can't tell you 100 percent, but I think a
7  lot of it dealt with the programming of the machine.
8    Q.  Okay.  And what is it -- what was it about
9  the programming of the machine that -- on the
10  Schneeberger that Engineering needed to support
11  Mr. Baker on?
12    A.  To write the programs.
13    Q.  Okay.  And did they do that?
14    A.  Yes.
15    Q.  And once Engineering wrote the programs, did
16  the Schneeberger work as expected or as desired?
17    A.  I don't know the timing of when they got the
18  programs, but the Schneeberger never made parts.  I
19  don't know it was -- you know, they just never made
20  the parts.  If it was an operator issue, a -- was it a
21  making the samples and testing them issue?  Was it a
22  programming issue?  It was a variety of things that
23  had to be done to make quantities of tools from the
24  Schneeberger that for one reason or another weren't

Page 107

1  done because we weren't getting tools.
2    Q.  Okay.  When you were -- when you say "we
3  weren't getting tools," you are saying we
4  weren't -- you weren't getting the tools that you
5  wanted from the Schneeberger?
6    A.  Correct.
7    Q.  To be made by the Schneeberger, right?
8    A.  Correct.
9    Q.  Okay.  And you mentioned a number of reasons
10  why that might be.  Did you ever -- did you ever come
11  to a conclusion as to why the Schneeberger was not
12  producing the quantities that you wanted?
13    A.  Variety.  I have no idea the specific reason
14  or what was causing it.  I just -- I just know we
15  weren't getting enough tools.
16    Q.  Okay.  Fair enough.
17    In paragraph 22, you say "... Mr. Baker
18  did not know how to run the Schneeberger machine."
19  How did you come to that conclusion?
20    A.  Because he said so.
21    Q.  Okay.  He told you that he did not know how
22  to run the Schneeberger machine?
23    A.  Correct.
24    Q.  And then you sent him to training in

Page 108

1  Chicago?
2    A.  Correct.
3    Q.  Okay.  And after -- after that training, was
4  he able to run it or still not be able to run it?
5    A.  I don't -- I don't know whether he actually
6  tried to run it, per se.
7    Q.  Okay.  So the answer is -- after the
8  training, do you know whether he knew how to run the
9  Schneeberger machine or not?
10    A.  No.
11    Q.  Okay.  With -- now, I'd like you to read
12  paragraph 23 to yourself and 24 as well.
13    A.  Okay.
14    Q.  Okay.  With respect to the CNC grinding
15  machines, did you simply just say to Mr. Baker see
16  if -- see if you can make it more efficient?
17    A.  That started the conversation.  Then we went
18  into areas where that improvement might be made.
19    Q.  Okay.  And prior to making this assignment
20  to Mr. Baker, did you have any idea how the CNC
21  machine, the grinding machine could be used more
22  efficiently?
23    A.  I don't understand the question.
24    Q.  Okay.  You said -- you assigned to Mr. Baker

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 109

1  to find a way to operate the CNC tool grinding
2  machines more economically, correct?
3     **A.   Correct.**
4     Q.   Okay.  When you made that assignment, did
5  you have any idea as to how that can be done?
6     **A.   Yes.**
7     Q.   And did you tell him how that -- what your
8  thoughts were?
9     **A.   Yes.**
10    Q.   And what were those thoughts?
11    **A.   One of them was each of the machines at the**
12 **time was programmed by one of the operators, and even**
13 **though we had tool 1, 2, 3 made on one machine with**
14 **one program and one set of grinding wheels, the same**
15 **tool on another machine used another program that**
16 **another operator had made using a different set of**
17 **wheels, so overall, the quality was -- was varied**
18 **quite a bit because of the variations in the process,**
19 **so one of the things I suggested that he look into**
20 **was, as we did with all our other CNC machines, is to**
21 **hardwire all the machines to our server and have**
22 **them -- have the programs for each tool uploaded into**
23 **the server, so, then, when it was needed, it could be**
24 **downloaded to the machine and used a standard set of**

Page 110

1  **cutting wheels.  Because part of the problem with the**
2  **cutting wheels was each operator had his own set, his**
3  **own configuration because each -- the grinding wheels**
4  **were in sets of three or four different grinding**
5  **wheels all put on the same spindle, and each**
6  **operator -- because of his different program, each one**
7  **had their own spindles of cutting wheels to work with.**
8  **Well, that did nothing but just a logistics nightmare**
9  **in having all the number of cutting wheels on the**
10 **floor, trying to restock the cutting wheels, so the**
11 **suggestion was to try to standardize on how we**
12 **produced the product.  Another one of my --**
13    Q.   And -- sorry.  Go ahead.
14    **A.   Another one of my thoughts was that the**
15 **grinding wheels themselves, having a rack where we had**
16 **an inventory that we wouldn't run out of the grinding**
17 **wheels when we needed because that was habitually**
18 **happening all the time.  They had to take apart one**
19 **set of grinding wheels to take the wheel that they**
20 **needed to add to another one to make the part, and**
21 **then when they went back to the original part, they**
22 **had to rebuild that whole spindle again, which is**
23 **time-consuming and very inefficient, so those were two**
24 **examples of the things where I thought we could**

Page 111

1  **be -- we could work to make things better.**
2     Q.   Okay.  And did you -- and any other other
3  than those two ideas that you just mentioned?
4     **A.   Those are two that I remember.**
5     Q.   Okay.  And you communicated that to
6  Mr. Baker?
7     **A.   Yes.**
8     Q.   And -- and did Mr. Baker not do anything or
9  do some of it or try some of it?  Did you give him a
10 deadline?
11        MS. BERTRAM:  Objection to the form of the
12 question.
13 BY MR. LEE:
14    Q.   First of all --
15        MS. BERTRAM:  Also compound.
16 BY MR. LEE:
17    Q.   Withdraw.
18        Okay.  First of all, did you give him a
19 deadline as to when he was to complete this task?
20    **A.   No.**
21    Q.   Okay.  Did he set a deadline for himself as
22 to when he was to complete this task?
23    **A.   No.**
24    Q.   Okay.  You gave him two ideas.  Did he start

Page 112

1  implementing that at some point?
2     **A.   He started to work on the grinding wheel**
3  **inventory, and it was -- it was a visual system, so**
4  **you could see the number of wheels we had.  It was**
5  **very visual, and just walking through the department,**
6  **I could see that the board was lacking the numbers of**
7  **grinding wheels that we needed that he agreed that he**
8  **was going to populate in his system, because he had**
9  **started to put this thing together to organize them,**
10 **but he never ordered the grinding wheels.**
11    Q.   Okay.  That's what you mean by here,
12 "Similarly, after a visual reorder board for machine
13 grinding wheels was developed, that indicated a
14 minimum of 50 percent of the CNC grinding wheels
15 needed to be replaced, Mr. Baker never ordered them,"
16 right?
17    **A.   Correct.**
18    Q.   That's what you are referring to?
19    **A.   Yes.**
20    Q.   Okay.  Did you point it out to him that he
21 needed to -- he should have ordered them?
22    **A.   Yes.**
23    Q.   Okay.  And did he?
24    **A.   Yes, eventually.**

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 113

1    Q.   Okay.  Did you write him up for ordering
2    them late?
3    A.   Nope.
4    Q.   Okay.  Now, with respect to what you called
5    the standardizing idea, was that ever worked on by
6    Mr. Baker and his team?
7    A.   No.
8    Q.   Okay.  Do you know why?
9    A.   No.
10   Q.   Did you ever follow up with him as to why I
11   gave you an idea about standardizing and you didn't do
12   anything?  Did you ever have a discussion with
13   Mr. Baker about it?
14   A.   Yes.
15   Q.   Okay.  And what was that discussion?  Tell
16   me what he said and what you said.
17   A.   I don't remember what was said.
18   Q.   Okay.  I don't -- I know it was a long time
19   ago, but you had a discussion with Mr. Baker about
20   standardizing, right?
21   A.   Correct.
22   Q.   So your conclusion as to why the
23   standardizing idea was not being done, do you recall
24   what that was?

Page 114

1    A.   What -- my discussion with him?
2    Q.   No, no.  Why it was not being done?
3    A.   I had the discussion, but I don't remember
4    on what the conversation was.  You know, I offered him
5    suggestions on how he might go about who to contact
6    and examples to see, but I don't remember the exact
7    conversation.  I always offered my experience and
8    mentorship to help him, but he just failed to complete
9    it.
10   Q.   Okay.  And did you ever have a conversation
11   with him about why he failed to complete it or,
12   apparently, he didn't even start it, right, you say?
13        MS. BERTRAM:  Objection.  Compound.  You
14   just asked two or three questions.
15   BY MR. LEE:
16   Q.   I'll reask.
17        With respect to the standardization
18   idea, you said he failed to complete it.  Did he start
19   it?
20   A.   Not that I saw.
21   Q.   Okay.  And did you have a conversation with
22   him about why he didn't start it?
23   A.   I'm sure we did.  I'm sure with all the
24   times that was on there, his project list, that we had

Page 115

1    that conversation a number of times.
2    Q.   Okay.  Did you have any -- what do you
3    recall him saying as to why he did not start it?
4    A.   I don't remember.
5    Q.   Okay.  Did he ever write a -- did you ever
6    see a rebuttal by him written on this subject as to
7    this CNC tool grinding efficiency issue?
8    A.   I don't remember --
9    Q.   Fair enough.
10   A.   -- specific one other than the rebuttals
11   that he had during the reviews, that was probably one
12   of them.
13   Q.   Okay.  But you don't remember what that
14   rebuttal was?
15   A.   No.
16   Q.   Okay.  With respect to -- could you read
17   paragraph 25 to yourself.  It's at the bottom of page
18   7 and goes on to the top of page 8.
19   A.   Okay.
20   Q.   With respect to filling the position for CNC
21   operators, your issue with Mr. Baker was that he did
22   not do it fast enough, correct?
23   A.   When the issue of hiring CNC operators came
24   up, we were in a project meeting with a consultant

Page 116

1    named Tom Stevens, and we were developing a plan to
2    what we called March to a Million in terms of our
3    manufacturing process to up our manufacturing
4    significantly because our -- our sales were excellent,
5    so as part of that March to a Million and then adding
6    machines and sending machines to Houlton Main and
7    having them make slides, we knew internally it was
8    going to be a huge upsurge in the usage of tools, so
9    as part of the March to a Million project, they
10   decided -- Engineering decided to, with Mr. Fontaine's
11   agreement, to add two more CNC cutter grinders to the
12   department, and with those cutter grinders, you needed
13   operators to run the project.  Now, in this case, this
14   is a huge company undertaking to implement this March
15   to a Million.  As part of that, each cell coordinator,
16   in this case, Mr. Baker, was called in with
17   Mr. Stevens to put together a project schedule to
18   understand how long he's going to take to get things
19   done, and at that time, we knew what the lead time for
20   the machines were going to be, because we checked with
21   Walter Grinders, so that showed when we needed the CNC
22   operators by, so that dictated a due date of when we
23   needed the bodies in place to run the machines because
24   the machines were not going to do us any good if there

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 117

1  wasn't a body to run them, so there was a due date
2  associated with hiring those CNC operators.  Now,
3  Mr. Baker gave Tom Stevens the due date that those
4  operators would be in place and hired.  Maybe not
5  fully trained, but at least hired, and that
6  was -- that was a hard, hard due date to comply with,
7  so this all stems out of that of trying to
8  instantaneously put in the reqs for hiring these CNC
9  operators, get the ball rolling, and then it just spun
10 out of control and just took forever to get the people
11 in.
12      Q.  Okay.  And did you ever
13 check -- figure -- did you ever learn why the
14 operators were not hired on time?
15      A.  That's kind of a complicated question
16 because there's a lot of moving parts to it, but a lot
17 of it came to not working the system, the system we
18 had established in terms of using operators that were
19 underutilized in other departments and bring them into
20 our department that Mr. Baker was dead set against it
21 and insisted that any outside -- any CNC operator from
22 some other department was not capable of running our
23 machines when, in fact, 75 percent roughly of the
24 operators that we had came from other departments

Page 118

1  within Smith & Wesson, so that the precedent was set
2  that there was no problem getting qualified CNC
3  operators from other areas of the plant and having
4  them work in our department.
5      Q.  I understand.  But in this instance for
6  these operators that you wanted to hire by a specific
7  time period for the two new Walter grinders, did you
8  ever come to a conclusion as to why they weren't hired
9  on time?
10      A.  My job is not to worry why.  My job was to
11 get it done.
12      Q.  Got that.
13      A.  And any method that I could with talking to
14 my peers to talking to Human Resources to get the
15 people in.
16      Q.  I understand.  So my question is did you do
17 an investigation and figure out why these operators
18 were not hired on time?
19      A.  Well, there was a number of reasons.  One
20 was the reqs kept getting lost, and we never actually
21 found out why, you know, because what would happen,
22 Mr. Baker would fill out a requisition for the
23 operators and submit it to me for signature.  Now, my
24 knowing the urgency of this situation of getting

Page 119

1  people in, I walked the requisitions up to the next
2  person to sign, which is Mr. Fontaine.  Then after
3  Mr. Fontaine signed the requisitions, they went to
4  Human Resources, so I know custody was in -- custody
5  of mine was right to Mr. Fontaine.  There was never
6  any delay, so that was one problem.  It was the
7  delays.
8          Second of all was the question of who
9  was qualified.  Again, my position is that CNC
10 operators within Smith & Wesson already were more than
11 qualified to learn the machines that we had and to
12 successfully complete the job tasks that we asked them
13 to do, but Mr. Baker was of the opinion that the
14 machines, even though he didn't know how to run them
15 himself, he wasn't sure -- he was sure that you needed
16 somebody with a lot more skills than the people that
17 we had in-house to run the machines, so he wanted to
18 get people from the outside in, which takes time.
19 Because not only was it time-consuming in terms of
20 getting the request out and people to answer, but,
21 also, at the time, CNC operators were in short supply
22 within the Western Mass area.  You just not -- could
23 not find a worthy CNC operator with experience that
24 wanted to come work for Smith & Wesson because they

Page 120

1  could get paid more by outside small machine shops.
2      Q.  Okay.
3      A.  So you're fighting a battle trying to find
4  qualified people.
5      Q.  Okay.  So --
6      MS. BERTRAM:  John, John, before you --
7      MR. LEE:  I just want to follow up on like
8  he mentioned something.  I want to follow up on that,
9  but go ahead.
10     MS. BERTRAM:  Okay.  Then can we take a
11 lunch break after that?
12     MR. LEE:  Sure.
13     MS. BERTRAM:  Okay.
14 BY MR. LEE:
15     Q.  You said -- you said the reqs kept getting
16 lost.  Did you -- do you know whether the HR
17 Department did an investigation into why the operators
18 were not hired by the desired date?
19     A.  I didn't know.  I didn't know if they did or
20 not.
21     Q.  Okay.  So you don't know whether, for
22 example, Anne Bruce checked with other people to
23 figure out why -- the timeline and why they were not
24 hired on time?

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 121

1    A.  I didn't know because I didn't really care.
2    Q.  Okay.
3    A.  All I wanted was the people in place at the
4 due dates that Earl had agreed upon.
5    Q.  Sure.
6        Now, once you signed the requisition
7 form and it went to Mr. Fontaine and then it went on
8 from Mr. Fontaine to HR and so on and the delays that
9 you mentioned, was that Mr. Baker's fault?
10    A.  I have no idea where -- where it happened.
11    Q.  Got it.
12    A.  But --
13    Q.  Okay.  We can't take -- go ahead.
14    A.  -- the thing is if the reqs didn't show up
15 on time, it was Mr. Baker's responsibility to have
16 known that and followed up on it and found out where
17 they were.  It was not just wait and see what happens
18 after two weeks.  He was -- if he didn't see any
19 action, it was his responsibility.  He should have
20 been following up on it.
21    Q.  Okay.  And do you know whether he did or he
22 did not?
23    A.  Obviously, he didn't because we went weeks
24 sometimes just getting the reqs in the right place.

Page 122

1    Q.  Okay.  Other than that, do you have any
2 other basis to believe that he did not follow up?
3 Other than the actual delay, do you have any other
4 basis to believe that he blew it off?
5    A.  Yeah, because we didn't get the people.
6    Q.  Okay.  Other than that, do you have any --
7    A.  Well, I think June when we wanted them in
8 March.
9        MR. LEE:  Okay.
10       MS. BERTRAM:  So do you want to take 45
11 minutes, John?
12       MR. LEE:  Sure.
13       MS. BERTRAM:  So that would put us at around
14 1:30 Eastern.
15       MR. LEE:  That would be perfect.
16       MS. BERTRAM:  Okay.  Great.  We'll see you
17 then.
18       THE VIDEOGRAPHER:  All right.  Stand by,
19 please.  The time is 11:41 a.m. Central time.  We are
20 off the record.
21       (Recess.)
22       THE VIDEOGRAPHER:  The time is 12:33 p.m.
23 Central time.  We are back on the record.
24 BY MR. LEE:

Page 123

1    Q.  Mr. Flatley, the annual review for Mr. Baker
2 was in June of 2013 and June of 2014, correct?
3    A.  Correct.
4    Q.  And then he did a -- you did an out-of-cycle
5 review for him in February of 2014, right?
6    A.  Correct.
7    Q.  Okay.  So those are the three reviews that
8 you did of him?
9    A.  Correct.
10    Q.  And then the S.M.A.R.T. objective worksheets
11 are attached to these, that you had mentioned before,
12 are attached to the reviews, am I correct?
13    A.  I think the June 13, they're associated with
14 that.
15    Q.  Okay.  So I'm going to show you what's been
16 marked as Plaintiff's Exhibit 356.  Do you have that
17 in front of you?
18    A.  No.
19    Q.  Okay.  What do you have in front of you?
20    A.  279 and 281.
21       MR. LEE:  Okay.  There should be -- put that
22 off.  Those will be the next ones, but -- well,
23 until -- until they get you 276 -- I mean, 356, why
24 don't we go to 279 and 281.

Page 124

1        (The witness was tendered
2        previously marked Plaintiff's
3        Exhibit 279 and 281.)
4 BY MR. LEE:
5    Q.  First, with respect to Exhibit --
6 Plaintiff's Exhibit 279, that's a draft of a letter
7 dated September 15th, 2014 on Anne Bruce's letterhead
8 to Earl Baker, correct?
9    A.  Correct.
10    Q.  Have you ever seen -- I'm sorry.  Have you
11 ever seen this before, this document?
12    A.  I must have because it's my handwriting on
13 here.
14    Q.  Okay.  And do you have a recollection of
15 Anne Bruce sending this letter to you to have you
16 comment on it?
17    A.  I don't remember it because it was so long
18 ago.
19    Q.  Right.
20    A.  But it's obvious she did.
21    Q.  And it begins, "This letter is intended to
22 provide a response to your rebuttal of your
23 Performance Review dated June 17, 2014," correct?
24    A.  Sure.

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 125

1    Q.   Okay.  On the first page, you see
2 handwritten writing, handwriting.  That's your
3 handwriting?
4    A.   Yes.
5    Q.   How about on the page 2, is that your
6 handwriting?
7    A.   Yes.
8    Q.   If you go to page -- if you look at the
9 bottom right-hand corner, do you see the numbers
10 SW0618, 0619 and so on?  Do you see that?
11    A.   Which page is this, Mr. Lee?
12    Q.   Okay.  So go to -- if you would go to
13 SW0623, for example.
14    A.   Where?
15    Q.   At the bottom right-hand corner.  Do you
16 see -- in Exhibit 279, do you see a Bates number at
17 the bottom right-hand corner?
18    A.   I see some scribbles.  I don't see any
19 numbers on the first page.
20    Q.   Okay.  Let's just double check this.  Page
21 number 1 of --
22         MS. BERTRAM:  John, John, you might want to
23 use -- we had this problem when I was in Springfield
24 two weeks ago, a week or two ago.  Apparently, when

Page 126

1 they print out there, they don't print the Bates
2 numbers, but this document does have page numbers, so
3 maybe you could use that down in the lower right-hand
4 corner.
5 BY MR. LEE:
6    Q.   Okay.  I see that.  Mr. Flatley, this
7 Plaintiff's Exhibit 279, on the second page, in your
8 handwriting, it says, "in facilities," am I correct?
9    A.   Right.
10    Q.   Okay.  Now, if you go to page 6.  First of
11 all, I have a question to ask you about other than
12 your handwritten comments, did you -- take a look at
13 page 7, for example.  Is that also your handwriting?
14    A.   It appears to be.
15    Q.   Okay.  It says -- one of the handwritten is
16 "Wednesday," the other one is "leaving," and the other
17 one is "morning," correct?
18    A.   Correct.
19    Q.   Okay.  And then if you go to page -- please
20 go to page 9.  Those are also your handwriting?
21    A.   Yes.
22    Q.   And then same is true of page 12, is that
23 your handwriting?
24    A.   Yes.

Page 127

1    Q.   Okay.  First question I have is other than
2 what is in your handwriting, did you -- did you have
3 any input into drafting Plaintiff's Exhibit 279?
4    A.   Unless I read them initially, I don't
5 remember.
6    Q.   Okay.  Fair enough.
7         My only -- for example, if you take a
8 look at page 1, for example, it's got a box that says,
9 "Larry Flatley Review Comments," and it says, "Earl
10 Baker Review Rebuttal."  Then it says,
11 "Smith & Wesson."  Do you see that?
12    A.   Yes.
13    Q.   My question to you is do you have a
14 recollection of writing, for example, the
15 Larry Flatley review comments or the Smith & Wesson
16 positions?
17    A.   I don't know -- well, I guess this was
18 written by Anne Bruce, so I got to say she wrote it.
19    Q.   Okay.  Now, my question -- well, obviously,
20 if, for example, she typed up something that you had
21 handwritten or something like that, we'll find that
22 out, but you, yourself, did not write this portion of
23 this -- these letters where it says "Larry Flatley
24 Review Comments"?

Page 128

1    A.   I didn't write it, but she must -- I can
2 only assume that she used my notes.
3    Q.   Okay.  Other than that assumption, do you
4 have a recollection of actually sending your comments
5 to Anne Bruce to be put into this letter?
6    A.   I don't remember.
7    Q.   Okay.  How about with respect to the
8 Smith & Wesson positions, do you have a recollection
9 of having input into those portions of Plaintiff's
10 Exhibit 279?
11    A.   I don't.  You know, it was so long ago, I
12 don't really remember this paper as much.
13    Q.   Okay.  Do you recall -- do you know what
14 happened to this paper, Plaintiff's Exhibit 279, what
15 Anne Bruce did with it?
16         MS. BERTRAM:  Objection.  Vague and calls
17 for speculation.
18 BY MR. LEE:
19    Q.   If you know.
20    A.   I don't know.
21    Q.   Okay.  If you take a look at -- take a look
22 at page 6, please.  You see the Smith & Wesson box
23 that begins, "The RoboCrib was an action assigned to
24 Earl as part of the M1M project."

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 129

1    A.  **Right.**
2    Q.  What was the M1M project?
3    A.  **It's March to a Million.**
4    Q.  Oh, got it.
5    A.  **Where we tried to increase our production.**
6    Q.  Got it.
7         And at the bottom, it says, "The
8    tracking and coordinating of inventory and shipment
9    was to be done in the RoboCrib software and
10   transporting of the tools back and forth was to be
11   supported by the existing Houlton Truck schedule.  The
12   truck that transfers" and so on.  Do you see that?
13   A.  **Right.**
14   Q.  Was that -- is that an accurate description
15   of what was going on during the Houlton project?
16   A.  **Yes.**
17   Q.  I'm going to ask you to turn to now
18   Exhibit 281 that should also be right in front of you.
19        MS. BERTRAM:  Which Exhibit No. was that,
20   John?  John, which Exhibit No. did you just identify?
21        MS. MAGIERA:  It's going to be 281.
22        MS. BERTRAM:  281.  Okay.  Great.
23        MS. MAGIERA:  Two, eight, one.
24   BY MR. LEE:

Page 130

1    Q.  Mr. Flatley, this one is a letter dated
2    September 19, 2014 on Anne Bruce's letterhead.  It,
3    again, also begins, "This letter is intended to
4    provide a response to your rebuttal of your
5    Performance Review dated June 18, 2014."  Do you see
6    that?
7    A.  **Yes.**
8    Q.  This one does not have any -- and it's a
9    12-page document?
10   A.  **Yes.**
11   Q.  If you go to page 10, there are a
12   handwritten -- there's handwriting there.  Is that
13   yours or do you know?
14   A.  **It looks like mine.**
15   Q.  Okay.  Take a look at -- that's the
16   only -- do you have a recollection of Anne Bruce
17   asking you to make comments on this Plaintiff's
18   Exhibit 281?
19   A.  **I don't have a direct memory of it, but it**
20   **looks like she must have if my handwriting is on it.**
21   Q.  Okay.  And that's the only handwriting that
22   I see there on page --
23   A.  **10.**
24   Q.  -- 10.  Again, with respect to the portions

Page 131

1    that are stated "Larry Flatley Review Comments" and
2    "Smith & Wesson," did you draft those or did
3    Anne Bruce draft those?
4    A.  **Anne Bruce said she wrote it, she drafted**
5    **it.  It must have been with my input from things that**
6    **I had told her.**
7    Q.  Okay.  And did you tell her orally or in
8    writing?
9    A.  **Well, like I said, these were -- based on my**
10   **June 18th, 2014 performance reviews, it was all**
11   **written.**
12   Q.  Okay.  Other than -- we'll, obviously, get
13   to the June 18, 2014 performance review, but did
14   you -- other than the June 18, 2014 performance
15   review, do you recall sending Anne Bruce any input
16   with respect to Plaintiff's Exhibit 281 other than
17   your handwritten comment?
18   A.  **I don't remember.**
19   Q.  Okay.  Is there anything that would refresh
20   your recollection like such as an e-mail or a memo or
21   a journal?
22   A.  **No.**
23   Q.  Okay.  As of -- as of this date,
24   September 19, 2014 -- let me ask it to you this way.

Page 132

1    Was it you -- did you have input into terminating
2    Mr. Baker?
3    A.  **No.**
4    Q.  Okay.  No one asked you whether he should be
5    terminated or not?
6    A.  **No.**
7    Q.  Okay.  Let me ask you as of the performance
8    review of June 18, 2014, did you come to a conclusion
9    or an opinion that Earl Baker should be terminated?
10   A.  **I was trying to mentor Earl to get him to**
11   **perform his job and his duties.  I tried everything I**
12   **could, even in June 14th (sic), to try and help him,**
13   **mentor him into accomplishing his goals to help both**
14   **the company and himself.**
15   Q.  Okay.  You're talking about June of 2014,
16   correct?
17   A.  **Yes.**
18   Q.  So -- and as you were trying to mentor him,
19   it wasn't your decision at that point or opinion to
20   terminate him?
21   A.  **Correct.**
22   Q.  Now, do you have Exhibit 356 in front of you
23   by now or no?
24   A.  **Yes.**

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 133

1    MS. BERTRAM: Was that 356?
2    MR. LEE: Correct. Hold on one second.
3         (The witness was tendered
4          previously marked Plaintiff's
5          Exhibit 356.)
6    MS. BERTRAM: Okay.
7    BY MR. LEE:
8    Q.   At the end of page -- strike -- let me -- do
9    you -- does this one have Bates numbers on the bottom
10   right-hand corner of the document, Mr. Flatley? It
11   should say Baker -- Baker 0001.
12   A.   Yes. Correct.
13   Q.   And then the next one is Baker 0002?
14   A.   Correct.
15   Q.   If you go to Baker 0006, do you see that you
16   signed this review on July 8th, 2013?
17   A.   Yes.
18   Q.   And Mr. Baker signed it on that same date?
19   A.   Correct.
20   Q.   And then Mr. -- it looks like -- do you
21   recognize Mr. Fontaine's signature there on July 1,
22   2013?
23   A.   Yes.
24   Q.   Okay. And as of -- as of this review, the

Page 134

1    review -- the document itself is dated June 25, 2013,
2    am I correct?
3    A.   Correct.
4    Q.   And on each of the boxes, you rate him as
5    meets expectations, correct?
6    A.   Correct.
7    Q.   Starting with Baker 003 through Baker 006,
8    those are the S.M.A.R.T. objectives worksheet that you
9    and I discussed prior -- previously, right?
10   A.   Correct.
11   Q.   And these are -- I take it S.M.A.R.T. is
12   some sort of an acronym the way it's written?
13   A.   Yes, but I don't know what it is.
14   Q.   It doesn't matter I don't think, but these
15   are objectives to be met to be -- to be -- for -- so
16   the employee is to strive towards, am I correct?
17   A.   Right. These were the assigned tasks,
18   correct.
19   Q.   And there are the -- for example, first one
20   says conduct monthly --
21   A.   Bimonthly Kaizens.
22   Q.   Kaizens, okay. And, again, Kaizens is a
23   team exercise, is it not, for problem-solving?
24   A.   Correct.

Page 135

1    Q.   Okay. And so that's an objective for
2    Mr. Baker at that point?
3    A.   Correct.
4    Q.   Okay. If you go to -- first of all, each
5    one of these -- these handwritings are yours, not
6    Mr. Baker's, am I correct?
7    A.   Correct.
8    Q.   Now, if you go to, for example, Baker
9    004, the next S.M.A.R.T. objective worksheet is to
10   utilize the ordering features in the RoboCrib software
11   for RoboCrib number 99. That's the objective, am I
12   correct?
13   A.   Correct.
14   Q.   That is in your handwriting?
15   A.   Correct.
16   Q.   Okay. And if you go down, and it says here
17   done by March 2014, correct?
18   A.   Correct.
19   Q.   Do you recall who came up with that timeline
20   for this trying to meet this objective?
21   A.   That was mine.
22   Q.   Okay. And did Mr. Baker object to it or did
23   he say -- did he have a comment about that?
24   A.   No comment whatsoever.

