**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**
**WESTERN DIVISION**

EARL DONALD BAKER,

      Plaintiff,

      vs.

SMITH & WESSON CORP.,

      Defendant.

Case No. 3:19-cv-30008-MGM

Honorable Mark G. Mastroianni

**PLAINTIFF'S RESPONSE TO DEFENDANT'S**
**STATEMENT OF UNDISPUTED FACTS**

In Response to Defendant S&W's Statement of Undisputed Facts Plaintiff states as follows:

Defendant has filed a 30 page Statement of Undisputed Facts with 92 paragraphs. Many of the "facts" asserted are not relevant to S&W's Motion for Summary Judgement as they related to 1) S&W's investigation of Baker's various reports and its ultimate conclusions regarding those reports; or 2) to S&W's rationales for the conduct at issue in Baker's reports. These facts are irrelevant to S&W's asserted basis for summary judgment as the only relevant facts relate to whether Baker engaged in "protected activity," including whether Baker had an objectively and subjectively reasonable belief, whether that protected activity was a cause of S&W's adverse employment actions against Baker, and whether S&W has established that it would have engaged in the adverse employment actions even absent the protected activity. However, Plaintiff will address the any "facts" which are in fact not "undisputed" as represented by Defendants.

11.  S&W asserts that "Baker testified that he did not review the A&M study or report while employed for S&W" and that Baker "did not ask for it or about it while he was employed."

1

While that testimony is true, S&W fails to point out that Baker also testified that he did not believe that anyone ever told him about the A&M report while he was employed by S&W or that he recalled ever seeing the report while he was employed.  (Deposition Transcript of Earl Baker, Plaintiff's Response Exhibit 1, p. 42).

19.  S&W states that Flatley "met with Baker every Monday at 1:00 p.m." and that "during these meetings, Flatley discussed with Baker his performance and the performance of his Department."  However, Baker flatly contradicted this description of the weekly meetings.  Baker gave the following testimony:

Q.  And you indicated that you also met with Mr. Flatley once a week to discuss the performance of the cutting department, right?

A.  No, that isn't right.

Q.  Did you meet with Mr. Flatley weekly?

A.  Yes.

Q.  And for what purpose?

A.  We discussed projects we were currently working on, and he would – he would ask what issues we were working on, he would record them in his notes, and he would pull out those notes in a later time and update our progress on – on those issues.

(Plaintiff's Response Exhibit 1, p. 58-59).

22.  S&W states that "Flatley identified on each form the dates by which each SMART Objective should be completed."  However, Baker testified to a different understanding of the nature of these "objectives":

Q.  And was it your understanding that you were expected to meet these SMART objectives?

A. Yes. They are objectives. They are not – these are things that come up in the – so, as part of management, you have clear objectives, this is what we like to attain. They aren't mandates and they aren't – so I just want to clarify that these are the things that we would like to complete.

(Plaintiff's Response Exhibit 1, p. 80-81). Baker's understanding that these were not "mandates" with definitive due dates is also supported by Flatley's own testimony. (Deposition Transcript of Larry Flatley, Plaintiff's Response Exhibit 2) Flatley testified as follows:

Q. And you said you did not set deadlines and he was supposed to set deadlines for himself?

A. Correct.

Q. Okay. Did you have – direct him to any timeline that you wished for, whether that is doable or not?

A. My manufacturing – or my management style is not to dictate to my employees when they had to get things done because then they could say I failed because you told me to do it in such and such time. My style is to allow the employee to develop their own action item list putting dates that they felt they were comfortable with in terms of completing on their own, and then we'd work through and see how long it takes to finish a project based on what they felt they could accomplish.

(Plaintiff's Response Exhibit 2, p. 101-102).

S&W also asserts that "Flatley continued to meet with Baker on a weekly basis to assess his progress towards these tasks and his other performance goals." The portion of Baker's testimony cited in support of this fact merely confirms that Baker "kept having weekly meetings with Mr. Flatley." (Plaintiff's Response Exhibit 1, p. 81, ln. 7-9). Further, Baker flatly

contradicted that the purpose of the weekly meetings was to "assess" his or his department's "performance."  See response to ¶ 19.

23.  S&W incorrectly states that the "pitch boards" are "white boards."  Rather, the boards had individual sleeves for documents relating to "the performance of the area that the board is covering for safety, quality, delivery and cost."  (Plaintiff's Response Exhibit 1, p. 53; Plaintiff's Response Exhibit 3, p. 20); Plaintiff's Response Exhibit 4).  S&W further states that "Baker testified that he understood that Flatley expected him to update the Pitch Board daily," citing page 36 of Baker's deposition.  Baker did not testify as represented.  Rather, Baker testified that when he was hired, Mike Jurga was maintaining the Cutter Department's pitch board for Stanley Wnuk (the prior cell coordinator).  (Plaintiff's Response Exhibit 1, p. 36).  After Baker started, however, "it seemed evident that [Flatley] wanted [Baker] to maintain the board as opposed to Jurga, so [Baker] started taking over those jobs from Mike.  So it was something that Mike Jurga, Dan Durrand, and myself did jointly every morning."  (Plaintiff's Response Exhibit 1, p. 36-37).

24.  S&W states that "It was Flatley's view that Baker did not update his Pitch Board in a timely manner, despite frequent reminders by Flatley.  In addition, the information he included was often incorrect."  S&W only cites to Flatley's Declaration filed in the OSHA matter is support of this assertion.  However, Flatley testified that he did not write Baker up or send Baker any emails or communicate in any other way that Baker was failing at this daily task.  (Plaintiff's Response Exhibit 2, p. 89-90).  Further, the Cutter Department pitch board was updated every day. (Plaintiff's Response Exhibit 1, p. 53).  Flatley's only verbalized criticism of Baker's board was when one machine's numbers were down for nightshift. Flatley would immediately ask why the numbers were down. The pitch board meeting, called a "Gemba Walk," was at 8:15 a.m.  The nightshift ended at 7:00 a.m.  The answers Flatley wanted could not be obtained until the following

day when nightshift reported for work. (Baker Dec. ¶ 3; Baker, p. 53-54).    In addition, Robert Francis, the VP of LEAN manufacturing, testified that Baker's pitch boards were "the best in the plant," but were "not judged by the same standards as the other departments' pitch boards." (Plaintiff's Response Exhibit 3, p. 59, Plaintiff's Response Exhibit 36).

25. S&W asserts that "Baker later conceded in an April 7, 2014, email to Fontaine that he should have been conducting the audits since he took over the Cutter Department in April 2013." However, in the cited email Baker did not "concede" that he "should have been conducting the audits."    Rather, Baker merely reported that he had "found the documentation about cell coordinators duties."  (Plaintiff's Response Exhibit 5).  S&W's implication that Baker was not conducting the audits between April 2013 and April 2014 is unsupported and misleading.

26. S&W asserts that "Baker never fully implemented the computer inventory system for the Department, which led to tool stock outs and a host of other issues affecting production" and cites to only Flatley's OSHA Declaration.  However, Baker, in his rebuttal to the same alleged performance issue raised in the June 5, 2014 review, called this assertion a "complete untruth" and provided facts to establish that he did in fact create the computer inventory system and that it was currently being used by S&W.  (Plaintiff's Response Exhibit 6).

