# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

## WESTERN DIVISION

EARL DONALD BAKER,

     Plaintiff,

     vs.

SMITH & WESSON CORP.,

     Defendant.

Case No. 3:19-cv-30008-MGM

Honorable Mark G. Mastroianni

## DECLARATION OF EARL D. BAKER

I, Earl D. Baker, pursuant to 28 U.S.C. §1746, and under penalties of perjury, state as follows:

1.     I am over the age of 18 years and can testify in Court to the facts in this declaration. I am a resident of North Carolina.

2.     I understand that this declaration will be filed with a federal court, and that the Court will consider the facts I provide in this declaration to be material.  I have been given an opportunity to review the contents of this declaration, to edit and revise the substance and language, and to make revisions I deem appropriate, as to form, grammar, phrasing, and substance.

3.     With respect to S&W's SUF, ¶ 24, the Cutter Department pitch board was updated every day without fail.  Flatley's only verbalized criticism was when one machine's numbers were down for the nightshift. Flatley would immediately asked why the numbers were down. The pitch board meeting, called a "Gemba Walk," was at 8:15 a.m.  The nightshift ended at 7:00 a.m.  The

1

answers Flatley wanted could not be obtained until the following day when nightshift reported for work.

4.        With respect to S&W's SUF, ¶ 28, we did "Kaizen's" within our department more often than as reflected in ¶ 28.  Further, Flatley never suggested in any way that what we were doing was insufficient until the February 2014 review. Flatley and I had thirteen scheduled meetings together every week plus many additional supplemental meetings yet he never once said I needed to do more Kaizens.

5.        With respect to S&W's SUF, ¶ 29, Flatley's one on one meeting notes do not show him raising any concerns or that he "had to repeatedly raise the same performance and project status concerns."  Rather, Flatley would ask what I was working on and I would tell him. He then asked when I expected to complete it and he would write it down. The following week he would ask how we were progressing on projects previously mentioned and would write it down.  At one point, Flatley asked that I prepare a GAN Chart from Microsoft Project Manager Software. I requisitioned the software for Project Manager, but Flatley would not sign the approval for the software. In late January, I tried to satisfy Flatley's request by preparing a GAN Chart for projects by hand.  During the February out-of-cycle review, Flatley pointed to my GAN Chart as evidence of my unprofessionalism. Later when we had the meeting with Fontaine and Suraci, Flatley showed the GAN Chart to Fontaine. I told Fontaine that Flatley refused to purchase the necessary software. Fontaine then ordered Flatley to authorize the purchase but Flatley never did.

6.        With respect to S&W's SUF, ¶ 30, I never had such a meeting with Anne Bruce and at no time did I tell her I was "struggling to meet Flatley's expectations."

7.        With respect to S&W's SUF, ¶ 31, the Cutter Department production, quality, and stock outs were better than ever. When looking at the measurables recorded on the pitch board, the

department had improved in every category since I took over the department. (See, for example, Plaintiff's Response Exhibit 8). There was no Performance Improvement Plan, nor verbal or written warning as required by S&W's progressive discipline policy. (Plaintiff's Exhibit 9).

8.      With respect to S&W's SUF, ¶ 34, I did complete all the projects given in the February 14 out of cycle review.

9.      With respect to S&W's SUF, ¶ 35, contrary to S&W's assertion that my "failure to complete these projects negatively impacted S&W's operations, at the time of February review all measurables of the cutter department were far above what they ever were prior to my employment. We were always two weeks ahead on the Houlton Project. There were never any contemporaneous documents showing we were not meeting Houlton Project obligations. While Flatley chose to meet daily on the Houlton Project, this was not due to any alleged failure on my part to complete the projects described. Further, we had to use outside vendors to produce enough tools for a $60,000,000 expansion, not, as asserted, because of my alleged failure to complete any projects. We had to double our current inventory which would have required the use of outside vendors in any event.

10.      With respect to S&W's SUF, ¶ 36) the assertion that I "had not even ordered the necessary tools" and that I "did not even inform the team leader [Jurga] which tools needed to be produced" is simply not true. As part of the daily Houlton meetings, Jurga, Flatley, Dziobek [from purchasing], Hedley [from engineering], and I met in the morning in Flatley's office. By noon everyone received a printout, distributed by Flatley, listing each person's daily tasks making it impossible for anyone, including Jurga, to not know what tools needed to be produced.

11.      With respect to S&W's SUF, ¶ 37), S&W asserts that I "did not develop a process to use the RoboCrib software effectively to make Crib 99 inventory." In June of 2013, Flatley and

I discussed the RoboCrib software and Flatley mentioned it in the Smart Goals of my 2013 review, stating a goal of March 2014 to have the RoboCrib software operational.  In Flatley's weekly meeting notes from December 2, of 2013, he notes we were "working with existing report."  The next week, Flatley noted that they were "updating the report to include dull tools."  (Plaintiff's Response Exhibit 10, Ex. B, p. 7).  These entries indicate that the RoboCrib software was generating reports by that time.