Page 136

1    Q.   Got it.
2         Did Mr. -- did you ever give or sign
3    commendations for Mr. Baker during his tenure as an
4    employee of Smith & Wesson?
5    MS. BERTRAM: Objection. Vague.
6    BY MR. LEE:
7    Q.   You can answer.
8    A.   What do you mean by accommodation?
9    Q.   Commendation.
10   A.   What do you mean by commendation?
11   Q.   A piece of paper called commendation or
12   something, you know, job well done.
13   A.   I personally did not.
14   Q.   Okay. Do you know whether Mr. Fontaine
15   signed commendations for Mr. Baker?
16   A.   I don't know.
17   Q.   Okay. Do you have Exhibits 307, 308 and 309
18   in front of you?
19   A.   No.
20   MR. STANWOOD: I have them right here.
21         (The witness was tendered
22          previously marked Plaintiff's
23          Exhibits 307, 308 and 309.)
24   BY MR. LEE:

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 137

1    Q.   Take a look at 307, please.
2    A.   Yes.
3    Q.   It says congratulations Lamonte Parks, and
4    it's signed by Dan Fontaine, right?
5    A.   Correct.
6    Q.   Have you ever seen this before?
7    A.   Yes.
8    Q.   Okay.  Take a look at 308.  Next one is
9    congratulations Mike Jurga, right?
10   A.   Correct.
11   Q.   And that one also is signed by Dan Fontaine?
12   A.   Correct.
13   Q.   Do you know whether Mr. Baker ever received
14   any commendations like this signed by Mr. Fontaine?
15   A.   I don't.
16   Q.   Okay.  You've never seen it or heard of it?
17   A.   Correct.
18   Q.   Okay.  Take a look at Exhibit 309.
19   A.   Correct.  Yep.
20   Q.   Is that your signature?
21   A.   No, it isn't.
22   Q.   Whose -- so you don't -- you don't recognize
23   this document at all?
24   A.   Nope.

Page 138

1    Q.   You've never seen it?
2    A.   Never seen it.
3    Q.   Okay.  Do you know whose handwriting that
4    is?
5    A.   No, I don't.
6    Q.   Okay.  Now, I'm going to turn your
7    attention -- let's go back to Exhibit 294.
8    A.   I don't have -- oh.
9    Q.   It's your Declaration.  Yeah.  We're going
10   back to your Declaration.  We were discussing
11   paragraph 25.  At the bottom, you say, "Mr. Baker"
12   expected -- "was expected to assist the Human
13   Resources Training Coordinator with developing a CNC
14   training program."  Do you see that?
15   A.   Yes.
16   Q.   Who was the Human Resource training
17   coordinator with whom Mr. Baker was supposed to
18   develop a CNC training program?
19   A.   I think the person's name was Chris Mihalik
20   (phonetic) or Mihalike, and he reported to Ed Suraci.
21   Q.   Chris Mihalik?
22   A.   I don't have the spelling on the last name.
23   Q.   Report to Ed Suraci.
24        And you say, "As a result of his

Page 139

1    obstinate position, however, the positions were filled
2    very slowly."  What was Mr. Baker's obstinate
3    position?
4    A.   He felt that -- that he had to hire people
5    from the outside to be able to fill the CNC positions
6    as opposed to working with internal candidates and the
7    other team leaders and other cell coordinators to
8    identify people that were underutilized and available
9    to put in the jobs versus going outside.
10   Q.   Okay.  When you say -- and did this,
11   Mr. Baker, express this obstinate position to you?
12   A.   Yes.
13   Q.   And orally or in writing?
14   A.   Orally.
15   Q.   Okay.  And your position was try to recruit
16   from internally, and Mr. Baker's position was try to
17   recruit from externally, correct?
18        MS. BERTRAM:  Objection.  Compound.
19   BY MR. LEE:
20   Q.   Strike that.  I'll rephrase the question.
21        Was there a difference of opinion
22   between you and Mr. Baker about where to get these CNC
23   operators?
24   A.   Yes.  My basis was -- my position was in the

Page 140

1    basis of what our standard policy was at
2    Smith & Wesson and Human Resources to utilize excess
3    CNC operators or excess employees that are
4    underutilized in other departments and place them into
5    open positions to maintain the employment, full
6    employment of our talented workers who you want to
7    continue to employ because of their skill level.  You
8    didn't want to lose those people to the outside.
9    Q.   Okay.  And Mr. Baker's opinion was that they
10   were not -- they were not qualified and that you guys
11   should -- Smith & Wesson should seek to hire from
12   outside, correct?
13   A.   Correct.
14   Q.   Okay.  Did you override him?  You were his
15   boss.
16   A.   I didn't have to.  It was company policy.
17   Q.   Okay.
18   A.   HR took care of that.
19   Q.   Okay.  So, eventually, HR took over and then
20   got the CNC operators?
21   A.   Well, I tried helping by talking to my -- my
22   coworkers and identifying people because Mr. Baker was
23   not doing it.  I went out and talked to my
24   compatriots, my other -- the other process line

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 141

1    managers to -- and their cell coordinators to identify
2    people that we could bring into the department.
3        Q.   Did you have a discussion with Mr. Baker as
4    to why his opinion was different from yours or from
5    the company policy of trying to hire from within?
6        A.   Sure.  We had the discussion.
7        Q.   What did he say?
8        A.   I don't remember the exact discussion.
9        Q.   I mean, I'm not asking you to recall exact
10   wording.  What was his -- what was Mr. Baker's
11   rationale for seeking to hire from outside?
12       A.   As I said before, that he felt that
13   they -- people that worked in the other CNC
14   departments on the other CNC machines weren't
15   qualified to run these particular machines where I was
16   explaining to him, number 1, it was company policy to
17   place people if there was excess people and we had
18   openings, and plus number 2, that roughly 75 percent
19   of the existing CNC people that we had in our
20   department, in the Cutter/Grind Department, came from
21   those other operating departments within
22   Smith & Wesson.
23       Q.   Okay.  And what did he say to that?
24       A.   I don't remember.

Page 142

1        Q.   Okay.  Did he -- did he just say no, I don't
2    care what you think, I don't care what the company
3    policy is or did he have a rationale?
4        MS. BERTRAM:  Objection.  Compound and to
5    the form of the question.
6    BY MR. LEE:
7        Q.   Did he have a rationale?
8        A.   I don't remember.
9        Q.   Okay.  Fair enough.
10       Is there anything that would refresh
11   your recollection as to the rationale as to why he
12   thought it would be better to hire from outside?
13       A.   No.
14       MS. BERTRAM:  Objection to the form.
15   BY MR. LEE:
16       Q.   You can answer.
17       A.   No, I don't remember.
18       Q.   Okay.  If you could read paragraph 26 to
19   yourself.  You state there that "... team problem
20   solving exercises with other department leaders" in
21   the first sentence.  Do you see that?
22       A.   Yes.
23       Q.   Is that Kaizen or is that something else?
24       A.   Same thing.

Page 143

1        Q.   I'm sorry?
2        A.   Same thing.
3        Q.   Same thing.  Yeah.
4            And who are these other department
5    leaders that he was supposed to work with?
6        A.   Could be other cell coordinators that were
7    on the same level as Earl to team leaders.  Could be
8    something that was discovered within our own -- within
9    his own department where there was a problem with a
10   cutter or a tool in another department that
11   they'd -- that they identified.  It could be a variety
12   of areas.
13       Q.   Okay.  And other than just generic or
14   general problem-solving with other cell coordinators
15   or doing Kaizens, was there anything specific in mind
16   that you had that Earl needed to do with the other
17   department leaders?
18       MS. BERTRAM:  Objection.
19       THE WITNESS:  No.
20       MS. BERTRAM:  Asked and answered.  What was
21   your response, Larry?  I'm sorry.
22       THE WITNESS:  No.
23   BY MR. LEE:
24       Q.   Okay.  Two sentences down, it says, "Between

Page 144

1    March 2013 and February 2014, however, Mr. Baker only
2    performed one of these problem solving exercises."  Do
3    you see that sentence?
4        A.   Yes.
5        Q.   How many problem-solving exercises was he
6    supposed to do in that time period?
7        A.   As I stated in the S.M.A.R.T. form, I had
8    asked him to do that bimonthly, two times a month,
9    have a Kaizen completed.
10       Q.   And that's in the review of the June, July
11   review of 2013?
12       A.   Correct.
13       Q.   Okay.  And in those bimonthly Kaizens, what
14   was he supposed to do?
15       MS. BERTRAM:  Objection.  Asked and answered
16   and vague.
17   BY MR. LEE:
18       Q.   Yeah.  You -- did you have anything specific
19   in mind that he was supposed to do on a bimonthly
20   basis other than hold a Kaizen?
21       MS. BERTRAM:  Objection.  Vague.  You can
22   answer it, Larry.
23   BY MR. LEE:
24       Q.   Can you answer it?

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 145

1    A.  Okay.  It was -- because manufacturing is
2  very fluid and it changes every day on different
3  situations, there's a whole host of potential problems
4  that would come up, whether it be stock outs, broken
5  tools, a better way of designing a fixture, a better
6  way of making a gauge.  There's a whole host of
7  sources of potential projects that would have fit the
8  bill, so I have nothing specifically in mind.  I just
9  was thinking towards continuous improvement.
10    Q.  Okay.  Now -- and then you say he was
11  hostile to the idea -- to the idea of working
12  cooperatively with others, and how did you -- how did
13  you learn he was hostile to it?
14    A.  By observing his interaction with other
15  departments when they had problems and they'd ask for
16  Earl's help, with timeliness of his response to how
17  well he responded.  It's just -- it just didn't seem
18  like a smooth -- it flowed smoothly.  It just didn't
19  seem like he was ready, willing and able to cooperate
20  to me.  My opinion was that he was just hostile
21  towards the other people that they even questioned
22  what he did.
23    Q.  Did you write him up for that or did --
24      MS. BERTRAM:  John, if you're talking, we

Page 146

1  can't hear you.
2      MR. LEE:  Can you hear me now?
3      THE COURT REPORTER:  No.
4      MS. BERTRAM:  We still can't hear you.
5      MR. LEE:  How is it now?
6      MS. BERTRAM:  It's very faint.
7      MR. LEE:  I'm wondering whether -- hold on
8  one second.  Let me see.  How about now?
9      MS. BERTRAM:  That's back to normal.
10      MR. LEE:  Okay.  We're back to normal?
11      MS. BERTRAM:  Yes.
12      MR. LEE:  I must have something -- I must
13  have done something with the volume.
14  BY MR. LEE:
15    Q.  Okay.  My question was so when you
16  felt -- when you observed that he was hostile to
17  working cooperatively with other department leaders,
18  did you write him up?
19    A.  No.
20    Q.  Did you talk to him about -- well, let me
21  ask you this.  Did you ask other team leaders to find
22  out what the issues are, if any?
23    A.  No.
24      MS. BERTRAM:  Objection.  Vague.

Page 147

1  BY MR. LEE:
2    Q.  Okay.
3      MS. BERTRAM:  Larry, make certain that you
4  pause at the end of John's question because
5  you're -- we're talking at the same time, and what was
6  your response to the question?
7      THE WITNESS:  No.
8      MS. BERTRAM:  Okay.
9  BY MR. LEE:
10    Q.  When you say -- when you say -- in the next
11  sentence says, "Mr. Baker refused to avail himself of
12  any of his coworker's expertise."  Do you see that?
13    A.  Yes.
14    Q.  Okay.  Did he -- how did you come to that
15  conclusion?  Did he tell you that?
16    A.  It was just the interaction between Earl and
17  coworkers.  He wouldn't -- like a lot of the people
18  there had much more experience not only with machinery
19  parts but being in Smith & Wesson, and they could have
20  helped Earl troubleshoot if he went to them to help
21  them -- or to ask them, but he wasn't inclined to go
22  seek out help from anybody else.
23    Q.  Okay.  And these people -- these people that
24  you felt that Earl -- that could have been helpful to

Page 148

1  Earl, as you sit here, do you -- do you -- who were
2  they?  Names.  Anyone?
3    A.  There was a cell coordinator, Josh Bury, a
4  cell coordinator for Thompson Center Barrels.
5    Q.  Okay.
6    A.  Bobby O'Donnell in the Pistol Barrel
7  Department --
8    Q.  Okay.
9    A.  -- are the two that come to mind.
10    Q.  Okay.  Anyone else that you can think of?
11    A.  Waleska Wick, who was at the time the cell
12  coordinator in Pistol Slide.
13    Q.  Okay.  Anyone else?
14    A.  That's all I can --
15    Q.  That's the woman from Brazil, correct?
16    A.  Correct.
17    Q.  Okay.  Anyone else?
18    A.  I can't think of anybody else at this time.
19    Q.  Okay.  And do you have a recollection of
20  having a discussion with him regarding, hey, why don't
21  you go ask Josh or Bob O'Donnell or Miss Wick?  Do you
22  have a recollection of having such discussions with
23  Mr. Baker?
24    A.  One discussion I remember specifically was

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 149

1  about the Schneeberger tooling. I asked him. He was
2  supposed to work very closely with Josh Bury to not
3  only identify the tool numbers that were most used and
4  the most needed and that was costing him the most to
5  breakage of tools, the tools themselves when they were
6  being used. I asked him to work very closely with
7  Josh, and it didn't seem like it ever happened.
8      Q.  Okay.  And this breakage of tools, did it
9  have something -- did it have anything to do with the
10 broken head, if you know?
11     A.  No.  Different -- different situation.
12 There were problems with broken tools in the T/C
13 Barrel cell.
14     Q.  Got it.
15     A.  Not because of the Schneeberger.
16     Q.  Got it.
17         Okay.  Other than that one instance
18 with Josh Bury, do you ever -- do you recall any other
19 discussion you had with Earl Baker about, hey, why
20 don't you go ask so and so or ask Josh or
21 Bob O'Donnell or Miss Wick or get help from someone
22 else?
23     A.  I don't remember anything specifically.
24     Q.  Okay.  Other than -- is there anything that

Page 150

1  might -- that would refresh your recollection, such
2  as, notes, your handwritten notes or any e-mails or
3  journals or anything like that?
4      A.  No.
5      MS. BERTRAM:  What was your response, Larry?
6      THE WITNESS:  No.
7  BY MR. LEE:
8      Q.  The last sentence says, "As a result, many
9  of the issues I identified as ripe for problem solving
10 worsened during Mr. Baker's time in the Cutter
11 Department."  Do you see that?
12     A.  Yes.
13     Q.  As you sit here, what are the many of the
14 issues identified as ripe that you can recall?
15     A.  Broken tools, poorly performing tools, tool
16 stock outs, tool improvements, variety of situations
17 that could have been dealt with.
18     Q.  Okay.  Anything else?
19     A.  No.
20     Q.  And dealing with broken tools and stock out
21 and things like that, that was part of his job, right,
22 Mr. Baker's job?
23     A.  Yes.
24     Q.  I'm going to skip a little bit, and I ask

Page 151

1  you to go to -- well, no.  Paragraph 27, can you read
2  that to yourself.  As of fall of 2013, in what way was
3  Mr. Baker not effectively managing his department?
4      A.  At this point, he was still not producing
5  any project improvement plans of how he was going to
6  attack the problems that we had laid out on the
7  S.M.A.R.T. forms.  He had not really followed up on
8  what he was going to do and never really communicated
9  what he wanted to do even though I kept asking him for
10 them.
11     Q.  And when you say -- were you expecting,
12 like, a written communication from him on the
13 follow-up on the S.M.A.R.T. forms or no or were you
14 expecting something oral?
15     A.  I was expecting a written form, however it
16 was configured, that listed what he was going to do
17 and when he was going to do it and what was the
18 expected outcome.
19     Q.  Okay.  And did you tell him that you wanted
20 a -- I want to make sure that we have this clear.  As
21 of fall of 2013, he's only had one review and that's
22 the June and July of 2013 review, correct?
23     A.  Correct.
24     Q.  In which you found him meets expectations,

Page 152

1  right?
2      A.  Right.
3      Q.  And in the follow-up to the S.M.A.R.T.
4  forms -- and those S.M.A.R.T. forms were attached to
5  Exhibit 356, the June, July '13 review, right?
6      A.  Correct.
7      Q.  So in the follow-ups as to -- regarding the
8  S.M.A.R.T. forms, what was he supposed to -- is there
9  another form that he's supposed to fill out or, in
10 other words, is there a follow-up form to the
11 S.M.A.R.T. form as the S.M.A.R.T. form proceeds?
12     A.  No.  He was to use whatever -- whatever form
13 or configuration he wanted to that would show what he
14 was going to do, what the tasks were, when they were
15 going to be done and when he -- what he expected as
16 results.
17     Q.  Okay.  And did you send -- and did you tell
18 him this that you expected this from him in writing?
19     A.  Yes.
20     Q.  Okay.  You mean the S.M.A.R.T. form?
21     A.  Not necessarily the S.M.A.R.T. form.  Just
22 some way of communicating it so we could have a
23 discussion so it could be tracked.
24     Q.  Okay.  But my question is when you

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 153

1    communicated this to him that you wanted progress
2    reports in writing, did you do that in writing, the
3    communication in writing?
4        **A.   We had the discussion because of the**
5    **S.M.A.R.T. forms.  That was part of it, and, again, I**
6    **had the weekly meetings with Earl.  Every Monday at**
7    **1:00 o'clock, we discussed the progress of each one of**
8    **those three items every Monday.**
9        Q.   Okay.  So discussion.  Weekly meetings.
10   Those are discussions.  I'm just trying to figure
11   out -- and we have your handwritten notes from those
12   weekly meetings, right?
13       **A.   Right.**
14       Q.   Okay.  So my question is did you ever send
15   him an e-mail or some sort of a written form of a
16   reprimand saying, hey, you're not giving me what
17   you're supposed to be giving me in a written form with
18   respect to progress on the -- on the S.M.A.R.T. forms?
19       MS. BERTRAM:  Objection to form.
20   BY MR. LEE:
21       Q.   Or was it just oral during the weekly
22   report -- weekly meetings?
23       **A.   What's the actual question?**
24       Q.   Okay.  You're right.  That was a very poor

Page 154

1    question.
2            When you were communicating to
3    Mr. Baker with respect to following up on his
4    objectives on the S.M.A.R.T. form, did you do that
5    communication to him in writing or orally?
6        **A.   Orally.**
7        Q.   During the weekly reports -- I mean, the
8    weekly meetings?
9        **A.   Yes.**
10       Q.   Okay.  And let me ask.  And what did he say?
11       **A.   I don't remember at this point.**
12       Q.   Okay.  When you say, "Mr. Baker did not meet
13   my deadlines" any performance -- "and the performance
14   of the Cutter Department continued to suffer," that is
15   the last sentence of paragraph 27.
16       **A.   Yes.**
17       Q.   Did you give Mr. Baker hard deadlines?
18       MS. BERTRAM:  Objection.  Vague and
19   compound.
20   BY MR. LEE:
21       Q.   On the three objectives from the S.M.A.R.T.
22   form, did you give hard deadlines?
23       MS. BERTRAM:  Same objections.  You can
24   answer, if you can.

Page 155

1        THE WITNESS:  What was the question?
2    BY MR. LEE:
3        Q.   Yes.  Of the S.M.A.R.T. form objective
4    worksheet that's part of the June, July 2013 review,
5    you say -- you say in the fall of 2013, he missed
6    deadlines, right?
7        **A.   Correct.**
8        Q.   Did you give those deadlines in the
9    S.M.A.R.T. objective worksheets?
10       **A.   I have to look at them.**
11       Q.   Yeah.  You just saw one of them where one of
12   the deadlines was done by March 2014, correct?
13       **A.   Yep.**
14       Q.   Did you give any other deadlines?
15       MS. BERTRAM:  Objection.  Vague and
16   compound.
17   BY MR. LEE:
18       Q.   If you take a look at -- can you go back and
19   take a look at page -- Exhibit 356 again.  On Baker
20   0004, the time-bound is done by March 2014, correct?
21       **A.   Correct.**
22       Q.   If you look at the next page that's Baker
23   0005, that one is need done by November 2013, right?
24   Do you see that?

Page 156

1        **A.   Correct.  Yep.**
2        Q.   And that one is to develop a program to get
3    full utilization out of the Schneeberger machine,
4    right?
5        **A.   Yes.**
6        Q.   And do you recall when the Schneeberger
7    was -- when that service person from Schneeberger came
8    out to check out the machine and figure out what was
9    wrong with it?
10       **A.   It was in July.**
11       Q.   Okay.  July of what year?
12       **A.   2013.**
13       Q.   Got it.
14           Now, if you go to page -- now, I'm up
15   to page 8, paragraph 28.  You gave me -- you gave
16   Mr. Baker an out-of-cycle review in February of 2014,
17   right?
18       **A.   Right.**
19       Q.   Before this out-of-cycle review of 2014, did
20   you tell Mr. Baker that he's getting an out-of-cycle
21   review?
22       **A.   No.**
23       Q.   Okay.  Not orally, not in writing?
24       **A.   Nope.**

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 157

1      Q.   Okay.  What prompted you to give him an
2   out-of-cycle review in February of 2014?
3      **A.   Based on my managerial philosophy, I don't**
4   **think it's fair to an employee to tell them of their**
5   **deficiencies on their prior review.  What I mean is I**
6   **don't think it's fair to tell somebody they're not**
7   **doing a good job when it's their review in June or**
8   **July, so what I was trying to do, again, trying to**
9   **mentor Mr. Baker by providing my honest opinion of his**
10  **performance so that he had time to make adjustments**
11  **and to remedy any nonconformances that he had in his**
12  **performance, so I was doing this out of trying to**
13  **mentor and help Earl -- or Mr. Baker to improve his**
14  **performance.**
15     Q.   Prior to giving him this review, did you
16  have discussions with anybody about your decision to
17  give this out-of-cycle review?
18     **A.   I had discussed it with Dan Fontaine.**
19     Q.   Okay.  And when did you have this discussion
20  with Mr. Fontaine?  I assume prior to giving the
21  out-of-cycle review, right?
22     **A.   Correct.**
23     Q.   How much prior to giving the out-of-cycle
24  review?

Page 158

1      **A.   I don't remember.**
2      Q.   Was it a matter of days or was it a matter
3   of weeks or was it a matter of months?
4      **A.   I don't remember.**
5      Q.   Is there anything that would refresh your
6   recollection, either a calendar meeting notice, an
7   e-mail, a journal entry, any of your handwritten notes
8   that would refresh your recollection as to when you
9   had a meeting with Mr. Fontaine about giving Mr. Baker
10  an out-of-cycle review?
11         MS. BERTRAM:  Objection to the form.
12  BY MR. LEE:
13     Q.   Did you understand the question?
14     **A.   Yeah.  I don't remember, and I don't think**
15  **there's anything that would remind me.**
16     Q.   Okay.  And at this -- how long -- this
17  discussion you had with Mr. Fontaine about your
18  decision to give Earl an out-of-cycle review, was it
19  in person or on the phone?
20     **A.   In person.**
21     Q.   Was there anybody else present?
22     **A.   No.**
23     Q.   How long was this meeting?
24     **A.   I don't remember.**

Page 159

1      Q.   Was it a matter of, like, five, ten
2   minutes or half an hour, hour or number of hours?
3          MS. BERTRAM:  Objection to the form.
4   BY MR. LEE:
5      Q.   Your best recollection of how long the
6   meeting was.
7      **A.   More than five minutes and less than eight**
8   **hours.**
9      Q.   Okay.  That's a pretty big range.
10     **A.   Right.**
11     Q.   Okay.  And you don't -- you don't have a
12  recollection any better than that, more than five
13  minutes and less than eight hours?
14     **A.   Nope.**
15     Q.   Okay.  And where was this meeting?
16     **A.   I may have met Dan in his office.**
17     Q.   Okay.  Now, as best -- did you take notes at
18  this meeting?
19     **A.   No.**
20     Q.   Did Dan take -- did Dan Fontaine take notes
21  at this meeting?
22     **A.   No.**
23     Q.   Okay.  So the best that you can recall in
24  this meeting at Mr. Fontaine's office of anywhere from

Page 160

1   five minutes to eight hours, tell me what you said and
2   tell me what he said.
3      **A.   I don't remember what we talked about.  It**
4   **was just Earl's performance and how I felt about it.**
5      Q.   Okay.  Other than, you know -- I understand
6   this was, what?  This must have been more than six
7   years ago, so six-and-a-half years ago.  Other than
8   that it was about giving Mr. Baker an out-of-cycle
9   review and how you felt about it, anything specific
10  that you can recall that you said and -- or what
11  Mr. Fontaine said?
12     **A.   I don't remember.**
13     Q.   Okay.  And I take it you didn't take any
14  notes during the meeting, but did you take any notes
15  after the meeting to sort of memorialize what was
16  discussed at this meeting?
17     **A.   No.**
18     Q.   And Mr. Fontaine was in agreement with you?
19         MS. BERTRAM:  Objection.  Calls for
20  speculation.
21  BY MR. LEE:
22     Q.   Well, if you recall.
23         MS. BERTRAM:  Same objection.
24  BY MR. LEE:

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 161

1    Q.   I know -- I know you don't recall what
2  Mr. Fontaine said, right?
3    **A.   Right.**
4    Q.   That specifically you don't recall what he
5  said, but, generally, did he agree with you or did he
6  not agree with you or --
7        MS. BERTRAM: Objection. Calls for
8  speculation and compound.
9  BY MR. LEE:
10   Q.   Well, it's not speculation. You were there.
11 Only two of you were in the room. What was
12 Mr. Fontaine's reaction?
13       MS. BERTRAM: Same objection.
14 BY MR. LEE:
15   Q.   What was his reaction?
16   **A.   He was in general agreement with me and just**
17 **was listening to my laying out my case that we needed**
18 **to help mentor Earl again.**
19   Q.   When you say "again," again as opposed to
20 when?
21   **A.   Daily meetings at the pitch board, with our**
22 **weekly meetings. Every time we had a discussion, you**
23 **know, we bring up the topics, and the results were not**
24 **what I expected.**

Page 162

1    Q.   Okay. Did he ever ask you why you never
2  wrote him up?
3    **A.   No.**
4    Q.   Did you ever volunteer why you never wrote
5  him up?
6    **A.   Nope.**
7    Q.   Okay. Now, I'm going to take a little
8  tangent from paragraph 28. When did you first find
9  out that Mr. Baker made an accusation or a claim of
10 improper relations between you and Pioneer to the HR
11 Department?
12   **A.   I don't even remember.**
13   Q.   Okay. But you did find out at some point
14 that Mr. Baker made an allegation against -- about
15 improper relations between Pioneer and you to the HR
16 Department?
17   **A.   What I learned later on, yes.**
18   Q.   Okay. Do you remember when later on?
19   **A.   I don't remember.**
20   Q.   Okay. Was it in 2014?
21   **A.   Yes.**
22   Q.   Okay. Do you remember how you found out?
23   **A.   No, because I don't remember when exactly I**
24 **did find out originally.**

Page 163

1    Q.   I understand, but my question is not when
2  but do you remember how you found out?
3    **A.   The one incident that I do remember where it**
4  **came and we discussed is when I went in to have an**
5  **interview with Rob Cicero.**
6    Q.   Okay.
7    **A.   And he told me that he was interviewing me**
8  **in terms of his investigation.**
9    Q.   Oh, so Mr. Cicero interviewed you during his
10 investigation?
11   **A.   Correct.**
12   Q.   In 2014?
13   **A.   Correct.**
14   Q.   Do you remember when in 2014?
15   **A.   No.**
16   Q.   Okay. Prior to Mr. Cicero's interview of
17 you as part of his investigation, did you have any
18 clue or inkling as to any allegations made by
19 Mr. Baker about you, improper relations between you
20 and Pioneer?
21       MS. BERTRAM: Objection. Vague as to the
22 terms "clue" and "inkling."
23 BY MR. LEE:
24   Q.   You can answer.

Page 164

1    **A.   Again, I don't remember. All I remember is**
2  **talking to Rob, and that's when it really came out.**
3  **Whether I heard it before that, I don't remember.**
4    Q.   Okay. Did you talk to Rob before the June
5  of 2014 review or after the June of 2014 review?
6    **A.   I don't remember.**
7    Q.   Is there anything that would refresh your
8  recollection as to when you talked to Rob?
9        MS. BERTRAM: Objection to form.
10 BY MR. LEE:
11   Q.   Either a -- either a calendar invite, an
12 e-mail, a journal entry, handwritten notes by you,
13 anything that would refresh your recollection as to
14 when Rob and you talked?
15   **A.   The only one I can really remember was the**
16 **calendar invite, which is -- doesn't exist anymore.**
17   Q.   Okay. So Mr. -- Mr. Cicero invited you by a
18 calendar invite?
19   **A.   Either that or through his assistant.**
20   Q.   Okay. Did he call you in advance before he
21 sent -- before you received a calendar invite?
22   **A.   No.**
23   Q.   Okay. When -- how many times did you have a
24 meeting with Rob Cicero during his interview -- during

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 165

1  his investigation?
2      A.  I remember only once.
3      Q.  Okay.  Anyone else -- and was it in
4  Mr. Cicero's office?
5      A.  Yes.
6      Q.  Was anybody else present?
7      A.  No.
8      Q.  How long was that meeting?
9      A.  I don't remember, but it was at least an
10  hour.
11      Q.  Okay.  Did you take any notes at that
12  meeting?
13      A.  No.
14      Q.  Did he -- did Mr. Cicero take any notes at
15  that meeting?
16      A.  I don't remember.
17      Q.  Okay.  The best that you can recall during
18  that meeting, what did he say and what did you say?
19      A.  I don't remember.  The only thing I remember
20  at this point was a discussion about the gift card I
21  had received from Pioneer Tool and what I did with it.
22      Q.  Okay.  Other than that, did you have any
23  other -- do you recall anything else that was
24  discussed between you and Mr. Cicero at that meeting?