27. With respect to the Schneeberger machine, S&W states that Baker did not identify plans, testing procedures, or timelines that would allow S&W to use the machine to its full potential, depriving the Company of substantial cost savings and operational efficiencies," again citing to Flatley's OSHA declaration.    Baker, took issue with Flatley's criticism of his work with the Schneeberger machine in his rebuttal to the June 5, 2014 review.  Baker noted that "the Schneeberger project, when I arrived, was a total failure.  After purchasing a $700,000 machine, no chamber reamers or buttons had been produced for 7 months.  Once I got involved, we were

5

producing good reamers within a week.  We now make 36 different tools for the tool crib that were never made before.  In the last fiscal year, the Schneeberger reduced outside purchases to Pioneer Tool by $467,000 on just 3 of the 36 tools we now produce."  (Plaintiff's Response Exhibit 6, p. 3).

28.  With respect to the bi-monthly Kaizen exercises, Baker stated in his Response to the February, 2014 review that he "did not know this was expected."  (Plaintiff's Response Exhibit **7**, p. 2).  Further, Baker did "Kaizen's" within the department more often than as reflected in ¶ 28. Further, Flatley never suggested in any way that what Baker was doing was insufficient until the February 2014 review. Flatley and Baker had thirteen scheduled meetings together every week plus many additional supplemental meetings yet he never once informed Baker that he needed to do more Kaizens.  (Baker Dec. ¶ 4).

29.  S&W asserts that "by the Fall of 2013, …Baker … was not progressing on his goals and projects."  However, the "deadlines" for the SMART goals identified in the June 2013 review had not yet come in the "fall" of 2013.  (Plaintiff's Response Exhibit 1, p. 490-492).  Further, Flatley's one on one meeting notes do not show him raising any concerns or that he "had to repeatedly raise the same performance and project status concerns."  Rather, Flatley would ask what Baker was working on and Baker would tell him. Flatley would then asked when Baker expected to complete the project and Flatley would write it down. The following week Flatley would ask how about the progress of projects previously mentioned and would write it down.  At one point, Flatley asked that Baker prepare a GAN Chart from Microsoft Project Manager Software. Baker requisitioned the software for Project Manager, but Flatley would not sign the approval for the software. In late January, Baker tried to satisfy Flatley's request by preparing a GAN Chart for projects by hand.  During the February out-of-cycle review, Flatley pointed to the

GAN Chart as evidence of Baker's unprofessionalism. Later during the meeting with Fontaine and Suraci, Flatley showed the GAN Chart to Fontaine. Baker told Fontaine that Flatley refused to purchase the necessary software. Fontaine then ordered Flatley to authorize the purchase but Flatley never did. (Baker Dec. ¶ 5).

30.  S&W states that "Baker approached Vice President of Human Resources Anne Bruce and told her that he was struggling to meet Flatley's expectations."  Baker contests this assertion as Baker "never had such a meeting with Anne Bruce and at no time did [he] tell her [he] was 'struggling to meet Flatley's expectations.'"  (Baker Dec. ¶ 6).

31.  S&W states that "Baker continued to struggle to manage the Cutter Department."  However, the Cutter Department production, quality, and stock outs were better than ever after Baker took over the department. (See, for example, Plaintiff's Response Exhibit 8).  When looking at the measurables recorded on the pitch board, the department had improved in every category. (Baker Dec. ¶ 7).

S&W also states that "on February 7, 2014, Flatley and Fontaine issued to Baker an interim performance evaluation and performance improvement plan (PIP) to provide his coaching and concrete goals before his upcoming annual review."  S&W cites to Flatley's and Fontaine's OSHA Declarations.  S&W also asserts that Flatley and Fontaine consulted with Bruce who "agreed with this approach" again citing to only Bruce's OSHA Declaration.  However, contrary to the statement that Fontaine participated in the issuance of the February out-of-cycle review and that Fontaine had approached Bruce about the review, Baker indicated that Fontaine had nothing to do with the preparation of the review and in fact, Fontaine intended to disregard the review.  Baker testified that he, Flatley, and Fontaine had a meeting about the review during which Baker "had an opportunity to express [his] feelings about the review and the other falsehoods that were in it.

And Dan Fontaine's response was he was getting a little miffed that he was being dragged into this, you know, slap fight. So, he took the review and said, this is out of cycle, it isn't anything, it doesn't – and I – he clapped it upside down on his desk. I told him that … Mr. Flatley had taken the first meeting saying his side, I hadn't really explained, so I started going into some of the factual errors. He said, listen, I'm going to tell you – cut you off right there and say, for our intents and purposes, this thing does not exist, and he slapped his hand on it. It was turned upside down on his desk. He said, this thing does not exist. It –it never happened." (Plaintiff's Response Exhibit 1, p. 140-41).

Further, other than Flatley's and Fontaine's Declarations prepared in response to Baker's OSHA complaint, there is no other evidence that a formal "performance improvement plan" ("PIP) was ever issued or presented to Baker. There was no PIP, nor verbal or written warning as required by S&W's progressive discipline policy. (Baker Dec. ¶ 7; Plaintiff's Response Exhibit 9; also, see ¶ 32 below).

32. S&W again refers to the "PIP" that Baker was purportedly placed on, describing the "PIP" as being "packaged as a training program." However, the document that S&W belatedly attempts to identify as a "PIP" is identified in the review itself under the "Description of Development Needs" section. (Plaintiff's Response Exhibit 10, Ex. C, p. 3). Further, the document is entitled "Earl Baker's Training Program" and states "[t]he ***training*** for Earl will have three components …." (Emphasis added.) (Plaintiff's Response Exhibit 10, Ex. D). In addition, in Baker's June 2014 review, it is noted that in February 2014 a "training program was laid out for Earl." (Plaintiff's Response Exhibit 10, Exhibit E, p. 4). Further, the purported PIP does not contain any reference to any alleged performance deficiencies, provide a timeline for Baker to demonstrate improved performance, or describe any consequences of any continued poor

performance. The "PIP" is not a PIP at all, but rather is a "Description of [Baker's] Development Needs" and indeed, as titled, describes training S&W intended to provide Baker to help his development as an employee.

33. S&W's own recitation of the facts in this paragraph clearly indicate a question of fact exists. Baker prepared a five page rebuttal to the "Earl Baker Result" portion of the February review disputing the purported performance deficiencies. (Plaintiff's Response Exhibit 11, Ex. D). Baker also prepared a separate response to "performance appraisal" portion of the review and emailed Suraci a draft of his proposed response to the February review, setting forth detailed factual responses to the review. (Plaintiff's Response Exhibit 12). Rather than showing an unwillingness to "accept any responsibility or accept management's feedback and instructions," Baker instead was addressing what he believed to be factual inaccuracies in the review.