13. With respect to S&W's SUF, ¶ 38, I have never yelled at Flatley, including during the meeting Flatley referenced in his deposition testimony at Plaintiff's Response Exhibit 2, p. 189-191.

13. With respect to S&W's SUF, ¶ 39, I was never told by anyone that I was belligerent or unprofessional, nor did Suarci ever tell me after any meeting that my behavior was "inappropriate."  I did refute false claims in a written rebuttal at the suggestion from Ann Glicia, an HR representative. After one meeting with Suraci and Fontaine, Suraci mentioned that I had seemed to be staring too intently at Fontaine, however notes about the meeting in Suraci's report states the meeting went well.  I never stated to Suraci, "I wasn't going to let Fontaine take me on."

14. With respect to S&W's SUF, ¶ 42, S&W asserts that I was instructed "to identify cost-cutting strategies with vendors, with a primary focus on strategies to make or regrind more tools in-house."  This statement is false. S&W was already at capacity for "in house" regrinds. Prior to my employment, the Cutter Department owned 109 Manual Machines. That number had been reduced to about 20 machines with more reliance on CNC machines and outside vendors.  If it were true that the department goals were to reduce outside vendor purchases, the company would not have gotten rid of more than 80 machines prior to my arrival.  Contrary to S&W's assertion, Flatley and others were making decisions that increased reliance on outside vendors.  Further, I

was never part of any conversation regarding a "new product launch support." Any such concept was never communicated to me.

15.    With respect to S&W's SUF, ¶ 43, I deny the allegation that I was "unwilling to accept any responsibility or accept management's feedback and instructions." My written rebuttals were intended to point out false statements and cited facts to support my contentions. For example, Flatley stated I delayed fixing the "Slide Problem" yet I provided the e-mails where I contacted the department within 15 minutes of their initial e-mail. I also provided documents showing that on two occasions I was ordered by Flatley not to share my findings with the Root Cause Analysis Group, and, in fact, I witnessed Fontaine chastise Flatley for this during one of our meetings. Further, Flatley claimed I "delayed hiring replacements" for CNC. However, Flatley had the requisition on his desk for two weeks before he took action. Further, Stephanie Wynn was asked if I was delinquent in completing the hiring and she replied that the timeline for filling the position was normal. (Plaintiff's Response Exhibit 14). It was not a case of me not "acknowledging my mistakes," but rather, I was merely correcting the inaccuracies in the reviews.

16.    With respect to S&W's SUF, ¶ 44, S&W's assertion that I "was warned that failure to improve [my] performance would lead to termination" is not true. Nothing like that was ever said to me.

17.    With respect to S&W's SUF, ¶ 45, I do not recall any Excel spreadsheet nor would I ever slide one under Fontaine's door. The thought that I would do this is laughable. At the June 18, 2014 meeting I was given assignments to work on and was told Flatley would check back with me on a certain date. Shortly thereafter I had health issues with my back causing my left leg to give out caused me to fall on several occasions. I went to the doctor who then put me on muscle relaxers and I was not permitted to drive or work. I turned in the proper doctor's notes for medical

leave upon return. Flatley verbally extended the deadlines to complete the projects however I went on vacation and was then placed on paid leave before we reached the new deadlines.

18.      With respect to S&W's SUF, ¶ 53,   I told Cicero I received Red Sox tickets mailed to my home with no return address. I told him that Derrick Upson told me he had season tickets and said if I wanted to go sometime to let him know. After considering that another vendor could have possibly sent the tickets I notified Cicero. I never did learn who sent them.

19.      With respect to S&W's SUF, ¶ 54, Flatley never "disciplined" me on any issue as that term is used in the S&W progressive discipline policy as I was never given a verbal warning, followed by a written warning, then suspension.  However, Flatley gave me an out-of-cycle review one day after I had emailed Pioneer pertaining to them questioning disbursement of tooling contracts.  The original review I received was dated the same day as my email to Pioneer (February 4, 2014). Flatley gave me the review the next day but the date on the review was the same as the email.   I saw other copies of this review that had later dates than the original, one dated as late as February 7th.

20.      With respect to S&W's SUF, ¶ 62, I was called by Lamonte Parks on July 5, the first day I was out of the office on vacation[1] and he said Flatley went to the shop floor and began clapping "like the movie Norma Rae."  I emailed Cicero to tell him of the incident. Cicero called me and said that Larry did clap but it was not about me.  Lamonte never said it was about someone else, Cicero did. I told Cicero I did not agree with his statement. I later learned that Flatley thought I had been fired at that time.

21.      With respect to S&W's SUF, ¶ 63, I was given a project by Flatley late Friday to change the Pitch board and be prepared to justify production on the Schneeberger Monday

---

[1] Cicero had made me an offer of separation and I requested some vacation time to consider the offer.  This vacation time later rolled into the administrative leave.

morning.  I worked the entire weekend to get the data for the report when around 11:00 p.m. Sunday night the Robo Software shut down. Pioneer managed the system for us so I sent a voicemail to Derrick Upson to see if he could get it running. He did not return my call until Monday and gave the explanation too many licenses of the Software were open at the same time causing the system to shut down. Every person with a license to open the Software works dayshift so it was impossible that too many people were using it on a Sunday night. It is my opinion it was intentionally shut down.