Page 166

1      A.  Vague recollection about, you know, the
2  allegations that were -- some of the allegations that
3  were made about Pioneer.
4      Q.  Okay.  And what was -- what is that vague
5  recollection about allegations made against Pioneer?
6      A.  That there was some sort of collusion going
7  on between Pioneer and myself and what was going on in
8  the department.
9      Q.  Okay.  And what was the nature of that
10  collusion allegation that you recall?
11      A.  It was alleged that I was favoring Pioneer
12  Tool in their pursuit of business with Smith & Wesson.
13      Q.  Anything more specific than that?
14      A.  It was just generally that.
15      Q.  Okay.  Let me ask it to you this way.  Prior
16  to this meeting with Mr. Cicero, had you ever heard
17  rumors of improper gifts from vendors to employees of
18  Smith & Wesson?
19      A.  No.
20      Q.  Never heard of it?
21      MS. BERTRAM:  Asked and answered.
22  Objection.
23  BY MR. LEE:
24      Q.  Okay.  You never heard of flat screen TVs

Page 167

1  being delivered to employees -- managers of
2  Smith & Wesson?
3      A.  No.
4      Q.  Never heard of iPads being delivered to
5  managers of Smith & Wesson?
6      A.  Not until later on after this whole
7  investigation.  I knew about gift cards, but they were
8  of appropriate value that they weren't an issue.
9      Q.  Okay.  And as far as you knew, gift cards
10  were -- receiving gift cards were acceptable under
11  Smith & Wesson policy?
12      A.  Correct.
13      Q.  Okay.  What if they weren't gift cards but
14  they were actual cash in the same amount as the gift
15  card, would that be acceptable?
16      A.  In that same amount, I think it was
17  acceptable under our guidelines.
18      Q.  So if a vendor gave a manager of
19  Smith & Wesson $100 in cash, that's acceptable under
20  Smith & Wesson guidelines?
21      MS. BERTRAM:  Objection to the form.  Calls
22  for speculation.
23  BY MR. LEE:
24      Q.  I'm not asking you to speculate.  You said

Page 168

1  the amount.  If the same amount as the gift card was
2  cash, that that's acceptable under Smith & Wesson
3  guidelines, is that correct?
4      MS. BERTRAM:  Same objection.
5      THE WITNESS:  Well, what's the difference?
6  What's the difference between a $50 gift card and $50
7  cash?
8  BY MR. LEE:
9      Q.  I don't know.  I'm asking.  So --
10      A.  If they're within the guidelines, I would
11  say.
12      Q.  Okay.  Okay.  So whether it's $50 or
13  whatever the guideline is, if a vendor gives cash to a
14  Smith & Wesson employee, that's acceptable so long as
15  it's within the guidelines?
16      A.  Yes.
17      Q.  Okay.  And where are the guidelines printed
18  or published with respect to receiving gifts from
19  vendors?
20      A.  I couldn't -- I can't answer that.  I don't
21  know.
22      Q.  Okay.  So when you say guidelines, is
23  this -- is this sort of something that's shared by
24  employees of Smith & Wesson as to what is acceptable

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 169

1  and what is not acceptable?
2      MS. BERTRAM: Objection. Vague.
3  BY MR. LEE:
4      Q.   Well, let me ask it to you this way.  If
5  it's not written and you don't know where it's
6  written, where do you go for Smith & Wesson guidelines
7  on what is an acceptable gift from a vendor and what
8  is not?
9      MS. BERTRAM: Objection. This is -- this is
10  badgering.
11  BY MR. LEE:
12     Q.   No, it's not.  No, it's not.
13     MS. BERTRAM: He said he doesn't recall,
14  and, now, you are saying if you don't recall, where do
15  you look?
16  BY MR. LEE:
17     Q.   No, no, no.  He said -- he says he doesn't
18  recall anything written -- any written policy.  Now,
19  my question is if you don't know of any written
20  policy, where do you go or who do you go to to find
21  out what is Smith & Wesson's guidelines as to what is
22  an acceptable gift from vendor and what is not an
23  acceptable gift from vendor?
24     MS. BERTRAM: Objection. Mischaracterizes

Page 170

1  his testimony.
2  BY MR. LEE:
3      Q.   You can answer.
4      A.   It was generally the -- generally occurred
5  that when somebody receives something like that from a
6  vendor, they normally would go see their boss who they
7  report to to discuss it to see whether the
8  appropriateness of that gift was okay with company
9  policy.  I, myself, had -- nobody had ever come to me
10  about it, and there was never an issue, so I never
11  went to look up the policy or to find out what it was.
12     Q.   Okay.  So since you never looked it up, you
13  don't know whether it exists or does not exist,
14  correct?
15     A.   Correct.
16     Q.   Same -- same question with respect to sports
17  tickets, baseball tickets, football tickets.  As far
18  as you know, is it acceptable to receive such tickets
19  from vendors?
20     A.   I have no idea.  I never ran into it, and
21  I've never had to inquire about it.
22     Q.   Okay.  Now, I'm going to go to in 2013,
23  sometime in the summer, did you go to an EASTEC show?
24     A.   Yes.

Page 171

1      Q.   And is an EASTEC trade show -- first,
2  explain to me what an EASTEC show is.  Who is EASTEC?
3      A.   EASTEC is the -- is part of the engineering
4  association, and it's a vendor show where people who
5  have either tools, machines, it's just a machining
6  show where anything that you would like to buy, they
7  have available or are demonstrating, whether it be
8  tool software, tool machines, cutting tools, anything
9  to do with manufacturing, the trade show to sell it.
10  It's a very large show.  It's --
11     Q.   Is it an annual show or a semi-annual show
12  or a biannual show?
13     A.   It's an annual show.
14     Q.   Okay.
15     A.   It's every year, and as part of my
16  participation, especially services business where
17  we're offering services to outside companies, I, as
18  part of my marketing program, always had a booth at
19  that show.
20     Q.   So Smith & Wesson had a booth at the EASTEC
21  show?
22     A.   Correct.
23     Q.   And I assume many other vendors in the
24  manufacturing sector also have booths at these shows?

Page 172

1      A.   Correct.
2      Q.   And the show -- the EASTEC show in 2013,
3  your best recollection, when did it take place?
4      A.   It was the end of May.
5      Q.   Okay.  And where was it?
6      A.   At the Eastern States Exposition, which is
7  affectionately known in our neck of the woods as the
8  Big E.  It's big fair grounds that have multiple
9  buildings, which is one of the few venues that could
10  hold a show that was that large.  It was 55 buildings
11  within the Big E complex.
12     Q.   So the Big E, is that, basically, Western
13  Mass when you say your neck of the woods?
14     A.   In West Springfield.
15     Q.   Oh, okay.  Is it always there or is
16  it -- does it move, the EASTEC show?
17     A.   The only facility large enough to be able to
18  handle that show because it was so big.
19     Q.   So every year late spring, early summer,
20  there's an EASTEC show at the Big E in Springfield,
21  Mass, is that correct?
22     A.   Correct.
23     Q.   Okay.  And how many days is this show?
24     A.   Usually, it was three days.

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 173

1    Q.   Okay.  Is that, like, a Friday, Saturday,
2  Sunday or Thursday, Friday, Saturday?
3    **A.   Usually, Tuesday, Wednesday, Thursday.**
4    Q.   Oh, okay.  And did you go?
5    **A.   Yes.**
6    Q.   Did Earl Baker go?
7    **A.   Yes.**
8    Q.   And how many days were you there?
9    **A.   I was there all three days.**
10   Q.   Okay.  And how about Earl?
11   **A.   He was there probably one afternoon.**
12   Q.   Okay.
13   **A.   What I tried to do was schedule each one of**
14 **my cell coordinators in the afternoon to be at the**
15 **booth in case some of their customers came by and also**
16 **had my manufacturers' reps at the booth also helping**
17 **us answer questions.**
18   Q.   Okay.  And did you have a conversation with
19 Earl Baker about Pioneer's raffle prizes or winning
20 Pioneer's raffle -- let me finish the question.  I
21 know what your answer is going to be, but you got to
22 let me finish the question.
23           Did you have a conversation with
24 Earl Baker about Pioneer's raffle prizes at the EASTEC

Page 174

1  show in 2013?
2    **A.   No.**
3    Q.   Okay.  Do you -- so I take it you did not
4  tell him that Earl, if you put your name in, you're
5  going to win?
6    **A.   I would tell him, if I said anything to him,**
7  **to put your card in, you have a potential of winning.**
8    Q.   Okay.  And other than that, did you ever
9  have a discussion with Earl about the raffle at EASTEC
10 show in 2013?
11   **A.   No.**
12   Q.   Okay.  Did you ever get a visit from anybody
13 wanting to deliver an iPad to you shortly after the
14 EASTEC show in 2013?
15   **A.   No.**
16   Q.   Okay.  And did you have a discussion about
17 this -- the EASTEC show and Pioneer's raffle with
18 anybody in 2014?
19   **A.   No.**
20   Q.   I'm going to see if I can just refresh your
21 recollection, but all I can -- for example, did
22 Rob -- did Rob Cicero ask you about it?
23   **A.   He asked about the one on the 13th.**
24   Q.   Correct.

Page 175

1    **A.   I think I talked to Rob before we**
2  **had -- before May of 2014.**
3    Q.   Got it.
4           So -- okay.  Now, we know at least you
5  talked to Rob before May of 2014, and he asked you
6  about the EASTEC show of 2013, correct?
7    **A.   It wasn't the EASTEC show.  It was about a**
8  **gift card that I had received at Christmas.**
9    Q.   Okay.  Okay.  I got that one.
10          My question to you is when you talked
11 to Rob Cicero that one time during his investigation,
12 do you recall having a discussion about the EASTEC
13 show of 2013?
14   **A.   I don't remember.**
15   Q.   Okay.  And do you have a recollection of
16 talking to Rob Cicero about the raffle prizes that can
17 be won from Pioneer at the EASTEC show in 2013?
18   **A.   I don't remember specifically talking about**
19 **that show, no.**
20   Q.   With respect to talking to -- about
21 the EASTEC show of 2013 and the potential
22 winning -- potentially winning raffle prizes from
23 Pioneer at that 2013, do you recall talking to anybody
24 about that?

Page 176

1           MS. BERTRAM:  I'm going to object because
2  it's compound and mischaracterizes his testimony
3  because you added in the --
4           MR. LEE:  I'll withdraw.
5           MS. BERTRAM:  It had two components to it.
6           MR. LEE:  I'll withdraw the question.
7           MS. BERTRAM:  Okay.
8  BY MR. LEE:
9    Q.   With respect to the EASTEC show of 2013, you
10 don't recall talking to Rob Cicero about it, correct?
11   **A.   Correct.**
12   Q.   Do you recall talking to Ed Suraci about it?
13   **A.   No.**
14   Q.   With respect to potentially winning raffle
15 prizes from Pioneer at the EASTEC show in 2013, do you
16 recall talking to Rob Cicero about it?
17   **A.   No.  I don't remember that.  Not the EASTEC**
18 **show.**
19   Q.   Okay.  Do you remember talking to Ed Suraci
20 about potentially winning raffle prizes from Pioneer
21 at the EASTEC show in 2013?
22   **A.   No.**
23   Q.   Now, my question is same thing.  Do you
24 recall talking to anybody about the EASTEC show of

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 177

1  2013, whether it be Kathy Salvador, Anne Bruce,
2  Ann Glica, anybody at Smith & Wesson?
3      **A.   No.**
4      Q.   With respect to the potential raffle prizes
5  you could win from Pioneer at the EASTEC show in 2013,
6  do you recall talking to anyone at Smith & Wesson
7  about that?
8      **A.   No.**
9      Q.   Okay.  Do you know who Ed Prystupa is?
10     **A.   Yes.**
11     Q.   And, first of all, what was Ed Prystupa's
12 job while you were at Smith & Wesson?  And I'm going
13 to limit that question to between 2010 and 2016.
14     **A.   He was the Andy Dziobek before Andy.**
15     Q.   Okay.  Do you recall -- do you
16 recall -- sorry.  Do you recall when Ed -- when Ed
17 moved out of that position and Andy Dziobek moved in?
18 Do you recall that?
19     **A.   It's when Ed retired.  I don't remember the**
20 **date.**
21     Q.   Did Ed retire before you or after you?
22     **A.   Before.**
23     Q.   Okay.  After Andy Dziobek went into
24 Ed Prystupa's position, do you know what position that

Page 178

1  Mr. Prystupa went to?
2      **A.   I remember he retired.**
3      Q.   Oh, he didn't go to any
4  other -- Mr. Prystupa was in the Purchasing
5  Department, correct?
6      **A.   Correct.**
7      Q.   Okay.  So your recollection is when
8  Mr. Dziobek came in to take Mr. Prystupa's position,
9  Mr. Prystupa retired?
10     **A.   Correct.**
11     Q.   And -- okay.  Prior to having that position
12 that Mr. Dziobek ended up taking, what was
13 Mr. Prystupa's position?
14     **A.   He was -- he was in the Purchasing**
15 **Department responsible for purchasing tools and**
16 **supplies.**
17     Q.   Okay.  What kind of supplies?
18     **A.   Any kind of supplies, whether it be rags,**
19 **Speedball, the cleaning agent for machines, to**
20 **anything that's ancillary to a plant, manufacturing**
21 **plant, he was responsible to order.**
22     Q.   Okay.  During your tenure at Smith & Wesson,
23 did you go through something called L-R-N?
24     **A.   I don't know what that is.**

Page 179

1      Q.   Okay.  Let me describe it.  Is there, like,
2  a training program online that Smith & Wesson provides
3  to its managers or employees with respect to various
4  issues?
5      **A.   Oh, the policy, online policy program that**
6  **we had to complete on a quarterly basis?**
7      Q.   Yes, sir.
8      **A.   Okay.**
9      Q.   Okay.  So is that a requirement on a
10 quarterly basis for all employees?
11     **A.   Yes.**
12     Q.   And is it kind of a webinar type of a thing
13 or a website type of a thing?  You log on and you go
14 through this training session?
15     **A.   Right, and then they give you a final exam**
16 **at the end, right.**
17     Q.   Okay.  And that's done on a quarterly basis?
18     **A.   If I remember correctly, yes.**
19     Q.   Okay.  Do you recall the LRN about whistle
20 blowing, if you recall?
21     **A.   I don't recall that specifically, but I'm**
22 **sure if it was on the required list, I went through**
23 **it.**
24     Q.   Okay.  I have a question about did

Page 180

1  Mr. -- after having this discussion with Mr. Cicero
2  about the allegations of improper relations with
3  Pioneer, did Mr. Cicero tell you anything about how to
4  manage Mr. Baker at that meeting?
5      **A.   No.**
6          MS. BERTRAM:  Objection.  Mischaracterizes
7  the testimony.
8  BY MR. LEE:
9      Q.   Okay.  And if not at that meeting, did he
10 tell you in any other way, telephone call or by e-mail
11 on how to manage Mr. Baker in light of his
12 allegations?
13         MS. BERTRAM:  Same objection.
14 BY MR. LEE:
15     Q.   You can answer.
16     **A.   Not that I remember.**
17     Q.   Okay.  Now, I'm going to move on from
18 Mr. Cicero, how about Mr. Suraci, did he ever tell you
19 about how to manage Mr. Baker in light of Mr. Baker's
20 allegations?
21     **A.   No.**
22     Q.   I'm going to ask it to you this way.  Did
23 anybody ever communicate with you about how to manage
24 Mr. Baker in light of his allegations regarding

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 181

1 Pioneer and improper relations?
2          MS. BERTRAM:  Same objections.
3     BY MR. LEE:
4     Q.  You can answer.
5     **A.  I don't remember anybody.**
6     Q.  Okay.  And if I say -- I'm going to go
7 through some names.  For example, did Anne Bruce ever
8 communicate with you about how to manage Mr. Baker in
9 light of his allegations --
10         MS. BERTRAM:  Same objections.
11    BY MR. LEE:
12    Q.  -- regarding Pioneer?
13    **A.  I don't remember.  I don't remember going**
14 **through it.**
15    Q.  Okay.  How about Miss Salvador?
16    **A.  I don't remember.**
17    Q.  How about Mr. Fontaine?
18         MS. BERTRAM:  Same objections.
19    BY MR. LEE:
20    Q.  Your answer is?
21    **A.  I don't remember.**
22    Q.  Okay.
23         MS. BERTRAM:  John, are you coming to the
24 end of this topic because there was an interest in

Page 182

1 taking a break?
2          MR. LEE:  We can take a break.
3          MS. BERTRAM:  Okay.
4          MR. LEE:  Hold on one second.  It's 2:00
5 o'clock my time, 3:00 o'clock your time, so, like, a
6 five- to ten-minute break is fine.
7          MS. BERTRAM:  Okay.  Sounds great.  Thank
8 you.
9          THE VIDEOGRAPHER:  Stand by, please.  The
10 time is 2:00 p.m. Central time.  We are off the
11 record.
12          (Recess.)
13          THE VIDEOGRAPHER:  The time is 2:16 p.m.
14 Central time.  We are back on the record.
15    BY MR. LEE:
16    Q.  Mr. Flatley, I have a question about
17 Exhibit 294.  You already testified you signed this
18 thing under oath.  Did you draft this, Exhibit 294?
19    **A.  Yes.**
20    Q.  Okay.  You drafted it and then you signed
21 it?  You had it typed up or you typed it yourself?
22    **A.  No.  Somebody else typed it.  I gave -- I**
23 **produced the notes.**
24    Q.  Okay.  Now, we're going to go back to

Page 183

1 paragraph 29, but I have -- I'm going to ask you to go
2 to page 11, paragraph 35.  "After the February 2014
3 interim" -- paragraph 35 says, "After the
4 February 2014 interim evaluation, Mr. Baker adopted an
5 openly hostile attitude towards me," and then it says,
6 "During this period, I also became aware that
7 Mr. Baker had approached Human Resources, complaining
8 that he could not meet my expectations."  Do you see
9 that?
10    **A.  Yes.**
11    Q.  How did you become aware that Mr. Baker had
12 approached HR at this time period?
13    **A.  After I presented the February '14 interim**
14 **evaluation to Mr. Baker, it was actually a follow-up**
15 **meeting with Mr. Fontaine, Ed Suraci and Earl, and**
16 **during that meeting, Mr. Suraci talked about the**
17 **situation with Mr. Baker of not feeling that he**
18 **couldn't meet my expectations.**
19    Q.  Okay.  And other than -- other than this one
20 meeting -- or other than a meeting that Mr. Suraci,
21 you, Mr. Fontaine and Earl had together, do you
22 recall -- who -- who did you deal with from HR?
23         MS. BERTRAM:  Objection.  Vague.
24    BY MR. LEE:

Page 184

1     Q.  You, obviously, dealt with Mr. Suraci from
2 HR at that meeting with Mr. Fontaine and Earl and you,
3 correct?
4     **A.  Correct.**
5     Q.  Okay.  And other than Mr. Suraci, did you
6 deal with anybody else from HR with respect to
7 Mr. Baker?
8     **A.  No.  Just Mr. Suraci.**
9     Q.  Okay.  So you didn't -- you didn't interact
10 with Kathy Salvador, for example?
11    **A.  No.**
12    Q.  You didn't interact with Ann Glica, for
13 example?
14    **A.  Only -- the only interaction I had was to**
15 **get the postings or find out the status of the**
16 **postings for the CNC operators that we were trying to**
17 **get.  I still had interactions with HR about that.**
18    Q.  Okay.  Other than trying to get the CNC
19 operators, with respect to the interim out-of-cycle
20 review and Mr. Baker's performance review, did you
21 deal with Anne Bruce, for example, about that?
22    **A.  I only remembered dealing with Ed Suraci.**
23 **He was -- he was with us in a few meetings.  We didn't**
24 **just have one meeting with Mr. Baker.  We had a few.**

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 185

1  I don't exactly remember how many.  It was more than
2  one.
3      Q.  Okay.  I'm just trying to -- okay.  You had
4  one meeting with Mr. Cicero, correct, that you and
5  I -- that you and I discussed, right?
6      A.  That was later.
7      Q.  Right.  And then -- and you had several
8  meetings with Mr. Suraci, correct?
9      A.  Correct.
10     Q.  Did you meet with Miss Bruce about
11 Mr. Baker's performance?
12         MS. BERTRAM: Objection.  Vague.
13 BY MR. LEE:
14     Q.  Did you meet with or have a conversation
15 with Miss Bruce about Mr. Baker's performance review?
16     A.  Not in February.
17         MS. BERTRAM: Same objection.
18 BY MR. LEE:
19     Q.  At any point.
20     A.  After June.
21     Q.  Okay.  After June of 2014, right?
22     A.  Correct.
23     Q.  Okay.  And that's the June of 2014 review
24 that you had with Mr. Fontaine, you and Miss Bruce,

Page 186

1  correct?
2      A.  That was -- our meeting was after that June
3  meeting.
4      Q.  Okay.
5      A.  I presented the June '14, July performance
6  review to Earl, and any meeting that I had with
7  Miss Bruce was after that.
8      Q.  Got it.
9          And when you gave your June review,
10 June of 2014 review to Earl, did you do it by yourself
11 or did you do it with anybody?
12     A.  I remember it just being by myself with
13 Earl.
14     Q.  Okay.  Did you have input from anybody
15 before you gave your June 2014 review to Earl?
16     A.  I don't remember any.
17     Q.  Okay.  Did you have a discussion with
18 Mr. Fontaine about Mr. Baker's June of 2014 review
19 prior to giving it --
20     A.  Yes.
21     Q.  -- to Mr. Baker?
22     A.  He had to sign the review form or review the
23 review form before I gave it to Mr. Baker.
24     Q.  Got it.

Page 187

1          So other than Mr. Suraci, this meeting
2  at which Mr. Suraci and Mr. Fontaine and Earl and you
3  had in which Mr. Baker said -- complained that he
4  cannot meet the expectations in the February 2014
5  interim review, did you have any other communications
6  with HR about Mr. Baker's performance review or the
7  complaints he made about improper relations with
8  vendors?
9          MS. BERTRAM: Objection.  Vague and
10 compound.
11 BY MR. LEE:
12     Q.  You can answer.
13     A.  I disagree with your -- your synopsis.  He
14 never complained to me or in those meetings he
15 couldn't meet my expectations.  That wasn't the
16 discussion.
17     Q.  Okay.
18     A.  That was never stated in those meetings.
19     Q.  Okay.  So how did you know that he said that
20 to HR?
21     A.  I was telling that to him in terms of these
22 are your expectations, and you haven't met them yet.
23     Q.  Okay.  It says, "During this period, I also
24 became aware that Mr. Baker had approached Human

Page 188

1  Resources, complaining that he could not meet my
2  expectations."  How did you know that Mr. Baker had
3  approached Human Resources?
4      A.  Because Mr. Suraci told me in the meeting
5  that that was the case.
6      Q.  Okay.  And this is the meeting where
7  Mr. Suraci went -- Mr. Suraci told you this at the
8  meeting was -- were Mr. Fontaine and Earl also at that
9  meeting?
10     A.  Yes.
11     Q.  Or is that a different meeting?
12     A.  No.  Same meeting.
13     Q.  Okay.  So during this meeting with the four
14 of you, Mr. Suraci said Mr. Baker had approached Human
15 Resources complaining that he could not meet your
16 expectations, right?
17     A.  Correct.
18     Q.  And what did you say in response to that?
19     A.  I don't really remember saying anything to
20 them.  What could I say?
21     Q.  Okay.  Did Mr. Fontaine say anything in
22 response to that?
23     A.  Again, I don't remember him saying anything.
24     Q.  Did Mr. Baker say anything in response to

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 189

1  that?
2      A.   Not -- I don't remember him saying anything.
3      Q.   Okay.  So this meeting at which Mr. Suraci,
4  Mr. Baker, Mr. Fontaine and you are at, were there any
5  notes taken by anybody?
6          MS. BERTRAM:  Objection.  Calls for
7  speculation.
8  BY MR. LEE:
9      Q.   Well, there are four of you in the room.
10 Were there any -- you've having this meeting.  Did you
11 see anybody take notes?
12     A.   I didn't notice.
13     Q.   Okay.  And after that meeting, did you take
14 any notes about the meeting?
15     A.   Myself, no.
16     Q.   Okay.  Did you have any communications with
17 either Mr. Suraci or Mr. Fontaine about that meeting
18 after the meeting as a follow-up?
19     A.   I don't believe I did.
20     Q.   Okay.  You say in the first sentence that
21 Mr. Baker adopted an openly hostile attitude towards
22 you.  How?
23     A.   He was very animated, very angry, hostile,
24 very belligerent towards me in front of Mr. Suraci and

Page 190

1  Mr. Fontaine.
2      Q.   At the meeting?
3      A.   Correct.
4      Q.   Okay.  And other than at the meeting, did
5  Mr. Baker adopt a hostile attitude towards you?
6      A.   Define hostile.  How do you mean that?
7      Q.   Well, you're the one who wrote it.  Your
8  definition is fine.  You said he was hostile towards
9  you at that meeting where the four of you are having a
10 meeting about the out-of-cycle 2014 review, right?
11     A.   Right.
12     Q.   My question is outside of that meeting, did
13 Mr. Baker adopt a hostile attitude towards you?
14     A.   After the meeting, I guess there was no more
15 yelling, belligerence or that kind of behavior anyway.
16 That was just at the meeting where we were discussing
17 his exceptions to the interim evaluation.
18     Q.   Okay.  And so after the meeting, did he ever
19 go back to a hostile attitude towards you?
20     A.   I don't think he was going to invite me over
21 for dinner anytime soon.
22     Q.   Okay.  But that's different from hostile,
23 right?  I mean, I'm just going by whatever is the
24 common Webster's Dictionary definition of hostile,

Page 191

1  but --
2      A.   He wasn't --
3      Q.   He was -- he was hostile -- you said he was
4  hostile at the meeting.  He was yelling.
5      A.   Right.
6      Q.   He was animated.  I'm just going after that
7  meeting where the four of you met, was -- did
8  Mr. Baker adopt a hostile attitude towards you,
9  whether he was going to invite you for dinner or not?
10         MS. BERTRAM:  Objection.  Vague and to
11 the -- and to the form of the question.
12 BY MR. LEE:
13     Q.   You can answer the question.
14     A.   He was not as hostile.  It was a more
15 professional interaction.
16     Q.   Okay.  And is that true from the time of the
17 interim review until the time he went on the
18 administrative leave?
19         MS. BERTRAM:  Objection.  Vague.
20 BY MR. LEE:
21     Q.   You said he was not hostile.  He was
22 professional.  Is that true from the period of
23 February 2014 interim review and the time that he went
24 on administrative leave?

Page 192

1          MS. BERTRAM:  Same objections.
2  BY MR. LEE:
3      Q.   You can answer.
4      A.   What I said was he was more professional.  I
5  wouldn't exactly call him totally professional, but he
6  wasn't yelling and screaming anymore, and he wasn't
7  openly accusing me of anything.
8      Q.   Okay.  What did he accuse you of at
9  the -- at the -- at the meeting?
10     A.   Of not telling the truth and making things
11 up.
12     Q.   Okay.  He disagreed with you vehemently,
13 correct?
14     A.   Correct.
15     Q.   Okay.  Now, after the meeting -- by the way,
16 this February 2014 meeting between Mr. -- among
17 Mr. Suraci, Mr. Baker, Mr. Fontaine and you, now,
18 focusing on after that period, after that meeting to
19 the point when Mr. Baker goes on administrative leave,
20 you said he was more professional and he wasn't openly
21 hostile, correct?
22     A.   Right.
23     Q.   Okay.  Did -- and did -- did that -- did
24 what I described as Mr. Baker's approach, did that

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 193

1    last throughout that period from that meeting among
2    the four of you to the time that Mr. Baker went on
3    administrative leave?
4        MS. BERTRAM: Objection. Vague and
5    compound.
6    BY MR. LEE:
7        Q.   You can answer.
8        A.   What's the question?
9        Q.   Yeah. What you described as more
10   professional and not hostile, you said that was
11   between after the meeting of the -- the meeting of
12   February 2014, and I'm just asking did that last all
13   the way through until he went -- him going on
14   administrative leave?
15       MS. BERTRAM: Objection. Mischaracterizes
16   his testimony. It's also asked and answered.
17   BY MR. LEE:
18       Q.   You can answer.
19       A.   He didn't have any loud outbursts or yelling
20   matches or accusations made towards me in our
21   interactions, but he still wasn't performing his job
22   duties the way he should have.
23       Q.   Okay. And those job -- that comes up in the
24   June of 2014 review, correct?

Page 194

1        A.   Correct.
2        Q.   Let me ask it to you this way, then.
3    Between the February -- between February of 2014 and
4    Mr. Baker going on administrative leave in July of
5    2014, did you write him up for anything?
6        A.   No. The only thing I wrote up was the
7    performance review from June, July of '14.
8        Q.   Got it.
9            Now, did you -- in that period between
10   February of 2014 and July of 2014, did you reprimand
11   Mr. Baker for anything?
12       MS. BERTRAM: Objection. Vague.
13       THE WITNESS: Define reprimand.
14   BY MR. LEE:
15       Q.   Discipline him.
16       A.   In what way?
17       Q.   For anything that a supervisor can
18   discipline a subordinate for. You didn't write him up
19   for anything, right? There's nothing written. No
20   written anything other than between February 2014 and
21   July 2014, correct?
22       A.   Right.
23       MS. BERTRAM: Objection. Compound. You've
24   asked about three questions in a row.

Page 195

1    BY MR. LEE:
2        Q.   Okay. Now, leave out -- leave out the
3    written write-up. Did you orally reprimand or
4    discipline Mr. Baker for anything between February of
5    2014 and July of 2014?
6        MS. BERTRAM: Objection. Vague.
7        THE WITNESS: I don't understand how you
8    discipline somebody orally. Did I try to mentor him?
9    Is that what you're asking?
10   BY MR. LEE:
11       Q.   Okay.
12       A.   Coach him?
13       Q.   Okay.
14       A.   Did I try to give him the benefit of the
15   doubt and work with him?
16       Q.   Okay.
17       A.   Is that what you're asking? Yes, I tried.
18       Q.   Okay. And none of those by your definition
19   constitutes discipline or reprimand, correct?
20       A.   Correct.
21       Q.   That's fair.
22           How did you find out that Mr. Baker was
23   on administrative leave?
24       A.   I think it was -- I think Dan Fontaine told

Page 196

1    me.
2        Q.   Okay. And do you know why he went on
3    administrative leave?
4        A.   No, I don't think I did at the time.
5        Q.   Okay. Do you know who decided Mr. Baker
6    should be on administrative leave?
7        A.   I didn't know at the time, no.
8        Q.   Okay. When an employee goes on
9    administrative leave, an employee who is under you who
10   reports to you, can that person just bypass you and go
11   right to HR and ask for administrative leave?
12       MS. BERTRAM: Objection. Hypothetical and
13   calls for speculation.
14       THE WITNESS: What was the question?
15   BY MR. LEE:
16       Q.   Yeah. An employee who reports to you --
17       A.   Right.
18       Q.   -- can that person bypass you and go right
19   to HR and request -- request administrative leave?
20       MS. BERTRAM: Same objections.
21       THE WITNESS: I don't know the policy
22   myself.
23   BY MR. LEE:
24       Q.   Okay. Fair enough.