34. Baker contests S&W's reference to "his PIP." (See ¶ 32 above). Further, S&W asserts that Baker "failed to complete any of the assigned projects." Baker contests this assertion and stated that "did complete all the projects given in the February 14 out of cycle review." (Baker Dec. ¶ 8). The three projects identified in the "training program" were: filling open positions; creating a process to fully utilize the Schneeberger machine; and develop a process to use the Robocrib software to maintain inventory in the Robo 99 crib. (Plaintiff's Response Exhibit 10, Ex. D). With respect to filling the open positions, Baker responded noting, in part, that 'two weeks were lost while the paperwork was in Larry's desk waiting to be signed." (Plaintiff's Response Exhibit 14, p. 3). Baker also refuted this issue when it was raised in the June review, noting that he "filled out the requisition [for the 23505 position] promptly, but that there were delays, including 4 weeks of delay that Baker attributed to Flatley. (Plaintiff's Response Exhibit 6, p. 1). Similarly, with respect to the 23501 positions, Baker states that after he "filled the requisition," "it

was left with Larry" and any resulting delays were not Baker's fault." *Id.* (Plaintiff's Response Exhibit 14). With respect to the other assigned projects, Baker refuted these issues in his Rebuttal to the June review. (Plaintiff's Response Exhibit 6; ¶ 26, 27 above).

35. S&W asserts that Baker's failure to implement a computerized production and shipping process for tools needed in the Houlton facility "resulted in a delay in start-up production in March and April 2014 because Crib 99 did not have the tools necessary to meet increasing production needs," citing only to Flatley's OSHA Declaration. Baker, however, refuted this fact in his rebuttal to the June review stating "[i]t is untrue that we did not have tools to meet Houlton's March or April tooling obligations. We were two weeks ahead of schedule at all times. This fact can be verified with Scott Ignachuck, Mike Jurga, Ed Anischik, Peter Lemelin, Andrew Dziobek, and Derek Upson." (Plaintiff's Response Exhibit 6, p. 1). In addition, Baker had raised issues regarding the tool fulfilment strategy as far back as November of 2013. (Plaintiff's Response Exhibit 15). Baker raised these concerns with Flatley, but was "meeting extreme resistance" so he was "taking [his] case" to Tom Walsh. (*Id.*) Baker shared this information with Suraci in April of 2014. (*Id.*)

Further, contrary to S&W's assertion that Baker's "failure to complete these projects negatively impacted S&W's operations," at the time of the February review, all measurables of the cutter department were far above what they were prior to Baker's employment. The department was always two weeks ahead on the Houlton Project. Baker was never provided with any contemporaneous documents showing the department was not meeting Houlton Project obligations. While Flatley chose to meet daily on the Houlton Project, this was not due to any alleged failure on Baker's part to complete the projects described. Further, S&W had to use outside vendors to produce enough tools for a $60,000,000 expansion, not, as asserted, because of Baker's

10

alleged failure to complete any projects. S&W had to double its current inventory which would have required the use of outside vendors in any event. (Baker Dec. ¶ 9).

36. S&W asserts that "Baker had not even ordered the necessary tools" and "did not even inform the team leader which tools needed to be produced so that production could be scheduled" is simply not true. As part of the daily Houlton meetings, Jurga [team leader], Flatley, Dziobek [from purchasing], Hedley [from engineering], and Baker met in the morning. By noon everyone received a printout, distributed by Flatley, listing each person's daily tasks making it impossible for anyone, including Jurga, to not know what tools needed to be produced. (Baker Dec. ¶ 10).

37. S&W asserts that "[o]ther aspects of Baker's performance continued to decline, despite being placed on a PIP." However, Baker had not been "placed on a PIP." (See ¶ 32 above). Further, S&W asserts that Baker "did not develop a process to use the RoboCrib software effectively to make Crib 99 inventory." In June of 2013, Flatley and Baker discussed the RoboCrib software and Flatley mentioned it in the Smart Goals of Baker's 2013 review, stating a goal of March 2014 to have the RoboCrib software operational. In Flatley's weekly meeting notes from December 2, of 2013, he notes he and Baker were "working with existing report," and the next week he noted that they were "updating the report to include dull tools." (Plaintiff's Response Exhibit 10, Ex. B, p. 7). These entries confirm that the RoboCrib software was generating reports by that time. (Baker Dec. ¶ 11).

38. S&W asserts that "[a]fter the February 2014 interim evaluation, it was Flatley's perception that Baker had formed an increasingly hostile attitude towards Flatley" citing to Flatley's OSHA Declaration. However, during his deposition, Flatley limited this allegedly perceived "openly hostile attitude" to just the meeting in February following the February review. In reviewing his OSHA Declaration during his deposition, the following testimony was provided:

Q.  You say in the first sentence that Mr. Baker adopted an openly hostile attitude towards you.  How?

A.  He was very animated, very angry, hostile, very belligerent towards me in front of Mr. Suraci and Mr. Fontaine.

Q.  At the meeting?

A.  Correct.

Q.  Okay. And other than at the meeting, did Mr. Baker adopt a hostile attitude towards you?

…

Q.  My question is outside that meeting, did Mr. Baker adopt a hostile attitude towards you?

A.  After the meeting, I guess there was no more yelling, belligerence or that kind of behavior anyway.  That was just at the meeting where we were discussing his exceptions to the interim evaluation.

Q.  Okay. And so after the meeting, did he ever go back to a hostile attitude towards you?

A.  I don't think he was going to invite me over for dinner anytime soon.

Q.  Okay. But that's different from hostile, right?  I mean, I'm just going by whatever is the common Webster's Dictionary definition of hostile, but –

…

Q.  I'm just going after that meeting where the four of you met, was – did Mr. Baker adopt a hostile attitude towards you, whether he was going to invite you to dinner or not?

[Objection - vague and to the form of the question.]

Q.  You can answer the question.

A.  He was not as hostile.  It was a more professional interaction.

(Plaintiff's Response Exhibit 2, p. 189-191).  Further, Baker states that "[he] ha[s] never yelled at

Flatley, including during the meeting Flatley referenced in his deposition testimony at Flatley, p.

189-191.  (Baker Dec. ¶ 12).

39.  Baker was never told by anyone that he was belligerent or unprofessional, nor did

Suraci ever tell him after any meeting that his behavior was "inappropriate."  Baker did refute false

claims in a written rebuttal at the suggestion from Ann Glica, an HR representative.  (Baker Dec.

¶ 13).  In addition, after one meeting with Suraci and Fontaine, Suraci mentioned that Baker had

seemed to be staring too intently at Fontaine, however notes about the meeting in Suraci's report

states the meeting went well.  (Plaintiff's Response Exhibit 16, p. 4).  Baker never stated to Suraci,

"I wasn't going to let Fontaine take me on."  (Baker Dec. ¶ 13).

40.  Baker contests S&W's reference to a "second PIP" and "trainings, coaching, and a

PIP" as the first purported PIP was not a PIP.  (See ¶ 32 above).