22.     With respect to S&W's SUF, ¶ 64, Cicero told me that he could not substantiate any of my allegations. I asked if he has spoken to Leszak Jedrezejczyk, Lamonte Parks, DeWayne Reese, Stan Capek, Stan Wnuk, Stan Wichorick, Ed Anischick, Maria Kaloroumakis, Josh Bury, Jim Valley, Bill Copson, James Peel, or Peter Lemlin? He said he had not talked to any of them with the exception of Lamonte Parks. While months went by he still never talked to most of these people and in my opinion never really investigated.

23.     With respect to S&W's SUF, ¶ 68, at no time did I manipulate witnesses nor was I ever belligerent with any S&W employee.

24.     With respect to S&W's SUF, ¶ 69, S&W asserts that I spread allegations, but in most cases the allegations came from the people I spoke with. I spoke with Josh Bury, Leszak Jedrezejczyk, Lamonte Parks, Stan Capek, DeWayne Reese to get their accounts of what happened. None of the information I received from these individuals came from me.

25.     With respect to S&W's SUF, ¶ 72, I was asked by Cicero if I felt I was in danger. I said yes and Cicero wanted to know why. I only told Smith and Wesson Flatley's nickname on the workroom floor ("Nurse Killer") and said I had no personal knowledge because it happened long before my employment.

26.     With respect to S&W's SUF, ¶ 73, I never stated that I wanted Flatley "punished" or that I wanted to "bring him down" to Bruce or anyone else at S&W.  In fact, I hoped to maintain a "professional" relationship with Flatley "should he be exonerated."  (Plaintiff's Response Exhibit 43).

27.     With respect to S&W's SUF, ¶ 77, S&W's assertion that Duffy "denied Baker's version of events" is not surprising given that Duffy was not a party to the whole incident.  As part of HR's investigation, I told them to speak with Maria Kaloroumakis, however they interviewed only Duffy, Maria's boss instead.  Duffy was not a witness to the entire event, but Maria was and would have corroborated my report of the incident.

28.     With respect to S&W's SUF, ¶ 82, S&W asserts that I testified I did not have any "specific information that Flatley knew" about my allegations when the February 2014 performance evaluation was prepared, which was true at that time. But, later on I did receive specific information from Cicero that Flatley was told about my submissions. Additionally, Cicero informed me that Flatley admitted he was the one breaking into my office. While it is true that S&W did not tell me when Flatley was informed of my submissions, those submissions began in late summer of 2013.  Flatley could have been told at any point from then on and it's my belief he did know early on in the investigation process.  Also, with respect to my testimony that I "do[] not contend that [I] was subject to discipline while employed at S&W," I was referring to the fact that I never received a written write-up or any other disciplinary action as discussed in S&W's policy. (Plaintiff's Response Exhibit 9).

29.     With respect to S&W's SUF, ¶ 88, S&W is taking words or phrases completely out of context. When I talked about "death or more death" I was referring to Harry Truman's decision to use the atomic bomb. I felt that if Debney would have investigated my concerns fully, it would

have resulted in many employees being fired and would probably hurt the company, but that "damage" would have been less than the damage caused by not investing and allowing the fraud and other misconduct to continue. When I used the words "scum" I was referring to whomever the investigation revealed guilty of fraud. However at this point no one had been deemed guilty so it's not aimed at any specific person but rhetorically at whoever was deemed guilty. The "genuflecting butt kissers" is not an actual person but rhetorically a person that knew what I knew but chose not to say anything. The reference to "blatant and arrogant [] vermin" refers to those deemed to be guilty. When I talk about "their Alpha dog displays" I was referring to Flatley walking out on the workroom floor and clapping when he thought I'd been fired.

30.     With respect to S&W's SUF, ¶ 89, at the point I was put on paid leave, my department's performance was the highest it had ever been. Claims that morale was at an all-time low are belied by the high rate of production. Unmotivated employees do not produce at that high of a level. Further, once I was placed on paid leave, production plummeted from 12,000 tools a month to 2500 a month. Additionally, an audit of the Robo 99 in September showed cycle counts of tools were not being performed and tool inventory numbers were no longer accurate. The negative numbers for September reflect the work of whoever took over the department while I was on paid leave. My numbers ended in July.

31.     During my employment with S&W, I was not made aware of the "Consumable Inventory Review (Autocrib)" internal audit report (Plaintiff's Response Exhibit 44) prepared by S&W to "review the Company's processes for monitoring and managing consumable inventories" and never saw a copy of that report.

9

I declare under penalties of perjury that the facts set forth in this declaration, including statements regarding any exhibits, are true and correct. This statement is given to comply with the requirements of 28 U.S.C. § 1746.

Dated: January 29, 2021

_____
Earl D. Baker