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 197

1      Is there a form for -- that one fills
2    out if one wants to go on administrative leave?
3          MS. BERTRAM:  Same objections.
4    BY MR. LEE:
5      Q.   Do you know?
6      A.   **I've never had to fill one out, so I don't**
7    **know.**
8      Q.   But has anybody -- so has anybody under you
9    gone on administrative leave?
10     A.   **No.**
11     Q.   Okay.  And, now, the way you answered the
12   question before, you said at the time you didn't know.
13   Did you subsequently find out why Mr. Baker went on
14   administrative leave?
15         MS. BERTRAM:  I'll object to the extent that
16   it calls for information subject to the
17   attorney-client privilege.  I don't know --
18   BY MR. LEE:
19     Q.   You don't -- you don't have to discuss
20   anything that any lawyer explained to you, but at the
21   time that Mr. Baker went on administrative leave, you
22   didn't know why he went on administrative leave,
23   right?
24     A.   **Correct.**

Page 198

1      Q.   You didn't know who decided he should go on
2    administrative leave, correct?
3      A.   **Correct.**
4      Q.   Subsequently, did you find out?
5      A.   **In what time period?**
6      Q.   At any time after he went on administrative
7    leave, did you find out why he went on administrative
8    leave?
9      A.   **Are you -- are you asking about my -- during**
10   **my employment at Smith & Wesson?**
11     Q.   Actually, it could be during your employment
12   or even afterwards.  At any time after Mr. Baker went
13   on administrative leave, did you find out why he went
14   on administrative leave?
15     A.   **Yes.**
16     Q.   And how did you find out?
17     A.   **By reviewing documents for this deposition.**
18     Q.   Okay.  And what document was it that taught
19   you or that showed you why he went on administrative
20   leave?
21     A.   **It was a letter from Anne Bruce.**
22     Q.   To?
23     A.   **Mr. Baker.**
24     Q.   Oh, okay.  And other than that letter from

Page 199

1    Anne Bruce to Mr. Baker -- and what did that letter
2    say as to why Mr. Baker was on administrative leave?
3          MS. BERTRAM:  Objection.  Document speaks
4    for itself.
5    BY MR. LEE:
6      Q.   That might be.  That's certainly not
7    attorney-client privilege.
8          MS. BERTRAM:  So you're just asking him
9    based on his memory what the document said --
10         MR. LEE:  Sure.
11         MS. BERTRAM:  -- that he reviewed maybe
12   several weeks ago?
13         MR. LEE:  Sure.
14   BY MR. LEE:
15     Q.   Based on that letter -- based on that letter
16   from Anne Bruce to Mr. Baker, what's your
17   understanding as to why Mr. Baker -- Mr. Baker went on
18   administrative leave?
19     A.   **I don't really remember the total**
20   **discussion.  I just remember that he was asked to go**
21   **on leave.**
22     Q.   Okay.  And who asked him to go on leave?
23     A.   **Miss Baker -- or Miss Bruce.**
24     Q.   Okay.  Okay.  And do you know any discussion

Page 200

1    that Miss Bruce had with Mr. Baker as to why Mr. Baker
2    should be on administrative leave?
3      A.   **That, I'm not privy to that information**
4    **between Mr. Baker and Anne Bruce.**
5      Q.   Okay.  While Mr. Baker -- or while Mr. Baker
6    was on administrative leave, did you have any
7    discussions with anyone from HR about Mr. Baker coming
8    back to work?
9      A.   **I don't remember a conversation.**
10     Q.   Okay.  Do you remember having any discussion
11   with Mr. Fontaine about Mr. Baker coming back to work
12   while Mr. Baker was on administrative leave?
13     A.   **I don't remember having that conversation.**
14     Q.   Okay.  Do you remember having any discussion
15   with anybody about Mr. Baker coming back to work while
16   he was on administrative leave?
17     A.   **I didn't really remember any conversation,**
18   **but they said he was on administrative leave, and I**
19   **didn't know how long was it going to last or what**
20   **was -- what the situation was.**
21     Q.   Okay.  So no one came to you and said, hey,
22   can he come back to work in your -- under you?
23         MS. BERTRAM:  Objection.  Vague.
24   BY MR. LEE:

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 201

1    Q.   That's my question.  While Mr. Baker was on
2  administrative leave, did anyone come to you and ask
3  whether Mr. Baker could come back to work under you?
4    A.   I don't remember having that -- a
5  conversation like that.
6    Q.   With anybody?
7    A.   I don't remember a conversation about that.
8    Q.   Okay.  And, again, I understand -- I
9  appreciate this was, what; six years ago or whatever.
10 Is there anything that would refresh your recollection
11 as to --
12       MS. BERTRAM:  Objection.
13 BY MR. LEE:
14   Q.   I haven't even finished answering (sic) the
15 question.
16       Is there anything that would refresh
17 your recollection as to what conversation you had with
18 anybody regarding Mr. Baker coming back to work while
19 he was on administrative leave?
20       MS. BERTRAM:  Objection to the form.
21 BY MR. LEE:
22   Q.   You can answer.
23   A.   I can't think of anything that would jog my
24 memory or something that would be out there.  I just

Page 202

1  can't think of anything.
2    Q.   Sure.  I mean, I noticed that you are a note
3  taker.  You like -- you write these -- at weekly
4  meetings, you write notes, and there are other
5  handwritten notes written by you, so I'm wondering
6  whether it be your handwritten notes or some sort of a
7  journal or some e-mail that could refresh your
8  recollection as to whether you had any discussion with
9  anybody during -- while Mr. Baker was on
10 administrative leave about Mr. Baker coming back to
11 work?
12   A.   I don't remember having that conversation
13 with anyone.
14   Q.   Fair enough.
15       I'm going to ask you to take a look at
16 paragraph 39 on page 12.
17       The June 17 e-mail from him to Earl,
18 what number is that?
19       Mr. Flatley --
20   A.   Yes.
21   Q.   -- paragraph 39 states that Mr. Baker's
22 June 2014 annual performance evaluation approached, it
23 was clear to you that Mr. Baker had failed to and was
24 unwilling to improve his performance or to fulfill the

Page 203

1  obligations of his performance improvement plan,
2  correct?
3    A.   Right.
4    Q.   And my first question is did you tell
5  Mr. Baker prior to his review of June '14 that you
6  felt he failed to and was unwilling to improve his
7  performance under the performance improvement plan?
8    A.   I don't believe I did.
9    Q.   Okay.  Did you tell him orally?
10   A.   I don't believe --
11       MS. BERTRAM:  Objection.  Asked and
12 answered.
13 BY MR. LEE:
14   Q.   My question -- you certainly didn't -- you
15 didn't -- you didn't send him an e-mail saying that,
16 right, saying that you felt -- you felt Mr. Baker
17 failed to and was unwilling to improve his
18 performance, correct?
19   A.   Correct.
20   Q.   Okay.  Did you tell him orally that you felt
21 he -- Mr. Baker failed to and was unwilling to improve
22 his performance?
23   A.   I don't believe I did.
24   Q.   Okay.  Now, what led you to believe that he

Page 204

1  failed to and was unwilling to improve his
2  performance?
3    A.   We set out a pretty good performance
4  improvement plan in February that sat down with
5  members of HR, Dan Fontaine, myself and Earl to talk
6  about what was needed to be improved and what the
7  projects were.  It was quite extensively laid out in
8  writing what he needed to do to improve his
9  performance, and he had not really progressed very far
10 in fulfilling those goals.
11   Q.   Okay.  And did Mr. Baker write a rebuttal as
12 to his views of the facts in connection with the
13 February 2014 review?
14   A.   Yes.
15   Q.   And did Mr. Baker write a rebuttal with
16 respect to his view of the June 2014 review?
17   A.   Yes.
18   Q.   Okay.  And I take it you disagreed with his
19 rebuttal, correct?
20   A.   Yes.  That's generally true.  Yep.
21   Q.   Okay.  And you wrote -- did you write a
22 response to his rebuttal?
23   A.   I myself did not.
24   Q.   Oh, okay.  Do you know who did?  Did anybody

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 205

1   on behalf of Smith & Wesson write a response to
2   Mr. Baker's rebuttal to the February 2014 review and
3   the June 2014 review?
4        MS. BERTRAM: Objection. Compound. Go
5   ahead.
6        THE WITNESS: Wasn't that letter from
7   Anne Bruce that we reviewed before the response back
8   to Earl's rebuttal?
9   BY MR. LEE:
10       Q.   Okay. My -- okay. Whatever that is,
11  Miss Bruce will testify as to what that is, but my
12  question is you, yourself, did not write a response to
13  Earl Baker's rebuttals to the June 2014 review and the
14  February 2014 review?
15       **A.   I did not write a rebuttal on the February**
16  **one to Earl Baker or the June '14 back to Earl Baker.**
17  **I did not.**
18       Q.   Okay. Did anybody from HR or from Legal
19  come and ask you to write a response to Mr. Baker's
20  rebuttals of June -- of June 2014 and February 2014?
21       **A.   Should we go back to the Anne Bruce?**
22       Q.   We could. We could. But my -- I just want
23  to test your memory. You testified that Anne Bruce
24  letter was written by Anne Bruce, right, or we assume

Page 206

1   since --
2        **A.   I gave her my view of things, my -- my**
3   **opinion on things, and she wrote the letter up.**
4        Q.   Got it.
5             And when you say you gave her your view
6   on things, was that --
7        **A.   Background.**
8        Q.   Background. Okay. Was that in writing or
9   was that orally?
10       **A.   I don't really remember.**
11       Q.   Okay. I just want to -- do you have a
12  recollection of talking to Miss Bruce in which you
13  gave your background to Miss Bruce about the
14  relationship or the performance issues that you saw
15  with Mr. Baker?
16       MS. BERTRAM: Objection. Asked and
17  answered.
18  BY MR. LEE:
19       Q.   And your answer is?
20       **A.   Look, I remembered talking to her when she**
21  **was drafting the letter, and that's what I remember.**
22       Q.   Did you talk to her in person or over the
23  phone?
24       **A.   In person.**

Page 207

1        Q.   Okay. And was there anybody else present
2   when you talked to Miss Bruce in person?
3        **A.   I don't remember.**
4        Q.   Okay. Where were you when you talked to
5   Miss Bruce in person when she was drafting those
6   letters?
7        **A.   I believe it was in her office.**
8        Q.   Okay. And how long were you in a meeting
9   with Miss Bruce when she was drafting those letters?
10       **A.   That, I don't remember.**
11       Q.   Do you recall -- now, remember you
12  hand wrote some changes there to those letters?
13       **A.   Correct.**
14       Q.   Did you do that in Miss Bruce's office or
15  did you do that by yourself somewhere else?
16       **A.   I don't remember.**
17       Q.   Okay. Do you remember getting that letter
18  from Miss Bruce to you by e-mail or hand delivery
19  or --
20       **A.   I don't remember.**
21       Q.   Okay. And how many meetings did you have
22  with Miss Bruce about her drafting those responses to
23  Mr. Baker's rebuttals?
24       **A.   That, I don't remember.**

Page 208

1        Q.   Okay. Now, in paragraph 39, I'm just going
2   to that middle sentence. It says, "I met with
3   Anne Bruce, Smith & Wesson's Vice President of Human
4   Resources, and Mr. Fontaine to discuss how to
5   effectively deliver Mr. Baker's upcoming evaluation."
6   Do you see that sentence?
7        **A.   Yes.**
8        Q.   Was that meeting the three of you together
9   or did you have separate meetings with Mr. Bruce
10  (sic), Miss Bruce and Mr. Fontaine?
11       **A.   I remember that meeting as being all three**
12  **together.**
13       Q.   Okay. So that's a different meeting than
14  you just having a meeting with Miss Bruce about
15  writing a rebuttal -- or writing -- Miss Bruce writing
16  a response to Mr. Baker's rebuttals, correct?
17       **A.   Timing-wise, Anne Bruce's rebuttal would be**
18  **after the review, the June 2014 review; where this**
19  **meeting that you are referring to was just before I**
20  **presented the review to Mr. Baker.**
21       Q.   Got it.
22            And at this meeting with Miss Bruce and
23  Mr. Fontaine, it was just the three of you?
24       **A.   Yes.**

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 209

1    Q.   And where was this meeting?
2    **A.   In Anne Bruce's office.**
3    Q.   And how long was this meeting?
4    **A.   That, I don't remember.**
5    Q.   Okay.  As best -- the best that you could
6    recall, what did you say, what did Mr. Fontaine say,
7    what did Miss Bruce say at that meeting?
8    **A.   I just don't remember the conversation.  It**
9    **was so long ago.**
10   Q.   Fair enough.
11        And do you recall -- did you take any
12   notes at that meeting?
13   **A.   I don't believe I did.**
14   Q.   Okay.  Did Mr. Fontaine take any notes at
15   that meeting?
16   **A.   I don't remember.**
17   Q.   Okay.  Did Miss Bruce take any notes at that
18   meeting?
19   **A.   I don't really remember.**
20   Q.   Okay.  And, again, the same question, is
21   there anything that you could think of that would
22   refresh your recollection as to what was discussed at
23   that meeting?
24   **A.   Not that I can think of.**

Page 210

1    Q.   Okay.  Final sentence says, "We wanted to
2    provide him with one last and final opportunity to
3    accept responsibility for his performance and address
4    his performance and conduct problems."  Do you see
5    that?
6    **A.   Yes.**
7    Q.   Okay.  And so as of the delivery of June '14
8    annual performance evaluation, there's no thought of
9    terminating him, was there?
10   **A.   Not at that point.**
11   Q.   Okay.  And there was a thought -- there was
12   thought of terminating him later?
13   **A.   That was -- I was not involved in**
14   **termination discussion.**
15   Q.   Fair enough.
16        And when it says here -- it says here,
17   you want to give him -- you -- "We," that's
18   Miss Bruce, Mr. Fontaine and you, "wanted to provide
19   him with one last and final opportunity to accept
20   responsibility for his performance and address his
21   performance and conduct problems."  Do you see that?
22   **A.   Yes.**
23   Q.   Was that communicated to him at his
24   June 2014 annual review?

Page 211

1    **A.   It was what in particular?**
2    Q.   That this is his final opportunity to accept
3    responsibility for his performance and address his
4    performance and conduct problems?
5    **A.   I don't believe it was actually phrased in**
6    **that way with the discussion when I presented the**
7    **performance, annual performance review, because I**
8    **would feel that would -- that would not be beneficial**
9    **to the discussion if I phrased it that way, so all I**
10   **was trying to do was present what responsibilities he**
11   **was expected to perform and give him, again, some**
12   **coaching on how to do it.**
13   Q.   Okay.  And this review that you gave was
14   just -- of June '14, 2014, it was just you and
15   Mr. Baker, correct?  There was no one else present?
16   **A.   I believe that was the case, yes.**
17   Q.   Where was that review given?
18   **A.   That would be in my office.**
19        **(The witness was tendered**
20        **previously marked Plaintiff's**
21        **Exhibit 185.)**
22   BY MR. LEE:
23   Q.   Okay.  And if you could take a look
24   at -- what was that exhibit number?

Page 212

1        MS. MAGIERA:  185.
2    BY MR. LEE:
3    Q.   Exhibit 185.
4    **A.   Can I say something?**
5    Q.   Sure.
6    **A.   I guess in my Declaration that -- I forgot**
7    **about this.  I guess when we presented the performance**
8    **review that Miss Bruce, Mr. Fontaine and I were -- all**
9    **presented it to Mr. Baker.**
10   Q.   Oh, so it wasn't just you; there were --
11   there were three of you?
12   **A.   Yes.**
13   Q.   Okay.  So there was a meeting among the
14   three of you prior to giving him the review and then
15   there was another meeting where the three of you
16   together gave the review to Mr. Baker in June of 2014,
17   am I correct?
18   **A.   It appears so.**
19   Q.   Okay.  So same question.  At the -- at the
20   meeting where Miss Bruce and Mr. Fontaine and you were
21   giving Mr. Baker the June of 2014 review, was it
22   communicated to him that he is getting a final
23   opportunity to accept responsibility for his
24   performance and address his performance and conduct

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 213

1  problems?
2      A.   I can't remember the exact conversation that
3  we had.
4      Q.   Okay.  That's fair.
5           But who gave the review?  The three of
6  you talked, sort of took turns or did you talk or did
7  Mr. Fontaine talk or did Miss Bruce talk?
8           MS. BERTRAM:  Objection.  Compound.
9  BY MR. LEE:
10     Q.   You can answer.
11     A.   I, again, don't remember exactly what.  I
12  don't remember who said what.
13     Q.   Okay.  And do you remember anybody saying to
14  Mr. Baker that he is getting a final opportunity to
15  accept responsibility for his performance and address
16  his performance and conduct problems?
17     A.   I just don't remember.
18     Q.   Okay.  And in your mind, what is it that you
19  needed to do to accept responsibility for his
20  performance and address his performance and conduct
21  problems?
22     A.   Was to take a look at the projects that were
23  assigned to him and expected and to actually develop
24  plans how to accomplish the goals that were set out

Page 214

1  for him.
2      Q.   Anything else?
3      A.   That was all --
4      Q.   I'm sorry.
5      A.   -- we asked for.
6      Q.   Okay.  Anything else?
7      A.   That was it.
8      Q.   Okay.  And as far as you know, that was what
9  was expressed to him at the June 2014 review?
10     A.   Yes.
11     Q.   Okay.  I'm going to -- do you -- hold on to
12  that.  Obviously, keep 294 in front of you, but do you
13  have Exhibit 185 in front of you?
14     A.   No.
15          MS. BERTRAM:  John, I don't have
16  Exhibit 185.  Could you ask Jill to send it to me?
17          MR. LEE:  Yeah.  Jill is -- Jill is going to
18  send it to you right now.
19          MS. BERTRAM:  Okay.  Thanks.
20  BY MR. LEE:
21     Q.   Mr. Flatley, do you have 185 in front of
22  you?
23     A.   Yes.
24     Q.   Okay.  First of all, in the middle of that

Page 215

1  first page, it says -- it's an e-mail from you to
2  Mr. Baker dated June 17, 2014, and it says, "Earl.
3  Attached is a copy of your review for tomorrow's
4  discussion."  Do you see that?
5      A.   Yes.
6      Q.   So you must have had the meeting with
7  Mr. Baker about his June 2014 review on June 18, 2014?
8      A.   It appears that way, yes.
9      Q.   Okay.  And does Mr. -- Mr. Flatley, does
10  Plaintiff's Exhibit 185 have a Bates number down at
11  the bottom right-hand corner?  For example, the first
12  page should be M0875.
13     A.   Correct.
14     Q.   Okay.  Now, if you go to the next page,
15  which is M0876, that actually is the review that you
16  gave him, a three-page review, right?  Three-page
17  form, correct?
18     A.   Correct.
19     Q.   Now, on M0879 and M0880 and M0881, did you
20  draft that?
21     A.   Yes.
22     Q.   Okay.  And did Mr. Baker write a rebuttal to
23  M -- strike that, to Plaintiff's Exhibit 185?
24     A.   I believe he did.

Page 216

1      Q.   Okay.
2      A.   We had a discussion.  Yep.
3      Q.   Okay.  Other than when Miss Bruce was
4  writing a response to Mr. Baker's rebuttal, do you
5  recall having any conversations with anybody about
6  Mr. Baker's rebuttal to the June 2014 review?
7      A.   The only one had any discussion -- I don't
8  really remember other than, obviously, I discussed it
9  with Anne Bruce, but I don't remember any discussions
10  with anyone else.
11     Q.   For example, maybe I can jog your memory,
12  and if you remember, you remember.  If you don't, you
13  don't.  Did you have a discussion with Mr. Fontaine
14  about Earl's rebuttal to the June 2014 review?
15     A.   It would seem that I probably would have,
16  but I don't remember.
17     Q.   Fair enough.
18          Did you have a discussion with
19  Mr. Suraci about Earl's June 2014 -- about Earl's
20  rebuttal to the June 2014 review?
21     A.   I don't believe I did.  I don't remember.
22     Q.   Okay.  How about did you have a discussion
23  with anybody, other than Anne Bruce, anybody else from
24  the HR Department about Earl Baker's rebuttal to the

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 217

1  June 2014 review?
2      A.  I don't believe I did.
3      Q.  I'm going to ask you to take a look at
4  paragraph 41 and read that -- page -- paragraph 41 on
5  page 13 of Plaintiff's Exhibit 294 and read that to
6  yourself.  It says here, the third line,
7  "However" -- and I'll read the whole thing.  "Each of
8  the performance issues and the goals documented in
9  Mr. Baker's June 2014 evaluation had been identified
10  and discussed with Mr. Baker as part of his
11  February 2014 evaluation and other coaching and
12  counseling sessions.  However, he once again rejected
13  each and every deficiency identified in the evaluation
14  and did not even attempt to address his performance
15  issues.  He failed to provide" plans for a
16  complete -- "plans for or complete any of the projects
17  assigned in his second performance improvement plan."
18  Do you see that?
19      A.  Yes.
20      Q.  Okay.  And when Mr. Baker rejected each and
21  every deficiency identified in the evaluation, how did
22  you learn that he rejected it?  How did you learn that
23  he rejected each and every deficiency identified in
24  the June 2014 evaluation?

Page 218

1      A.  Well, he never completed the assignments.
2      Q.  Okay.  Other than that, other than that he
3  did not complete the assignments, is there any other
4  basis for your statement that he rejected each and
5  every deficiency identified in the evaluation?
6      A.  Well, he had his exceptions to the review
7  notes.  The city (sic) disagreed with what was
8  written.
9      Q.  Okay.  So he disagreed with it, and he did
10  not complete it.  Other than those things, is there
11  any other basis for your belief that he rejected each
12  and every deficiency identified in the evaluation?
13      A.  I think that pretty much told me everything
14  I knew.
15      Q.  Okay.  And you say he did not even attempt
16  to address his performance issues.  Again, other than
17  the fact that he wrote a rebuttal and you say he did
18  not -- he did not complete his objectives, is there
19  any other basis for your belief that he did not even
20  attempt to address his performance issues?
21      A.  I never received any project plans, any
22  project outlines or project initiatives.  Based on the
23  projects that were assigned to him and actually
24  communicated to him during that June meeting, he never

Page 219

1  followed up to complete any of the tasks.
2      Q.  Okay.  Other than what you just said, is
3  there any other basis for your belief that he did not
4  even attempt to address his performance issues?
5      A.  That's about what I remember.
6      Q.  Okay.  Did you give him a deadline by which
7  he must address his performance issues or provide a
8  plan?
9          MS. BERTRAM: Objection. Vague. Compound.
10  BY MR. LEE:
11      Q.  In the June 2014 review, did you -- did you
12  give him a deadline by which he must come up with a
13  plan to address his performance issues or come up with
14  a plan?
15          MS. BERTRAM: Same objection.
16  BY MR. LEE:
17      Q.  You can answer.
18      A.  I don't remember going through specific
19  dates.
20      Q.  Can you take a look at -- you have Exhibit
21  294 in front of you, Mr. Flatley?
22      A.  I don't think so.
23      Q.  No.  That's your Declaration.  The
24  one -- yeah.

Page 220

1      A.  Yep.
2      Q.  Okay.  You have that in front of you.  If
3  you go to page Exhibit A -- if you go to Exhibit B2,
4  Plaintiff's Exhibit 294, those are your handwritten
5  notes, right, the weekly notes?
6      A.  Yes.
7          MS. BERTRAM: John, I just want to clarify
8  the question.  You said go to A and then you said go
9  to B2.
10  BY MR. LEE:
11      Q.  Never mind.  Exhibit B2, Plaintiff's Exhibit
12  294 are your handwritten notes, correct?
13      A.  Correct.
14      Q.  And Exhibit C is the February '14
15  out-of-cycle review, correct?
16      A.  C?
17      Q.  D -- C.  I'm sorry.  Exhibit C to
18  Plaintiff's Exhibit 294 is the February 2014
19  out-of-cycle review?
20      A.  Correct.
21      Q.  If you go to Exhibit D, Exhibit D to
22  Plaintiff's Exhibit 274 -- 294.  Exhibit D to
23  Plaintiff's Exhibit 294 is Mr. Baker's objectives for
24  February -- for the February 2014 review, correct?

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 221

1    A.   Correct.
2    Q.   Okay.  And you drafted that, did you not?
3    A.   Correct.
4    Q.   If you go to Exhibit E to Plaintiff's
5    Exhibit 294, that's the June 2014 review, am I
6    correct?
7    A.   It appears so.
8    Q.   Okay.  And if you go to Exhibit -- the last
9    three pages of Exhibit E says, "E. Baker 2014 Review
10   Results of Prior Year's Objectives," pages 1, 2, 3.
11   Were those drafted by you?
12        MS. BERTRAM:  John, just give me a chance to
13   get to them.  I'm having trouble with my PDF.  This is
14   after the notes, right?
15        MR. LEE:  Exhibit E is the June 5 -- dated
16   June 5, 2014, and the last three pages of it are -- is
17   a narrative.  Heading of it is "E. Baker 2014 Review
18   Results of Prior Year's Objectives."
19        MS. BERTRAM:  Okay.  I've finally got it.
20   BY MR. LEE:
21   Q.   Are you there, Mr. Flatley?
22   A.   Yes.
23   Q.   And those three pages of narrative entitled
24   "E. Baker 2014 Review Results of Prior Year's

Page 222

1    Objectives," those are written by you, correct?
2    A.   Correct.
3    Q.   Okay.  Now, Exhibit F, Exhibit F to
4    Plaintiff's Exhibit 294, those are the project plans
5    and -- to establish a project plan and implement.  Do
6    you see that?
7    A.   Yep.
8    Q.   And those were written by you?
9    A.   That, I don't remember.
10   Q.   Okay.  I want to double check -- I want to
11   double check and I understand this.  I am referring to
12   Exhibit F to Plaintiff's Exhibit 294, and it's a
13   single page document entitled "E. Baker
14   Goals - June 18, 2014," correct?
15   A.   Yep.
16   Q.   There are handwritten notes in that
17   document.  Are those -- are those writings yours?
18   A.   Yes.
19   Q.   Okay.  And you have 1, 2, 3, 4, 5 and you
20   have 1, 2, 3 are typed up and 4 and 5 are handwritten.
21   Do you see that?
22   A.   Yes.
23   Q.   And you don't recognize this document?
24   A.   It's been a long time.  I just don't

Page 223

1    remember everything I've written on this.
2    Q.   Okay.  Is there anybody else that would have
3    written this document?
4    A.   That, I can't answer, but I'm assuming it
5    looks like my style of headings and everything.
6    Q.   Okay.  And my question is anywhere on here,
7    are there schedules or deadline by which Mr. Baker was
8    to submit a plan to you?
9    A.   Yes.  Down at the bottom.  You have these
10   five programs, and Mr. Baker was instructed to give us
11   a high -- a high-level plan.  It was supposed to be
12   done on Monday.
13   Q.   Okay.  Where it says, "By Monday, 6-23, when
14   will it be," question mark?
15   A.   Right.
16   Q.   Okay.  And that's written in handwriting,
17   right?
18   A.   Correct.
19   Q.   And did you give this to Mr. Baker?
20   A.   Yes.
21   Q.   This Exhibit F written like this in
22   handwriting?
23   A.   I'm going to say yes.
24   Q.   Okay.  When you say you're going to say, you

Page 224

1    have a recollection of handing this Exhibit F to
2    Mr. Baker in -- on June 18, 2013 -- 2014?
3    A.   I don't remember it 100 percent, but I think
4    what the intent was during our meeting of and having
5    the performance review, we had decided what the
6    project between Anne Bruce, Dan Fontaine, myself and
7    Earl, what the project would be, and we had him list
8    it, and I guess two more were added to the original
9    three, and then we had an agreement with Earl that we
10   had the high-level project plans to everyone on -- by
11   Monday, 6-23, and then he could go back in and do the
12   actual breakdown for the action items afterwards.
13   Q.   Okay.  And was it this deadline, the 6-23
14   deadline that led you to conclude that he rejected
15   each and every deficiency and did not even attempt to
16   address his performance issues?
17   A.   I don't understand the question.
18   Q.   Okay.
19   A.   I don't see the distinction between the two.
20   Q.   Oh, okay.  If you take a look at -- that
21   Exhibit F and then go ahead and go back to paragraph
22   41, page 13 of Exhibit 294.
23   A.   Exhibit what?
24   Q.   294.  Go to paragraph 41, please.