41.  Baker contests S&W's reference to "Baker's second PIP" as the first purported PIP

was not a PIP.  (See ¶ 32 above).  Further, the purported "second PIP" was also not a PIP.  The

document cited by S&W is entitled "E. Baker Goals 6/18/14, Establish a Project Plan and

Implement." Again, as with the first "PIP," the document does not contain any reference to any

alleged performance deficiencies, provide a timeline for Baker to demonstrate improved

performance, or describe any consequences of any continued poor performance.  Rather, the

document merely sets forth three tasks that were apparently assigned to Baker.

42.  S&W asserts that Baker was instructed "to identify cost-cutting strategies with

vendors, with a primary focus on strategies to make or regrind more tools in-house."  This

statement is false.  (Baker Dec. ¶ 14).  S&W was already at capacity for "in house" regrinds. Prior

to Baker's employment, the Cutter Department owned 109 Manual Machines. That number had been reduced to about 20 machines with more reliance on CNC machines and outside vendors. If it were true that the department goals were to reduce outside vendor purchases, the company would not have gotten rid of more than 80 machines prior to Baker's arrival. Contrary to S&W's assertion, Flatley and others were making decisions that increased reliance on outside vendors. Further, Baker was never part of any conversation regarding a "new product launch support" and no such concept was ever communicated to him. (*Id*.)

43. As recognized by S&W Baker prepared a rebuttal to the June 5 review, just as he had to the February review. (Plaintiff's Response Exhibit 6.) As he did following the February review, Baker challenged the alleged performance issues that were again raised in the June review. Baker denies the allegation that he was "unwilling to accept any responsibility or accept management's feedback and instructions." (Baker Dec. ¶ 15). Baker's written rebuttals were intended to point out false statements and cited facts to support his contentions. For example, the June review stated Baker delayed fixing the "Slide Problem" yet Baker presented e-mails indicating he had contacted the department within 15 minutes of the initial e-mail. Baker also provided evidence that on two occasions when Baker was ordered by Flatley to not share his findings with the Root Cause Analysis Group. (*Id*.) Further, Flatley claimed Baker "delayed hiring replacements" for CNC. However, Flatley had the requisition on his desk for two weeks before he took action. (*Id*.) Further, Stephanie Wynn, S&W's "talent acquisition specialist," was asked if Baker was delinquent in completing the hiring and she replied that the timeline for filling the position was normal. (Plaintiff's Response Exhibit 14). It was not a case of Baker not "acknowledging [his] mistakes," but rather, he was merely correcting their inaccuracies. (*Id*.)

44.  With respect to S&W's assertion that Baker "was warned that failure to improve his performance would lead to termination" is not true.  Nothing like that was ever said to Baker.  (*Id*.)

45.  S&W asserts that Baker "did not provide any of the required project plans by the performance improvement plan's stated deadline," citing only to Fontaine's same statement in his OSHA Declaration.  Baker contests S&W's reference to "the performance improvement plan." (See ¶ 32 above).  In addition, S&W does not cite to any document which sets forth any such deadlines.  In ¶ 41, S&W cited to Plaintiff's Response Exhibit 10, Ex. F as the purported PIP, but that document does not contain any deadlines.  Further, Baker asserts that during the June 18, 2014 meeting he was given certain assignments to work on and was told that Flatley would check back with him on a certain date. Shortly thereafter Baker had health issues with back causing his left leg to give out which in turn caused him to fall on several occasions. Baker went to the doctor who then put him on muscle relaxers and he was not permitted to drive or work.  Baker turned in the proper doctor's notes for medical leave upon his return to work.  Flatley verbally extended the deadlines to complete the projects, however Baker was placed on administrative leave before the new deadlines were reached.  (Baker Dec. ¶ 17; Plaintiff's Response Exhibits 17, 18 and 19). Finally, Baker did not recall any Excel spreadsheet nor would he ever slide one under Fontaine's door.  Baker states that "the thought that [he] would do this is laughable."  (Baker Dec. ¶ 17).

47.  S&W asserts that it "first became aware of Baker's complaints about Pioneer in March, 2014 …."  Baker contests this assertion as Baker reported these issues well before March of 2014. In the summer of 2013, Baker met with HR representatives Kathy Salvador and Ann Glica.  Baker reported to Glica and Salvador that he believed Flatley's treatment of him and Baker's not receiving a cost of living raise that other employees received resulted from Flatley's "growing animosity" towards Baker because Baker opposed Flatley over some issues with Pioneer.

(Plaintiff's Response Exhibit 1, p. 105).  Baker relayed the Pioneer raffle incident and that he believed that Pioneer was given unwarranted preference over other vendors, that there were charges that should have been billed, but were not, and that there were refunds that S&W should have received, but did not.  *Id*.

Specifically, Baker relayed that he had discovered that there were times when he or another employee would go to "vend" a tool from an autocrib, the crib was empty, but that S&W would still be charged for the tool.  *Id*. at 107.  Upon investigating the issue, Baker himself found over $9,000 that should have been refunded to the company and surmised that there could be "tens of thousands of dollars" in other refunds owed, but that it was never addressed and "Flatley let it go." *Id*. at 108.  Baker reported that he felt that some of the decisions that Flatley was making were not in the best interest of S&W and its shareholders, but rather "had to do with some outside influence" and were "not in line with what the normal fiduciary relationship of a manager to his company." *Id*. at 111.  Salvador told him to keep the information about Pioneer to himself because "they did not know who was involved."  *Id*. at 114-115.

Baker continued to report and provide evidence to Flatley and HR regarding billing and accounting issues that Baker was discovering.  For example, during a subsequent meeting with HR representatives, Baker reported an incident relayed by another employee that the employee had been using a drill that was making 7,000 holes per part before it got dull, but that he had been forced to use a Pioneer drill that was only getting 700 parts per drill which "extrapolated into a huge investment on the company's part."  *Id*. at 124-25.  Similarly, Baker was told by yet another employee that it was "mandated" that the employee buy reamers from Pioneer for $330 each that did not work as well as another vendor's that were only $189 each.  *Id*. at 126.  Baker spoke to a "number of people" who "shared similar stories that they had heard or witnessed themselves."  *Id*.

at 129-130. Baker also pointed out to Flatley that many vendors, not just Pioneer, were taking back drill tools for repair but then re-selling them to S&W, and that there was "no accounting" to monitor or correct these issues. (Plaintiff's Response Exhibit 1, p. 195).

48. S&W describes Baker's concerns, "as Cicero understood them." However, the issues Baker raised were much broader and covered a wider spectrum than what Cicero "understood." Baker reported to both Cicero and Suraci that confidential billing information provided by one vendor was shared with other vendors. S&W's Ethics policy states:

6. Competitive practices.

All business activities and practices will be fair and ethical. The Company will compete effectively and vigorously, yet will refrain from any activity that could be perceived as a restraint of trade, and (sic) unfair business practice or an abuse of economic power.

(Plaintiff's Response Exhibit 24). Andrew Dziobek of S&W's purchasing department confirmed that a purchaser "would never give out exact pricing that one vendor included in a bid to another vendor" as to so "wouldn't be fair bidding" (Deposition of Andrew Dziobek, Plaintiff's Response Exhibit 25, p. 71).