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 225

1    **A.   Yeah.**
2    Q.   It says, "However, he once again rejected
3    each and every deficiency identified in the evaluation
4    and did not even attempt to address his performance
5    issues.  He failed to provide plans for or"
6    comply -- "complete any of the" projected -- "projects
7    assigned in his second performance improvement plan."
8    Do you see that?
9    **A.   Which?**
10   Q.   Paragraph 41 on page 13.
11   **A.   If my memory serves me correctly, he**
12   **actually never gave me a copy of any high-level plan.**
13   **He gave a very cursory high-level project plan, one,**
14   **to Dan Fontaine.  That was all we ever saw.**
15   Q.   Okay.  He didn't give it to you; he gave it
16   to Dan Fontaine?
17   **A.   Correct.**
18   Q.   Okay.  And when did Mr. Baker give that to
19   Mr. Fontaine?  Do you know?
20   **A.   I think it was Monday, the 23rd, but I'm not**
21   **100 percent sure.**
22   Q.   Okay.  And after that Monday, the 23rd, were
23   there any -- were there further communications between
24   you and Mr. Baker with respect to following up on that

Page 226

1    plan that he submitted on the 23rd, on June 23rd,
2    2014?
3    **A.   I don't really remember any, per se.  I**
4    **don't know what the -- what happened after this.**
5    Q.   Is there anything that would refresh
6    your recollection as to what happened after June 23rd,
7    2014?
8    **A.   Not that I remember.**
9    Q.   Okay.  Okay.  Do you have -- do you recall,
10   for example, talking to either Mr. Fontaine or
11   Miss Bruce or both after June 23rd, 2014 with respect
12   to what Mr. Baker submitted on June 23rd, 2014?
13   **A.   I'm sure I talked to Mr. Fontaine.  I'm not**
14   **sure whether I talked to Miss Bruce about this**
15   **particular topic.**
16   Q.   Okay.  Okay.  And after you talked -- what
17   do you recall talking to Mr. Fontaine about
18   what -- let me finish the question and then you
19   can -- what do you recall talking to Mr. Fontaine
20   about what Mr. Baker submitted on June 23rd, 2014?
21   **A.   What I do remember is that he had submitted**
22   **one project sheet, and that was it, and that's**
23   **basically what I remember from the conversation.  That**
24   **was what the pertinent information was.**

Page 227

1    Q.   Okay.  But the discussion that you had with
2    Mr. Fontaine about the project sheet that Mr. Baker
3    submitted, do you recall -- first of all, do you
4    recall if there was anybody else involved in that
5    conversation?
6    **A.   I don't even remember the sheet that he gave**
7    **Mr. Fontaine.  I don't even think I ever got a copy of**
8    **it.**
9    Q.   Okay.
10   **A.   I don't even remember that.  I just -- I**
11   **vaguely remembered talking to Dan about him getting**
12   **the one sheet.**
13   Q.   Okay.  Do you remember when that
14   conversation was, the conversation between you and
15   Mr. Fontaine about the one sheet that Mr. Fontaine got
16   on June 23rd, 2014?
17   **A.   I can't say for sure exactly what day it**
18   **was, whether it was the 23rd or 24th.  I just remember**
19   **it was vaguely around that time.**
20   Q.   Okay.  Do you remember the content of that
21   conversation between you and Mr. Fontaine?
22   **A.   No, I don't.  I don't remember, not really.**
23   **Can't really --**
24   Q.   Again, same thing.  Was it an oral

Page 228

1    conversation or was it an e-mail conversation or a
2    text conversation?
3    **A.   I believe it was an oral conversation.**
4    Q.   Do you recall whether it was in person or by
5    phone?
6    **A.   In person.**
7    Q.   Okay.  Do you recall where the conversation
8    took place?
9    **A.   Not really.  I don't really remember.**
10   Q.   Okay.  Do you recall how long the
11   conversation was?
12   **A.   No, I don't remember.**
13   Q.   Do you recall what he said or what you said?
14   Again, the best.  Only thing we can ask for you -- ask
15   from you is your best recollection during that
16   conversation.
17   **A.   I can't remember what was said six years**
18   **ago.**
19   Q.   Sure.
20        And do you recall what the conclusion
21   of that conversation was?
22   **A.   I don't remember.**
23   Q.   Okay.  I'm going to have you -- I'm going to
24   have you take a look at paragraphs 36 and 37 on page

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 229

1    11 of Plaintiff's Exhibit 294.  Okay.  A chip issue
2    came up in May of 2014 on the pistol slides, correct?
3        **A.  Cosmetic issue.**
4        Q.  Yes.  Had that issue come up before, before
5    May 2014?
6        **A.  Not that specific line.  We've had finish**
7    **problems with cutters in the past, but that was**
8    **specifically something different.**
9        Q.  Okay.  Do you recall what repair was made by
10   whom to fix that problem?
11       MS. BERTRAM:  Objection.  Compound and
12   vague.
13   BY MR. LEE:
14       Q.  The cosmetic issue with the slide problem
15   that you described in May of 2014, did it get
16   resolved?
17       **A.  Yes.**
18       Q.  And how did it get resolved?
19       **A.  It had a CNC machine repaired.**
20       Q.  By whom, do you recall?
21       **A.  It was by a Walter technician.**
22       Q.  Okay.  Was it United Grinding?
23       **A.  Yes.**
24       Q.  Okay.  And was it Walter number 4?

Page 230

1        **A.  I guess.  I don't know exactly what machine**
2    **it was.**
3        Q.  Okay.  And do you recall what the problem
4    was?
5        **A.  It was -- if my memory serves me correctly,**
6    **it was a problem with one of the heads was not**
7    **operating properly, one of the drives for the heads.**
8        Q.  Okay.  And do you recall United Grinding
9    assessing that machine prior to May of 2014?
10       **A.  I don't remember.  I don't know -- I don't**
11   **know when that repairman came to Smith & Wesson or**
12   **what had happened prior to that.  I just don't have**
13   **the records on the machine.**
14       Q.  Okay.  And what -- and with respect
15   to -- and who -- who -- who figured out what was wrong
16   with the machine?
17       MS. BERTRAM:  Objection.  Vague.
18   BY MR. LEE:
19       Q.  You said it was -- you said it was
20   repaired -- the problem was caught and fixed, correct,
21   when it was -- after the May 2014 incident?
22       **A.  The repairman was there to work on the**
23   **machine for -- I don't know if the actual cause of**
24   **that problem was why he was there or was he doing**

Page 231

1    **maintenance on something else, but he -- he noticed,**
2    **he saw the problem, and he says, yeah, I know what**
3    **happened.  It's this machine that I'm working on.**
4    **It's one of the drives in the machine that I'm working**
5    **on.**
6        Q.  Okay.  And so it was the repairman who fixed
7    the -- who caught the defect?
8        **A.  Who noticed it, yes.**
9        Q.  Okay.  So -- and Mr. Baker had nothing to do
10   with catching the defect?
11       **A.  He showed the tool to the repairman, and the**
12   **repairman, I know what that is.**
13       Q.  Okay.
14       **A.  And that's when he did the job.**
15       Q.  Who else was involved in fixing this problem
16   with the pistol slides in May of 2014?
17       MS. BERTRAM:  Objection.  Vague.
18   BY MR. LEE:
19       Q.  If you know.
20       **A.  I don't understand.  What are you actually**
21   **asking?**
22       Q.  Okay.  Were you involved in the -- fixing
23   the cosmetic issues with the pistol slides in May of
24   2014?

Page 232

1        **A.  I was not totally 100 percent.  I went to**
2    **the meetings that -- the Kaizen team meetings as a**
3    **supporter.**
4        Q.  Okay.
5        **A.  I didn't work on the problem, per se.**
6        Q.  Okay.  And this Kaizen team meeting, who
7    was -- who was -- who participated in the Kaizen team
8    meeting?
9        **A.  It was a number of people from Pistol Slide,**
10   **from Cutter/Grinder, from Maintenance and other -- it**
11   **all started back in late April where an operator**
12   **called up Earl -- or Mr. Baker to tell him there was a**
13   **problem with the tool leaving a mark on the slide.**
14   **Well, Mr. Baker didn't really respond to the operator.**
15   **He didn't come down and see what was going on, so the**
16   **operator's supervisor, Waleska Wick, the CC of the**
17   **Pistol Slide Department, then called Earl -- or**
18   **Mr. Baker to come down and see what the problem was,**
19   **and he said I'd be down right after lunch.  Well,**
20   **Mr. Baker didn't show up.**
21       Q.  Okay.
22       **A.  So she called him again, and he said I'll be**
23   **right up, and, again, he didn't come.  Then I guess he**
24   **had to leave to go to a funeral in Ohio.  When he came**

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 233

1    back from the funeral, I was in his department with
2    the cutter and the slide showing him this is our
3    problem.  They're having the Kaizen to try and resolve
4    it.  Here, you got to go to the meeting on it, and
5    then he had showed it to the machine repair person at
6    that time, and the machine repair person told him what
7    the problem was and that he was going to work on it to
8    fix it.
9        Q.   Okay.  And so, again -- now, first of all,
10   how do you know that before Mr. Baker went off
11   on -- went off to the funeral that he was called about
12   this issue?
13       A.   There was a piece of paper in the discovery
14   notes that I've just seen recently that described the
15   situation.
16       Q.   Okay.  And that piece of note was written by
17   whom?
18       A.   I don't remember.
19       Q.   Did you write it?
20       A.   No.
21       Q.   Okay.  And other than that note, prior to
22   Mr. Baker leaving to go to the funeral, do you know
23   who said what to Mr. Baker with respect to this gun
24   slide issue, the cosmetic issue?

Page 234

1        A.   The only thing I know is what I read.  It
2    was one operator and Waleska Wick.
3        Q.   Okay.
4        A.   Two people called Mr. Baker about it.
5        Q.   And -- so how do you know they called
6    Mr. Baker about it?
7        A.   It was in the note.
8             MS. BERTRAM:  Objection.  Asked and
9    answered.
10   BY MR. LEE:
11       Q.   Okay.  And -- and how do you know what
12   this -- once he called -- they called Mr. Baker about
13   it, do you know what discussion they had?
14       A.   No, I don't.
15       Q.   Okay.  Did you ever find out?
16       A.   No.
17       Q.   Okay.  And once Mr. Baker came back from the
18   funeral, do you know how it was fixed?
19            MS. BERTRAM:  Objection.  Asked and
20   answered.
21   BY MR. LEE:
22       Q.   You can answer.
23       A.   Again, I was there with the -- the tool.
24   There was a problem on the slide to show Earl what was

Page 235

1    actually happening on the part and left and told him
2    where the meeting was and that -- what time it was,
3    and in the interim, he had gone over and talked to the
4    repair person.  Oh, yeah, the machine is causing this.
5        Q.   Okay.  And who was in that meeting, the
6    Kaizen meeting?
7        A.   Again, the people that were there was the
8    Pistol Slide Department, Quality Department, a
9    representative from the Cutter Department.
10       Q.   Yeah, but do you know -- do you know their
11   names?
12       A.   No.  I don't remember the names on who was
13   there.
14       Q.   Okay.  And that group that met to try to
15   solve this problem, do you know what they discussed
16   and what they did to solve the problem?
17       A.   My recollection was that they were working
18   on it, and then when the machine repair person gave
19   him a little insight into what was causing it, it was,
20   basically, they were all set, but they were in the
21   process of understanding the problem, trying to
22   isolate it, trying to come up with a Kaizen to try and
23   solve the problem.
24       Q.   I understand.  Were you part of that Kaizen?

Page 236

1        A.   I said I was on the supervisory or support
2    team just there to help out where needed or be there
3    just to observe.  My -- I was not part of the team.
4        Q.   Okay.  So who was part of the team?
5        A.   As I said, representatives from Pistol
6    Slide, Quality and -- and Cutter.
7        Q.   Was Mr. Baker a part of that team?
8        A.   He was when he returned.
9        Q.   Okay.  And was Mr. Francis part of that
10   team?
11       A.   That, I don't remember.
12       Q.   Okay.  Who was -- who was part of that team
13   from the Engineering Department?
14       A.   That, I couldn't tell you.  I don't
15   remember.
16       Q.   Okay.  Do you know what Mr. Baker's role was
17   in solving that problem?
18            MS. BERTRAM:  Objection.  Asked and
19   answered.
20   BY MR. LEE:
21       Q.   Either he knows or he doesn't.
22       A.   Like I said, I showed him the tool and the
23   cutter -- the tool and the slide, what it was doing,
24   and told him to go to the meeting, but he had asked

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 237

1  the -- the Walter tech about it, and he found -- he
2  said if the machine is causing the problem, I can fix
3  it, and then Earl brought that to the team.
4      Q.  Okay.  And you witnessed all this?
5      A.  No.  I heard this.
6      Q.  From whom?
7      A.  From being at the team meeting.
8      Q.  Okay.  Who at the team meeting said this?
9      A.  I don't remember.
10     Q.  Okay.  Do you have a recollection of who
11  said what at the team meeting that you attended?
12     A.  No.  I don't remember.
13     Q.  Do you recall saying anything to Earl at the
14  team meeting?
15     A.  Not at the team meeting, I didn't say
16  anything to him.  Before I asked him not to jump in
17  with the total response yet.  I wanted the team to
18  follow the course of action for the Kaizen and to work
19  their way into the -- help them work their way into
20  the solution.
21     Q.  Okay.  And you communicated that to Earl?
22     A.  Yes.
23     Q.  And precisely what did you say to him?
24     A.  I don't remember exactly what I said to him.

Page 238

1      Q.  Okay.  Do you remember what he said to you?
2      A.  I don't remember.
3      Q.  Okay.  Is there anything that would refresh
4  your recollection as to what you said to Earl and what
5  Earl said to you --
6          MS. BERTRAM:  Objection to the form.
7  BY MR. LEE:
8      Q.  -- at the team meeting?
9      A.  I don't remember back then.
10     Q.  Okay.  Was there another slide problem with
11  a Walter machine in 2013, do you recall?
12     A.  Define supply problem.
13     Q.  Slide problem I said.  Not supply problem.
14     A.  I don't remember.
15     Q.  Okay.  Do you remember ever dealing with
16  United Grinding?  Do you know who United Grinding is?
17     A.  Yes.
18     Q.  And who is United Grinding?
19     A.  They're -- they represent Walter Grinder who
20  we buy the machines from.
21     Q.  Okay.
22          MS. BERTRAM:  John, before we get too deep
23  into this, I don't know if it's a related topic or a
24  separate topic, can we take like a five-minute break?

Page 239

1          MR. LEE:  Sure.
2          MS. BERTRAM:  Okay.
3          THE VIDEOGRAPHER:  Stand by, please.  The
4  time is 3:29 p.m. Central time.  We are off the
5  record.
6          (Recess.)
7          THE VIDEOGRAPHER:  The time is 3:48 p.m.
8  Central time.  We are back on the record.
9  BY MR. LEE:
10     Q.  Now, I'm going to ask you, Mr. Flatley, to
11  put Exhibit 294 off to the side for just a bit.  I'm
12  going to do a bunch of identification of documents,
13  and as we identify these documents, we're going to
14  send them to you, Connie, and to Missy.
15          MS. BERTRAM:  Okay.
16          (The witness was tendered
17              previously marked Plaintiff's
18              Exhibit 345.)
19  BY MR. LEE:
20     Q.  First is Exhibit No. 345.  Mr. Flatley,
21  Exhibit No. 345, do you see in the bottom right-hand
22  corner, they are SW0925 and SW0926?
23     A.  Right.
24     Q.  Are these your handwritings?

Page 240

1      A.  Yes.
2      Q.  And do you know from what -- from what
3  period this handwriting is?
4      A.  Tell you the truth, I have no idea what this
5  is.
6      Q.  Okay.  Do you know what it is a part of?  In
7  other words, this is not part of your weekly meeting
8  notes, correct?
9      A.  Correct.
10     Q.  Do you know what this -- what these notes
11  are from?
12     A.  Not really.  It has some of the topics that
13  we've talked about, but I don't know what this is
14  from.
15     Q.  Let me ask it to you this way, then.  Other
16  than -- for example, we went -- we saw at least some
17  of your handwritten notes from the weekly meetings,
18  correct?
19     A.  Yes.
20     Q.  Just as a matter of writing -- keeping
21  notes, did you have any other -- did you have a
22  particular place where you took all your notes or did
23  you have a number of those notes?
24     A.  I had a file in my desk with the weekly

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 241

1    meeting notes for Cutter Department in our cutter
2    meeting, the 1:00 o'clock cutter meeting. That was
3    the only notes I kept, and that's the only notes I
4    had.
5        Q.   Okay. Okay. So these notes, you don't even
6    know what they're -- they're not part of the weekly
7    meeting notes, correct?
8        A.   No.
9        Q.   Okay. And if you could take a look -- just,
10   like, there are some topics today you and I discussed.
11   Like, for example, RoboCrib software --
12       A.   Right.
13       Q.   -- or manage carbide blanks, Schneeberger,
14   OA of Schneeberger.
15       A.   Right.
16       Q.   But it doesn't jog your memory as to what
17   these notes are from?
18       A.   I do not remember.
19       Q.   Okay. And, obviously, since you don't
20   remember, you don't remember ever giving these notes
21   to anybody?
22       A.   I don't even know where these -- what these
23   were -- where these -- why these were taken.
24       Q.   Okay. Fair enough.

Page 242

1        A.   I just don't remember.
2            MR. LEE: That's fair enough.
3                    (The witness was tendered
4                     previously marked Plaintiff's
5                     Exhibit 346.)
6    BY MR. LEE:
7        Q.   Okay. Now, if you could go to Exhibit 346.
8    On that first page, just for identification, Exhibit
9    346 is SW0794, SW0795, SW0789, 0790, 0791, right?
10       A.   Correct.
11       Q.   That -- on the first page on SW0794, is that
12   your handwriting?
13       A.   It appears to be.
14       Q.   Okay. The initials down at the bottom seems
15   like R.W. right next to the page number 2?
16       A.   Yes.
17       Q.   Who is R.W.?
18       A.   I don't know.
19       Q.   But that -- and that's not -- that is not
20   your handwriting, the R.W.?
21       A.   I'm not sure. That doesn't look like mine.
22       Q.   But where it says, "Revised per Bruce
23   meeting," that is your handwriting?
24       A.   Yes.

Page 243

1        Q.   Do you recall what you revised per Bruce
2    meeting?
3        A.   It looks like there was a -- between the two
4    forms, there was one word changed, one word change.
5        Q.   Okay. And do you recall why you made that
6    word change?
7        A.   I don't remember, but it's -- it says here
8    revised per Anne Bruce meeting.
9        Q.   Right. My question to you is do you recall
10   what from the Bruce meeting caused you to make the
11   word change?
12       A.   I'm assuming -- well, I can't assume
13   anything, but this is -- might have been a discussion
14   of the review prior to presenting it to Mr. Baker and
15   during that review, they suggested making
16   that -- that change in words verbiage.
17       Q.   Who is "they"?
18       A.   Anne Bruce and Mr. Fontaine.
19                   (The witness was tendered
20                    previously marked Plaintiff's
21                    Exhibit 347.)
22   BY MR. LEE:
23       Q.   Okay. And I ask you to go to Exhibit
24   No. 347.

Page 244

1            MS. BERTRAM: Hold on, John, until I get a
2    copy.
3            MR. LEE: Sure.
4            MS. BERTRAM: It would be great if Jill
5    could send these to me as a group because there's a
6    little delay in my e-mail system, and I don't want to
7    hold thing up.
8            MR. LEE: Okay. Oh, they were all sent this
9    morning, but she just sent it again.
10           MS. BERTRAM: What number is it?
11           MR. LEE: 347.
12           MS. BERTRAM: Yeah. I don't -- I don't see
13   them.
14           MR. LEE: She just sent it again.
15           MS. BERTRAM: Okay. Here they are. Hold
16   on. Okay. That's good. I can just keep this e-mail
17   open. Okay. I've got it.
18   BY MR. LEE:
19       Q.   First, Mr. Flatley, is it SW921, 922, 923,
20   924?
21       A.   Yes.
22       Q.   Exhibit -- Plaintiff's Exhibit 347. If you
23   go through them, are those handwritings yours?
24       A.   Yes.

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 245

1    Q.   And why did you make these -- and these are
2    notes to Mr. Baker's rebuttals, correct?
3      A.   Correct.
4    Q.   The very first rebuttal, for example, has to
5    do with filling the position of the CNC operators,
6    right?
7      A.   Yes.
8    Q.   And you see in there in the last sentence,
9    it mentions Stephanie Wynne can verify these facts?
10     A.   Yes.
11   Q.   Who is Stephanie Wynne, if you know?
12     A.   She was the person at the time responsible
13   for postings in Human Resources.
14   Q.   Okay.  And do you know what Anne Bruce did
15   to check with Stephanie Wynne with respect to this
16   issue of filling the CNC operators' positions?
17     A.   That is -- would be speculation on my part.
18   I don't know what Anne Bruce did.
19   Q.   Got it.
20     A.   With --
21   Q.   Okay.  And did you make these notes for
22   somebody or was it just -- were these just notes for
23   yourself?
24     A.   I don't remember why I made these notes.

Page 246

1    Q.   My question I suppose is once you've made
2    these notes from Mr. Baker's 2014 review rebuttal, did
3    you communicate it to anybody?
4      A.   I don't know.  Again, I don't know why I
5    made these notes on here.
6    Q.   Okay.  What I mean communicate, for example,
7    did you send, for example, these handwritten notes to
8    anybody or explain these handwritten notes to anybody
9    verbally or in writing?
10     MS. BERTRAM:  Objection.  Compound.
11   BY MR. LEE:
12   Q.   I'm going to break it up.  Did you send
13   these notes to anybody?
14     A.   I can't remember.
15   Q.   Okay.  Do you remember ever explaining these
16   notes to anybody, whether that be in writing or
17   orally?
18     A.   I can't remember.  It's six years ago.  I
19   know this is my writing, but I just don't remember why
20   I did it.
21     MR. LEE:  Okay.
22        (The witness was tendered
23         previously marked Plaintiff's
24         Exhibit 348.)

Page 247

1    BY MR. LEE:
2    Q.   And if you could go to Exhibit 348, and the
3    heading on this document is "Schneeberger Machine OA,"
4    correct?
5      A.   Yes.
6    Q.   Did you draft this?  And, Mr. Flatley, this
7    348 is SW720, 721, 722, correct?
8      A.   Correct.
9    Q.   My question, I guess, is number one, did you
10   draft this or do you know where it came from?  Sorry.
11   I also missed SW0723, which is the fourth page of
12   Plaintiff's Exhibit 348.
13     A.   Okay.  The first sheet looks like something
14   I wrote.
15   Q.   Okay.
16     A.   The backup sheets, I'm not familiar with
17   these.  I don't know where these came from.
18   Q.   So just to make it clear, SW0720 is
19   something you believe you wrote?
20     A.   Yes.
21   Q.   Do you recall why you wrote it?
22     A.   No, I don't.
23   Q.   Okay.  I mean, was this supposed to be part
24   of some report or was it supposed to be communicated

Page 248

1    to somebody, if you recall?
2      A.   I don't remember why I wrote this.
3    Q.   Okay.  With respect to now second, third and
4    fourth page of Plaintiff's Exhibit 348, which is
5    SW721, 722, 723, first of all, do you recall ever
6    seeing this before?
7      A.   No.  This isn't mine.
8    Q.   So I take it you have no clue where
9    it came from?
10     A.   Correct.
11     MR. LEE:  Okay.  You could skip -- well,
12   Exhibit 349, that was the Exhibit D to your
13   Declaration that we discussed before, correct -- not
14   Exhibit D.  Exhibit might have been F.  Can you go to
15   exhibit -- never mind about 349.  You can pretty much
16   skip it.
17        (The witness was tendered
18         previously marked Plaintiff's
19         Exhibit 350.)
20   BY MR. LEE:
21   Q.   Go to Exhibit 350.  First of all, it says at
22   the top in handwriting, "Earl's Ideas for
23   Improvements."  Do you see that?
24     A.   Yes.

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 249

1    Q.   Is that your handwriting?
2    A.   Yes.
3    Q.   Do you know who drafted this document?
4    A.   I'm going to say Earl -- or Mr. Baker
5    because that's what I wrote on the top.
6    Q.   Okay.  And do you know why he drafted it?
7    A.   I'm not familiar.  Without a date, it's hard
8    to figure out why it was written.
9    Q.   Okay.  And do you know when it was written?
10   A.   No.  Without a date, I can't tell.
11   Q.   Okay.  If you look at the content of this
12   document, other than your handwriting, are they
13   accurate depictions of Mr. Baker's ideas for
14   improvements?
15        MS. BERTRAM:  Objection.  Compound.
16        THE WITNESS:  Having the labels Earl's ideas
17   for improvement, I guess this is one of his iterations
18   for improvements, one of his list of improvements.
19   BY MR. LEE:
20   Q.   Okay.  And is this something that he
21   submitted to you?
22   A.   I can't exactly be sure, but I would think
23   that's why he drafted it.
24   Q.   And you would think that's why you wrote in

Page 250

1    your handwriting this is Earl's ideas for
2    improvements, right?
3    A.   Right.
4    Q.   Okay.  Was this part of a review or was this
5    just sort of something that came out of your weekly
6    discussions, if you recall?
7    A.   Without having a date on this, I'm kind
8    of -- I'm kind of confused of when this was written
9    and why it was written.
10   Q.   Okay.
11   A.   It could be, you know, early on in his
12   employment at Smith & Wesson, did he come up with this
13   or was this iteration from sometime after?  I'm not
14   exactly sure without a date.
15   Q.   Do you recall doing anything with respect to
16   this document in response to Earl drafting it and
17   submitting it to you?
18        MS. BERTRAM:  Objection.  Lack of
19   foundation.
20        THE WITNESS:  What was the question again,
21   Mr. Lee?
22   BY MR. LEE:
23   Q.   Yes.  Do you recall doing anything in
24   response to this document from Earl?

Page 251

1    A.   I didn't do anything.  We probably had a
2    discussion about it.  I can't remember.  Again, not
3    knowing the date on it, I don't know what we resolved
4    about this.
5        MR. LEE:  Fair enough.
6              (The witness was tendered
7               previously marked Plaintiff's
8               Exhibit 351.)
9    BY MR. LEE:
10   Q.   If you go to now Exhibit No. 351.
11        MS. BERTRAM:  Did you say 351?
12   BY MR. LEE:
13   Q.   Yes.  First for identification, Mr. Flatley,
14   this is SW0808 through SW0814, correct?
15   A.   Right.
16   Q.   And the heading of it, anyway, is "Earl
17   Baker 2014 Review Rebuttal."  Do you see that?
18   A.   Yes.
19   Q.   What I'm interested in are what looks to be
20   photocopies of Post Its with handwriting on them, and
21   they're on every page of this exhibit, am I correct?
22   A.   Yes.
23   Q.   And those handwritings are yours?
24   A.   Yes.

Page 252

1    Q.   And do you know -- first of all, do you know
2    why you wrote these notes on Post Its?
3    A.   Well, I wrote them on there so I could after
4    my first initial reading of this information, I had my
5    initial thoughts --
6    Q.   Okay.
7    A.   -- what to say, and I didn't want to forget
8    what I was thinking, so I posted it on Post It notes.
9    Q.   Okay.  And once you've posted these on these
10   Post It notes as your initial thoughts upon reading
11   Mr. Baker's 2014 review rebuttal, did you communicate
12   that to anybody?
13   A.   I can't remember what I did with this actual
14   copy, what I did after the Post It notes.
15   Q.   Yeah.  My question is not so much about the
16   actual rebuttal itself.  The rebuttal was written by
17   Mr. Baker, correct?
18   A.   Right.
19   Q.   And you wrote certain initial thoughts on
20   Post Its?
21   A.   Right.
22   Q.   First of all, did you do that on your own or
23   did somebody ask you to do it?
24   A.   Well, the way it's laid out, I believe I did

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 253

1 it on my own to be able to keep my thoughts, document
2 my thoughts on what he had said.
3    Q.   Okay.  Now, these Post Its, did you -- that
4 contain your thoughts, did you communicate these Post
5 Its to anybody?
6    A.   That, I can't -- I don't remember.  I don't
7 know -- I don't remember.  I don't really remember
8 doing much with this.
9    Q.   Okay.  Do you remember ever explaining your
10 thoughts on the Post Its to anybody, whether that be
11 in writing or orally?
12    A.   I just don't remember six years ago.
13    Q.   Okay.
14        MS. BERTRAM:  John, what's your plan
15 for -- for wrapping up today?
16        MR. LEE:  Here -- okay.  What time -- here
17 is my -- I'm going to -- I'm not -- obviously, I'm not
18 bound to this, but I'm going to take a guess that as
19 I'm doing this with Mr. Flatley, running through these
20 documents where we see his handwriting --
21        MS. BERTRAM:  Right.
22        MR. LEE:  -- or his name come up, I'm going
23 to guess I'm going to have maybe a couple hours more
24 maybe, two-and-a-half hours more.  That's my

Page 254

1 guesstimate right now.  What we could do is -- here's
2 what I'm guessing.  Whether it be Mr. Suraci or with
3 Mr. Flatley or we'll see how Miss Salvador goes on
4 Saturday, I'm a little -- Mr. Salvador's (sic) name
5 comes up a lot in a lot of the documents, so what we
6 could do is probably wrap it all up, maybe, like, pick
7 a date and just kind of finish them all up, of course,
8 subject to everybody's schedule conveniences ideally
9 sometime in the first half of September.  This doesn't
10 have to be on the record.  Are you, like, planning any
11 trip, Mr. Flatley, in the --
12        THE COURT REPORTER:  Do you -- so
13 do -- Michael, do you want to go off the record?
14        MS. BERTRAM:  Why don't we just go ahead and
15 stay on the record because we're just planning things
16 out.
17        MR. LEE:  Sure.  Yeah.  I'm just --
18        MS. BERTRAM:  I had no expectation that you
19 were going to try to exceed seven hours with respect
20 to Mr. Flatley's deposition.
21        MR. LEE:  Yeah.  I mean --
22        MS. BERTRAM:  And we're getting close to
23 seven hours.
24        MR. LEE:  I understand.  I understand, and

Page 255

1 if you say shut it off at seven hours, you know, we're
2 going to end up in front of the judge, and we're going
3 to do this whole thing, and we're going to do the same
4 thing with Earl, but that's down the line.  What I
5 would like to do is we're at Exhibit 351, and there's
6 some mop up I need to do with Exhibit 294, the
7 Declaration, and then there's a bunch of e-mails where
8 his name -- name comes up, and, really, some of that
9 stuff, to be honest with you, Connie, if I -- if you
10 and I stipulate, stipulate that those e-mails say what
11 they say, I'm not so sure that we need to do anything
12 more than that, although it will be interesting to see
13 some of those questions will -- do relate to some of
14 what we discussed today, you know, about reamers and
15 things like that, but as I said, that's my guesstimate
16 as to what I have left, and I understand it's, what;
17 5:18 your time.  5:15 your time.  And we can -- as of
18 right now, I believe Mr. Flatley and Mr. Suraci,
19 obviously, there's going -- I don't believe
20 Mr. Fontaine is going to take that long or certainly
21 not the full seven hours, I don't think.  Same thing
22 with Miss Glica.  Miss Salvador, I really don't know
23 until I start asking her questions simply because
24 she -- her name appears in a lot of e-mails, but, you

Page 256

1 know, she's a lot of CCs and BCCs and things -- or CCs
2 to e-mails, so I think what we could do is figure out
3 a time, like I said, hopefully to mop it all up.  But I
4 will tell you, Connie, my goal is to finish discovery
5 in the first half of September.  Lawyers being
6 lawyers, what that usually means is likely rest of
7 September, but that's my goal.
8        MS. BERTRAM:  Well, let's -- let's just
9 focus on the witness we have in front of us right now
10 who has his own schedule and such.  How much time are
11 you proposing to conclude his deposition?  You're
12 saying a couple of hours.
13        MR. LEE:  Yeah.  My guess right now --
14        MS. BERTRAM:  I interpret that as around
15 two.
16        MR. LEE:  My guess is --
17        MS. BERTRAM:  If we have a firmer proposal,
18 Ann and Larry I can talk about it.
19        MR. LEE:  Sure.  My guesstimate right now is
20 two to two-and-a-half hours left, and you guys can
21 talk about it and pick a date or whatever, and, again,
22 I don't want to screw up people's schedule, especially
23 if they have travel plans and things like that, but
24 I've told you sort of in the big picture what I'm

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 257

1  thinking or what I'm estimating, and we have some, you
2  know, little issues out there hanging, including
3  Mr. Cicero, so we can deal with it however you want to
4  deal with it.
5      MS. BERTRAM: Okay. Why don't you let Ann
6  and Larry and I take a break.
7      MR. LEE: Okay.
8      MS. BERTRAM: Talk about your proposal, you
9  know, with the understanding that if we're able to
10  stipulate as to some of these exhibits, it might cut
11  it down from, like, two hours to maybe an
12  hour-and-a-half, and --
13      MR. LEE: Yeah. I mean, I'm not -- I'm not
14  going to be a pain or unreasonable about this, and
15  mainly because, you know, what's good for the goose is
16  good for the gander. I could play the same -- same
17  thing with you. I'm just trying to take a guess as to
18  I have a list of exhibits where Mr. Flatley's name
19  comes up, and some of them might be pretty -- pretty
20  quick. Yeah, that's my name, and I don't remember it.
21  I'm not putting words in your mouth, Mr. --
22  Mr. Flatley. That's my name and my name is on that
23  e-mail and I don't remember a dang thing about it,
24  that could be the testimony; in which case, it will be

Page 258

1  a lot quicker, but I just don't know, but some of
2  those e-mails do relate to some of these issues that
3  have already come up. Okay.
4      MS. BERTRAM: Let us -- let's take a break
5  and talk about it, and we can go back on the record
6  then.
7      MR. LEE: Got it.
8      MS. BERTRAM: Okay. Thanks, John.
9      THE VIDEOGRAPHER: All right. Stand by,
10  please. The time is 4:19 p.m. Central time. We are
11  off the record.
12      (Recess.)
13      THE VIDEOGRAPHER: The time is 4:27 p.m.
14  Central time. We are back on the record.
15      MS. BERTRAM: So we're willing to make
16  Mr. Flatley available for up to two hours on a date
17  that works for everyone in early September. With
18  respect to the other witnesses, we'll just have to
19  talk separately about them.
20      MR. LEE: I understand, and I apologize,
21  Mr. Flatley. Frankly, I was with Connie. I thought
22  we could finish up, but, you know -- and I don't have
23  a whole lot left, but that's my best estimate, and
24  let's figure that out. I hope I'm not throwing a

Page 259

1  wrench into your holiday schedule or anything like
2  that, but that's fine, and you know my schedule,
3  Connie. I sent it to you, so --
4      MS. BERTRAM: Right.
5      MR. LEE: -- we'll discuss that, and I'll go
6  from there, and so this dep will be continued until a
7  mutually convenient time.
8      THE COURT REPORTER: Do you want to do --
9      MR. LEE: And just for the -- and I'm
10  not -- you know, I don't want to have -- God knows, I
11  don't want to have to fight over this in the court,
12  you know. I'm not -- I'll do my best to finish up.
13  I'm not committing to the two hours. That's all I can
14  say.
15      MS. BERTRAM: We agreed to make him
16  available for up to two hours, so.
17      MR. LEE: Sure. Okay. Thanks
18      MS. BERTRAM: Thanks. Have a good evening,
19  everybody.
20      THE COURT REPORTER: Do you -- hold on one
21  second before we go off. Do you want to do signature
22  on this portion or wait?
23      MS. BERTRAM: Let's -- we'll go ahead and do
24  signature on this portion.