In violation of this stated policy, Baker reported that immediately after receiving a bid on a particular tool from another vendor, Pioneer submitted a bid that undercut the other vendor and which was significantly under the price that Pioneer had previously charged for the tool ($19 versus $65). Baker stated that he had a document reflecting Pioneer's previous charge in his office. (Plaintiff's Response Exhibit 1, p. 226). However, that very night, Baker's office got broken into and the document was stolen. (Plaintiff's Response Exhibit 1, p. 227). Baker then tried to retrieve the document from the company's SAP system, but there was no record of it in that system. *Id*. Baker then went to the Accounts Payable department, who had a record that the invoice was paid. *Id*. Baker forwarded the invoice to Cicero "to show him that the database in

purchasing had been altered."  Baker testified that he believed that altering the database was an "SEC violation."  *Id.*   Baker believed that "something inappropriate happened in the bidding process," and wanted to bring that to Suraci's and Cicero's attention.  (Plaintiff's Response Exhibit 1, p. 235-236).

Baker also reported to Suraci that Pioneer requested to bid on a particular cutter that Baker and Flatley had just discussed that day and that Baker had suggested be sent out to another company for a bid.  Baker noted that the email from Pioneer was odd in that President of Pioneer states he is "definitely interested in hearing what you think about our pricing" which he had never mentioned before.  Baker stated to Suraci that the unsolicited bid did not "pass the smell test." (Plaintiff's Response Exhibit 20).  Suraci then forwarded the email to Bruce, who responded "ok, this is getting more interesting."  (*Id.*).

Baker also reported to Cicero about occurrences where an employee would vend a tool, and therefore be charged by Pioneer, but the tool would be defective, so the employee would have to vend a second tool, incurring a second charge.  The defective tool would then be returned to Pioneer for repair. However, the tool would then be re-loaded into the autocrib, forcing yet another charge to be incurred by S&W.  *Id*. at 300.  Baker felt this was another example of "financial and accounting improprieties" which he brought to Flatley's attention but was told to "forget about it." *Id*.  Similarly, Baker provided Cicero with evidence that Flatley would protect Pioneer's business even when another company provided a more advantageous bid.  (Plaintiff's Response Exhibit 21).

Baker also reported that when he was hired, one of his tasks was getting "Robo 99" computerized.  (Plaintiff's Response Exhibit 1, p. 362).  While completing this task, Baker noticed that S&W had an excess of inventory, several years' worth, of a certain drill, however, S&W

continued to receive these drills under a blanket purchase order and paying $300 each for drills that the company did not need.  Because no one was monitoring the inventory, S&W had paid "hundreds and hundreds of thousands of dollars" for drills that the company did not need.  *Id*.

Baker specifically asked Cicero to look into "crib 99," which was the subject of an internal audit conducted by S&W after an accounting mistake was reported.[1]  During his deposition, Cicero gave the following testimony:

Q.  In what way did crib 99 relate to Mr. Bake's concerns that you investigated?

[Objection based on lack of foundation]

A.  So Mr. Baker described to me generally his concern about the way tools were being managed in various what they call cribs, so cases or, in this case, caged-in area, and he asked me to look into irregularities, and then he pointed me towards examples that he believes supported the irregularity. … [H]e created sort of categories, as I recall, of things, including the way things were charged, the way things were --- the quality of certain things and others related to the tools in the crib. … I think Mr. Baker expressed multiple concerns about the process in general …

(Deposition Transcript of Robert Cicero, Plaintiff's Response Exhibit 22, p. 130-31).

49.  While Baker has contested the thoroughness and accuracy of Cicero's investigation, the only "evidence" of that investigation provided throughout this litigation was Cicero's August 20, 2014 summary of that investigation.  Although more information and specific documents were requested about the investigation, S&W objected to the production of such information based on the attorney-client privilege and work product doctrine.  As such, Baker cannot comment on the "number of witnesses' and "large volume of documents" that Cicero reviewed in his investigation.

---

[1] See Plaintiff's Response to Defendant's Motion for Summary Judgment, p. 5)

50.  While S&W provides three examples of "improper gifts" that Baker reported, Baker's reports were actually much broader.  During Baker's employment, S&W had a "Business Ethics" policy which all employees, including Baker, was required to sign upon hire at S&W.  (Deposition Transcript of Kathy Salvador, Plaintiff's Response Exhibit 23, p. 208).  The Ethics policy contained the following provisions:

> Relationship to Suppliers
>
> Suppliers should be treated fairly, without discrimination.  Purchase decisions should be based on the merits of the purchase opportunities provided by competing offers.
> Receipt of improper payments, including but not limited to cash payments, material gifts, transportation, meals, entertainment and lodging whose purpose it is to unfairly influence the competitive balance that exists between the suppliers is prohibited.

(Plaintiff's Response Exhibit 24, p. 6-7).

In violation of these company policies, Baker believed that there was a "pay-to-play" culture at S&W with regard to the vendors, particularly Pioneer, and that his belief was supported by the other employees he talked to.  (Plaintiff's Response Exhibit 1, p. 130).  For example, Baker relayed to Cicero a conversation Baker had with Leszek Jedrezejczyk regarding Flatley having yelled at Baker on the floor of the cutter department.  Jedrezejczyk reportedly told Baker Jedrezejczyk thought Baker had "gotten into Flatley's pocket," apparently referring to the "kickbacks" Pioneer was giving to Larry.  Jedrezejczyk also confirmed the issue of S&W making tools for Pioneer which Pioneer would then sell back to S&W for a profit and provided the names of other potential witnesses to that practice.  (Plaintiff's Response Exhibit 26).  However, Cicero did not speak to Jedrezejczyk to Baker's knowledge.  (See ¶ 64 below).  While the other employees were not as "alarmed" by the pay-to-play practice as Baker was, they felt it had been "going on for a while."  *(*Plaintiff's Response Exhibit 1, p. 130).  Baker believed Pioneer giving gifts to

Flatley and other "higher ranking" S&W people "showed a quid pro quo" environment. (Plaintiff's Response Exhibit 1, p. 273).

Baker stated that he reported to Cicero that Baker had been told by a former Pioneer driver that the driver had delivered televisions to the homes of S&W "bosses," and that Baker and others had received baseball tickets and gift cards. (Plaintiff's Response Exhibit 1, p. 272-273, 375). Cicero testified that it was not part of his investigation to look into the televisions deliveries, but that it was HR's responsibility. (Plaintiff's Response Exhibit 22, p. 95). During its investigation, S&W's HR department received confirmation from another employee that a television set had actually been delivered to his home, but that he returned it because accepting it "would be against company policy." Anne Bruce, VP of HR, made the determination at that point to stop the investigation into the television sets because she did not want to "freak [the employee] out any further." Salvador, who had been conducting the investigation into the TVs did not proceed further. (Plaintiff's Response Exhibit 27; Plaintiff's Response Exhibit 23, pp. 54-55; Deposition Transcript of Ed Suraci, Plaintiff's Response Exhibit 28, p. 59).