Page 260

1      THE COURT REPORTER: So you want to
2  reserve --
3      MS. BERTRAM: Yeah.
4      THE COURT REPORTER: -- or waive?
5      MS. BERTRAM: No. We should do -- we should
6  do the signature part for the whole thing.
7      THE COURT REPORTER: Okay.
8      MS. BERTRAM: Because the second day may
9  impact things that are said in the first day. I don't
10  know why, but we do want normal delivery of the
11  transcript.
12      THE COURT REPORTER: Are you ordering this,
13  Mr. Lee?
14      MR. LEE: Yes. Normal delivery.
15      THE COURT REPORTER: Okay. All right.
16  Thank you.
17      MR. LEE: Thank you.
18      MS. BERTRAM: Thank you. Bye.
19      THE VIDEOGRAPHER: I'll take us off the
20  record, then. Please stand by. The time is 4:29 p.m.
21  Central time. This concludes the deposition of
22  Larry Flatley. We are off the record.
23          (Whereupon, the deposition was
24           continued generally.)

STEPHEN LAWRENCE FLATLEY
August 19, 2020

Page 261

1                 COURT REPORTER CERTIFICATE

2          I, CYNTHIA A. SPLAYT, CSR No. 084.003295,

3    Certified Shorthand Reporter, do hereby certify:

4          That prior to being examined, the witness

5    named in the forgoing proceedings, STEPHEN LAWRENCE

6    FLATLEY, was duly sworn to testify the truth, the

7    whole truth and nothing but the truth;

8          That said proceedings were taken before me

9    via Zoom, and were taken down by me in shorthand and

10   thereafter transcribed in typewriting under my

11   direction and supervision; and hereby certify that the

12   foregoing transcript of proceedings is a full, true

13   and correct transcript of my shorthand notes so taken.

14         I further certify that I am neither counsel

15   for nor related to any party to said action, nor in

16   any way interested in the outcome thereof.

17         In witness whereof, I have hereunto set my

18   hand this 26th day of August, 2020.

19

20

21

22

23       _____
         CYNTHIA A. SPLAYT, CSR
         License No.  084.003295

24

Paszkiewicz Court Reporting
847.619.7155



Discovery Deposition Of

# STEPHEN LAWRENCE FLATLEY - VOL. II

October 1, 2020

Earl Donald Baker v. Smith & Wesson Corp.

No. 3:19-cv-30008-MGM

Court Reporter: Kimberly Winkler Christopher

**Paszkiewicz Court Reporting**
**1900 E. Golf Road**
**Suite 950**
**Schaumburg, IL 60173**
**Phone: (847) 598-0322 / (855) 595-3577 toll-free**

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

EARL DONALD BAKER,              )
                                )
        Plaintiff,              )
                                )
  vs.                           ) Case No. 3:19-cv-30008-MGM
                                )
SMITH & WESSON CORP.,           )
                                )
        Defendant.              )


        The continued videotaped deposition of

STEPHEN LAWRENCE FLATLEY, conducted virtually,

called for examination, taken before KIMBERLY

WINKLER CHRISTOPHER, CSR No. 084-002752, a Certified

Shorthand Reporter of the State of Illinois, on the

1st day of October, A.D. 2020, at 12:05 p.m. Central

Time.

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 2

 1  PRESENT:

 2  LEE & BREEN, LLC
    188 Industrial Drive
 3  Suite 403
    Elmhurst, Illinois 60126
 4  BY:  MR. JOHN Y. LEE
    jlee@leebreenlaw.com
 5  312-241-1420

 6  Appeared on behalf of the Plaintiff;

 7  BERTRAM, LLP
    1717 K Street, NW
 8  Suite 900
    Washington, D.C. 20006
 9  BY:  MS. CONNIE N. BERTRAM
    cbertram@bertramllp.com
10  703-627-1649

11  ALSO PRESENT:

12     MICHAEL SKASICK, Moderator

13

14

15

16

17

18

19

20

21

22

23

24

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 3

1                    I N D E X
     WITNESS                              EXAMINATION
2
     STEPHEN LAWRENCE FLATLEY
3
     Examination by Mr. Lee                        5
4
5                  E X H I B I T S
6    NUMBER                                       PAGE
7    Exhibit 6     (MO1425-MO1426)                  6
     Exhibit 7     (M00904-M00906)                  9
8    Exhibit 8     (SW0000316-SW0000311)           10
     Exhibit 9     (SW0000314)                     11
9    Exhibit 12    (e-mail chain)                  11
     Exhibit 13    (M01469-M01470)                 12
10   Exhibit 14    (SW0000376)                     13
     Exhibit 15.1  (SW0000361-SW0000363)           14
11   Exhibit 17    (SW0000173)                     14
     Exhibit 27.1  (e-mail chain)                  15
12   Exhibit 27.2  (e-mail chain)                  17
     Exhibit 29    (Earl Baker's Training
13                 Program - 2/4/14)               18
     Exhibit 45    (SW0000481)                     18
14   Exhibit 51    (SW0000402-SW0000404)           20
     Exhibit 62    (SW0000418)                     27
15   Exhibit 67    (M01374-M01375)                 29
     Exhibit 72    (SW0000359-SW0000360)           32
16   Exhibit 81    (SW0000183)                     33
     Exhibit 88    (SW0000374)                     39
17   Exhibit 91    (M01333-M01334)                 41
     Exhibit 100   (SW0000493)                     42
18   Exhibit 110   (SW0000261)                     45
     Exhibit 140   (SW000095-SW000097)             45
19   Exhibit 146   (SW0000494)                     48
     Exhibit 150   (M01545-M01548)                 48
20   Exhibit 151   (M00925-M00927)                 51
     Exhibit 183   (M02541-M02550)                 52
21   Exhibit 184.2 (Baker0000180)                  54
     Exhibit 185   (M00875-M00881)                 55
22   Exhibit 186   (SW0000988)                     55
     Exhibit 187   (M01243-M01245)                 60
23   Exhibit 196.1 (Baker0000183-Baker0000184)     60
     Exhibit 197   (M00832)                        61
24   Exhibit 199   (M02339-M02340)                 62

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 4

1                    I N D E X (Continued)

2

                        E X H I B I T S
3
   NUMBER                                    PAGE
4
   Exhibit 200    (M02613)                    62
5  Exhibit 201    (M02337-M02338)             63
   Exhibit 202    (M01686-M01687)             64
6  Exhibit 205    (M01779-M01780)             68
   Exhibit 233.2 (4-page document)            70
7  Exhibit 250    (M02261)                    74
   Exhibit 355    (photographs)               80
8  Exhibit 357    (presentation)              81

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 5

1    THE MODERATOR: We are now on the record.
2 This is the videotaped deposition of Larry
3 Flatley, Volume 2. Today's date is October 1st,
4 2020. The time is 12:05 p.m. Central Time.
5    All attorneys present will be indicated on
6 the stenographic record. The court reporter will
7 now swear in the witness.
8    (Witness sworn.)
9        LARRY FLATLEY,
10 called as a witness herein, having been first duly
11 sworn, was examined and testified further as
12 follows:
13        DIRECT EXAMINATION (Continued)
14 BY MR. LEE:
15    Q Good afternoon, Mr. Flatley. I'm going to
16 show you a bunch of exhibits and then ask you
17 questions about them. And in an attempt to see if I
18 could -- if we could save time, it will be more
19 efficient.
20    What I'm going to be asking you about is to,
21 No. 1, to identify the e-mail either because you
22 sent it or you received it or you've seen it or you
23 were copied on it. Other than identifying it, I'm
24 going to ask you if you have any memory of the

Page 6

1 content of the e-mail other than the actual e-mails
2 themselves. So those are the questions I'm going to
3 go through. So, for example, if you don't have a
4 memory of particular contents of particular e-mails
5 or events, then I'm going to ask if there's anything
6 that would refresh your recollection about those
7 events. Other than -- so those are the general
8 questions I'm going to be asking you, okay?
9    So I'm going to ask you to take a look at
10 Exhibit No. 6.
11    MS. BERTRAM: Before we proceed, there's a
12 lot of echoing that's happening. And I feel like
13 from --
14    MR. LEE: From me or --
15    MS. BERTRAM: I don't know who's the source
16 of it. But when you were speaking, John, you were
17 echoing.
18    Do you have like your cell phone and another
19 device that are on --
20    MR. LEE: No.
21    MS. BERTRAM: (Continuing) -- with a
22 speaker?
23    MR. LEE: No.
24    MS. BERTRAM: Hey, Michael --

Page 7

1    MR. LEE: I've been -- I've been doing
2 exactly the same thing all the way through, so --
3    MS. BERTRAM: Okay. So, Michael, could you
4 speak because it was particularly bad when you
5 spoke.
6    THE MODERATOR: Yes, Counsel. This is the
7 moderator. I think it could be the room that Mr.
8 Flatley is in. I'm seeing a lot of empty space
9 behind him.
10    MS. BERTRAM: Okay.
11    THE MODERATOR: It could be a possibility
12 that that's audio going to him and --
13    MS. BERTRAM: Okay.
14 BY MR. LEE:
15    Q Okay. Showing you what's been marked as
16 Exhibit 6, Plaintiff's Exhibit 6, Mr. Flatley. I
17 direct your attention to the middle e-mail dated May
18 17, 2013.
19    **A May 17?**
20    Q Yes. It's an Earl Baker e-mail to you among
21 other people on May 17, 2013.
22    **A Okay.**
23    Q Okay. Do you recall getting this e-mail?
24    **A No.**

Page 8

1    Q Okay. Do you recall the content of this
2 e-mail?
3    **A No.**
4    Q Is there anything that could refresh your
5 recollection as to the contents of this e-mail other
6 than other e-mails on this same subject?
7    **A My name's on it, but -- so I'm assuming that**
8 **I did, but I don't remember it.**
9    Q That's fair enough. Now, if you could do --
10 that's fair enough.
11    Now, I'm not -- obviously tell us all that
12 you remember and things like that. But, in other
13 words, I'm not going to suggest to you that if you
14 don't remember the e-mail and you remember -- you
15 don't remember the contents of the e-mail, that
16 that's going to be the way it is for the other
17 e-mails. But what I'm going to do is -- if Michael
18 is there and hearing this, the next ones I'm going
19 to do are 7, 8, 9, 12, 13, 14, 15.1, and 17. And
20 if -- I'm not suggesting that your answers should be
21 the same. But if the answers are the same, we're
22 going to blow through those. So the next one is 7.
23    MS. BERTRAM: And, John, I object to doing
24 these as a group. We need to look at individual

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 9

1  exhibits.
2      MR. LEE:  Sure.  No, I'm going to give
3  him -- give it to him.  I'm just saying Michael
4  should have them ready so that I'm not doing all of
5  them, so --
6      MS. BERTRAM:  Okay.  I understand.
7      MR. LEE:  Yeah.
8  BY MR. LEE:
9      Q  Showing you what's been marked as Exhibit 7.
10  Down at the bottom -- towards the bottom there's an
11  e-mail dated May 16, 2013, from Carl Hynes to
12  various people, including you, correct?  And the
13  subject line is "TCA Chamber Reamers."
14      Do you see that?
15      A  Yes, I do.
16      Q  Do you recall this e-mail?
17      A  Again, my name's on it, but I don't remember
18  it.
19      Q  Okay.  Do you remember the contents of this
20  e-mail at all?
21      A  No.
22      Q  Okay.  And other than this e-mail itself, is
23  there anything that could refresh your recollection
24  as to the contents of the e-mail reflected in

Page 10

1  Plaintiff's Exhibit 7?
2      MS. BERTRAM:  Objection to the form.
3  BY MR. LEE:
4      Q  You can answer.
5      A  No, I don't think anything would remind me
6  of it.
7      Q  Okay.  If you could go to Exhibit 8 now,
8  sir.  It's an e-mail dated -- second e-mail down --
9  e-mail dated May 21, 2013, from Earl Baker to Tom
10  Walsh and you, correct?
11      A  Correct.
12      Q  And the subject has to do with broach --
13  T-12996 broach?
14      A  Okay.
15      Q  Okay.  Do you have -- taking a look at
16  Plaintiff's Exhibit No. 8, do you have a
17  recollection of getting this e-mail?
18      A  Again, my name is on it, but I don't
19  remember this.
20      Q  And when you say -- when you say "this," I
21  assume you mean the content of the e-mail as well?
22      A  Correct.
23      Q  Okay.  And other than the e-mail itself, is
24  there anything that could refresh your recollection

Page 11

1  as to the contents of the e-mail?
2      A  I don't think so.
3      Q  Okay.  Exhibit No. 9, please.  Exhibit No. 9
4  is an Earl Baker e-mail to various people -- a copy
5  to various people, including you, dated May 17,
6  2013.  And the subject line is "Standardization of
7  touch off on chamber reamers."
8      Do you see that?
9      A  Yes.
10      Q  The same question, sir.  Do you recall this
11  e-mail at all?
12      A  I don't remember this e-mail.
13      Q  Okay.  Do you remember the contents of the
14  e-mail at all?
15      A  No, I don't remember.
16      Q  Other than the actual e-mail itself marked
17  as Plaintiff's Exhibit No. 9, is there anything that
18  could refresh your recollection as to the contents
19  of the e-mail?
20      A  I don't think so.
21      Q  Okay.  If you could turn to Exhibit 12, sir.
22  Exhibit 12, not the very top but the second e-mail
23  is a June 14, 2013, e-mail exchange between you and
24  Carl Hynes.  And the subject line is "T10621-13

Page 12

1  Reamers."
2      Do you see that?
3      A  Yes.
4      Q  The same question, sir.  Do you recall -- do
5  you recall -- I'm going to ask if you -- if Connie
6  objects, then she objects.
7      Do you recall this e-mail or the contents of
8  this e-mail at all?
9      A  I don't remember.
10      Q  Okay.  Other than the actual e-mail itself,
11  do you recall -- is there anything that could
12  refresh your recollection as to the contents of the
13  e-mail?
14      A  Not that I could think of.
15      Q  Okay.  If you could go to Exhibit 13.  If
16  you go to the bottom half of the Exhibit 13, an
17  e-mail from Ted Hebert to Earl Baker -- Hebert is
18  H-e-b-e-r-t -- to Earl Baker with a copy to Andy
19  Dziobek and you and Carl Hynes, correct?
20      A  Correct.
21      Q  And the subject is "Gundrills in Crib 99."
22      Am I correct that the subject is gundrills
23  in Crib 99?
24      A  Correct.

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 13

1    Q  Okay.  My question is -- first my question
2  is do you remember the e-mail or the contents of the
3  e-mail?
4    **A  I don't remember it.**
5    Q  Okay.  Other than the actual e-mail itself
6  marked as Plaintiff's Exhibit No. 13, is there
7  anything that could refresh your recollection as to
8  the contents of the e-mail?
9      MS. BERTRAM:  Objection as to form.
10  BY MR. LEE:
11    Q  You can answer.
12    **A  No, there isn't.**
13    Q  Okay.  Let's go to Exhibit 14.  If you go to
14  the second e-mail, that's an e-mail dated June 27,
15  2013, from you to Earl Baker, Andy Dziobek, and Carl
16  Hynes.  The subject is "More Pioneer Tools Stocked
17  in Crib 99."
18      Do you see that?
19    **A  Correct.**
20    Q  Do you recall this e-mail or the contents of
21  this e-mail?
22    **A  I don't remember this e-mail.**
23    Q  Other than the -- other than the e-mail
24  itself marked as Exhibit -- Plaintiff's Exhibit

Page 14

1  No. 14, is there anything that you could think of
2  that could refresh your recollection as to the
3  contents of Exhibit 14?
4    **A  I can't think of anything.**
5    Q  Okay.  If you could go to Exhibit 15.1, sir.
6  And I'm going to direct your attention to the second
7  e-mail.  It's an e-mail from Bill Fletcher to Earl
8  Baker and Dziobek and you.  And it's dated July 2,
9  2013.
10    **A  Okay.**
11    Q  Do you recall this e-mail or the contents of
12  this e-mail marked as Plaintiff's Exhibit 15.1?
13    **A  I don't remember this discussion.**
14    Q  Okay.  Other than the actual e-mail itself
15  marked as Plaintiff's Exhibit 15.1, is there
16  anything that could refresh your recollection as to
17  the contents of Exhibit 15.1?
18    **A  No, there isn't.**
19    Q  If you could turn to Exhibit 17.  Exhibit 17
20  is an e-mail from Earl Baker dated October 28th to
21  various people and a copy to you, correct?
22    **A  Yes.**
23    Q  The subject is "Chips on newly ground
24  tools," right?

Page 15

1    **A  Okay.**
2    Q  Do you recall this e-mail or the contents of
3  this e-mail?
4    **A  I do not.**
5    Q  Other than the actual e-mail itself marked
6  as Plaintiff's Exhibit No. 17, is there anything
7  that could refresh your recollection as to the
8  contents of Plaintiff's Exhibit 17?
9      MS. BERTRAM:  Objection as to form.
10      MR. LEE:  Oh, I'm sorry.  I thought we were
11  asking for an answer -- or waiting for an answer.
12  BY MR. LEE:
13    Q  The question was other than the actual
14  e-mail marked as Exhibit -- Plaintiff's Exhibit
15  No. 17, is there anything that could refresh your
16  recollection as to the contents of Exhibit 17?
17      MS. BERTRAM:  Objection as to the form.
18  BY MR. LEE:
19    Q  You can answer.
20    **A  No, there isn't.**
21    Q  Okay.  If you could go to Exhibit 27.1.
22      MS. BERTRAM:  27.1?
23      MR. LEE:  27.1.
24  BY MR. LEE:

Page 16

1    Q  This is an e-mail string between -- among
2  Jeremy Terpos, T-e-r-p-o-s; Earl Baker; and Ryan
3  Morin, M-o-r-i-n.  And the subject matter is
4  "Benchmark Tooling Order."  And I notice that your
5  name does not appear anywhere in the e-mail.
6      First of all, do you recall the issue of
7  ordering tools from Benchmark by Earl Baker?
8      MS. BERTRAM:  Objection vague as to the term
9  "issue."
10  BY MR. LEE:
11    Q  And your answer is?
12    **A  I don't understand the question.**
13    Q  Okay.  Do you recall Earl Baker ordering
14  tools from Benchmark as part of his job in January
15  of 2014?
16    **A  I don't remember.**
17    Q  Okay.  That's fair enough.  And do you
18  remember those Benchmark tools being allocated to
19  Pioneer in January of 2014?
20    **A  Well, Pioneer --**
21      MS. BERTRAM:  Objection.
22      THE WITNESS:  Pioneer was a distributor for
23  Benchmark.
24  BY MR. LEE:

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 17

1    Q  Okay.  That's fair enough.
2        And that's -- other than -- and do you know
3   how Pioneer became Benchmark's Pioneer --
4   Benchmark's distributor?
5    A  No, I don't.
6        MS. BERTRAM:  Objection, speculation.
7   BY MR. LEE:
8    Q  I said do you know.  Okay.  That's fine.
9        I'm going to ask you to take a look at
10  Exhibit 27.2.
11       MS. BERTRAM:  Larry, when John asks you a
12  question, make certain you pause to allow me to
13  assert an objection for the record.  The audio is
14  really bad on the deposition so we have to pause a
15  little extra.
16       THE WITNESS:  Okay.
17  BY MR. LEE:
18   Q  Showing you what's been marked as
19  Plaintiff's Exhibit 27.2.  And, again, it's an
20  e-mail exchange between Derrick Hedley, Earl Baker,
21  Ted Hebert, and Andy Dziobek regarding a regrind to
22  Kennametal.
23       Do you recall the issue of regrinds to
24  Kennametal that Earl was working on?

Page 18

1        MS. BERTRAM:  Objection, vague as to the
2   word "issue."
3   BY MR. LEE:
4    Q  And your answer is?
5    A  No, I'm not familiar with the subject.
6    Q  Okay.  If you could turn to Exhibit 29.
7   Exhibit 29 is a document dated Earl Baker's Training
8   Program, February 4, 2014, correct?
9    A  That's correct.
10   Q  And you drafted this document?
11   A  Yes, I did.
12   Q  Okay.  The handwriting where it says
13  "complete" after the 2/11, 2/14, 3/3, and 4/14,
14  whose handwriting is that?
15   A  That is mine.
16   Q  Okay.  If you could turn to Exhibit 45.
17       Showing you what's been marked as
18  Plaintiff's Exhibit 45, that's an e-mail dated
19  March 18, 2014, from Earl Baker to you regarding
20  Mosher grinding wheels; am I correct?
21   A  Correct.
22   Q  Do you recall the e-mail or the content of
23  the e-mail at all?
24       MS. BERTRAM:  Objection to the form.

Page 19

1   BY MR. LEE:
2    Q  Let me ask it to you one at a time.
3        Do you recall this e-mail marked as
4   Plaintiff's Exhibit 45?
5    A  I remember vaguely about the subject matter,
6   but not the exact details.
7    Q  Okay.  Tell us what you remember about the
8   subject matter.
9    A  I remember there was an issue that came up
10  about paying too much for grinding wheels and that
11  Mr. Baker was going to get in touch with Ed Prystupa
12  and see what they could find to find replacements
13  that would benefit Smith & Wesson with a savings.
14   Q  Okay.  So other than that and other than
15  the -- other than the content of this e-mail, is
16  there anything that would refresh your recollection
17  as to that issue that you just described?
18       MS. BERTRAM:  Objection as to the form.
19  BY MR. LEE:
20   Q  And your answer is?
21   A  If you had a Kaizen sheet or something about
22  the actual outcome of the whole thing, that might
23  help me; but this e-mail doesn't.
24   Q  Okay.  That's my point.  Other than the

Page 20

1   e-mail itself and what you just testified to, is
2   there anything that would refresh your recollection
3   as to the issue of the Mosher grinding wheels?
4    A  No, I don't think so.
5    Q  Okay.  If you could turn to Exhibit 51.
6        Showing you what's been marked as Exhibit
7   51, if you could turn to the second page.  On
8   March 25 there are e-mail -- there's an e-mail
9   exchange among Derrick Upson, you, Earl Baker,
10  regarding "tools needed for Houlton."
11       Do you see that?
12   A  I'm only on two of the many e-mails that are
13  here.
14   Q  Correct.  And I notice that you're not on
15  the e-mails on the first page, for example, of
16  Plaintiff's Exhibit 51.
17   A  Right.
18   Q  So my question to you is, first of all, as
19  to the e-mails that -- e-mail exchange where your
20  name does appear, do you recall this e-mail at all?
21       MS. BERTRAM:  Objection to the form.
22       MR. LEE:  I'll rephrase it.
23  BY MR. LEE:
24   Q  After the e-mails where your name does

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 21

1  appear in Plaintiff's Exhibit 51, do you recall
2  Plaintiff's Exhibit 51?
3      **A  I don't remember these specific e-mails.**
4      Q  Okay.  The way you answered it, do you --
5  okay.  Do you recall the content of these e-mails?
6      MS. BERTRAM:  Objection, vague and compound.
7  BY MR. LEE:
8      Q  Do you recall the contents of these e-mails?
9      **A  I remember about trying to purchase tools**
10  **for Houlton for M1M.**
11      Q  Okay.  And what do you recall about trying
12  to purchase tools for Houlton?
13      MS. BERTRAM:  Objection, compound.
14      THE WITNESS:  I don't understand the
15  question.  What specific are you asking?
16  BY MR. LEE:
17      Q  Well, you said you recall the issue of
18  trying to purchase tools for Houlton, right?
19      **A  Correct.**
20      Q  My question is what do you recall about
21  trying to purchase tools for Houlton?
22      MS. BERTRAM:  Objection.  Grossly compound
23  and calls for a narrative.
24  BY MR. LEE:

Page 22

1      Q  And your answer is?
2      **A  What specifically are you asking me about?**
3      Q  What do you recall about trying to purchase
4  tools for Houlton?
5      **A  That was part of the M1M project to supply**
6  **tools to Houlton on an expedited -- on an expedited**
7  **process.**
8      Q  Okay.  And other than that, what do you
9  recall about that process of trying to purchase
10  tools for Houlton on an expedited basis?
11      MS. BERTRAM:  The same objections.
12  BY MR. LEE:
13      Q  You can answer.
14      **A  I don't understand what you're actually**
15  **asking.**
16      Q  I'm asking for your recollection based on
17  your answer.  You said you recall the issue of
18  trying to purchase tools for Houlton on an expedited
19  basis, correct?
20      **A  Right.**
21      Q  Okay.  So of that issue, what is it that you
22  recall -- let me ask, what is it that you recall
23  that the cutter department did to -- in trying to
24  purchase tools on an expedited basis for Houlton?

Page 23

1      **A  It intended to keep an inventory of the**
2  **needed tools and purchase tools if necessary to**
3  **fulfill those production requirements for those**
4  **quantities required and to ship them up to Houlton**
5  **before they were needed.**
6      Q  Okay.
7      **A  So they'd be available for production when**
8  **they were needed.**
9      Q  Okay.  And you were trying to do that on an
10  expedited basis?
11      **A  Correct.**
12      Q  Okay.  Is there anything else that you
13  recall about the cutter department working on that
14  project?
15      MS. BERTRAM:  Objection to the form.
16  BY MR. LEE:
17      Q  You can answer.
18      **A  Is there something specific you're asking**
19  **about?**
20      Q  No.  Well, okay.  What was Earl's role in
21  that project?
22      **A  Earl was given the task to make sure we had**
23  **enough of the inventory of each tool and to come up**
24  **with a process to ship it to Houlton --**

Page 24

1      Q  Okay.  And did he do that?
2      **A  (Continuing) -- specified on our**
3  **requirements.**
4      Q  Okay.  And did he do that?
5      **A  He had difficulty meeting that objective.**
6      Q  In what way did he have difficulty?
7      **A  He wasn't ordering the tools when we needed**
8  **them.**
9      Q  Okay.  And so what did you do about that?
10      **A  I actually convened meetings in my office**
11  **with the people involved to make sure we knew what**
12  **the inventory requirements were and we had tools on**
13  **order to satisfy those orders --**
14      Q  Okay.
15      **A  (Continuing) -- requirements.**
16      Q  And when you convened that meeting, who was
17  at that meeting?
18      **A  Earl Baker --**
19      Q  Okay.
20      **A  (Continuing) -- Andy Dziobek and Mike Jurga.**
21      Q  Okay.  Anyone else?
22      **A  That's it.**
23      Q  And how long was that meeting?
24      MS. BERTRAM:  Objection.  Mischaracterizes

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 25

1 the testimony.
2 BY MR. LEE:
3     Q  Was there more than one meeting?
4     **A  Yes.**
5     Q  Okay.  How many?
6     **A  I don't remember the exact quantity.**
7     Q  Okay.  Was there more than one?
8     **A  Definitely more than one.**
9     Q  More than three?
10    **A  Definitely more than three.**
11    Q  More than five?
12    **A  More than ten.**
13    Q  Okay.  And so the number of meetings
14 regarding the Houlton -- getting tools to Houlton
15 was more than ten meetings.
16        Was there more than 15?
17    **A  I can't -- there was quite a few.  I just**
18 **don't remember how many.**
19    Q  Okay.  And you wanted -- you did these
20 meetings so that the tools can be ordered for
21 Houlton, correct?
22    **A  Correct.**
23    Q  Okay.  And the team that was working on that
24 was Earl, Andy Dziobek, and Mike Jurga?