52.    S&W asserts that Baker told Cicero Baker "assumed" Flatley had won an iPad. However, Baker told Cicero that when the Pioneer driver came to Baker's office, the driver held out the iPad as if to hand it to Baker and said "Larry Flatley won something." (Plaintiff's Response Exhibit 1, p. 106). Baker did not take the iPad but told the driver where Flatley's office was. (*Id.*) While Baker told Cicero that he never saw Flatley receive the iPad, he nevertheless believed that Flatley had in fact won it. In Baker's mind, this validated Flatley's claim that the raffle was "rigged" and would be won by the highest-ranking S&W employee at the barbeque. (Plaintiff's Response Exhibit 1, p. 330). When Flatley told Baker at the barbeque "come back tomorrow, you'll be the highest-ranking employee and you'll be sure to win," Baker thought he was joking.

(Plaintiff's Response Exhibit 1, p. 106). Believing that Flatley won an expensive iPad (whether he received it or not), in Baker's mind demonstrated the quid pro quo culture at S&W. (Plaintiff's Response Exhibit 1, pp. 273, 328).

53.    S&W asserts that "Cicero was unable to substantiate Baker's allegations that Pioneer improperly attempted to influence Baker with gifts." However, Baker told Cicero that Baker had received Red Sox tickets mailed to his home with no return address. (Plaintiff's Response Exhibit 1, p. 337). Baker also told Cicero that Derrick Upson had previous told Baker that Upson had season tickets and said if Baker wanted to go sometime to let Upson know. However, after considering that another vendor could have possibly sent the tickets Baker notified Cicero. Baker never did learn who sent the tickets, but certainly had let Cicero know that it could have been another vendor. (Baker Dec. ¶ 18).

With respect to the Visa card Baker received at Christmas time, because it was above "nominal" value, Baker determined that he could not keep it. (Plaintiff's Response Exhibit 1, p. 333). Suraci asked Baker to write an e-mail explaining how Baker had received the card. (*Id*.) Suraci commented, "where there's smoke there's fire." (*Id*. at 335). It was Suraci's decision to get Cicero involved at that point, not Baker's. (*Id*.)

54.    Baker contests that the "claims" identified in the paragraph were the only issues Baker raised in this regard. (See ¶ 48 above). Further, Flatley never "disciplined" Baker on any issue as that term is used in the S&W progressive discipline policy as Baker was never given a verbal warning, followed by a written warning, then suspension. However, Flatley gave Baker an out-of-cycle review one day after Baker had emailed Pioneer pertaining to them questioning disbursement of tooling contracts. The original review Baker received was dated the same day as the email to Pioneer (February 4, 2014). Flatley gave Baker the review the next day but the date

on the review was the same as the email.   Baker subsequently saw other copies of this review that had later dates than the original, one dated as late as February 7th.  (Baker Dec. ¶ 19).

62.  S&W asserts that "Baker conceded that the co-worker had explained to Baker that the clapping incident had nothing to do with him."  However, that is not the case.  Baker was called by another employee, Lamonte Parks, who reported to Baker that the first day Baker was out of the office on vacation, Flatley went to the shop floor and began clapping "like the movie Norma Rae".  (Baker Dec. ¶ 20).   Baker then emailed Cicero to tell them of the incident. (Plaintiff's Response Exhibit 29).   Cicero then called Baker and said that while Flatley did clap, it was not about Baker.  Park never told Baker it was about someone else, Cicero did.  Baker told Cicero Baker did not agree with his statement. (Baker Dec. ¶ 20).

63.  S&W's recitation of the facts of this incident are supported only by reference to Cicero's OSHA Declaration and his August 20 letter, with no supporting evidence.  Baker contests S&W version of the event.  Baker states that he was given a project by Flatley late Friday that required Baker to work the entire weekend.  (Baker Dec. ¶ 21).  At approximately 11:00 p.m. Sunday night, the Robo Software shut down. Pioneer managed the system for S&W so Baker sent a voicemail to Derrick Upson to see if Upson could get it running. Upson did not return the call until Monday when he gave the explanation too many licenses of the Software were open at the same time causing the system to shut down.  Every person with a license to open the Software works dayshift so it was Baker believed it was impossible that too many people were using it on a Sunday night. It was Baker's opinion that it was intentionally shut down.  (*Id.*)

64.  S&W asserts that "Baker expressed disagreement with Cicero's findings and reiterated each of his prior allegations."  However, Baker had reason to question Cicero's findings and the merit of the investigation.  During that meeting, Baker asked if Cicero had spoken to the witnesses

Baker had identified - Leszak Jedrezejczyk, Lamonte Parks, DeWayne Reese, Stan Capek, Stan Wnuk, Stan Wichorick, Ed Anischick, Maria Kaloroumakis, Josh Bury, Jim Valley, Bill Copson, James Peel, or Peter Lemlin, but Cicero responded he had not talked to any of them with the exception of Lamonte Parks.  (Baker Dec. ¶ 22); Baker, p. 346-58).  While Cicero purportedly continued the investigation "through July and early August," Cicero still never talked to most of the witnesses identified and in Baker's opinion never really fully investigated Baker's allegations. (*Id*.)

Further, after Cicero issued his August 20 "summary" of his investigation findings, Baker learned additional information which supported his initial belief that Cicero's investigation and purported results were not valid.  After, Cicero's report stated that he'd found no evidence that any vendor was given preferential treatment, Baker spoke to Al Goode of MSC.  Goode informed Baker that Cicero had acted as a mediator between MSC and Pioneer in a dispute involving a situation where Pioneer had shared MSC bid information, which had been submitted confidentially to S&W, with other MSC customers.  Thus, "there not only was evidence that bids were taken from MSC and given to Pioneer to create a competitive imbalance, but that Mr. Cicero was aware of it having mediated the dispute."  (Plaintiff's Response Exhibit 1, p. 304).

65.  S&W asserts that the August 20, 2014 letters "explained in detail Cicero's findings with respect to each of the allegations raised by Baker."  However, the August 20, 2014 letter itself refutes this assertion stating: "We will not respond here to all of your allegations, although all of them have been reviewed and considered.  We are providing this summary of our conclusions with respect to several of your assertions in the hope that you will better understand our findings." (Plaintiff's Response Exhibit 30, Ex. A, p. 1).

67. S&W asserts that Baker "started making allegations about Flatley" after the February 2014 review, however, Baker began making allegations about Flatley in the summer of 2013 during the meeting with Glica and Salvador. (Plaintiff's Response Exhibit 1, p. 102-03). Further, S&W states it was "unable to substantiate" Baker's claims. However, Baker contends that S&W's "investigation" was flawed. For example, as noted above with respect to the missed meeting incident, Baker told them to speak to Maria Kaloroumakis (Plaintiff's Response Exhibit 31), but they only spoke to James Duffy. Further, Baker told them to speak to Derrick Hedley because he witnessed Flatley telling Baker to only enter three tools a day into the Robo report. Baker told Flatley that at that rate with 13,000 different tools the Robo report would take years to complete. Flatley became "unhinged" screaming obscenities and repeated his mandate of only three tools a day. After Flatley left Baker's office, Hedley said, "Wow, that was uncomfortable". In Anne Bruce's Declaration she states she spoke to Hedley and he denied his Civil Rights were violated due to racism. In this case, Bruce asked the wrong questions to the right person. Baker spoke to Hedley and asked him if anyone ever spoke to him about Flatley's comments and the Robo report and Hedley said no. (*Id*.)