Page 26

1     **A  Correct.**
2     Q  Okay.  And you said Earl had difficulty in
3 doing that.  And what in your opinion was his
4 difficulty?
5     **A  He did not have the quantities required**
6 **available being shipped to Houlton on the time**
7 **requirement.**
8     Q  Okay.  And other than that, did he have any
9 other difficulty with this project?
10    **A  No.  That was it.**
11    Q  Okay.  And so did you take him off the
12 project and give it to someone else to do it?
13    **A  No.  What I did was I established a set of**
14 **meetings on a weekly basis to get the inventory up**
15 **to the requirements that we were looking for.  Once**
16 **we satisfied the first wave going through, I**
17 **explained to Mr. Baker that this is your project,**
18 **this is -- this is the way we did it.  You can**
19 **follow through and do the same thing.  But we went a**
20 **period of time and, again, the same thing happened.**
21 **We didn't have the inventory of tools that we needed**
22 **to get to Houlton on the time required so we had to**
23 **start the meeting -- I had to get involved again in**
24 **the meetings with Mr. Baker, Mr. Dziobek, and Mike**

Page 27

1 **Jurga.**
2     Q  Okay.  So he wasn't getting the tools that
3 Houlton needed on time, correct?
4     **A  Correct.**
5     Q  Okay.  And other than that difficulty, did
6 he have any other difficulty with this project?
7        MS. BERTRAM:  Objection.  Mischaracterizes
8 the witness's testimony and asked and answered.
9 BY MR. LEE:
10    Q  And your answer is?
11    **A  No, just fulfilling inventory requirements.**
12    Q  Okay.  And did you figure out why he wasn't
13 filling those -- fulfilling those inventory
14 requirements?
15    **A  No.  No, I didn't.**
16    Q  Okay.  Fair enough.
17       If you could turn to Exhibit 62.  Well,
18 before you go to Exhibit 62, in these meetings did
19 you ever ask Earl Baker why he was not meeting the
20 inventory requirements of Houlton?
21    **A  Not in those meetings, no.  In our Monday**
22 **meetings, our weekly meetings between Earl and I,**
23 **was asking him.**
24    Q  Okay.  And what did he say?

Page 28

1     **A  I don't remember.**
2     Q  Okay.  Is there anything that could refresh
3 your recollection as to what Earl said when you
4 asked him why the Houlton inventory requirements
5 were not being met?
6        MS. BERTRAM:  Objection to the form.
7 BY MR. LEE:
8     Q  You can answer.
9     **A  I can't think of any.**
10    Q  Okay.  Thank you.
11       Now if you could turn to Exhibit 62.  Have
12 you ever seen this e-mail before, Plaintiff's
13 Exhibit 62?
14    **A  No, I have not.**
15    Q  Okay.  Do you ever recall taking Earl and
16 going to Dan Fontaine's office for a meeting just
17 among the three of you in late March 2014?
18    **A  I remember a number of meetings with Dan,**
19 **Earl and I and other people.  I don't know -- I**
20 **don't remember this specific one.**
21    Q  Okay.  So you don't remember a meeting --
22 well, let me ask it to you this way:  Do you recall
23 a meeting just with the three of you where either
24 you or Mr. Fontaine told Earl Baker to not go to HR?

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 29

1    **A  I don't remember any conversation about**
2    **telling Earl not to go to HR.**
3        Q  Okay.  You don't remember Dan Fontaine
4    saying that at a meeting where there was three of
5    you; Mr. Fontaine, you, and Earl Baker?
6        **A  I don't remember the specifics of that**
7    **meeting.**
8        Q  Fair enough.  I'm going to show you what's
9    been marked as Plaintiff's Exhibit 67.
10       Did you ever become aware of Smith & Wesson
11   doing an investigation into what gifts were provided
12   by Pioneer to Smith & Wesson employees?
13       MS. BERTRAM:  Objection, asked and answered.
14       THE WITNESS:  I don't understand the
15   question.
16   BY MR. LEE:
17       Q  Okay.  Did you ever become aware of Smith &
18   Wesson doing an investigation into Pioneer giving
19   gifts to Smith & Wesson employees?
20       **A  Yes.**
21       Q  Okay.  And how did you become aware of that?
22       MS. BERTRAM:  Objection, asked and answered.
23       THE WITNESS:  I was meeting with Rob Cicero
24   and he asked me about some items that I had

Page 30

1    received.
2    BY MR. LEE:
3        Q  Okay.  And what were the items that you had
4    received?
5        **A  It was one to a Mama Iguana's restaurant in**
6    **Northhampton and a gift card.**
7        Q  Okay.  And other than that were you aware of
8    any other investigation into gifts from Pioneer to
9    Smith & Wesson employees?
10       **A  No, I wasn't.**
11       Q  Okay.  Were you aware of gifts by any other
12   vendor to Smith & Wesson employees -- strike that.
13   I will rephrase it.
14       Were you aware of Smith & Wesson's
15   investigation into any other vendors' gifts to Smith
16   & Wesson employees?
17       **A  I was not.**
18       Q  I'm going to show you what's marked as
19   Plaintiff's Exhibit 71.  Plaintiff's Exhibit 71, the
20   second e-mail is -- you know what?  Skip 71.  We
21   already went through this.  This is the Bill
22   Fletcher e-mail from -- okay.  Never mind.
23       72, please.  Showing you what's been marked
24   as Plaintiff's Exhibit 72.  The second e-mail is an

Page 31

1    e-mail from you to Andy Dziobek and Earl Baker dated
2    July 10, 2013, correct?
3        **A  It appears that way.**
4        Q  Yes.  Do you recall this e-mail?  And take a
5    look at the second page as well, sir.  Those are
6    e-mail exchanges dated July 10, 2013, between you
7    and Earl -- among you, Earl, and Andy Dziobek,
8    correct?
9        **A  A copy was sent to me, yes.**
10       Q  Yes.  And the subject matter is "Revised
11   Plan on CNC Slotting" -- s-l-o-t-t-i-n-g --
12   Broaches," right?
13       **A  Correct.**
14       Q  And they forward to you an e-mail from Bill
15   Fletcher down at the bottom of Plaintiff's
16   Exhibit 72, right?
17       **A  Yes.**
18       Q  My question is do you recall these e-mails?
19       **A  I just don't remember.**
20       Q  Okay.  Do you recall the contents of these
21   e-mails?
22       MS. BERTRAM:  Objection to the form of the
23   question.
24       THE WITNESS:  What is the question you're

Page 32

1    asking?
2    BY MR. LEE:
3        Q  Yes.  The e-mail exchange beginning with
4    Bill Fletcher's e-mail of July 8, 2013, that's
5    forwarded by Andy Dziobek to you and Earl Baker on
6    July 10 and then you respond on July 10.  My
7    question is do you recall the contents of those
8    e-mails?
9        MS. BERTRAM:  Objection to the form.
10       THE WITNESS:  I don't -- it's so long ago, I
11   don't remember the details of it.
12   BY MR. LEE:
13       Q  Okay.  Do you remember generally what the
14   subject was?
15       **A  Generally, yes.**
16       Q  And what was the subject?
17       **A  I guess there was a question as to the**
18   **pricing on some tools from one vendor to another.**
19       Q  Okay.  Other than that, do you recall
20   anything else about the contents of Exhibit 72?
21       MS. BERTRAM:  The same objection.
22       THE WITNESS:  No, I don't.
23   BY MR. LEE:
24       Q  Okay.  Is there anything that could refresh

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 33

1  your recollection as to the contents of Exhibit 72
2  other than the actual e-mail marked as Exhibit 72?
3        MS. BERTRAM: Objection to form.
4  BY MR. LEE:
5     Q You can answer.
6     **A Not that I can think of.**
7     Q Okay. And if you could go to Exhibit 81.
8  The middle e-mail is an e-mail from Dan Fontaine to
9  you with a copy to Earl Baker and the subject matter
10 is "Pitch Board," and it's dated April 11, 2014?
11    **A Correct.**
12    Q Do you recall this e-mail?
13    **A No, I don't.**
14    Q Do you recall the contents of this e-mail?
15    **A I don't remember the e-mail.**
16    Q Okay. So do you remember the contents of
17 the e-mail where Mr. Fontaine directs you to have
18 Earl send him an overall picture of this pitch
19 board?
20       MS. BERTRAM: Objection to the form.
21       THE WITNESS: Again, it's on the e-mails, so
22 that's all I can tell you. I don't specifically
23 remember it. I know there was a -- something about
24 the pitch boards. This must have been the -- to get

Page 34

1  Danny up to speed.
2  BY MR. LEE:
3     Q Okay. I get that, but my question to you is
4  so, for example -- not for example.
5        Dan Fontaine sends you an e-mail that says,
6  "Larry, Please have Earl send me an overall picture
7  of his pitch board. I would also like a picture of
8  each individual item on the board. I need this
9  information by 8:00 on Monday morning." That's the
10 content of the e-mail.
11       Do you recall that content?
12       MS. BERTRAM: Objection to the form.
13       THE WITNESS: No, I do not.
14 BY MR. LEE:
15    Q Okay. So do you recall, for example, having
16 a -- communicating with Earl about sending an
17 overall picture of the pitch board to Dan Fontaine?
18    **A If I had received this e-mail from Dan, I**
19 **would have communicated to Earl to send him the**
20 **pictures, but I don't remember it.**
21    Q Okay, exactly. So other than the content of
22 the e-mail itself, do you recall anything else,
23 anything else about -- strike that.
24       Other than the actual e-mail itself marked

Page 35

1  as Plaintiff's Exhibit 81, do you recall the content
2  of the e-mail at all?
3        MS. BERTRAM: Objection to the form.
4        THE WITNESS: Specifically what contents?
5  Just about the pictures or the pitch board?
6  BY MR. LEE:
7     Q Right. And the pictures of each individual
8  item on the board that's referenced in the e-mail.
9  Do you recall that?
10    **A And what do you mean do I recall that?**
11    Q Do you recall seeing it? Do you recall
12 communicating to Earl?
13    **A As I said, I don't remember the e-mail. I**
14 **don't remember specifically communicating it to**
15 **Earl. So long ago.**
16    Q That's fair enough.
17       And I'm saying so other than the actual
18 e-mail itself marked as Plaintiff's Exhibit 81, do
19 you have a recollection of the contents of what's
20 referenced in Plaintiff's Exhibit 81?
21       MS. BERTRAM: Objection.
22       THE WITNESS: I don't --
23 BY MR. LEE:
24    Q And your answer?

Page 36

1     **A I don't understand the question.**
2     Q I'm sorry?
3     **A I don't understand the question.**
4     Q Okay. The contents of the e-mail -- the
5  contents of Exhibit 81 refers to pictures of Earl
6  Baker's pitch board and pictures of each individual
7  items on the pitch board, correct?
8     **A Correct.**
9     Q Okay. So and that's what is referenced in
10 Exhibit 81, right?
11    **A Right.**
12    Q Okay. And my question is other than
13 Exhibit 81, do you have a recollection of the
14 contents of what is referenced in Plaintiff's
15 Exhibit 81?
16       MS. BERTRAM: Objection to form.
17 BY MR. LEE:
18    Q And your answer?
19    **A Do you specifically mean do I remember the**
20 **pitch board?**
21    Q The pictures of the pitch board that
22 Mr. Fontaine is e-mailing to you.
23    **A Well --**
24       MS. BERTRAM: Objection to form.

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 37

1    THE WITNESS: He's asking for -- e-mailing
2  me pictures.
3  BY MR. LEE:
4    Q I get that. So my question is he's asking
5  for pictures from Earl, correct?
6    A Correct.
7    Q Okay. My question is then do you recall the
8  pictures that is referenced in Mr. Fontaine's e-mail
9  other than the -- other than the e-mail itself?
10    MS. BERTRAM: The same objection.
11    THE WITNESS: Let me ask this: Do you
12  mean -- are you asking did I see any of the pictures
13  that Earl took?
14  BY MR. LEE:
15    Q Yes.
16    A No, I did not.
17    Q Okay. And do you recall whether Earl handed
18  in those pictures to you or Mr. Fontaine?
19    A I don't -- don't know whether he gave them
20  to him or not.
21    Q Okay. And do you recall whether he even had
22  pictures of his pitch board?
23    MS. BERTRAM: Objection. Calls for
24  speculation.

Page 38

1  BY MR. LEE:
2    Q I'll -- do you know whether Earl Baker had
3  pictures of his pitch board?
4    A I do not know.
5    Q Okay. So did you ever ask Mr. Fontaine
6  why -- did you ever ask Mr. Fontaine why he was
7  asking for Earl Baker's pitch board pictures?
8    A I don't remember the conversation.
9    Q Okay. Did you ever tell Earl to take
10  pictures of his pitch board?
11    A I specifically don't remember the
12  conversation; but if Dan sent me this e-mail, I
13  would have definitely gone to see Earl to ask --
14    Q Okay.
15    A (Continuing) -- about pictures.
16    Q Okay.
17    A Monday at 8:00 o'clock.
18    Q Okay. And so do you ever recall having a
19  conversation with anybody at Smith & Wesson about
20  the pictures of Earl's pitch board?
21    A No.
22    Q Okay. Is there anything that could refresh
23  your collection as to whether you had any
24  conversation with anyone at Smith & Wesson about the

Page 39

1  pictures of Earl's pitch board?
2    A No, I can't think of anything.
3    Q Okay. Can you go to Exhibit 88.
4    Have you ever seen this e-mail before marked
5  as Plaintiff's Exhibit 88?
6    A No, I have not.
7    Q Okay. I refer your direction -- I refer you
8  to the second paragraph of the e-mail -- by the way,
9  this is an e-mail dated April 14, 2014, by Earl
10  Baker to Ed Suraci, Anne Bruce, and Rob Cicero,
11  correct, regarding -- the subject is "Changing the
12  pitch board," right?
13    A Yes.
14    Q The second paragraph says, "Thursday, Larry
15  admitted to Dan Fontaine that he hadn't looked at
16  the pitch board with me for two entire weeks. Dan
17  criticized Larry for leaving me with tasks without
18  any instruction."
19    Do you see that?
20    A Yes.
21    Q Do you recall having any conversations with
22  Dan Fontaine about Earl's pitch board?
23    A No, I do not, not on this specific alleged
24  two weeks missed.

Page 40

1    Q Okay. So do you recall Dan Fontaine
2  criticizing you for leaving Earl without -- leaving
3  Earl with tasks without any instructions?
4    A I don't remember the conversation with Dan.
5    Q Okay. And do you remember the conversation
6  with Dan where Larry -- you admitted to Dan that you
7  hadn't looked at the pitch board with Earl for two
8  entire weeks?
9    A I don't --
10    MS. BERTRAM: Object, foundation.
11  BY MR. LEE:
12    Q I'm asking for your recollection.
13    A I don't remember missing two weeks of
14  viewing the board.
15    Q Fair enough. Is there anything that could
16  refresh your recollection as to the content of this
17  e-mail where Earl Baker mentions you having
18  discussions with Larry about Earl's pitch board?
19    MS. BERTRAM: Objection to the form.
20  BY MR. LEE:
21    Q You can answer.
22    A What was the question again?
23    Q Yes. You said you don't recall the
24  incidents stated in the second paragraph of

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 41

1  Exhibit 88, correct?
2      **A  Correct, I don't remember the --**
3      Q  Yeah.  My question -- yeah.  My question is
4  is there anything that could refresh your
5  recollection as to the incidents referenced in the
6  second paragraph of Exhibit 88?
7      MS. BERTRAM:  Objection to the form.
8      THE WITNESS:  I can't think of any.
9  BY MR. LEE:
10     Q  Okay.  Can you turn to Exhibit 91.  This is
11  an e-mail exchange among you, Carl Hynes, Scott
12  Ignachuck -- and Scott Ignachuck with copies to Ted
13  Hebert, Derrick Upson, and Earl Baker regarding
14  tools for Houlton.  Am I correct?
15     **A  Yes.**
16     Q  Do you recall these e-mails?
17     **A  Okay.**
18     Q  Okay.  The question is do you recall the
19  e-mails marked as Plaintiff's Exhibit 91?
20     **A  No, I don't.**
21     Q  Okay.  Do you recall the contents of the
22  events referenced in Plaintiff's Exhibit 91?
23     MS. BERTRAM:  Objection to the form.
24     THE WITNESS:  I don't recall.

Page 43

1      Q  Well, what it states here.  Standing up for
2  one's self may take guts but one has an equal
3  responsibility to stand up when they are wrong.
4      Could you read the e-mail to yourself.
5      **A  Okay.  And the question is?**
6      Q  Do you recall the contents of this e-mail?
7      MS. BERTRAM:  Objection to the form.
8      THE WITNESS:  I don't really remember it.
9  BY MR. LEE:
10     Q  Okay.  And other than the actual e-mail
11  marked as Plaintiff's Exhibit 100, is there anything
12  that could refresh your recollection as to the
13  contents referenced in the e-mail?
14     **A  I don't think so.**
15     Q  Okay.  Can you go to Exhibit 101.  Exhibit
16  101, take a look at the -- not the top e-mail, but
17  the second e-mail.
18     **A  Didn't we discuss --**
19     Q  Yeah, we did this one.  We can skip 101.
20  If you could go to 110.
21     MS. BERTRAM:  And, John, while Mr. Flatley
22  is reviewing the exhibit, we've gone a little over
23  an hour at this point.  So there's an hour remaining
24  in the deposition.

Page 42

1  BY MR. LEE:
2      Q  Okay.  And other than the actual e-mails
3  marked as Plaintiff's Exhibit 91, is there anything
4  that could refresh your recollection as to the
5  contents of Exhibit 91?
6      MS. BERTRAM:  Objection to the form.
7      THE WITNESS:  I can't think of anything.
8  BY MR. LEE:
9      Q  Okay.  Can you turn to Exhibit 100.
10  Plaintiff's Exhibit 100 is an e-mail dated April 17,
11  2014, from Earl Baker to Dan Fontaine with copies to
12  Ed Suraci and to you, correct?
13     **A  Yes.**
14     Q  And the subject is "Eating crow again,"
15  right?
16     **A  Correct.**
17     Q  Do you recall this e-mail?
18     **A  I don't really remember it.**
19     Q  Okay.  Do you recall the contents of this
20  e-mail?
21     MS. BERTRAM:  Objection to the form.
22     THE WITNESS:  What's the content, about
23  eating crow or --
24  BY MR. LEE:

Page 44

1      MR. LEE:  I disagree that there's an hour
2  remaining in the deposition, but we can take a break
3  and I'm going to tell Mike which ones I'm going to
4  go through.  And if you pull the plug after
5  one hour, that's fine.  As I've always said, what's
6  good for the goose is good for the gander.  We can
7  take a quick break.  But, Mike, I'm going to read
8  the numbers of the e-mails that I'm going to be
9  asking Mr. Flatley about.
10     It's going to be 110, 140, 146, 150, 161,
11  171, 183, 184.2, 185, 186, 187, 196.1.  And then
12  let's at least get to that point.  So we are at 110.
13  We can take a 5-minute break and then pick up with
14  110.
15     MS. BERTRAM:  Okay.
16     THE MODERATOR:  Stand by, please.  The time
17  is 1:04 p.m. Central Time.  We are off the record.
18         (Discussion off the record.)
19         (Short recess.)
20     MR. LEE:  Can we get back on the record.
21     THE MODERATOR:  All right.  I will take us
22  back on the record then.  Please stand by.
23     The time is 1:15 p.m. Central Time.  We are
24  back on the record.

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 45

1  BY MR. LEE:
2      Q I'm going to show you what's been marked as
3  Exhibit 110. The bottom e-mail is an e-mail
4  exchange between you and Earl Baker of May 1, 2014.
5  The subject is "Might not be in."
6      **A Okay.**
7      Q Do you recall that e-mail?
8      **A No, I don't.**
9      Q Okay. Go to Exhibit 111. Directing your
10  attention to the second e-mail, it's an e-mail
11  exchange between Earl Baker and Ed Suraci dated
12  May 1, 2014.
13      I'm sorry?
14      I'd like you to read the e-mail from Earl
15  Baker to Ed Suraci dated May 1, 2014, at 3:44 p.m.
16      Do you recall the incident at all referenced
17  in the e-mail from Earl Baker to Ed Suraci dated
18  May 1, 2014, at 3:44 p.m.?
19      MS. BERTRAM: Objection.
20      THE WITNESS: I don't -- I don't remember.
21  BY MR. LEE:
22      Q Okay. Fair enough. Could you go to
23  Exhibit 140.
24      Showing you what's been marked as

Page 46

1  Exhibit 140, those are e-mail exchanges between you
2  and Earl Baker dated May 12th, 2014.
3      **A Yes.**
4      Q And I'd like you to take a look at that
5  second page as well. It is a three-page e-mail
6  string, correct?
7      **A It appears that way.**
8      Q Yeah. First of all, the handwritings, do
9  you recognize any of the handwritings?
10      **A That's my handwriting.**
11      Q All of it or -- for example, like on the
12  left-hand margin on the first page of Page --
13  Exhibit 140, that's your handwriting?
14      **A It appears to be.**
15      Q Okay. How about on the second page of
16  Exhibit 140.
17      Is that also your handwriting?
18      **A Yes.**
19      Q Okay. On the first page of Exhibit 140,
20  towards the right-hand side I see three pieces of
21  handwriting. The first one says I think 214. Is
22  that -- something check 70. Do you see that?
23      **A Yeah, but some of it is cut off.**
24      Q Yeah. Is that your handwriting as well?

Page 47

1      **A It appears to be.**
2      Q Okay. And then it says, "According to Peter
3  on 513 the counts were off of our Houlton tools."
4      Is that your handwriting?
5      **A I'm not sure. Some of it is cut off.**
6      Q I just want you to identify, whether it's
7  cut off or not, whether that is your handwriting or
8  not.
9      **A My handwriting, but some of the right-hand
10  side of it has been cut off.**
11      Q Fair enough. First of all, do you recall
12  these e-mails?
13      **A I don't remember them.**
14      Q Okay. Let me ask you, do you recall your
15  handwritten notes?
16      **A I don't remember them.**
17      Q Okay. Other than the actual e-mails
18  themselves marked as Exhibit 140 and the handwritten
19  notes themselves, is there anything that could
20  refresh your recollection as to the contents of
21  Exhibit 140?
22      MS. BERTRAM: Objection to the form.
23  BY MR. LEE:
24      Q And your answer is?

Page 48

1      **A I have to look and see what the e-mails say
2  so I'm reading them.**
3      **Okay. The question again.**
4      MR. LEE: Yeah. Kim, could you read the
5  question back.
6      (Record read as requested.)
7      THE WITNESS: I don't think so. I just
8  don't remember.
9  BY MR. LEE:
10      Q Okay. Exhibit 146. Whenever you're ready
11  to answer this question. My question is do you
12  recall this e-mail -- these e-mail exchanges marked
13  as Exhibit 146?
14      **A Okay.**
15      Q Okay. The question is do you recall these
16  e-mails marked as Plaintiff's Exhibit 146?
17      **A I don't specifically remember these e-mails.**
18      Q Okay. Fair enough. Can you go to
19  Exhibit 150. If you'd turn to the second page of
20  this exhibit marked as Plaintiff's Exhibit 150, it's
21  an e-mail dated May 17, 2013, from you to Baker,
22  Billingsley, Martin, Nelson, and Wnuk. Am I
23  correct?
24      **A I guess we don't have that one.**

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 49

1    MS. BERTRAM: Was it 150?
2    MR. LEE: 150.
3    THE WITNESS: Nothing to Stanley Wnuk or
4  anybody else on here.
5  BY MR. LEE:
6    Q Is the first page of the 150 you have,
7  Mr. Flatley -- if you look at the bottom right-hand
8  corner, is it M1545?
9    A Right. I got it there. Yeah, I see it.
10   Q Okay. And the next one is M1546.
11   Am I correct that Exhibit 150 is M01545
12 through M01548?
13   A I don't know what those numbers mean.
14   Q But am I correct that those are the -- it's
15 a four-page document, correct?
16   A Correct.
17   Q And they go from M01545 through M01548; am I
18 correct?
19   A I don't know where those numbers are coming
20 from.
21   MS. BERTRAM: John, the copy that I have
22 does not have the Bates numbers on it.
23   MR. LEE: Okay.
24   MS. BERTRAM: Is this the one, "Evidence of

Page 50

1  the good old boys club?
2    MR. LEE: Correct.
3  BY MR. LEE:
4    Q Is your Plaintiff's Exhibit 150 four pages,
5  Mr. Flatley?
6    A Yes.
7    Q And is the last page an attachment called
8  "Older Men Scam"?
9    A Yes.
10   Q And is the second page of this exhibit in
11 the middle -- is it an e-mail from you to Baker,
12 Billingsley, Martin, Nelson, and Wnuk dated May 17,
13 2013?
14   A Yes. It's a --
15   Q And the subject is You guys -- You guys
16 should be aware?
17   A Right.
18   Q Or, You guys should beware! Is that
19 correct?
20   A Correct.
21   Q Okay. Is this the -- is this the joke that
22 you sent around to these guys that worked in your
23 department?
24   A I'm not sure because there's no way of

Page 51

1  attaching this e-mail. The heading that I have
2  anyway.
3    Q Okay. Fair enough.
4    Let me ask you this: Do you have a
5  recollection of this document called "Older Men
6  Scam" being sent to you by anybody at Smith &
7  Wesson?
8    A Okay.
9    Q Okay. Do you have a recollection of sending
10 this joke to anyone at Smith & Wesson?
11   A I just don't specifically remember.
12   Q Okay. Do you have a recollection of ever
13 discussing this joke with Ed Suraci?
14   A No, I don't remember discussing with Ed.
15   Q Okay. Do you have a recollection of
16 discussing this joke with anybody at Smith & Wesson?
17   A I just don't remember it.
18   Q Fair enough. Can you go to Exhibit 151.
19 Exhibit 151 is an e-mail string that includes Earl
20 Baker and you regarding questions about broaches,
21 right?
22   A I'd have to read it.
23   Q Okay.
24   A I have to read this whole thing.

Page 52

1    Q Sure.
2    A Okay.
3    Q Do you recall these e-mails?
4    A No, I don't.
5    Q I'm sorry. I didn't hear the question --
6  answer.
7    A No, I don't.
8    Q Okay. Can you go to now 171. Never mind.
9  We already went through 171. It's a duplicate.
10   183, please. And if you take a look at 183,
11 Mr. Flatley, I am interested in asking you questions
12 about the attachment to that e-mail which begins
13 with "Discussion Agenda."
14   A Okay.
15   Q Okay. My question to you is the second page
16 of Exhibit -- Plaintiff's Exhibit 183 has a single
17 page. It's got no content other than the logo of
18 Smith & Wesson, is that correct, if you go to the
19 second page of Exhibit 183?
20   A Yes, it appears that way.
21   Q There's a logo -- on the second page of
22 Exhibit 183 is just a logo of Smith & Wesson, right?
23   A Correct.
24   Q Okay. If you go to the third page, it says

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 53

1    "Discussion Agenda," right?
2        A  Yes.
3        Q  And if you go to the last page -- I just
4    want to make sure you and I are looking at the same
5    thing.  If you go to the last page, the top of the
6    last page says "Preparation," and the bottom says
7    "Actions & Time Frame," correct?
8        A  Yes.
9        Q  My question, first of all, is do you recall
10   getting this document?
11       A  It was so long ago I don't really remember.
12       Q  I understand that.  As you just reviewed the
13   document, do you have a recollection of this
14   document at all?
15       A  I just don't remember it.
16       Q  Okay.  Do you have a recollection of ever
17   using this document as a guidance in a meeting?
18       A  Well, I don't remember the document so I
19   can't remember if it was used or not.
20       Q  Okay.  That's fair enough.  I'm going to ask
21   you to turn to the first page of Exhibit 183.  It's
22   an e-mail from Anne Bruce to Earl Baker dated
23   June 17, 2014; am I correct?
24       A  Correct.

Page 54

1        Q  And the subject matter is "Agenda and
2    Discussion Guide"; is that correct?
3        A  Correct.
4        Q  And the attachment is "Agenda_Baker Flatley
5    Discussion 6_18_14.pdf; Facilitation
6    Guide_Discussion.pdf," right?
7        A  Correct.
8        Q  The first paragraph, it says "Earl."  And
9    the second sentence says, "This guide and
10   instructions have also been provided to Larry
11   Flatley and Dan Fontaine."
12       A  Yes.
13       Q  Do you recall getting it?
14       A  As I said, I don't really remember the
15   document.
16       Q  Fair enough.  If you could turn to
17   Exhibit 1- -- 184.2.
18          184.2 is an e-mail exchange among you, Earl
19   Baker, and Andy Dziobek dated June 17, 2014.
20       A  Yes.
21       Q  Do you recall this -- these e-mail
22   exchanges?
23       A  Okay.
24       Q  Do you recall this e-mail?

Page 55

1        A  I don't remember it.
2        Q  Okay.  And now we're up to 185.  Exhibit 185
3    is an e-mail from you to Earl Baker dated June 17,
4    2014, sending him a copy of Earl's review for
5    tomorrow's discussion; am I correct?
6        A  Correct.
7        Q  And attached to that e-mail is the actual
8    review that you sent to Earl, correct?
9        A  Correct.
10       Q  Did you send anything else to Earl with
11   respect to Earl's review of June 2014 other than the
12   attachment to this e-mail marked as Exhibit 185?
13       A  It appears that I was just following up with
14   what was asked of me to do and -- but I don't
15   remember specifically sending it.  I just -- it
16   appears in the previous e-mail this is what I was
17   asked to do.
18       Q  Okay.  And who asked you to do this?
19       A  It appears in the previous e-mail, reviewed,
20   Anne Bruce.
21       Q  Okay.  Now, take a look at Exhibit 186,
22   please.  It says, "E. Baker Goals - 6/18/14.
23   Establish a Project Plan and Implement."
24          Do you see that?

Page 56

1        A  Yes.
2        Q  And I notice that Exhibit 186 is not part of
3    the review that's marked as Plaintiff's Exhibit 185;
4    am I correct?
5        A  Yes.
6           MS. BERTRAM:  Objection.  Vague, lacks
7    foundation.
8    BY MR. LEE:
9        Q  Am I correct?
10       A  The goals from 6/18.
11       Q  Correct.  My question, is Exhibit -- is
12   Exhibit 186 part of the review that you sent to Earl
13   Baker in Exhibit 185 or was it not part of the
14   review that you sent to Earl Baker on Exhibit 185?
15          MS. BERTRAM:  Objection to the form.
16          THE WITNESS:  It doesn't -- I just don't
17   remember.  This review I did, this one I'm not sure
18   if this is mine or what this is.
19   BY MR. LEE:
20       Q  "This" being 186.  I just want to make the
21   record clear.
22          Mr. Flatley, Exhibit 185 is an e-mail from
23   you to Earl Baker and it attaches the June 2014
24   review of Earl Baker, correct?  Is that correct?