Further, Baker told S&W that the Heat Treat department's Pitch Boards showed no one had done Safety Audits for over 6 months, yet Flatley had signed the forms as completed. After Baker informed Suraci, who then informed Fontaine, Flatley was apparently informed as well. Flatley fixed the boards and backdated them to appear as if they were always in compliance. During Anne Bruce's investigation she asked Dave Billingsley if Flatley reviewed the boards daily. Billingsley said he had. She used this answer to assert Baker's claims were false yet her questions did not address the issue at hand. Baker never alleged that Flatley never reviewed the board, but rather, Baker alleged that the audits were never done which is a different issue. (*Id*.)

Finally, while investigating the gifted TV's, a witness said he was aware of 5 people other than himself receiving TV's but Bruce halted the investigation and never looked into who the other parties were.   (Plaintiff's Response Exhibit 27; Plaintiff's Response Exhibit 23, pp. 54-55; Plaintiff's Response Exhibit 28, p. 59). To the extent Bruce was "unable to substantiate" Baker's allegations, it was because she and her department did not perform a complete and accurate investigation.

68.    S&W claims Baker manipulated witnesses and was belligerent, however, they fail to give any specific examples. At no time did Baker manipulate witnesses nor was he ever belligerent with any S&W employee.  (Baker Dec. ¶ 23).  If anything, S&W was intimidating witnesses.  On July 25, while he was on leave, Baker reported to Suraci that Baker was still getting calls from his fellow employees.  Baker noted, however, that "the tone has changed and they are denying that they have seen or know anything and want me to not use there (sic) names because they are concerned about what's happening to Leo (Leszek Jedrezejczyk).  They said they are concerned about their overtime and retaliation and need to distance themselves from their statements and the whole issue."  (Plaintiff's Response Exhibit 32).  Baker, however, vows to "stand behind everything I have told you."  (*Id*.)

69.    S&W asserts that Baker initiated the allegations, but in most cases the allegations came from the people Baker spoke with, including Josh Bury, Jedrezejczyk, Lamonte Parks, Stan Capek, DeWayne Reese to get their accounts of what happened. None of the information Baker received from these individuals came from him.  (Baker Dec. ¶ 24).

70.  S&W asserts that "Baker accused Flatley and others of being part of the "Nazi" party, "evil," a "rapist," and a murderer."  However, Baker contests this assertion.  Bruce's letter of September 24, 2014 describing the results of the HR investigation, mentions that Baker "accused

Larry of being 'evil,' a 'nazi,' a 'rapist,' and of being culpable in the suicide of his fiancé almost 20 years ago." (Plaintiff's Response Exhibit 33).  Similarly, Cicero's letter to Baker of August 20, 2014, providing the results of Cicero's investigation into Baker's allegations, Cicero states that Baker had expressed concerns for his personal safety based on Baker's purported reference to "three incidents that showed 'what Larry is capable of.'"  Plaintiff's Response Exhibit 34, p. 7. The three cited incidents were Baker's "allegations" that Larry had sexually assaulted a female co-worker, that Larry had something to do with the death of his fiancé, and that another employee had told Baker that Larry had "threatened him with bodily harm."  *Id.*  Cicero's report and Bruce's letter are the first written mention of these alleged statements and accusations by Baker against Flatley.  These allegations are not mentioned in any of Baker's reviews or in any written communication with Baker or any written "write-up."  Nor is there any evidence of any disciplinary action taken against Baker for these purported allegations.

Further, Cicero's actual testimony does not support the notion that Baker made any such "allegations."  Rather, Baker purportedly told Cicero that Baker feared for his and his family's safety.  When asked why, Cicero testified that Baker relayed "a rumor" that Baker had heard that "about 10 years prior, Mr. Flatley had sexually assaulted a woman." (Plaintiff's Response Exhibit 22, p. 172). Baker also gave "the example" of Flatley "having something to do with his wife's suicide and another employee relaying a story to Baker about "Larry physically threatening him." Rather than Baker making "allegations" or accusations against Flatley, Baker merely relayed what he had heard regarding Flatley in response to Cicero's question of why Baker felt concerned for his safety.

71.  S&W asserts "Baker alleged that Flatley sexually assaulted a S&W employee."  Baker contests that he made any such "allegation."  (See ¶ 70 above).  S&W further asserts that Suraci,

Bruce, Salvador, and Glica were "deeply troubled that Baker was willing would (sic) make such a serious and hurtful accusation based on this kind of assumption." However, Suraci testified that the "rape" and "murder" allegations were investigated immediately and determined to be false. Suraci stated that he used the allegations "as a learning opportunity with Earl" but that everyone "moved on" from those allegations "within two weeks to a month" of February 25, 2014. (Plaintiff's Response Exhibit 28, p. 151-152). Suraci also noted in his investigation notes in March of 2014, after the purported "rape" and "murder" "allegations" that S&W did not have a sufficient basis to terminate Baker at that time. (Plaintiff's Response Exhibit 35, p. 1).

72.    S&W asserts that "Baker also alleged, without any factual basis, that Flatley was responsible for the death of his fiancé nearly 20 years before." Baker contests this assertion. (See ¶ 70 above). S&W further asserts that "Cicero and the HR team were deeply troubled that Baker would be willing to make this type of accusation based solely on a 20 year old rumor." Baker contests this assertion as well. (See ¶ 71 above). Baker was asked by Cicero if Baker felt he was in danger. When Baker responded "yes," Cicero wanted to know why. Baker only told Cicero Flatley's nickname on the workroom floor ("Nurse Killer") but said he had no personal knowledge because it happened long before my employment. (Baker Dec. ¶ 25).

73.    Baker never stated that he wanted Flatley "punished" or that he wanted to "bring him down" to Bruce of anyone else at S&W. (Baker Dec. ¶ 26). In fact, Baker wanted to maintain a "professional" relationship with Flatley should he be "exonerated." (*Id*.)

74.    S&W references Baker's "increasingly reckless and threatening behavior and accusations," citing to only Smith's and Bruce's OSHA Declarations. Baker disputes that he was engaging in any "reckless and threatening behavior or accusations." Other than Smith and Bruce saying that such "behavior" and "accusations" existed, S&W has cited to no other evidence.

Further, S&W provides no evidence to support the statement that Smith and Bruce were "concerned" given that "Baker had access to sensitive and highly confidential information and worked in a firearm manufacturing facility" and the implication that Baker was somehow a danger to others.

77. S&W's assertion that Duffy "denied Baker's version of events" is not surprising given that Duffy was not a party to the whole incident. As part of HR's investigation, Baker told them to speak with Maria Kaloroumakis, however they interviewed Duffy, Maria's boss instead. Duffy was not a witness to the entire event, but Maria was and would have corroborated Baker's report of the incident. (Baker Dec. ¶ 27).