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 57

1      A  What's the question on 186?
2      Q  No.  185.  185 is the actual review that you
3   sent to Earl Baker on June 17, 2014, correct?
4      A  Correct.
5         MS. BERTRAM:  Objection.  Vague as to the
6   phrase "actual review."
7   BY MR. LEE:
8      Q  Okay.  Now, take a look at 186, please.
9   It's not included in the review that was sent on
10  June 17th from you to Earl marked as Plaintiff's
11  Exhibit 185, correct?
12        MS. BERTRAM:  Objection, vague.
13  BY MR. LEE:
14     Q  You can answer.
15     A  Correct.
16     Q  Okay.  And you said 186, you don't know
17  whose document that is; is that correct?
18     A  I'm not fully sure.
19     Q  Okay.  Do you have a recollection of
20  drafting this document marked as Plaintiff's 186?
21     A  Of tracking it?
22     Q  Drafting it.  Do you have a recollection of
23  drafting the document marked as Exhibit 186?
24     A  I don't specifically remember this form.

Page 58

1      Q  That's fair enough.  Whose handwriting is
2   that on Exhibit 186?
3      A  I don't know.
4      Q  Fair enough.  Do you have a recollection of
5   meeting with Earl Baker for his review on Exhibit --
6   in June of 2014?
7      A  Specifically on June 18th?
8      Q  It seems that way from Exhibit 185
9   because -- right?  Because you sent it to him and
10  say, This is for tomorrow.
11     A  Right.
12     Q  Do you have a recollection of meeting with
13  Earl for the meeting for the June 2014 review?
14     A  I remember having a meeting, right.
15     Q  Do you recall who else was there?
16     A  Anne Bruce and Dan Fontaine, Earl Baker.
17     Q  Okay.  Do you recall this Exhibit 186 being
18  presented to Earl Baker at that meeting on June 18,
19  2014?
20     A  I don't really remember.
21     Q  Fair enough.  Do you recall what was said by
22  Anne Bruce to Earl Baker at that meeting?
23     A  I don't remember the specific conversation.
24     Q  Okay.  Do you remember what Earl said at

Page 59

1   that meeting?
2      A  Again, I don't remember the specific
3   conversation.
4      Q  Do you remember what Dan Fontaine said at
5   that meeting?
6      A  I can't remember the specific conversation.
7      Q  Do you recall how long that meeting was?
8   Your best recollection is all that we could ask for.
9      A  Somewhere between 2 and 3 hours.
10     Q  Okay.  Do you recall where the meeting was?
11     A  Anne Bruce's office.
12     Q  Okay.  Now if you could go to 187, please.
13  And I'm just going to ask you to take a look at --
14  it's an e-mail string that's three pages long.  It
15  involves you, Carl Hynes, Ted Hebert, and Earl
16  Baker; am I correct?
17     A  Ted Hebert.
18     Q  Yes, Hebert.  Is that how you pronounce
19  Mr. -- Ted's last name?
20     A  Hebert.
21     Q  Hebert, okay.  There used to be a
22  quarterback named Hebert, but he pronounced it
23  Abair (phonetic).  That's why I call it Abair.
24        As you review it, Mr. Flatley, my question

Page 60

1   is going to be whether you recall this e-mail and
2   the contents that are described in the e-mail.
3      A  Okay.
4      Q  Okay.  Do you recall these e-mail exchanges
5   marked as Plaintiff's Exhibit 187?
6      A  I can't really remember them.
7      Q  Okay.  Do you recall the contents described
8   in the e-mails marked as Plaintiff's Exhibit 187?
9         MS. BERTRAM:  Objection as to form.
10        THE WITNESS:  I don't remember.
11  BY MR. LEE:
12     Q  Okay.  Is there anything that would refresh
13  your recollection as to the contents described in
14  Exhibit 187?
15     A  I don't think so.
16     Q  Okay.  Exhibit 196.1.  And after you review
17  them, Mr. Flatley, my questions are going to be the
18  same again, so. . .
19     A  Okay.
20     Q  Do you recall these e-mail exchanges marked
21  as Plaintiff's Exhibit 196.1?
22     A  I don't -- the only one I -- I don't really
23  remember the e-mails per se.
24     Q  Okay.  Do you remember the events that are

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 61

1  described in Plaintiff's Exhibit 196.1?
2      A  Yes.
3          MS. BERTRAM:  Object to the form.
4  BY MR. LEE:
5      Q  And I'm going to test your memory on this.
6  It's a short-term memory though.
7          Is this the slide issue that you and I
8  discussed at your last deposition session?
9      A  Yes.
10     Q  Fair enough.  Can you please go to 197,
11  please.  I'm sorry.  198.  No, no.  I'm sorry.  197
12  is correct.
13         As you review 197, Mr. Flatley, my question
14  is going to be the same again, whether you recall
15  the e-mail or the contents that are described in the
16  e-mail.
17     A  Okay.  What's your question?
18     Q  Do you recall the e-mail marked as
19  Plaintiff's Exhibit 197?
20     A  I don't really remember the e-mail.
21     Q  Okay.  Do you remember the events that are
22  described in the content of Exhibit 197?
23         MS. BERTRAM:  Objection to the form.
24  BY MR. LEE:

Page 62

1      Q  And your answer?
2      A  I don't remember the specific details.
3      Q  Okay.  Fair enough.  Can you go to
4  Exhibit 199.
5      A  Okay.
6      Q  Do you remember the e-mail?
7      A  Which e-mail?  There's two.
8      Q  Do you remember the e-mail exchange here
9  contained in Exhibit -- Plaintiff's Exhibit 199?
10     A  It appears I was involved in two out of
11  three.
12     Q  Correct.  That's what I'm asking.  Do you
13  recall the e-mail?
14     A  I don't recall the specifics about it.
15     Q  Okay.  It's an e-mail about Earl having
16  physical issues and being out, right?
17     A  Right.
18     Q  Other than that do you recall anything about
19  the events described in Exhibit 199?
20     A  I don't remember the actual events.
21     Q  Fine.  Fair enough.
22         Exhibit 200.  In the middle there's an
23  e-mail dated June 26th from -- e-mail exchange
24  between you and Earl dated June 26th at 7:15 a.m.

Page 63

1  and 12:12 p.m., correct?
2      A  Well --
3      Q  Sorry.  I misdescribed it.
4          You see the e-mail from you to -- Earl Baker
5  to you with a copy to Mike Jurga and you sending
6  that e-mail to Ed Suraci?
7      A  It appears to be true.
8      Q  Yeah.  It's an e-mail about Earl telling --
9  sending you an e-mail saying he's going to be out
10  because he has physical issues, right?
11     A  Correct.
12     Q  And you're forwarding that to Ed Suraci?
13     A  Correct.
14     Q  Okay.  Other than the contents of this
15  e-mail, do you have any other recollection about the
16  events described in Exhibit 200?
17     A  I don't remember it.
18     Q  Fair enough.  Exhibit 201.
19     A  Okay.
20     Q  Exhibit 201 has an e-mail dated June 26th
21  from Earl Baker to you with a copy to Mike Jurga and
22  the subject is "Back issue," right?
23     A  Correct.
24     Q  And you forward that to Anne Bruce, Dan

Page 64

1  Fontaine, and Ed Suraci, right?
2      A  It appears that way.
3      Q  Okay.  First of all, do you recall having a
4  discussion about Earl's back issue with any one of
5  those three people; Anne Bruce, Dan Fontaine, or Ed
6  Suraci?
7      A  Other than what it shows here by forwarding
8  the e-mail, that was the basis for the discussion.
9      Q  Right.  So there was a discussion or -- my
10  question is do you recall discussing Earl's physical
11  issues with anybody, including Anne Bruce, Dan
12  Fontaine, and Ed Suraci?
13     A  I do not remember it.
14     Q  Okay.  How about Mike Jurga?
15     A  I don't remember discussing with Mike.
16     Q  Fair enough.  Exhibit 202.
17         MS. BERTRAM:  John, do you want to take a
18  break so you can get organized and wrap things up in
19  10 or 15 minutes?
20         MR. LEE:  I doubt I'll be done in 10 or
21  15 minutes.  And we can take a break; that's fine.
22  That's fine.  If you want a 5-minute -- actually
23  let's just do 202 because it's sort of the same
24  subject matter.

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 65

1      MS. BERTRAM:  Okay.
2  BY MR. LEE:
3      Q  If you could review that e-mail,
4  Mr. Flatley.
5      A  Yes.
6      Q  My question to you, first of all, pretty
7  simple.  At the bottom is an e-mail from Earl Baker
8  to you dated June 26th, 2014.  That's the same
9  e-mail as in Exhibit 201, correct, the one that
10  says, "Larry, The doctor called in a new
11  prescription tonight"?  Do you see that?
12     A  Yes.
13     Q  And that's in both Exhibit 201 and 202?
14     A  It appears that way.
15     Q  Yes.  Now, in Exhibit 202, above it -- above
16  the e-mail from Earl Baker to you dated June 26th,
17  2014, at 7:43 p.m., on June 27th Ed Suraci e-mails
18  Anne Bruce with a copy to Kathy Salvador, correct?
19     A  It appears that way.
20     Q  And the subject is "EB Update."
21     A  Okay.
22     Q  Subject has changed from Back Issue to EB
23  Update, right?
24     A  Correct.

Page 66

1      Q  Number one, have you ever seen this e-mail
2  before between Ed Suraci and Anne Bruce with a copy
3  to Kathy Salvador dated June 27, 2014, at
4  11:32 a.m.?
5      A  No, I haven't.
6      Q  Okay.  If you look at that e-mail, Ed Suraci
7  makes certain representations to Anne Bruce about,
8  Larry gave me things or, Larry's notes and what he
9  recalled (verbally), confirming that Earl needed to
10  completed a high level plan (who, resources, when).
11     Do you see that?
12     A  Which part of the e-mail?
13     Q  Okay.  First if you go to the
14  second-to-the-last paragraph of that e-mail from Ed
15  Suraci to Anne Bruce, Larry's notes, and what he
16  recalled (verbally), confirmed that Earl needed to
17  complete a high level plan (who, resources, when),
18  and notify Larry by Monday 6/23 when it would be
19  completed.
20     Do you see that?
21     A  Correct.
22     Q  Do you recall having this discussion with Ed
23  Suraci?
24     A  I don't remember the conversation.

Page 67

1      Q  Do you recall giving your notes to Ed
2  Suraci?
3      A  I don't remember.
4      Q  The second paragraph says, Larry gave me his
5  copy of, quote, E. Baker Goals - 6/18/14 (Establish
6  a Project Plan and implement), quote.
7      Do you see that?
8      A  Yes.
9      Q  Do you recall ever giving Larry your copy of
10  E. Baker Goals?
11     A  You mean Ed?
12     Q  Yes.
13     A  This e-mail says that -- I don't remember
14  specifically handing it to him.
15     Q  Okay.  Do you remember handing it to
16  anybody?
17     A  I don't remember.
18     Q  Fair enough.
19     MR. LEE:  Okay.  We can take our break now.
20     THE TECHNICIAN:  Stand by, please.  The time
21  is 2:12 p.m. Central Time.  We are off the record.
22        (Short recess.)
23     THE MODERATOR:  The time is 2:23 p.m.
24  Central Time.  We are back on the record.

Page 68

1  BY MR. LEE:
2      Q  Mr. Flatley, if you could go to Exhibit 205.
3      MS. BERTRAM:  And, John, we'll give you a
4  little bit of flexibility and give you 30 more
5  minutes to wrap things up.
6      MR. LEE:  Well, I don't -- I can't commit to
7  it, but my guess is I will be able to be -- I will
8  be done with it for the simple -- in fact, you might
9  be pretty surprised at how -- how close I am.  Of
10  course, that depends on what happens between now and
11  then.  But I don't want to waste time because one of
12  the things that I realized was some of the -- some
13  of the bigger number of stuff -- the bigger number
14  stuff, that we had already done it last session.
15  That's why --
16  BY MR. LEE:
17     Q  Go to 205, please.  It's a June 30 e-mail
18  from you to Ed Suraci regarding Earl bringing in a
19  medical note and going to see Patty Weller, correct?
20     A  Correct.
21     Q  And Ed Suraci tells Ann Glica to stay close
22  to this situation.
23     Do you have a recollection of ever
24  discussing Earl's situation with Ann Glica?

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 69

1    A What do you mean by "situation"?
2    Q Well, do you see the top -- the very first
3  e-mail, top e-mail, Ed Suraci says to Ann Glica,
4  "Fyi, suggest staying close to this situation"?
5       Do you see that?
6    A Right.
7    Q Yeah. My question is do you have a
8  recollection of ever communicating with Ann Glica
9  about Earl being out on -- because of back issues or
10  medical issues?
11    A Well, he was asked to go give his note to
12  Patty Weller, which is standard operating procedure
13  for us when somebody is out more than three days. I
14  didn't talk to Ed specifically.
15    Q Did you talk to anybody about the situation
16  being Earl taking his medical note to Patty Weller?
17    A I guess on this e-mail I just advised Ed
18  Suraci.
19    Q Right. Did you talk to Ed Suraci -- do you
20  recall talking to Ed Suraci about it after you sent
21  this e-mail to him?
22    A I don't remember talking to him, no.
23    Q Okay. Who is Patty Weller?
24    A Patty Weller is our nurse.

Page 70

1    Q Okay. So as far as you know, somebody
2  that -- who reports to you had a medical issue and
3  has a note and you sent him to the nurse, correct?
4    A Correct. Standard operating procedure.
5    Q Fair enough. Do you have any idea why Ed
6  Suraci is telling Ann Glica to stay close to the
7  situation?
8       MS. BERTRAM: Objection. Calls for
9  speculation.
10  BY MR. LEE:
11    Q And your answer is?
12    A No, I don't.
13    Q Okay. If you could go to 233.2. 233.2 is a
14  four-page exhibit, correct?
15    A Correct.
16    Q And the second page is a pick ticket; am I
17  correct?
18    A Which page?
19    Q The second page is a pick -- on the upper
20  right-hand corner of the second page it says Pick
21  Ticket, right?
22    A Correct.
23    Q What is a pick ticket?
24    A This is a Pioneer document that I would have

Page 71

1  to speculate on. I don't know a hundred percent
2  what it's for.
3    Q Okay. If you go to the third page and the
4  fourth page. And the subject matter is, Old regrind
5  order.
6       Do you see that?
7    A Yes.
8    Q Okay. So do you recall this e-mail exchange
9  between Ted Hebert and you and then between you --
10  strike that -- between you and Ted Hebert regarding
11  the old regrind order?
12       I think you might want to see it from --
13  reverse chronologically. You want to go from the
14  back page, the last e-mail, and then come forward.
15  That will give you the chronology.
16    A I don't -- this doesn't seem -- it seems
17  kind of a funny trail for this e-mail. I guess the
18  Ted Hebert one twice.
19    Q Yeah. If you'd look at the top page, it's
20  an e-mail from Ted Hebert to you with a copy to Andy
21  Dziobek and Carl Hynes and the subject is Old
22  regrind order, right?
23    A Yes.
24    Q And it says, Larry, Earl has owed us a PO

Page 72

1  for the attached since February. This was for
2  T111735-01 regrind done at Kennametal. Any way we
3  can get a PO for these.
4       Do you see that?
5    A Yes.
6    Q Do you recall -- do you recall communicating
7  with Ted Hebert or Andy Dziobek about the events
8  described in that first page of e-mail from Ted
9  Hebert?
10    A I don't remember the specific conversation
11  about it, but this is -- again, wasn't my forte.
12  The only reason why I was even involved, according
13  to this e-mail, was because they hadn't received a
14  PO for these particular parts from Earl.
15    Q Okay. And do you recall having the PO
16  issue?
17    A I don't remember. Must have.
18    Q Why do you say that?
19    A Because it appears to have been resolved.
20  If it wasn't resolved, we would see more e-mails
21  about it.
22    Q Got it. But you don't have an independent
23  recollection of these events other than what's
24  described in Exhibit 233.2?

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 73

1    A  Not specifically.
2        MS. BERTRAM:  Objection to form.
3    BY MR. LEE:
4        Q  Okay.
5        A  This wasn't part of my daily job duties to
6    get POs.
7        Q  Okay.  Fair enough.  So when Earl was on
8    leave, who did his PO work?
9        A  If they needed any, Mike Jurga would put
10   together the information that he needed and I would
11   sign them.
12       Q  Got it.
13       A  Send them off to Andy.
14       Q  Got it.  And so the process is if Earl was
15   there, Earl would do the PO and then send them to
16   you and you sign it and you send it off to Andy,
17   right?
18       A  Well, it's a request --
19       MS. BERTRAM:  Objection, vague.
20       MR. LEE:  Okay.
21       MS. BERTRAM:  Objection.
22       THE WITNESS:  Fill out a request for PO.
23   BY MR. LEE:
24       Q  Sure.

Page 74

1        A  And Andy would actually write the PO itself.
2        Q  And the one who signs off on it is you?
3        A  On the request, correct.
4        Q  Does anybody else sign off on the request?
5        A  No.
6        Q  And that was true the entire time that Earl
7    Baker was a cell coordinator, correct?
8        A  Yes.
9        Q  Can you go to 250.  Exhibit 250, the subject
10   is "Review Response to Earl Baker Performance Review
11   Rebuttal," Location, Anne's office.
12       It's an invitation sent by Anne Bruce to
13   you, Dan Fontaine, and Ed Suraci; am I correct?
14       A  Correct.
15       Q  And the meeting is set for July 25, 2014?
16       A  Yes.
17       Q  That can't be right.  At 2:30 a.m.?  There's
18   something wrong that timing, right?  There's got to
19   be something wrong with that invite.
20       You wouldn't have had a meeting at 2:30 in
21   the morning, right?
22       A  No.
23       Q  Okay.  And in it Anne Bruce writes, Larry
24   and Dan:  I would like to touch base briefly to

Page 75

1    review the written response to Earl's concerns
2    regarding his review.  In preparation for Earl's
3    return we need to be able to respond to him with
4    objective facts and timelines.  Please let me know
5    if this time works for you.
6        First of all, do you recall this invite?
7        A  I don't specifically remember it.
8        Q  Okay.  Do you recall having a meeting in
9    Anne's office with Ed Suraci, Dan Fontaine, and
10   Larry Flatley about doing a response to Earl's
11   concerns regarding his review?
12       A  I don't remember specifically meeting, no.
13       Q  Okay.  Do you have a -- the way you say it,
14   there's -- my question is -- okay.  There's a
15   meeting invite, right?  That's Exhibit No. 250.
16       A  Correct.
17       Q  Do you recall, first of all, working on
18   responding with objective facts and timelines for
19   Anne Bruce?
20       MS. BERTRAM:  Objection to the form.
21   BY MR. LEE:
22       Q  You see the second sentence of her invite
23   says, In response -- in preparation for Earl's
24   return we need to be able to respond to him with

Page 76

1    objective facts and timelines?
2        Do you see that?
3        A  Yes.
4        Q  Do you recall ever working on objective
5    facts and timelines for Anne Bruce?
6        A  We actually worked on the responses for
7    facts -- objective facts and timelines for Earl,
8    Mr. Baker.
9        Q  Correct.
10       A  We worked with him for his -- his plan for
11   improvement.
12       Q  Okay.  And we discussed it at the last
13   deposition where you handwrote some changes.
14       Do you recall that?
15       A  Which particular changes?
16       Q  Okay.  Never mind what you testified --
17   never mind.
18       Do you have any specific recollection of
19   submitting anything to Anne Bruce regarding what she
20   requests in this invite marked as Plaintiff's
21   Exhibit 250?
22       MS. BERTRAM:  Objection to the form.
23       THE WITNESS:  I remember the theory of what
24   we did, but not the specifics about it.

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 77

```
1   BY MR. LEE:
2      Q  That's fair enough.
3         And when you say what you did -- you said,
4   What we did, who is "we"?
5      A  Mr. Fontaine and myself.
6      Q  Okay.  Did Mr. Fontaine and you work
7   together on it?
8      A  We talked about it.
9      Q  Okay.  Other than talking about it, did you
10  put anything down in writing between you and
11  Mr. Fontaine?
12        MS. BERTRAM:  Objection to the form.
13        THE WITNESS:  I remember -- well, the -- was
14  the final product for Mr. Baker that we put
15  together.  That was all that was created.
16  BY MR. LEE:
17     Q  Fair enough.  And did you -- did you or
18  Mr. -- let me ask it.  Did you submit that to Ms.
19  Bruce?
20     A  If we had this meeting, we probably talked
21  about it at that meeting.
22     Q  Right.  But talking about it -- other than
23  talk -- that meeting being a meeting among Ed
24  Suraci, Dan Fontaine, and you and Anne Bruce in Anne
```

Page 78

```
1   Bruce's office?
2      A  Yes.
3      Q  Okay.  And do you have a recollection of
4   that meeting?
5      A  I don't remember the specifics about it.
6      Q  Okay.  Do you recall -- do you recall that
7   meeting taking place on Friday, June 25?
8      A  I can't remember specifically.
9      Q  Okay.  Do you recall what was discussed at
10  that meeting by -- among the four of you?
11     A  Again, that was so long ago, I don't know
12  what was said between specific people.
13     Q  Okay.  Do you recall how long the meeting
14  was?
15     A  No, I don't.
16     Q  Okay.  And do you recall as a result of that
17  meeting on July 25, 2014, any document that you
18  drafted?
19        MS. BERTRAM:  Objection, vague.
20  BY MR. LEE:
21     Q  Post -- on July 25, 2014, Earl's on leave,
22  correct?
23     A  I don't know if that date was -- I don't
24  know if that was the time he was away.
```

Page 79

```
1      Q  Okay.  And my -- I'm going back to your
2   recollection of that meeting on July 25, if -- as
3   you say, if it happened.
4         Do you recall it happening?
5      A  I can't remember specifically.  It's an
6   assumption that if we had the invite, I'm assuming
7   that it happened.
8      Q  Okay.  Other than that assumption, do you
9   have a recollection of it happening?
10     A  I can't remember.  It's so long ago.
11     Q  Fair enough.  Now, my question is while Earl
12  Baker was on leave, do you recall generating any
13  documents to submit to either Ed Suraci or Anne
14  Bruce regarding Earl Baker's review?
15     A  I don't remember when he -- I don't remember
16  when he was on leave.
17     Q  Okay.  Fair enough.  If you could go to --
18  you know what?  I might be --
19        MR. LEE:  Mike, if you hear this.  We're
20  going to send you 355 and 357, and then I'm going to
21  take -- they're not really big; but if you could
22  print those out and give them to Mr. Flatley and
23  we'll take a 5-minute break.  I'm just going to
24  check to see other than 355 and 357 whether I want
```

Page 80

```
1   to go through anything else with him, all right?
2         THE MODERATOR:  Off the record then,
3   Counsel?
4         MR. LEE:  Yes.
5         THE MODERATOR:  All right.  Stand by,
6   please.  The time is 2:40 p.m. Central Time.  We are
7   off the record.
8         (Short recess.)
9         THE MODERATOR:  The time is 2:47 p.m.
10  Central Time.  We are back on the record.
11  BY MR. LEE:
12     Q  Mr. Flatley, showing you what's been marked
13  as Exhibit 355.
14     A  Yes.
15     Q  Those are photos of a pitch board, right?
16     A  It's kind of -- it's very blurry.  It's hard
17  to -- it appears to be.
18     Q  Correct.  Do you recognize them at all?
19     A  The only thing I can really recognize is in
20  the center photos the forging department.  But
21  everything is so blurry it's hard to see what
22  specific things are.
23     Q  Okay.  Do you know who took these photos?
24     A  No, I do not.
```

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 81

1    Q  Okay.  Do you know why whoever took these
2  photos took these photos?
3    **A  I do not know.**
4    Q  Okay.  Do you know to whom these photos were
5  submitted?
6    **A  No, I do not.**
7    Q  Okay.  If you could go to Exhibit 357.  My
8  question to you when you're done reviewing it,
9  Mr. Flatley, is, first of all -- the first question
10  is whether you recognize this document?
11    **A  Looks like a presentation from our Kaizen**
12  **group.  It looks like a slide presentation.**
13    Q  Okay.  Have you ever seen this document
14  before?
15    **A  No, I haven't.**
16    Q  Okay.  Do you know -- when you say -- you
17  said Kaizen group.
18      Is there a separate group that's called
19  Kaizen group?
20    **A  Yeah.  The Bob Francis group.**
21    Q  Oh, okay.  You call that -- that group the
22  Kaizen group?
23    **A  The Kaizen group or the -- I forgot the**
24  **proper term.**

Page 82

1    Q  The Lean manufacturing group?
2    **A  Yes.**
3    Q  Okay.  And have you ever been on Smith &
4  Wesson's system to review the Kaizen group's
5  guidelines on the pitch board and -- on the pitch
6  board?
7      MS. BERTRAM:  Objection, vague.  What did
8  you say, Larry?
9      THE WITNESS:  I said I worked with Bob
10  Francis when we initially set up our boards and
11  starting them off back in -- I don't remember the
12  year.
13  BY MR. LEE:
14    Q  Right, that's fine.  My question to you is
15  do you know whether Bob Francis's group subsequently
16  put together a guidance or a guideline for the pitch
17  board on the Smith & Wesson's system?
18    **A  Yes, he had one.**
19    Q  Okay.  And do you recognize this to be a
20  guidance or a guideline on the Smith & Wesson
21  on-line system from the Kaizen group?
22    **A  I do not know specifically why this**
23  **presentation was developed.**
24    Q  Okay.

Page 83

1    **A  Other than to document what we put together**
2  **for our pitch boards.**
3    Q  Okay.  But you, yourself, did not develop
4  this document, correct --
5    **A  No.**
6    Q  (Continuing) -- marked as Plaintiff's
7  Exhibit 357?
8    **A  No, I did not develop this, no.**
9    Q  Okay.  And do you remember seeing this on
10  the Smith & Wesson system, "this" being Plaintiff's
11  Exhibit 357?
12    **A  On the Lean share drive, but these are**
13  **actually the departmental pitch boards that I had in**
14  **my department.  These are the actual boards**
15  **themselves.**
16    Q  Okay.  But my question is, yes, these are
17  photos of the pitch boards themselves.  My question
18  is do you recall ever seeing these guidelines or
19  these documents on the Smith & Wesson system that
20  you believe was developed by the Kaizen group?
21      MS. BERTRAM:  Objection, vague.
22  BY MR. LEE:
23    Q  And your answer?
24    **A  What are you actually asking me?**

Page 84

1    Q  I'm sorry?
2    **A  What was the actual question?**
3    Q  Oh.  My question is do you recall seeing
4  this document, Exhibit 357, or documents like it
5  that are the guidance for the pitch board on the
6  Smith & Wesson system that was developed by the
7  Kaizen group?
8      MS. BERTRAM:  Objection, lack of foundation.
9  There's been no testimony that this is a guidance
10  document.
11  BY MR. LEE:
12    Q  Fair enough.  But you can answer.
13    **A  I did not specifically look on the Lean**
14  **drive to see this document.**
15    Q  Okay.  And there was a Lean drive though?
16    **A  Yes.**
17    Q  Okay.  And that Lean drive was developed and
18  maintained by Bob Francis's department?
19    **A  Correct.**
20      MR. LEE:  No further questions.
21      MS. BERTRAM:  I don't have any questions,
22  but the witness would like to read and sign.
23      MR. LEE:  Okay.  Thank you, Mr. Flatley.
24      MS. BERTRAM:  Thank you, Larry.

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 85

1        THE COURT REPORTER:  Can I take transcript
2   orders?
3        MR. LEE:  Regular for us.
4        MS. BERTRAM:  Regular.
5        THE COURT REPORTER:  Okay.  Thank you.
6        MS. BERTRAM:  Thank you.
7        THE MODERATOR:  All right.  I will take us
8   off the video record.  Please stand by.
9        The time is 2:48 p.m. Central Time.  This
10  concludes the deposition of Larry Flatley, Volume 2.
11  We are off the record.
12          FURTHER DEPONENT SAITH NOT
13
14
15
16
17
18
19
20
21
22
23
24

STEPHEN LAWRENCE FLATLEY - VOL. II
October 1, 2020

Page 86

1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2                         WESTERN DIVISION

3   EARL DONALD BAKER,           )
                                 )
4           Plaintiff,           )
                                 )
5    vs.                         )  Case No. 3:19-cv-30008-MGM
                                 )
6   SMITH & WESSON CORP.,        )
                                 )
7           Defendant.           )

8

9               I, STEPHEN LAWRENCE FLATLEY, state that

10  I have read the foregoing transcript of the

11  testimony given by me at my deposition on the 1st

12  day of October, 2020; that said transcript

13  constitutes a true and correct record of the

14  testimony given by me at said deposition except as I

15  have so indicated on the errata sheets provided

16  herein.

17

18                          _____
                            STEPHEN LAWRENCE FLATLEY
19
    No corrections (Please initial)_____
20  Number of errata sheets submitted_____

21  SUBSCRIBED AND SWORN to
    before me this _____ day
22  of _____, 2020

23

    _____
24      Notary Public

Paszkiewicz Court Reporting
847.619.7155

STEPHEN LAWRENCE FLATLEY - VOLUME 2.   OCTOBER 1, 2020.

Page 87

1

2                        REPORTER CERTIFICATE

3          I, KIMBERLY R. CHRISTOPHER, CSR, do hereby
     certify that there came before via videoconference

4

5                     STEPHEN LAWRENCE FLATLEY

6    who was by me first duly sworn to testify to the
     truth and nothing but the truth of all knowledge
     touching and concerning the matters in controversy
7    in this cause; that the witness was thereupon
     examined under oath and said examination was reduced
8    to writing by me; and that this deposition is a true
     and correct record of the testimony given by the
9    witness.

10   I further certify that I am neither attorney nor
     counsel for nor related nor employed to any of the
11   parties to the action in which this deposition is
     taken; further, that I am not a relative or employee
12   of any attorney or counsel employed by the parties
     hereto or financially interested in this action.

13

14                   Dated:  October 14, 2020

15

16                   _____
                     KIMBERLY R. CHRISTOPHER, CSR
17                   C.S.R. Certificate No. 084-002752

18

19

20

21

22

23

24