80. S&W asserts that "HR's investigation concluded that Baker was not treated differently than other Cell Coordinators with respect to their Boards or meetings with Flatley concerning them." However, Bob Francis confirmed Baker's allegations in this regard, testifying that Baker's pitch boards were "the best in the plant," but were "not judged by the same standards as the other departments' pitch boards." (Plaintiff's Response Exhibit 3, p. 59, Plaintiff's Response Exhibit 36).

82. S&W asserts that Baker testified he did not have any "specific information that Flatley knew" about his allegations when the February 2014 performance evaluation was prepared, which was true at the time. But, later Baker did receive specific information from Cicero that Flatley was told about his submissions. Additionally, Cicero informed Baker that Flatley admitted he was the one breaking into Baker's office. (Baker Dec. ¶ 28). While it is true that S&W did not tell Baker when Flatley was informed of his submissions, those submissions began in late summer of 2013. Flatley could have been told at any point from then on and it's Baker's belief that Flatley did know early on in the investigation process. (*Id.*) Also, with respect to Baker's testimony that he "does

not contend that he was subject to discipline while employed at S&W," Baker was referring the fact that he never received a written write-up or any other disciplinary action as discussed in S&W's policy.  (*Id.*)   Ann Glica testified regarding S&W's "progressive discipline policy." (Deposition of Ann Glica, Plaintiff's Response Exhibit 37, pp. 71-72).   Glica states that the first step in the process would be a verbal warning, the second step a written warning, the third step suspension, and the final step would be termination.  (*Id.*)  S&W has not presented any evidence that Baker received any written "warnings" or that he was ever suspended from his position.

88.  S&W is taking Baker's words or phrases completely out of context. When Baker talked about "death or more death" he was referring to Harry Truman's decision to use the atomic bomb. Baker felt that if Debney would have investigated Baker's concerns fully, it would have resulted in many employees being fired and would probably hurt the company, but that "damage" would have been less than the damage caused by not investigating and allowing the fraud and other misconduct to continue.  (Baker Dec. ¶ 29). When Baker used the word "scum," he was referring to whomever the investigation revealed guilty of fraud.  (*Id.*)   However, at this point no one had been deemed guilty so it's not aimed at any specific person but rhetorically at whoever was deemed guilty. The "genuflecting butt kissers" is not an actual person but rhetorically a person that knew what Baker knew but chose not to say anything.  The reference to "blatant and arrogant [] vermin" refers to those deemed to be guilty. When Baker mentions "their Alpha dog displays" he was referring to Flatley walking out on the workroom floor and clapping when he thought Baker had been fired.  (*Id.*)

89.  S&W asserts that "employee morale within his department was at an all-time low." Again, S&W only cites to various OSHA Declarations in support of this assertion.  Baker refutes this assertion.  At the time Baker was put on paid leave, his department's performance was the highest it had ever been.  (Baker Dec. ¶ 30).  Claims that morale was at an all-time low are belied by the high rate of production. Unmotivated employees do not produce at that high of a level.  (*Id*.)  Further, once Baker was placed on paid leave, production plummeted from 12,000 tools a month to 2,500 a month.  Additionally, an audit of the Robo 99 in September showed cycle counts of tools were not being performed and tool inventory numbers were no longer accurate. The negative numbers for September reflect the work of whoever took over the department while Baker was on paid leave as Baker's numbers ended in July. (*Id*.)

90.  S&W asserts that "Flatley had determined in Baker's June 5, 2014 evaluation that Baker was unable to continue as Cell Coordinator …."  Baker contests this assertion.  First, nowhere in the June 2014 review does Flatley make such a determination, and in fact, Flatley testified that as of June it was not his decision or opinion that Baker should be fired.  Flatley also stated that he did not have any input in terminating Baker and was never asked whether Baker should be terminated or not.  (Plaintiff's Response Exhibit 2, p. 132).  Similarly, Fontaine, also testified that no decision had been made to terminate Baker as of June, 2014.  (Plaintiff's Response Exhibit 38, p. 89, ln. 8-10).

Further, in March of 2014, Suraci noted that S&W did not have a sufficient basis to terminate Baker at that time. (Plaintiff's Response Exhibit 35, p. 2).  On March 28, Fontaine stated that he met with both Baker and Flatley and that he "had concerns with both of them."  (Plaintiff's Response Exhibit 39).  In April, as reported in Suraci's investigation notes, Francis reported to Suraci that Francis believed that "data from Earl's area is good, and shows improvements to

processes, and that Dan Fontaine and Larry Flatley don't seem to recognize or appreciate those improvements. Instead, they just say that the numbers are bullshit." (Plaintiff's Response Exhibit 35, p. 5). Francis further testified that Baker's department's performance during Baker's employment was "one of the best in the company" and that Baker's department's performance was "exceptional." (Plaintiff's Response Exhibit 3, p. 32, 35, Plaintiff's Response Exhibit 36). In July, Francis was in the process of helping Baker put together various charts and spreadsheets, as well as a presentation, "to show respect for the work that you and your team have done" and to "document improvements" in Baker's department. (Plaintiff's Response Exhibit 40). Baker was terminated before the presentation could be made.

Baker was reviewed in June of 2014 and given certain objectives. While S&W asserts that these recommendations were goals with specific deadlines, Baker understood these to be "objectives," but not "mandates," and that it was actually Baker who expressed his goals to Flatley and Fontaine and that they would then help keep Baker on track progressing towards those goals. (Plaintiff's Response Exhibit 1, p. 81, 91). In any event, Baker was out of the office for health reasons, then on vacation, and the was put on administrative leave in mid-July, 2014 and did not return back to work before his termination. Even after Baker was put on administrative leave, it was Fontaine's understanding that Baker was coming back to work. (Plaintiff's Response Exhibit 38, p. 95). On or about August 29, 2014, Anne Bruce left Baker a voicemail message wanting to talk to him about his return to work, and even as late as September 19, 2014, Bruce was drafting a letter to Baker to rebut the issues raised in his Rebuttal to the June review. (Plaintiff's Response Exhibit 41 and 42). As such, as late as September 19, S&W intended that Baker would return to work. Given that Baker had been on administrative leave since early July, there could not have been any change to S&W's evaluation of Baker's job performance between September 19 and

32

September 23 when he was terminated.  The ***ONLY*** thing that happened between September 19

and September 23 is that Baker filed his OSHA complaint on September 22.

Date: January 29, 2021

Respectfully submitted,

EARL D. BAKER

By:      /s/ John Y. Lee


John Y. Lee
Lee & Breen, LLC
188 Industrial Drive, Suite 403
Elmhurst, IL 60126
Tel.: (312) 241-1420
Email: jlee@leebreenlaw.com

By: /s/ Benjamin Rudolf
        Attorney for Plaintiff

Benjamin Rudolf
Murphy & Rudolf, LLP
One Mercantile Street
Worcester, MA 01609
Tel.: (508) 425-6330
Email: brudolf@murphyrudolf.com